**LEWIS RICE LLC**
Michael J. Hickey, applying *Pro Hac Vice*
mhickey@lewisrice.com
Philip J. Mackey, applying *Pro Hac Vice*
pmackey@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

**KEESAL, YOUNG & LOGAN**
Ben Suter, CASB No. 107680
ben.suter@kyl.com
Stacey M. Garrett, CASB No. 155319
stacey.garrett@kyl.com
A Professional Corporation
400 Oceangate, Suite 1400
Long Beach, California 90802
(562) 436-2000
(562) 436-7416 (fax)

*Attorneys for Defendant Build-A-Bear Workshop, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY TOYS HOLDINGS, LLC; JAZWARES, LLC; KELLY AMUSEMENT HOLDINGS, LLC; and JAZPLUS, LLC, | Case No. 2:24-cv-01169-JLS-MAR |
| Plaintiffs, | **BUILD-A-BEAR WORKSHOP, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS** |
| vs. | Date:     May 10, 2024 |
| BUILD-A-BEAR WORKSHOP, INC., | Time:     10:30 a.m. |
| | Place:    Honorable Josephine L. Staton |
| Defendant. | Courtroom 8A |

- 1 -

Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant Build-A-Bear Workshop, Inc. ("Build-A-Bear") requests that the Court take judicial notice of, or alternatively incorporates into Plaintiffs' Complaint by reference, the following:

1.     Images of Squishmallows taken from Plaintiffs' public pleadings in other lawsuits, as shown in **Exhibit A**;

2.     The results of searches for the term "Squishmallows" on three major e-commerce websites, Amazon.com (last accessed 3/3/2024) (**Exhibit B**), Walmart.com (last accessed 3/3/2024) (**Exhibit C**), and Target.com (last accessed 3/3/2024) (**Exhibit D**);

3.     The fact that Plaintiff Jazwares, LLC's website, www.jazwares.com/pages/squishmallows, displays Squishmallows not shown in Plaintiff's Complaint, including images shown in Build-A-Bear's current Motion to Dismiss;

4.     The fact that non-party, Ty, Inc. currently markets and sells certain plush toy products on its website at (https://shop.ty.com/catalog/sab/?lang=en and https://shop.ty.com/catalog/puffies/?lang=en) (last accessed 3/3/2024), printouts of which are attached hereto as **Exhibit E**;

5.     The fact that non-party, Dan-Dee International Ltd. sold a certain plush toy product through Wal-mart until at least as recent as December 21, 2023, as shown in **Exhibit F** (last accessed 12/21/2023);

6.     The fact that non-party Squishable.com has marketed certain plush toy products since 2008 (https://web.archive.org/web/20081205033257/http:/www.squishable.com:80/), and currently markets certain plush toy products on its website (https://www.squishable.com/category/Big_Animals.html) (last accessed 3/3/2024), attached hereto as **Exhibit G**;

7.     The fact that non-party Kidrobot has marketed certain plush toy products since 2015 (https://web.archive.org/web/20150925074656/https://www.kidrobot.com/collections/yummy-world), and currently markets certain plush

toy products on its website (https://www.kidrobot.com/collections/yummy-world) (last accessed 3/3/2024), attached hereto as **Exhibit H**;

8.     Pleadings in *Kellytoy USA, Inc., et al. v. Dan-Dee Int'l, Ltd., et al.*, Case No. 2:18-cv-05399 (C.D. Cal.) attached hereto as **Exhibit I**;

9.     Pleadings in *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.) attached hereto as **Exhibit J;**

10.     Pleadings in *Kellytoy Worldwide, Inc., et al. v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.) attached hereto as **Exhibit K;**

11.     Pleadings in *Kelly Toys Holdings, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.) attached hereto as **Exhibit L;**

12.     Pleadings in *Kellytoy Worldwide, Inc. v. Hugfun International, Inc.*, Case No. CV-19-07652-MWF (C.D. Cal.) attached hereto as **Exhibit M**;

13.     Pleadings in *Build-A-Bear Workshop, Inc. v. Kelly Toys Holdings, et al.*, Case No. 2:24-cv-00211 (E.D. Mo.) attached hereto as **Exhibit N**;

14.     The facts that only Kellytoy Worldwide, Inc. is the registered Copyright Claimant of Copyright Number VA0002906026, and only Kelly Toys Holdings, LLC is the only Copyright Claimant for Copyright Number VA0002346938, according to the Copyright Office's Public Records Catalog, printouts of which are attached hereto as **Exhibit O**.

## I.      LEGAL STANDARD

Judicial notice under Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).  Facts subject to judicial notice may be considered on a motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 322 (2007); *Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

Additionally, "[i]f a document is not attached to a complaint, it may be incorporated by reference 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Royal 4 Sys., Inc. v. RLI Ins. Co.*, No. CV 22-05732-RSWLRAO, 2022 WL 19263327, at *3 (C.D. Cal. Dec. 9, 2022) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "'The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken–or doom–their claims.'" *Clement 1 LLC v. Scottsdale Ins. Co.*, No. CV 23-3779 PA (JCX), 2023 WL 4492422, at *2 (C.D. Cal. July 11, 2023) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 889 F.3d 988, 1002 (9th Cir. 2018)).

## II.     ARGUMENT

### A.     Item Nos. 1 & 8 Through 13, Pleadings Filed in Other Judicial Proceedings, Are Proper Subjects for Judicial Notice

Public pleadings from prior lawsuits filed by Plaintiffs are the proper subject of judicial notice.  The Ninth Circuit has consistently held that district courts may take judicial notice of pleadings filed in other courts.  *See, e.g., Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("[i]t is well established that we may take judicial notice of judicial proceedings in other courts."); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of, *inter alia*, the plaintiff's briefs from another case reasoning "[w]e may take judicial notice of court filings and other matters of public record" because those documents are "the proper subject of judicial notice"); *Wilkins v. VanDiver*, No. 820CV02417JLSDFM, 2022 WL 18229997 (C.D. Cal. Oct. 25, 2022) (quoting *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007)) ("Courts 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'").

The referenced images of Plaintiffs' various Squishmallows products in Exhibit A attached hereto, filed by Plaintiffs in prior lawsuits, are directly related to Plaintiffs' claims against Build-A-Bear (indeed, the products form the basis of Plaintiffs' claims), and the deficiencies of Plaintiffs' asserted trade dress definition which are highlighted in Build-A-Bear's Motion to Dismiss. Plaintiffs did not merely assert trade dress rights or trade dress infringement of certain specified Squishmallows products within the entire Squishmallows line. Instead, Plaintiffs invoked purported trade dress rights in the **entire** product line as part of their Complaint, and images of other products from the line may be considered, especially those that Plaintiffs have themselves asserted in other lawsuits to be representative of the trade dress.

Furthermore, statements made by and photographs asserted by Plaintiffs in other judicial proceedings concerning their purported rights in the Squishmallows are readily verifiable, not subject to reasonable dispute, and are a matter of public record. Plaintiffs not only defined the purported Squishmallows trade dress as that which is shown in their asserted images, but Plaintiffs also presented several different trade dress definitions throughout pleadings in other courts. Again, as stated with regard to the images Plaintiffs asserted in other courts, Plaintiffs' asserted trade dress definitions are directly related to the rights Plaintiffs claim to own, if any, and Plaintiffs' ability to prove said rights.

The pleadings containing Plaintiffs' claimed trade dress definitions are a matter of public record. Accordingly, the pleadings which contain images purportedly displaying Plaintiffs' trade dress and Plaintiffs' claimed trade dress definitions are properly subject to judicial notice. As discussed above, courts routinely take judicial notice of pleadings filed in other courts. *E.g., Rosales-Martinez*, 753 F.3d at 894.

**B.**     **Items 2 Through 7, The Fact That Additional Squishmallows and Previously Accused Products That Encompass Plaintiff's Asserted Trade Dress Exist**

Items 2 and 3, the existence of numerous Squishmallows products online in the public marketplace at retailers such as Amazon (Exhibit B), Walmart (Exhibit C), and Target (Exhibit D) and on Plaintiff Jazwares, LLC's own website, that are not included in Plaintiffs' Complaint, are properly judicially noticeable.  "It is common 'for courts to take judicial notice of factual information found on the world wide web.'" *Abundant Living Fam. Church v. Live Design*, Inc., No. 5:22-cv-00140-RSWL-MRWx, 2022 WL 14708949, at *5 (C.D. Cal. Oct. 24, 2022) (internal quotations omitted); *see also   Aguiar v. MySpace LLC*, No. CV-14-05520(SJO)(PJWX), 2017 WL 1856229, at *9 n.6 (C.D. Cal. May 5, 2017) (judicially noticing website screen shots).

The facts presented in Items 2 and 3 (Exhibits B through D and images in Build-A-Bear's Motion to Dismiss) are relevant to Build-A-Bear's argument that Plaintiffs' asserted definition of its trade dress (which Plaintiffs' assert is embodied within its Squishmallows product line) is insufficient where Plaintiffs' definition is overly broad and vague and in fact is not found in every product within the Squishmallows product line.

For similar reasons, Items 4 through 7, the existence of numerous products available in the public marketplace that Plaintiffs previously accused of infringing Plaintiffs' purported rights in the Squishmallows (Items 4 and 5) or exemplify a similar product design to that which Plaintiffs have asserted against Build-A-Bear (Items 6 and 7), are likewise the appropriate subject of judicial notice.  *See MySpace LLC*, 2017 WL 1856229, at *9 n.6 (taking judicial notice of website screen shots); *see also Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 966 (C.D. Cal. 2005) (taking judicial notice of Amazon webpage and non-party website).  Items 3 through 6 are relevant to Build-A-Bear's argument that Plaintiffs' definition of its trade dress

- 6 -

is overly broad making it impossible to differentiate between stuffed animals that would be deemed infringing and those that would not be, and Items 6 and 7 are also relevant to Build-A-Bear's arguments that Plaintiffs were not the first entities to use product design elements and features similar to those shown in the Squishmallows product line, *i.e.*, an Asian style, Kawaii face.  Specifically, Items 4 and 5 show that Ty, Inc. and Dan-Dee International Ltd. continued to sell products that were previously accused of trade dress infringement under the same foundation such claims are now brought against Build-A-Bear, calling into question the strength of Plaintiffs' rights, if any.

The facts presented in Items 1 through 7 – the existence of numerous other Squishmallows products available on the public market, the existence of products that Plaintiffs previously asserted infringe its purported rights in the Squishmallows, and the existence of numerous products that were marketed and sold (before 2016) and still are marketed and sold today embodying the same or similar product designs to those shown in Plaintiffs' Squishmallows line – are readily verifiable by Plaintiffs and are not subject to any reasonable dispute.

## C.    Item 14, Copyright Catalog Print Outs

Similar to Items 1 and 8 through 13, discussed in depth above (*see* Section II.A.), it is proper for courts to take judicial notice of records at the United States Copyright Office, namely printouts of the records for Copyright Numbers VA0002906026 and VA0002346938. *Warren v. Fox Fam. Worldwide, Inc.*, 171 F. Supp. 2d 1057, 1062 (C.D. Cal. 2001), *aff'd,* 328 F.3d 1136 (9th Cir. 2003) (taking judicial notice of copyright registration certificates); *Fisher v. Nissel*, No. CV 21-5839-CBM-(KSX), 2022 WL 16961479, at *4 (C.D. Cal. Aug. 15, 2022) (taking judicial notice of printouts from the Copyright Office's Public Records Catalog); *Evans v. NBCUniversal Media, LLC*, No. CV 21-0984-CBM-PD(X), 2021 WL 4513624, at *2 (C.D. Cal. July 23, 2021) ("[t]he Court grants Defendants' request for judicial notice as to the U.S. Copyright Office's online Public Records Catalog").

Plaintiffs' Complaint likewise asserted claims for copyright infringement, specifically infringement of the works purportedly identified by Copyright Numbers VA0002906026 and VA0002346938. The Copyright Office's Public Records Catalog printouts of the aforementioned Copyright Numbers are therefore directly relevant to Plaintiffs' claims and Build-A-Bear's Motion to Dismiss for lack of standing grounds. Moreover, as the claimed owner of the asserted copyrighted works, Plaintiffs are uniquely positioned to verify the information for which judicial notice is requested in Item 14.

**D.      Items 1 Through 3 and 8 Through 13 Are Properly Incorporated By Reference to the Complaint**

Additionally, Items 1 through 3, and 8 through 13, may be properly noticed by the Court in view of their incorporation by reference in Plaintiffs' Complaint.

**1.      Items 1 through 3, Pleadings and Websites with Additional Squishmallows**

First, with respect to Items 1 through 3, by asserting its trade dress definition in the Complaint, which allegedly represents a common look across the entire Squishmallows product line, but failing to include the entire line of Squishmallows products, "plaintiffs [are] selecting only portions of [the Squishmallows products] that support their claims, while omitting portions of those very [Squishmallows products] that weaken–or doom–their claims.'" *Clement 1 LLC v. Scottsdale Ins. Co.*, No. CV 23-3779 PA (JCX), 2023 WL 4492422, at *2 (C.D. Cal. July 11, 2023) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 889 F.3d 988, 1002 (9th Cir. 2018). Moreover, Plaintiffs' asserted definition of its trade dress, which necessarily includes the entire line of Squishmallows products, forms the basis of Plaintiffs' claim for trade dress infringement. *Interactive Health LLC v. King Kong United States, Inc.*, No. CV 06-1902-VBF(PLAx), 2008 U.S. Dist. LEXIS 126609, at *7 (C.D. Cal. Mar. 6, 2008) ("when a plaintiff seeks protection for an entire line of products, the plaintiff must demonstrate the trade dress signifies an overall look that is consistent

1    throughout the entire line.").

2         Thus, under the incorporation by reference doctrine, Items 1 through 3, which

3    show additional Squishmallows products that Plaintiffs failed to reference in the

4    Complaint and which are apparently integral to Plaintiffs' asserted trade dress

5    definition, should be incorporated by reference to the Complaint.

6    **III.**   **CONCLUSION**

7         Based on the foregoing, Build-A-Bear Workshop, Inc. respectfully requests

8    that this Court dismiss Plaintiffs' Complaint in its entirety, and award any further

9    relief to Defendant as this Court deems appropriate.

10

11                                  Respectfully submitted,

12                                  **KEESAL, YOUNG & LOGAN**

13   DATED: March 5, 2024

                                    By:  */s/ Stacey M. Garrett*

14
                                    Ben Suter, CASB No. 107680
15                                  ben.suter@kyl.com
                                    Stacey M. Garrett, CASB No. 155319
16                                  stacey.garrett@kyl.com
                                    A Professional Corporation
17                                  400 Oceangate, Suite 1400
                                    Long Beach, California 90802
18                                  (562) 436-2000
                                    (562) 436-7416 (fax)
19
                                    **LEWIS RICE LLC**
20                                  Michael J. Hickey, applying *Pro Hac Vice*
                                    mhickey@lewisrice.com
21                                  Philip J. Mackey, applying *Pro Hac Vice*
                                    pmackey@lewisrice.com
22                                  600 Washington Avenue, Suite 2500
                                    St. Louis, Missouri 63101
23                                  (314) 444-7630

24                                  (314) 612-7630 (fax)

25

26

27

28
                                    - 9 -

# EXHIBIT A

*Kelly Toys Holdings, LLC et al. v. Build-A-Bear Workshop, Inc.*, 2:24-cv-01169 JLS (MARx) (C.D. Cal.) ECF No. 1 at 2, 4, 8, 10, 14, 18-19 (filed Feb. 12, 2024).





EXHIBIT A
Page 1 of 15





2

EXHIBIT A
Page 2 of 15



EXHIBIT A
Page 3 of 15

*Kelly Toys Holdings, LLC et al. v. Zuru, LLC*, 2:23-cv-09255 (C.D. Cal.) ECF No. 1 at 2, 4, 8–10, 12–13, 16 (filed Nov. 2, 2023).



EXHIBIT A
Page 4 of 15



*Kelly Toys Holdings, LLC v. www.axolotlsquishmallow.com.*, 1:23-cv-01382
(AKH) (S.D.N.Y.) ECF No. 6-1 at 1–4 (filed Mar. 6, 2023).



2

EXHIBIT A
Page 5 of 15

*Kelly Toys Holdings LLC v. 19885566 Store*, 1:22-cv-09384-JMF (S.D.N.Y.) ECF No. 6 at 11-13 (filed Dec. 12, 2022).



*Kelly Toys Holdings, LLC v. Chang Sha Zhuo Qian Dian Zi Ke Ji You Xian Gong Si*, 1:22-cv-03739 (JPO) (S.D.N.Y.) ECF No. 8 at 11-12 (filed May 31, 2022).



*Kelly Toys Holdings, LLC v. Top Dep't Store*, 1:22-cv-00558 (PAE) (S.D.N.Y.) ECF No. 6 at 8 (filed Feb. 2, 2022).



5

EXHIBIT A
Page 6 of 15

*Kelly Toys Holdings, LLC v. Alialialill Store*, 1:21-CV-08434 (AKH) (RWL) (S.D.N.Y.) ECF No. 8 at 11-13 (filed Nov. 15, 2021).



*Kelly Toys Holdings, LLC v. www.Squishmallow-Official.Com*, 1:21-cv-08431 (JPC) (S.D.N.Y.) ECF No. 5 at 10 (filed Oct. 27, 2021).



*Kelly Toys Holdings, LLC v. Abderah-54*, 21-cv-8433 (RA) (S.D.N.Y.) ECF No. 7 at 11 (filed Nov. 5, 2021).



6

*Kelly Toys Holdings, LLC v. Airpods Pro Store*, 1:21-cv-08435 (LJL) (S.D.N.Y.)
ECF No. 8 at 11, 13 (filed Mar. 16, 2022).



*Kelly Toys Holdings, LLC v. Dongguan Yikang Plusei Toys Co.*, 1:21-CV-08111 (JGK)
(S.D.N.Y.) ECF No. 6 at 8 (filed Oct. 13, 2021).



*Kelly Toys Holdings, LLC v. Baoding Mi Xiaomei Trading Co., Ltd., et al.*, 1:21-
cv-06029-LGS-SLC (S.D.N.Y.) ECF No. 5 at 12-13 (filed Sep. 13, 2021).



7

*Kellytoy Worldwide, Inc. v. Idea Nuova, Inc. et al.*, 2:20-cv-02040-CBM-JPR (C.D. Cal.)
ECF No. 1-1 at 1 (filed Mar. 2, 2020).



8

EXHIBIT A
Page 9 of 15

*Kellytoy Worldwide, Inc. et al v. TY, Inc. et al.*, 1:20-cv-00748 (N.D. Ill.) ECF No. 1-2 at 1-2 (filed Jan. 31, 2020).



*Kellytoy Worldwide, Inc. v. Hugfun, International, Inc. et al.*, 2:19-cv-07652 (C.D. Cal.) ECF No. 1 at 28, 30–33 (filed Sep. 4, 2019).



9

EXHIBIT A
Page 10 of 15



10

EXHIBIT A
Page 11 of 15



**Keychain Packs**
$9.99
Get Keychain Packs!

**Small Baby Squad**
Get Small Baby Squad!

**Small Squads**
Get Small Squads!

**Cameron "Cam"**
$14.99 – $24.99
Get Cameron "Cam"!

**Fifi**
$14.99 – $24.99
Get Fifi!

**Hans**
$14.99 – $24.99
Get Hans!

**Ace**
$14.99 – $24.99
Get Ace!

**Astrid**
$14.99 – $24.99
Get Astrid!

**Stanley**
$14.99 – $24.99
Get Stanley!

**Connor**
$14.99 – $24.99
Get Connor!

**Simon**
$14.99 – $24.99
Get Simon!

**Tim**
$14.99 – $24.99
Get Tim!

11

EXHIBIT A
Page 12 of 15



EXHIBIT A
Page 13 of 15



EXHIBIT A
Page 14 of 15



**Addison**
$14.99
Get Addison!

**Ava**
$14.99
Get Ava!

**Blake**
$14.99
Get Blake!

**Emma**
$14.99
Get Emma!

**Harper**
$14.99
Get Harper!

**Jaxton**
$14.99
Get Jaxton!

**Liam**
$14.99
Get Liam!

**Mia**
$14.99
Get Mia!

**Olive**
$14.99
Get Olive!

**Small Baby Squad**
Get Small Baby Squad!

14

EXHIBIT A
Page 15 of 15

# EXHIBIT B

Delivering to St Louis 63150
Update location

All ▾ | squishmallows

EN ▾ | Hello, sign in Account & Lists ▾ | Returns & Orders | 🛒 0

All | Medical Care ▾ | Groceries ▾ | Best Sellers | Amazon Basics | Prime ▾ | New Releases | Customer Service | Music | Shop women-owned businesses

1-48 of over 10,000 results for **"squishmallows"**          Sort by: Featured ▾

### Eligible for Free Shipping
Free Shipping by Amazon
Get FREE Shipping on eligible orders shipped by Amazon

### More-sustainable Products
Climate Pledge Friendly

### Department
Toys & Games
  Stuffed Animals & Teddy Bears
  Kids' Plush Toy Pillows
  Plush Figure Toys
  Arts & Crafts Supplies
Home & Kitchen

### Customer Review
⭐ & Up
⭐ & Up
⭐ & Up
⭐ & Up

### Toy Character
Stitch
Harry Potter
Pokemon
Sonic the Hedgehog
Eeyore
Nightmare Before Christmas
Lilo
▾ See more

### Brands
Squishmallows
TeeTurtle
Squishville
AIXINI
Niuniu Daddy
Mewaii
Auspicious beginning
▾ See more

### Toy & Game Price
Under $25
$25 to $50
$50 to $100
$100 to $200
$200 & Above
[ $ Min ] [ $ Max ] [ Go ]

### Deals & Discounts
All Discounts
Today's Deals

### Toys Age Range
Birth to 24 Months
2 to 4 Years
5 to 7 Years
8 to 13 Years
14 Years & Up

### Material
Plastic
Silicone
Vinyl



**Squish, Collect and Squad Up with Squishmallows**
Shop Squishmallows ›



Squishmallows Original 14-Inch Fritz Green
1

Squishmallows Original 8-Inch Empressa Pink
2

Squishmallows Original 12-Inch Elea Grey
1

Sponsored

## Results

Sponsored

**Squishmallows Original 14-Inch Fritz Green Frog with Easter Print Belly - Official Jazwares Large Plush**
1
300+ bought in past month
$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



Overall Pick

**Squishmallows Official Kellytoy 8" Plush Mystery Pack - Styles Will Vary in Surprise Box That Includes Three 8" Plush**
7,121
5K+ bought in past month
$22.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



**Squishmallows Original 12-Inch Borsa Spotted Highland Cow - Medium-Sized Ultrasoft Official Jazwares Plush**
519
10K+ bought in past month
$15.99 Typical: $56.90

FREE delivery on $35 shipped by Amazon.
Ages: 3 years and up




+2 colors/patterns





Acrylic
Cotton
Nylon
Polycarbonate
⌄ See more

**Toy Figure Theme**
Anime
Comic
Fantasy
Horror
Military
Movie
Sports
⌄ See more

**Toy Figure Occasion**
Baby Shower
Bridal Shower
Christmas
Easter
Engagement
Halloween
Hanukkah
⌄ See more

**Toy Animal Type**
Bears
Birds
Bunnies & Rabbits
Cats
Dinosaurs
Dogs
Elephants
Fish & Sea Life
Frogs & Amphibians
Giraffes
Horses & Ponies
Kangaroos
Koalas
Lions & Big Cats
Monkeys & Apes
Snakes, Turtles & Reptiles
Zebras

**Stuffed Animals & Plush Toys Size**
4.9 Inches & Under
5 to 6.9 Inches
7 to 9.9 Inches
10 to 14.9 Inches
15 to 19.9 Inches
20 Inches & Above

**Business Type**
Small Business

**Animal Theme**
Bear
Bird
Bull
Butterfly
Cat
Caterpillar
Cheetah
⌄ See more

**Toy Figure Special Features**
Light
Sound

**All Top Brands**
Top Brands

**International Shipping**
International Shipping Eligible

Squishmallows Original 14-Inch Lyla Vanilla Birthday Cake with Rainbow Sprinkles Embroidery - Official Jazwares Large Plush
27
2K+ bought in past month
$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Original 8-Inch Reina Green Butterfly with Flower Crown - Official Jazwares Large Plush
27
5K+ bought in past month
$12.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Official Kellytoy Plush 12" Maui The Pineapple - Ultrasoft Stuffed Animal Plush Toy
5,034
2K+ bought in past month
$15.99 List: $22.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

## Trending now
Sponsored





KMUYSL Unicorn Toys for Girls Ages 3 4 5 6 7 8+ Year - Unicorn Mommy Stuffed Animal with 4 Baby Unicorns in Her Tummy,...
1,442
1K+ bought in past month
$29.99 List: $45.99
Join Prime to buy this item at $26.99

Auspicious beginning Shiba Inu Plush-19.6" Corgi Plush Dog Plushies Stuffed Animal, Plushie Toy Anime Kawaii Plush Soft...
16,542
300+ bought in past month
$20.99 List: $24.99
Save 10%  with coupon

19.7" Shiba Inu Plush, Soft Corgi Plushies Adorable Throw Pillow, Cute Puppy Anime Dog Stuffed Animals Gifts for Girls Boys Kids...
115
50+ bought in past month
$17.99 List: $21.99

## More results







Squishmallows Original 14-Inch Peony Unicorn Pancakes with Whipped Cream - Official Jazwares Large Plush
7
1K+ bought in past month
$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**

Squishmallows 12-Inch Daxxon Purple Alien - Medium-Sized Ultrasoft Official Kelly Toy Plush
486
2K+ bought in past month
$15.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

Squishmallows 5 Inch (Pack of 10) Plush - Diane Bigfoot, Giles Grasshopper, Maritza Cactus, Nico Axolotl, Rachel Mushroom,...
591
5K+ bought in past month
$37.55 List: $44.99

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**

2/12
EXHIBIT B

**Seller**

Wonderful World Collectibles, LLC
Amazon.com
Rare & Cute Collection
Deblieux
GameHavenNC
Barbi's Bargains
Woohooo LLC

**Availability**

Include Out of Stock

Shop now

Sponsored

Ages: 3 years and up

More Buying Choices
$34.95 (7 used & new offers)

New Arrival Pick



Squishmallows Original 16-Inch Ada Cream Cow with Green Floral Print Spots - Official Jazwares Large Plush

22

1K+ bought in past month

$24.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**
Ages: 3 years and up

Sponsored



Claw Machine for Kids,Mini Vending Machines Candy Grabber Prize Dispenser Toys for Girls,Electronic Arcade Claw...

543

900+ bought in past month

Limited time deal

$39.99 List: $69.99

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 20 years

Sponsored



Mini Claw Machine for Kids, Arcade Games for Home, Large Candy Claw Machine with Toys Inside, Vending Machines Toys,...

28

50+ bought in past month

$28.99 List: $34.99

Save 10% with coupon

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 18 years



+13 colors/patterns

Sponsored

Niuniu 13.7in Squishy Boba Tea Plush Toy - Great Gift for Kids

2,210

200+ bought in past month

$19.99

Save 3% at checkout

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 3 years



Sponsored

Butter Slime Kit Two-Toned 11 Packed Fidget Toy, Educational Slime Toys, Birthday Gifts Prize Party Favors for Girl Boys Kids 6...

329

1K+ bought in past month

$11.99 List: $20.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



+4 colors/patterns

Squishmallows Original 14-Inch Cam Calico Cat - Large Ultrasoft Official Jazwares Plush

3,395

2K+ bought in past month

$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**
Ages: 3 years and up



Sponsored



Squishmallows Original Disney 14-Inch Simba Plush - Large Ultrasoft Official...

200+ bought in past month

$24.99

FREE delivery **Fri, Mar 8** on $35 of items

## More results



Squishmallows Original 5-Inch Scented Mystery Plush - Little Ultrasoft Official Jazwares Plush

706

600+ bought in past month

$8.99 List: $10.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 12-Inch Willoughby Sage Green Possum - Medium-Sized Ultrasoft Official Jazwares Plush

297

1K+ bought in past month

$15.99 Typical: $34.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 14-Inch Sunshine Rainbow with Clouds - Large Ultrasoft Official Jazwares Plush

1,454

2K+ bought in past month

$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$17.42 (9 used & new offers)

Ages: 3 years and up



Sponsored

Squishmallows 10" Gigi The Cat Plush - Official Kellytoy 2024 - Collectible Soft Squishy Kitty Stuffed Animal Toy - Add to Yo...

17

1K+ bought in past month

$24.48 List: $34.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 36 months - 8 years



Sponsored

14 Pack Slime,Super Mini Butter Slime Kit,Funny Scented Slimes for Girls and Boys,Party Favor Birthday Gifts,Soft and Non-...

180

300+ bought in past month

$9.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Sponsored

Squishmallows Original 12-Inch Elea Grey Lamb with Pink Floral Belly - Official Jazwares Plush

1

300+ bought in past month

$16.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up







+24 colors/patterns

+8 colors/patterns

Sponsored

Squishmallows Disney Original 10-Inch Stitch HugMees - Medium-Sized Ultrasoft Official Jazwares Plush

Squishmallows Original 8-Inch Pierogi Banana Monkey - Official Jazwares Plush

Auspicious Shiba Inu Stuffed Animal Plush - 15.7" Cute Dog Pillow and Toy, Soft Anime Kawaii Gifts for Boys and Girls

424

13

16,542

3K+ bought in past month

2K+ bought in past month

300+ bought in past month

$14⁹⁹

$12⁹⁹

$18⁹⁹ List: $35.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

Save 10%  with coupon

Or fastest delivery **Wed, Mar 6**

Or fastest delivery **Wed, Mar 6**

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

Ages: 3 years and up

Ages: 3 years and up

Or fastest delivery **Wed, Mar 6**

Shop now

Sponsored







+2 colors/patterns

Squishmallows Stackables Original 12-Inch Truman Blue Leatherback Turtle - Ultrasoft Official Jazwares Plush

Squishmallows Original 5-Inch Mitchard Kiwi Bear - Official Jazwares Plush

Sponsored

Shiba Inu Dog Plush Pillow, Corgi Stuffed Animal Plush Toy Hug Pillow Gifts for Girl Boy (Brown, 11.8in)

2

30

1K+ bought in past month

782

1K+ bought in past month

$9⁹⁹

50+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

$16⁹⁹ Typical: $18.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

Or fastest delivery **Wed, Mar 6**

Save 10%  with coupon

Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

Ages: 3 years and up

Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

3/3/24, 11:00 AM    Case 2:24-cv-01169-JLS-MAR    Document 21-2    Filed 03/05/24    Page 32 of 671    Page ID
Amazon.com: squishmallows
#:159



Sponsored

LUV HER Squishmallow Girls Add A Charm Box Set with 1 Charm Bracelet & 5 Interchangeable Charms - Ages 3+

78



Sponsored

KMUYSL Cat Plush Toy Birthday Kitty Plush Pillow, Soft Cute Birthday Stuffed Animal Cat Plushies Pillow Home Room...

14



Squishmallows 14-Inch Light Brown Otter with Fuzzy Ears Plush - Add RIE to Your Squad, Ultrasoft Stuffed Animal Large...

932

2K+ bought in past month



Squishmallows Original 12-Inch Charles Pickle with Mustache - Medium-Sized Ultrasoft Official Jazwares Plush

379

2K+ bought in past month

$30$^{89}$

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$29.95 (13 used & new offers)
Ages: 3 years and up



Squishmallows Flip-A-Mallows 12-Inch Mint Ice Cream and Toasted Cinnamon Roll Plush - Add Maya and Chanel to Your...

232

500+ bought in past month

$19$^{99}$ Typical: $39.99$

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$15.73 (7 used & new offers)
Ages: 3 years and up



Squishmallows 14-Inch Pace Tan Fennec Fox - Large Ultrasoft Official Kelly Toy Plush

430

1K+ bought in past month

$19$^{99}$

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



+2 colors/patterns

Squishmallows 10-Inch Bubbles The Purple Bunny Easter Plush - Official Jazwares- Collectible Cute Soft & Squishy Bunny...

10

1K+ bought in past month



Squishmallows 5" Mystery Box Plush 5 Pack - New 2024 Assortment - Various Styles - Official Kellytoy - Collectible So...

2,366

4K+ bought in past month

$34$^{99}$ Typical: $39.99$



Squishmallows Original 14-Inch Reshma Light Pink Cow with Purple Bandana - Large Ultrasoft Official Jazwares Plush

2,943

1K+ bought in past month

$19$^{99}$

$27^{99}$

FREE delivery **Mar 7 - 11**
Or fastest delivery **Mar 6 - 7**
More Buying Choices
$24.99 (2 new offers)
Ages: 36 months - 8 years

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$30.78 (4 used & new offers)
Ages: 24 months and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$19.19 (14 used & new offers)
Ages: 3 years and up







Squishmallows Original 14-Inch
Andreina Pink Monarch Butterfly
with White Sparkle Belly - Large
Ultrasoft Official Jazwares Plush
1,184
1K+ bought in past month
$19⁹⁹

Squishmallows Original 14-Inch
Perry Teal Dolphin with Red
Surfboard - Official Jazwares
Large Plush
10
1K+ bought in past month
$19⁹⁹

+4 colors/patterns

Squishville by Original
Squishmallows Purple Pals Squad
Plush - Six 2-Inch Squishmallows
Plush Including Bashira, Mollie,...
646
200+ bought in past month
$16⁹⁹ List: $17.99

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$12.99 (17 new offers)
Ages: 3 years and up







Squishmallows Original 8-Inch
Maudi Marbled Blueberry
Cupcake with Blue Wrapper -
Official Jazwares Plush
3
700+ bought in past month
$12⁹⁹

Squishmallows 16-Inch Rosie
Spotted Pig with Yellow Flower
Crown - Large Ultrasoft Official
Kelly Toy Plush - Amazon...
467
1K+ bought in past month
$24⁹⁹

Squishmallows Original 14-Inch
Rutabaga Caterpillar with
Multicolored Stripes - Large
Ultrasoft Official Jazwares Plush
775
600+ bought in past month
$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$22.18 (7 used & new offers)
Ages: 3 years and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$17.17 (8 used & new offers)
Ages: 3 years and up





Squishmallows Original 14-Inch
Scarlito Purple Barn Owl - Large
Ultrasoft Official Jazwares Plush

219

600+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices

Squishmallows Original 12-Inch
Michaela Rainbow Leopard with
Pink Bandana - Official Jazwares
Plush

25

1K+ bought in past month

$16⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Original 16-Inch
Malcolm Mushroom - Official
Jazwares Large Plush

9

1K+ bought in past month

$24⁵⁰

FREE delivery **Fri, Mar 8**
Or fastest delivery **Mar 5 - 6**
Only 1 left in stock - order soon.

Ages: 3 years and up







Squishmallows Original 5-Inch
Plush 10-Pack - Gigi Tabby Cat,
Dolan Dino, Brina Bigfoot, Maui
Pineapple, Amal Moth, and Mor...

8

700+ bought in past month

$44⁹⁹

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$41.89 (5 used & new offers)

Ages: 3 years and up

Squishmallows 12-Inch Aldous
Teal and Black Fruit Bat -
Medium-Sized Ultrasoft Official
Kelly Toy Plush

872

1K+ bought in past month

$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$10.50 (23 new offers)

Ages: 3 years and up

Squishmallows Original 12-Inch
Ludwig Teal Frog with Mint Green
Belly - Medium-Sized Ultrasoft
Official Jazwares Plush

1,335

1K+ bought in past month

$15⁹⁹ Typical: $26.91

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$12.44 (6 used & new offers)

Ages: 3 years and up







Squishmallows Original 14-Inch
Afiyah Pink Pot Succulent - Large
Ultrasoft Official Jazwares Plush

Squishmallows Original 16-Inch Woodward Snowshoe Cat with Fuzzy Belly - Official Jazwares Large Plush

15

800+ bought in past month

$24⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue. Mar 5**


700

300+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$14.99 (6 used & new offers)

Ages: 3 years and up

Squishmallows Original 16-Inch Andres Brown Sheltie with Hearts Headband - Official Jazwares Large Plush

4

1K+ bought in past month

$24⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue. Mar 5**



Squishmallows Original 12-Inch Enid Neon Yellow Mushroom - Medium-Sized Ultrasoft Official Jazwares Plush

206

1K+ bought in past month

$12¹⁷ List: $15.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 14-Inch Sachie Grey Striped Whale Shark with White Belly - Large Ultrasoft Official Jazwres Plush

783

1K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$18.90 (6 used & new offers)

Ages: 3 years and up



Squishmallows 12-Inch Fancy Octopus - Add Zobey to Your Squad, Ultrasoft Stuffed Animal Medium-Sized Plush Toy, Officia...

1,840

800+ bought in past month

$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$14.72 (32 used & new offers)

Ages: 3 years and up



Squishmallows Official Kellytoy Plush 16" Austin The Avocado - Ultrasoft Stuffed Veggie Toy

4,045

1K+ bought in past month

$24⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

More Buying Choices
$23.99 (8 used & new offers)

Ages: 3 years and up



Squishmallows 20-Inch Diane Peach Bigfoot with Rainbow Hair - Jumbo Ultrasoft Official Kelly Toy Plush - Amazon Exclusive

495

700+ bought in past month

$39⁹⁹

FREE delivery **Fri, Mar 8**
Or fastest delivery **Thu, Mar 7**

More Buying Choices
$37.05 (7 used & new offers)

Ages: 3 years and up



Squishmallows Original 12-Inch Rayen Pancake 3-Stack with Butter Flower - Medium-Sized Ultrasoft Official Jazwares Plush

1,879

700+ bought in past month

$15⁹⁹

FREE delivery **Mon, Mar 11** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Only 9 left in stock (more on the way).

More Buying Choices
$13.83 (15 used & new offers)

Ages: 3 years and up



**Squishmallows Original 3.5-Inch Clip-On Plush 5-Pack - Ultrasoft Official Jazwares Plush - Amazon Exclusive**

176

1K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$19.79 (3 used & new offers)

Ages: 3 years and up



**Squishmallows Original Harry Potter 10-Inch Gryffindor Lion Plush - Medium-Sized Ultrasoft Official Jazwares Plush**

1,233

3K+ bought in past month

$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

+2 colors/patterns

**Squishmallows Sonic The Hedgehog 10-Inch Sonic Plush - Medium-Sized Ultrasoft Official Kelly Toy Plush**

144

1K+ bought in past month

$24⁷⁵ Typical: $30.45

FREE delivery **Mar 6 - 8**
Or fastest delivery **Wed, Mar 6**
Only 2 left in stock - order soon.

More Buying Choices
$21.90 (33 new offers)

Ages: 3 years and up

## Other items to consider

Sponsored | Based on products bought together



**Magnet Tiles - Clear Magnetic 3D Building Blocks - Educational Toys, Games, Activities, Puzzles - Creativity, Motor Skills, Learnin...**

169

$49⁹⁹



+2 colors/patterns

**Jurassic Dinosaur Micro Blocks Set, 1530pcs Tyrannosaurus Rex Mini Blocks Building Toys for Adults Boys 8-14 14+ Teens**

127

$24⁹⁰



**Kids 600pcs Set Building Blocks Construction Toy - Learning Playset STEM Educational Kit Child Branin Development...**

473

1K+ bought in past month

$19⁹⁹

Save 40% with coupon

## Related searches

| gift cards | stuffed animals | slime |
|---|---|---|
| weighted stuffed animals | mini brands | roblox gift card |


Previous | 1 | 2 | 3 | ⋯ | 7 | Next >

## Brands related to your search

Sponsored

Squish, Collect and Squad Up with Squishmallows
Shop Squishmallows >

Soft and snuggly Squishmallows pet beds
Shop Squishmallows >

## Need help?

Visit the help section or contact us

Sponsored

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
| --- | --- | --- | --- |
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| About Amazon | Supply to Amazon | Amazon Secured Card | Shipping Rates & Policies |
| Accessibility | Protect & Build Your Brand | Amazon Business Card | Amazon Prime |
| Sustainability | Become an Affiliate | Shop with Points | Returns & Replacements |
| Press Center | Become a Delivery Driver | Credit Card Marketplace | Manage Your Content and Devices |
| Investor Relations | Start a Package Delivery Business | Reload Your Balance | Recalls and Product Safety Alerts |
| Amazon Devices | Advertise Your Products | Gift Cards | Help |
| Amazon Science | Self-Publish with Us | Amazon Currency Converter | |
| | Host an Amazon Hub | | |
| | › See More Ways to Make Money | | |

English | United States

| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
| --- | --- | --- | --- | --- | --- | --- |
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info
Entertainment
Professionals
Need

Kindle Direct Publishing
Indie Digital & Print
Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video Direct
Video Distribution
Made Easy

Shopbop
Designer
Fashion
Brands

Amazon
Warehouse
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security
Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart
Security
for Every
Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon Subscription
Boxes
Top subscription boxes –
right to your door

PillPack
Pharmacy
Simplified

Amazon Renewed
Like-new products
you can trust

Conditions of Use    Privacy Notice    Your Ads Privacy Choices

© 1996-2024, Amazon.com, Inc. or its affiliates

# EXHIBIT C



Full-court freshness
Sponsored

Fulfillment Speed | Brand | Price | Sort by | Best Match

Easter toys | Shop All Squishmallows | 12 inch Squishmallows | 16 inch Squishmallows | 20 inch Squishmallows | Cow Squishmallows | Frog Squishmallows | Axolotl Squishmallows | Dog Squishmallows | Cat Squishmallows | Halloween Squishmallows | Easter Squishmallows

Fulfillment Speed
Age
Brand
Customer Rating
Price
Character
Animal Type
Color
Occasion
Retailer
Benefit Programs
Departments
Availability

**Results for "squishmallows"** (23)

Price when purchased online

+ Add

Now $10.97 ~~$39.99~~
Squishmallows Plush 10 inch Blue & White Birthday Cake Child's Ultra Soft Plush
★★★★★ 950
Pickup **today**

+ Add

$7.88
Squishmallows Official 8 inch Bubbles the Lavender Bunny with Flower Crown - Child's Ultra Soft Stuffed Plush Toy
★★★★☆ 4
Pickup **today**

+ Add

Now $12.98 ~~$28.99~~
Squishmallows Original Sanrio 8 inch Hello Kitty in a Easter Bunny Suit - Child's Ultra Soft Stuffed Plush Toy
★★★★½ 8
Pickup **today**

+ Add

Now $10.97 ~~$23.25~~
Squishmallows Official Plush 10 inch Angie the Brown Celebration Dog Child's Ultra Soft Plush Toy
★★★★★ 307
Pickup **today**

Options

$4.98
Squishmallows 3.5" Easter Clip-On Reina the Butterfly
★★★★★ 1
Pickup **today**

+ Add

Now $12.98 ~~$27.99~~
Squishmallows Official 8 inch Hello Kitty My Melody in a Bunny Suit - Child's Ultra Soft Stuffed Plush Toy
★★★★½ 7
Pickup **today**

+ Add

$9.98
Squishmallows Lavendar Bunny
★★★★★ 1
Pickup **today**

+ Add

$4.98
Squishmallows Official 5 inch Ditty the Salmon Lemur with Flower Pin - Child's Ultra Soft Stuffed Plush Toy
★★★★★ 1
Pickup **today**

+ Add

$4.98

Lots of toys to love for less
Their favorite brands at low, low prices!

+ Add

$6.97 $34.85/oz

+ Add

$7.88

EXHIBIT C

Squishmallows Official 5 inch Triston the Yellow Chick Holding a Flower - Child's Ultra Soft Stuffed Plush Toy

Pickup **today**

Squishmallows Molded Lip Balm, 2 Pack, Coconut & Strawberry

★★★★☆ 131

Pickup **today**

🔄 Subscribe

**Shop deals**

Squishmallows Official 8 inch Bebe the Blue Bird with Bunny Ears - Child's Ultra Soft Stuffed Plush Toy

★★★★★ 1

Pickup **today**

$9.98

Squishmallows Official Hugmee Plush 10 inch Satine the Peach Bunny with Fuzzy Belly - Child's Ultra Soft Stuffed Toy

Pickup **today**

+ Add

$19.98

Squishmallows 14 inch Tinley Rainbow Tie-Dye Axolotl Plush

Pickup **today**

+ Add

$12.98

Squishmallows Official 8 inch Stitch with Bunny Ears - Child's Ultra Soft Stuffed Plush Toy

★★★★★ 1

Pickup **today**

+ Add



### Hop this way

**Break out the baskets**

Bunny-approved toys for every kiddo.

**Shop Easter toys**

$19.98

Squishmallows 14 inch Hara the Green Bunny with Carrot Juice - Child's Ultra Soft Stuffed Plush Toy

Pickup **today**

+ Add

$19.98

Squishmallows 14 inch Keisha - Orange Cupcake W/Orange Frosting

Pickup **today**

+ Add

$19.98

Squishmallows Official 10 inch Ronnie the Brown Cow Treat Pail - Child's Ultra Soft Stuffed Plush Toy

Pickup **today**

+ Add

$19.98

Squishmallows Bunny Treat Pail Plush

★★★★★ 1

Pickup **today**

+ Add

$10.98

Squishmallows Cotton 2 Piece Towel and Washcloth Set

★★★★☆ 3

Pickup **today**

+ Add

$9.97

Snackles Small Size Snackle Plush Toy by ZURU Ages 3 and up

★★★★☆ 89

Pickup **today**

+ Add

$12.98 ~~$22.99~~

Squishmallows Official 8 inch Hello Kitty Pompompurin in a Easter Bunny Suit - Child's Ultra Soft Stuffed Plush Toy

★★★★★ 6

Out of stock

Shop similar

$7.88

Squishmallows Official 8 inch Grant the Tan Goat with Easter Egg - Child's Ultra Soft Stuffed Plush Toy

Out of stock

Shop similar

EXHIBIT C



Now $ 5 97 $19.99
Squishmallows Original 5-inch Assorted

Now $ 34 99 $39.99
Squishmallow 5" Plush Mystery Box, 5-Pack -

Squishmallows Official 5 inch Sophie the Cream Lamb with Chocolate Bunny - Child's Ultra Soft Stuffed Plush Toy

$ 27 00
Squishmallows Official Plush 8 inch Pink



EXHIBIT C

# EXHIBIT D

Ship to 63101            Town And Country



Sponsored

## Popular filters



| $15- $25 | $0- $15 | Up to 11" | New | Easter Squishmallo | Up to 20" |

Filter    Sort    Deals    Brand    Height    Price    Featured    Type

## 536 results for "squishmallows"



Pickup    Shop in store    Same Day Delivery    Shipping



Squishmallow
16" Edwin ...
Squishmallows
⭐⭐⭐⭐⭐ 5

Squishmallow
16" Aqua...
Squishmallows
⭐⭐⭐⭐⭐ 5

Squishmallow
5" Plush...
Squishmallows
⭐⭐⭐⭐⭒ 6

Squishmallow
New 10"...
Squishmallows
⭐⭐⭐⭐⭐ 16

EXHIBIT D

**$21.99** reg ~~$24.99~~
Sale

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

Sponsored

**$21.99** reg ~~$24.99~~
Sale

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

Sponsored

$44.99

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11

Not available in stores

Add to cart

$27.99

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11

Not available in stores

Add to cart



Squishmallows
12" Camet...
Squishmallows
⭐⭐⭐⭐⭐ 6

$39.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11

Not available in stores

Add to cart



Squishmallows
16" Refalo...
Squishmallows
⭐⭐⭐⭐⭐ 121

$24.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

Not available in stores

Add to cart



Squishmallows
16" Trinity...
Squishmallows
⭐⭐⭐⭐⭐ 17

**$21.99** reg ~~$24.99~~
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

Sponsored



Squishmallows
16" Dieric...
Squishmallows
⭐⭐⭐⭐⭐ 15

**$21.99** reg ~~$24.99~~
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

Sponsored



**Free $15 Target GiftCard** when you spend $50 on select laundry items*

Sponsored



**Squishmallow 16" Purple...**

Squishmallows

⭐⭐⭐⭐⭐ 11

$21.99 reg $24.99
Sale
When purchased online

Ships free with RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And Country
Ready within 2 hours with pickup

Add to cart



**Squishmallow New 8" Zi...**

Squishmallows

⭐⭐⭐⭐⭐ 3

$21.99
When purchased online

Ships free with RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart



**Kellytoy Squishmal...**

Squishmallows

⭐⭐⭐⭐ 3

$62.99 reg $69.99
Sale
When purchased online

Ships free with RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart



**Squishmallow Kids'...**

Squishmallows

⭐⭐⭐⭐ 25

$20.00
When purchased online

Ships free with RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And Country
Ready within 2 hours with pickup

Add to cart

Sponsored



**Girls' Squishmal...**

Squishmallows





**Squishmallow Kids'...**

Squishm... New at 



**Squishmallow Kids' Throw**

Squishmallows



**Squishmallow 5" Myster...**

Squishmallows

★★★★★ 243

$8.99

When purchased online

Only ships with $35 orders

Ships free with

RedCard or $35 orders

Exclusions Apply.

Get it by Wed, Mar 6

In stock at Town And Country

Ready within 2 hours with pickup

Add to cart

★★★★☆ 3

$20.00

When purchased online

Ships free with

RedCard or $35 orders

Exclusions Apply.

Get it by Wed, Mar 6

Not available at Town And Country

Check nearby stores

Add to cart

★★★★★ 37

$14.99

When purchased online

Ships free with

RedCard or $35 orders

Exclusions Apply.

Get it by Wed, Mar 6

In stock at Town And Country

Ready within 2 hours with pickup

Add to cart

$47.99

When purchased online

Ships free with

RedCard or $35 orders

Exclusions Apply.

Get it by Mon, Mar 11

Not available in stores

Add to cart



Squishmallows 4" Blind...

Squishmallows

★★★★☆ 7

$5.99



Squishmallows 11" Sakur...

Squishmallows

★★★★★ 43

$11.99



Squishmallows Fiesta...

Squishmallows

★★★☆☆ 7

$24.29 reg $26.99



Squishmallows 11" Neelu...

Squishmallows

★★★★★ 14

$11.99





 

squishmallows

Get it by Wed, Mar 6

In stock at Town And Country

Ready within 2 hours with pickup

Add to cart

In stock at Town And Country

Ready within 2 hours with pickup

Add to cart

Get it by Mon, Mar 11

Not available in stores

Add to cart

In stock at Town And Country

Ready within 2 hours with pickup

Add to cart



Free **$15 Target GiftCard** when you
spend $50 on select laundry items*

Sponsored









**Squishmallow 8" Sanrio...**

Squishmallows

⭐⭐⭐⭐☆ 11

$14.99

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

**Squishmallow 12" Sophi...**

Squishm...    New at ◎

⭐⭐⭐⭐⭐ 3

$14.99

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

**Squishmallow 16" Purple...**

Squishmallows

⭐⭐⭐⭐⭐ 11

$21.99 reg $24.99
Sale

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart

**Squishmallow Collection...**

Squishmallows

⭐⭐⭐⭐⯪ 14

$24.99

When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.

Add to cart



page 1 of 23 ⌄

**Related searches**

| cat stuffed animals | big pikachu plush | plush bear | gund stuffed bear | tigger plush stuffed a |

Sponsored

## Get top deals, latest trends, and more.

Email address

**Sign up**

Privacy policy

# EXHIBIT E



HOME / SQUISHY BEANIES

**47 Results**

Best Matches

Filter



**HATCH**
EASTER CHICK IN EGG LARGE
**$11.99**
FREE SHIPPING AVAILABLE 🇺🇸

**HILDEE**
MULTICOLORED HEDGEHOG
**$9.99**          —
Ⓜ Ⓛ Available in Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**SLUSH**
GREY AND WHITE HUSKY
**$9.99**      **$11.99**      —
Ⓜ Ⓛ Available in Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA                    ADD TO BA                    ADD TO B





**BITSY**
PURPLE DOG
**$9.99**          —
Ⓜ Ⓛ Available in Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**ROXIE**
PINK FOX
**$9.99**      **$11.99**      —
Ⓜ Ⓛ Available in Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**FETCH**
DALMATIAN DOG
**$9.99**      **$11.99**      —
Ⓜ Ⓛ Available in Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



ADD TO BA    ADD TO BA    ADD TO B







**CATNIP**
GREY MOUSE
**$9.99**                    —
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**POPPY**
PINK KOALA
**$9.99**    **$11.99**
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**OCTAVIA**
PURPLE OCTOPUS
**$9.99**    **$11.99**
Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA    ADD TO BA    ADD TO B







**NESSA**
MUTLICOLORED CATERPILLAR
**$9.99**                    —
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**SONNY**
MULTICOLORED CAT
**$9.99**    **$11.99**
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**MUFFIN**
PINK AND WHITE CAT
**$9.99**    **$11.99**    —
Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA    ADD TO BA    ADD TO B





**HEATHER**                    **GISELLE**                    **HELENA**

PASTEL STRIPED CAT
**$9.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

MULTICOLOR LEOPARD
**$9.99** **$11.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

BLUE HUSKY
**$9.99** **$11.99**
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|





COOPER
PASTEL SLOTH
**$9.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

KIRRA
BLUE CAT
**$9.99** **$11.99**
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

DUNSTON
BROWN MONKEY
**$9.99** **$11.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|





LINUS
BROWN AND WHITE LEMUR
**$9.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

FANTASIA
PINK UNICORN
**$9.99** **$11.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

HARMONIE
WHITE UNICORN
**$9.99** **$11.99** -
M L Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



**DOTTY**
MULTICOLOR LEOPARD
**$9.99**   -
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**CLOVER**
GREEN BEAR
**$9.99**   **$11.99**   -
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**PINKY**
PINK OWL
**$9.99**   **$11.99**   -
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸


ADD TO BA     ADD TO BA     ADD TO B



**BAMBOO**
BLACK AND WHITE PANDA
**$9.99**   -
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**HOPE**
PASTEL BEAR
**$9.99**   **$11.99**   -
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**GILBERT**
PINK GIRAFFE
**$9.99**   **$11.99**   -
Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA     ADD TO BA     ADD TO B



**WINKS**
PINK OWL
**$9.99**   -
Available In Multiple Sizes



**KIKI**
GREY STRIPED CAT
**$9.99**   **$11.99**   -
Available In Multiple Sizes



**OWEN**
RAINBOW OWL
**$9.99**   **$11.99**   -
Available In Multiple Sizes

ADD TO BA          ADD TO BA          ADD TO B



Ski

Sign in and subscribe to our email list to get Free U.S. Ground Shipping

🔍 Search

Sign In | Wishlist | My Bag | En

Holiday | Beanie Boos | Beanies | Bundles | Beanie Bellies | Gift Sets | Squishy Beanies | Beanie Balls | Clips | Ty Fashion | Licensed

ADD TO BA          ADD TO BA          ADD TO B









**BUTTERCUP**
YELLOW BEAR
**$9.99**
Ⓜ Ⓛ  Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**MUFFIN SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~          **$11.99**
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

**CATNIP SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BA          ADD TO B



### FETCH SQUISH BUNDLE
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



### OCTAVIA SQUISH BUNDLE
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



### ROXIE SQUISH BUNDLE
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



### NESSA SQUISH BUNDLE
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



### CATNIP AND MUFFIN BUNDLE
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



### BITSY AND KIRRA BUNDLE
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



### DUNSTON AND LINUS BUNDLE
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



### ROXIE AND POPPY BUNDLE
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



### NESSA AND OCTAVIA BUNDLE
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BA          ADD TO E



**PINKY AND COOPER BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

**ALL SMILES BUNDLE**
MEDIUM SQUISHY BEANIES
~~$26.97~~
**$23.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BAG

## Squishy Beanies

Ty Squishy Beanies are the soft, huggable friend you can take everywhere you go! Made from colorful, cozy fabric, Squishy Beanies are available in a larger size of many of your favorite Beanie Boos plush characters. These large Beanie Boo squishy plushies have enormous glittery eyes and adorable smiles. Ty Squishy Beanies, sometimes called Squish-a-Boos, will become your child's favorite nap or bedtime squishy pillow animals. Collect all of these squishy, plush animals, and get ready for your Squishy Beanie hugfest!



**ABOUT TY** ▼

Birthday Calendar
FAQs
Blogs
Privacy Policy
Terms and Conditions
Distribution Policy
CPSIA

**HOW CAN WE HELP?** ▼

Order Status
Returns and Refund Policy
Contact

**POPULAR STYLES** ▼

Cats
Disney
Dragons
Unicorns
Dogs

**CONNECT**

Facebook  Twitter  Instagram  YouTube  Pinterest

**Email List Subscription**

Subscribe to Ty's email list to receive the latest news about your favorite products!

Enter Your Email    Sign Up

**CUSTOMER SUPPORT**

1-800-876-8000 | M-F 9AM-5PM(CST)

© 2024 Ty - All Rights Reserved

# EXHIBIT F



Toys / Toys for All

Black-owned beauty.
Sponsored

Dan Dee

# Dan Dee Unicorn Soft Plush 10-inch Basket All Occasions

**$29.99**

Price when purchased online

Add to cart

Up to 60% off gifts
Explore deals

**How do you want your item?**

| Shipping | Pickup | Delivery |
|---|---|---|
| Arrives Jan 11<br>$15.99 | Not available | Not available |

Delivery to **South Gate, 90280**

Sold and shipped by **Revived Retail**

3 seller reviews

View seller information

**Extended holiday returns** Details

Free Holiday returns until **Jan 31**

Add to list

Add to registry

Sponsored
$14.99
Plushible Bear 10 Inch (Sitting)
3+ day shipping
+ Add

**500+ bought since yesterday**

Options

Now $19.97 ~~$41.99~~

Bluey Talking 13" Bluey Talking Plush, Ages 3

691

+ Add

$29.99

Dan Dee Large Sparkly Plush Unicorn Dandee Stuffed Animal Gift Present 20" Tall

3+ day shipping

+ Add

$49.99

Claire's Club Sound and Dancing Unicorn Soft Toy

3+ day shipping

3+ day shipping



**Now $159.99** ~~$209.99~~

Mega Brands MEGA Brands Barbie Dreamhouse

★★★★☆ 29

3+ day shipping

Best seller



Options

Sponsored

**Now $21.99** ~~$25.99~~

PayUSD Upgrade Kids Selfie Camera, Christmas birthday Gifts for Girls/boys Age 3-9, HD Digital Video Cameras for Toddler, Portable Toy for 3 4 5 6 7 8 Year Old Girl with 32Gb Purple

★★★★½ 18

2-day shipping

Clearance



+ Add

Sponsored

**Now $21.99** ~~$99.99~~

Dinosaur Toys for 1-2 Year Old Boy, Roar Music and Light Moving Dino Baby Toys with Mist Spray, Electric Dinosaur Birthday Gi

★★★★½ 475

2-day shipping

## About this item

### Product details ⌃

Dan Dee Unicorn Soft Plush 10-inch Basket All Occasions

ⓘ **We aim to show you accurate product information.** Manufacturers, suppliers and others provide what you see here, and we have not verified it. See our disclaimer

### Specifications ⌃

**Brand**
Dan Dee

**Animal Type**
Unicorn

### Warranty ⌃

**Warranty information**

Please be aware that the warranty terms on items offered for sale by third party Marketplace sellers may differ from those displayed in this section (if any). To confirm warranty terms on an item offered for sale by a third party Marketplace seller, please use the 'Contact seller' feature on the third party Marketplace seller's information page and request the item's warranty terms prior to purchase.

💳 **Earn 5% cash back on Walmart.com.** See if you're pre-approved with no credit risk. Learn more

☆☆☆☆☆ (0 reviews)

Write a review

This item doesn't have any reviews yet.

▪️ **Debit with rewards.** Get 3% cash back at Walmart, up to $50 a year. See terms for eligibility. Learn more.

💬 Report incorrect product information

**CeraVe**

New Ultra Light Gel

Sponsored ⓘ

Best seller

Best seller

**1000+ bought since yesterday**



**$26.21**

BLIPPI 16" My Buddy Plush Toy

★★★★☆ 409



+3 options

**$10.99**

Options from $10.99 – $12.89

8",10",12" Rocky Lankybox Merch Stuffed Toys, Lanky Box Toys, Birthday Gift for Kids,



**Now $17.99** $40.00  90.0 ¢/ea

Bluey – Talking Bingo 12" Plush, Ages 3

★★★★☆ 373

---

**Report:**   ⓘ Report seller   |   ⚠ Report suspected stolen goods (to CA Attorney General)

**Related pages**

| | |
|---|---|
| Stuffing Unicorn | Stuffed Emoji |
| Fluffy Unicorn | Unicorn Stuffed Animals |
| Easter Stuffed Animals | Hug Emojis |
| Unicorn Duck | Unicorn Pod |
| Other Unicorn Toys | Unicorn Toys |
| Unicorn Plush | Unicorn Games |

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20081205033257/http://www.squishable.com:80/




home | help | us | gallery | contact | login! | order tracking | cart
*your basket is empty and sad!*

## Big Squishable Animals

They're giant, round, fuzzy, stuffed animals. Hug them.

### Squishable Pig

$38 | View
**Add to Cart**

### Squishable Alligator

$38 | View
**Add to Cart**

### Squishable Snail

$42 | View
**Add to Cart**

### Squishable Rhino

$38 | View
**Add to Cart**

### Squishable Whale

$38 | View
**Add to Cart**

### Squishable Zebra

$38 | View
**Add to Cart**

### Squishable Puppy

$38 | View
**Add to Cart**

### Squishable Hippo

$38 | View
**Add to Cart**

### Squishable Leopard

$38 | View
**Add to Cart**

### Squishable Giraffe

$38 | View
*Back Early Dec!*

### Squishable Elephant
$38 | View
*Back Early Dec!*

### Squishable Bunny

$38 | View
*Back Early Dec!*

## Join Our Mailing List
Hear about new and back-in-stock stuff!

Email    Submit

## Squishy Travel Blog



Horace the Nomadic Monkey is in:
**Juneau, Alaska**

## Squishable News

**Holiday Shipping Deadlines!**

Orders placed by 5 pm on Tue, 12/16 are guaranteed to arrive by 12/24 via **Standard Shipping.**

**Waiting for a restock?**

All the squishables are expected back in stock in time for holiday shipping! Join our mailing list and we'll let you know the minute they're back!

*28 November 2008*
What do we do all day? You really wanna know? Check the Squishable Twitter Feed to keep tabs on Zoe, Aaron, and our new email guru, Beth

*10 October 2008*
Woohoo! Bundle of Bunnies are back!

*9 October 2008*
You know what we've got? A squishable lion scarf to fend off the impending cold! Scared of lions, how 'bout a giraffe or an alligator!

*18 September 2008*
Are you heading to New York Anime Festival 2008? So are the squishables! If you're in NYC Sept 26-28, come by booth 535 in the dealers room and say "Heeeeeey!"

### Squishable Penguin



$38 | View
*Back Early Dec!*

### Squishable Octopus



$44 | View
*Back Early Dec!*

### Squishable Tiger
$38 | View
*Back Early Dec!*

### Squishable Duck
$38 | View
*Back Early Dec!*

### Squishable Shark



$38 | View
*Back Early Dec!*

### Squishable Tortoise



$42 | View
*Back Early Dec!*

### Squishable Panda
$38 | View
*Back Early Dec!*

### Squishable Cow
$38 | View
*Back Early Dec!*

### Squishable Rooster



$38 | View
*Back Early Dec!*

### Squishable Sheep
$38 | View
*Back Early Dec!*

### Squishable Monkey
$38 | View
*Back Early Dec!*

### Squishable Hedgehog
$42 | View
*Back Early Dec!*

---

**On the Bench:** *The run for these Squishables has ended. We might have a couple left...or we might not!* Dalmatian, Frog

## Squishable Wardrobe

### Fuzzy Lion Scarf

$15 | View
**Add to Cart**

### Fuzzy Frog Scarf

$15 | View
**Add to Cart**

### Fuzzy Giraffe Scarf

$15 | View
**Add to Cart**

## Squishable Understudies

### Giant Turtle Understudy
$88 | View
**Add to Cart**

### Meerkat Understudy

$19 | View
**Add to Cart**

### Fuzzy Kiwi Understudy
$48 | View
**Add to Cart**

### Giant Chocolate Moose Understudy
$98 | View
**Add to Cart**

### T-bone Steak Understudy

$20 | View
**Add to Cart**

### Box of Donuts Understudy
$35 | View
**Add to Cart**

### Bundle of Bunnies Understudy
$15 | View
**Add to Cart**

### Carrot Bunny Understudy

$15 | View
**Add to Cart**

### Surrealist Rat Understudy
$38 | View
**Add to Cart**

---

*13 June 2008*
Pandas, people, Pandas are now in stock, along with their chromatic cousins, Zebras!

*30 May 2008*
Hedgehogs! We've got some! Also Octopuses, Alligators, Piggies, and Sheep are all back in stock! Crazy!

*11 May 2008*
We're heading to AnimeCentral from May 16-18! Stop by booth 836 and hug a squishable!

*3 May 2008*
Best fan video. Ever. I want to be this guy when I grow up.

*20 March 2008*
Squishy fan Michael wins my personal Photoshop admiration with this freakishly awesome picture.

*4 March 2008*
It's another Squishy Fan Video! "Lamborghini" the Leopard and "Lion", the Tiger, valiantly defend themselves against some Supersonic Crushing!! Thanks guys!

*27 November 2007*
Ohmygodohmygodohmygod. Someone made a squishable fan video!!! Holy crap! Check it out on youtube.

## Charities We Dig!

Electronic Frontier Foundation September/October user-picture drive

DC Central Kitchen The very last Panda auction

The YES Fund July user-picture drive

The Comic Book Legal Defense Fund - August user-picture drive

Wolong Giant Panda Breeding Center - June user-picture drive

The Heifer Foundation - May user-picture drive

Tipitina's Foundation - April user-picture drive

The Esther Honey Foundation - February user-picture drive

Donors Choose - Buy Nothing

Day fundraiser

<span style="color:green">Operation Smile</span> - Winter user-picture drive

<span style="color:green">DC Central Kitchen</span> - The very last octopus auction

We're not endorsed or affiliated with these charities, we just like 'em!

privacy policy | terms of use | contact us

All Content © 2007-2008 Squishable.com, Inc. | Site Design by Binaryspark



*$59 = Free U.S. Shipping (https://www.squishable.com/mm5/merchant.mvc? Screen=FAQS#free_shipping)*

*Try SQUEE Club! (https://www.squishable.com/mm5/merchant.mvc? Screen=PROD&Product_Code=PGSQUEE)*

 (https://www.squishable.com/mm5...

(https://www.squishable.com/mm5/merchant.mvc? Screen=SFNT)

HOME (HTTPS://WWW.SQUISHABLE.COM/MM5/MERCHANT.MVC?SCREEN=SFNT)  >

**STANDARD SQUISHABLES! (HTTPS://WWW.SQUISHABLE.COM/MM5/MERCHANT.MVC? SCREEN=CTGY&CATEGORY_CODE=BIG_ANIMALS)**

## Categories



In-Stock only

 Newest Items ▼



Squishable Wolf

$54.00



Squishable Dragon Roll

$52.00





(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_wolf)

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_drac





Squishable Demon
Plague Doctor

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=demon_plague_doctor)

Squishable Spooky
Wreath

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=spooky_wre





Squishable Flocked
Wreath

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=flocked_wreath)

Squishable Loves: Reptar

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishloves





Comfort Food Christmas
Tree Cookie

$45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=christmas_tree_cookie)

Squishable Death's-head
Hawkmoth

$58.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=deaths_hea



Squishable Baby Mothman

$49.00 (https://www.squishable.com/mm5/merchant.mvc? Screen=PROD&Product_Code=squish_baby_mothman)



Squishable Tie Dye Reaper

$52.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=tie_dye_reap



Squishable Alligator

$45.00 (https://www.squishable.com/mm5/merchant.mvc? Screen=PROD&Product_Code=squishable_alligator)



Squishable Hen

$49.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squishable_



Squishable Queen Bee

$48.00 (https://www.squishable.com/mm5/merchant.mvc? Screen=PROD&Product_Code=squishable_queen_bee)



Squishable Palm Tree

$45.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_palm



Comfort Food Soy Sauce

$45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_soy_sauce)



NEW!
Comfort Food Mustard

 $48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



NEW!
Comfort Food Ketchup

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_ketchup)



Squishable Lich

$55.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable Caterpillar

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_caterpillar)



Comfort Food Christmas
Star Cookie

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=christmas_s



Squishable Oyster

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_oyster_15)



Squishable Flocked
Christmas Tree

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=flocked_chr



Comfort Food Sushi Roll
II

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_sushi_roll_ii)



Comfort Food Smoothie

 $46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_smo



Squishable Baby Goat

$48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_baby_goat)



Squishable Cotton
Candy Baby Unicorn

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cotto



Squishable Hydra

$58.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_hydra_15)



Squishable Apatosaurus

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable T-Rex II

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_t_rex_ii)



Comfort Food
Strawberry Jam

$46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Squishable Arctic
Narwhal

$45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_arctic_narwhal)



Squishable Triceratops

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_





Squishable Go! Ship

$35.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=go_ship)

Comfort Food Cotton
Candy

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Water
Dragon

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_water_dragon)

Squishable Strawberry
Cow

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_





Comfort Food Red
Velvet Cupcake

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_red_velvet_cupcake)

Squishable GO!
Spaceship

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=go_spacesh





[Comfort Food Mac 'n Cheese](https://www.squishable.com)

 $52.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_mac_and_cheese)

[Squishable Coral Octopus](https://www.squishable.com)

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cora





[Comfort Food Cold Brew](https://www.squishable.com)

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_cold_brew)

[Squishable GO! Airplane](https://www.squishable.com)

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=go_airplane





[Comfort Food Iced Tea](https://www.squishable.com)

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_iced_tea)

[Comfort Food Peppermint Mocha](https://www.squishable.com)

 $48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Squishable Succulent

$52.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_succulent_15)



Squishable Baby Axolotl

$50.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_baby



Squishable Wizard

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_wizard_15)



Squishable Gargoyle

$55.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_garg



Squishable Hati

$55.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_hati_15)



Comfort Food
Cheeseburger

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food
Sourdough

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_sourdough_15)



Comfort Food Ham
Musubi

 $46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Gumball
Machine

 $49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_gumball_machine_15)



Squishable Blue Jay

$48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_blue



Squishable Rose

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_rose_15)



Squishable Cuddly
Kangaroo

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cudc





Squishable Shadow
Dragon

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_shadow_dragon_15)

Squishable Baphomet

$55.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_bapl





Comfort Food Buttered
Toast

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_buttered_toast_15)

Comfort Food Coffee
Pot

 $48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Squishable Cauldron

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_cauldron_15)

Squishable Rattlesnake

$48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_rattl



Squishable Venus Flytrap

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_venus_fly_trap_15)



Squishable Lunar Lion

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_luna



Squishable Poodle Moth

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_poodle_moth_15)



Squishable Rosy Maple
Moth

$55.00

(https://www.squishable.com/mercha
Screen=PROD&Product_Code=squish_rosy



Comfort Food Unicorn
Latte

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_unicorn_latte_15)

Comfort Food Dipped
Ice Cream Pop

 $46.00

(https://www.squishable.com/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Baby Red
Panda

$48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_red_panda_15)

Squishable Piggy

$46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_pig_





Squishable GO!
Ambulance

$39.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_ambulance_12)

Comfort Food Kabob

 $52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food
Lemonade

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_lemonade_15)

Squishable Reaper

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_reap





Squishable Plague Nurse

$49.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_plague_nurse_15)

Squishable Snowy Owl

$45.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_snov





Comfort Food Cereal Box

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_cereal_box_15)

Comfort Food Ramen

 $55.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=comfortfoo





Comfort Food Loaf of Bread

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_loaf_of_bread_15)

Squishable Ladybug II

$48.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_lady





Comfort Food Unicorn
Cake

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_unicorn_cake_15)

Squishable Mushroom

$48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_mus





Squishable Spooky
Ghost

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_spooky_ghost_15)

Squishable GO! Train

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_go_t



Squishable GO! Fire
Truck

$39.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_firetruck_12)

Squishable GO! Dump
Truck

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_go_c



Squishable GO! Front
Loader

$39.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_frontloader_18)



Squishable Plague
Doctor

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_plag



Comfort Food Peanut
Butter Jar

 $46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_pb_jar_15)



Squishable Dolphin III

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_dolp



Squishable Baby Corgi

$48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_corgi_15)



Squishable Orca

$48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_orca





Squishable Jellyfish II

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_jellyfish_15_ii)

Comfort Food Broccoli

 $55.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Baby Panda

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_panda_15)

Comfort Food America
Ice Pop

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food Grapes

 $55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_grapes_15)

Squishable Red Dragon

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_red_



Squishable Snuggly
Sloth

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_snuggly_sloth_15)



Squishable Sunflower

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Squishable NHL®
Philadelphia Flyers®
Gritty™ Mascot

$60.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=nhl_gritty_15)



Comfort Food Soup
Dumpling

 $48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Popcorn

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_popcorn)



Comfort Food Hot Sauce

 $44.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food Pumpkin
Spice Latte

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_pumpkin_spice_latte)

Squishable Sakura
Dragon

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_saku





Comfort Food Matcha
Tea

 $45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_matcha_latte)

Squishable Mint
Octopus

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_mint





Comfort Food Bubble
Tea

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_bubble_tea)

Squishable Dachshund
Hot Dog

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_hot_





Squishable Baby Owl

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_owl_15)

Comfort Food Onigiri

 $46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Baby
Penguin

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_penguin_15)

Squishable Baby Koala

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_baby





Comfort Food Avocado
Toast

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_avocado_toast)

Squishable Cute
Octopus

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cute



Squishable Fluffy Bunny

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_fluffy_bunny_15)



Squishable Baby
Raccoon

$46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_baby



Squishable Baby Unicorn

$48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_unicorn_15)



Comfort Food Cherries

$48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Squishable Stegosaurus
III

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_stegosaurus_15)



Squishable Rainbow

$45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_rainl



### Comfort Food Corn

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_corn)



### Comfort Food Carrot

 $40.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



### Comfort Food Banana

 $42.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_banana_15)



### Squishable Comfort
Food Taco

 $42.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_taco



### Comfort Food Pineapple

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_pineapple_15)



### Comfort Food Pizza Slice

 $40.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish





Comfort Food Avocado

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=opensquish_avocado_9686)

Comfort Food Hot Dog

 $42.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food
Gingerbread Man

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_gingerbread_man)

Comfort Food
Watermelon

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food Shrimp
Sushi

 $42.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_shrimp_sushi_15)

Squishable Fuzzy
Bumblebee

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Comfort Food Hamburger

 $45.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_hamburger_15)



Squishable Baby Fox

$48.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_baby



Squishable S'more

 $48.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_smore_15)



Squishable Sea Turtle

$48.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_sea_



Squishable Pink Donut

 $45.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=opensquish_squish_pink_donut_15)



Squishable Narwhal

$46.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_narw





Squishable Heart

$42.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_heart_15)

Squishable Great White
Shark

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_grea





Squishable Corgi

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_corgi_15)

Mystery Squishable

Was $47 Now $34.99
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_mys

**JOIN THE NEWSLETTER!**

---

**CONNECT!**







s://www.facebook.com/squishabledotcom)     (https://www.instagram.com/squishables/)     (https://twitter.com/squish



(https://www.tiktok.com/@squishable.com)



(merchant.mvc?Screen=MAIL)



(https://discord.com/invite/squishable)

## SHOP SQUISHABLES

Standard Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=Big_Animals)
Comfort Foods
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=comfort_food)
Mini Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=Squishable_Mini)
Undercovers
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=undercover)
Micro Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=Squishable_Micro)
Massive Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=squishable_massive)
Alter Egos
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=alter_egos)
Snackers
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=snackers)
Retiring Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=Retiring_Animals)
Plague Doctor
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=plague_doctor)

## SHOP OTHER STUFF

Squishable Loves
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=squishloves)

## PARTICIPATE

Vote on New Designs
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=voting_category)
Submit a New Design
(https://www.squishable.com/mm5/merchant.mvc?Screen=PROS)
Open Squish FAQ
(https://www.squishable.com/mm5/merchant.mvc?Screen=FFAQ)
Squish Designers
(https://www.squishable.com/mm5/merchant.mvc?Screen=OSDE)
In-process Designs
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=prototypes)
Retired Squishables
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=retired_squishables)
Fan Art
(https://www.squishable.com/mm5/merchant.mvc?Screen=FANA)
Activities 4U
(https://www.squishable.com/mm5/merchant.mvc?Screen=ACTY)

## INFO

Visit an official Squishable store!
(https://www.squishable.com/mm5/merchant.mvc?Screen=POPU)
Help Me!
(https://www.squishable.com/mm5/merchant.mvc?Screen=FAQS)
Contact Us
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTUS)

Picnic Baby
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=picnic_baby)

Squishable GO
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=squishable_go)

Sparkles Blind Box
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=sparkles)

Bags
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=squishswag)

Crafts and games
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=arts)

Boozy Buds
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=boozy_buds)

The Yay Team
(https://www.squishable.com/mm5/merchant.mvc?Screen=CTGY&Category_Code=Yay_Team)

Squee Club
(https://www.squishable.com/mm5/merchant.mvc?Screen=FAQS#squee)

Squee Central
(https://www.squishable.com/mm5/merchant.mvc?Screen=SQEC)

About Us
(https://www.squishable.com/mm5/merchant.mvc?Screen=ABUS)

Hire Me
(https://www.squishable.com/mm5/merchant.mvc?Screen=JOBS)

Philanthropy
(https://www.squishable.com/mm5/merchant.mvc?Screen=CRTY)

Blog
(https://www.squishable.com/mm5/merchant.mvc?Screen=BLOG)

**WHOLESALE**

Wholesale Login (http://wholesale.squishable.com/)

Wholesale Inquiries
(https://www.squishable.com/mm5/merchant.mvc?Screen=WHQY)

Custom Products
(https://www.squishable.com/mm5/merchant.mvc?Screen=CUST)

International
(https://www.squishable.com/mm5/merchant.mvc?Screen=INTL)

Official Retailers
(https://www.squishable.com/mm5/merchant.mvc?Screen=SLOC)

---

 (https://ssl.comodo.com/ev-ssl-certificates.php)

privacy notice (https://www.squishable.com/mm5/merchant.mvc?Screen=PRPO)

cookie settings

terms of use (https://www.squishable.com/mm5/merchant.mvc?Screen=TOUS)

warranty info (https://www.squishable.com/mm5/merchant.mvc?Screen=WRTY)

**Do Not Sell My Info**    (https://www.squishable.com/mm5/merchant.mvc?Screen=CCPA)

# EXHIBIT H

# kidrobot™

SHOP BLOG FORUM LIMITED LICENSED BLANK TOYS **YUMMY WORLD** LABBIT LAND .

# kidrobot™

SHOP    BLOG    FORUM    LIMITED    LICENSED    BLANK TOYS    YUMMY WORLD    LABBIT LAND

Sort by: Alphabetically: A-Z

## COLLECTIONS

Accessories

Adventure Time x Kidrobot

All

Apparel

Art Giants by Kidrobot

Art Toys

Best Fiends x Kidrobot

Blind Boxes

Bots

DC Comics x Kidrobot

Dunny

Family Guy x Kidrobot

Frank Kozik

Happy Labbit

Kidrobot Black

Licensed

Limited Edition

Marvel x Kidrobot

Mega Man x Kidrobot

Munny World

New Arrivals

Santa Cruz x Kidrobot

SDCC Releases

Smorkin' Labbit

The Simpsons x Kidrobot

TMNT x Kidrobot

Tristan Eaton

Yummy World

# YUMMY WORLD

Yummy World is a deliciously fun world made up of a unique cast of characters. Yummy World is set in the town of Tree, a magically yummy place where food is fun and fresh baked friendships and adventures meet!!! Come along a the softer side of Kidrobot!

 YUMMY WORLD 4" Melony Watermelon Plush – Kidrobot

YUMMY WORLD 4" Melony Watermelon Plush
$ 5.99

 Yummy World Backpack Sandy – Kidrobot – 1

Yummy World Backpack Sandy
$ 24.99

 YUMMY WORLD Blue Ju Keychain – Kidrobot

YUMMY WORLD Blue Juice B Keychain
$ 4.99



Yummy World Bookmark Cheezy Pie
$ 5.99



Yummy World Bookmark Cocoa
$ 5.99



Yummy World Bookmark Dbl Twins
$ 5.99



Yummy World Bookmark Sandy
$ 5.99



Yummy World Chair Allover Print
$ 89.99



Yummy World Chair Yummy
$ 89.99

 YUMMY WORLD Cheezey Pie Small Plush – Kidrobot

YUMMY WORLD Cheezey Pie Small Plush
$ 5.99



  

Plush
$ 11.99



Yummy World Cheezy Pie Backpack
$ 24.99



YUMMY WORLD Coco Small Plush
$ 5.99



Yummy World Coin Purse Sprinkles
$ 8.99



Yummy World Coin Purse Yummy
$ 8.99



YUMMY WORLD Double Scoop Ice Cream Cone Keychain – Kidrobot – 1

YUMMY WORLD Double Scoop Ice
Cream Cone Keychain
$ 4.99

YUMMY WORLD Cookie W/Lt. Blue
Frosting Keychain
$ 4.99



YUMMY WORLD Franky the Hot Dog
Small Plush
$ 5.99



Yummy World Hat- Dbl Scoop Twins



Yummy World Hat- Sassy



Yummy World Hat- Sprinkles

# kidrobot™

SHOP    BLOG    FORUM    LIMITED    LICENSED    BLANK TOYS    YUMMY WORLD    LABBIT LAND

YUMMY WORLD Hotdog Keychain
$ 4.99

YUMMY WORLD Ice Cream Sandwich
Keychain
$ 4.99



YUMMY WORLD Large Dipped
Marshmallow
$ 29.99





YUMMY WORLD Large Peppermint
$ 29.99

YUMMY WORLD Large Macaroon
$ 29.99

YUMMY WORLD Large Pea Pod
$ 29.99

YUMMY WORLD Large Pink Lemonade
$ 29.99

YUMMY WORLD Large Taco
$ 29.99

 NEW

YUMMY WORLD Melony the
Watermelon Backpack
$ 24.99



Yummy World Pencil Bag-Franky
$ 9.99



YUMMY WORLD PB&J; Keychain
$ 4.99

Yummy World Pencil Bag-Sprinkles
$ 9.99

# kidrobot™



YUMMY WORLD Pink Cupcake Keychain

$ 4.99

YUMMY WORLD Pink Donut 10" Plush

$ 11.99

Yummy World Pencil Bag-Yummyworld

$ 9.99

YUMMY WORLD Pizza Keychain

$ 4.99

YUMMY WORLD Pudding Cup Chocolate Keychain

$ 4.99



YUMMY WORLD Purple Pudding Pop Keychain

$ 4.99

YUMMY WORLD Rocket Pop Keychain

$ 4.99

YUMMY WORLD Sandy the Ice Cream Sandwich Small Plush

$ 11.99

YUMMY WORLD Small Cherry

$ 5.99

YUMMY WORLD Small Chile Pepper

$ 5.99

YUMMY WORLD Small Cotton Candy

$ 5.99

YUMMY WORLD Small Kiwi

$ 5.99

YUMMY WORLD Small Latte

$ 5.99

YUMMY WORLD Small Pistachio

$ 5.99

YUMMY WORLD Strawberry 10" Plush

$ 11.99

1   2   Next »



SHOP    BLOG    FORUM    LIMITED    LICENSED    BLANK TOYS    YUMMY WORLD    LABBIT LAND

MY ACCOUNT

Shipping / Taxes          Help / Contact
Return Policy             Find A Store
WTF?                      My Profile
Legal Notice              My Cart
Wholesale Inquiries
Careers
About Us

Sign up to get the latest on sale releases and more ...

Enter your email address...

SIGN UP

© 2015 Kidrobot. Designed by Kidrobot. Website template by Shopify

FREE USA SHIPPING ON $75+* | Learn more

0

• • •

# YUMMY WORLD

Welcome to Yummy World. Yummy World is the softer side of the iconic Kidrobot brand featuring a selection of deliciously unique and trendy Yummy World plush toys, soft plush food pillows, collectible vinyl keychains, food plushies and more. Yummy World is loved by everyone from celebrities to fashionistas to kids and parents. Jump into Yummy World and start collecting today! **Share your Yummy selfies with #yummyworld on Instagram or upload them here:**

GET OUR APP

Submit Your Photo



Sort: ⌄

Yummy World Cecily the Scented Cinnamon Roll Interactive Plush (PRE-ORDER)
$39.99

Yummy World & Coca-Cola® Classic 10" Coca-Cola Can Plush with Sound (PRE-ORDER)

GET OUR APP

No Reviews

$ 29.99

No Reviews





Yummy World Camille the Yummy Meal XL
Interactive Plush by Kidrobot

$ 59.99

72 reviews

Yummy World XL Cheesy Puffs Interactive
Food Plush

$ 59.99

71 reviews





Yummy World Ernest Eggplant & Georgia
Plush 2-Pack

$ 39.99

Yummy World Zoey and the YumYumables XL
Interactive Plush

$ 54.99

🔵 GET OUR APP

3 reviews

61 reviews





Yummy World Canned Ham 10" Plush (PRE-ORDER)

$ 34.99

No Reviews

Yummy World Yummy Bears 10" Interactive Plush by Kidrobot

$ 39.99

19 reviews





Yummy World Gourmet Snacks Blind Box Vinyl Mini Series

$ 10.99

16 reviews

Yummy World Tasty Treats Blind Box Vinyl Figures

$ 10.99



GET OUR APP

16 reviews





Yummy World Nicole the Ramen Bowl Plush

$ 34.99

19 reviews

Yummy World Crunchy Pickle in a Bag 10"
Interactive Plush

$ 19.99

6 reviews







Yummy World Pizza Supreme 12" Interactive
Plush

$ 39.99

2 reviews

Yummy World Bonnie Burger 13" Interactive
Plush

$ 39.99

1 review





Yummy World Chicken Sandwich Chicky Meal 11" Interactive Plush

$ 54.99

1 review

Yummy World Bertha Bucket of Fried Chicken Interactive Plush

$ 54.99

7 reviews





Yummy World Dante the Dragon Fruit 13" Interactive Plush

$ 45.99

1 review

Yummy World Large Flaco Taco Plush by Kidrobot

$ 34.99

22 reviews

GET OUR APP

Yummy World Plush Food Collection by Kidrobot







Yummy World Conversation Hearts 10"
Interactive Plush

$ 34.99

2 reviews

Yummy World Haylee Heart Cookie 10" Plush

$ 19.99

14 reviews





Yummy World 16" French Fries Plush with
Interactive Plushie Fries

$ 34.99

reviews

Yummy World Breezy and the Twists Licorice
Candy Plush

$ 34.99

16 reviews

GET OUR APP



Yummy World Chips and Guac Large
Interactive Plush

$ 34.99

20 reviews



Yummy World 16" Avocado Plush with
Interactive Plushie Pit

$ 36.99

22 reviews



Yummy World Milk and Cookies Interactive
Plush

$ 54.99

reviews



Yummy World Sweet and Savory Blind Box
Keychains

from $ 6.99

13 reviews

GET OUR APP





Yummy World Attack of the Donuts Keychain
Series by Kidrobot

from $ 5.99

6 reviews

Yummy World Parker & Jayden Peanut Butter
and Jelly Sandwich Plush

$ 34.99

24 reviews





Yummy World 10" Pink Donut Plush Pillow

$ 24.99

11 reviews

Yummy World XL Victorio Veggie Taco Plush
Set

$ 54.99

13 reviews

GET OUR APP





Yummy World Bubba the Shrimp Nigiri Sushi Interactive Plush

$ 34.99

3 reviews

Yummy World 10" Pancake Plush Pillow

$ 24.99

15 reviews





Yummy World Smores Samantha S'more Plush Toy by Kidrobot

$ 34.99

reviews

Yummy World Bruce the Banana Interactive Plush by Kidrobot

$ 34.99

17 reviews

GET OUR APP





Yummy World Patsy the Pop Art Pastry Tart
Plush

$ 19.99

12 reviews

Yummy World Collectible Mystery Enamel Pins

$ 6.99

9 reviews





Yummy World Medium Bunford Burger Plush

$ 24.99

14 reviews

Yummy World Franky 10" Hotdog Plush by
Kidrobot

$ 19.99

9 reviews





Yummy World Jeni and the Jelly Beans XL
Interactive Plush

$ 54.99

10 reviews



Yummy World 10" Sandy the Ice Cream
Sandwich Plush Pillow

$ 24.99

13 reviews



Yummy World Jack O'Lantern Interactive
Pumpkin Plush with Candy Corns

$ 39.99

reviews



Yummy World 16" Gingerbread Man Jimmy
Interactive Plush

$ 36.99

5 reviews


GET OUR APP





Yummy World Hanz Pretzel 10" Plush

$ 19.99

3 reviews

Yummy World Strawberry 10" Plush Pillow

$ 19.99

3 reviews



Yummy World Walter Waffle Cone Ice Cream Scoop Plush

$ 24.99

6 reviews

Yummy World Gus the Gummy Worm Plush Toy

$ 24.99

2 reviews







Yummy World Lola Lollipop Small Carnival Plush

$ 6.99

4 reviews

Yummy World Rainbow Soft Serve Sally Ice Cream Cone Plush

$ 36.99

3 reviews

‹ ›

# NEWS & UPDATES

Sign up to get the latest on sales, new releases and more…

Enter your email address...

**SIGN UP**

 GET OUR APP



## STUFF TO KNOW　　＋

## ABOUT　　＋

## ADDITIONAL INFO　　＋

© 2024 Kidrobot. Made with Love.



# EXHIBIT I

1  MARK B. MIZRAHI (CA State Bar No. 179384)
     mmizrahi@wrslawyers.com
2  MAX N. WELLMAN (CA State Bar No. 291814)
     mwellman@wrslawyers.com
3  WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
   11400 W. Olympic Boulevard, 9th Floor
4  Los Angeles, California 90064-1582
   Telephone:   (310) 478-4100
5  Facsimile:    (310) 479-1422

6  *Attorneys for Plaintiffs Kellytoy (USA),*
   *Inc. and Kellytoy Worldwide, Inc.*

7

8                    UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11 KELLYTOY (USA), INC., a California        Case No.  2:18-cv-05399 JAK (AGRx)
   corporation; and KELLYTOY
12 WORLDWIDE, INC., a California             **FIRST AMENDED COMPLAINT**
   corporation;                             **FOR:**
13
                Plaintiffs,                  **1.  FEDERAL COPYRIGHT**
14                                           **INFRINGEMENT (17 U.S.C. § 501);**
         vs.                                 **2.  FEDERAL TRADEMARK**
15                                           **INFRINGEMENT, FALSE**
   DAN-DEE INTERNATIONAL, LTD.,              **DESIGNATION OF ORIGIN AND**
16 a Delaware corporation; RITE AID          **FALSE DESCRIPTION (15 U.S.C. §**
   CORPORATION, a Delaware                   **1125);**
17 corporation, and DOES 1 through 10,       **3.  COMMON LAW TRADEMARK**
   inclusive,                                **INFRINGEMENT**
18                                           **4.  CALIFORNIA COMMON LAW**
                Defendants.                  **UNFAIR COMPETITION;  AND**
19                                           **5.  CALIFORNIA STATUTORY**
                                             **UNFAIR COMPETITION**
20
                                             **DEMAND FOR JURY TRIAL**
21

22

23

24        Plaintiffs KELLYTOY (USA), INC., a California corporation and

25 KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

26 "Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

27 LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

28 Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

---

EXHIBIT I
Page 1 of 81

Case 2:24-cv-04169-JLR-MAR   Document 24-2   Filed 03/05/24   Page 118 of 671   Page ID
Case 2:23-cv-03399-JAK-AGR   Document 16-2   Filed 08/24/16   Page 2 of 23   Page ID
#:245

"Defendants") for injunctive relief and damages under the laws of the United States and the State of California as follows:

## JURISDICTION AND VENUE

1.      This action arises under the copyright laws of the United States, 17 U.S.C. § 101 *et seq*., the trademark laws of the United States, 15 U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress infringement and unfair competition.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.      This Court has personal jurisdiction over Defendants, as Defendants are doing business in California and this District and are subject to the jurisdiction of this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout the state of California and this District.  Similarly, defendant Rite Aid has numerous retail stores within the state of California and this District.  In addition, defendants Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade dress, knowing that Kellytoy is a California resident, and thereby purposefully directed their activities towards California.

## NATURE OF THE ACTION

5.      This is an action for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*.; and trade dress infringement, trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), California Bus. & Prof. Code § 17200, *et seq*., and the common law.

6.      Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress, which Kellytoy pioneered and

3222901.1

-2-

EXHIBIT I
Page 2 of 81

Case 2:24-cv-01169-JLS-MAR   Document 24-2   Filed 02/05/24   Page 119 of 671   Page ID
Case 2:23-cv-03399-JAR-NGR   Document 16-2   Filed 08/24/16   Page 3 of 23   Page ID
#:246

1   created.  Kellytoy actively markets its Squishmallows through numerous media

2   outlets, including, without limitation, on social media, at tradeshows, through

3   Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

4   and on Kellytoy's website, depicting images of its proprietary Squishmallows line of

5   plush toys.

6         7.    Now that Kellytoy's Squishmallows have exploded in popularity and

7   have garnered much customer and industry recognition, Kellytoy discovered that

8   defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid two

9   knock-off products for distribution within this state and district that both infringe

10   upon Kellytoy's trade dress and one of which infringes upon Kellytoy's copyrighted

11   design in its Squishmallows.

12         8.    Accordingly, to prevent and remediate the rampant consumer confusion

13   and misappropriation of Kellytoy's copyrighted designs in its Squishmallows

14   resulting from Defendants' unauthorized use, promotion and sale of the Infringing

15   Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks

16   immediate and permanent injunctive relief, compensatory damages, disgorgement of

17   Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable

18   attorneys' fees and expenses, a product recall, and corrective advertising sufficient

19   to address Defendants' wrongdoing.

20         **THE PARTIES**

21         9.    Kellytoy (USA), Inc. is a California corporation with its principal place

22   of business located in Los Angeles, California.

23        10.    Kellytoy Worldwide, Inc. is a California corporation with its principal

24   place of business located in Los Angeles, California.

25        11.    Kellytoy is in the business of developing, manufacturing and selling

26   children's toys including, among other things, plush toys.

27        12.    On information and belief, defendant Dan-Dee International, LTD.

28   ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

3222901.1                    -3-                        EXHIBIT I
                  FIRST AMENDED COMPLAINT               Page 3 of 81
                       119 of 671

Case 2:24-cv-04169-JLS-MAR   Document 24-2   Filed 08/05/24   Page 120 of 671   Page ID
Case 2:23-cv-03399-JAR-NCR   Document 16-2   Filed 08/24/16   Page 4 of 23   Page ID#:159
#:247

13.     Dan-Dee is in the business of manufacturing and selling children's toys including, among other things, plush toys.

14.     On information and belief, defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with a place of business in Pennsylvania and numerous stores in this judicial district.

15.     Rite Aid is in the business of owning and operating drug stores and pharmacies throughout the United States and, on information and belief, this District that sell various merchandise, including plush toys bearing third-party trademarks and under its own private label, RITE STUFF.

16.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

17.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## BACKGROUND FACTS
### Kellytoy and Its Protected Intellectual Property Rights

18.     Kellytoy is engaged in the business of creating, manufacturing, distributing and selling unique plush toys, including, without limitation, its Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,* **Exhibit 1**.)

19.     Kellytoy has been in business for approximately 35 years and in that time has developed a reputation for producing high quality, unique, creative and innovative plush toys that are highly prized in the industry.

20.     Kellytoy exerts great efforts to promote and preserve its image identity

Case 2:24-cv-04169-JLS-MAR Document 24-2 Filed 02/05/24 Page 121 of 671 Page ID
#:248
Case 2:23-cv-05399-JAK-AGR Document 16-2 Filed 08/24/16 Pages of 23 of Page ID #:170

and the image and identity of its high quality plush toys, including by creating

distinctive designs and marks for use on its products and seeking U.S. trademark

and copyright registrations for such designs and marks, including those at issue in

this Complaint.

21.  In 2016, Kellytoy conceived of and began creating its Squishmallows

line of plush toy designs, ultimately marketed in connection with the

SQUISHMALLOW trademark, that share common, unique features that distinguish

them from the goods of others. These designs are wholly original to Kellytoy and

comprise copyrightable subject matter under the laws of the United States.

22.  Kellytoy has been and is the sole owner of all right, title and interest in

and to the copyrights in the individual "characters" in the Squishmallows line and

the distinguishing, unique, and recognizable features that are common across the

Squishmallows line.  From 2016 to the present, Kellytoy has expended large sums

of money in developing, advertising and promoting these product designs through

the United States.  In fact, Kellytoy is spending approximately $50,000 per month in

direct to consumer and business-to-business advertising in connection with its

SQUISHMALLOW branded goods.

23.  Kellytoy sells a broad range of Squishmallows that feature the brand's

iconic trade dress, which is not easily reduced to writing, but includes, without

limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of

animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial

features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light

"marshmallow," memory foam-like texture – as more fully depicted in **Exhibit 1**

hereto – features common to Kellytoy's line of Squishmallows (collectively together

with **Exhibit 1** the "Squishmallow Trade Dress").

24.  The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of

Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which

were created by or assigned to Kellytoy (the "Squishmallow Designs").  As set forth

Case 2:24-cv-04169-JLS-MAR   Document 24-2   Filed 08/05/24   Page 122 of 671   Page ID
Case 2:23-cv-03399-JAK-AGR   Document 16-2   Filed 08/24/16   Page 6 of 23   Page ID
#:249

1  in greater detail below, these Squishmallow Designs are the subject of Copyright

2  Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C.

3  §101 *et seq.*

4      25.    Continuously and without interruption, beginning in 2016, Kellytoy has

5  expended a great deal of time, effort, and money in the promotion of its

6  Squishmallows.  Due to Kellytoy's unique design, extensive marketing efforts,

7  media coverage, and market penetration, the Squishmallow Trade Dress has

8  acquired distinctiveness in the marketplace when applied to plush toys.  Indeed,

9  because of Kellytoy's extensive promotional activities and widespread display of its

10  Squishmallows directed to the public, and a consequence of Kellytoy's fair and

11  honorable dealings with its customers, the relevant consuming public has come to

12  recognize and associate plush toys bearing the Squishmallow Trade Dress as high

13  quality goods connected with or offered by a single source, Kellytoy.  The

14  Squishmallow Trade Dress has valuable goodwill and consumer recognition

15  associated with it and has come to symbolize the valuable goodwill and reputation

16  of Kellytoy.

17      26.    In addition to being original and inherently distinctive, the

18  Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet

19  search using the Google search engine yields about 140,000 "hits" for the search

20  term "Squishmallows."

21      27.    In addition to marketing and selling them through thousands of retail

22  stores nationwide, Kellytoy markets and sells its Squishmallows on its website

23  <squishmallows.com> featuring dozens of copyright-protected photographs of its

24  plush toys and models holding its Squishmallows. Copies of the homepage and

25  other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

26      28.    Further adding to their recognizability and secondary meaning in the

27  marketplace, Squishmallows have been featured in numerous magazines, press

28  articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto,

1  including many mainstream media outlets such as the *Washington Post*, the *Chicago*
2  *Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example
3  only, Squishmallows have been also recognized by The *Washington Post* and
4  *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized
5  Squishmallows in its October 2017 issue, under the "Products We Love" section;
6  and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21,
7  2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows
8  and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."



22      29.     Kellytoy's Squishmallows have also been featured in the October 2017
23  issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family*
24  *Magazine* and included in the 2017 gift guides for various publications, including in
25  *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.
26      30.     Kellytoy's Squishmallows have also been the subject of numerous
27  industry awards and product recommendation lists, including by the National
28  Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in

1   **Exhibit 4**.  In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of

2   the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book*

3   *Magazine*, and have been featured in numerous other trade magazines, such as,

4   *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

5     31. Kellytoy's Squishmallows have also been the subject of extensive

6   marketing campaigns, including email campaigns, social media posts, and direct to

7   consumer advertising.  Kellytoy's Squishmallows currently have nearly 21,000

8   Instagram followers, more than 30,000 Facebook followers – more than many

9   longer-existing and well-known plush brands.  To its followers, Kellytoy regularly

10   publishes photographs of its Squishmallows.  Many of these followers, in turn, share

11   these posts with their friends and social media followers.  A copy of Squishmallows

12   Instagram page is attached as **Exhibit 5**.

13     32. In addition, hundreds of well-known YouTube influencers and vloggers

14   have shared and posted images and videos of themselves holding plush toys in

15   Kellytoy's line of Squishmallows products. Tens of thousands of consumers have

16   done the same through numerous media platforms, including, Facebook, Instagram,

17   Pinterest and YouTube. These posts have generated millions of "likes" and "shares."

18     33. Fans have been extremely engaged on social media, including

19   Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's

20   Squishmallows, with the average Squishmallows post likes on Instagram hovering

21   over 1000+ per post and 45-100 average comments per post.

22     34. Kellytoy's Squishmallow website traffic has grown exponentially since

23   its launch in 2017 to an average of 4,313 visits per day.

24     35. Kellytoy's Squishmallows are listed amongst the leading global brands

25   and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by

26   several industry publications.

27     36. As a direct result of Kellytoy's efforts at promoting and building its

28   brand, Kellytoy's Squishmallows line has exploded in popularity, creating

Case 2:24-cv-04169-JLR-MAR   Document 24-2   Filed 02/05/24   Page 125 of 671   Page ID
Case 2:23-cv-03399-JAR-NCR   Document 16-2   Filed 08/24/16   Page 9 of 23   Page ID #:14
#:252

1   substantial demand for and interest in Squishmallows, and generating enormous

2   goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the

3   United States and around the world.  In fact, Kellytoy's Squishmallows are sold

4   through hundreds of retailers including some of the largest retailers in the country,

5   including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500

6   Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target

7   stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts

8   Berry Farms and numerous others.

9   37.   Since the summer of 2017, Kellytoy has sold a whopping 11 million

10   (11,000,000) units of Squishmallows with no indication that sales will be slowing

11   down anytime soon.  Kellytoy's Squishmallows products embodying the

12   Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the

13   U.S. over the past year.

14   38.   In fact, Kellytoy's Squishmallows sold out through Walgreens.com

15   during their Gift of the Week promotion in early November 2017, as well as

16   exceeding all sales goals for the campaign, both online and in stores.

17   39.   Because of Squishmallows' massive success and popularity, consumers

18   have come to associate Kellytoy's high-quality Squishmallows plush toys with the

19   Squishmallows Trade Dress and, conversely, have come to recognize the

20   Squishmallow Trade Dress as a designation of source.

21   **Defendants' Unlawful Conduct**

22   40.   At the outset, none of the defendants to this action is licensed or

23   otherwise authorized by Kellytoy to market or distribute products bearing or

24   embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

25   41.   Upon information and belief, sometime in spring of 2018, notably well

26   after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant

27   Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell

28   and supply to Rite Aid various plush toys bearing substantially similar copies of

Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter referred to as "Infringing Plush") for distribution by Rite Aid through its United States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's trademarks are collectively attached hereto as **Exhibit 6**.

42.     Upon information and belief, Dan-Dee offered to sell the Infringing Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43.     Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush.

44.     Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because Dan-Dee has, rather than investing in creating its own designs and identity, copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45.     In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46.     Kellytoy is informed and believes that Defendants, without Kellytoy's

Case 2:24-cv-01169-JLS-MAR Document 21-2 Filed 03/05/24 Page 127 of 671 Page ID
Case 2:18-cv-08393-JAK-AGR Document 16-1 Filed 08/24/18 Page 11 of 23 Page ID #:176
#:254

consent or permission, intend to sell, advertise, promote, display, and distribute, toys
bearing Squishmallow Designs and Squishmallow Trade Dress in United States
commerce.

47.    The activities of Defendants in copying, distributing, advertising,
selling, offering for sale and otherwise using the Squishmallow Trade Dress
embodied in the Infringing Plush – including by wholesalely copying the shape and
look – constitute false designation of origin regarding sponsorship of those plush
toys and falsely represent to the public that Defendants' plush toys originate from
Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or
licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such
activities of Defendants are likely to confuse, mislead, and deceive Defendants'
customers, purchasers, and members of the public as to the origin of the toys bearing
the Squishmallow Trade Dress, or to cause such persons to believe that Defendants'
Infringing Plush and/or Defendants have been sponsored, approved, authorized, or
licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in
violation of 15 U.S.C. §1125(a).

48.    Upon information and belief, the activities of Defendants were done
willfully with full knowledge of the falsity of such designations of origin and false
descriptions or representations, with the intent to trade on the enormous goodwill
Kellytoy has earned in its Squishmallows, and with the intent to cause confusion,
and to mislead and deceive the purchasing public into believing that the products
Defendants sell are directly sponsored by, authorized, by, associated with, or
originate from Kellytoy.

49.    As further evidence of Dan-Dee's intent to trade upon Kellytoy's
goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed
one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very
different plush toys for use in connection with the Infringing Plush.

50.    Defendants, by their unauthorized copying and use of Kellytoy's

Squishmallow Designs and Squishmallow Trade Dress, have engaged and will engage in acts of copyright infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works.  Defendants activities will damage the reputation, business and good will of Kellytoy nationally and in this judicial district.

51.     Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

52.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

### **(Federal Copyright Infringement -- 17 U.S.C. §501)**

(Against all Defendants)

53.     Kellytoy repeats and realleges each and every allegation above as though fully set forth herein.

54.     Kellytoy owns a valid copyright in the Squishmallow Designs. The Squishmallow Designs are original, decorative, and non-functional.  After having had access to Kellytoy's Squishmallow Designs, Defendants, without authorization from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a design that Defendants copied from the Squishmallow Designs.

55.     All of the Squishmallow Designs were originally created by Kellytoy or were assigned to and are owned by Kellytoy.

56.     The Squishmallow Designs comprise original works of authorship that may be copyrighted under United States law.  In fact, Kellytoy has complied with requirements of Title 17 of the United States Code with respect to the registration of

Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by United States Copyright Registration Nos. VA0002096020 and VA0002093075, entitling Kellytoy to the exclusive rights and privileges in and to the above-referenced copyrights.  These copyright registrations are valid and subsisting.

57.     Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.     Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106.  Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.     Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.     On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.     On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law.  Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur.  Accordingly, Kellytoy is entitled to preliminary and permanent injunctions

restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

**SECOND CAUSE OF ACTION**

**(Trademark Infringement, False Designation of Origin and False Description -- 15 U.S.C. §1125)**

(Against All Defendants)

63.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 52 above as if fully set forth herein.

64.     The Squishmallow Trade Dress is non-functional and highly distinctive, and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

65.     Kellytoy owns all right, title and interest in and to the Squishmallow Trade Dress.

66.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will soon commence importation, distribution, advertising, offers for sale, and sale of replicas of the Squishmallow Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

67.     The Infringing Plush designs are confusingly similar to the Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

68.     Defendants' use and further threatened uses of the Squishmallow Trade Dress thus constitutes trade dress infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

69.     As a direct and proximate result of Defendants' unlawful conduct,

Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

70. Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court. Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products.

71. Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

### THIRD CAUSE OF ACTION

### (Common Law Trademark Infringement)

(Against all Defendants)

72. Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

73. Defendants have violated Kellytoy's exclusive common law rights in the Squishmallow Trade Dress.

74. Kellytoy has continuously used its Squishmallow Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin. As such, Kellytoy has common law rights to the Squishmallow Trade Dress.

75.  Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

**<u>FOURTH CAUSE OF ACTION</u>**

**(California Common Law Unfair Competition)**

(Against all Defendants)

76.  Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77.  This claim arises under the common law of the State of California relating to unfair competition.

78.  Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress.  Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79.  Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy.  Defendants have thus committed unfair competition under the common law of the State of California.

80.  By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81.  Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

82.  Kellytoy has no adequate remedy at law.  Thus said activities of

1  Defendants have caused, if not enjoined, will continue to cause irreparable harm and

2  damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business

3  reputation and good will.

4         83.     Upon information and belief, Defendants have engaged in their

5  unlawful conduct alleged herein intentionally, maliciously, fraudulently and

6  oppressively entitling Kellytoy to punitive damages in an amount to be determined

7  at trial.

8  **<u>FIFTH CAUSE OF ACTION</u>**

9  **(California Statutory Unfair Competition –**

10  **California Bus. & Prof. Code § 17200, *et seq*.)**

11  (Against all Defendants)

12         84.     Kellytoy repeats and re-alleges each and every allegation of paragraphs

13  1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set

14  forth herein.

15         85.     By reason of the foregoing, Defendants have been, and are, engaged in

16  "unlawful, unfair or fraudulent business practices" in violation of California

17  Business and Professional Code Section 17200 *et seq*.

18         86.     Said activities of Defendants have caused and, if not enjoined, will

19  continue to cause irreparable harm and damage to the rights of Kellytoy in its

20  Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy

21  has no adequate remedy at law for these wrongs and injuries.  The damage to

22  Kellytoy includes harm to its goodwill and reputation in the marketplace that money

23  cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and

24  permanent injunction restraining and enjoining Defendants' and their agents,

25  servants, and employees, and all persons acting thereunder, in concert with, or on

26  their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable

27  imitation or variation thereof, in connection with the sale and/or marketing of any

28  products.  Kellytoy is further entitled to restitutionary disgorgement of all of

1   Defendants' ill-gotten gains pursuant to California Business and Professions Code §

2   17203 and to recover its costs and attorneys' fees incurred in bringing and

3   prosecuting this action.

4

5   <div align="center">**PRAYER FOR RELIEF**</div>

6       WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

7       1.      That Defendants, their officers, members, directors, agents, servants,

8   employees, successors, licensees, representatives, successors, assigns, and all

9   persons acting in concert or participation with them, be permanently enjoined and

10  restrained from:

11          (i) Manufacturing, importing, distributing, advertising, offering to

12              sell or selling the Infringing Plush or any colorable imitations of

13              the Squishmallow Designs and/or Squishmallow Trade Dress;

14          (ii)  Using the Squishmallow Trade Dress or any confusingly

15              similar trade dress in connection with plush or other toys;

16          (iii) Using the Squishmallow Trade Dress, or any confusingly

17              similar mark, in connection with the advertisement, offer to sell

18              or sale of any toy products;

19          (iv) Using any false designation of origin, or representing or

20              suggesting directly or by implication that Defendants, or any

21              brands or other sources identifiers created by Defendants, or

22              their toys, are affiliated with, associated with, authorized by, or

23              otherwise connected to Kellytoy, or that Defendants are

24              authorized by Kellytoy to use the Squishmallow Trade Dress or

25              Squishmallow Designs;

26          (v)  Copying, distributing, displaying or making derivative works of

27              the Squishmallow Designs;

28          (vi) Engaging in any other activity constituting unfair competition

Case 2:24-cv-01169-JLS-MAR Document 21-2 Filed 03/05/24 Page 135 of 671 Page ID
Case 2:18-cv-08590-JAK-AGR Document 1-1 Filed 08/24/18 Page 19 of 23 Page ID #:194
#:262

1      with Kellytoy, or constituting infringement of the

2      Squishmallow Trade Dress or Squishmallow Designs; and

3   (vii) Assisting, aiding, or abetting any other person or business entity

4      in engaging or performing any of the activities referred to in

5      subparagraphs (i) through (vi) above, or effecting any

6      assignments or transfers, forming new entities or associations,

7      or utilizing any other device for the purpose of circumventing

8      or otherwise avoiding the prohibitions set forth in

9      subparagraphs (i) through (vi) above.

10    2.    That Defendants be directed to file with the Court and serve on

11 Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing

12 under oath setting forth in detail the manner and form in which Defendants have

13 complied with the injunction.

14    3.    That the Court direct any third parties providing services to

15 Defendants in connection with any infringing and/or enjoined conduct, including

16 social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces

17 (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment

18 providers, including credit card companies (*e.g.*, PayPal, Visa) and other service

19 providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services

20 to Defendants in connection with the offer for sale and sale of the Infringing Plush

21 or any other products using or embodying the Squishmallow Trade Dress or

22 Squishmallow Designs.

23    4.    That Defendants be required to pay Kellytoy such damages as it has

24 sustained as a consequence of Defendants' infringement of the of the Squishmallow

25 Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

26    5.    Adjudge that each of the Defendants, by its unauthorized use of

27 Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it

28 may have undertaken relating to the Squishmallow Trade Dress, have violated

3222901.1           -19-
FIRST AMENDED COMPLAINT
135 of 671        EXHIBIT I
Page 19 of 81

Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq*.), and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade Dress;

6.   Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the Squishmallow Designs and/or Squishmallow Trade Dress in the United States on Defendants' behalf and inform them that they must immediately cease such use;

7.   Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity under the Squishmallow Trade Dress or Squishmallow Designs;

8.   Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, and all plates, molds, matrices, programs and other means of making same;

9.   Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of Defendants' products that infringe Kellytoy's copyrights in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

10.   Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction of all copies of Defendants' products that infringe Kellytoy's copyright in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other articles by means of which copies of the works embodied in the Squishmallow

1    Designs may be produced;

2        11.      That each Defendant provide Kellytoy in writing with the following

3 information relating to Defendants' goods marketed, advertised, offered for sale, or

4 sold under the Squishmallow Trade Dress or Squishmallow Designs:

5        (i)      the name, address and telephone number of each and every United

6                States entity to whom Defendants have made available or otherwise

7                provided any such products; and

8        (ii)     a full accounting as to the precise dollar amount of such products made

9                available or provided and the profits recognized by Defendants in

10               connection with such actions;

11        12.      Direct Defendants to pay the costs of corrective advertising;

12        13.      Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred

13 in initiating and prosecuting this action;

14        14.      Direct Defendants to pay punitive damages and exemplary damages

15 according to proof;

16        15.      That Kellytoy recover its actual damages, Kellytoy's lost profits, and

17 Defendant's profits arising from Defendants' conduct complained-of herein;

18        16.      That the Court award enhanced profits and treble damages;

19        17.      That Kellytoy be awarded statutory damages;

20        18.      That Kellytoy be awarded interest, including pre-judgment

21 interest, on the foregoing sums;

22        19.      That the Court direct such other actions as the Court may deem just and

23 proper to prevent the public from deriving the mistaken impression that any

24 products or services offered, advertised, or promoted by or on behalf of Defendants

25 are authorized by Kellytoy or related in any way to Kellytoy's products or services;

26        20.      That Defendants be ordered to disgorge all of their ill-gotten gains

27 pursuant to California Business and Professions Code § 17203; and

28

21.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated:  August 24, 2018          WOLF, RIFKIN, SHAPIRO,
                                 SCHULMAN & RABKIN, LLP


By: _____/s/ Mark B. Mizrahi_____
     MARK B. MIZRAHI
     MAX N. WELLMAN
Attorneys for Plaintiffs
KELLYTOY (USA), INC. and
KELLYTOY WORLDWIDE, INC.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand and request a trial by jury of all issues raised that are triable by jury.

Respectfully submitted,

Dated:  August 24, 2018                    WOLF, RIFKIN, SHAPIRO,
                                           SCHULMAN & RABKIN, LLP


By:      /s/ Mark B. Mizrahi
            MARK B. MIZRAHI
            MAX N. WELLMAN
         Attorneys for Plaintiffs
         KELLYTOY (USA), INC. and
         KELLYTOY WORLDWIDE, INC.

Case 2:24-cv-01169-JLS-MAR   Document 39-2   Filed 02/07/24   Page 140 of 671   Page ID
#:267
Case 2:19-cv-05399-JAK-AGR   Document 39-2   Filed 02/07/19   Page 1 of 10   Page ID#:42

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE DEFENDANTS' MOTION TO DISMISS
(DKT. 24)**

## I.    Introduction

On June 15, 2018, Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc. (collectively, "Kellytoy" or "Plaintiffs") brought this action against Dan-Dee International, Ltd. ("Dan-Dee"), Rite Aid Corporation ("Rite Aid") (collectively, "Defendants") and Does 1-10. Dkt. 1. Kellytoy filed an amended complaint on August 24, 2018 ("FAC" (Dkt. 16)). The FAC presents five causes of action: (i) federal copyright infringement; (ii) federal trademark / trade dress infringement; (iii) common law trademark / trade dress infringement; (iv) California common law unfair competition; and (v) California statutory unfair competition.

On September 7, 2018, Defendants filed a motion to dismiss the FAC ("Motion" (Dkt. 24)). Plaintiffs filed an opposition, and Defendants filed a reply. Dkts. 32, 34. A hearing was held on the Motion on January 28, 2019, and the matter was taken under submission. Dkt. 37.

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART.**

## II.    Factual Background

### A.    Parties

Kellytoy develops, manufactures and sells children's toys, including a line of plush toys that are marketed and sold under the SQUISHMALLOW brand ("Squishmallows"). FAC ¶¶ 6, 11, 18. Dan-Dee also manufactures and sells children's toys, including plush toys. *Id.* ¶ 13. Rite Aid sells merchandise at its retail stores, including plush toys bearing third-party trademarks and under its own label, RITE STUFF. *Id.* ¶ 15. Dan-Dee has produced and sold to Rite Aid certain plush toys that allegedly infringe Kellytoy's intellectual property rights. *Id.* ¶¶ 7, 41, 42.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | LA CV18-05399 JAK (AGRx) | | Date | February 7, 2019 |
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | | |

B.      Trade Dress Infringement Allegations

1.      <u>Squishmallow Trade Dress</u>

Kellytoy began developing its Squishmallows line of plush toy designs in 2016. *Id.* ¶ 21. Since that time, it has made substantial financial investments to develop, advertise and promote these product designs throughout the United States. *Id.* ¶ 22. The FAC alleges that "[d]ue to Kellytoy's unique design, extensive marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys," and "the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy." *Id.* ¶ 25. The FAC alleges that "[t]he Squishmallow Trade Dress is non-functional." *Id.* ¶ 64.

The FAC alleges that the Squishmallow trade dress includes the following non-exhaustive list of features:

> (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

*Id.* ¶ 23. It is also alleged that the Squishmallow trade dress is "more fully depicted" in the images attached to the FAC and reproduced below. *Id.*; Ex. 1 to FAC.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

**Squishmallow Designs**



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

2.   <u>Allegedly Infringing Product</u>

In spring 2018, Dan-Dee entered an agreement with Rite Aid, which called for the production and sale of various plush toys that would be distributed in Rite Aid stores in the United States. FAC ¶ 41. The FAC alleges that these plush toys feature "substantially similar" designs to the Squishmallows. *Id.* The FAC further alleges that, because Dan-Dee's plush toys are of lesser quality than the Squishmallows, they are sold at lower prices. *Id.* ¶ 44.

In 2017, Kellytoy met with representatives of Rite Aid, and showed the Rite Aid representatives its Squishmallows line of products. *Id.* 45. The FAC states that "Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof." *Id.* The FAC also alleges that "Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush." *Id.* ¶ 49. It is alleged that the designs of Dan-Dee's plush toys "are confusingly similar to the Squishmallow Trade Dress." *Id.* ¶ 67. Photographs of Dan-Dee's plush toys are attached to the FAC and reproduced below. *Id.* ¶ 41; Ex. 6 to FAC.

 

C.   Allegations as to Copyright Infringement

Kellytoy holds copyrights in the Squishmallow designs. FAC ¶¶ 24, 54. The unicorn Squishmallow design is registered with the U.S. Copyright Office under registration numbers VA0002096020 and VA0002093075. *Id.* ¶ 56. The FAC alleges that the Squishmallow designs are original works, each of which was created by or assigned to Kellytoy. *Id.* ¶¶ 54-56.

The FAC alleges that Defendants had access to the Squishmallow designs prior to Defendants' development and distribution of their unicorn plush toy. *Id.* ¶ 54. The FAC further alleges that Defendants copied the design from the Squishmallow unicorn to create their competing product. *Id.* It is alleged that Defendants infringed Kellytoy's exclusive rights to the Squishmallow unicorn design in connection with Defendants' production, promotion and sale of a similar unicorn plush toy. *Id.* ¶¶ 57-58. A photograph of Dan-Dee's unicorn plush toy is attached to the FAC and reproduced below, next to images of the Squishmallow unicorns. *Id.* ¶ 57; Ex. 7 to FAC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

 

### III.   Request for Judicial Notice

Defendants request judicial notice of three documents in connection with the Motion ("Request" (Dkt. 24-1)). Each document is a printout of a portion of a publicly available website that features images of third-party products. Exhibit A is a printout from the website Instagram.com. Exhibits B and C are printouts accessed from archive.org, or the "Wayback Machine." Pursuant to Fed. R. Evid. 201, a court may take judicial notice of facts that are either (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Defendants seek judicial notice "of the existence of the three third party products discussed in their motion to dismiss, namely Pusheen, Sumikko Gurashi, and Squishable Pig." Dkt. 24-1 at 2. It appears that Defendants also seek judicial notice of the fact that each third-party product "existed and w[as] public[ly] available at least as early as the dates shown" on the corresponding printout. *Id.* Plaintiffs object to the Request on three grounds: (i) the documents have not been authenticated; (ii) they do not come from a reliable source; and (iii) they are irrelevant to the issues presented by the Motion. Dkt. 33.

The facts for which Defendants seek judicial notice are not generally known within this jurisdiction. In addition, there are sufficient concerns as to the authenticity of the documents that contain the information at issue. Moreover, the facts as to which the Request has been made are not material to the resolution of the Motion. For these reasons, the Request is **DENIED.**

### IV.   Analysis

#### A.   Legal Standards

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility

Case 2:24-cv-01169-JLR-MAR   Document 31-2   Filed 03/05/24   Page 145 of 671   Page ID
Case 2:23-cv-05399-JAK-AGR   Document 39-2   Filed 02/07/19   Page 31 of 50   Page ID
#:272

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a plaintiff pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim. Such a motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations of the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

     B.    Application

          1.    <u>Copyright Infringement</u>

              a)    Legal Standards

To establish copyright infringement, a plaintiff must show (i) "ownership of a valid copyright," and (ii) "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). The Ninth Circuit has recently clarified that the second element of copyright infringement involves two distinct components: "copying" and "unlawful appropriation." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018) (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164-65 (9th Cir. 1977)). Proof of copying is required because "independent creation is a complete defense to copyright infringement." *Id.* (citing *Feist*, 499 U.S. at 345-46). Proof of unlawful appropriation is required because certain copying – including the reproduction of "ideas" or "concepts" used in the plaintiff's work – is not prohibited by the Copyright Act. *Id.* (citing 17 U.S.C. § 102(b)).

The proof of copying and unlawful appropriation "involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)). Infringement may also be established by demonstrating that the alleged infringers violated any of the exclusive rights granted to copyright holders under 17 U.S.C. § 106. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007).

Case 2:24-cv-01169-JAK-MAR   Document 31-2   Filed 03/05/24   Page 146 of 671   Page ID
#:273
Case 2:18-cv-05399-JAK-AGR   Document 39-2   Filed 02/07/19   Page 31 of 40   Page ID #:418

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | | Date | February 7, 2019 |
|---|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | | |

The Ninth Circuit uses "a two-part test to determine whether two works are substantially similar: an extrinsic test and an intrinsic test." *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 637 (9th Cir. 2008). The history of the application of the substantial similarity tests has been described as follows:

> As originally adopted in [*Krofft*], the extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.

*Id.* (citations omitted). "The intrinsic test is left to the trier of fact." *Benay v. Warner Bros. Entm't,* 607 F.3d 620, 624 (9th Cir. 2010).

> b)   Application

The FAC alleges that Kellytoy holds registered copyrights in the Squishmallow unicorn designs. Registration of a copyright is prima facie evidence of the validity of the copyright. *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002); 17 U.S.C. § 410(c). The FAC also alleges that Defendants had access to the Squishmallow designs before Defendants' developed and distributed their unicorn plush toy. It further alleges that Defendants copied the design for their unicorn plush toy from the Squishmallow unicorn. The FAC also includes images of the Squishmallow unicorns and of the Dan-Dee unicorn plush toy.

Defendants argue that these allegations are insufficient to state a claim for copyright infringement. They contend that Kellytoy was required, but failed to identify the specific similarit(ies) between the parties' works. Defendants also argue that Kellytoy alleges copyright infringement as to an unprotectable idea, not as to a protectable expression. Defendants assert that, at most, Kellytoy would be entitled to "thin" copyright protection for the Squishmallow unicorn. However, Defendants argue that the Kellytoy and Dan-Dee designs are not "virtually identical" as required under that standard.

Kellytoy is not entitled to copyright protection for the idea of a unicorn plush toy "or to elements of expression that necessarily follow from the idea of such dolls," such as "any similarity in expression resulting from either the [imagined] physiognomy of [unicorns] or from the nature of stuffed animals." *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir. 1987). However, Kellytoy states that it does not claim protection for those ideas, but rather the particular expression of those ideas in the Squishmallow unicorn design. As shown by the photographs, the Squishmallow unicorn does not bear a strong resemblance to a "realistic" representation of a unicorn. Rather, it is an artistic interpretation of a unicorn character, the design of which required using creativity that resulted in variations from the traditional image of a unicorn. Accordingly, the Squishmallow unicorn design contains expressive elements that extend beyond pure protected ideas. Further, in light of the allegations of complete copying by Defendants and the inclusion of images of both parties' designs in the FAC, it is not necessary that the FAC identify with particularity each alleged similarity between the works at the pleading stage.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

Construing the allegations in the light most favorable to Kellytoy, the FAC states a plausible claim for copyright infringement. The FAC presents allegations that, if assumed to be true, would be sufficient to establish all of the following: (i) ownership of a valid copyright; (ii) copying; and (iii) unlawful appropriation. For the foregoing reasons, the Motion is **DENIED** as to the copyright cause of action.[1]

        2.    Trademark Infringement

        a)    Legal Standards

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir. 1993)). To prove trade dress infringement, "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Entm't Inc.,* 581 F.3d 1138, 1145 (9th Cir. 2009) (citing *Disc Golf Ass'n v. Champion Discs,* 158 F.3d 1002, 1005 (9th Cir. 1998)).

Under the traditional definition of functionality, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Moldex-Metric, Inc. v. McKeon Prod., Inc.,* 891 F.3d 878, 881 (9th Cir. 2018) (citations omitted). The "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Id.* at 881-82. "[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that [courts] focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards,* 251 F.3d at 1259.

The Ninth Circuit has identified four factors as significant in assessing functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantage of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir. 1998). In addition to these four factors, courts inquire "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1072 (9th Cir. 2006).

The Ninth Circuit has described the framework for functionality as a two-part test. *See Millennium Labs., Inc. v. Ameritox, Ltd.,* 817 F.3d 1123, 1128-29 (9th Cir. 2015) ("[T]he test for functionality proceeds in two steps.") (quoting *Au-Tomotive Gold,* 457 F.3d at 1072). At "Step One," courts apply the *Disc Golf* factors to determine whether the asserted trade dress is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Id.* at 1129; *see also TrafFix Devices, Inc. v. Marketing*

---

[1] This is not a final determination as to the validity or scope of the claimed copyrights, or whether the Dan-Dee design is infringing. These issues concern fact-based matters that were not presented through the Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

*Displays, Inc.*, 532 U.S. 23, 32-33 (2001). "If the claimed trade dress is determined to be functional under Step One, then 'the inquiry is over.'" *Millennium Labs.*, 817 F.3d at 1129 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072). If not, the analysis proceeds to "Step Two," which addresses whether trade dress protection would impose a significant non-reputation-related competitive advantage. *Id.*

    b)  Application

Defendants argue that Kellytoy's claimed trade dress is described insufficiently through vague allegations in the FAC. Consequently, they contend that the allegations are not sufficient to provide notice of the claim. They assert that the description in the FAC is "so vague that the alleged trade dress covers nearly the entire market for anime-inspired plush toys." Dkt. 34 at 3. Defendants further argue that, because the claimed trade dress is functional, it is not eligible for trade dress protection. Defendants acknowledge that the FAC contains a conclusory pleading of non-functionality, but contend that is inadequate under the applicable standards absent more specific factual allegations.

Kellytoy responds that the written description of its trade dress in the FAC must be read in light of the attached images, and that together they provide a sufficient description. Kellytoy adds that it is not required to plead non-functionality of its claimed trade dress, although it claims to have done so.

Kellytoy is correct that "pictures of a product combined with a list of the elements of the trade dress" can be sufficient to put defendants on notice as to the claimed trade dress. *See* Dkt. 32 at 19 n.4. However, the mere presence of pictures and a written list is not *per se* sufficient, and must be evaluated on a case-by-case basis. The written description of the claimed trade dress in the FAC does not provide sufficient specificity as to the nature and scope of Kellytoy's claim. It states that the claimed trade dress

    includes, without limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

FAC ¶ 23.

This general description offers little insight into the scope or nature of Kellytoy's claim. In addition, the written description in the FAC can reasonably be construed as substantially broader than the trade dress protection Kellytoy actually seeks. It is also too broad to form the basis of a plausible claim for trade dress infringement.

Kellytoy argues that any ambiguities in its written description are "answered by reference to the images of the products at issue." Dkt. 32 at 19. However, in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

There has been no showing that any amendment to the Complaint would be futile. In light of the well accepted principle that leave to amend should be freely given, it is appropriate to do so here. This outcome is confirmed by the representations in the Opposition to the Motion and at the hearing that Kellytoy can provide a more detailed statement in support of its trade dress allegations. *See id.* at 26-27.

For the foregoing reasons, the Motion is **GRANTED** without prejudice as to the federal trademark infringement causes of action.

           3.      Remaining Causes of Action

Defendants assert that the third, fourth and fifth causes of action are derivative of the federal trademark causes of action and should be dismissed for the same reasons. Kellytoy did not respond to this argument in its brief or at the hearing.

The third, fourth and fifth causes of action arise from the same underlying allegations of trade dress infringement. Therefore, a parallel analysis to what has been stated above applies to these causes of action. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). Therefore, the Motion is **GRANTED** without prejudice as to the third, fourth and fifth causes of action.

**V.**    **Conclusion**

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to the first cause of action. The Motion is **GRANTED** as to the second through fifth causes of action. Any amended complaint shall be filed no later than February 21, 2019.

**IT IS SO ORDERED.**

                                         _____ : _____

Initials of Preparer   ak

Case 2:24-cv-01169-JLS-MAR   Document 24-2   Filed 03/05/24   Page 150 of 671   Page ID
#:277
Case 2:18-cv-05399-JAK-AGR   Document 46-2   Filed 03/05/19   Page 34 of 81   Page ID #:493

1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  MARK B. MIZRAHI (BAR NO. 179384)
   mark.mizrahi@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1900
4  Los Angeles, California 90067
   Telephone:  (310) 255-6100
5  Facsimile:  (310) 255-6200

6  *Attorneys for Plaintiffs Kellytoy (USA),*
   *Inc. and Kellytoy Worldwide, Inc.*
7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11 | KELLYTOY (USA), INC., a California corporation; and KELLYTOY WORLDWIDE, INC., a California corporation; | Case No.  2:18-cv-05399 JAK (AGRx) |

12

13                                         **SECOND AMENDED COMPLAINT
                                           FOR:**

               Plaintiffs,                 1.  **FEDERAL COPYRIGHT
14                                             INFRINGEMENT (17 U.S.C.
                                               § 501);**
       vs.                                 2.  **FEDERAL TRADEMARK
15                                             INFRINGEMENT, FALSE
                                               DESIGNATION OF ORIGIN
16 DAN-DEE INTERNATIONAL, LTD.,               AND FALSE DESCRIPTION
   a Delaware corporation; RITE AID           (15 U.S.C. § 1125);**
17 CORPORATION, a Delaware               3.  **COMMON LAW TRADEMARK
   corporation, and DOES 1 through 10,        INFRINGEMENT;**
   inclusive,                            4.  **CALIFORNIA COMMON LAW
18                                             UNFAIR COMPETITION; AND**
               Defendants.               5.  **CALIFORNIA STATUTORY
19                                             UNFAIR COMPETITION.**
20
                                           **DEMAND FOR JURY TRIAL**
21
22

23

24         Plaintiffs KELLYTOY (USA), INC., a California corporation and

25 KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

26 "Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

27 LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

28 Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

EXHIBIT I
Page 34 of 81

Case 2:24-cv-04169-JLS-MAR   Document 24-2   Filed 03/05/24   Page 151 of 671   Page ID
#:278
Case 2:23-cv-03399-JAR-NGR   Document 46-2   Filed 03/05/24   Page 2 of 37   Page ID #:436

"Defendants") for injunctive relief and damages under the laws of the United States and the State of California as follows:

## **JURISDICTION AND VENUE**

1.     This action arises under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*, the trademark laws of the United States, 15 U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress infringement and unfair competition.

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

3.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.     This Court has personal jurisdiction over Defendants, as Defendants are doing business in California and this District and are subject to the jurisdiction of this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout the state of California and this District.  Similarly, defendant Rite Aid has numerous retail stores within the state of California and this District.  In addition, defendants Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade dress, knowing that Kellytoy is a California resident, and thereby purposefully directed their activities towards California.

## **NATURE OF THE ACTION**

5.     This is an action for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*; and trade dress infringement, trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), California Bus. & Prof. Code § 17200, *et seq.*, and the common law.

6.     Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress, which Kellytoy pioneered and

-2-

SECOND AMENDED COMPLAINT

EXHIBIT I
Page 35 of 81

1  created.  Kellytoy actively markets its Squishmallows through numerous media

2  outlets, including, without limitation, on social media, at tradeshows, through

3  Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

4  and on Kellytoy's website, depicting images of its proprietary Squishmallows line of

5  plush toys.

6       7.    The explosion in popularity of Kellytoy's Squishmallows and  the

7  resulting and widespread customer and industry recognition, has unfortunately led to

8  illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that

9  defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid, which

10  Rite Aid has re-sold, numerous units of two knock-off products for distribution

11  within this state and district that both infringe upon Kellytoy's trade dress and one

12  of which infringes upon Kellytoy's copyrighted design in its Squishmallows.

13       8.    Accordingly, to prevent and remediate the rampant consumer confusion

14  and misappropriation of Kellytoy's copyrighted designs in its Squishmallows

15  resulting from Defendants' unauthorized use, promotion and sale of the Infringing

16  Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks

17  immediate and permanent injunctive relief, compensatory damages, disgorgement of

18  Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable

19  attorneys' fees and expenses, a product recall, and corrective advertising sufficient

20  to address Defendants' wrongdoing.

21               **THE PARTIES**

22       9.    Kellytoy (USA), Inc. is a California corporation with its principal place

23  of business located in Los Angeles, California.

24

25       10.    Kellytoy Worldwide, Inc. is a California corporation with its principal

26  place of business located in Los Angeles, California.

27       11.    Kellytoy is in the business of developing, manufacturing and selling

28  children's toys including, among other things, plush toys.

EXHIBIT I
Page 36 of 81

Case 2:24-cv-01169-JLR-MAR   Document 21-2   Filed 03/05/24   Page 153 of 671   Page ID
#:280
Case 2:23-cv-03399-JAR-NCR   Document 46-2   Filed 03/05/24   Page 94 of 57   Page ID #:458

12.     On information and belief, defendant Dan-Dee International, LTD. ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

13.     Dan-Dee is in the business of manufacturing and selling children's toys including, among other things, plush toys.

14.     On information and belief, defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with a place of business in Pennsylvania and numerous stores in this judicial district.

15.     Rite Aid owns and operates drug stores and pharmacies throughout the United States and, on information and belief, this District that sell various merchandise, including plush toys bearing third-party trademarks and under its own private label, RITE STUFF.

16.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

17.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## **BACKGROUND FACTS**
### **Kellytoy and Its Protected Intellectual Property Rights**

18.     Kellytoy is an innovative and highly successful creator, manufacturer, distributor and seller of unique plush toys, including, without limitation, its Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,* **Exhibit 1**.)

19.     Kellytoy has been in business for approximately 35 years and in that time has developed a reputation for producing high quality, unique, creative and

-4-

EXHIBIT I
Page 37 of 81

Case 2:24-cv-04169-JLS-MAR   Document 21-2   Filed 03/05/24   Page 154 of 671   Page ID
#:281
Case 2:23-cv-05339-JAR-AGR   Document 46-2   Filed 03/05/24   Page 37 of 57   Page ID #:459

1  innovative plush toys that are highly prized in the industry.

2       20.    Kellytoy devotes extensive time and resources  promoting and

3  preserving its image identity and the image and identity of its high quality plush

4  toys, including by creating distinctive designs and marks for use on its products and

5  seeking U.S. trademark and copyright registrations for such designs and marks,

6  including those at issue in this Complaint.

7       21.    In 2016, Kellytoy conceived of and began creating its Squishmallows

8  line of plush toy designs – ultimately marketed in connection with the

9  SQUISHMALLOW trademark – that share common, unique features that

10  distinguish them from the goods of others.  These designs are wholly original to

11  Kellytoy and comprise copyrightable subject matter under the laws of the United

12  States.

13       22.    Indeed, Kellytoy has been and is the sole owner of all right, title and

14  interest in and to the copyrights in the individual "characters" in the Squishmallows

15  line and the distinguishing, unique, and recognizable features that are common

16  across the Squishmallows line.  From 2016 to the present, Kellytoy has expended

17  large sums of money in developing, advertising and promoting these product

18  designs through the United States.  In fact, Kellytoy is spending approximately

19  $50,000 per month in direct to consumer and business-to-business advertising in

20  connection with its SQUISHMALLOW branded goods.

21       23.    Kellytoy sells a broad range of SQUISHMALLOW branded plush toys

22  featuring the brand's iconic trade dress, and whose overall look, feel and image –

23  and in particular but without limitation its shapes, colors, textures and graphics –

24  serve as a distinctive source identifier to the consuming public.  Though not easily

25  reduced to writing, these features include: (1) substantially egg/bell shaped plush

26  toys depicting various similarly shaped fanciful renditions of animals/characters; (2)

27  simplified Asian style Kawaii faces with repeating and complementary rounded/oval

28  shaped graphics depicting features on the characters themselves (such as eyes,

4080086.2

-5-

EXHIBIT I
Page 38 of 81

Case 2:24-cv-04169-JLS-MAR   Document 24-2   Filed 03/05/24   Page 157 of 671   Page ID
#:282
Case 2:23-cv-05599-JAK-AGR   Document 46-2   Filed 03/05/24   Page 157 of 671   Page ID

1  snouts and bellies) and which conform to and support the overall egg/bell shape of

2  the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils,

3  mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile

4  velvety velour-like textured exterior with a light and silky memory foam-like

5  stuffing providing an extremely soft and squeezable marshmallow feel.  These

6  features, and the resulting overall look and feel of these toys, are more fully

7  depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's

8  line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow

9  Trade Dress").

10       24.    The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of

11  Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which

12  were created by or assigned to Kellytoy (the "Squishmallow Designs").  As

13  explained in greater detail below, these Squishmallow Designs are the subject of

14  Copyright Registrations issued by the United States Copyright Office, pursuant to

15  17 U.S.C. §101 *et seq.*

16       25.    Continuously and without interruption, beginning in 2016, Kellytoy has

17  expended a great deal of time, effort, and money in the promotion of its

18  Squishmallows.  And due to Kellytoy's unique design, robust marketing efforts,

19  media coverage, and market penetration, the Squishmallow Trade Dress has

20  acquired distinctiveness in the marketplace when applied to plush toys.  Indeed,

21  because of Kellytoy's extensive promotional activities and widespread display of its

22  Squishmallows directed to the public, and as a consequence of Kellytoy's fair and

23  honorable dealings with its customers, the relevant consuming public has come to

24  recognize and associate plush toys bearing the Squishmallow Trade Dress as high

25  quality goods connected with or offered by a single source, Kellytoy.  The

26  Squishmallow Trade Dress has valuable goodwill and consumer recognition

27  associated with it and has come to symbolize the valuable goodwill and reputation

28  of Kellytoy.

26.     In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 1,140,000 "hits" for the search term "Squishmallows."

27.     In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

28.     Further adding to their recognizability and secondary meaning in the marketplace, Squishmallows have been featured in numerous magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto, including many mainstream media outlets such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, Squishmallows have been also recognized by The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized Squishmallows in its October 2017 issue, under the "Products We Love" section; and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21, 2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."

Case 2:24-cv-01169-JLS-MAR   Document 21-2   Filed 03/05/24   Page 157 of 671   Page ID
Case 2:23-cv-05399-JAR-NCR   Document 46   Filed 03/05/19   Page 38 of 37   Page ID #442
#:284



29.     Kellytoy's Squishmallows have also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.     Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 4**. In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

31.     Kellytoy's Squishmallows have also, as alleged above, been the subject of consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently have nearly 44,300 Instagram followers, more than 60,000 Facebook

followers – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy regularly publishes photographs of its Squishmallows.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page is attached as **Exhibit 5**.

32.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares."

33.     Squishmallows' legion of loyal fans have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Squishmallows, with the average Squishmallows post likes on Instagram hovering over 1000+ per post and 45-100 average comments per post.

34.     Kellytoy's Squishmallow website traffic has grown exponentially since its launch in 2017 to an average of 4,313 visits per day.

35.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

36.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target

stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

37.    Since the summer of 2017, Kellytoy has sold approximately a whopping 22 million (22,000,000) units of Squishmallows with no indication that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products embodying the Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

38.    In fact, Kellytoy's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

39.    Because of Squishmallows' massive success and popularity, consumers have come to associate Kellytoy's high-quality Squishmallows plush toys with the Squishmallows Trade Dress and, conversely, have come to recognize the Squishmallow Trade Dress as a designation of source.

## **Defendants' Unlawful Conduct**

40.    At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

41.    Upon information and belief, sometime in spring of 2018, notably well after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell and supply to Rite Aid various plush toys bearing substantially similar copies of Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter referred to as "Infringing Plush") for distribution by Rite Aid through its United States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's trademarks are collectively attached hereto as **Exhibit 6**.

42.    Upon information and belief, Dan-Dee offered to sell the Infringing Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid

in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43. Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush. Upon information and belief, Rite Aid has indeed sold the Infringing Plush in interstate commerce.

44. Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush. Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because, rather than investing in creating its own designs and identity, Dan Dee has copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45. In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46. Kellytoy is informed and believes that Defendants, without Kellytoy's consent or permission, intend to sell, advertise, promote, display, and distribute, toys bearing Squishmallow Designs and Squishmallow Trade Dress in United States commerce.

47. The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress

embodied in the Infringing Plush – including by copying wholesale the shape and look – constitute false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that Defendants' plush toys originate from Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such activities of Defendants are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of the toys bearing the Squishmallow Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of 15 U.S.C. §1125(a).

48.     Upon information and belief, the activities of Defendants were done willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, with the intent to trade on the enormous goodwill Kellytoy has earned in its Squishmallows, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy.

49.     As further evidence of Dan-Dee's intent to trade upon Kellytoy's goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush.

50.     Defendants, by their unauthorized copying and use of Kellytoy's Squishmallow Designs and Squishmallow Trade Dress, have engaged and will engage in acts of copyright infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works.  Defendants' activities have damaged and will continue to damage

Case 2:24-cv-01609-JLS-AGR Document 41-2 Filed 03/05/24 Page 162 of 671 Page ID
Case 2:18-cv-08393-JAK-AGR Document 46-1 Filed 03/08/19 Page 46 of 81 Page ID #:447
#:289

the reputation, business and good will of Kellytoy nationally and in this judicial district.

51.  Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

52.  Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

### **FIRST CAUSE OF ACTION**

**(Federal Copyright Infringement -- 17 U.S.C. §501)**

(Against all Defendants)

53.  Kellytoy repeats and realleges each and every allegation above as though fully set forth herein.

54.  Kellytoy owns a valid copyright in the Squishmallow Designs. The Squishmallow Designs are original, decorative, and non-functional.  After having had access to Kellytoy's Squishmallow Designs, Defendants, without authorization from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a design that Defendants copied from the Squishmallow Designs.

55.  All of the Squishmallow Designs were originally created by Kellytoy or were assigned to and are owned by Kellytoy.

56.  The Squishmallow Designs comprise original works of authorship that may be copyrighted under United States law.  In fact, Kellytoy has complied with requirements of Title 17 of the United States Code with respect to the registration of Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by United States Copyright Registration Nos. VA0002096020 and VA0002093075, entitling Kellytoy to the exclusive rights and privileges in and to the above-referenced copyrights.  These copyright registrations are valid and subsisting.

Case 2:24-cv-01169-JLS-MAR Document 21-2 Filed 03/05/24 Page 163 of 671 Page ID
Case 2:18-cv-08396-JAK-AGR Document 46-2 Filed 03/08/19 Page 14 of 37 Page ID #:448
#:290

57.     Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.     Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106.  Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.     Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.     On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.     On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law.  Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur.  Accordingly, Kellytoy is entitled to preliminary and permanent injunctions restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

Case 2:24-cv-01169-JLS-AGR Document 41-2 Filed 03/05/24 Page 164 of 671 Page ID
Case 2:18-cv-03309-JAK-AGR Document 46-1 Filed 03/08/19 Page 15 of 57 Page ID:449
#:291

## **SECOND CAUSE OF ACTION**

**(Trademark Infringement, False Designation of Origin and False Description --**

**15 U.S.C. §1125)**

(Against All Defendants)

63.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 52 above as if fully set forth herein.

64.     The Squishmallow Trade Dress is non-functional and highly distinctive, and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

65.     Kellytoy owns all right, title and interest in and to the Squishmallow Trade Dress.

66.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will soon commence importation, distribution, advertising, offers for sale, and sale of replicas of the Squishmallow Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

67.     The Infringing Plush designs are confusingly similar to the Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

68.     Defendants' use and further threatened uses of the Squishmallow Trade Dress thus constitutes trade dress infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

69.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

Case 2:24-cv-01169-JLS-MAR   Document 21-2   Filed 03/05/24   Page 165 of 671   Page ID
Case 2:18-cv-08590-JAK-AGR   Document 46-1   Filed 03/08/19   Page 16 of 57   Page ID #:450
#:292

Dress, as well as the goodwill associated therewith, and have diverted sales and

profits from Kellytoy to Defendants. Thus, as a direct and proximate result of

Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer

damage to its valuable brand and reputation, and other damages in an amount to be

proven at trial, including Defendants' profits and Kellytoy's lost profits.

70.     Defendants' actions described above will cause, have caused, and will

continue to cause irreparable damage to Kellytoy, unless Defendants are restrained

by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants'

infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and

permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining

Defendants' and their agents, servants, and employees, and all persons acting

thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow

Trade Dress, or any colorable imitation or variation thereof, in connection with the

sale and/or marketing of any products.

71.     Defendants' aforesaid acts are exceptional within the meaning of 15

U.S.C § 1117.

### THIRD CAUSE OF ACTION

### (Common Law Trademark Infringement)

(Against all Defendants)

72.     Kellytoy repeats and re-alleges each and every allegation of paragraphs

1 through 52 and 64 through 67 as though fully set forth herein.

73.     Defendants have violated Kellytoy's exclusive common law rights in

the Squishmallow Trade Dress.

74.     Kellytoy has continuously used its Squishmallow Trade Dress to

identify its goods in California and elsewhere, and to distinguish them from goods

of a different origin.  As such, Kellytoy has common law rights to the Squishmallow

Trade Dress.

4080086.2

-16-

75. Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

**FOURTH CAUSE OF ACTION**

**(California Common Law Unfair Competition)**

(Against all Defendants)

76. Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77. This claim arises under the common law of the State of California relating to unfair competition.

78. Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress. Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79. Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

80. By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81. Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

82.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.

83.     Upon information and belief, Defendants have engaged in their unlawful conduct alleged herein intentionally, maliciously, fraudulently and oppressively entitling Kellytoy to punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### (California Statutory Unfair Competition –

### California Bus. & Prof. Code § 17200, *et seq.*)

(Against all Defendants)

84.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set forth herein.

85.     By reason of the foregoing, Defendants have been, and are, engaged in "unlawful, unfair or fraudulent business practices" in violation of California Business and Professional Code Section 17200 *et seq.*

86.     Said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy has no adequate remedy at law for these wrongs and injuries.  The damage to Kellytoy includes harm to its goodwill and reputation in the marketplace that money cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any

Case 2:24-cv-01169-JLS-MAR Document 41-2 Filed 03/05/24 Page 168 of 671 Page ID
Case 2:18-cv-08396-JAK-AGR Document 46-1 Filed 03/08/19 Page 19 of 37 Page ID #:453
#:295

1    products.  Kellytoy is further entitled to restitutionary disgorgement of all of

2    Defendants' ill-gotten gains pursuant to California Business and Professions Code §

3    17203 and to recover its costs and attorneys' fees incurred in bringing and

4    prosecuting this action.

## **PRAYER FOR RELIEF**

6        WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

7        1.    That Defendants, their officers, members, directors, agents, servants,

8    employees, successors, licensees, representatives, successors, assigns, and all

9    persons acting in concert or participation with them, be permanently enjoined and

10   restrained from:

> (i)    Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the Squishmallow Designs and/or Squishmallow Trade Dress;
>
> (ii)   Using the Squishmallow Trade Dress or any confusingly similar trade dress in connection with plush or other toys;
>
> (iii)  Using the Squishmallow Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;
>
> (iv)   Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers created by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the Squishmallow Trade Dress or Squishmallow Designs;
>
> (v)    Copying, distributing, displaying or making derivative works of the Squishmallow Designs;

28

      (vi)    Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress or Squishmallow Designs; and

      (vii)   Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

2.     That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

3.     That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the Squishmallow Trade Dress or Squishmallow Designs.

4.     That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of the Squishmallow Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

5.     Adjudge that each of the Defendants, by its unauthorized use of Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it

may have undertaken relating to the Squishmallow Trade Dress, have violated Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade Dress;

6.   Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the Squishmallow Designs and/or Squishmallow Trade Dress in the United States on Defendants' behalf and inform them that they must immediately cease such use;

7.   Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity under the Squishmallow Trade Dress or Squishmallow Designs;

8.   Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, and all plates, molds, matrices, programs and other means of making same;

9.   Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of Defendants' products that infringe Kellytoy's copyrights in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

10.   Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction of all copies of Defendants' products that infringe Kellytoy's copyright in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other

Case 2:24-cv-01169-JLS-AGR   Document 61-2   Filed 03/05/24   Page 171 of 671   Page ID
Case 2:18-cv-08395-JAK-AGR   Document 46-1   Filed 03/08/19   Page 22 of 57   Page ID #:456
#:298

articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

11.     That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under the Squishmallow Trade Dress or Squishmallow Designs:

(i)     the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

(ii)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.     Direct Defendants to pay the costs of corrective advertising;

13.     Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded statutory damages;

18.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

19.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

20.     That Defendants be ordered to disgorge all of their ill-gotten gains pursuant to California Business and Professions Code § 17203; and

1       21.     For such other and further relief as the Court may deem just and

2   proper.

3                                       Respectfully submitted,

4   DATED: March 5, 2019               FREEMAN, FREEMAN & SMILEY, LLP

5

6

7                               By:        / s / Mark B. Mizrahi
                                        _____

8                                       TODD M. LANDER
                                        MARK B. MIZRAHI
9                                       Attorneys for Plaintiffs
                                        KELLYTOY (USA), INC. and
10                                      KELLYTOY WORLDWIDE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:24-cv-01169-JLS-MAR   Document 21-2   Filed 03/05/24   Page 173 of 671   Page ID
Case 2:18-cv-08390-JAK-AGR   Document 46-1   Filed 03/08/19   Page 24 of 37   Page ID #:458
#:300

1
## **DEMAND FOR JURY TRIAL**

2      Plaintiffs hereby demand and request a trial by jury of all issues raised that

3  are triable by jury.

4                                        Respectfully submitted,

5  DATED: March 5, 2019             FREEMAN, FREEMAN & SMILEY, LLP

6

7

8                              By:      _/ s / Mark B. Mizrahi_____
                                       TODD M. LANDER
9                                      MARK B. MIZRAHI
                                       Attorneys for Plaintiffs
10                                     KELLYTOY (USA), INC. and
                                       KELLYTOY WORLDWIDE, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Scott P. Shaw, Bar No. 223592
       Sshaw@calljensen.com
2    L. Lisa Sandoval, Bar No. 310380
       Lsandoval@calljensen.com
3    CALL & JENSEN
     A Professional Corporation
4    610 Newport Center Drive, Suite 700
     Newport Beach, CA  92660
5    Tel:   (949) 717-3000
     Fax:   (949) 717-3100
6
7
8    Neil Zipkin (admitted *pro hac vice*)
       Nzipkin@arelaw.com
9    Jessica Capasso (admitted *pro hac vice*)
       Jcapasso@arelaw.com
10   AMSTER, ROTHSTEIN & EBENSTEIN LLP
     90 Park Avenue, 21st Floor
11   New York, NY 10016
     Tel:   (212) 336-8120
12   Fax:   (212) 336-8001
13
14   Attorneys for Defendants Dan-Dee International, Ltd.
     and Rite Aid Corporation
15

16              **UNITED STATES DISTRICT COURT**

17             **CENTRAL DISTRICT OF CALIFORNIA**

18
19   KELLYTOY (USA), INC., a California          Case No.  2:18-cv-05399-JAK (AGRx)
     corporation; and KELLYTOY
20   WORLDWIDE, INC., a California             **DEFENDANTS DAN-DEE**
     corporation,                              **INTERNATIONAL, LTD.'S AND**
21                                             **RITE AID CORPORATION'S**
                 Plaintiffs,                   **NOTICE OF MOTION AND MOTION**
22                                             **TO DISMISS SECOND AMENDED**
             vs.                               **COMPLAINT; MEMORANDUM OF**
23                                             **POINTS AND AUTHORITIES**
     DAN-DEE INTERNATIONAL, LTD., a
24   Delaware corporation; RITE AID
25   CORPORATION, a Delaware corporation,      Date:   June 17, 2019
     and DOES 1 through 10, inclusive,         Time:  8:30
26                                             Ctrm:  10B
                 Defendants.
27                                             Complaint Filed:   June 15, 2018
28                                             Trial Date:   None Set

DAN06-01:2449390  1:4-2-19

1   **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on June 17, 2019 at 8:30 a.m., or as soon

3   thereafter as the matter may be heard in the above-entitled court, located at 350 W. 1st

4   Street, Los Angeles, California, 90012, Courtroom 10B, Defendants Dan-Dee

5   International, Ltd. and Rite Aid Corporation (together, "Defendants") will and hereby

6   do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

7   ("FRCP"), to dismiss Counts 2 through 5 of Plaintiffs Kellytoy (USA), Inc. and

8   Kellytoy Worldwide, Inc.'s (together, "Plaintiffs'") Second Amended Complaint for

9   failure to state a claim.

10      This motion is made on the ground that Plaintiffs have failed to state a claim for

11  federal trade dress infringement, common law trademark infringement, California

12  common law unfair competition, and California statutory unfair competition.

13      This Motion will be based on this Notice of Motion and Motion, the

14  Memorandum of Points and Authorities filed concurrently herewith, and such further

15  arguments and papers as may be presented to the Court before or during the hearing.

16

17  Dated:  April 2, 2019          CALL & JENSEN

18                              A Professional Corporation
                            Scott P. Shaw

19                              L. Lisa Sandoval

20

21                          By: */s/ L. Lisa Sandoval*
                            L. Lisa Sandoval

22                          Attorneys for Defendants Dan-Dee International,

23                          Ltd. and Rite Aid Corporation

24

25

26

27

28

DAN06-01:2449390_1:4-2-19            - 2 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 59 of 81

175 of 671

# TABLE OF CONTENTS

                                                                                    Page

I.    INTRODUCTION .................................................................................. 1

II.   LEGAL STANDARDS ........................................................................... 2

      A.    Motion to Dismiss ...................................................................... 2

      B.    Trade Dress ................................................................................. 3

III.  ARGUMENT ......................................................................................... 6

      A.    Kellytoy Fails to Adequately Identify Protectable Trade
            Dress ........................................................................................... 6

      B.    Kellytoy's Alleged Trade Dress is Functional ........................... 9

      C.    The Remaining Causes of Action Must Fail Because There
            Is No Protectable Trade Dress ................................................. 13

IV.   CONCLUSION .................................................................................... 15

APPENDIX ................................................................................................. 16

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 60 of 81

# TABLE OF AUTHORITIES

Page

Federal Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................2, 10

*Aurora World, Inc. v. TY Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009)..................................3, 4, 10, 11, 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................2

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994) ...............................................................15

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ..............................................................4

*Continental Laboratory Products, Inc. v. Medax International, Inc.*,
  114 F. Supp. 2d 992 (S.D. Cal. 2000) ...................................................4

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
  No. CV 15-769 PSG, 2015 U.S. Dist. LEXIS 188274 (C.D. Cal.
  May 8, 2015).........................................................................4, 6, 9, 15

*Diamond Foods, Inc. v. Hottrix, LLC*,
  No. 14-cv-03162-BLF, 2016 U.S. Dist. LEXIS 93247 (N.D. Cal July 18, 2016)........9

*Global Manufacturing Group, LLC v. Gadget Universe.Com*,
  417 F. Supp. 2d 1161 (S.D. Cal. 2006) ................................................12

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
  No. CV 14-03954 DDP, 2014 U.S. Dist. LEXIS 156675 (C.D. Cal. Nov. 5, 2014) ....4

*Leatherman Tool Grp. v. Cooper Indus.*,
  199 F.3d 1009 (9th Cir. 1999) ...........................................................12

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 61 of 81

CALL &
JENSEN

**TABLE OF AUTHORITIES (cont'd)**

Page

*Mercado Latino, Inc. v. Indio Prods.*,
   No. CV 13-01027 DDP, 2017 U.S. Dist. LEXIS 55304 (C.D. Cal. Apr. 11, 2017)..... 4

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995).................................................................................. 5, 10, 11

*R.F.M.A.S., Inc. v. So*,
   619 F. Supp. 2d 39 (S.D.N.Y. 2009) .............................................................. 8

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
   668 F.3d 677 (9th Cir. 2012) ........................................................................ 12

*Sherman-Bey v. Marshall*,
   No. CV 09-06494 RGK (RZ), 2011 U.S. Dist. LEXIS 73801 (C.D. Cal.
   Apr. 25, 2011)............................................................................................... 2

*Traffix Devices v. Mktg. Displays*,
   532 U.S. 23 (2001)............................................................................... 3, 5, 10-12

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992)....................................................................................... 3

*Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*,
   644 F.2d 769 (9th Cir. 1981) .................................................................... 5, 12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000).................................................................................. 3, 4, 5


Federal Statutes

15 U.S.C. § 1125(a) ....................................................................................... 3
15 U.S.C. § 1125(a)(3) ................................................................................... 4
15 U.S.C. § 1127 ........................................................................................... 3
17 U.S.C. § 91 ............................................................................................... 16

DAN06-01:2449390  1:4-2-19                          - iii -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES
EXHIBIT I
178 of 671
Page 62 of 81

CALL &
JENSEN

**TABLE OF AUTHORITIES (cont'd)**

Page

State Statutes

Cal. Bus. and Prof. Code § 17200 ...................................................................................14

Cal. Bus. and Prof. Code § 17203 ...................................................................................14


Federal Rules

Fed. R. Civ. P. 8 ................................................................................................................2

Fed. R. Civ. P. 8(a)(2) ......................................................................................................2

Fed. R. Civ. P. 12(b)(6) ................................................................................................1, 2

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 63 of 81

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Dan-Dee International, Ltd. ("Dan-Dee") and Rite Aid Corporation ("Rite Aid") (collectively, "Defendants") move this Court for an Order dismissing counts two through five of the Second Amended Complaint ("Second Amended Complaint," Dkt. 46) filed by Plaintiffs Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc. (collectively, "Kellytoy" or "Plaintiffs"), with prejudice.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on Thursday, March 21, 2019.

## I.    INTRODUCTION

After this Court dismissed Kellytoy's First Amended Complaint, Kellytoy revised its description of its trade dress for a second time.  However, little has changed, and Kellytoy's description of its trade dress remains "too broad to form the basis of a plausible claim for trade dress infringement."  (Order on Motion to Dismiss, Dkt. 39, at 9).[1]  Kellytoy's revisions make clear that it simply cannot articulate a trade dress that covers its entire line of Squishmallows and at the same time shoehorn Dan-Dee's products into that description.  The Second Amended Complaint is the third time Kellytoy has unsuccessfully tried to describe a trade dress that can act as a source indicator.  However, since its products lack uniformity, Kellytoy's description is so broad it encompasses a wide variety of existing products of others and impermissibly covers an entire product category.  Finally, since each and every element of Kellytoy's purported trade dress is functional (and the arrangement of those elements is dictated by the function of a particular looking stuffed toy), the trade dress is not protectable as a matter of law, and Kellytoy fails to state any actionable claim.

---

[1] For convenience, paragraph 23 of Kellytoy's original Complaint (Dkt. 1, ¶ 23), the First Amended Complaint (Dkt. 16, ¶ 23), and the Second Amended Complaint (Dkt. 46, ¶ 23) are attached as an Appendix to this Memorandum.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 64 of 81
180 of 671

CALL & JENSEN

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of claims for "failure to state a claim upon which relief can be granted."  In *Bell Atlantic Corporation v. Twombly*, the Supreme Court concluded that, to survive a motion to dismiss for failure to state a claim, a complaint must advance "allegations plausibly suggesting (not merely consistent with)" a successful claim for relief.  550 U.S. 544, 557 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss . . . ."  *Iqbal*, 556 U.S. at 679.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]'-- 'that the pleader is entitled to relief.'"  *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Under this standard, Plaintiffs must allege facts which, if proven, would plausibly entitle it to the relief it seeks.  Plaintiffs' Second Amended Complaint must contain allegations "respecting all the material elements necessary to sustain recovery under some viable legal theory."  *Sherman-Bey v. Marshall*, No. CV 09-06494 RGK (RZ), 2011 U.S. Dist. LEXIS 73801, at *12 (C.D. Cal. Apr. 25, 2011).  As discussed more fully below, since Plaintiffs have not alleged (and cannot allege) the existence of trade dress in the entire Squishmallows product line that is protectable, it is impossible to

EXHIBIT I
Page 65 of 81

CALL &
JENSEN

1  allege facts that would entitle Plaintiffs to relief under the Lanham Act, common law, or

2  the law of the State of California.

3  **B.    Trade Dress**

4  The Lanham Act provides for the protection of trademarks and trade dress used to

5  identify and distinguish a producer's goods from those manufactured or sold by others

6  and to indicate the source of the goods. *See* 15 U.S.C. § 1127. Pertinent to this case,

7  the Lanham Act provides a cause of action for infringement of unregistered trade dress,

8  a category that includes both packaging design and product design. *See* 15 U.S.C. §

9  1125(a). The trade dress of a product refers to its "total image and overall appearance."

10  *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1141 (C.D. Cal. 2009) (citing *Two*

11  *Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70 (1992)).

12  Here, Plaintiffs assert infringement of the Squishmallows trade dress embodied in

13  the design of its **product**, not the packaging, contending that the product design of their

14  varying assortment of products constitutes a source identifier. The Supreme Court has

15  cautioned against misuse or over-extension of trade dress to products, noting that

16  "product design almost invariably serves purposes **other than** source identification . . ."

17  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000) (emphasis

18  added). This is a recognition that the purpose of product design is generally functional

19  and aesthetic and falls outside the scope of trade dress protection.[2] *See id.* ("Consumers

20  are aware of the reality that, almost invariably, even the most unusual of product

21  designs -- such as a cocktail shaker shaped like a penguin -- is intended not to identify

22  the source, but to render the product itself more useful or more appealing."). Therefore,

23  "[t]rade dress protection must subsist with the recognition that in many instances there

24  is no prohibition against copying goods and products. In general, unless an intellectual

25  property right such as a patent or copyright protects an item, it will be subject to

26  copying." *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29 (2001). For this very

27  _____

28  [2] Functional or aesthetic features fall under the purview of patent and copyright law.

CALL &
JENSEN

DAN06-01:2449390_1:4-2-19                                    - 3 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 66 of 81

182 of 671

reason, "the Ninth Circuit has advised courts to evaluate such [product design] claims with greater scrutiny than claims involving other forms of trade dress." *Aurora World*, 719 F. Supp. 2d at 1152 (citing *Continental Laboratory Products, Inc. v. Medax International, Inc.*, 114 F. Supp. 2d 992, 997 (S.D. Cal. 2000)).

The Ninth Circuit has set forth three pleading requirements for a valid claim of trade dress infringement of a product under the Lanham Act. A plaintiff must allege:

> (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role[,] either because it is inherently distinctive or has acquired secondary meaning;[3] and (3) that the defendant's product . . . creates a likelihood of consumer confusion.

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Moreover, a plaintiff must describe its claimed trade dress with sufficient detail and clarity to give a defendant and the court sufficient notice of the plaintiff's claim. *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 U.S. Dist. LEXIS 188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."); *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954 DDP (MANx), 2014 U.S. Dist. LEXIS 156675, at *8-9 (C.D. Cal. Nov. 5, 2014); *Mercado Latino, Inc. v. Indio Prods.*, No. CV 13-01027 DDP (RNBx), 2017 U.S. Dist. LEXIS 55304, at *4-6 (C.D. Cal. Apr. 11, 2017). Here, Plaintiffs' trade dress claim fails for two reasons -- the claimed trade dress is functional and it continues to be described in far too broad terms to give Defendants or the Court notice of its claim.

The burden of proof is on Plaintiffs to prove non-functionality. 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this Act for trade dress

---

[3] Since Plaintiffs are alleging product design trade dress they must meet the higher burden to prove secondary meaning as product design cannot be inherently distinctive. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000) ("[I]n an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning.").

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 67 of 81

not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); *see also Wal-Mart Stores*, 529 U.S. at 210 (Section 43(a) "require[s] that a producer show that the allegedly infringing feature is not 'functional.'"). There is a "statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection." *Traffix Devices*, 532 U.S. at 30.

Functional elements of a product cannot be granted trade dress protection. According to the Supreme Court, "a product feature is functional, and cannot serve as a [protectable trade dress], if it is ***essential to the use or purpose*** of the article or it affects the cost or quality of the article. . . . [A] functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Traffix Devices*, 532 U.S. at 32 (emphasis added) (internal quotations and citations omitted). Courts also consider whether the feature at issue "constitute[s] the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981). The functionality doctrine prevents trademark and trade dress law, which seek to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.

> It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended ***forever*** (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164-165 (1995) (emphasis added).

By seeking to use the functional aspects of their products as trademarks, Plaintiffs are diving head first into the very forbidden waters described by the Supreme Court.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 68 of 81

184 of 671

CALL &
JENSEN

# III. ARGUMENT

## A. Kellytoy Fails to Adequately Identify Protectable Trade Dress

In its Second Amended Complaint, Kellytoy still fails to provide Dan-Dee and the Court with a detailed and precise description of its trade dress. Instead, Kellytoy has simply added more words to its trade dress description resulting in a more confusing definition. Kellytoy's alleged trade dress remains impermissibly vague and broad, and Kellytoy has not met its burden. *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 U.S. Dist. LEXIS 188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Paragraph 23 of the Second Amended Complaint defines Kellytoy's alleged trade dress as follows:

> (1) substantially egg/bell-shaped shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters;
>
> (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped toys;
>
> (3) embroidered two-dimensional facial features, such as eyes nostrils, mouths;
>
> (4) distinctive contrasting and non-monochrome coloring; and
>
> (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

(Dkt. 46, at ¶ 23).

Dan-Dee is at a loss to know what constitutes a "simplified Asian style Kawaii face." Does it mean a "cute" face based on the Japanese-English translation of "Kawaii?" Moreover, what would constitute a "complementary" shaped graphic for eyes, snouts, and bellies?" What about the contrasting coloring is "distinctive?" How

DAN06-01:2449390_1:4-2-19 - 6 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 69 of 81

185 of 671

CALL & JENSEN

do the "simplified Asian style Kawaii faces" "conform to and support the overall egg/bell shaped toys?"

After attempting to describe its trade dress in words, Kellytoy, in paragraph 23 of the Second Amended Complaint, references the depictions in Exhibit 1. As it argued previously in opposition to the Motion to Dismiss the First Amended Complaint, Kellytoy asserts again that the written descriptions must be read in light of the attached images.

However, the revisions to the Second Amended Complaint are telling. In both the First Amended Complaint and the Second Amended Complaint, Kellytoy included an Exhibit 1, which purportedly showed the individual products that comprise the Squishmallows line. Notably, in Exhibit 1 to the Second Amended Complaint, Kellytoy has quietly removed the following images from the list:[4]



However, as shown in Exhibit 3 to the Second Amended Complaint, these items remain in Kellytoy's Squishmallow line as do other products not previously listed in Exhibit 1. *See* Dkt. 46, Ex. 3. For instance, the Squishmallows line also includes the following, which are also missing from Exhibit 1:



_____

[4] The panda and frog were specifically referred to in Defendants' Reply Memorandum (Dkt. 34, at 2-3) as examples of toys having very different features than many of the other products.

DAN06-01:2449390_1:4-2-19                 - 7 -
DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 70 of 81

186 of 671

CALL &
JENSEN

Thus, Dan-Dee is left to wonder were these products left out because Kellytoy has admitted that they do not incorporate the alleged trade dress?  Or because the so-called fox, elephant, bunny, and lamb ears are not round?  Or because the fox, lamb, chick, and elephant's noses are not round?  Or perhaps because the cow, frog, fox, lamb, and elephant do not have "Asian style Kawaii faces"?  Or is it because the lamb's coloring is monochrome without "distinctive contrasting coloring"?  It is clear that Kellytoy cannot describe its alleged trade dress in precise terms because the entire Squishmallows line does not have a consistent appearance and thus, the enumerated elements (even when combined with the photographs) still "do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw." (Dkt. 39, at 9.)

Again, Kellytoy does not explain which Squishmallows features are source identifying.  As this Court noted, there are "substantial differences among the designs of the products in the Squishmallows line."  (Dkt. 39, at 9).  In fact, due to the lack of consistency in the Squishmallows line, Plaintiff simply cannot articulate a trade dress that covers the entire line.  This is fatal to Kellytoy's claim of trade dress rights.  *See R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009) ("The elements specified as the trade dress must be present in every item in that product line.").  In the Second Amended Complaint, Kellytoy has cherry picked certain products from its line that it believes conform to its described trade dress and left out the others.  However, Plaintiff cannot pick and choose.  Either Plaintiff has a trade dress that covers the entire line of Squishmallows or it does not.  Defendants assert it does not.

In the Second Amended Complaint, Kellytoy has introduced a new term "Asian style Kawaii face" in place of the similarly vague term "anime-inspired."  The use of impermissibly broad and vague terms continues to describe an entire genre of products that have flooded the toy market both before and after Plaintiffs' introduction of its Squishmallow line.  Kellytoy is attempting to use that broad definition to belatedly seek

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 71 of 81

187 of 671

CALL & JENSEN

to keep Dan-Dee out of that broad market. This is improper. *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 U.S. Dist. LEXIS 188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."); *Diamond Foods, Inc. v. Hottrix, LLC*, No. 14-cv-03162-BLF, 2016 U.S. Dist. LEXIS 93247, at *30 (N.D. Cal. July 18, 2016) (Plaintiff must "plead the 'precise expression of the character and scope of the claimed trade dress.'").

For the reasons discussed above, Plaintiffs' claims of trade dress rights still do not provide sufficient notice of what constitutes the alleged trade dress and do not state a valid claim for relief because Plaintiffs' claims are so broad and vague that they cover an entire product category and a general idea. Defendants are at a loss to know what Plaintiffs are claiming to own and the trade dress claims asserted in the Second Amended Complaint should be dismissed on this ground alone.

## B. Kellytoy's Alleged Trade Dress is Functional

The elements of the alleged "Squishmallow Trade Dress" are set forth in paragraph 23 of the Second Amended Complaint. *See* Appendix attached hereto. Aside from adding the gratuitous, conclusory, and patently false statement in paragraph 64 of the Amended Complaint that the "Squishmallow Trade Dress is non-functional," Plaintiffs continue to provide no support for such contention. On this basis alone, Plaintiffs fail to adequately plead a claim for trade dress infringement. *See Deckers Outdoor Corp.*, 2015 U.S. Dist. LEXIS 188274, at *12-13 ("In light of the standard pleading requirement that plaintiffs support the elements of their claims with more than conclusory statements, the Court is persuaded by the approach of district courts that require plaintiffs to allege how a trade dress is non-functional. . . . The Court holds that Plaintiff's conclusory statement of non-functionality fails to sufficiently allege the element, particularly because some features of the claimed trade dress do perform a utilitarian function . . . .").

CALL & JENSEN

The trade dress elements articulated by Plaintiffs are set forth above. "[D]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Here, each of the elements of alleged trade dress asserted by Kellytoy is functional, "constitutes the actual benefit that the consumer wishes to purchase," and thus, is not entitled to trade dress protection.

> 1. **"substantially egg/bell-shaped shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters"**

Here, Plaintiffs have added the term "egg" to its prior description of the shape of its Squishmallow trade dress. Referring to Exhibit 1 of the Second Amended Complaint for examples of what is meant by "egg/bell shaped,"[5] to the extent the shapes are consistent, "substantially egg/bell-shaped" is believed to mean substantially oval in shape with a flattened bottom. The flattened bottom is essential to allowing the product, a plush toy, to stand upright and is undeniably functional.[6] Moreover, most stuffed toys depict animals or characters.

> 2. **"simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped toys"**

The claimed "simplified Asian style Kawaii faces," while aesthetic, are functional since the right to use them exclusively "would put competitors at a significant non-reputation-related disadvantage" and exclusive rights would preclude others from competing for a broad range of stuffed toys. *Traffix Devices*, 523 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165). In fact, this Court has made clear that "the

---

[5] The dictionary definition of "bell-shaped" is something having the shape of a bell such as the flared end of a wind instrument (*see* https://www.merriam-webster.com/dictionary/bell) which does not apply to the shape of the products shown in Plaintiffs' Exhibit 1.
[6] A stuffed toy having a bell-shaped or an oval body portion can hardly be viewed as distinctive.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
EXHIBIT I
Page 73 of 81

CALL & JENSEN

aesthetic features of plush toys . . . are essential selling features of the toys" and therefore, functional. *See Aurora World*, 719 F. Supp. 2d at 1149. Moreover, as in *Aurora World*, facial features "are essential to the goal of making the plush toys look like animals." *Id.* at 1147. To the extent the facial features "support the overall egg/bell shaped toys," is further evidence of functionality.

### 3. "<u>embroidered two-dimensional facial features, such as eyes nostrils, mouths</u>"

Here again, facial features such as eyes, nostrils, and mouths "are essential to the goal of making the plush toys look like animals." *Id.* at 1147. That they are embroidered is insignificant as it is a common and safe way to affix features on stuffed animals.

### 4. "<u>distinctive contrasting and non-monochrome coloring</u>"

This is a newly added element of the purported trade dress, first appearing in the Second Amended Complaint. A "non-monochrome" and "distinctive" color scheme are aesthetic features which "are essential selling features" of plush toys and therefore, functional. *See Aurora World*, 719 F. Supp. 2d at 1149. The exclusive right to manufacture plush toys in "non-monochrome coloring" would certainly "put competitors at a significant non-reputation-related disadvantage." *Traffix Devices*, 523 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165).

### 5. "<u>short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel</u>"

The velvety velour-like textured exterior is an essential property of any "plush" toy. Plaintiffs' addition that it is "short-pile" does nothing to change this. The exterior must be soft and plush for a toy to fall into the category of a stuffed animal or plush toy and this is what the consumer is seeking to buy. Where a feature "constitutes the actual



DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 74 of 81

benefit that the consumer wishes to purchase" it is functional. *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981).

The "light and silky" memory foam-like stuffing is likewise an essential property of any "stuffed" toy.[7] Again, this is what consumers are seeking to buy -- a stuffed toy -- and that is how such toys are made and how they look. A "velvety" exterior with stuffing cannot possibly constitute trade dress for a stuffed or plush toy regardless of how many adjectives are used to describe it. Moreover, trade dress protection extends to the overall image or look of a product design, not the tactile properties that cannot be seen by the consumer. *See Aurora World*, 719 F. Supp. 2d at 1141 (citing *Global Manufacturing Group, LLC v. Gadget Universe.Com*, 417 F. Supp. 2d 1161, 1166 (S.D. Cal. 2006)).

Here, once again, Plaintiffs have "merely listed attributes of its products that are common to many plush toys and asserted they are not utilitarian." *Aurora World*, 719 F. Supp. 2d at 1150. This is not enough to survive a motion to dismiss. *Id.* All plush toys that fall into the category of anime-inspired, Kawaii or "cute" faced plush toys are stuffed, have soft velvety exteriors, and substantially flat bottoms so that they do not topple over. Some are egg shaped; others are bell shaped. The right to use these features exclusively, as belatedly sought by Plaintiffs, "would put competitors at a significant non-reputation-related disadvantage." *Traffix Devices*, 532 U.S. at 32. This is fatal to Plaintiffs' trade dress claim of which "the whole is nothing other than the assemblage of functional parts." *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 684 (9th Cir. 2012) (citing *Leatherman Tool Grp. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999)). In sum, Plaintiffs' entire product design is functional and thus, cannot be recognized as a trademark. *See Aurora World*, 719 F. Supp. 2d at 1146 ("For an overall product configuration to be recognized as a trademark, the entire design

---

[7] In fact, like most toys, Plaintiffs' stuffed toys are stuffed with ordinary polyester fill rather than "marshmallow" or memory foam. The stuffing is conventional.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 75 of 81

191 of 671

CALL & JENSEN

must be nonfunctional."). The combination of the above-recited elements commonly found in plush toys is functional and is incapable of serving as a source of origin. Instead, these elements combine to form the very product a consumer wishes to purchase.

## C. The Remaining Causes of Action Must Fail Because There Is No Protectable Trade Dress

Besides asserting causes of action for trade dress and copyright infringement, Plaintiffs continue to assert the following in the Second Amended Complaint: (1) common law trademark infringement; (2) California common law unfair competition; and (3) California statutory unfair competition. As pled by Plaintiffs, each of these causes of action is based on Defendants' alleged copying of the Squishmallow Trade Dress. (*See* Dkt. 46, ¶¶ 73-74, 78-80, 86). In particular, in their third cause of action for common law trademark infringement Plaintiffs allege:

> 73. Defendants have violated Kellytoy's exclusive common law rights in the *Squishmallow Trade Dress*.
>
> 74. Kellytoy has continuously used its Squishmallow *Trade Dress* to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin. As such, Kellytoy has common law rights to the *Squishmallow Trade Dress*.

(Dkt. 46, ¶¶ 73-74) (emphasis added). In their fourth cause of action for California common law unfair competition Plaintiffs allege:

> 78. Defendants' Infringing Plush incorporate [*sic*] matter constituting reproduction, copies and colorable imitation of Kellytoy's *Squishmallow Trade Dress*. Defendants' unauthorized use of Kellytoy's *Squishmallow Trade Dress* constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

/ / /

/ / /



DAN06-01:2449390_1:4-2-19

- 13 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 76 of 81
192 of 671

79. Upon information and belief, Defendants have intentionally appropriated Kellytoy's **Squishmallow Trade Dress** with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

(Dkt. 46, ¶¶ 78-79) (emphasis added). In their fifth cause of action for California statutory unfair competition under California Business and Professions Code § 17200 Plaintiffs allege:

86. Said activities of Defendants have caused, if not enjoined, and will continue to cause irreparable harm and damage to the rights of Kellytoy in its **Squishmallow Trade Dress** and to its business reputation and good will. Kellytoy has no adequate remedy at law for these wrongs and injuries. The damage to Kellytoy includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's **Squishmallow Trade Dress**, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. Kellytoy is further entitled to restitutional disgorgement of all of Defendants' ill-gotten gains pursuant to California Business and Professional Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

(Dkt. 46, ¶ 86) (emphasis added).

While the specific language differs from claim to claim, each is based upon Defendants' unauthorized use of Plaintiffs' alleged exclusive rights in the claimed Squishmallow Trade Dress. Since the Squishmallow Trade Dress is not protectable, and since each of these claims is based on the copying of a protectable trade dress, Plaintiffs' third, fourth, and fifth causes of action fail to state a claim and should be dismissed. The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code

CALL & JENSEN

§ 17200 are 'substantially congruent' to claims made under the Lanham Act."  *Deckers Outdoor Corp.*, 2015 U.S. Dist. LEXIS 188274, at *22 (citing *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)); *see also* this Court's Order on Motion to Dismiss, Dkt. 39, at 10.  Thus, because Plaintiffs have "failed to plead trade dress infringement, [their claims] premised on the same theory are likewise insufficiently pled . . . ."  *Id.* at 23.

## IV.  CONCLUSION

None of Plaintiffs' causes of action two through five state a claim upon which relief can be granted.  Further, in light of Kellytoy's continued inability to describe its purported trade dress in terms having sufficient clarity about the nature and scope of its claimed trade dress, Defendants respectfully request that the second, third, fourth and fifth causes of action in the Second Amended Complaint be dismissed with prejudice.

Dated:  April 2, 2019

CALL & JENSEN
A Professional Corporation
Scott P. Shaw
L. Lisa Sandoval


By: */s/ L. Lisa Sandoval*
L. Lisa Sandoval

Attorneys for Defendants Dan-Dee International, Ltd. and Rite Aid Corporation

- 15 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 78 of 81

**APPENDIX**

23.    Kellytoy sells a broad range of Squishmallows that feature the brand's iconic trade dress, which is not easily reduced to writing, but includes, without limitation: (1) substantially bell-shaped plush toy animals/characters (i.e. substantially oval in shape with substantially flat bottoms), (2) Japanese-inspired minimalist and whimsical facial features, (3) a velvety velour-like-plush exterior, and (4) stuffed with a "spongy," memory foam-like stuffing -- as more fully depicted in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively the "Squishmallow Trade dress") which are the subjects of numerous United States copyright registrations. The plush designs depicted **in Exhibit 2** -- a subset of Kellytoy's line of Squishmallows -- comprise some of Kellytoy's most popular Squishmallows, which were created by or assigned to Kellytoy (the "Squishmallow Designs"). As set forth in greater detail below, these Squishmallow Designs are the subject of Copyright Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C. 91 *et seq*.

(Compl., Dkt. 1 ¶ 23).

23.    Kellytoy sells a broad range of Squishmallows that feature the brand's iconic trade dress, which is not easily reduced to writing, but includes, without limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture -- as more fully depicted in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

(FAC, Dkt. 16 ¶ 23).

23.    Kellytoy sells a broad range of SQUISHMALLOW branded plush toys featuring the brand's iconic trade dress, and whose overall look, feel and image -- and in particular but without limitation in shapes, colors, textures and graphics -- serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 79 of 81

195 of 671

CALL & JENSEN

graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils, mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of these toys, are more fully depicted, without limitation, in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

(Second Amended Complaint, Dkt. 46 ¶ 23).



DAN06-01:2449390  1:4-2-19                           - 17 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 80 of 81

196 of 671

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:18−cv−05399−JAK−AGR          Date   9/23/2019

Title     KELLYTOY USA, INC. ET AL V. DAN−DEE INTERNATIONAL, LTD. ET AL

---

Present     The Honorable JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

         Andrea Keifer                             Not Reported
         Deputy Clerk                     Court Reporter / Recorder


Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

         Not Present                               Not Present


**Proceedings:**     **(IN CHAMBERS) ORDER DISMISSING CASE WITHOUT PREJUDICE (JS-6)**

In light of the parties' Notice of Settlement, the Court orders that this action is dismissed without prejudice. The Court retains jurisdiction to vacate this Order and to reopen the action within 45 days from the date of this Order, provided, however, any request by any party(ies) that the Court do so, shall make a showing of good cause as to why the settlement has not been completed within the 45-day period, what further settlement processes are necessary, and when the party(ies) making such a request reasonably expect the process to be concluded. This Order does not preclude the filing of a stipulation of dismissal with prejudice pursuant to Fed. R. Civ. P. 41, which does not require the approval of the Court. Such stipulation shall be filed within the aforementioned 45-day period, or by such later date ordered by the Court pursuant to a stipulation by the parties that conforms the requirements of a showing of good cause stated above.


                                                    :00
                              Initials of Preparer:   ake

CV–90                    – CIVIL MINUTES–GENERAL –                    Page 1 of 1

EXHIBIT I
Page 81 of 81

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) Case No. 1:20-cv-00748 |
| | ) |
| | ) Honorable Gary Feinerman |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| TY INC., and DOES 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF KELLY TOY WORLDWIDE, INC.'S MEMORANDUM OF LAW IN

### SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Dean D. Niro
Oliver D. Yang
VITALE, VICKREY, NIRO, SOLON & GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
Telephone: (312) 236-0733
dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC.

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................1

II.     STATEMENT OF FACTS ..........................................................2

III.     ANALYSIS ...................................................................................6

     A.     The Preliminary Injunction Standards ..................................6

     B.     Kellytoy Is Likely To Succeed On The Merits ......................6

         1.     The Squishmallows Trade Dress has developed a secondary meaning ..........................................................7

         2.     The Squishmallows Trade Dress is non-functional ..................12

             a.     *The Squishmallows Trade Dress does not have any design elements that have been subject to a utility patent* ...........13

             b.     *The Squishmallows Trade Dress provides no utilitarian advantage* ................................................14

             c.     *Kellytoy has not advertised utilitarian advantages of Squishmallows* ........................................16

             d.     *Many alternate designs for stuffed animals exist* ..............16

             e.     *The Squishmallows Trade Dress does not affect quality or costs* ........................................16

         3.     Customers are likely to be Confused ........................17

             a.     *The Squishmallows Trade Dress and the Infringing Plush are similar in appearance and suggestion* ......................18

             b.     *Squishmallows and the Infringing Plush are similar goods* ....................................19

             c.     *Squishmallows and the Infringing Plush are sold in the same area* ........................................20

             d.     *The consumer's degree of care* ..........................20

             e.     *The Squishmallows Trade Dress is strong* ........................21

             f.     *Actual confusion* ........................................21

             g.     *Ty intended to palm off its products as Squishmallows* .....22

     C.     Kellytoy Will Suffer Irreparable Harm Absent A Preliminary Injunction ................................................22

      D.     **The Irreparable Harm to Kellytoy Outweighs**
              **The Potential Harm Ty Would Suffer Were**
              **A Preliminary Injunction Wrongfully Granted** ..................................24

      E.     **The Public Interest Will be Served By Granting the Injunction** .........24

      F.     **Injunction Bond** .......................................................................................25

 **IV.**    **CONCLUSION** ..................................................................................................25

EXHIBIT J
Page 3 of 139

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Badger Meter, Inc. v. Grinnell Corp.*,
   13 F.3d 1145 (7th Cir. 1994) ....................................................7, 12, 17, 18, 20, 21

*Bodum USA, Inc. v. A Top New Casting Inc.*,
   927 F.3d 486 (7th Cir. 2019) ..........................................................7, 12, 13, 15, 16

*Cae, Inc. v. Clean Air Engineering, Inc.*,
   267 F. 3d 660 (7th Cir. 2001) ........................................................................21

*Deckers Outdoor Corporation v. The Partnerships, et al.*,
   2013 WL 1337616 (N.D. Ill. March 27, 2013) ........................................25

*Eli Lilly & Co. v. Natural Answers, Inc.*,
   233 F.3d 456 (7th Cir. 2000) ........................................................................25

*Ferrari S.P.A. v. Roberts*
   944 F.2d 1235 (6th Cir. 1991) ........................................................................8

*Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*,
   647 F.3d 723 (7th Cir. 2011) ......................................................................13

*Gurglepot, Inc. v. New Shreve, Crump & Low LLC*,
   153 F.Supp.3d 441 (D. Mass 2015) ................................................................8

*Health O Meter Inc. v. Terraillon Corp.*,
   873 F.Supp. 1060 ................................................................................7

*Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*,
   560 F.2d 1325 (7th Cir. 1977) ......................................................................22

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
   846 F.2d 1079 (7th Cir.1988) ..............................................................6, 18, 23

*KJ Korea, Inc. v. Health Korea, Inc.*,
   66 F. Supp. 3d 1005 (N.D. Ill. 2014) ......................................................19, 20, 21

*Logan Graphic Prod., Inc. v. Textus USA, Inc.*,
   No. 02 C 1823, 2003 WL 21011746 (N.D. Ill. May 5, 2003) ....................12, 15, 16

*Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"*
   2015 WL 3818622 (N.D. Ill. 2015) ..............................................................22

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
   426 F.3d 532 (2nd Cir. 2005)........................................................................18

EXHIBIT J
Page 4 of 139

*Michalic v. Cleveland Trankers, Inc.*,
364 U.S. 325, 81 S.Ct. 6 (1960) ...................................................................8

*Minemyer v. B-Roc Representatives, Inc.*,
678 F. Supp. 2d 691 (N.D. Ill. 2009) ...........................................................8

*Packman v. Chicago Tribune Co.*,
267 F.3d 628 (7th Cir. 2001) ......................................................................17

*Promatek Indus., Ltd. v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) ......................................................................19

*Qualitex Co. v. Jacobson Products Co.*,
514 U.S. 159 (1995) ...............................................................................8, 13

*Re/Max N. Cent., Inc. v. Cook*,
272 F.3d 424 (7th Cir. 2001) ......................................................................22

*Roulo v. Russ Berrie & Co.*,
886 F.2d 931 (7th Cir. 1989) ........................................................................7

*Scherr v. Volpe*,
466 F.2d 1027 (7th Cir. 1972) ....................................................................25

*Service Ideas, Inc. v. Traex Corp.*,
846 F.2d 1118 (7th Cir. 1988) ....................................................................15

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
695 F.3d 676 (7th Cir. 2012) ........................................................................6

*Sylvester v. SOS Children's Villages Illinois, Inc.*,
453 F.3d 900 (7th Cir. 2006) ........................................................................8

*Thomas & Betts Corp., v. Panduit Corp.*,
138 F.3d 277 (7th Cir. 1998) ...............................................................7, 9, 10

*Top Tobacco v. Fantasia Distribution Inc.*,
101 F. Supp. 3d 783 (N.D. Ill. 2015) ......................................17, 19, 20, 21

*Trans Union LLC v. Credit Research, Inc.*,
142 F. Supp. 2d 1029 (N.D. Ill. 2001) .........................................................7

*Turnell v. CentiMark Corp.*,
796 F.3d 656 (7th Cir. 2015) ........................................................................6

*Ty, Inc. v. Jones Grp., Inc.*,
237 F.3d 891 (7th Cir. 2001) .............................................6, 17, 18, 19, 24

*Wal-Mart Stores, Inc. v. Samara Bros.*,
529 U.S. 205 (2000) ......................................................................................7

**Federal Statutes**

11 U.S.C. § 1125 ................................................................................................6, 17

v

## I.   __INTRODUCTION__

Imitation may indeed by the height of flattery, but in nakedly imitating the distinctive look and feel of Kellytoy Worldwide, Inc.'s ("Kellytoy") Squishmallow's plush toys, Ty, Inc. ("Ty") has accelerated past the line of permissible competition and into an obvious infringement of the Squishmallows trade dress.  And given the transparent nature of the infringement and the clear resulting risk to Squishmallows' hard earned goodwill, only a preliminary injunction can prevent Kellytoy from suffering irreparable harm.

The facts and law demanding this result are straightforward.  Kellytoy introduced the Squishmallows line – a series of plush toys with abstract depictions of popular animals – in 2017, and did so after a lengthy design process focused on creating a line of toys that maintained a unique combination of features heretofore not seen in the U.S. marketplace.  It succeeded.  In fact, Kellytoy's designers and an independent industry expert confirm below that assembly of non-functional characteristics – namely, an egg/bell shape without discrete limbs and no torso, embroidered facial features based on the Japanese Kawaii style, and a soft shell with a squishy stuffing – are not found on other plush toys in the United States.  Nor is there any doubt that the overwhelming consumer and industry reaction to Squishmallows give rise to clear secondary meaning under applicable law, affording Squishmallows durable trade dress rights.  The assembly of evidence set out below, including extensive advertising and marketing, 40 million units shipped to national retailers in three years, widespread consumer engagement on social media and otherwise, all put that question firmly to rest.

Ty, against that backdrop, now seeks to misappropriate that goodwill by selling competing goods that unambiguously copy the particular look and feel of Squishmallows.  That Ty is deliberately converting the unique combination of elements defining the Squishmallows trade dress cannot be the subject of any reasonable dispute.  A simple review of two of the parties' respective products confirms the intentional nature of this infringement:

EXHIBIT J
Page 7 of 139

Kellytoy Squishmallow



Ty's Squish-a-Boo



Beyond that, the concurrently filed declaration of an established industry expert – Richard Gottlieb – echoes that inevitable conclusion, making this a garden variety infringement case: Squismallows embody protectable trade dress that Ty is knowingly infringing.

That much resolves the likelihood that Kellytoy will ultimately prevail on the merits of its claims – it will. But it will also suffer clear irreparable harm if Ty is not enjoined as requested. Specifically, Ty intends to market its infringing toys nationwide – and has already exhibited them at toy industry trade shows – and the imminent threat of that full throated infringement campaign cannot be overstated. Ty should not be permitted to trade off of the Squishmallows goodwill and in the process confuse the public into believing that Ty's Infringing Plush[1] originates from or is associated with Kellytoy's originals. Kellytoy has the exclusive right – indeed, the duty – to control its reputation, but it cannot control the quality of infringing goods, be they Ty's or another competitor's. And the more the public is exposed to Ty's competing products, ones incorporating the features of the Squishmallows Trade Dress (shape, etc.), the less resonant and valuable will be the trade dress in functioning as indicia of product source. Left with no other option in protecting its rights, Kellytoy now moves this court for a preliminary injunction to prevent Ty from distributing the Infringing Plush until this case is resolved.

## II.     STATEMENT OF FACTS

Kellytoy creates, manufactures, distributes, and sells unique plush toys. (Declaration of Jeanne Yoon ("Decl. Yoon") ¶ 8.) This includes the highly successful and famous Squishmallows line of plush animals, which Kellytoy created Squishmallows in 2016. (*Id*. ¶ 9.)

---

[1] *See* Exhibit I to the Mizrahi Declaration attaching photographs of the Infringing Plush.

EXHIBIT J
Page 8 of 139

That creation introduced a new class of plush toys and carved a previously non-existent niche in the marketplace, and the public has enthusiastically embraced Squishmallows – Kellytoy has shipped approximately 40 million units of Squishmallows since the summer of 2017, resulting in tens of millions of dollars in revenue to Kellytoy. (*Id.* ¶ 23.)

The scope of this success is the product of deliberate design decisions intended to distinguish Squishmallows from other plush toys. Jeanne Yoon – Kellytoy's Vice-President of Sales and Development – explains in her declaration, for example, that Kellytoy's designers settled on the particular elements of the Squishmallows design to create an identifiable look and feel that would distinguish Kellytoy's goods from others in the marketplace. (*Id.* ¶ 10.) Those elements include: (1) a specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs; (2) abstract, embroidered facial features based on the Japanese Kawaii style; (4) oval/rounded graphic features; and (5) an ultra-soft shell and mooshy, silky stuffing, as more fully described at Paragraph 31 of the Complaint (the "Squishmallows Trade Dress"). (*Id.*) And Ms. Yoon attaches, as Exhibit 1 to her declaration, examples of Squishmallows reflecting the unmistakable trade dress they embody. (*Id.*, Ex. 1.) Beyond that, the commercial peculiarity of that combination of features, and the fact that Squishmallows are the only plush toy line embodying them, is confirmed by Richard Gottlieb – an experienced toy industry expert – whose accompanying declaration makes clear that these toys "possess a distinctive overall look and feel that is not shared by the plush toys of others in the marketplace." (Gottlieb Decl. ¶ 16.) Mr. Gottlieb's expert conclusion is based on his review of thousands of plush toys – constituting a representative sample of the marketplace – as a means of testing the distinctive nature of Squishmallows. (*Id.* ¶ 13.)

That singularity of combined features has facilitated the undeniable popularity of Squishmallows, and the resonance of their design with the consuming public and the industry at large. These goods are sold nationwide and in the country's largest retailers, including Costco, Walmart, Walgreens, CVA, Kroger, Fred Meyer, Target, Party City, Dave & Busters and Knotts Berry Farm. (*Id.* ¶ 22.) Squishmallows have also been featured in various national media – Ok! Magazine, E! News, the Chicago Tribune, the Washington Post, the Pittsburgh Post-Gazette and

the Houston Chronicle, a mere sampling of the media attention generated – and have received numerous industry awards, *e.g.,* by the National Parenting Product Awards, Toys Tots Pets & More, Parents' Choice, HowToLearn.com, Creative Child, The Mom's Choice Awards, and The National Parenting Center. (*Id.* ¶¶ 10, 22 and 23.)  Given this consumer buzz, industry insiders have not surprisingly recognized Squishmallows in myriad ways, *e.g.,* Toy Insider named Squishmallows as one of the top holiday toys, Toy Book Magazine featured them in a cover story, and Teddy Bear and Friends Magazine and Animal Tales Magazine likewise featured them and their market success.  (Declaration of Elisa Vazquez ("Decl. Vazquez") ¶¶ 32-33).)

Perhaps the most compelling evidence of Squishmallows' trade dress, however, is the demonstrable public appetite for information concerning and access to these goods.  Dan Grody, a longtime public relations executive Kellytoy retained to coordinate the marketing of Squishmallows, explains more particularly that – in decades of managing PR campaigns – he has never seen the level of consumer engagement Squishmallows has realized since 2017.  (Grody Decl. ¶ 9.)  Mr. Grody recounts, for example, that a review of Google Trends – tracking search terms and topics – over the past twelve months reveals the significant global force Squishmallows has become, one that in the fall of 2019 surpassed the highly successful Ty's Beannie Boos and Aurora's YouHoo & Friends in search volume.  (*Id.* ¶ 13.)  And that engagement is particularly telling given the limited time Squishmallows have been in the market. Mr. Grody again provides important context in this regard, noting that the metrics he relies upon show that Squishmallows are continuing to expand in popularity at a time (three years post launch) when most brands experience declines, and that the return on marketing investment Kellytoy is enjoying exceeds that of other lines that have devoted far more in resources and time. (*Id.* ¶ 14.)  Kellytoy is, in other words, spending less and receiving more on Squishmallow than other toy manufacturers have achieved concerning other brands, a fact Mr. Grody assigns to the distinctive characteristics and look and feel of the goods themselves.  (*Id.*)

Mr. Grody's conclusions are echoed by the evidence of direct consumer engagement of their fans on social media specifically.  Those legions of fans share Kellytoy's social media posts with their followers on Facebook, Instagram, Pinterest, YouTube, and other sites, resulting in

EXHIBIT J
Page 10 of 139

millions of "likes." (Decl. Vazquez ¶ 15.) A simple Google search for the term *Squishmallows*, for example, returns more than a million results, and countless user-created videos appear on YouTube of fans using and collecting Squishmallows plush toys. (Decl. Yoon ¶ 16; Decl. Vazquez ¶ 27). These fans even put the Squishmallows to transformative uses, such tutorials on how to draw Squishmallows or stop-motion videos. (Decl. Vazquez ¶ 27.) Nor is there any doubt that these consumers identify Squishmallows' look and feel as source identifiers. Mr. Grody's Declaration includes, for example, a sampling of recent social media posts from consumers explaining generally their effort to locate Squishmallows, and their disappointment in discovering that some of what they discover are knock-offs. (Decl. Grody ¶ 16.) Those posts are revealing in multiple respects, but most tellingly they reflect the consumers' understanding that there are "official" Squishmallows and, by corollary, imitation goods whose origins they do not recognize. And that recognition, in turn, establishes that the combination of features Kellytoy designed is operating precisely as intended – to identify the source of origin of Squishmallows.

That consumer recognition, like the product design, did not occur by accident. To the contrary, Kellytoy has spent handsomely advertising and promoting Squishmallows since their 2017 launch, and indeed maintains an annual marketing budget of $1,000,000 devoted specifically to these goods. (Yoon Decl., ¶ 14.) This includes advertisements to consumers and business-to-business advertisements and, as mentioned above, a robust social media presence dedicated to Squishmallows – these goods have more than 109,000 Instagram followers, 82,000 Facebook followers, and 12,000 Twitter followers, more than many longer-existing and well-known plush brands. (Decl. Vazquez ¶ 14.) Through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions and close to another 100 MILLION impressions through paid placements on Facebook and Instagram. (Decl. Grody ¶ 12.)

All of which is to reiterate what is apparent from the record – Kellytoy could have chosen alternate designs for Squishmallows, but instead chose the elements of the Squishmallows Trade Dress to create an easily-identifiable line of toys to distinguish it from the goods of others. Those decisions were not motivated by cost – Kellytoy could have chosen alternative designs

that are less expensive to produce and, in fact, it produces numerous plush toys that cost less to produce than Squishmallows. (Decl. Yoon ¶ 11.) And that fact is important, because Ty, or other Kellytoy competitors, could create plush toys with alternate designs without any disadvantage – other than the disadvantage of not riding on the Squishmallows good will. (*Id*.) For the reasons explained below, however Ty's intentional decision to misappropriate that good will presents a case where the very essence of trade dress protection is implicated, and where nothing less than injunctive relief will assure that justice is done.

### III.    ANALYSIS

#### A.    The Preliminary Injunction Standards

To obtain a preliminary injunction, a plaintiff must show: (1) the plaintiff has a reasonable likelihood of success on the merits; and (2) the plaintiff will suffer irreparable harm absent a preliminary injunction and has no adequate remedy at law. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the plaintiff makes this showing, the court considers (3) the irreparable harm the defendant will suffer if preliminary relief is granted balanced against the irreparable harm the plaintiff will suffer if relief is denied; and (4) the public interest in granting or denying the preliminary injunction. *Id*.

#### B.    Kellytoy Is Likely To Succeed On The Merits

A plaintiff satisfies the first requirement if it shows that it has "some likelihood" of success on the merits. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896 (7th Cir. 2001) ("Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits.") This requires only a "better than negligible" chance of succeeding on the merits. *Id*. (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988)). To succeed on the merits of a trademark action, a plaintiff must prove (1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product. *Id*. at 897; *see also* 11 U.S.C. § 1125(a).[2] Trade dress encompasses the overall "look

---

[2] Kellytoy's trademark infringement and unfair competition claims alleged in the complaint, under Illinois

(Continued…)

and feel" of a product, including its size, color or color combinations, texture, graphics, packaging or other visual features that connote the source of such goods in the minds of consumers – essentially serving the function of a trademark. *See e.g., Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir. 1989); *see also Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994). That is, in certain circumstances, trade dress may extend to features (e.g., shape, texture etc.) of the product itself. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000). A plaintiff has a protectable trademark in a product's design if it has acquired a secondary meaning and is non-functional. *Id*. at 211; *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019). As explained below, Kellytoy meets this test and is more than likely to prevail on the merits.

    1. **The Squishmallows Trade Dress has developed a secondary meaning**

    The Seventh Circuit employs a several-factor factual analysis to determine whether a particular product design has acquired secondary meaning, including: (a) the amount and manner of advertising; (b) the volume of sales; (3) the length and manner of use; (4) consumer surveys; (5) evidence of intentional copying; and (6) unsolicited media coverage. *See Thomas & Betts Corp., v. Panduit Corp.,* 138 F.3d 277, 293 (7th Cir. 1998). The ultimate import of these factors is to determinate when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.* at 291. The *Thomas & Betts* Court observed, for example, that a mark holder may establish secondary meaning by means of "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id*. at 291.[3] Nor does the law make any distinction between the weight to be given to either direct or circumstantial evidence and, indeed, circumstantial evidence may often be "more

---

statutory and common law, are subject to the same analysis as its Lanham Act claim for purposes of determining likelihood of success on the merits. *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) (granting preliminary injunction).

[3] We note that the Seventh Circuit has long held that survey evidence is not required to prove secondary meaning. *See e.g., Health O Meter Inc. v. Terraillon Corp.,* 873 F.Supp. 1060. 1173 (N.D. Ill. 1995).

certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Trankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11 (1960); *see also Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704-05 (N.D. Ill. 2009); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); *and see* Federal Civil Jury Instructions of the Seventh Circuit 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence.")

    These general principles aside, trade dress protection supports a specific and important policy consideration striking at the heart of intellectual property law – namely, advancing the economic policies of trademark law, a principal one of which is to reduce consumers' search costs by "quickly and easily assur[ing] a potential customer that *this* item – the item with this mark – is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995). Beyond that, trade dress emphasizes the law's encouragement of investment in brand development and, by corollary, the discouragement of free-riding. Specifically, trade dress protection "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* And it likewise and conversely discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale. *Id.* at 164.

    The enforcement of that policy ensures that source identifying characteristics are afforded the protection they deserve and the consuming public expects. The Sixth Circuit found in *Ferrari S.P.A. v. Roberts*, for example, that the shape and design of specific Ferrari models had penetrated the marketplace sufficiently to preclude the defendant from selling fiberglass kits that would allow one to make a non-Ferrari car look like a Ferrari model: "Ferrari charges, and the district court found, that the unique and distinctive shape and design of the Daytona Spyder and the Testarossa are protected trade dress which Roberts has infringed by copying them and marketing his replicas." 944 F.2d 1235, 1239 (6th Cir. 1991); *see also Gurglepot, Inc. v. New Shreve, Crump & Low LLC,* 153 F.Supp.3d 441, 449 (D. Mass 2015) (public association with distinctive shape and appearance of plaintiff's goods render it protectable trade dress).

Kellytoy has plainly established a secondary meaning under these principles. It has created certain finite and distinguishable characteristics that are consistent through its line of Squishmallow toys, and which serve a clear source identifying function to the consuming public. Those features are described above, and include the egg/bell shape with no proportionate, pronounced limbs (the absence of which amplifies the distinctive shape), the Asian Kawaii faces and complementary rounded graphics, embroidered facial features, distinctive monochrome coloring and short pile velvety texture and silky memory-foam-like stuffing. (Decl. Yoon ¶ 10.)

The fact that these characteristics were the product of deliberate design decisions emphasizes the uniqueness of the Squishmallows' look and feel. As Ms. Yoon explains in her declaration, the product creators at Kellytoy consciously crafted the shape and look of the Squishmallow line to reflect a specific artistic expression that would immediately be identifiable by the consuming public, and would in turn identify Squishmallows to the exclusion of all other plush toys. (*Id.*¶ 12.) And they did so by surveying the marketplace for purposes of tracking the standard features of these toys and designing products that maintained consistent and combined qualities that *are not* found on competing toys. (*Id.*¶ 13.) Nor is there any reasonable doubt that Squishmallows' combination of features is unique in the marketplace. As noted above, Richard Gottlieb, the toy industry expert, explained – as noted above – he has "never seen a single plush toy incorporating all of these features and otherwise being expressed quite the way they appear in the Squishmallows." (Decl. Gottlieb, ¶ 16.) The Squishmallows features, in other words, present an abstract, and yet identifiable, expression of the animals that are included in the line, and they consequently reflect a look and feel that is unique to Kellytoy's plush goods.

That commercial reality is a matter of undeniable fact in the marketplace, nor is there any doubt that Squishmallows have penetrated the consciousness of the consumer, and acquired durable secondary meaning.

***The amount and volume of advertising.*** As a starting point, Kellytoy's advertising campaign evidences the extent to which consumers have embraced the look and feel of Squishmallows as source identifying features under *Thomas & Betts, supra.* Mr. Grody – a principal at Tellum Grody Public Relations, Inc. ("TGPR") – and Elisa Vazquez of Kellytoy

9

establish, among other things, that TGPR has overseen the Squishmallows marketing campaign since 2017 and has been stunned by the level of consume recognition and engagement with the campaign. Mr. Grody recounts, for example, that (1) the dedicated Squishmallows.com website receives in excess of 5,500 visits *per day* on its website traffic consistently ranks in the top 50,000 for U.S. sites (and top 125,000 for global sites) and recorded as high as 14,162 in the U.S. in December 2019[4]; (2) Squishmallows currently has over 104,000 Instagram followers, over 80,000 Facebook followers, and more than 10,000 Twitter followers; (3) Squishmallows has more than 28.5K organic posts on Instagram that use the official hashtag (#Squishmallows), and the average Squishmallows post likes on Instagram hovers at over 3000+ per post and 100+ average comments per post; (4) through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions, including paid placement on Facebook and Instagram since July 21, 2017 that total 23.6 MILLION unique individuals and 83.7 MILLION impressions; and (5) digital advertisements used by Kellytoy to advertise its Squishmallows plush toys in conjunction with specific retailers have yielded average click through rates of 30+%, while the industry average is about 1-2%. (Dec. Grody ¶ 10-13.)

 ***Volume of Sales.*** Mr. Grody emphasizes that the extent of consumer response to the Squishmallows campaign in such a short time is unprecedented in his experience, and the data to which he testifies – and the testimony of Mr. Gottlieb, the toy industry expert – establish that the Squishmallows trade dress has acquired secondary meaning. (Decl. Grody ¶ 9; Decl. Gottlieb ¶ 16.) And the remaining *Thomas & Betts* factors merely serve to confirm that obvious legal conclusion. The volume of Squishmallows sales, to take one particularly apropos example, squares directly with the data and observations of Messrs. Grody and Gottlieb. Squishmallows have sold and shipped approximately 40,000,000 (40 million) units since 2017, a figure in

---

[4] To put this into context, there are nearly 1 3/4 billion websites available on the World Wide Web. (Mizrahi Decl., at ¶ 2.) As one might expect, the most popular websites the United States are Google, YouTube, Facebook, Amazon – with Apple.com being at number 30. (Mizrahi Decl., at ¶ 3.)

harmony with the consumer response Mr. Grody recites and the particularized characteristics Mr. Gottlieb focused upon. (Decl. Grody ¶¶ 13-14; Decl. Gottlieb ¶ 10.) Ms. Yoon amplifies those facts, explaining that in twenty years as a primary toy manufacturer Kellytoy has never experienced anything like the explosion of Squishmallows popularity. (Decl. Yoon ¶ 27.)

**Length and manner of use.** The Grody and Yoon Declarations demonstrate that Squishmallows have been consistently and continuously been sold in the marketplace since 2017, and they have always included the features discussed above and which embody the product's trade dress. It is those abstract features and the consistency of their use that distinguishes Kellytoy's Squishmallows from its competitors. And Kellytoy's advertising educates the consuming public concerning those features through "look for" advertising. Ms. Yoon explains in her declaration, for example, that Kellytoy's press releases, social media sites, marketing materials and stationary all expressly states that the "shape, look, feel, and texture of Squishmallows® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress." (Decl. Yoon ¶¶ 18-21.)

**Consumer Evidence.** The widespread evidence discussed above is substantiated by direct consumer evidence of source identifying recognition. Ms. Yoon again provides particulars, including among other things that the Google search engine yields over 1,370,000 "hits" for Squishmallows, and Mr. Grody additionally recounts the voracious consumer appetite for these products in his declaration. (Decl. Yoon ¶ 16, Grody ¶¶ 13-14.) But within the perpetual stream of public commentary on social media concerning Squishmallows is specific consumer recognition that there are "official" Squishmallows. A sampling of Facebook posts demonstrate in fact the products' many fans search high and low for Squishmallows they have not previously seen and which they want to add to their collection – and knock off brands that are the product of competitors' efforts to confuse the public into believing that their imitation goods are in fact made by the same manufacturer as Squishmallows. This evidence, in short, demonstrates that: (1) the consuming public has identified Squishmallows resolutely; (2) a sub-culture of Squishmallows followers has formed, and which communicates with one another about Squishmallows through social media; and (3) this degree of devotion and continuous

commentary is, in the plush toy industry, particular to Squishmallows. (Decl. Vazquez ¶ 15.)

*Media Coverage/Industry Recognition.* Squishmallows have been the subject of repetitive and extensive media coverage. Ms. Vazquez sets out in her declaration, for example, a long list traditional and internet press coverage that has focused on these goods, coupled with a steady stream of media events and trade publications that likewise have focused on Squishmallows. (Decl. Vazquez ¶¶ 20-31.) To name just a few, Squishmallows were featured in issues of *OK! Magazine, L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017, 2018, and 2019 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, E! News, and *L.A. Parent*. (Decl. Vazquez ¶ 22.) That is in addition to the numerous industry awards these goods have received, and which are mentioned above. (*Id.* ¶ 10.) This collectively supplements the myriad evidence already assembled concerning secondary meaning, and serves to confirm what that evidence makes obvious – Squishmallows possess protectable trade dress.

*Deliberate Copying.* That Ty deliberately copied the Squishmallows Trade Dress is beyond any reasonable dispute. Ty transparently and self-consciously copied that trade dress in its effort to convert the goodwill Kellytoy has generated in its Squishmallows plush toys. Lest there be any doubt, Mr. Gottlieb – the industry expert – makes clear that Ty decided to "fully duplicate the look and feel of the Squishmallows trade dress." (Decl. Gottlieb ¶ 22.) Indeed, Ty has not merely created an outwardly similar product, but Ty has self-consciously copied details that relate "specifically to the combined characteristics that make Squishmallows unique in the marketplace." (*Id.* ¶ 21.) This is, in short, deliberate and willful copying. (*Id.* ¶ 20.)

### 2.   <u>The Squishmallows Trade Dress is non-functional</u>

To be protectable, trade dress, *as a whole*, cannot be solely functional. *See Bodum*, 927 F.3d at 491. Functionality must be analyzed by reference to the overall combination and arrangement of the various features – not on the functionality of each of the individual features. *Badger*, 13 F.3d at 1154; *Logan Graphic Prod., Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2003 WL 21011746, at *4 (N.D. Ill. May 5, 2003).

That said, a product's trade dress may have a "function" in the everyday meaning of the

term without being "functional" within the meaning of trademark law. *See Bodum*, 927 F.3d at 492. A French press coffeemaker has, for example, protectable trade dress in the product's overall appearance even though all of the product design elements have functions, including a handle, lid, feet at the bottom, and a round knob for the strainer. *Id.* ("[T]o establish it has a valid trade dress, [the plaintiff] did not have to prove that something like a handle does not serve any function. It merely needed to prove that preventing competitors from copying the [French press's] particular design would not significantly disadvantage them from producing a competitive and cost-efficient French press coffeemaker."). Thus, the defendant may not copy the plaintiff's combination of these elements even where the plaintiff could not claim trade dress in an individual element. *Id.* at 493.

Functionality may not, in that regard, be used to defeat trade unless that trade dress ***as a whole*** is "'essential to the use or purpose of the article or if it affects the cost or quality of the article,'" or if its use is "a competitive necessity" because not using the trade dress would put competitors at a significant non-reputation-related disadvantage. *Id.* at 491 (quoting *Qualitex*, 514 U.S. at 165). In assessing that question, the Seventh Circuit courts consider: (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost. *Id.* (citing *Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011)). No single factor is dispositive and courts consider each factor separately. *Id.*

    a.   *The Squishmallows Trade Dress does not have any design elements that have been subject to a utility patent*

The first factor weighs in favor of non-functionality. Kellytoy has never filed for a utility patent for the Squishmallows plush toy as a whole, or for any element thereof. (Decl. Yoon ¶ 41.)

b.   *The Squishmallows Trade Dress provides no utilitarian advantage*

When viewed as a whole – as required under applicable law – the Squishmallows Trade Dress cannot reasonably be characterized as providing a utilitarian advantage.  The subject goods comprise plush toys, rather than utilitarian goods such as tools, chairs, etc.  In addition, the claimed trade dress does not include clasps or other functional features.  Rather, it is comprised of elements of design and aesthetics, calculated to provide a unique/distinguishing "look and feel" across a line of plush toys to identify them as genuine Squishmallows.

As explained above, and in light of their overall shape, the Squishmallows plush toys embodying the Squishmallows Trade Dress lack a discrete head or torso or pronounced/proportionate limbs.  They are, in fact, highly abstracted renditions of animals or other creatures, designed to conjure images of the creatures they depict but without accurately representing their physiognomy.  The limbless egg/bell shape of Squishmallows does not provide any utilitarian advantage over the countless alternative shapes available, such as round, square, oblong, or realistic to an animal's shape.

Despite that, Ty suggested in prior correspondence that "the oval pillow shape of Kellytoy's products is functional for the additional reason that the oval shape permits the product to sit upright for display or play, while still maintaining a pillow like appearance with a tapered and smaller area for display of the head portion of the product."  Setting aside for the moment that the capacity to sit upright provides **no net advantage**, this self-serving assertion ignores the fact that, if designing a toy that could sit in this manner was the purpose, Kellytoy could easily have achieved the same goal by shaping them as flat bottomed and flat topped ovals, squares, rectangles, spheres, etc.  Stated another way, having them taper towards the top represents a design choice, not a utilitarian/functional choice.

Regardless, Squishmallows do not reliably stand.  It takes little if anything to knock them over, and the fact that they are typically handled by children while sitting on the retailer's shelves will all but ensure that they will not be standing upright for very long, unless independently supported.  More to the point, if standing upright provided a utilitarian advantage, Kellytoy would have designed Squishmallows to stand up more stably, e.g., as squares,

rectangles, triangles, spheres, cylindrical, oblong/lateral pillows, etc. or with a much wider base relative to the upper portion. (Decl. Yoon ¶ 37.) The same holds true for having them stand up for purposes of play – they lack the stability to support the allegation that their shape was dictated by utilitarian considerations. (*Id*.)

In any event, an ability to stand does not make the Squishmallows Trade Dress functional because consumers do not select Squishmallows for their ability to stand. Indeed, numerous social media posts by Squishmallows consumers show the products on their sides, backs, and being held by users as does numerous posts/advertisements placed by Kellytoy. (*See* Decl. Vazquez ¶ 35, Ex. F.) Thus, standing is not essential to the use or purpose of Squishmallows.[5]

Even if eyes, mouths, or coloring have a function in stuffed animals, Ty is not free to copy the look and feel created by Kellytoy's selection of the combination of these features. *See Bodum*, 927 F.3d at 492. The Squishmallows Trade Dress expresses those features in its own way giving Kellytoy's Squishmallows a distinctive overall look and feel, especially when viewed in combination with the other features of the Squishmallows Trade Dress. If a plaintiff "seeks to protect the overall look of its product – the combination and arrangement of the various features – the appropriate inquiry focuses on the overall trade dress and not on the individual features." *Logan*, 2003 WL 21011746, at *4. In our case, rather than copying the overall look and feel of Squishmallows, Ty could have employed countless other features that would not infringe Kellytoy's trade dress. *See supra; see also Bodum*, 927 F.3d at 492 (combination of functional elements still trade dress because competitor could have used alternative designs of the elements); *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123–24 (7th Cir. 1988).

This merely serves to confirm what it obvious – no particular element of the Squishmallows Trade Dress provides a utilitarian advantage, much less all the elements in

---

[5] The remaining elements of the Squishmallows Trade Dress are likewise nonfunctional. In addition to their unusual shape (with the absence of discrete head and torso or proportionate limbs), further supporting their abstracted overall appearance, they also possess simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring.

combination.  Rather, Kellytoy designed the Squishmallow Trade Dress – with its unitary aesthetic across its Squishmallows line – to distinguish the source of products embodying the Squishmallow trade dress from the source of other toys.  (Decl. Yoon ¶ 48.)

c.  *Kellytoy has not advertised utilitarian advantages of Squishmallows*

Kellytoy has never advertised any utilitarian advantages of its Squishmallows, other than the fact that the Squishmallows can be used as pillows – something that holds true for the vast majority of plush toys.  (Decl. Yoon ¶ 42.)  Kellytoy has never advertised that the Squishmallows stand or sit on their bottoms.  (Decl. Vazquez ¶ 34.)

d.  *Many alternate designs for stuffed animals exist*

The existence of competing product designs indicates a trade dress is non-functional.  *See Logan*, 2003 WL 21011746, at *4 ("[I]t is appropriate at [the preliminary injunction] stage to consider the existence of alternative designs in the marketplace when determining whether product features are functional.").  As noted above, alternate and non-infringing designs are not just available, but are in wide use in the marketplace.  (Decl. Yoon ¶ 46.)  Ty itself sells, in fact, numerous lines of plush toys that do not co-opt the Squishmallows Trade Dress.  (*Id*. ¶ 43.)  It cannot reasonably be disputed as a result that ample alternate designs are available.  *See Bodum*, 927 F.3d at 493 (concluding that "ample evidence" exists of alternate designs where both litigants manufactured products with different design elements).

The shape, appearance, texture, and feel of the Squishmallows plush toys are all aesthetic features as to which there are innumerable alternatives.  (Decl. Yoon ¶¶ 42–44.)  Kellytoy designed the Squishmallows shape, appearance, texture, and feel to distinguish the Squishmallows from other toys.  (Decl. Yoon ¶ 9.)  There are also numerous alternative designs in the marketplace that abstractly depict animals and other creatures – without discrete heads and torsos and without proportionate limbs – that do not infringe upon the Squishmallows Trade Dress.  While they possess some of the elements of the Squishmallows Trade Dress, they critically differ in shape and thus avoid infringement.  (*See* Decl. Yoon ¶¶ 42–44 for examples.)

e.  *The Squishmallows Trade Dress does not affect quality or costs*

Kellytoy did not select the features of the Squishmallows Trade Dress for purposes of

increasing quality or reducing costs.  Kellytoy could have, as noted, chosen alternative designs that are less expensive to produce.  (Decl. Yoon ¶¶ 11-12.)  Kellytoy uses an ultra-silky polyester fill for the Squishmallows stuffing, for example, and alternate fillings are available for stuffed toys that are less expensive, such as regular polyester stuffing and 3D light weight stuffing.  (*Id*.) Likewise, Kellytoy could have chosen ways to depict nostrils, mouths, and other features that are less expensive than embroidering those features.  (*Id*.)  Less expensive alternatives to embroidery include printing and sublimation printing.  (*Id*.)  The short-pile velvety velour-like textured exterior provides no cost savings.  Other less expensive available exterior materials include Tricot, EF Velboa and Velboa.  (*Id*.)  And Ty, for its part, could have selected any number of alternatives designs that would have worked equally well from a cost of goods and ease of manufacture standpoint but would not have provided the overall look and appearance that Kellytoy sought for its Squishmallows plush toy line.  (*Id*.)  The same holds true for the Squishmallows egg/bell shape.  That shape provides no manufacturing cost savings; other shapes such as squares, circles, triangles are equally, or less, expensive to manufacture.  (*Id*.)

### 3. <u>Customers are likely to be Confused</u>

A defendant's product infringes the plaintiff's trade dress if the plaintiff shows that similarity of the defendant's trade dress to that of the plaintiff's creates a likelihood of confusion on the part of consumers as to the source of the goods.  15 U.S.C. § 1125; *Badger*, 13 F.3d at 1151; *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015).

Courts in the Seventh Circuit consider seven factors when analyzing the likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.  *Top Tobacco*, 101 F. Supp. 3d at 789 (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)).  No single factor is dispositive, and a plaintiff need not allege facts for all factors.  (*See id*.)  The weight a court assigns to any factor will depend on the facts and circumstances of the case.  *See Ty*, 237 F.3d at 898 (affirming preliminary injunction obtained by maker of beanie baby plush toys).

a. *The Squishmallows Trade Dress and the Infringing Plush are similar in appearance and suggestion*

The first factor weighs in favor of a likelihood of confusion if the plaintiff's and the defendant's products outwardly are similar in appearance. *See Badger*, 13 F.3d at 1152. Here, the Infringing Plush toys are outwardly similar in appearance to Squishmallows. As can be readily seen from an inspection of the Infringing Plush, the Infringing Plush contain all of the visual elements of the Squishmallows Trade Dress, including the overall bell/egg shape without distinct heads and torsos, both depict animals/creatures without proportionate and pronounced appendages; abstract, Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics and embroidered facial features; and contrasting and non-monochrome coloring. (Decl. Mizrahi, Ex. I.) One can also tell through visual inspection and that the Infringing Plush contain a very soft, short pile outer shell similar to the Squishmallows. (*Id.*) As can readily inferred from the name assigned by Ty to the Infringing Plush, namely, Squish-a-Boos, that they possess a mooshy filling. (*Id.*) A buyer who had access to Ty's Squish-a-Boos during a recent tradeshow confirmed to Kellytoy that the Infringing Plush possess a similar shell material and "mooshy" feel reasonably Squishmallows. (Decl. Rauch ¶ 3.) Mr. Gottlieb puts the question to rest, opining that when coupled "with a sounds-like name, Squish-A-Boo, makes for a product that consumers will easily confuse with the Squishmallows product." (Decl. Gottlieb ¶ 22.)

Significantly, Mr. Gottlieb confirms that Ty took the features that distinguish the Squishmallows line from the goods of others (e.g., the shape, the lack of limbs, and the abstract features) and incorporated them into the Infringing Plush. (Decl. Gottlieb ¶ 19.)

Nonetheless, to the extent the products may contain minor differences, such as Ty using larger eyes, those differences do not defeat the likelihood of confusion because the courts, in analyzing similarity, do not consider the products side-by-side, but instead consider the conditions of the marketplace. *See Ty*, 237 F.3d at 899; *Int'l Kennel Club*, 846 F.2d at 1088; *see also Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2nd Cir. 2005) (reversing denial of preliminary injunction because district court compared the products side-by-side rather than considering the market conditions).

EXHIBIT J
Page 24 of 139

Here, consumers are unlikely to distinguish between genuine Squishmallows and the Infringing Plush based on the larger eyes or other minor differences. As discussed more below, the target customer for Squishmallows are children between 5 and 14. (Decl. Gottlieb ¶ 23.) Those children are unlikely to remember the details of the product, aside from the general look and feel, and they might request Squishmallows from their parents, who later purchase the products without the children present. The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush.

Even if consumers later notice differences between Squishmallows and the Infringing Plush, "[i]nitial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002), as amended (Oct. 18, 2002). The similarities discussed above allow Ty to profit from customers' initial interest confusion.

### b. *Squishmallows and the Infringing Plush are similar goods*

The plaintiff's and defendant's products are considered similar in type if the buying public would reasonably think they come from the same source, or are affiliated with, connected to, or sponsored by, the same source. *Ty*, 237 F.3d at 900; *Top Tobacco*, 101 F. Supp. 3d at 790; *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014). For example, the public may presume products come from the same source when "the objects are similar in that they are small stuffed objects that are soft, pellet-filled, eight to nine inch plush toys made from velboa-type fabric." *Ty*, 237 F.3d at 899–900. This factor is further supported if the plaintiff and defendant are in the same industry. *Top Tobacco*, 101 F. Supp. at 790.

In this case, the Infringing Plush and the Squishmallows comprise the same types of goods. As described above, Squishmallows and the Infringing Plush are both similar sized plush toys, of similar shape and feel, and marketed to the same consumers. Thus, this factor further supports the conclusion that the buying public is likely to think Squishmallows and the Infringing Plush are associated or originate from a common source.

c. *Squishmallows and the Infringing Plush are sold in the same area*

For the third factor, courts consider the products' geographical areas of distribution; whether the products directly compete with each other; whether products are sold to consumers in the same type of store; and whether the products are sold through the same marketing channels. *Top Tobacco*, 101 F. Supp. 3d at 790–91. Facts supporting the third factor include both products being advertised nationwide (*KJ Korea*, 66 F. Supp. 3d at 1016); that both products being sold in the same city (*id.*); both products being sold in the same type of retail stores or same sections of stores (*Top Tobacco*, 101 F. Supp. 3d at 791). The area and manner of concurrent use favors a finding of likelihood of confusion if the products directly compete for customers. *See Badger*, 13 F.3d at 1152.

Squishmallows and the Infringing Plush are sold in the same area. In fact, Squishmallows are sold in hundreds of retailers nationwide, including the largest retailers in the country, such as Walgreens, Fred Meyer, Kroger, and CVS, among others, many of the same nationwide retailers through which Ty has historically sold its plush toys. (Decl. Yoon ¶¶ 22, 31.) Squishmallows and the Infringing Plush have even appeared at the same trade show, the Atlanta International Gift & Home Furnishings Market. (*See* Declaration of Andrew J. Rauch ("Decl. Rauch") ¶ 3.) Kellytoy is also informed that Ty intends to display the Infringing Plush at Toy Fair New York, scheduled to take place February 22–25, 2020, considered the most important and most attended tradeshow in the United States. (*See* Decl. Yoon ¶ 334) This factor, too, weighs in favor of a finding of "likelihood of confusion."

d. *The consumer's degree of care*

Although people of all ages purchase Squishmallows, the target customers are children between 5 and 14. (Decl. Gottlieb ¶ 23.) While children can be expected to recall the overall "look and feel" of a product or product line, one outside of the presence of such toys, children are unlikely to remember the fine details of the product. (*Id.*) Moreover, the children often request toys from their parents, who in many cases later purchase the products without the children present. (*Id.*) The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush. Moreover, Squishmallows are not expensive, generally

ranging from $2.99 to $19.99, and are frequently impulse buys. (Decl. Yoon ¶ 38.) The more widely advertised, accessible and inexpensive the products, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *See Cae, Inc. v. Clean Air Engineering, Inc.*, 267 F. 3d 660, 683 (7th Cir. 2001). These factors, according to Mr. Gottlieb, increase the likelihood of consumer confusion. (Decl. Gottlieb, ¶ 24.)

e. *The Squishmallows Trade Dress is strong*

To determine the strength of the plaintiff's trade dress, courts "examine the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Top Tobacco*, 101 F. Supp. 3d at 791. Relevant evidence includes the amount of advertising and the amount of sales. *See id.*; *KJ Korea,* 66 F. Supp. 3d at 1016.

Here, the Squishmalows Trade Dress is strong for all the reasons described above. Indeed, the evidence assembled and recited in demonstrating that these goods have attained secondary meaning establishes, by corollary, the obvious strength of the Trade Dress and its resonence with the consuming public. *See supra.* Finally, to maintain its strength, Kellytoy has vigorously protected it in the marketplace against infringements via multiple lawsuits (not to mention disputes resolved through demand letters). (Decl. Mizrahi ¶ 4.)

f. *Actual confusion*

"Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *KJ Korea*, 66 F. Supp. 3d at 1016. A lack of evidence of **actual** confusion is not dispositive of the **likelihood** of confusion, and a plaintiff need no introduce, for example, a market survey evidencing likelihood of confusion. *Top Tobacco*, 101 F. Supp. 3d at 792 (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)); *see also Badger*, 13 F.3d at 1153. Here, Ty's infringing goods have not yet been released for general public sale, and thus no evidence of actual confusion can or could be available. That said, Kellytoy already has direct evidence demonstrating that actual confusion almost certainly will ensue if Ty's products are permitted to go to market. Specifically, Andrew Rauch, a Kellytoy Vice-President, testifies by

way of his Declaration that a Kellytoy customer (i.e., a retail buyer) informed him on January 15, 2020 – while attending a trade show in Atlanta – that Ty was selling or promoting products "very similar" to Squishmallows. (Decl. Rauch ¶ 3.) The import of that testimony is clear – if a Kellytoy customer/buyer is taking the time to identify the similarity of these goods to Kellytoy, before Ty's infringing goods are in release, subsequent and actual customer confusion is a practical inevitability if Ty ultimately releases its products on a widespread basis.

> g.   *Ty intended to palm off its products as Squishmallows*

Ty has a history in the toy market of entering after a market is established and competing with confusing products. Rather than innovate, Ty looks to competitors for new product ideas and, in many cases, undercuts the pricing for the originals and used its well-established distribution network and significant capital to establish itself as the market leader for its knockoff products – essentially drowning out the originals in the marketplace. (Decl. Yoon ¶ 53.) By way of example, a competitor created the Jellycat® Pom Poms toy, and Ty copied the look and feel with a toy under its Beanie Boo line, as depicted in the Yoon declaration. (*Id.* ¶¶ 55-56.) A competitor created the YooHoo & Friends toys, and Ty copied the look and feel under its Beanie Boos line, as depicted in the declaration. (*Id.* ¶¶ 57-58.) A competitor created the Tsum Tsum toy, and and Ty copied the look and feel with a toy under its Teeny Tys line, as depicted in the declaration. (*Id.* ¶ 59.) Thus, Ty intended to enter the market that Kellytoy established for Squishmallows and trade of the Squishmallows good will.

## C.   Kellytoy Will Suffer Irreparable Harm Absent A Preliminary Injunction

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2015 WL 3818622 (N.D. Ill. 2015), citing *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted).

If a preliminary injunction is not granted, Kellytoy will suffer loss for which there is no adequate remedy at law because: (1) Ty's infringement connects the Infringing Plush to genuine Squishmallows by causing consumer confusion regarding source and affiliation; (2) Kellytoy has no control over the manufacturing or quality control of the Infringing Plush – therefore, any quality problems related to Ty's products would be attributed to Kellytoy, resulting in damaged goodwill and undetectable lost sales; and (3) the ongoing advertising and sale of the Infringing Plush by Ty decreases the distinctiveness of the Squishmallows Trade Dress.

As detailed above, Kellytoy has made substantial investment in – and succeeded in – establishing its significant reputation and goodwill in its Squishmallows Trade Dress. In the absence of an injunction, Kellytoy will lose the value of that investment. The net result will be damage to Kellytoy in the form of lost profits and business opportunities, which amount cannot be measured or compensated by monetary damages alone. Further, unabated infringement will encourage others to use Kellytoy intellectual property without a license.

In addition, Ty has hijacked that reputation to sell competing products over which Kellytoy has no control. Trademarks identify their owners and in them resides the reputation and goodwill of their owners. Thus, if Ty is permitted to infringe upon the Squishmallows Trade Dress, Ty is borrowing Kellytoy's reputation for its own goods, whose quality no longer lies within Kellytoy's control. A trademark owner's loss of the ability to control its mark, thus, creates a high likelihood for damage to its reputation. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club*, 846 F.2d at 1092.

Kellytoy employs rigorous quality controls over its Squishmallows. (Decl. Yoon ¶ 29.) But Kellytoy has no control over the quality of Ty's directly competitive Infringing Plush. Quality control does not solely relate to durability, but also to aesthetics. As close as Ty's designs are to Kellytoy's authentic Squishmallows designs, Kellytoy would never release Squishmallows bearing Ty's specific designs: they do not comport with the Squishmallows aesthetic. (Decl. Yoon ¶ 50.)

There is also the issue of safety. Plush toys are most often provided to children. If

23

something untoward were to occur in connection with Ty's Infringing Plush, such "bad will" would likely be imputed to Kellytoy's Squishmallows. Once there is a safety scare concerning a product, in the age of social media and the Internet, news in the marketplace spreads like wildfire often without the measured reflection necessary to properly distinguish Ty's Infringing Plush from Kellytoy's Squishmallows. The fact that Kellytoy is powerless over the design and quality of the Infringing Plush further supports a finding of irreparable harm.

### D. The Irreparable Harm to Kellytoy Outweighs The Potential Harm Ty Would Suffer Were A Preliminary Injunction Wrongfully Granted

Comparatively, the potential harm to Ty is insignificant. First, Ty will simply be prevented from willfully infringing Kellytoy's Squishmallows Trade Dress and from trading on Kellytoy's goodwill – actions Ty never had the right to do in the first place. *See Ty*, 237 F.3d at 903 (When assessing the harm to the alleged infringer, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.") In fact, Ty's wrongful conduct towards Kellytoy is part of its modus operandi in the marketplace, where it has done the same thing to others. (Decl. Yoon ¶¶ 53-59.) It should not be allowed to succeed, again, here.

Second, Ty, in contrast to Kellytoy, is a newcomer to the market with its Infringing Plush, without an established market position and brand strength. An injunction barring Ty from violating the Squishmallows Trade Dress will not substantially impede Ty's ability to do business. It could simply change the design of the Infringing Plush – which, to Kellytoy's knowledge, has not yet been distributed to Ty's customers. Kellytoy wrote to Ty on January 16, 2020 informing it of Kellytoy's claims to the Squishmallows Trade Dress; to the extent that Ty continued to invest in the Infringing Plush and take orders therefor, it should only have itself to blame. (Decl. Mizrahi ¶ 5.) Regardless, Ty will not be put out of business: Ty sells numerous other successful lines of plush toys and can continue to sell those to its customers – it simply cannot infringe on the Squishmallows Trade Dress. This balance, in short, favors granting injunctive relief. *See Ty*, 132 F.3d at 1172.

### E. The Public Interest Will be Served By Granting the Injunction

The public interest will be served by granting Kellytoy's request for a preliminary

injunction, as it will prevent consumer confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) ("[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion."). Indeed, the gravamen of trademark protection is the right of the public to be free of confusion, along with the right of the trademark owner to control its reputation and its products' reputation; therefore, preventing Ty from infringing the Squishmallows Trade Dress and other of Kellytoy's rights promotes the interests of the public. *See id.* Granting of the requested injunction is in the public's interest.

### F. **Injunction Bond**

The amount of the security bond under Federal Rule of Civil Procedure 65(c) is in the discretion of the Court. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). The Seventh Circuit has determined that a strong likelihood of success is a major factor which could weigh heavily in favor of waiving a bond requirement. *Id.* Because of the strong and unequivocal nature of Kellytoy's evidence of trade dress infringement, and the fact that Ty will retain possession of its inventory and thus could sell it at a later date, Kellytoy asks this Court to require Kellytoy post a bond of no more than ten thousand U.S. dollars ($10,000.00). *See, e.g., Deckers Outdoor Corporation v. The Partnerships, et al.*, 2013 WL 1337616 (N.D. Ill. March 27, 2013) (setting $10,000 bond).

## IV. **CONCLUSION**

For the reasons set forth above, Kellytoy asks this Court to grant the Motion, enter the proposed order submitted to the Court, and enjoin Ty from selling, offering to sell, causing to be sold, disseminating, importing, distributing, circulating, promoting, marketing, advertising, or in any way commercially exploiting the Infringing Plush within the United States.

Dated: February 21, 2020        Respectfully submitted,

By:    */s/ Dean D. Niro*

    Dean D. Niro
    Oliver D. Yang
    VITALE, VICKREY, NIRO, SOLON & GASEY LLP
    311 S. Wacker Dr., Suite 2470
    Chicago, IL 60606
    Telephone: (312) 236-0733

dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander (*pro hac pending*)
Mark B. Mizrahi (*pro hac pending*)
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA  90067
Telephone:  (310) 255-6100
Facsimile:     (310) 255-6200
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and
KELLYTOY (USA), INC.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KELLYTOY WORLDWIDE, INC. and
KELLYTOY (USA), INC.,

               Plaintiffs,

vs.

TY INC., and DOES 1-10,

               Defendants.

) Case No. 1:20-cv-00748
)
) Honorable Gary Feinerman
)
)
)
)
)
)
)
)

## DECLARATION OF JEANNE YOON IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

I, Jeanne Yoon, declare and state as follows:

1.    I am over eighteen years of age and I have personal knowledge of the facts set forth herein. If called upon to testify I would do so to the same effect.

2.    I am an employee of Kellytoy Worldwide, Inc. ("Kellytoy Worldwide") and a resident of Los Angeles County, California.

3.    I make this declaration in support of Kellytoy Worldwide, Inc.'s Motion for Preliminary Injunction against Ty Inc.

4.    I have been employed by Kellytoy since May 2003 as serve as its Senior Vice President of Sales and Product Development.

5.    As the Senior Vice President of Sales and Development of Kellytoy Worldwide, I am responsible for managing and overseeing Kellytoy Worldwide's design of its plush toys and its retail development activity of the various brands distributed by Kellytoy Worldwide, particularly in the United States and China. My responsibilities also include sales, including sales presentation, pricing, and all follow-ups, for a majority of the

1

EXHIBIT J
Page 33 of 139

mass market, including drug store chains, grocery, and club stores. I also oversee import and domestic sales for Kellytoy Worldwide.

6. Unless stated herein to the contrary, each document relied on or referenced in this declaration has been kept in the course of a regularly conducted business activity, and it has been the regular practice of Kellytoy to create and maintain these records as part of its regularly conducted business activity.

7. Due to my position as Senior Vice President of Sales and Product Development, I am generally familiar with the facts of this case.

8. Kellytoy Worldwide is engaged in the business of creating, manufacturing, distributing and selling unique plush toys, including, without limitation, its highly successful and famous Squishmallows line of plush under the SQUISHMALLOWS brand ("Squishmallows"). Among Kellytoy Worldwide's Squishmallows branded line of plush toys are the specific Squishmallows designs set forth in **Exhibit 1** hereto.

**Kellytoy Worldwide and Its Protected Intellectual Property Rights**

9. In 2016, together with one of Kellytoy Worldwide's other designers, I conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features that distinguish them from the goods of others (the "Squishmallows Trade Dress"). The Squishmallows line possesses unique, recognizable and distinguishing features that are common across much of the Squishmallows line.

10. We chose the specific combination of design elements comprising the Squishmallows Trade Dress for the express purpose of creating a uniquely identifiable look and feel that would distinguish Kellytoy Worldwide's line of goods from the goods of others in the marketplace and to make them identifiable to consumers as a line coming from Kellytoy Worldwide, such as the combination of: (1) the specific shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs; (2) Kawaii, abstract, embroidered facial features; (4) oval/rounded graphic features; and (5) an ultra

2

soft shell and mooshy, silky stuffing.

11.  Using alternate design elements from the ones discussed above would not disadvantage a competitor—other than competitors attempting to benefit from the goodwill Kellytoy has achieved in its Sqishmallows Trade Dress.  In fact, we did not select the features of the Squishmallows Trade Dress for purposes of increasing quality or reducing costs. We could have chosen alternative designs that are less expensive to produce.  In fact, Kellytoy Worldwide has numerous plush toys that cost significantly less to produce than the plush toys in its Squishmallows line.  For example, Kellytoy Worldwide uses an ultra-silky polyester fill for the Squishmallows stuffing.  Alternate fillings are available for stuffed toys that are less expensive, such as regular polyester stuffing and 3D light weight stuffing.  Likewise, Kellytoy Worldwide could have chosen ways to depict nostrils, mouths, and other features that are less expensive than embroidering those features, such as printing and sublimation printing. Likewise, the short-pile velvety velour-like textured exterior provides no cost savings, as numerous other less expensive available exterior materials include Tricot, EF Velboa and Velboa.  The same holds true for the Squishmallows egg/bell shape.  The egg/bell shape provides no substantial manufacturing or other cost savings.  Other shapes such as squares, spheres, triangles are equally or less expensive to manufacture.

12.  The specific features that comprise the Squishmallows Trade Dress together (including the materials and other design choices) with the resulting overall look and feel thereof were the result of deliberate design decisions made by Kellytoy Worldwide in order to create a distinctive line of plush toys that would distinguish the toys in that line from the plush toys of others.  Any of the material or design alternatives described above would have worked equally well from a cost of goods and ease of manufacture standpoint, though they would not have provided the overall look and appearance that Kellytoy Worldwide sought for its Squishmallows plush toy line.¶

13.  In essence, Kellytoy Worldwide – by designing goods that included this

3

particular combination of characteristics – created an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace. And that newly created niche has spawned a cultural craze in which numerous imitators have emerged, including the Defendant.

**A.** **Kellytoy's Extensive Advertising and Promotional Activities**

14.     From 2016 to the present, Kellytoy Worldwide has embarked on a consistent campaign to develop, advertise and promote its Squishmallows through the United States. That campaign has been expensive and, in fact, Kellytoy Worldwide is spending approximately $500,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows line of plush toys with a total annual Squishmallows marketing budget nearing $1,000,000. Advertising and promotion of its Squishmallows line of plush toys has been a high priority for Kellytoy Worldwide and for which Kellytoy Worldwide has expended much time and effort, in addition to money.

15.     As detailed below, Kellytoy Worldwide did not just market and sell its Squishmallows line has one of many Kellytoy Worldwide plush toy offerings. Rather, it made a deliberate effort to distinguish that line has an entirely separate offering by creating a website, Facebook page, Instagram account, Twitter account, etc. dedicated solely to its Squishmallows line.

16.     A simple Internet search using the Google search engine yields over 1,370,000 "hits" for the search term "Squishmallows." Attached hereto as **Exhibit 2** is a true and correct copy of a screenshot of the first page of Google showing 1,370,000 hits returned on January 28, 2020 for the search term "Squishmallows."

17.     In an effort to inform the public that overall "look and feel" of Kellytoy Worldwide's Squishmallows plush toys comprise Kellytoy Worldwide's proprietary trade dress, Kellytoy Worldwide includes an explicit statement to that effect on many of its marketing materials, such as its Squishmallows specific website, social media accounts, press releases, and stationary used to correspond directly with customers. Specifically, as

4

set forth in the below referenced exemplars from Kellytoy Worldwide's Squishmallows.com website, press releases, social media accounts, and stationery, each of these materials contains the following statement along the following lines: "The shape, look, feel, and texture of Squishmallow® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

18.     Indeed, in addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy Worldwide markets and sells its Squishmallows on its website dedicated to its Squishmallows <squishmallows.com> featuring dozens of photographs of its plush toys and models holding its Squishmallows. This is true in spite of the fact that Kellytoy Worldwide has numerous other lines of branded plush toys. True and correct copies of printouts of pages from <squishmallows.com> are attached hereto as **Exhibit 3**. As part of Kellytoy Worldwide's marketing strategy, in order to inform the public of the fact that the "look and feel" Squishmallows comprise Kellytoy Worldwide's proprietary trade dress, Kellytoy Worldwide states as much in various marketing materials, including on the footer of its website.

19.     Kellytoy Worldwide also frequently releases press releases which are picked up and published by numerous media outlets such as Yahoo! Finance, Ask.com, BusinessWire.com, HaroldOnline, among numerous others. In one such press release, Kellytoy Worldwide highlighted the fact that that Kellytoy Worldwide goes to great lengths to "emphasize inform consumers that the overall shape, look, feel, and texture of its Squishmallows branded plush toy constitutes Kellytoy's proprietary trade dress." A true and correct copy of a February 10, 2020 press release published by Yahoo! Finance is attached hereto as **Exhibit 4**.

20.     Kellytoy Worldwide also promotes its Squishmallows plush toys through dedicated social media accounts under the Squishmallows brand, such as Facebook, Instagram, twitter etc. True and correct copies of printouts of pages, captured on June 28, 2019, from Kellytoy Worldwide's Squishmallows Instagram page are attached hereto as

5

EXHIBIT J
Page 37 of 139

**Exhibit 5**. A true and correct copy of a printout of the "About" page, captured on June 17, 2019, from Kellytoy Worldwide's Squishmallows Facebook page is attached hereto as **Exhibit 6**. A true and correct copy of a printout of the Squishmallows Twitter page, captured on June 17, 2019, is attached hereto as **Exhibit 7**. On each of these social media accounts, Kellytoy Worldwide expressly informs the public that "The shape, look, feel, and texture of Squishmallow® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

21.     In fact, Kellytoy Worldwide includes a similar statement in its marketing materials, including (1) its marketing circular, a true and correct exemplar of which is attached hereto as **Exhibit 8** (distributed to numerous expected buyers and other attendees in advance of the upcoming New York Toy Fair), and (2) Kellytoy Worldwide's stationary it uses to communicate directly to Squishmallows plush customers, a true and correct copy of which is attached hereto as **Exhibit 9**.

22.     As a direct result of these and other efforts at promoting and building its recognition in the marketplace, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and designs in the United States and around the world. In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 6200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

23.     Since the summer of 2017, Kellytoy has shipped approximately a 40 million (40,000,000) units of traditionally shaped Squishmallows and, based on the product trajectory, there is no indication that sales will be slowing down anytime soon. Kellytoy's Squishmallows products embodying the Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

6

EXHIBIT J
Page 38 of 139

24. In fact, Kellytoy Worldwide's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

25. Kellytoy's Squishmallows have become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts, flasks, and jewelry, bearing the images of some of Kellytoy Worldwide's most popular Squishmallows branded toys. But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by numerous different infringers, as depicted below:

 



7

EXHIBIT J
Page 39 of 139



26.    Because of the immense popularity of Kellytoy Worldwide's Squishmallows line of plush toys, Kellytoy Worldwide has recently embarked on a global initiative with Evolution USA to license the Squishmallows designs and trademark to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming. (Attached as **Exhibit 10** hereto is a true and correct copy of an article published by ToyBook.com announcing the launch of Kellytoy Worldwide's global licensing program with Evolution USA.)

27.    Because of Kellytoy Worldwide's efforts to distinguish its Squishmallows line and the resulting massive success and popularity of that line, consumers have come to associate Kellytoy Worldwide's high-quality Squishmallows plush toys with Kellytoy Worldwide or at least a single source. I know this from my discussions with customers, the wide press coverage and awards relating to Squishmallows, and by reviewing hundreds of social media posts (on Instagram, Facebook, etc.) from end consumers. Kellytoy Worldwide has had many successful product offerings over the years, but come close to

8

EXHIBIT J
Page 40 of 139

Squishmallows in terms of market penetration, press coverage, social media buzz, and customer recognition. Squishmallows have outperformed any other product and all of these categories by double-digit orders of magnitude.

28.　Also from my discussions with customers, my review of numerous press mentions, and my review of numerous social media posts from end consumers, it is evident that Kellytoy Worldwide's Squishmallows are instantly recognizable by the combination of their egg/bell-like shape, absence of proportionate/pronounced limbs, simplified Kawaii-inspired aesthetics, short pile silky shell, and airy, silky stuffing – features common among all of Kellytoy Worldwide's traditional Squishmallows.

29.　I am informed and believe that Kellytoy Worldwide's Squishmallows branded plush toys owe their popularity, in part, due to the high quality of these goods and the rigorous quality control procedures that they undergo.

30.　In order to protect the goodwill Kellytoy Worldwide has accumulated in its Squishmallows trade dress, Kellytoy Worldwide has often had to enforce its rights vis-à-vis third parties who have, in Kellytoy Worldwide's view, infringed upon those rights. In certain instances, Kellytoy Worldwide managed to resolve such disputes to its satisfaction short of litigation. In other instances, Kellytoy Worldwide filed complaints against such third parties. In those cases no longer pending, Kellytoy Worldwide entered into confidential settlement agreements with the defendants on terms consistent with Kellytoy Worldwide's goal of protecting its rights in its Squishmallows trade dress. In fact, besides this litigation, Kellytoy Worldwide has two other litigations pending concerning the infringement of Kellytoy Worldwide's Squishmallows Trade Dress.

31.　As part of my duties as Kellytoy Worldwide's Senior Vice President of Sales and Product Development, I routinely visit retail stores throughout the country. During those visits, I have observed Ty branded plush toys being sold in many of the same large retailers through which Kellytoy Worldwide's goods are sold, such as Walgreens, Fred Meyer, Kroger, and CVS, among others.

9

EXHIBIT J
Page 41 of 139

32.     I am also informed and believe that Ty has been offering to sell its "Squish-a-Boos" plush line to customers at prices that are significantly lower than the prices charged by Kellytoy Worldwide for its authentic Squishmallows branded plush.  Such sales tactics will significantly harm Kellytoy Worldwide's ability to make a profit on its authentic Squishmallows line of plush toys, as Kellytoy Worldwide will have no choice but to try to match Ty's pricing in order to compete in the marketplace.  With Ty's significant distribution network in the marketplace, this will cause great harm to Kellytoy Worldwide's market share and profitability for its authentic Squishmallows plush toys.

33.     It is clear, based on my experience in the industry and at Kellytoy Worldwide, that Ty's conduct threatens to significantly undercut Kellytoy Worldwide's pricing for Kellytoy Worldwide's authentic Squishmallows.  That is because Ty has waited on the sidelines for two and half years to launch its highly similar "Squish-a-Boos" plush line, after Kellytoy Worldwide had established extensive goodwill in the Squishmallows trade dress.  In other words, now that Kellytoy Worldwide has invested so significantly in the development, advertising, and promotion of its Squishmallows line of toys, Ty can ride Kellytoy Worldwide's proverbial coattails without having to undertake those same investments.

34.     The next big industry tradeshow in the United States is Toy Fair New York, scheduled to take place on February 22-25, 2020 – considered the most important and most attended tradeshow in the United States.  I am informed and believe that Ty plans to show its "Squish-a-Boos" plush line at the upcoming Toy Fair New York.

35.     As part of Kellytoy Worldwide's campaign to highlight to customers that the overall "look and feel" of its Squishmallows is meant to distinguish them from the plush toys of others and to indicate a single source, renderings of various Squishmallows designs appear on the hangtags for the Squishmallows plush toys.  A true and correct photograph of a hangtag typically affixed to Kellytoy Worldwide's authentic Squishmallows are attached collectively hereto as **Exhibit 11**.

<div align="center">10</div>

36.     Similarly, even though the product displays naturally contain actual specimens of Squishmallows plush goods, Kellytoy Worldwide also includes graphic depictions of various Squishmallows designs on the displays. Kellytoy Worldwide does this to emphasize and educate the customers that the overall "look and feel" of the Squishmallows line is intended to communicate a single source. True and correct photographs of product displays for the Squishmallows line of toys, in various sizes, are attached hereto collectively as **Exhibit 12**.

37.     If standing upright provided a utilitarian advantage, Kellytoy would have designed Squishmallows to stand up more stably, e.g., as squares, rectangles, triangles, spheres, cylindrical, oblong/lateral pillows, etc. or with a much wider base relative to the upper portion.

38.     Squishmallows generally retail, depending on the size, from $2.99 to $19.99.

39.     As part of my duties, I also participate in overseeing the production of Kellytoy Worldwide's Squishmallows plush line. In that capacity, I have regular exposure to different materials and manufacturing processes used in connection with the production of plush toys, including the materials and manufacturing processes used in connection with the development of the Squishmallows line.

40.     In addition, as part of my duties, I routinely visit retailers and trade shows nationwide to familiarize myself with the plush toy offerings of Kellytoy Worldwide's competitors in the marketplace.

41.     At no time has Kellytoy Worldwide filed for a utility patent for the Squishmallows plush as a whole or any element thereof.

42.     None of Kellytoy Worldwide's advertising touts the utilitarian advantages of the Squishmallows, other than the fact that the Squishmallows can be used as pillows – a characteristic of many, if not most, plush toys.

43.     All of the elements of the Squishmallows plush design are aesthetic

11

EXHIBIT J
Page 43 of 139

in nature, none of them providing any particular function, other than to distinguish these plush toys from those of others. In fact, the shape, appearance, texture, and feel of the Squishmallows plush toys are all aesthetic features as to which there are innumerable alternatives and which, indeed, were specifically designed to distinguish the Squishmallows from other toys. For example, there are countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, cube shaped plush toys, rectangular shaped plush toys, spherical shaped plush toys, cylindrical shaped plush toys, etc.), such as:



12

EXHIBIT J
Page 44 of 139



13

 

44.     Likewise, set forth above, there are numerous alternative means to depict body and facial features, e.g., traditional plush toy body and facial features often have prominent and proportionate limbs and facial features appear in three dimensions, such as protruding snouts, etc.

45.     In addition, there are a myriad of alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), as depicted below:

  

14

EXHIBIT J
Page 46 of 139

 

46. Similarly, there are countless alternative stuffing materials available (e.g., beans, cotton, hard foam, etc.). Regardless, when the features of the Squishmallow plush toys are viewed collectively, it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace.

47. Also, there are also a myriad of alternative designs for plush toys in the marketplace which, while embodying some of the Squishmallow features, do not include all of them in a single plush toy. There are an infinite number of forms, features, and textures in which to design a plush toy – the vast majority of which do not infringe upon Kellytoy Worldwide's Squishmallow trade dress.

48. The selection of the particular shape, materials, and design of Kellytoy Worldwide's Squishmallows do not result from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys. Although the Squishmallows plush are made with high-quality materials, the particular design has nothing to do with the quality – something determined by the quality of the materials chosen and the manufacturer's machinery, skill and care with which the products are manufactured, in line with Kellytoy Worldwide's quality control standards. The ultimate quality results from the material and

15

manufacturing choices made by the Kellytoy and is not related to the design aesthetic or the particular combination of features that give rise to the overall "look and feel" of Kellytoy Worldwide's Squishmallows plush.

49.     Moreover, protection of the Squishmallow trade dress as a trademark would not impose a non-reputation-related competitive disadvantage on Ty Inc. To the contrary, the Squishmallow trade dress – with its unitary aesthetic across its Squishmallows line – was specifically designed to distinguish the source of products embodying the Squishmallow trade dress from the source of other toys. As set forth above, there are numerous alternative designs available to Ty Inc. to compete in the marketplace without trading off of the goodwill garnered by Kellytoy Worldwide in its Squishmallows plush.

50.     From correspondence received by Kellytoy Worldwide's attorneys from Ty's attorneys, we are informed that Ty will be using the Squish-a-Boos trademark in connection with the accused infringing goods. As close as Defendant's designs are to Kellytoy Worldwide's authentic Squishmallows designs, Kellytoy Worldwide would never release Squishmallows bearing Defendant's specific designs: They simply do not comport with the aesthetic that Kellytoy Worldwide wishes to associate with its Squishmallows branded goods.Through my visual inspection of photographs of the Ty Squish-a-Boos, it is apparent that they possess a very soft, short pile outer shell similar to Kellytoy Worldwide's Squishmallows line.

51.     Due to my long-standing experience in the plush toy market and my efforts to monitor the activities of Kellytoy Worldwide's competitors, including through my discussions with various colleagues, I am familiar with Ty Inc.'s launch of various plush toy lines including the ones discussed herein below.

52.     Ty Inc. is one of the largest manufacturers of stuffed plush toys in the world. Its first major product success was Ty Beanie Babies.

53.     As sales of Beanie Babies began to wane, Ty sought to add new product lines. Rather than innovate, however, Ty Inc. looked to its competitors for new product

16

EXHIBIT J
Page 48 of 139

ideas and, in many cases, undercut the pricing for the originals and used its well-established distribution network and significant capital to establish itself as the market leader for its knockoff products – essentially drowning out the originals in the marketplace.

54.     To illustrate, I am setting forth a few nonexhaustive examples of Ty Inc.'s afore-described conduct.

Jellycat® Pom Poms

55.     Some years ago, a plush toy manufacturer operating under the trademark Jellycat® released the below depicted ostrich design named Pom Poms:



56.     Soon thereafter, Ty released an extremely close copy of Pom Poms under its Beanie Boo line, essentially the same basic design with larger eyes, set forth below:



17

EXHIBIT J
Page 49 of 139

Aurora® Yoohoo Lemur

57.    In or about January 2007, Aurora launched its YooHoo & Friends brand of plush toy characters, including the below depicted lemur:



58.    At some point in 2009, after Aurora's YooHoo & Friends established the market for such goods, Ty released a line of plush animal toys called the Beanie Boos, which copied the overall "look and feel" of Aurora's YooHoo & Friends, exemplified by the below-depicted lemur:



Although Aurora was unsuccessful in obtaining a preliminary injunction against Ty Inc. in connection with Ty's Beanie Boos, that fact does not take away from the fact that this establishes a modus operandi for Ty Inc., i.e., wait for a competitor to establish a market for an innovative designer line and then undercut the price (e.g., Ty's Beanie Boos at approximately $4.50 vs. Aurora's YooHoo's at approximately $6.50) and flood the marketplace with goods that co-opt the overall look and feel of that line.

18

EXHIBIT J
Page 50 of 139

Disney's Tsum Tsum

59.     A similar thing happened with Disney's Tsum Tsum line.  A mere six months after Disney launched this line, Ty Inc. launched its TY Teeny Ty line copying the same overall look and feel and adapting it to its Beanie Boos designs.



Disney's Tsum Tsum



TY Teeny Ty

///

19

EXHIBIT J
Page 51 of 139

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of February, 2020, at Vernon, California.

JEANNE YOON

20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TY INC. and DOES 1- 10, <br><br> Defendants. | Case No. 1:20-cv-00748 |

## FIRST AMENDED COMPLAINT

Plaintiffs KELLYTOY WORLDWIDE, INC., a California corporation ("Kellytoy Worldwide") and KELLYTOY (USA), INC., a California corporation ("Kellytoy USA") (together, "Kellytoy") bring this action against defendant TY INC. ("Ty") and DOES 1 through 10 (collectively, "Defendants") for injunctive relief and damages under the laws of the United States and the State of Illinois, as follows:

### JURISDICTION AND VENUE

1.      This action arises under the trademark laws of the United States, 15 U.S.C. §§ 1114 and 1125(a), under the statutory and common law of trademark/trade dress infringement and unfair competition.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.      This Court has personal jurisdiction over Defendants, as Defendants are doing business in the State of Illinois and this District and are subject to the jurisdiction of this Court.

EXHIBIT J <br> Page 53 of 139

5.      Ty has purposely and willfully directed its intentional misuse and infringement of the Kellytoy trademark and trade dress in the State of Illinois with the knowledge that the actions have caused damage within the State of Illinois.

6.      By transacting business with customers in this District, and by using the goodwill and reputation built by Kellytoy, in this district, Ty has purposely availed itself of the privilege of conducting business in this judicial district and has established sufficient contacts with the State of Illinois such that it is subject to jurisdiction in Illinois.

7.      To the extent Kellytoy's claims arise from Illinois statutory and/or common law, this Court has proper jurisdiction because it bears a logical relationship to the aggregate core of operative facts relating to Kellytoy's claims under the Lanham Act.

8.      Defendant Ty is a corporation organized under the laws of the state of Delaware with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

## NATURE OF THE ACTION

9.      This action, as alleged below, arises specifically because defendant Ty has embarked on a transparent campaign to hijack Kellytoy USA and Kellytoy Worldwide's longstanding and well-earned goodwill in the plush toy marketplace by infringing on Kellytoy USA's registered trademark and Kellytoy Worldwide's distinctive trade dress.  Ty, in its haste to sow customer confusion and consequently draw business from Kellytoy USA, has employed a name, PUFFIES, that is a virtual and linguistic replica of Kellytoy USA's registered PUFFY® trademark.  Indeed, the Ty mark sounds the same, looks the same, means essentially the same thing, and is used for similar goods as Kellytoy USA uses in connection with its long established PUFFY® mark.  That duplication is plainly deliberate – Ty is attempting to confuse customers into believing, falsely, that its goods are associated with and derive from the same source of origin as Kellytoy USA's products.  Beyond all that, Ty is offering for sale its competing plush

EXHIBIT J
Page 54 of 139

toys (bearing the infringing PUFFIES mark) in the same tradeshows as Kellytoy USA's products, all but assuring the intended and expected customer confusion.

10.     In addition, Kellytoy Worldwide's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy Worldwide's Squishmallows feature a highly distinctive and widely recognized trade dress (described below), which Kellytoy Worldwide pioneered and created.  Kellytoy Worldwide actively markets its Squishmallows through numerous media outlets, including, without limitation, on social media, at tradeshows, through Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com, and on Kellytoy Worldwide's website and social media accounts, depicting images of its proprietary Squishmallows line of plush toys.

11.     The explosion in popularity of Kellytoy Worldwide's Squishmallows, and the resulting and widespread customer and industry recognition, has unfortunately led to illegal imitation by some of Kellytoy Worldwide's competitors.  Defendants are merely the latest, though most brazen and capable, of the intellectual property pirates seeking to conscript Kellytoy Worldwide's goodwill for unfair competitive purposes.  Indeed, Kellytoy Worldwide has discovered that defendant Ty has been making and offering for sale to customers nine (9) knock-off products under the moniker Squish-A-Boos that incorporate Kellytoy Worldwide's Original Squishmallows Trade Dress (defined below) for distribution to customers throughout the United States and within this state and district that infringe upon Kellytoy Worldwide's Original Squishmallows Trade Dress.

12.     Accordingly, Kellytoy has no alternative but to take steps to preserve and protect its intellectual property from this naked attack, and it thus has filed this action for trademark infringement, trade dress infringement, unfair competition and false designation of origin under

the Lanham Act, 15 U.S.C. § 1125(a), Illinois unfair competition laws, Illinois Deceptive Trade Practices Law pursuant to 815 ILCS §§ 510/1, *et seq*. and the common law trade dress infringement.

## THE PARTIES

13.    Kellytoy (USA), Inc. is a California corporation with its principal place of business located in Los Angeles, California.

14.    Kellytoy Worldwide, Inc. is a California corporation with its principal place of business located in Los Angeles, California.  (Kellytoy USA and Kellytoy Worldwide will sometimes be referred to collectively herein as "Kellytoy.")

15.    Kellytoy is in the business of developing, manufacturing and selling children's toys including, among other things, plush toys.

16.    Defendant Ty Inc. ("Ty") is a Delaware corporation with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

17.    Ty is in the business of manufacturing and selling children's toys, including plush toys.

18.    The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

19.    Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

4548394.1
27183-838

## BACKGROUND FACTS

### Kellytoy and Its Protected Intellectual Property Rights

20.     Kellytoy USA and Kellytoy Worldwide are innovative and highly successful creators, manufacturers, distributors and sellers of unique plush toys.

21.     Kellytoy USA has been in business for approximately three decades and in that time has developed a reputation for producing high quality, unique, and creative plush toys that are highly prized in the industry and in widespread demand by the consuming public.  Similarly, Kellytoy Worldwide has been in business for nearly two decades and developed its own reputation for producing high quality, unique, and creative plush toys, including, most recently, its highly successful Squishmallows line of plush toys in connection with the SQUISHMALLOW® and SQUISHMALLOWS brands.  (*See, e.g.,* **Exhibit 1**.)

22.     Kellytoy devotes extensive time and resources promoting and preserving its image and identity and the image and identity of its high-quality plush toys.  That includes, without limitation, creating distinctive designs and marks for use on its products, seeking U.S. trademark and copyright registrations for such marks and designs, and taking all steps necessary to preserve and protect its intellectual property.

### Kellytoy USA's PUFFY® TRADEMARK

23.     In particular, Kellytoy USA is the sole and exclusive owner of United States Federal Trademark Registration No. 4517007 for the trademark PUFFY (the "PUFFY Mark") for "plush toys, not intended for pets."  A true and correct copy of United States Certificate of Registration No. 4517007 for the PUFFY Mark is attached as **Exhibit 2**.

24.     Kellytoy USA has been and is the sole owner of all right, title and interest in and to the PUFFY Mark and the United States trademark registration therefor (occasionally referred to as the "Mark").

EXHIBIT J
Page 57 of 139

25.    Kellytoy USA has made widespread and prominent use of the PUFFY Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2009, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source, Kellytoy USA.   As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy USA's goods sold in connection with the PUFFY Mark, the PUFFY Mark has attained goodwill among consumers nationally.

### Kellytoy Worldwide's SQUISHMALLOW® TRADEMARK

26.    Kellytoy Worldwide is the sole and exclusive owner of United States Federal Trademark Registration No. 5454574 for the trademark SQUISHMALLOW, often also designated as SQUISHMALLOWS, (the "SQUISHMALLOW Mark") for "plush toys."  A true and correct copy of United States Certificate of Registration No. 5454574 for the SQUISHMALLOW Mark is attached as **Exhibit 3**.

27.    Kellytoy Worldwide has made widespread and prominent use of the SQUISHMALLOW Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2017, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source, Kellytoy Worldwide.   As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy Worldwide's goods sold in connection with the SQUISHMALLOW Mark, the SQUISHMALLOW Mark has attained goodwill among consumers nationally.

### Kellytoy Worldwide's Squishmallows Trade Dress

28.    In 2016, Kellytoy conceived of and began creating its original Squishmallows line of plush toy designs that shares common, unique features distinguishing them from the goods of others (the "Original Squishmallows line"), representative examples of which are depicted on

**Exhibit 1** hereto. Most of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the Squishmallows brand. In essence, Kellytoy created a distinctive line of plush toys that has spawned a cultural craze in which numerous imitators have emerged, not the least of which are Defendants.

29. Since that time, in addition to its Original Squishmallows line, Kellytoy has introduced various other lines of Squishmallows branded plush toys, such as its Squishmallows Stackables line, its Squishmallows Hugmees line, among others. In this action, Kellytoy only asserts its trade dress rights garnered in its Original Squishmallows line of plush toys, as more fully described herein below, which has comprised approximately 95% of the total Squishmallows branded plush toys sold by Kellytoy Worldwide to date.

30. In that regard, however, Kellytoy Worldwide has been and is the sole owner of all right, title and interest in and to the Original Squishmallows line that possesses unique, recognizable and distinguishing features that are common across much of the Original Squishmallows line. From 2016 to the present, Kellytoy Worldwide has expended large sums of money in developing, advertising and promoting the Original Squishmallows Trade Dress (defined below), and the product designs bearing it, through the United States. In fact, Kellytoy Worldwide has an annual marketing budget of approximately $1,000,000 and is spending approximately $500,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows branded goods.

31. Due to Kellytoy Worldwide's distinctive trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. In fact, because of Kellytoy Worldwide's extensive promotional activities and widespread display of plush toys bearing the Original Squishmallows Trade Dress directed to the

EXHIBIT J
Page 59 of 139

public, and a consequence of Kellytoy Worldwide's well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing embodying the trade dress as high quality goods connected with or offered by Kellytoy Worldwide. As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kellytoy Worldwide.

32. Consistent with that advertising and marketing scope, Kellytoy Worldwide sells a broad range of Squishmallows branded plush toys in its Original Squishmallows line featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its distinctive combination of shapes, colors, textures and graphics – serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto (collectively, together with **Exhibit 1**, the "Original Squishmallows Trade Dress").

33. Kellytoy Worldwide has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Original Squishmallows line. And due to Kellytoy Worldwide's distinctive designs, robust marketing efforts, media

coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kellytoy Worldwide's extensive promotional activities and widespread display of its Original Squishmallows line directed to the public and as a result of the fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys bearing the Original Squishmallows Trade Dress as high quality goods connected with or offered by a single source, Kellytoy Worldwide. The Original Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy Worldwide.

34. Beyond merely being original and inherently distinctive, the Original Squishmallows Trade Dress is also widely recognized by consumers. A simple Internet search using the Google search engine yields, for example, about 1,370,000 "hits" for the search term "Squishmallows."

35. The scope of Kellytoy Worldwide's sales reflects the market penetration of its intellectual property. The company markets and sells its Squishmallows branded plush not only through thousands of retail stores nationwide, but additionally on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of selected pages from website located at <squishmallows.com> are attached as **Exhibit 4**, which specifically call out the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Worldwide's proprietary trade dress." Kellytoy Worldwide's Squishmallow website traffic has, not surprisingly, grown exponentially since its launch in 2017, and has now reached an average in excess of 5,500 visits per day.

36.     Kellytoy Worldwide also actively engages in promoting its Original Squishmallows line of branded plush toys through its numerous social media accounts, including on Instagram, Facebook, and Twitter.  Indeed, Kellytoy Worldwide's legion of loyal fans of its line of Original Squishmallows line of branded plush toys have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy Worldwide's Original Squishmallows line.  For example, the average Squishmallows post likes on Instagram, for example, hovering over 2000+ per post and 45-100 average comments per post.  In fact, Kellytoy Worldwide's Squishmallows branded plush toys have garnered over 200 Million media impressions and since July 21, 2017, Kellytoy Worldwide's paid placements on Facebook and Instagram campaigns have reached more than 23.6 MILLION unique individuals and 83.7 MILLION impressions.

37.     Kellytoy Worldwide uses digital ads to advertise its Original Squishmallows line of plush toys.  Owing to their immense popularity, these ads promoting specific retailers have average click through rates of 30+% (the industry average is rates of 30+% (the industry average is 1-2%).

38.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 5** hereto, including many mainstream media publications such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, the Original Squishmallows line has been also recognized by: (1) The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2) *LA Parent* in its October 2017 issue, under the "Products We Love" section, which specifically identified designs from the Original Squishmallows line; and (3) *OK!* Magazine in its August 21, 2017 issue, which, as depicted below, featured Squishmallows and described them

4548394.1
27183-838

10

in flattering terms, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home. Collect the whole squad! squishmallows.com."

39.     There are myriad further examples of the popularity and market penetration of the Original Squishmallows line. To name just a few, designs from the Original Squishmallows line were featured in the October 2017 issues of *L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

40.     In fact, Kellytoy Worldwide's Original Squishmallows line sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.



41.     Reflecting the quality of the goods, Kellytoy Worldwide's Original Squishmallows line has also received numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more

fully set out in **Exhibit 5**. Thus, for example, Kellytoy Worldwide's Original Squishmallows line was named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

42. The popular blog *Trendy Mom Reviews* listed Kellytoy Worldwide's Original Squishmallows line as one of "The Best Gifts for 2018!" Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy Worldwide's Original Squishmallows line of branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

43. The Original Squishmallows line of branded toys were also: (1) named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!; (2) selected as among the "5 Editor's Picks From Toy Fair" 2019 by *Gifts & Decorative Accessories*; (3) featured by *The Toy Insider* in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress"; (4) featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue, in *The Toy Book's* August 5, 2019 issue (specifically featuring the upcoming Halloween Squishmallows line), and in *The Toy Book's* issue (specifically featuring the Squishmallows branded turtle) on May 15, 2019; (5) featured in *TFE Toys & Family Entertainment's* NYC Toy Fair 2019 issue; and (6) won the *Parent and Teacher Choice Award* for 2019 from HowtoLearn.com.

44. Kellytoy Worldwide's Original Squishmallows line has become so popular that a selection of designs were included in the celebrity gift bags distributed to the celebrity attendees in connection with the 2019 Teen Choice Awards, including Jenn Ortega, Lucy Hale, Lil Nas X, Sarah Hyland, One Republic, among numerous others.

45.     This widespread publicity and recognition has occurred in conjunction with Kellytoy Worldwide's advertising efforts concerning the Original Squishmallows line, which, as alleged above, have comprised consistent and robust marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy Worldwide's Squishmallows currently have over 128,000 Instagram followers, over than 85,000 Facebook followers, and more than 28,000,000 views on the popular TikTok video app – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy Worldwide regularly publishes photographs of its Squishmallows plush toys.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page, bearing photographs of Squishmallows plush toys, is attached as **Exhibit 6**, which specifically calls out the fact that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

46.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy Worldwide's Original Squishmallows line of products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Twitter, TikTok, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares" and all feature, among other things, depictions of Kellytoy Worldwide's Original Squishmallows line of plush toys.  In fact, several members of the public have created their own Instagram fan accounts and Facebook groups, all bearing content featuring the Original Squishmallows line of branded plush toys.

47.     Kellytoy Worldwide's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

48.     As a direct result of Kellytoy Worldwide's efforts at promoting and building its brand, Kellytoy Worldwide's Original Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Original Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy Worldwide's Original Squishmallows line is sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1,000 Costco stores, 5,500 Wal-Mart stores, 8,500 Walgreens stores, 6,200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Justice, Hallmark stores, Albertson's, Knotts Berry Farms and numerous others.

49.     Furthermore, during several summer 2019 grand openings for Costco, the highly coveted 24 inch Original Squishmallows plush sold out within two days, exceeding store expectations and projected demand.

50.     Since the summer of 2017, Kellytoy Worldwide has shipped approximately a whopping 45 million (45,000,000) units of its Original Squishmallows line and there is no indication that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products embodying the Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

51.     Nor has the pace of sales of Kellytoy Worldwide's Original Squishmallows line of branded toys slowed.  To the contrary, sales of the Original Squishmallows line of plush have been steadily increasing and there is no indication of their popularity waning any time soon. These goods have, in fact, become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts and jewelry, bearing the images of some of Kellytoy Worldwide's

most popular Original Squishmallows branded toys.  Few plush lines can boast having third parties attempt to "merchandise" its copyrighted designs and goods generally bearing its trademark – something typically reserved for Disney, Looney Tunes, and the like.  But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by three different infringers, as depicted below:

  





52.     The immense popularity – indeed ubiquity – of Kellytoy Worldwide's Original Squishmallows line of plush toys, including those set forth on **Exhibit 1**, has now reached the point where Kellytoy Worldwide has recently embarked on a global initiative to license the Original Squishmallows designs and trademark to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming.  (*See*, *e.g.*, **Exhibit 7** hereto.)

53.     As a result of the extensive efforts to promote, advertise and sell the products embodying the Original Squishmallows Trade Dress and its deliberate efforts to specifically publicize the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Wordlwide, Inc.'s proprietary trade dress," consumers have come to associate the Original Squishmallows Trade Dress with a designation of source and the products are inherently distinctive and/or have acquired secondary meaning.

54.     All of which is to reiterate that due to the Original Squishmallows line's massive success and popularity, consumers have come to associate Kellytoy Worldwide's high-quality

Original Squishmallows line of plush toys with the Original Squishmallows Trade Dress and, conversely, have come to recognize the Original Squishmallows Trade Dress as a designation of source. But that success has come at a price – the popularity of Kellytoy's Original Squishmallows line of branded goods has attracted many imitators, such as Defendants, all of whom are attempting to benefit from Kellytoy Worldwide's hard earned goodwill, and to do so illegally. In fact, Kellytoy has pursued numerous third-party infringers who have co-opted the Original Squishmallows Trade Dress and succeeded in stemming such infringements. Defendants, however, are uniquely positioned in the marketplace – through their massive marketing and distribution network – to capitalize upon Kellytoy Worldwide's Original Trade Dress, as discussed in greater detail below.

### **Defendants' Unlawful Conduct**

55.     At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy USA's PUFFY Mark or Kellytoy Worldwide's Original Squishmallows Trade Dress. Ty is a direct competitor of Kellytoy in the plush toy market.

56.     Ty has made a career out of copying the original designs of others and using its large market share to usurp the goodwill of its competitors. Ty is a serial copier of the original designs of others.

57.     Most recently, during the week of the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Kellytoy USA learned that, in spite of Kellytoy USA's prior use and registration of the PUFFY Mark, Ty had a pending United States trademark application, based on intent to use, for the trademark TY PUFFIES. During that same show, Kellytoy Worldwide learned that Ty was offering for sale at that same tradeshow goods that embody the Original Squishmallows Trade Dress.

58.     Consequently, by letter dated January 15, 2020, Kellytoy wrote directly to defendant Ty demanding that it cease-and-desist from using Kellytoy USA's PUFFIES trademark and copying Kellytoy Worldwide's Original Squishmallows Trade Dress.  Ty responded by denying its wrongful conduct and essentially stating its intention to continue to infringe Kellytoy's proprietary rights by continuing to offer the Infringing Plush (defined below) for sale, including at the upcoming New York Toy Fair – the biggest toy tradeshow in the country, if not the world.

59.     Kellytoy is informed and believes that sometime in 2019, and notably well after Kellytoy USA established its reputation in its PUFFY Mark and Kellytoy Worldwide established its reputation in its Original Squishmallows Trade Dress – and after the Mark and Trade Dress acquired distinctiveness in the marketplace – Defendant Ty began offering for sale various plush toy lines bearing a trademark and trade dress that are substantially and confusingly similar to Kellytoy USA's PUFFY Mark and to Kellytoy Worldwide's Original Squishmallows Trade Dress.

60.     Specifically, Kellytoy USA is informed and believes that, at the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Ty used the PUFFIES trademark in connection with its plush toys (hereinafter collectively referred to as the "Infringing Puffies") that bears close similarity, in sight, sound, and meaning with Kellytoy USA's PUFFY Mark and, as set forth below:



61.     Making matters even worse, at the same tradeshow, Ty displayed and marketed plush toys under the moniker "Squish-a-Boos" bearing the Original Squishmallows Trade Dress (hereinafter collectively referred to as the "Infringing Squish Plush") – plush toys that so closely resemble the unique "look and feel" of the Original Squishmallows Trade Tress that manifest customer confusion was plainly intended and is certain to occur.  Photographs of the Infringing Squish Plush are collectively attached hereto as **Exhibit 8**.

62.     Defendants' Infringing Puffies and Infringing Squish Plush shall hereinafter be referred to collectively as the "Infringing Plush."

63.     Kellytoy is specifically informed and believes, for example, that Defendants manufactured in, and imported from, China the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy USA sells its

PUFFY branded plush and Kellytoy Worldwide sells its Original Squishmallows line. Indeed, both Kellytoy and Ty sell plush toys to many of the same retailers, such as Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS.

64.    In fact, Kellytoy Worldwide currently sells its authentic SQUISHMALLOWS branded plush to Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS and expects that Ty will make attempts to sell to its copies of Kellytoy's Original Squishmallows at prices lower than Kellytoy Worldwide sells its authentic Original Squishmallows.

65.    Such unauthorized activities are clearly intended to draw on the goodwill Kellytoy USA has garnered in its PUFFY Mark and that Kellytoy Worldwide has garnered in its Original Squishmallows Trade Dress, and to compete unfairly and illegally for Kellytoy's customers through trademark confusion, trade dress confusion, and predatory tactics.

66.    Kellytoy is informed and believes, for example, that Ty has been offering to sell the Infringing Squishy Plush to customers at prices that are lower than the prices charged by Kellytoy Worldwide for its authentic Original Squishmallows line of branded plush. Kellytoy Worldwide is further informed and believes that Ty is able to undercut Kellytoy Worldwide's sales prices because, rather than investing in creating its own designs and identity, Ty has instead copied and infringed Kellytoy Worldwide's proprietary Original Squishmallows Trade Dress and otherwise because its Infringing Squishy Plush are of inferior quality as compared to Kellytoy Worldwide's Original Squishmallows branded plush.

67.    Kellytoy is additionally informed and further believes that Defendants, without Kellytoy's consent or permission, advertise, promote, and display, and intend to sell and distribute, the Infringing Plush in United States commerce and that Defendants' Infringing Plush are marketed and will be sold in the same channels of trade as Kellytoy's authentic plush toys.

4548394.1
27183-838

20

68.     The Defendants' deliberate misconduct in copying, advertising, and, offering for sale and otherwise using the PUFFY Mark trademark and the Original Squishmallows Trade Dress in connection with the Infringing Plush – including by copying wholesale the shape and look of Kellytoy Worldwide's Original Squishmallows Trade Dress – constitute trademark infringement, trade dress infringement, and false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that the Infringing Plush originate from a common source with Kellytoy's authentic PUFFY branded and Original Squishmallows plush toys, and/or that Defendants' Infringing Plush have been sponsored, approved or licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.

69.     These activities are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of Defendants' toys bearing the PUFFIES trademark and the Original Squishmallows Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of, among other laws, 15 U.S.C. §§ 1114 and 1125(a).

70.     Kellytoy is informed and believes that the Defendants' activities were conducted willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, with the intent to trade on the enormous goodwill Kellytoy USA has earned in its PUFFY Mark and Kellytoy Worldwide has garnered in its Original Squishmallows Trade Dress, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants offer for sale and sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy or, at the very least, from a common source as Kellytoy's PUFFY and Original Squishmallows lines of branded plush toys.

EXHIBIT J
Page 73 of 139

71.     Defendants, by their unauthorized infringement, copying and use of Kellytoy's PUFFY Mark and Original Squishmallows Trade Dress, have engaged and will engage in acts of trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works.  Defendants' activities have damaged and will continue to damage the reputation, business and good will of Kellytoy nationally and in this judicial district.

72.     Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

73.     Kellytoy has no adequate remedy at law.  Thus, these activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

**(Federal Trademark Infringement – 15 U.S.C. § 1114(1)-(2))**
(All Defendants)

74.     Kellytoy USA repeats, realleges and incorporates each of the allegations made above as if fully set forth herein.

75.     Kellytoy USA owns and has a protectable interest in the registered PUFFY Mark.

76.     As the owner of all rights, title and interest in and to the PUFFY Mark, Kellytoy USA has standing to maintain in action for trademark infringement under the Lanham Act, including 15 U.S.C. §1114.

77.     Without Kellytoy USA's authorization or consent, and having knowledge of Kellytoy USA's prior rights in the PUFFY Mark, Defendants have designed, manufactured,

EXHIBIT J
Page 74 of 139

distributed, advertised, offered for sale and/or sold highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy USA, in or affecting interstate commerce.

78.     Defendants have caused actual confusion, a likelihood of confusion, mistake and deception as to the source of origin, sponsorship, authorization, association, or affiliation of Defendants' goods, such that the public has been confused and there is a likelihood that the public will be confused into believing that the products Defendants promote, distribute, and sell are directly sponsored by, associated with, or originate from the same source as Kellytoy USA's plush toys sold in connection with the PUFFY Mark.

79.     Defendants' use of the PUFFY Mark violates sections 32(1) and (2) of the Lanham Act, 15 U.S.C. § 1114(1)-(2), because it constitutes unauthorized, willful and/or deliberate use in commerce of reproductions, counterfeits, copies, and/or colorable imitations of Kellytoy USA's federally-registered mark in connection with the sale, offering for sale, distribution, and advertising of products and services in a manner likely to cause confusion, mistake, and deception.

80.     On information and belief, Defendants' acts have been willful and deliberate.

81.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy USA's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy USA to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy USA has suffered damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy USA's lost profits.

82.     Defendants' actions described above have caused and will continue to cause irreparable damage to Kellytoy USA, unless Defendants are restrained by this Court.  Kellytoy

EXHIBIT J
Page 75 of 139

USA has no adequate remedy at law with regard to Defendants' infringing conduct.

Accordingly, Kellytoy USA is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy USA's PUFFY Mark, or any colorable imitation or variation thereof, including PUFFIES, in connection with the sale and/or marketing of any products.

83.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

**(Trademark Infringement and
False Designation of Origin and False Description -- 15 U.S.C. §1125)**
(All Defendants)

84.     Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

85.     Kellytoy USA owns and has a protectable interest in the registered PUFFY Mark. As the owner of all rights, title and interest in and to PUFFY Mark, Kellytoy USA has standing to maintain an action for false designation of origin and unfair competition under the Lanham Act, including 15 U.S.C. § 1125.

86.     The PUFFY Mark is highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy USA.

87.     Kellytoy USA owns all right, title and interest in and to the PUFFY Mark.

88.     Without Kellytoy USA's authorization or consent, and having knowledge of Kellytoy USA's prior rights in the PUFFY Mark, Defendants have imported, distributed, advertised, offered for sale and sold, and/or will continue to import, distribute, advertise, offer

for sale, highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy USA, in or affecting interstate commerce.

89.   Defendants' PUFFIES trademark is confusingly similar to the PUFFY Mark. Defendants' use of the PUFFY Mark has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy USA's goodwill and reputation as symbolized by the PUFFY Mark.

90.   Defendants' use and further threatened uses of the PUFFY Mark thus constitutes trademark infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

91.   As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy USA's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy USA to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy USA has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy USA's lost profits.

92.   Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy USA, unless Defendants are restrained by this Court. Kellytoy USA has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy USA is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the PUFFY Mark, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

93.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C

§ 1117.

## THIRD CAUSE OF ACTION

**(Trademark Infringement, Trade Dress Infringement,
False Designation of Origin and False Description -- 15 U.S.C. §1125)**
(All Defendants)

94.     Kellytoy Worldwide repeats, realleges and incorporates each and every allegation

made above as if fully set forth herein.

95.     Kellytoy Worldwide owns and has a protectable interest in the Original

Squishmallows Trade Dress.

96.     As owner of all rights, title and interest in and to the Original Squishmallows

Trade Dress, Kellytoy Worldwide has standing to maintain an action for trade dress infringement

under the Lanham Act including, 15 U.S.C. § 1125.

97.     The Original Squishmallows Trade Dress is non-functional and highly distinctive

and has each become associated in the public mind with plush toy products of the highest quality

and reputation finding their origin in a single source, Kellytoy Worldwide.

98.     Original The Squishmallows Trade Dress has acquired secondary meaning based

upon, at least in part to, the amount and manner of advertising of products embodying the

Squishmallows Trade Dress, the volume of sales, as well as, the length and manner of use of the

products.

99.     The Original Squishmallows Trade Dress – comprised of a proprietary combination

of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture

and graphics– is non-functional and highly distinctive, and has become associated in the minds of

the consuming public with plush toy products of the highest quality and reputation finding their

origin in a single source, Kellytoy Worldwide.  Indeed, the Original Squishmallows Trade Dress

EXHIBIT J
Page 78 of 139

when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with Kellytoy's Original Squishmallows line. The non-functional nature of these features are evidenced and clear, in part, by reference to the following: (1) the Original Squishmallows Trade Dress is not the subject of an expired or unexpired utility patent; (2) the unique combination of stylistic elements yielding no utilitarian advantage; (3) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy Worldwide's whimsical, abstract renditions of animals, and rectangular shaped plush toys, spherical shaped plush toys, cube shaped plush toys, realistic plush toy animals, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, pvc pellets, cotton, hard foam, etc.); furthermore, when the features of the Original Squishmallows Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (4) Kellytoy Worldwide's not touting or marketing utilitarian advantages of its Original Squishmallows Trade Dress, and (5) the Original Squishmallows Trade Dress not resulting from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys, e.g., the egg/bell shape provides no manufacturing cost savings (other shapes such as squares, circles, triangles are equally, or less, expensive to manufacture) and there are numerous less expensive shell materials (e.g., Tricot, EF Velboa and Velboa), stuffings (e.g., regular polyester stuffing and 3D light weight stuffing), and ways to depict the facial features other than embroidery (e.g., printing and sublimation printing). In fact, Defendants sell numerous lines of plush toys that do not co-opt the Original Squishmallows

     100.     Trade Dress, such as its Beanie-Boos line of plush toys. Moreover, protection of the Original Squishmallows Trade Dress as a trademark would not impose a non-reputation-

related competitive disadvantage, as there are many ways to design an equally pleasing plush toy without copying the Original Squishmallows Trade Dress. Regardless, however, the product features of the Original Squishmallows Trade Dress do not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Original Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Original Squishmallows Trade Dress from the source of other toys.

101.    Without Kellytoy Worldwide's authorization or consent, and having knowledge of Kellytoy Worldwide's prior rights in the Original Squishmallows Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will continue to import, distribute, advertise, offer for sale, and sell replicas of the Original Squishmallows Trade Dress to the consuming public in direct competition with Kellytoy Worldwide, in or affecting interstate commerce.

102.    The Infringing Squishy Plush designs are, each alone and together, confusingly similar to the Original Squishmallows Trade Dress. Defendants' use of the Original Squishmallows Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Original Squishmallows Trade Dress.

103.    Defendants' use and further threatened uses of the Original Squishmallows Trade Dress thus constitute trademark infringement, trade dress infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

104.    As further evidence of Ty's intent to trade upon Kellytoy Worldwide's goodwill in Kellytoy Worldwide's Original Squishmallows Trade Dress, in order to ensure consumer confusion, Defendants adopted a mark – for use in connection with the Infringing Squishy Plush,

namely Squish-A-Boos – that includes the same "squish" prefix and that has same number of syllables and sound as the SQUISHMALLOW Mark.

105.    As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy Worldwide's rights in the Original Squishmallows Trade Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy worldwide to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy Worldwide has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy Worldwide's lost profits.

106.    Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy Worldwide, unless Defendants are restrained by this Court. Kellytoy Worldwide has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy Worldwide is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using Kellytoy Worldwide's Original Squishmallows Trade Dress, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

107.    Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## **FOURTH CAUSE OF ACTION**

### **(Common Law Trade Dress Infringement)**
(All Defendants)

108.    Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

109. This claim arises under the common law of this State relating to trade dress infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

110. Kellytoy Worldwide is the owner of all right, title, and interest in and to the Original Squishmallows Trade Dress used by Kellytoy Worldwide by virtue of its extensive manufacture and sale of products bearing such trademarks and trade dress as set forth in the preceding paragraphs of this Complaint. In particular, because of their enormous sales and publicity, Kellytoy Worldwide has acquired common law trade dress rights in and to the Original Squishmallows Trade Dress. Kellytoy Worldwide's common law trade dress is distinctive, and furthermore, have acquired secondary meaning.

111. The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy Worldwide's common law trade dress. Such unauthorized use by Defendants of Kellytoy Worldwide's common law trade dress constitutes common law trade dress infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy Worldwide when, in fact, they are not.

112. Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy Worldwide's common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kellytoy Worldwide and to place others in the position to

EXHIBIT J
Page 82 of 139

palm off its goods as those of Kellytoy Worldwide, and as such, Defendants have committed trade dress infringement and unfair competition under the common law.

113.    By such actions in infringing' Kellytoy Worldwide's common law trade dress, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy Worldwide and impairing' Kellytoy Worldwide's valuable rights in and to such trade dress.

114.    Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy Worldwide's rights, and Kellytoy Worldwide is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

115.    Kellytoy Worldwide has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy Worldwide's rights in and to its trade dress, and to Kellytoy Worldwide's business, reputations, and goodwill.

## FIFTH CAUSE OF ACTION

### (Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq.*)
(All Defendants)

116.    Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

117.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the Original

EXHIBIT J
Page 83 of 139

Squishmallows Trade Dress and using deceptive representations or designations of origin in connection with Defendants' products.

118.     The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy Worldwide is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy Worldwide, in that the public will likely associate Defendants' goods with Kellytoy Worldwide and/or Kellytoy Worldwide's goods, and cause the dilution of the distinctive quality of Kellytoy Worldwide's Original Squishmallows Trade Dress, and Kellytoy Worldwide's common law trade dress in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy Worldwide is entitled to injunctive relief.

119.     The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy Worldwide, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy Worldwide is entitled to injunctive relief.

120.     The unauthorized use by Defendants of the Original Squishmallows Trade Dress is causing and is likely to cause substantial injury to the public and to Kellytoy Worldwide.

### **SIXTH CAUSE OF ACTION**

**(Illinois Common Law Unfair Competition)**
(All Defendants)

121.     Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

122.    Defendants' acts constitute common law trade dress infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trade dress infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

123.    Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

124.    Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy Worldwide, and Kellytoy Worldwide is left with no adequate remedy at law such that the damage to Kellytoy Worldwide will continue unless and until enjoined by the Court.

## SEVENTH CAUSE OF ACTION

### (Common Law Trademark Infringement)
(All Defendants)

125.    Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if full set forth herein.

126.    This claim arises under the common law of this State relating to trademark infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

127.    Kellytoy USA is the owner of all right, title, and interest in and to the PUFFY Mark used by Kellytoy USA by virtue of its extensive manufacture and sale of products bearing such trademark as set forth in the preceding paragraphs of this Complaint.  In particular, because of their enormous sales and publicity, Kellytoy USA has acquired common law trademark rights

in and to the PUFFY Mark. Kellytoy USA's common law trademark is distinctive, and furthermore, has acquired secondary meaning.

128. The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy USA's common law trademark. Such unauthorized use by Defendants of Kellytoy USA's common law trademark constitutes common law trademark infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy USA when, in fact, they are not.

129. Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy USA's common law trademark with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off their goods as those of Kellytoy USA and to place others in the position to palm off its goods as those of Kellytoy USA, and as such, Defendants have committed trademark infringement and unfair competition under the common law.

130. By such actions in infringing' Kellytoy USA's common law trademark, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy USA and impairing' Kellytoy USA's valuable rights in and to such trademark.

131. Kellytoy USA is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy USA's rights, and Kellytoy USA is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

132. Kellytoy USA has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy USA's rights

EXHIBIT J
Page 86 of 139

in and to its trademark, and to Kellytoy USA's business, reputation, and goodwill.

## EIGHTH CAUSE OF ACTION

### (Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq*.)
(All Defendants)

133.    Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if set forth herein.

134.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the PUFFY Mark and using deceptive representations or designations of origin in connection with Defendants' products.

135.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy USA is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy USA, in that the public will likely associate Defendants' goods with Kellytoy USA and/or Kellytoy USA's goods, and cause the dilution of the distinctive quality of Kellytoy USA's PUFFY Mark in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq*., for which Kellytoy USA is entitled to injunctive relief.

136.    The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection

of Defendants with Kellytoy USA, in violation of 815 ILCS §§ 510/1 *et seq*., for which Kellytoy

USA is entitled to injunctive relief.

137.    The unauthorized use by Defendants of the PUFFY Mark is causing and is likely

to cause substantial injury to the public and to Kellytoy USA.

## NINTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)
(All Defendants)

138.    Kellytoy USA repeats, realleges and incorporates each and every allegation made

above as if fully set forth herein.

139.    Defendants' acts constitute common law trademark infringement in violation of

state common law, including the common law of the State of Illinois. Such acts of common law

trademark infringement constitute unfair competition within the meaning of the common law,

including the common law of the State of Illinois.

140.    Upon information and belief, Defendants' conduct was and continues to be

willful, intentional, and in bad faith.

141.    Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy

USA, and Kellytoy USA is left with no adequate remedy at law such that the damage to Kellytoy

Worldwide will continue unless and until enjoined by the Court.

## JURY DEMAND

Kellytoy Worldwide and Kellytoy USA demand a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Kellytoy Worldwide and Kellytoy USA pray for judgment against

Defendants as follows:

EXHIBIT J
Page 88 of 139

1.      That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be preliminarily and permanently enjoined and restrained from:

> (i)      Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the PUFFY Mark or the Original Squishmallows Trade Dress;
>
> (ii)     Using the Original Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;
>
> (iii)    Using the PUFFY Mark or any confusingly similar mark, including without limitation PUFFIES, in connection with plush toys or other goods;
>
> (iii)    Using the Original Squishmallows Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;
>
> (iv)     Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers used by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the PUFFY Mark or the Original Squishmallows Trade Dress;
>
> (v)  Infringing or contributing to the infringement of any of Kellytoy's trademarks or trade names, including without limitation the PUFFY Mark and/or Original Squishmallows Trade Dress, or otherwise engaging in unfair competition with Kellytoy in any manner or engaging in any conduct

4548394.1

27183-838

tending to falsely represent or likely to confuse, mislead or deceive suppliers, purchasers, or any member of the public into thinking that Defendants or any of their products are affiliated with Kellytoy or that Kellytoy has otherwise sponsored, approved, or licensed any products or services of Defendants;

(vi) Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the PUFFY Mark or the Original Squishmallows Trade Dress; and

(vii) Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above;

2.      That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

3.      That Kellytoy USA has superior rights to exclusive use in the PUFFY Mark and that Kellytoy Worldwide has superior rights to exclusive use in the Original Squishmallows Trade Dress in connection with toys and/or pillows vis-à-vis Defendants;

4.      That Defendants shall not in the future file or maintain an application for registration or registration of any mark that includes "puffy" or "puffies" or any designation(s) confusingly similar thereto with the United States Patent and Trademark Office or any other governmental or state authority;

5.     That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the PUFFY Mark, the Original Squishmallows Trade Dress, or any design, word or designation confusingly similar to the PUFFY Mark and/or the Original Squishmallows Trade Dress, including without limitation, PUFFIES, or any alternate spellings thereof;

6.     That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of each of the Original Squishmallows Trade Dress and the PUFFY Mark and trebling of those damages under 15 U.S.C. § 1117;

7.     Adjudge that each of the Defendants, by their unauthorized use of Kellytoy's PUFFY Mark and the Original Squishmallows Trade Dress for plush toys, and such other acts as it may have undertaken relating to the PUFFY Mark and/or Original Squishmallows Trade Dress, have violated Kellytoy's rights under 15 U.S.C. §§ 1114, 1125(a) and 1125(d), under Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq., Illinois* state law, and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the PUFFY Mark and the Original Squishmallows Trade Dress;

8.     Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the PUFFY Mark or the Original Squishmallows Trade Dress

in the United States on Defendants' behalf and inform them that they must immediately cease such use;

9.     Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity bearing or using the PUFFY Mark (including, e.g., the PUFFYIES mark), or the Original Squishmallows Trade Dress;

10.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the PUFFY Mark or the Original Squishmallows Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, including without limitation the PUFFIES designation, and all plates, molds, matrices, programs and other means of making same;

11.     That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under either or both of the PUFFY Mark and/or the Original Squishmallows Trade Dress:

(i)     the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

(ii)     the total number of units distributed and sold; and

(iii)     the total number of units remaining in inventory; and

(iv)     a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.     Direct Defendants to pay the costs of corrective advertising;

13.     Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

18.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

19.     Providing that Defendants' conduct constitutes willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

20.     Providing that Defendants' conduct will create a likelihood of dilution and injury to Kellytoy's business reputation in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

21.     Providing that Defendants used Kellytoy USA's PUFFY Mark and/or Kellytoy Worldwide's Original Squishmallows Trade Dress with the intent to cause confusion and to deceive the public in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

22.     Providing that Defendants have injured Kellytoy by depriving it of sales of its genuine goods and services, by injuring its business reputation, and by passing off Defendants' goods as Kellytoy's goods and/or created a likelihood of confusion and/or false designation of origin, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

23.     Providing that Defendants' willfully misappropriated and used the PUFFY Mark and/or Original Squishmallows Trade Dress and such conduct constitutes misappropriation, unfair competition and unjust enrichment, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law; and

24.     For such other and further relief as the Court may deem just and proper.

DATED: May 21, 2020                     Respectfully sutmitted,

                                        _____/ s / Dean D. Niro_____
                                        Dean D. Niro
                                        Olivan D. Yang
                                        VITALE, VICKREY, NIRO, SOLON & GASEY LLP
                                        311 S. Wacker Dr., Suite 2470
                                        Chicago, IL 60606
                                        (312) 236-0733
                                        dniro@vvnlaw.com
                                        oyang@vvnlaw.com


DATED: May 21, 2020                     _____/ s / Mark B. Mizrahi_____
                                        Todd M. Lander
                                        Mark B. Mizrahi
                                        FREEMAN, FREEMAN & SMILEY, LLP
                                        1888 Century Park East, Suite 1500
                                        Los Angeles, CA 90067
                                        (310) 255-6100
                                        todd.lander@ffslaw.com
                                        mark.mizrahi@ffslaw.com
                                        *Admitted Pro Hac Vice*

                                        Attorneys for Plaintiffs KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC.

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was served upon all counsel of record via filing with CM/ECF on May 21, 2020.

_____ / s / Mark B. Mizrahi _____

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
(310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

4548394.1

27183-838

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KELLY TOYS HOLDINGS, LLC, KELLYTOY WORLDWIDE, INC., and KELLYTOY (USA), INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TY INC. and DOES 1- 10, <br><br> Defendants. | Case No. 1:20-cv-00748 |

## SECOND AMENDED COMPLAINT

Plaintiffs KELLY TOYS HOLDINGS, LLC, a Delaware limited liability company ("Kellytoy Holdings"), KELLYTOY WORLDWIDE, INC., a California corporation ("Kellytoy Worldwide") and KELLYTOY (USA), INC., a California corporation ("Kellytoy USA") (collectively, "Kellytoy") bring this action against defendant TY INC. ("Ty") and DOES 1 through 10 (collectively, "Defendants") for injunctive relief and damages under the laws of the United States and the State of Illinois, as follows:

## JURISDICTION AND VENUE

1.     This action arises under the trademark laws of the United States, 15 U.S.C. §§ 1114 and 1125(a), under the statutory and common law of trademark/trade dress infringement and unfair competition.

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.

3.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.     This Court has personal jurisdiction over Defendants, as Defendants are doing

business in the State of Illinois and this District and are subject to the jurisdiction of this Court.

5.     Ty has purposely and willfully directed its intentional misuse and infringement of Kellytoy's trademark and trade dress rights in the State of Illinois with the knowledge that the actions have caused damage within the State of Illinois.

6.     By transacting business with customers in this District, and by using the goodwill and reputation built by Kellytoy, in this district, Ty has purposely availed itself of the privilege of conducting business in this judicial district and has established sufficient contacts with the State of Illinois such that it is subject to jurisdiction in Illinois.

7.     To the extent Kellytoy's claims arise from Illinois statutory and/or common law, this Court has proper jurisdiction because it bears a logical relationship to the aggregate core of operative facts relating to Kellytoy's claims under the Lanham Act.

8.     Defendant Ty is a corporation organized under the laws of the state of Delaware with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

## NATURE OF THE ACTION

9.     This action, as alleged below, arises specifically because defendant Ty has embarked on a transparent campaign to hijack Kellytoy's longstanding and well-earned goodwill in the plush toy marketplace by infringing on Kellytoy's registered trademark and distinctive trade dress.  Ty, in its haste to sow customer confusion and consequently draw business from Kellytoy, has employed a name, PUFFIES, that is a virtual and linguistic replica of Kellytoy's registered PUFFY® trademark.  Indeed, the Ty mark sounds the same, looks the same, means essentially the same thing, and is used for similar goods as Kellytoy uses in connection with its long established PUFFY® mark.  That duplication is plainly deliberate – Ty is attempting to confuse customers into believing, falsely, that its goods are associated with and derive from the same source of origin as Kellytoy's products.  Beyond all that, Ty is selling and/or offering for

4697917.2
27183-838

2

EXHIBIT J
Page 97 of 139

sale its competing plush toys (bearing the infringing PUFFIES mark) in the same tradeshows and trade channels as Kellytoy's products, all but assuring the intended and expected customer confusion.

10.     In addition, Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress (described below), which Kellytoy Worldwide pioneered and created. Kellytoy actively markets its Squishmallows through numerous media outlets, including, without limitation, on social media, at tradeshows, through Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com, and on Kellytoy's website and social media accounts, depicting images of its proprietary Squishmallows line of plush toys.

11.     The explosion in popularity of Kellytoy's Squishmallows, and the resulting and widespread customer and industry recognition, has unfortunately led to illegal imitation by some of Kellytoy's competitors.  Defendants are merely the latest, though most brazen and capable, of the intellectual property pirates seeking to conscript Kellytoy's goodwill for unfair competitive purposes.  Indeed, Kellytoy has discovered that defendant Ty has been making and offering for sale to customers nine (9) knock-off products under the moniker Squish-A-Boos that incorporate Kellytoy's Original Squishmallows Trade Dress (defined below) for distribution to customers throughout the United States and within this state and district that infringe upon the Original Squishmallows Trade Dress.

12.     Accordingly, Kellytoy has no alternative but to take steps to preserve and protect its intellectual property from this naked attack, and it thus has filed this action for trademark infringement, trade dress infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), Illinois unfair competition laws, Illinois Deceptive Trade

EXHIBIT J
Page 98 of 139

Practices Law pursuant to 815 ILCS §§ 510/1, *et seq*. and the common law trade dress infringement.

### THE PARTIES

13.     Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business located in Los Angeles, California.

14.     Kellytoy (USA), Inc. is a California corporation with its principal place of business located in Los Angeles, California.

15.     Kellytoy Worldwide, Inc. is a California corporation with its principal place of business located in Los Angeles, California.  (Kellytoy Holdings, Kellytoy USA and Kellytoy Worldwide will sometimes be referred to collectively herein as "Kellytoy.")

16.     Kellytoy is in the business of developing, manufacturing and selling children's toys including, among other things, plush toys.

17.     After the initial complaint in this action was filed, Kellytoy Holdings acquired ownership of the intellectual property rights at issue in this action from Kellytoy Worldwide and Kellytoy USA.  After Kelly Toys Holdings acquisition of the intellectual property rights, Kellytoy Worldwide and Kellytoy USA continue to operate and use the intellectual property rights with Kelly Toys Holdings, LLC's consent, such that Kellytoy Worldwide and Kellytoy USA continue have a beneficial interest therein.

18.     Defendant Ty Inc. ("Ty") is a Delaware corporation with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

19.     Ty is in the business of manufacturing and selling children's toys, including plush toys.

20.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy

will amend this Complaint to allege their true names and capacities when the same are ascertained.

21.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## BACKGROUND FACTS

### Kellytoy and Its Protected Intellectual Property Rights

22.     Kellytoy USA and Kellytoy Worldwide are innovative and highly successful creators, manufacturers, distributors and sellers of unique plush toys.

23.     Kellytoy USA has been in business for approximately three decades and in that time has developed a reputation for producing high quality, unique, and creative plush toys that are highly prized in the industry and in widespread demand by the consuming public.  Similarly, Kellytoy Worldwide has been in business for nearly two decades and developed its own reputation for producing high quality, unique, and creative plush toys, including, most recently, its highly successful Squishmallows line of plush toys in connection with the SQUISHMALLOW® and SQUISHMALLOWS brands.  (*See, e.g.,* **Exhibit 1**.)

24.     Kellytoy devotes extensive time and resources promoting and preserving its image and identity and the image and identity of its high-quality plush toys.  That includes, without limitation, creating distinctive designs and marks for use on its products, seeking U.S. trademark and copyright registrations for such marks and designs, and taking all steps necessary to preserve and protect its intellectual property.

## Kellytoy's PUFFY® TRADEMARK

25.     In particular, by assignment from Kellytoy USA, Kellytoy Holdings is the sole and exclusive owner of United States Federal Trademark Registration No. 4517007 for the trademark PUFFY (the "PUFFY Mark") for "plush toys, not intended for pets." A true and correct copy of United States Certificate of Registration No. 4517007 for the PUFFY Mark is attached as **Exhibit 2**.

26.     Prior to the assignment in favor of Kellytoy Holdings, Kellytoy USA was the sole owner of all right, title and interest in and to the PUFFY Mark and the United States trademark registration therefor (occasionally referred to as the "Mark"), which is now owned by Kellytoy Holdings.

27.     Kellytoy made widespread and prominent use of the PUFFY Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2009, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source. As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy's goods sold in connection with the PUFFY Mark, the PUFFY Mark has attained goodwill among consumers nationally – such goodwill now being owned by Kellytoy Holdings. There has been continuous goodwill and acquired distinctiveness in the PUFFY Mark regardless of the acquisition by Kellytoy Holdings. Goods bearing the PUFFY Mark continue to be sold in interstate commerce by Kellytoy.

## Kellytoy's SQUISHMALLOW® TRADEMARK

28.     By assignment from Kellytoy Worldwide, Kellytoy Holdings is the sole and exclusive owner of United States Federal Trademark Registration No. 5454574 for the trademark SQUISHMALLOW, often also designated as SQUISHMALLOWS, (the "SQUISHMALLOW Mark") for "plush toys." A true and correct copy of United States Certificate of Registration No.

5454574 for the SQUISHMALLOW Mark is attached as **Exhibit 3**.

29.     Kellytoy has made widespread and prominent use of the SQUISHMALLOW Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2017, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source.  As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy's goods sold in connection with the SQUISHMALLOW Mark, the SQUISHMALLOW Mark has attained goodwill among consumers nationally– such goodwill now being owned by Kellytoy Holdings.  There has been continuous goodwill and acquired distinctiveness  in the SQUISHMALLOW Mark regardless of the acquisition by Kellytoy Holdings.  Goods bearing the SQUISHMALLOW Marks continue to be sold in interstate commerce by Kellytoy.

### **Kellytoy's Original Squishmallows Trade Dress**

30.     In 2016, Kellytoy Worldwide conceived of and began creating its original Squishmallows line of plush toy designs that shares common, unique features distinguishing them from the goods of others (the "Original Squishmallows line"), representative examples of which are depicted on **Exhibit 1** hereto.  Most of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the Squishmallows brand.  In essence, Kellytoy created a distinctive line of plush toys that has spawned a cultural craze in which numerous imitators have emerged, not the least of which are Defendants.

31.     Since that time, in addition to its Original Squishmallows line, Kellytoy has introduced various other lines of Squishmallows branded plush toys, such as its Squishmallows Stackables line, its Squishmallows Hugmees line, among others.  In this action, Kellytoy only asserts its trade dress rights garnered in its Original Squishmallows line of plush toys, as more

fully described herein below, which has comprised approximately 95% of the total Squishmallows branded plush toys sold by Kellytoy to date.

32.     Kellytoy Holdings is the sole owner of all right, title and interest in and to the Original Squishmallows line that possesses unique, recognizable and distinguishing features that are common across much of the Original Squishmallows line.  From 2016 to the present, Kellytoy has expended large sums of money in developing, advertising and promoting the Original Squishmallows Trade Dress (defined below), and the product designs bearing it, through the United States.  In fact, Kellytoy has an annual marketing budget of approximately $1,000,000 and is spending approximately $500,000  annually in direct to consumer and business-to-business advertising in connection with its Squishmallows branded goods.

33.     Due to Kellytoy's distinctive trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  In fact, because of Kellytoy's extensive promotional activities and widespread display of plush toys bearing the Original Squishmallows Trade Dress directed to the public, and a consequence of Kellytoy's well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing embodying the trade dress as high quality goods connected with or offered by Kellytoy.  As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kellytoy.

34.     Consistent with that advertising and marketing scope, Kellytoy sells a broad range of Squishmallows branded plush toys in its Original Squishmallows line featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its distinctive combination of shapes, colors, textures and graphics – serve as a

distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as nostrils, eyes, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto (collectively, together with **Exhibit 1**, the "Original Squishmallows Trade Dress").

35. Kellytoy has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Original Squishmallows line. And due to Kellytoy's distinctive designs, robust marketing efforts, media coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kellytoy's extensive promotional activities and widespread display of its Original Squishmallows line directed to the public and as a result of the fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys bearing the Original Squishmallows Trade Dress as high quality goods connected with or offered by a single source, Kellytoy. The Original Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

36. Beyond merely being original and inherently distinctive, the Original Squishmallows Trade Dress is also widely recognized by consumers. A simple Internet search

using the Google search engine yields, for example, about 1,370,000 "hits" for the search term "Squishmallows."

37.     The scope of Kellytoy's sales reflects the market penetration of its intellectual property.  The company markets and sells its Squishmallows branded plush not only through thousands of retail stores nationwide, but additionally on its website located at <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.  Copies of selected pages from website located at <squishmallows.com> are attached as **Exhibit 4**, which specifically call out the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kelly Toys Holdings, LLC proprietary trade dress."  Kellytoy's Squishmallow website traffic has, not surprisingly, grown exponentially since its launch in 2017, and has now reached an average in excess of 5,500 visits <u>per day</u>.

38.     Kellytoy also actively engages in promoting its Original Squishmallows line of branded plush toys through its numerous social media accounts, including on Instagram, Facebook, and Twitter.  Indeed, Kellytoy's legion of loyal fans of its line of Original Squishmallows line of branded plush toys have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Original Squishmallows line.  For example, the average Squishmallows post likes on Instagram, for example, hovering over 2000+ per post and 45-100 average comments per post.  In fact, Kellytoy's Squishmallows branded plush toys have garnered over 200 Million media impressions and since July 21, 2017, Kellytoy's paid placements on Facebook and Instagram campaigns have reached more than 23.6 MILLION unique individuals and 83.7 MILLION impressions.

39.     Kellytoy uses digital ads to advertise its Original Squishmallows line of plush toys.

Owing to their immense popularity, these ads promoting specific retailers have average click through rates of 30+% (the industry average is rates of 30+% (the industry average is 1-2%).

40.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 5** hereto, including many mainstream media publications such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, the Original Squishmallows line has been also recognized by: (1) The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2) *LA Parent* in its October 2017 issue, under the "Products We Love" section, which specifically identified designs from the Original Squishmallows line; and (3) *OK!* Magazine in its August 21, 2017 issue, which, as depicted below, featured Squishmallows and described them in flattering terms, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."



41.     There are myriad further examples of the popularity and market penetration of the Original Squishmallows line.  To name just a few, designs from the Original Squishmallows line were featured in the October 2017 issues of *L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

42.     In fact, Kellytoy's Original Squishmallows line sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

43.     Reflecting the quality of the goods, Kellytoy's Original Squishmallows line has also received numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 5**.  Thus, for example, Kellytoy's Original Squishmallows line was named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

44.     The popular blog *Trendy Mom Reviews* listed Kellytoy's Original Squishmallows line as one of "The Best Gifts for 2018!"  Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy's Original Squishmallows line of  branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

45.     The Original Squishmallows line of branded toys were also:  (1) named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!; (2) selected as among the "5 Editor's Picks From Toy Fair" 2019 by *Gifts & Decorative Accessories*; (3) featured by *The Toy Insider* in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress"; (4)

4697917.2
27183-838

12

featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue, in

*The Toy Book's* August 5, 2019 issue (specifically featuring the upcoming Halloween

Squishmallows line), and in *The Toy Book's* issue (specifically featuring the Squishmallows

branded turtle) on May 15, 2019; (5) featured in *TFE Toys & Family Entertainment's* NYC Toy

Fair 2019 issue; and (6) won the *Parent and Teacher Choice Award* for 2019 from

HowtoLearn.com.

46.     Kellytoy's Original Squishmallows line has become so popular that a selection of

designs were included in the celebrity gift bags distributed to the celebrity attendees in

connection with the 2019 Teen Choice Awards, including Jenn Ortega, Lucy Hale, Lil Nas X,

Sarah Hyland, One Republic, among numerous others.

47.     This widespread publicity and recognition has occurred in conjunction with

Kellytoy's advertising efforts concerning the Original Squishmallows line, which, as alleged

above, have comprised consistent and robust marketing campaigns, including email campaigns,

social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently have

over 169,000 Instagram followers, over than 95,000 Facebook followers, and more than

60,000,000 views on the popular TikTok video app – more than many longer-existing and well-

known plush brands.  To its followers, Kellytoy regularly publishes photographs of its

Squishmallows plush toys.  Many of these followers, in turn, share these posts with their friends

and social media followers.  A copy of Squishmallows Instagram page, bearing photographs of

Squishmallows plush toys, is attached as **Exhibit 6**, which specifically calls out the fact that the

"shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy

Worldwide, Inc.'s proprietary trade dress."

48.     In addition, hundreds of well-known YouTube influencers and vloggers have

shared and posted images and videos of themselves holding plush toys in Kellytoy's Original

Squishmallows line of products. Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Twitter, TikTok, Pinterest and YouTube. These posts have generated millions of "likes" and "shares" and all feature, among other things, depictions of Kellytoy's Original Squishmallows line of plush toys. In fact, several members of the public have created their own Instagram fan accounts and Facebook groups, all bearing content featuring the Original Squishmallows line of branded plush toys.

49.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

50.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Original Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Original Squishmallows Trade Dress in the United States and around the world. In fact, Kellytoy's Original Squishmallows line is sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1,000 Costco stores, 5,500 Wal-Mart stores, 8,500 Walgreens stores, 6,200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Justice, Hallmark stores, Albertson's, Knotts Berry Farms and numerous others.

51.     Furthermore, during several summer 2019 grand openings for Costco, the highly coveted 24 inch Original Squishmallows plush sold out within two days, exceeding store expectations and projected demand.

52.     Since the summer of 2017, Kellytoy has shipped approximately a whopping 55 million (55,000,000) units of its Original Squishmallows line and there is no indication that sales will be slowing down anytime soon. Kellytoy's Squishmallows products embodying the Trade

Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

53.     Nor has the pace of sales of Kellytoy's Original Squishmallows line of branded toys slowed.  To the contrary, sales of the Original Squishmallows line of plush have been steadily increasing and there is no indication of their popularity waning any time soon.  These goods have, in fact, become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts and jewelry, bearing the images of some of Kellytoy's most popular Original Squishmallows branded toys.  Few plush lines can boast having third parties attempt to "merchandise" its copyrighted designs and goods generally bearing its trademark – something typically reserved for Disney, Looney Tunes, and the like.  But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by three different infringers, as depicted below:

  





54.     The immense popularity – indeed ubiquity – of the Original Squishmallows line of plush toys, including those set forth on **Exhibit 1**, has now reached the point where Kellytoy has embarked on a global initiative to license the Original Squishmallows designs and trademark to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and

puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming. (*See*, *e.g.*, **Exhibit 7** hereto.)

55. Moreover, recognizing the fame and proprietary nature of the Squishmallows Trade Dress and its recognition by consumers in the marketplace, famous brands such as Disney, Lucasfilm, among others, have licensed their famous characters (including Mickey Mouse, Winnie the Pooh, Baby Yoda) to Kellytoy Holdings to be adapted to the Squishmallows Trade Dress. The famous characters include the distinct features of the Sqwishmallows Trade Dress.

56. As a result of the extensive efforts to promote, advertise and sell the products embodying the Original Squishmallows Trade Dress and its deliberate efforts to specifically publicize the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kelly Toys Holdings, LLC proprietary trade dress," consumers have come to associate the Original Squishmallows Trade Dress with a designation of source and the products are inherently distinctive and/or have acquired secondary meaning.

57. All of which is to reiterate that due to the Original Squishmallows line's massive success and popularity, consumers have come to associate Kellytoy's high-quality Original Squishmallows line of plush toys with the Original Squishmallows Trade Dress and, conversely, have come to recognize the Original Squishmallows Trade Dress as a designation of source. But that success has come at a price – the popularity of Kellytoy's Original Squishmallows line of branded goods has attracted many imitators, such as Defendants, all of whom are attempting to benefit from Kellytoy's hard earned goodwill, and to do so illegally. In fact, Kellytoy has pursued numerous third-party infringers who have co-opted the Original Squishmallows Trade Dress and succeeded in stemming such infringements. Defendants, however, are uniquely positioned in the marketplace – through their massive marketing and distribution network – to

capitalize upon Kellytoy's Original Trade Dress, as discussed in greater detail below.

**Defendants' Unlawful Conduct**

58.     At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's PUFFY Mark or Kellytoy's Original Squishmallows Trade Dress.  Ty is a direct competitor of Kellytoy in the plush toy market.

59.     Ty has made a career out of copying the original designs of others and using its large market share to usurp the goodwill of its competitors.  Ty is a serial copier of the original designs of others.

60.     During the week of the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Kellytoy learned that, in spite of Kellytoy's prior use and registration of the PUFFY Mark, Ty had a pending United States trademark application, based on intent to use, for the trademark TY PUFFIES.  During that same show, Kellytoy learned that Ty was offering for sale at that same tradeshow goods that embody the Original Squishmallows Trade Dress.

61.     Consequently, by letter dated January 15, 2020, Kellytoy wrote directly to defendant Ty demanding that it cease-and-desist from using Kellytoy's PUFFIES trademark and copying Kellytoy's Original Squishmallows Trade Dress.  Ty responded by denying its wrongful conduct and essentially stating its intention to continue to infringe Kellytoy's proprietary rights by continuing to offer the Infringing Plush (defined below) for sale, including at the upcoming New York Toy Fair – the biggest toy tradeshow in the country, if not the world.

62.     Kellytoy is informed and believes that sometime in late-2019/early-2020, and notably well after Kellytoy USA established its reputation in its PUFFY Mark and Kellytoy Worldwide established its reputation in its Original Squishmallows Trade Dress – and after the

Mark and Trade Dress acquired distinctiveness in the marketplace – Defendant Ty began offering for sale various plush toy lines bearing a trademark and trade dress that are substantially and confusingly similar to Kellytoy's PUFFY Mark and Original Squishmallows Trade Dress.

63.     Specifically, Kellytoy is informed and believes that, at the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Ty used the PUFFIES trademark in connection with its plush toys (hereinafter collectively referred to as the "Infringing Puffies") that bears close similarity, in sight, sound, and meaning with Kellytoy's PUFFY Mark and, as set forth below:



64.     Making matters even worse, at the same tradeshow, Ty displayed and marketed plush toys under the moniker "Squish-a-Boos" bearing the Original Squishmallows Trade Dress (hereinafter collectively referred to as the "Infringing Squish Plush") – plush toys that so closely resemble the unique "look and feel" of the Original Squishmallows Trade Dress that manifest

customer confusion was plainly intended and is certain to occur. Photographs of the Infringing Squish Plush are collectively attached hereto as **Exhibit 8**.

65.     Defendants' Infringing Puffies and Infringing Squish Plush shall hereinafter be referred to collectively as the "Infringing Plush."

66.     Kellytoy is specifically informed and believes, for example, that Defendants manufactured in, and imported from, China the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its PUFFY branded plush and its Original Squishmallows line. Indeed, both Kellytoy and Ty sell plush toys to many of the same retailers, such as Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS.

67.     In fact, Kellytoy currently sells its authentic SQUISHMALLOWS branded plush to Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS and expects that Ty has sold or will make attempts to sell to its copies of Kellytoy's Original Squishmallows at prices lower than Kellytoy sells its authentic Original Squishmallows.

68.     Such unauthorized activities are clearly intended to draw on the goodwill Kellytoy has garnered in its PUFFY Mark and its Original Squishmallows Trade Dress, and to compete unfairly and illegally for Kellytoy's customers through trademark confusion, trade dress confusion, and predatory tactics.

69.     Kellytoy is informed and believes, for example, that Ty has been offering to sell the Infringing Squishy Plush to customers at prices that are lower than the prices charged by Kellytoy for its authentic Original Squishmallows line of branded plush. Kellytoy is further informed and believes that Ty is able to undercut Kellytoy's sales prices because, rather than

investing in creating its own designs and identity, Ty has instead copied and infringed Kellytoy's proprietary Original Squishmallows Trade Dress and otherwise because its Infringing Squishy Plush are of inferior quality as compared to Kellytoy's Original Squishmallows branded plush.

70.     Kellytoy is additionally informed and further believes that Defendants, without Kellytoy's consent or permission, advertise, promote, and display, and sell and distribute, the Infringing Plush in United States commerce and that Defendants' Infringing Plush are marketed and sold in the same channels of trade as Kellytoy's authentic plush toys.

71.     The Defendants' deliberate misconduct in copying, advertising, offering for sale, sale and otherwise using the PUFFY Mark trademark and the Original Squishmallows Trade Dress in connection with the Infringing Plush – including by copying wholesale the shape and look of the Original Squishmallows Trade Dress – constitute trademark infringement, trade dress infringement, and false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that the Infringing Plush originate from a common source with Kellytoy's authentic PUFFY branded and Original Squishmallows plush toys, and/or that Defendants' Infringing Plush have been sponsored, approved or licensed by Kellytoy, or are in some way affiliated or connected with Kellytoy.

72.     These activities are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of Defendants' toys bearing the PUFFIES trademark and the Original Squishmallows Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of, among other laws, 15 U.S.C. §§ 1114 and 1125(a).

73.     Kellytoy is informed and believes that the Defendants' activities were conducted willfully with full knowledge of the falsity of such designations of origin and false descriptions

or representations, with the intent to trade on the enormous goodwill Kellytoy has earned in its PUFFY Mark and its Original Squishmallows Trade Dress, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants offer for sale and sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy or, at the very least, from a common source as Kellytoy's PUFFY and Original Squishmallows lines of branded plush toys.

74. Defendants, by their unauthorized infringement, copying and use of Kellytoy's PUFFY Mark and Original Squishmallows Trade Dress, have engaged and will engage in acts of trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works. Defendants' activities have damaged and will continue to damage the reputation, business and good will of Kellytoy nationally and in this judicial district.

75. Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

76. Kellytoy has no adequate remedy at law. Thus, these activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

### **(Federal Trademark Infringement – 15 U.S.C. § 1114(1)-(2))**

(All Defendants)

77. Kellytoy repeats, realleges and incorporates each of the allegations made above as if fully set forth herein.

78.     Kellytoy owns and/or has a protectable interest in the registered PUFFY Mark.

79.     As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark, Kellytoy has standing to maintain in action for trademark infringement under the Lanham Act, including 15 U.S.C. §1114.

80.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the PUFFY Mark, Defendants have designed, manufactured, distributed, advertised, offered for sale and/or sold highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

81.     Defendants have caused actual confusion, a likelihood of confusion, mistake and deception as to the source of origin, sponsorship, authorization, association, or affiliation of Defendants' goods, such that the public has been confused and there is a likelihood that the public will be confused into believing that the products Defendants promote, distribute, and sell are directly sponsored by, associated with, or originate from the same source as Kellytoy's plush toys sold in connection with the PUFFY Mark.

82.     Defendants' use of the PUFFY Mark violates sections 32(1) and (2) of the Lanham Act, 15 U.S.C. § 1114(1)-(2), because it constitutes unauthorized, willful and/or deliberate use in commerce of reproductions, counterfeits, copies, and/or colorable imitations of Kellytoy's federally-registered mark in connection with the sale, offering for sale, distribution, and advertising of products and services in a manner likely to cause confusion, mistake, and deception.

83.     On information and belief, Defendants' acts have been willful and deliberate.

84.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the PUFFY Mark, as well as the goodwill associated

therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

85. Defendants' actions described above have caused and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court. Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's PUFFY Mark, or any colorable imitation or variation thereof, including PUFFIES, in connection with the sale and/or marketing of any products.

86. Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

<div align="center">

**SECOND CAUSE OF ACTION**

**(Trademark Infringement and**
**False Designation of Origin and False Description -- 15 U.S.C. §1125)**

(All Defendants)

</div>

87. Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

88. Kellytoy owns and/or has a protectable interest in the registered PUFFY Mark. As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark, Kellytoy has standing to maintain an action for false designation of origin and unfair competition under the Lanham Act, including 15 U.S.C. § 1125.

89.     The PUFFY Mark is highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

90.     Kellytoy owns all right, title and interest and/or is an authorized user thereof in and to the PUFFY Mark.

91.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the PUFFY Mark, Defendants have imported, distributed, advertised, offered for sale and sold, and/or will continue to import, distribute, advertise, offer for sale, highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

92.     Defendants' PUFFIES trademark is confusingly similar to the PUFFY Mark. Defendants' use of the PUFFY Mark has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the PUFFY Mark.

93.     Defendants' use and further threatened uses of the PUFFY Mark thus constitutes trademark infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

94.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

95.     Defendants' actions described above will cause, have caused, and will continue to

cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court. Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the PUFFY Mark, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

96.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## THIRD CAUSE OF ACTION

### (Trademark Infringement, Trade Dress Infringement,
### False Designation of Origin and False Description -- 15 U.S.C. §1125)
(All Defendants)

97.     Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

98.     As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the Original Squishmallows Trade Dress, Kellytoy has standing to maintain an action for trade dress infringement under the Lanham Act including, 15 U.S.C. § 1125.

99.     The Original Squishmallows Trade Dress is non-functional and highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

100.    Original The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part to, the amount and manner of advertising of products embodying the

Squishmallows Trade Dress, the volume of sales, as well as, the length and manner of use of the products.

101.     The Original Squishmallows Trade Dress – comprised of a proprietary combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – is non-functional and highly distinctive, and has become associated in the minds of the consuming public with plush toy products of the highest quality and reputation finding their origin in a single source.  Indeed, the Original Squishmallows Trade Dress when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with the Original Squishmallows line.  The non-functional nature of these features are evidenced and clear, in part, by reference to the following:  (1) the Original Squishmallows Trade Dress is not the subject of an expired or unexpired utility patent; (2) the unique combination of stylistic elements yielding no utilitarian advantage; (3) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, and rectangular shaped plush toys, spherical shaped plush toys, cube shaped plush toys, realistic plush toy animals, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, pvc pellets, cotton, hard foam, etc.); furthermore, when the features of the Original Squishmallows Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (4) Kellytoy not touting or marketing utilitarian advantages of its Original Squishmallows Trade Dress, and (5) the Original Squishmallows Trade Dress not resulting from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys, e.g., the egg/bell shape provides no manufacturing cost savings (other shapes such as squares, circles, triangles are equally, or less, expensive to

manufacture) and there are numerous less expensive shell materials (e.g., Tricot, EF Velboa and Velboa), stuffings (e.g., regular polyester stuffing and 3D light weight stuffing), and ways to depict the facial features other than embroidery (e.g., printing and sublimation printing). In fact, Defendants sell numerous lines of plush toys that do not co-opt the Original Squishmallows Trade Dress, such as its Beanie-Boos line of plush toys. Moreover, protection of the Original Squishmallows Trade Dress as a trademark would not impose a non-reputation-related competitive disadvantage, as there are many ways to design an equally pleasing plush toy without copying the Original Squishmallows Trade Dress. Regardless, however, the product features of the Original Squishmallows Trade Dress do not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Original Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Original Squishmallows Trade Dress from the source of other toys.

102.    Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Original Squishmallows Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will continue to import, distribute, advertise, offer for sale, and sell replicas of the Original Squishmallows Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

103.    The Infringing Squishy Plush designs are, each alone and together, confusingly similar to the Original Squishmallows Trade Dress. Defendants' use of the Original Squishmallows Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Original Squishmallows Trade Dress.

104.    Defendants' use and further threatened uses of the Original Squishmallows Trade Dress thus constitute trademark infringement, trade dress infringement, false designation of

4697917.2
27183-838

EXHIBIT J
Page 123 of 139

origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

105.    As further evidence of Ty's intent to trade upon Kellytoy's goodwill in the Original Squishmallows Trade Dress, in order to ensure consumer confusion, Defendants adopted a mark – for use in connection with the Infringing Squishy Plush, namely Squish-A-Boos – that includes the same "squish" prefix and that has same number of syllables and sound as the SQUISHMALLOW Mark.

106.    As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Original Squishmallows Trade Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

107.    Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the Original Squishmallows Trade Dress, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

108.    Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## FOURTH CAUSE OF ACTION

### (Common Law Trade Dress Infringement)
(All Defendants)

109.    Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

110.    This claim arises under the common law of this State relating to trade dress infringement.  This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

111.    As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the Original Squishmallows Trade Dress, Kellytoy has standing to maintain an action for trade dress infringement under the common law.  In particular, because of their enormous sales and publicity, Kellytoy has acquired common law trade dress rights in and to the Original Squishmallows Trade Dress.  Kellytoy's common law trade dress is distinctive, and furthermore, have acquired secondary meaning.

112.    The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy's common law trade dress.  Such unauthorized use by Defendants of Kellytoy's common law trade dress constitutes common law trade dress infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy when, in fact, they are not.

EXHIBIT J
Page 125 of 139

113.    Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy's common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kellytoy and to place others in the position to palm off its goods as those of Kellytoy, and as such, Defendants have committed trade dress infringement and unfair competition under the common law.

114.    By such actions in infringing Kellytoy's common law trade dress, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy and impairing Kellytoy's valuable rights in and to such trade dress.

115.    Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy's rights, and Kellytoy is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

116.    Kellytoy has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy's rights in and to its trade dress, and to Kellytoy's business, reputations, and goodwill.

## **FIFTH CAUSE OF ACTION**

### **(Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq.*)**
(All Defendants)

117.    Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

118.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or

4697917.2
27183-838

31

sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the Original Squishmallows Trade Dress and using deceptive representations or designations of origin in connection with Defendants' products.

119.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs.  The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy, in that the public will likely associate Defendants' goods with Kellytoy and/or Kellytoy's goods, and cause the dilution of the distinctive quality of Kellytoy's Original Squishmallows Trade Dress, and Kellytoy's common law trade dress in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

120.    The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

121.    The unauthorized use by Defendants of the Original Squishmallows Trade Dress is causing and is likely to cause substantial injury to the public and to Kellytoy.

## SIXTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)

(All Defendants)

122.    Kellytoy repeats, realleges and incorporates each and every allegation made above

as if fully set forth herein.

123.    Defendants' acts constitute common law trade dress infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trade dress infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

124.    Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

125.    Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy, and Kellytoy is left with no adequate remedy at law such that the damage to Kellytoy will continue unless and until enjoined by the Court.

## SEVENTH CAUSE OF ACTION

### (Common Law Trademark Infringement)

(All Defendants)

126.    Kellytoy repeats, realleges and incorporates each and every allegation made above as if full set forth herein.

127.    This claim arises under the common law of this State relating to trademark infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

128.    As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark , Kellytoy has standing to maintain an action for common law trademark infringement.  Indeed, Kellytoy has undertaken extensive manufacture and sale of products bearing such trademark, as set forth in the preceding paragraphs of this

Complaint. In particular, because of their enormous sales and publicity, Kellytoy has acquired common law trademark rights in and to the PUFFY Mark. Kellytoy's common law trademark is distinctive, and furthermore, has acquired secondary meaning.

129. The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy's common law trademark. Such unauthorized use by Defendants of Kellytoy's common law trademark constitutes common law trademark infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy when, in fact, they are not.

130. Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy's common law trademark with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off their goods as those of Kellytoy and to place others in the position to palm off its goods as those of Kellytoy, and as such, Defendants have committed trademark infringement and unfair competition under the common law.

131. By such actions in infringing' Kellytoy's common law trademark, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy and impairing Kellytoy's valuable rights in and to such trademark.

132. Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy's rights, and Kellytoy is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

133. Kellytoy has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy's rights in and to its trademark, and to Kellytoy's business, reputation, and goodwill.

## EIGHTH CAUSE OF ACTION

**(Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq*)**

(All Defendants)

134. Kellytoy repeats, realleges and incorporates each and every allegation made above as if set forth herein.

135. Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the PUFFY Mark and using deceptive representations or designations of origin in connection with Defendants' products.

136. The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy, in that the public will likely associate Defendants' goods with Kellytoy and/or Kellytoy's goods, and cause the dilution of the distinctive quality of Kellytoy's PUFFY Mark in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

137.     The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy, in violation of 815 ILCS §§ 510/1 *et seq*., for which Kellytoy is entitled to injunctive relief.

138.     The unauthorized use by Defendants of the PUFFY Mark is causing and is likely to cause substantial injury to the public and to Kellytoy.

## NINTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)

(All Defendants)

139.     Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

140.     Defendants' acts constitute common law trademark infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trademark infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

141.     Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

142.     Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy, and Kellytoy is left with no adequate remedy at law such that the damage to Kellytoy will continue unless and until enjoined by the Court.

## JURY DEMAND

Kellytoy demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

4697917.2
27183-838

36

1.     That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be preliminarily and permanently enjoined and restrained from:

      (i)     Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the PUFFY Mark or the Original Squishmallows Trade Dress;

      (ii)     Using the Original Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

      (iii)     Using the PUFFY Mark or any confusingly similar mark, including without limitation PUFFIES, in connection with plush toys or other goods;

      (iii)     Using the Original Squishmallows Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

      (iv)     Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers used by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the PUFFY Mark or the Original Squishmallows Trade Dress;

      (v)     Infringing or contributing to the infringement of any of Kellytoy's trademarks or trade names, including without limitation the PUFFY Mark and/or Original Squishmallows Trade Dress, or otherwise engaging in unfair competition with Kellytoy in any manner or engaging in any conduct

tending to falsely represent or likely to confuse, mislead or deceive

suppliers, purchasers, or any member of the public into thinking that

Defendants or any of their products are affiliated with Kellytoy or that

Kellytoy has otherwise sponsored, approved, or licensed any products or

services of Defendants;

(vi)    Engaging in any other activity constituting unfair competition with

Kellytoy, or constituting infringement of the PUFFY Mark or the Original

Squishmallows Trade Dress; and

(vii)   Assisting, aiding, or abetting any other person or business entity in

engaging or performing any of the activities referred to in subparagraphs

(i) through (vi) above, or effecting any assignments or transfers, forming

new entities or associations, or utilizing any other device for the purpose of

circumventing or otherwise avoiding the prohibitions set forth in

subparagraphs (i) through (vi) above;

2.      That Defendants be directed to file with the Court and serve on Kellytoy, within

thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in

detail the manner and form in which Defendants have complied with the injunction;

3.      That Kellytoy has superior rights to exclusive use in the PUFFY Mark and that

Kellytoy has superior rights to exclusive use in the Original Squishmallows Trade Dress in

connection with toys and/or pillows vis-à-vis Defendants;

4.      That Defendants shall not in the future file or maintain an application for

registration or registration of any mark that includes "puffy" or "puffies" or any designation(s)

confusingly similar thereto with the United States Patent and Trademark Office or any other

governmental or state authority;

4697917.2

27183-838

38

EXHIBIT J
Page 133 of 139

5. That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the PUFFY Mark, the Original Squishmallows Trade Dress, or any design, word or designation confusingly similar to the PUFFY Mark and/or the Original Squishmallows Trade Dress, including without limitation, PUFFIES, or any alternate spellings thereof;

6. That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of each of the Original Squishmallows Trade Dress and the PUFFY Mark and trebling of those damages under 15 U.S.C. § 1117;

7. Adjudge that each of the Defendants, by their unauthorized use of Kellytoy's PUFFY Mark and the Original Squishmallows Trade Dress for plush toys, and such other acts as it may have undertaken relating to the PUFFY Mark and/or Original Squishmallows Trade Dress, have violated Kellytoy's rights under 15 U.S.C. §§ 1114, 1125(a) and 1125(d), under Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq., Illinois* state law, and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the PUFFY Mark and the Original Squishmallows Trade Dress;

8. Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the PUFFY Mark or the Original Squishmallows Trade Dress

4697917.2
27183-838

39

in the United States on Defendants' behalf and inform them that they must immediately cease such use;

9.    Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity bearing or using the PUFFY Mark (including, e.g., the PUFFYIES mark), or the Original Squishmallows Trade Dress;

10.    Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the PUFFY Mark or the Original Squishmallows Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, including without limitation the PUFFIES designation, and all plates, molds, matrices, programs and other means of making same;

11.    That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under either or both of the PUFFY Mark and/or the Original Squishmallows Trade Dress:

    (i)    the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

    (ii)    the total number of units distributed and sold; and

    (iii)    the total number of units remaining in inventory; and

    (iv)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.    Direct Defendants to pay the costs of corrective advertising;

13.     Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

18.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

19.     Providing that Defendants' conduct constitutes willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

20.     Providing that Defendants' conduct will create a likelihood of dilution and injury to Kellytoy's business reputation in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

21.     Providing that Defendants used the PUFFY Mark and/or the Original Squishmallows Trade Dress with the intent to cause confusion and to deceive the public in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

22.     Providing that Defendants have injured Kellytoy by depriving it of sales of its genuine goods and services, by injuring its business reputation, and by passing off Defendants' goods as Kellytoy's goods and/or created a likelihood of confusion and/or false designation of origin, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

23.     Providing that Defendants' willfully misappropriated and used the PUFFY Mark and/or Original Squishmallows Trade Dress and such conduct constitutes misappropriation, unfair competition and unjust enrichment, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law; and

24.     For such other and further relief as the Court may deem just and proper.


DATED: October 21, 2020                    Respectfully sutmitted,

                                           _____
                                                /s/ Dean D. Niro
                                           Dean D. Niro
                                           Olivan D. Yang
                                           VITALE, VICKREY, NIRO, SOLON & GASEY LLP
                                           311 S. Wacker Dr., Suite 2470
                                           Chicago, IL 60606
                                           (312) 236-0733
                                           dniro@vvnlaw.com
                                           oyang@vvnlaw.com

DATED: October 21, 2020

_/ s / Mark B. Mizrahi_

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
(310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com
_Admitted Pro Hac Vice_

Attorneys for Plaintiffs KELLY TOYS HOLDINGS,
LLC, KELLYTOY WORLDWIDE, INC., and
KELLYTOY (USA), INC.

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was served upon all counsel of record via filing with CM/ECF on October 21, 2020.

_____/ s / Mark B. Mizrahi_____

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
(310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

4697917.2
27183-838

44

# EXHIBIT K

HUESTON HENNIGAN LLP
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Sourabh Mishra, State Bar No. 305185
smishra@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:    (888) 775-0898

*Attorneys for Plaintiffs Kelly Toys Holdings, LLC;*
*Jazwares, LLC; Kelly Amusement Holdings, LLC;*
*and Jazplus, LLC.*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY TOYS HOLDINGS, LLC; JAZWARES, LLC; KELLY AMUSEMENT HOLDINGS, LLC; and JAZPLUS, LLC,<br><br>                Plaintiffs,<br><br>        vs.<br><br>ZURU, LLC,<br><br>                Defendant. | Case No. 23-9255<br><br>**COMPLAINT FOR:**<br><br>   1. **Trade Dress Infringement Under the Lanham Act;**<br>   2. **Common Law Trade Dress Infringement;**<br>   3. **Copyright Infringement Under the Copyright Act;**<br>   4. **Common Law Unfair Competition; and**<br>   5. **California Statutory Unfair Competition.**<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -

COMPLAINT

Plaintiffs KELLY TOYS HOLDINGS, LLC, JAZWARES, LLC, KELLY AMUSEMENT HOLDINGS, LLC, and JAZPLUS, LLC (collectively, "Kelly Toys") bring this action against Defendant ZURU, LLC ("Zuru") for injunctive relief and damages under the laws of the United States and the State of California, as follows:

## INTRODUCTION

1. Plaintiffs are among the world's leading manufacturers and distributors of high-quality plush toys and other consumer products. In 2016, their distinctive line of plush toys branded "Squishmallows" was released. Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike. Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released. Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media. And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide. As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]



---

[1] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

6509778

2.     Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase.  Rather than competing fairly in the marketplace by creating its own unique concepts and product lines, Defendant Zuru, a billion-dollar company, decided that it would be easier to simply copy, imitate, and profit off the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying their products. Zuru is familiar with this business model: it has previously been sued by the LEGO Group for selling toys that are confusingly, strikingly, and substantially similar to the look and feel of LEGO figurines.

3.     In June 2023, Zuru announced the release of its "Snackles" plush toys. As seen below, the Snackles toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and velvety velour-like textured exterior.  And, in marketing Snackles, Zuru likewise urges consumers to, like Squishmallows, "collect' all "12 Snackles" and "start building your Snackle family!"  And, likely noticing that consumers refer to Squishmallows as Squish, Zuru boasts on product listings that Snackles has the "softest, squishiest plush."

- 3 -
COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

4.     In the marketplace, Zuru has been transparently trying to position its products to trick customers looking for Squishmallows to buy Snackles instead.  For example, Snackles products are often found right *next to* Squishmallows products in retail stores.  In addition, when consumers search for "Squishmallows" on retail websites like Amazon.com, paid search results identify Snackles instead.  Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail outlets and pays website operators to appear in search term results, all in an effort to trick consumers into purchasing Snackles even though they are looking to buy Squishmallows.

- 4 -
COMPLAINT

5.     Zuru's efforts have created substantial and actual confusion.    For example, consumer reviews on Snackles products indicate that consumers believe that they were buying Squishmallows instead: "My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce."  Even Squishmallows fans have noted on message boards that they were confused when they first saw Snackles, commenting: "I saw them in a shop earlier and literally had to check the tag to figure out whether they were squishs.  In my defense, they weren't in a box like in the picture, they were on a shelf right next to the squishs."   As one Squishmallows fan observed about Snackles: "they're 100% trying to trick ppl like your partner."

6.     Zuru's actions have already caused significant harm.    For example, customer confusion has led to lost potential customers, sales, and market share.  Plus, Zuru's bidding on search result positioning has caused Kelly Toys to have to spend more money to buy paid search term results for its *own* "Squishmallows" mark.   In short, Kelly Toys is being forced to spend more time and resources to compete with Snackles products that employ Squishmallows' own trade dress and copyrights.

7.     This is a straightforward case of trade dress and copyright infringement. Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows and Zuru is willfully infringing those trade dress rights.   Courts regularly find trade dress infringement in similar cases.  *See, e.g.*, *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 714 (9th Cir. 2010) (affirming jury verdict finding trade dress infringement); *MGA Entm't, Inc. v. Multitoy, Inc.*, No. CV04-2524, 2005 WL 8156296, at *3-4 (C.D. Cal. Oct. 11, 2005) (finding that defendant infringed plaintiff toy company's trade dress).  Kelly Toys Holdings, LLC also owns copyrights to certain Squishmallows and Zuru is likewise willfully infringing on those copyrights by selling its Snackles products that copy constituent elements of those copyrights. Through this action, Kelly Toys seeks monetary and injunctive relief to stop Zuru's

latest copycat efforts, put an end to consumer confusion, and vindicate the intellectual property rights in Squishmallows.

### THE PARTIES

8. Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

9. Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

10. Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

11. Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

12. Plaintiffs are all affiliated entities, governed by common ownership and intercompany agreements.

13. On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the copyrights and trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products, as well as all registered copyrights in and related to the Squishmallows products, to Plaintiff Kelly Toys Holdings, LLC. Accordingly, Plaintiff Kelly Toys Holdings, LLC is the legal owner of registered copyrights in and related to its Squishmallows products and the Squishmallows trade dress.

14. Kelly Toys Holdings, LLC provides the rights to the remaining plaintiffs, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the Squishmallows products that incorporate the protected intellectual property rights. Plaintiffs are all related companies that each independently have the ability to inspect and monitor the Squishmallows products and to maintain the products' quality. Each plaintiff thus has a cognizable interest in the infringement at issue.

- 6 -
COMPLAINT

EXHIBIT K
Page 6 of 135

15. Defendant Zuru is a consumer toy limited liability company organized under the laws of California with its principal place of business in California. Zuru is the United States arm of non-party ZURU Group, a group of toy and consumer products companies founded in Cambridge, New Zealand. Zuru is in the business of manufacturing and selling children's toys, including plush toys.

## JURISDICTION AND VENUE

16. This action involves the trademark laws of the United States, 15 U.S.C. § 1125(a), and, specifically, the statutory and common law of trade dress infringement. This action also involves the copyright laws of the United States, 17 U.S.C. § 101, *et seq.*

17. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125. Specifically, the Court has federal question jurisdiction in this case over the claims brought under federal law and supplemental jurisdiction over the claims brought under state law.

18. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

19. This Court has personal jurisdiction over Defendant Zuru because it is a California limited liability company with its principal address listed as: 2121 E. Maple Ave., El Segundo, CA 90245.

## BACKGROUND FACTS

### Kelly Toys Launches Its Squishmallows Products

20. Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the SQUISHMALLOWS brand.

21. In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others. Most of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the

- 7 -
COMPLAINT

Squishmallows brand. In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.



22.     Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products that possess unique, recognizable and distinguishing features that are common across much of the Squishmallows line. From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising and promoting the Squishmallows Trade Dress (defined below), and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products.

### Squishmallows Has a Distinctive Trade Dress

23.     Due to the distinctive Squishmallows trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. In fact, because of Kelly Toys' extensive promotional activities

1  and widespread display of plush toys embodying the Squishmallows Trade Dress

2  directed to the public, and as a consequence of Kelly Toys' well-earned reputation for

3  fairness and integrity in dealings with its customers, the relevant consuming public has

4  come to recognize and associate plush toys embodying the trade dress as high quality

5  goods connected with or offered by Kelly Toys. As a result, that trade dress has

6  valuable goodwill and consumer recognition associated with it and has come to

7  symbolize the exemplary reputation of Kelly Toys.

8      24.    Consistent with that advertising and marketing scope, Kelly Toys sells a

9  broad range of Squishmallows products featuring the iconic trade dress, and whose

10  overall look, feel and image—and in particular but without limitation its shapes,

11  colors, textures and graphics—serve as a distinctive source identifier to the consuming

12  public. Though not easily reduced to writing, these features include: (1) substantially

13  egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of

14  animals/characters; (2) simplified Asian style Kawaii faces with repeating and

15  complementary rounded/oval shaped graphics depicting features on the characters

16  themselves (such as eyes, snouts and bellies) and which conform to and support the

17  overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes,

18  nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and

19  (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-

20  like stuffing providing an extremely soft and squeezable marshmallow feel (the

21  "Squishmallows Trade Dress").



- 9 -

COMPLAINT



25.    The Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look and feel that is uniquely associated with Squishmallows.  The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions); (iii) myriad alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

- 10 -

COMPLAINT

26. Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors. Competitors have successfully used innumerable alternative design elements and combinations of those elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Squishmallows Trade Dress from the source of other toys. Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source – Squishmallows.

**Kelly Toys Holdings, LLC Owns Copyrights in Squishmallows**

27. Additionally, Kelly Toys Holdings, LLC is also the owner of registered copyrights in and related to its Squishmallows products (the "Squishmallows Works"), including listed those in the below chart:

- 11 -
COMPLAINT

| Copyrighted Works | Copyright Number |
|---|---|
|  | VAU001395927 |
|  | VA0002093073 |
|  | VA0002096023 |
|  | VA0002118285 |
|  | VA0002183993 |
|  | VA0002118286 |

- 12 -
COMPLAINT

| | | |
|---|---|---|
| 1 2 3 4 |  | VA0002093075 |
| 5 6 7 8 |  | VA0002148804 |
| 9 10 11 12 13 |  | VAU001395816 |
| 14 15 16 17 |  | VAU001399134 |
| 18 19 20 21 22 |  | VA0002127224 |
| 23 24 25 26 |  | VA0002137255 |
| 27 28 | | |

- 13 -

COMPLAINT

## Squishmallows Are Distinctive and Popular

28.     Kelly Toys and its predecessor have, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  As a further result of Kelly Toys' extensive promotional activities and widespread display of its Squishmallows directed to the public and as a result of its fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high quality goods connected with or offered by a single source.  The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize valuable goodwill and reputation.

29.     In addition to being original and inherently distinctive, the Squishmallows Trade Dress is also widely recognized by consumers.  A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

30.     Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.

31.     Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook, and Twitter.  Indeed, Kelly Toys' legion of loyal fans of its line of Squishmallows have been extremely engaged on social media, including TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows.  Squishmallows videos have been viewed more than 11 billion times

- 14 -

COMPLAINT

on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

32.    Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

33.    Indeed, sales of Squishmallows have increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

34.    Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others.    By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[2]

---

[2] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

35.     The New York Times has proclaimed that "Squishmallows are Taking Over,"[3] Forbes named them "2022's Must-Have Christmas Toy,"[4] and The Guardian has recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[5]

36.     Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken

_____

[3] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[4] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,* Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[5] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

- 16 -

over the toy world," and that "as toy stores go, the marshmallow-like plush toy's meteoric rise to the top of the $100 billion global toy market is one for the ages."[6]

     37.    Squishmallows' fandom ranges across all ages, from children to teens to adults. Celebrities like Kim Kardashian and Lady Gaga have identified themselves as avid devotees of the brand, and have published messages and photos of their Squishmallows collections on their social media accounts:



---

[6] Mark Caldwell, *Soft Sell*, Costco Connection, Oct. 2023, at 22, https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-23/US_October_Connection_2023.pdf.

38.     In September of 2022, Squishmallows was awarded the coveted "Toy of the Year, "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation.  Squishmallows are so popular that they have been identified as the most popular toy brand across 41% of the U.S. states—far ahead of other well-known mega brands like Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh.

39.     Due to Squishmallows' massive success and popularity, consumers associate the high-quality Squishmallows toys with the Squishmallows Trade Dress.

**Zuru Has a History of Selling Copycat and Defective Products**

40.     Zuru is a direct competitor of Kelly Toys in the plush toy market. However, unlike Kelly Toys, Zuru has made a business model of copying other well-known products, hoping to trade on the goodwill that those companies spent years garnering.  Zuru and its parent company, Zuru Inc., have been sued in the past for similar forms of infringement, including for infringing on the trade dress of other well-known products.  For example, LEGO sued Zuru, Inc. for its creation of miniature toys and packaging which were strikingly similar to the overall look and feel of LEGO's products thereby deliberately creating consumer confusion:[7]

---

[7] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, Compl., ECF No. 1 at 12 (D. Conn. Dec. 13, 2018).

| *Authentic LEGO Product* | *Zuru Copycat Product* |
|---|---|



The court agreed with LEGO, granting a preliminary injunction enjoining Zuru from infringing on LEGO's copyrights and trademarks and denying Zuru's motion to dismiss the complaint, finding that LEGO had sufficiently alleged a claim for trade dress infringement.[8]

_____

[8] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, 2019 WL 13158199, at *2 (D. Conn. July 8, 2019).

COMPLAINT

41.     Zuru products are also of lesser quality.  Just this year in June 2023, Zuru recalled 7.5 million bath toys after "multiple lacerations and puncture wounds were reported in children playing with them."[9]  According to the United States Consumer Product Safety Commission, there were at least twelve injuries from those toys, nine of which required stitches or medical attention.

### The Infringing Snackles Products

42.     On June 16, 2023, Zuru launched "Snackles," a line of plush toys that copies and imitates Squishmallows.  To be clear, Zuru is not licensed or otherwise authorized by Kelly Toys to market or distribute products embodying the copyrighted designs or the Squishmallows Trade Dress.

43.     Snackles toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and velvety velour-like textured exterior.  Side by side comparisons of Squishmallows and copycat Snackles products plainly show how striking the similarities are:

---

[9] *7.5 Million Baby Shark Bath Toys are Recalled After They Cut or Stabbed Children*, Associated Press (June 23, 2023), https://apnews.com/article/zuru-baby-shark-bath-toys-recalled-2bace294be48edfb1bfc2bf17d57c097.

- 20 -
COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |

EXHIBIT K
Page 21 of 135

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|



6509778

EXHIBIT K
Page 22 of 135

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

- 23 -

COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  | |
|  |  |
|  |  |

- 24 -
COMPLAINT

## Zuru's Copycat Coco Squishies Products

44.     Zuru has not limited its copying of Squishmallows to its Snackles line; rather, this is just one of several dubious Zuru product lines copying Squishmallows. For example, Zuru also sells a line of egg-shaped plush toys called "Coco Squishies." Not only has Zuru directly copied the name of Squishmallows, the Coco Squishies products also look *strikingly* like authentic Squishmallows.  Zuru is directly trading off of Squishmallows' goodwill and brand name in the hopes that consumers will confuse the products and buy its own thinking they are authentic Squishmallows.

45.     As depicted in the chart below, Zuru's Coco Squishies are direct copies of well-known and beloved Squishmallows characters:

| Squishmallows Original Product | Coco Squishies Copycat Product |
|---|---|
|  |  |
|  |  |

- 25 -
COMPLAINT



46.     The direct resemblance between Coco Squishies and Squishmallows rules out any chance of coincidence.  As shown above, Squishmallows has a pink poodle with curly pink hair atop its head and on its ears; Zuru created a pink poodle with curly pink hair atop its head and on its ears.  Squishmallows has a white bull terrier with a pink belly, pink ears, and large dark spot on its eye; Zuru created a white bull terrier with a pink belly, pink ears, and a large dark spot on its eye.  Squishmallows has a light grey husky with light blue eyes; Zuru created a light grey husky with blue eyes.  Squishmallows has a dalmatian with a large black spot over its left eye; Zuru created a dalmatian with a large black spot over its left eye.

## **Consumer Confusion**

47.     Not only do Snackles visually and tactilely simulate Squishmallows, but Zuru has also been trying to intentionally position its products to trick customers looking for Squishmallows into buying Snackles instead.  Zuru has taken steps to

- 26 -

COMPLAINT

ensure that customers seeking out Squishmallows land upon the confusingly similar Snackles products instead.

48.     Upon information and belief, Zuru pays website operators for Snackles to appear when a user searches for "Squishmallows" on retail websites like Amazon.com. As shown below, Zuru is, upon information and belief, purchasing sponsored product and sponsored branded video campaigns under Squishmallows search terms.   For example, when a consumer searches for "Squishmallows" on Amazon.com, some of the very first results they see will be Snackles products instead:



49.     Similarly, when a customer is on a specific Squishmallows product on Amazon.com, Snackles advertising appears on the same page in an effort to confuse a consumer into thinking these are the same line of products:



50.     Zuru has also purchased sponsored branded video campaigns on online retail websites under Squishmallows search terms, so that when a consumer searches for "Squishmallows" they may be met with the following Snackles ad, intermixed with authentic Squishmallows products:



- 28 -
COMPLAINT

51.     Zuru does not limit this practice to online retailers: it also takes steps to confuse customers shopping in brick-and-mortar retail stores.  Snackles products are placed *directly next* to Squishmallows products in retail stores in an effort to trick consumers into purchasing Snackles instead of Squishmallows.  As depicted below, customers looking for Squishmallows were confused by the inclusion—on the very same shelf—of a Snackles cow that visually resembles Connor the Cow, a Squishmallows product.  Moreover, another Snackles product is also mixed in with authentic Squishmallows:





52.     Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail stores in an effort to trick consumers.  For example, the following images show Snackles products displayed directly next to Squishmallows in a Costco store:




53. Snackles products also create a likelihood of confusion with original Squishmallows products. In fact, there is evidence of *actual* consumer confusion. For example, consumer reviews on Snackles products show that consumers have purchased Snackles believing that they were buying Squishmallows instead:

prak

★★★★★ **Soooo Cute**
Reviewed in the United States on October 5, 2023
Color: Dragon (Tabasco) | **Verified Purchase**

My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce. Vibrant colors.

Tammy Huddy

★★★★★ **LOVE! LOVE! LOVE!**
Reviewed in the United States on October 8, 2023
Color: Sloth (Push Pop) | **Verified Purchase**

First of all, I think I love squishamallows more than my children! This one did not dissapoint! Purchased it as a gift. My child loves it so much that my other girls have requested one as well! Went ahead and purchased the Chicken and we have two mini versions as well!

Priced right and makes a great gift! Highly recommend!

Helpful | Report

- 31 -
COMPLAINT

54.     Other consumers have aired their confusion, noting that they "thought [Snackles] were [Squishmallows] at a glance":



55.     As the comments on this photo show, other consumers were likewise tricked, again noting that Snackles are being placed "on a shelf right next to the [Squishmallows]" and observing that "they're 100% trying to trick ppl like your partner":



- 32 -

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Dangerous_Avocado392** · 3 mo. ago

In his defense they're 100% trying to trick ppl like your partner. The font gives squish vibes but not enough for them to get sued or anything. Some of them are kinda cute tho. I'm so desperate for squish I would maybe get one lol. For some reason my Costco stopped stocking/selling squish? (I don't go every week) but I haven't seen one since ~March😭😭

⬆ 1 ⬇    💬 Reply    ⬆ Share    ⋯

56.    Other consumers have also noted how similar Snackles are to Squishmallows, even noting particular Squishmallows characters that have been clearly copied by Snackles:



**r/squishmallow** · 3 mo. ago
u/iloveNarwhals100                                          Join  ⋯

Thoughts on Zuru's new "Snackles"? If im being honest they're sort of cute but they also just look kinda like a lame attempt to make something squishmallow-esc

discussion

**SquishmallowKing** · 3 mo. ago

There's an axolotl who is a total rip-off of Nico.

⬆ 1 ⬇    💬 Reply    ⬆ Share    ⋯

**Auswatt** · 3 mo. ago

It's like a ripoff using the concept of those little plastic food characters imo

⬆ 1 ⬇    💬 Reply    ⬆ Share    ⋯

57.    Consumers have noted the obvious similarities between Snackles and Squishmallows in comments of videos presenting Snackles products, including in some cases going so far as to confuse the product names and refer to Snackles products as "Snackmallows," "Snacksquishmallows," and "Snacksquishy":

- 33 -

COMPLAINT

**pawgjade**

Jade · 8-25

**Follow**

Found the snackmallow in @Smyths Toys Superstores

Of course ive only started with one and luckly got lottie the snackmallow i wanted. Do i need the whole collection?

#snackmallow #squishy #squishies #squishi #snacksquishmallow #snacksquishy

**Martina**
They look like squishmallows

8-20    ♡ 34    Reply

View 2 replies ⌄

**shyla(Taylor's_Version)**
yo, these look like squishmallows

8-29    ♡ 0    Reply

**Autumn🍁**
Literally a rip off of squishmallows

9-18    ♡ 1    Reply

**rachel arnold**
SQUISH MELLO DUPEEEE

1d ago    ♡ 0    Reply

**Garfieldhatesmondaysdotorg**
Zuru jumping on the Squishmallows train five years too late. 😊

8-7    ♡ 2    Reply

- 34 -
COMPLAINT

58. Zuru's actions have already caused significant harm. As a result of consumer confusion, Kelly Toys has lost potential customers, sales, and market share. For example, customer reviews reveal that customers looking for Squishmallows mistakenly purchased Zuru's Snackles products instead. And, upon information and belief, even customers who knew the difference between Squishmallows and Snackles before purchase have mistakenly purchased Snackles because of Zuru's use of the Squishmallows Trade Dress and infringement of the Squishmallows products.

59. Moreover, Zuru's bidding on Squishmallows search terms on online retailer sites has forced Kelly Toys to in turn increase its spend on search terms for its *own* "Squishmallows" mark. In other words, Kelly Toys has had to spend more money to ensure that when consumers search for "Squishmallows," they will be shown Squishmallows products and not copycat Snackles products strategically placed to confuse them.

60. In sum, Zuru's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys. And, unless enjoined, Zuru will continue to further escalate their infringing activities.

## **FIRST CAUSE OF ACTION**

## **(Trade Dress Infringement – 15 U.S.C. § 1125)**

61. Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

62. Kelly Toys Holdings, LLC owns and has a protectable interest in the Squishmallows Trade Dress.

63. As owner of all rights, title and interest in and to the Squishmallows Trade Dress, Kelly Toys Holdings, LLC has standing to maintain an action for trade dress infringement under the Lanham Act including, 15 U.S.C. § 1125.

64. The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, the Squishmallows brand.

- 35 -
COMPLAINT

65.     The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

66.     The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows brand plush toys would not impose a non-reputation-related competitive disadvantage against competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize.  The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function; rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys products from those of competitors.

67.     Without Kelly Toys' authorization or consent, and having knowledge of Kelly Toys Holdings, LLC's prior rights in the Squishmallows Trade Dress, Defendant has designed, manufactured, distributed, advertised, offered for sale and/or will continue to design, distribute, advertise, offer for sale, and sell replicas of the Squishmallows Trade Dress to the consuming public in direct competition with Kelly Toys, in or affecting interstate commerce.

68.     Zuru's infringing designs are, each alone and together, confusingly similar to the Squishmallows Trade Dress.  Defendant's use of the Squishmallows Trade Dress has caused, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally,

- 36 -

COMPLAINT

1    irreparable injury to goodwill and reputation associated with the Squishmallows Trade

2    Dress.

3         69.    Defendant's use of the Squishmallows Trade Dress thus constitutes trade

4    dress infringement in violation of 15 U.S.C. § 1125(a).

5         70.    As further evidence of Zuru's intent to trade upon Kelly Toys' goodwill

6    in its Squishmallows Trade Dress, in order to ensure consumer confusion, Zuru not

7    only copied Squishmallows Trade Dress and original designs, but also incorporated

8    product placement with products that Kelly Toys had already licensed for use in

9    collaboration with its Squishmallows toys.

10        71.    As a direct and proximate result of Zuru's unlawful conduct, it has

11   misappropriated Kelly Toys Holdings, LLC's rights in the Squishmallows Trade

12   Dress, as well as the goodwill associated therewith, and has diverted sales and profits

13   from Kelly Toys to Zuru.  Thus, as a direct and proximate result of Defendant's acts

14   of willful infringement, Kelly Toys has suffered and/or will suffer irreparable damage

15   to its valuable brand and reputation, and other damages in an amount to be proven at

16   trial, including Defendant's profits and Kelly Toys' lost profits.

17        72.    Defendant's actions described above will cause, have caused, and will

18   continue to cause irreparable damage to Kelly Toys, unless Defendant is enjoined by

19   this Court.  Kelly Toys has no adequate remedy at law with regard to Defendant's

20   infringing conduct.  Accordingly, Kelly Toys is entitled to a permanent injunction,

21   pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents,

22   servants, and employees, and all persons acting thereunder, in concert with, or on their

23   behalf, from using Kelly Toys' Squishmallows Trade Dress, or any colorable imitation

24   or variation thereof, in connection with the sale and/or marketing of any products.

25        73.    Defendant's aforesaid acts are exceptional within the meaning of 15

26   U.S.C. § 1117.

27

28

- 37 -
COMPLAINT

## **SECOND CAUSE OF ACTION**

### **(California Common Law Trade Dress Infringement)**

74.     Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

75.     Kelly Toys Holdings, LLC is the owner of all right, title, and interest in and to the Squishmallows Trade Dress used by Kelly Toys by virtue of its extensive manufacture and sale of products embodying such trade dress as set forth in the preceding paragraphs of the Complaint.

76.     Kelly Toys' common law trade dress is distinctive, and furthermore, has acquired secondary meaning.  Kelly Toys has continuously used its Squishmallows Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin.  As such, there are common law rights to the Squishmallows Trade Dress.

77.     The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kelly Toys.

78.     The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

79.     The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows products would not impose a non-reputation-related competitive disadvantage against

- 38 -

COMPLAINT

competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize. The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. Rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys' plush toys from those of competitors.

80. The infringing products advertised, distributed, offered for sale, and sold by Defendant incorporate matter constituting replicas and imitations of Kelly Toys' common law trade dress. Such unauthorized use by Defendant of Kelly Toys' common law trade dress constitutes common law trade dress infringement and has already caused, and will likely continue to cause, confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and is causing purchasers to believe such products are authentic products of Kelly Toys when, in fact, they are not.

81. Upon information and belief, Defendant has willfully and intentionally misappropriated aspects of Kelly Toys' common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kelly Toys, and as such, Defendant has committed trade dress infringement under the common law.

82. By such actions in infringing Kelly Toys' common law trade dress, Defendants are improperly trading upon the reputation and goodwill, and are impairing valuable rights in, such trade dress.

83. Upon information and belief, Defendant has committed the above alleged acts in conscious disregard of Kelly Toys' rights, and Kelly Toys is therefore entitled to punitive damages pursuant to the common law of the State of California.

84. Kelly Toys has no adequate remedy at law. The conduct of Defendant has caused and, if not enjoined, will continue to cause, irreparable damage to the rights in and business, reputation, and goodwill of the Squishmallows Trade Dress.

- 39 -
COMPLAINT

## THIRD CAUSE OF ACTION

### (Federal Copyright Infringement – 17 U.S.C. § 501(a))

85. Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

86. Kelly Toys Holdings, LLC is the exclusive owner of the Squishmallows Works.

87. On information and belief, Defendant had actual notice of Plaintiffs' exclusive rights in and to the Squishmallows Works.

88. Defendant did not attempt and therefore inherently failed to obtain Plaintiffs' consent or authorization to use, manufacture, reproduce, copy, display, prepare derivative works of, distribute, sell, transfer, rent, perform and/or market Plaintiffs' Squishmallows Works.

89. Without permission, Defendant knowingly and intentionally reproduced, copied, and displayed the Squishmallows Works by manufacturing, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling infringing products which bear such Squishmallows Works, or artwork that is, at a minimum, substantially similar to the Squishmallows Works. For example:

- 40 -

COMPLAINT

| Copyrighted Works | Copyright Number | Infringing Zuru Product |
|---|---|---|
|  | VAU001395927 |  "Hugh" |
|  | VA0002093073 |  "Daisy" |
|  | VA0002096023 |  "Terry" |
|  | VA0002118285 |  "Terry" |
|  | VAU0002183993 |  "Terry" |
|  | VA0002118286 |  "Dani" |

- 41 -

COMPLAINT

| | | |
|---|---|---|
|  | VA0002093075 | "Richard" |
|  | VA0002148804 | "Richard" |
|  | VAU001395816 | "Richard" |
|  | VAU001399134 | "Susie" |
|  | VA0002127224 | "Susie" |

| | VA0002137255 | |
|---|---|---|
|  | |  |
| | | "Lottie" |

90.  Defendant's unlawful and willful actions as alleged herein constitute infringement of the Squishmallows Works, including exclusive rights to reproduce, distribute and/or sell such Squishmallows Works in violation of 17 U.S.C. § 501(a).

91.  Defendant's knowing and intentional copyright infringement, as alleged herein, has caused substantial and irreparable harm to Plaintiffs in an amount as yet unknown but to be proven at trial, for which Plaintiffs have no adequate remedy at law, and unless enjoined, Defendant will continue to cause substantial and irreparable harm to Plaintiffs.

92.  Based on Defendant's wrongful conduct, Plaintiffs are entitled to injunctive relief, Plaintiffs' actual damages and lost profits, and Defendant's profits arising from Defendant's conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages, in an amount to be proven at trial and enhanced discretionary damages for willful copyright infringement, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (California Common Law Unfair Competition)

93.  Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

94.  This claim arises under the common law of the State of California relating to unfair competition.

95.  Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress.  Defendant's unauthorized use of Kelly Toys' Squishmallows Trade

- 43 -

1 Dress constitutes unfair competition, and is likely to cause confusion and mistake in

2 the minds of the trade and the purchasing public as to the source of Defendant's

3 products and to cause purchasers to believe that Defendant's products are authentic

4 products of Kelly Toys when in fact, they are not.

5      96.    Upon information and belief, Defendant has intentionally appropriated

6 Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake,

7 and deception as to the source of its goods and with the intent of palming off their

8 goods as those of Kelly Toys. Defendant has thus committed unfair competition under

9 the common law of the State of California.

10      97.    By its actions in infringing Kelly Toys' Squishmallows Trade Dress,

11 Defendant is improperly trading upon the reputation and goodwill, and impairing

12 valuable rights in, the Squishmallows Trade Dress.

13      98.    Upon information and belief, said activities of Defendant have caused,

14 and if not enjoined, will continue to cause, irreparable harm and damage to the rights

15 in the Squishmallows Trade Dress and to business reputation and goodwill.

16      99.    Upon information and belief, Defendant has engaged in the unlawful

17 conduct alleged herein intentionally, maliciously, fraudulently, and oppressively

18 entitling Kelly Toys to punitive damages in an amount to be determined at trial.

19 <div align="center">**FIFTH CAUSE OF ACTION**</div>

20 <div align="center">**(California Statutory Unfair Competition –**</div>

21 <div align="center">**Cal. Bus. & Prof. Code § 17200, *et seq.*)**</div>

22      100.   Kelly Toys repeats, realleges, and incorporates each and every allegation

23 made above as if fully set forth herein.

24      101.   By reason of the foregoing, Defendant has been and is engaged in

25 "unlawful, unfair or fraudulent business practices" in violation of Cal. Bus. & Prof.

26 Code § 17200 *et seq.*

27      102.   Kelly Toys Holdings, LLC is the exclusive owner of the Squishmallows

28 Works, and its Squishmallows Trade Dress constitutes a protectable property right.

<div align="center">- 44 -</div>
<div align="center">COMPLAINT</div>

Defendant's conduct—including without limitation its infringement of the Squishmallows Trade Dress and Kelly Toys Holdings, LLC's registered copyrights—will and has caused an impairment and diminishment of Kelly Toys' rights. Indeed, the activities of Defendant have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights in the Squishmallows Trade Dress, ownership rights of the Squishmallows Works, and to business reputation and goodwill. Kelly Toys has no adequate remedy at law for these wrongs and injuries. The damage to Kelly Toys includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Accordingly, Kelly Toys is entitled to a permanent injunction restraining and enjoining Defendant and its agents, servants, employees, and all persons acting thereunder, in concert with, or on its behalf, from using Squishmallows Trade Dress or infringing on the Squishmallows Works, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. Kelly Toys is further entitled to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kelly Toys prays for judgment against Defendant as follows:

a. That Defendant, its officers, members, directors, agents, servants, employees, successors, licensees, representatives, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i) Manufacturing, distributing, advertising, offering to sell or selling their infringing products or any colorable imitations of the Squishmallows Trade Dress or the Squishmallows Works;

(ii) Using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii) Using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products;

- 45 -
COMPLAINT

(iv)  Using imitations of the Squishmallows Works in connection with plush toys or other goods;

(v)  Infringing or contributing to infringement of Kelly Toys Holdings, LLC's copyrights or trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant;

(vi)  Engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress or Squishmallows Works; and

(vii)  Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

b.  That Defendant be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

c.  That Kelly Toys Holdings, LLC has superior rights to exclusive use in the Squishmallows Works and the Squishmallows Trade Dress in connection with toys vis-à-vis Defendant;

d.  That the Court direct any third parties providing services to Defendant in connection with any infringing and/or enjoined conduct, including social media

- 46 -
COMPLAINT

platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Amazon, Etsy, eBay, Alibaba), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendant in connection with the offer for sale and sale of the infringing products or any other products using, infringing, or embodying the Squishmallows Trade Dress or the Squishmallows Works;

e.     That Defendant be required to pay Kelly Toys such damages as it has sustained as a consequence of Defendant's infringement of the Squishmallows Trade Dress and the Squishmallows Works and trebling of those damages under 15 U.S.C. § 1117;

f.     Adjudge that the Defendant, by its unauthorized use of Kelly Toys' Squishmallows Trade Dress and Squishmallows Works for plush toys, and other acts as it may have undertaken relating to the Squishmallows Trade Dress and/or Squishmallows Works, has violated Kelly Toys' rights under 15 U.S.C. § 1125(a), 17 U.S.C. § 501(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully;

g.     Direct Defendant to provide Kelly Toys with an identification in writing of any and all entities that are presently using the Squishmallows Trade Dress or Squishmallows Works on Defendant's behalf and inform them that they must immediately cease such use;

h.     Direct Defendant to immediately recall any and all merchandise previously provided to any entity embodying or using the Squishmallows Trade Dress or the Squishmallows Works;

i.     Enter an order, pursuant to 15 U.S.C. § 1118, directing Defendant to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, embodying any unauthorized copy of the

- 47 -

COMPLAINT

Squishmallows Trade Dress or any of the Squishmallows Works, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation therefor, and all plates, molds, matrices, programs, and other means of making the same;

j.     That Defendant provide Kelly Toys in writing with the following information relating to Defendant's goods marketed, advertised, offered for sale, or sold under either or both of the Squishmallows Trade Dress and/or Squishmallows Works:

(i)     the name, address, and telephone number of each and every United States entity to whom Defendant has made available or otherwise provided any such products;

(ii)    the total number of units distributed and sold;

(iii)   the total number of units remaining in inventory; and

(iv)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendant in connection with such actions;

k.     Direct Defendant to pay the costs of corrective advertising;

l.      Direct Defendant to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

m.     Direct Defendant to pay punitive damages and exemplary damages according to proof;

n.     That Kelly Toys recover its actual damages, Kelly Toys' lost profits, and Defendant's profits arising from Defendant's conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages;

o.     That the Court award enhanced and treble damages;

p.     That Kelly Toys be awarded interest, including pre-judgment interest, on the foregoing sums;

- 48 -
COMPLAINT

1       q.     That the Court direct such other actions as it may deem just and proper to

2 prevent the public from deriving the mistaken impression that and products or services

3 offered, advertised, or promoted by or on behalf of Defendant is authorized by Kelly

4 Toys or related in any way to Kelly Toys' products or services; and

5       r.     For such other and further relief as the Court may deem just and proper.

6

7 Dated:  November 2, 2023       **HUESTON HENNIGAN LLP**

8

9

10

11                 By:  */s/ Moez M. Kaba*

12                      Moez M. Kaba, State Bar No. 257456
                       *mkaba@hueston.com*

13                      Sourabh Mishra, State Bar No. 305185

14                       *smishra@hueston.com*
                      523 West 6th Street, Suite 400

15                      Los Angeles, CA 90014

16                      Telephone:    (213) 788-4340
                      Facsimile:    (888) 775-0898

17

18                      *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

# DEMAND FOR JURY TRIAL

Kelly Toys hereby demands a trial by jury.

Dated: November 2, 2023        **HUESTON HENNIGAN LLP**

By: _/s/ Moez M. Kaba_
    Moez M. Kaba, State Bar No. 257456
     _mkaba@hueston.com_
    Sourabh Mishra, State Bar No. 305185
     _smishra@hueston.com_
    523 West 6th Street, Suite 400
    Los Angeles, CA 90014
    Telephone:    (213) 788-4340
    Facsimile:    (888) 775-0898

    _Attorneys for Plaintiffs_

1  JEAN-PAUL CIARDULLO, CA Bar No. 284170
     jciardullo@foley.com
2  ASHLEY M. KOLEY, CA Bar No. 334723
     akoley@foley.com
3  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3300
4  LOS ANGELES, CA 90071-2418
   TELEPHONE: 213.972.4500
5  FACSIMILE:   213.486.0065

6  JONATHAN MOSKIN (*Pro Hac Vice*)
   NY Bar No. 1949031
7    jmoskin@foley.com
   **FOLEY & LARDNER LLP**
8  90 PARK AVENUE
   NEW YORK, NY 10016
9  TELEPHONE: 212.682.7474
   FACSIMILE:   212.687.2329
10
   *Attorneys for Defendant*
11 *ZURU, LLC*

12
                    **UNITED STATES DISTRICT COURT**
13
                   **CENTRAL DISTRICT OF CALIFORNIA**
14
                         **WESTERN DIVISION**
15

16 KELLY TOYS HOLDINGS, LLC;        Case No. 2:23-cv-09255 MCS(AGRx)
   JAZWARES, LLC; KELLY
17 AMUSEMENT HOLDINGS, LLC; and     **ZURU, LLC's NOTICE OF MOTION**
   JAZPLUS, LLC                     **AND MOTION TO DISMISS**
18
                                    Hon. Mark C. Scarsi
19               *Plaintiffs*,
20       v.                         Date:   February 12, 2024*
                                    Time:   9:00 AM
21 ZURU, LLC,                       Court:  First Street, 7C
22               *Defendant*.
23

24

25

26

27       * As noted in the Parties' Stipulation at Dkt. 22, n.2, the Standing Order seemed to
28 impose constraints on the timing of the hearing date. Zuru requests the earliest available
   hearing date consistent with the Parties' proposed briefing schedule at Dkt. 22.

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 51 of 135
4889-2439-3108.5
389 of 671

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on Monday, February 12, 2024, at 9:00 AM (or as determined by the Court consistent with the parties' proposed briefing schedule at Dkt. 22) before the Honorable Mark C. Scarsi at the First Street Courthouse, 350 W. 1st Street, Courtroom 7C, 7th floor, Los Angeles, California 90012, Defendant, Zuru, LLC ("Zuru") will, and hereby does respectfully move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is made on the grounds that Plaintiffs have failed to plausibly articulate protectable trade dress, and Plaintiffs have failed to confirm whether they have supplied deposit copy images of their alleged copyright registrations. Zuru also moves unopposed on two other grounds discussed herein.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 18, 2023, as well as subsequent correspondence. This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the accompanying Declaration of Jean-Paul Ciardullo, the Request for Judicial Notice and exhibits attached thereto, the accompanying Proposed Order, and all pleadings, papers, and records on file in this action, and such matters of which this Court may take judicial notice, and upon such further oral argument and documentary evidence as may be presented at the time of hearing.

Dated: December 22, 2023                    Foley & Lardner LLP

                                            */s/ Jean-Paul Ciardullo*
                                            Jean-Paul Ciardullo

                                            *Attorneys for Defendant*
                                            *ZURU, LLC*

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 52 of 135

4889-2439-3108.5

390 of 671

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................2

    A.  Plaintiffs and Squishmallows .................................................................2

    B.  Zuru and Snackles ...................................................................................8

III.  APPLICABLE LAW ..........................................................................................10

    A.  Rule 12(b)(6) ........................................................................................10

    B.  Trade Dress ...........................................................................................10

IV.  PLAINTIFFS FAIL TO ADEQUATELY DEFINE PROTECTABLE
TRADE DRESS ACROSS THEIR LARGE AND VARIED PRODUCT
LINE-UP ............................................................................................................13

    A.  Plaintiffs' Definition Is Vague And Overreaching ...............................13

    B.  This Court's Past Rulings On Squishmallows Trade Dress ..................20

V.  PLAINTIFFS SHOULD CONFIRM THE ORIGIN OF THE
"COPYRIGHTED WORKS" IMAGES ...........................................................23

VI.  UNOPPOSED GROUNDS ................................................................................24

    A.  Lack Of Standing ..................................................................................24

    B.  Copyright Preemption ...........................................................................24

VII.  CONCLUSION ..................................................................................................25

i

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 53 of 135

4889-2439-3108.5

391 of 671

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
   768 F. Supp. 2d 1040 (N.D. Cal. 2011) ..........................................................................12

*Aquawood, LLC v. Toys "R" Us-De*laware, Inc.,
   No. 215CV05869ABMRWX, 2016 WL 10576620 (C.D. Cal. Mar. 10, 2016)............24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................................10

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,*
   457 F.3d 1062 (9th Cir. 2006) ....................................................................................12, 13

*Crafty Prods. v. Michaels Cos.*,
   389 F. Supp. 3d 876 (S.D. Cal. 2019)..............................................................................12

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
   No. CV 15-769 PSG (SSx), 2015 WL 12731929 (C.D. Cal. May 8, 2015).................10

*Goscicki v. Custom Brass & Copper Specialties, Inc.*,
   229 F. Supp. 2d 743 (E.D. Mich. 2002)..........................................................................13

*Greenberg v. Johnston*,
   No. CV-14-046505-MWF (VBKx), 2014 WL 12586252 (C.D. Cal. Oct. 22, 2014) ...10

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..........................................................................................10

In *Rose Art Indus. v. Swanson*,
   235 F.3d 165 (3d Cir. 2000)..............................................................................................11

*Interactive Health LLC v. King Kong United States, Inc.*,
   No. CV 06-1902-VBF(PLAx), 2008 WL 11337393 (C.D. Cal. Mar. 6, 2008) ............12

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
   58 F.3d 27 (2d Cir. 1995)..................................................................................................18

*Kellytoy Worldwide, Inc. v. TY, Inc.*,
   No. 20 C 748, 2020 WL 5026255 (N.D. Ill. Aug. 25, 2020)..................................passim

ii

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 54 of 135

4889-2439-3108.5

392 of 671

*Lanard Toys Ltd. v. Novelty Inc.*,
  511 F. Supp. 2d 1020 (C.D. Cal. 2007) ...................................................................24

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
  113 F.3d 373 (2d Cir. 1997)........................................................................... 13, 18

*Leatherman Tool Grp., Inc. v. Cooper Indus.*,
  199 F.3d 1009 (9th Cir. 1999) ..............................................................................18

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
  292 F. Supp. 2d 535 (S.D.N.Y. 2003) ...................................................................11

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ..............................................................................10

*Mike Vaughn Custom Sports, Inc. v. Piku*,
  15 F. Supp. 3d 735 (E.D. Mich. 2014)...................................................................18

*National Lighting Co., Inc. v. Bridge Metal Industries, LLC*,
  601 F. Supp. 2d 556 (S.D.N.Y. 2009) ............................................................. 15, 19

*Paramount Farms Int'l LLC v. Keenan Farms Inc.*,
  No. 2:12-cv-01463-SVW-E, 2012 WL 5974169 (C.D. Cal. Nov. 28, 2012)...............12

*Parker v. Hinton*,
  No. 22-5348, 2023 WL 370910 (6th Cir. Jan. 24, 2023)............................................23

*R.F.M.A.S., Inc. v. So*,
  619 F. Supp. 2d 39 (S.D.N.Y. 2009) .....................................................................19

*Roblox Corp. v. Wowwee Grp. Ltd.*,
  2023 WL 2433970 (N.D. Cal. Mar. 9, 2023)...........................................................24

*Sara Designs, Inc. v. A Classic Time Watch Co.*,
  234 F. Supp. 3d 548 (S.D.N.Y. 2017) ....................................................................17

*Shelbyco Inc. v. Western Trimming Corp.*,
  No. 2:97-CV-196C, 1997 WL 377982 (D. Utah May 12, 1997) ................................16

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005) ................................................................................24

*Sleep Sci. Partners v. Lieberman*,
  No. 09-04200 CW, 2010 WL 1881770 (N.D. Cal. May 10, 2010) ...............................10

iii

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 55 of 135

4889-2439-3108.5

393 of 671

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001) ............................................................................. 10

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.,*
    532 U.S. 23 (2001) .............................................................................................. 12

*Walker & Zanger, Inc. v. Paragon, Indus.,*
    549 F. Supp. 2d 1168 (N.D. Cal. 2007) ............................................... 11, 16, 17

*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,*
    916 F.2d 76 (2d Cir. 1990) .................................................................................. 18

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
    529 U.S. 205 (2000) ............................................................................................ 12

*Williams v. Bridgeport Music, Inc.,*
    No. LA CV13-06004 JAK (AGRx), 2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) ..... 24

*Yurman Design, Inc. v. PAJ, Inc.,*
    262 F.3d 101 (2d Cir. 2001) ........................................................................ 11, 12

**Federal Statutes**

15 U.S.C. § 1127 .................................................................................................... 10

**State Rules**

California Rule of Professional Conduct 3.3(a)(2) ........................................... 22

**Federal Regulations**

37 C.F.R. §2.52 ...................................................................................................... 20

**Other Authorities**

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3
    (4th ed. 2014) ...................................................................................................... 11

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:5.50
    (5th ed. 2020) ................................................................................................ 1, 11

iv

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 56 of 135

4889-2439-3108.5

394 of 671

# I.    __INTRODUCTION__

Defendant Zuru, LLC ("Zuru") moves under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Complaint. Specifically, Plaintiffs' trade dress claims under the Lanham Act and state law fail to articulate a plausible and proper definition of the asserted trade dress. Unlike a typical trade dress case in which the plaintiff claims rights in a single product, Plaintiffs overreachingly attempt to claim rights in an entire product category of <u>hundreds</u> (perhaps thousands) of different-looking designs of which Plaintiffs have failed to give proper notice in their Complaint. As observed in the McCarthy treatise, "[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §8:5.50 (5th ed. 2020).

On its face, Plaintiffs' vague and overbroad definition of the trade dress – filled with conclusory and undefined terms like "distinctive" and "Asian style" – goes well beyond the particular toys at issue in this case, and would impermissibly ensnare an entire product category of generic round stuffed animals with cartoonish faces. Significantly, Plaintiffs' definition of the trade dress would even encompass non-party competitors' products for which Plaintiffs previously retracted infringement claims, demonstrating that Plaintiffs' definition fails to give any reasonable guidance as to what would or would not be considered infringing. Undoubtedly aware of the inherent problem in trying to claim trade dress across so many different-looking products, Plaintiffs have not attempted to file for any federal trade dress registration, nor is it plausible that they could provide any coherent drawing of their vaguely-claimed trade dress that could satisfy Trademark Office regulations. In the 2019 *Dan-Dee* case, a Central District of California Court already dismissed Plaintiffs' equivalent trade dress claims on the grounds that Plaintiffs had failed to properly articulate their claimed trade dress. This Court should reach the same result.

Zuru also seeks dismissal on certain other narrower but important grounds discussed herein, some of which Plaintiffs have stated they will not oppose.

4889-2439-3108.5

## II.   BACKGROUND

### A.   Plaintiffs and Squishmallows

According to Plaintiffs, Squishmallows were introduced in 2016. (Complaint, ¶1.) The products were originally sold by a predecessor company called Kellytoy Worldwide, Inc., which then transferred all purported intellectual property rights to current plaintiff Kelly Toys Holdings, LLC ("KTH") in March 2020. (*Id*., ¶13.) Plaintiff Jazwares, LLC ("Jazwares") is a separate toy company that acquired KTH (apparently as part of that same transaction), and currently holds KTH as a separate subsidiary. (Dkt. 5.) Jazwares is in turn owned by the insurance company Alleghany Corporation. (*Id*.) The Complaint states that KTH is the owner of all the purported intellectual property at issue and that it "provides the rights to the remaining plaintiffs [] to sell and distribute the Squishmallows products that incorporate the protected intellectual property rights." (Complaint, ¶14.) The Complaint does not otherwise explain the relationship among the four plaintiffs, the substance of any intellectual property licensing arrangement among them, whether such arrangements are exclusive, or what specifically each plaintiff does in the marketplace.

Although the Complaint only shows pictures of a handful of Squishmallows, the Squishmallows product line in fact consists of <u>hundreds</u> (or possibly thousands) of different products comprising vastly different-looking characters, and assuming a variety of different configurations. Examples of these can be found in **Exhibit A** to the concurrent Request for Judicial Notice, which contains images of Squishmallows compiled from Plaintiffs' pleadings in other lawsuits. Further images of Squishmallows from Amazon.com, Walmart.com, and Target.com are included at Exhibits B-D to that Request.[1]

---

[1] As further discussed in Zuru's concurrently filed Request for Judicial Notice, such publicly-available search results may be judicially noticed, and Zuru takes no substantive position on their content beyond that they show Squishmallows.

2

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 58 of 135
4889-2439-3108.5
396 of 671

Samples of some of the images from Exhibit A are shown below:



MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 59 of 135

4889-2439-3108.5

Plaintiffs have even turned Squishmallows into stuffed animal slippers, pet beds, and stackable pillows, as shown below.[2]



In fact, the limitless diversity of different Squishmallows eludes any straightforward listing. The pictures in Plaintiffs' Complaint (*e.g.*, pp. 2, 8) amount to only a small percentage of Squishmallows, failing to adequately convey their diversity of appearance. Indeed, it may be that Plaintiffs have intentionally embraced a certain degree of ambiguity surrounding the full scope of their product line as a marketing tactic. The Jazwares website itself only lists a small percentage of the products, and appears to be in a state of constant flux.

---

[2] These images were collected from the Jazwares website (https://shop.jazwares.com/pages/squishmallows), and from Walmart.com (see Exhibit C to concurrent Request for Judicial Notice). As discussed in Zuru's Request for Judicial Notice, it is permissible to take notice of these.

4

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 60 of 135

4889-2439-3108.5

398 of 671

Squishmallows are sold under a prominent stylized logo reading "*Original Squishmallows*," that is displayed on product hangtags, store displays, and websites: [3]




Although Plaintiffs' present Complaint purports to assert trade dress rights, there is no public record available at the U.S. Trademark Office website of any attempt by Plaintiffs to formally register any trade dress in the Squishmallows, and as part of the meet and confer on this Motion, Plaintiffs confirmed no such applications are pending. (Ciardullo Dec., ¶3.) The fact that Plaintiffs have not sought registration deprives the designs of any presumption of validity, and places a hefty burden of proof on Plaintiffs to establish such rights. Indeed, as discussed *infra*, Zuru does not believe that Plaintiffs could satisfy regulatory requirements for visually depicting their trade dress because there is no consistency across

---

[3] The image of the Squishmallows bin is from the Complaint, p.30. The other images were obtained from the Jazwares website and are properly the subject of judicial notice. See concurrently filed Request for Judicial Notice.

5

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 61 of 135
4889-2439-3108.5
399 of 671

the product line, and hence no way to define the trade dress across the line.

With respect to copyright, although certain of the Squishmallows designs have purportedly been registered, Plaintiffs make no claim of having registered the others, including many that are shown in the Complaint. This belies the supposed importance of the asserted designs.

In fact, Plaintiffs have had difficulty enforcing their purported Squishmallows intellectual property in past litigation, including in this District.

In *Kellytoy Worldwide, Inc. et al v. TY, Inc. et al.*, No. 20-cv-00748 (N.D. Ill. Jan. 31, 2020) ("Ty Case"), Plaintiffs had sued Ty over stuffed toys depicted below:



(Ty Case, Dkt. 1-9.)

The Illinois court denied Plaintiffs' Preliminary Injunction Motion, observing that Plaintiffs had only a "modest likelihood of showing that the Squishmallows trade dress is valid," and that its overall chance of success the case was "weak." *Kellytoy Worldwide, Inc. v. TY, Inc.*, No. 20 C 748, 2020 WL 5026255, at *9-10 (N.D. Ill. Aug. 25, 2020). The

6

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 62 of 135
400 of 671
4889-2439-3108.5

Ty Case was later dismissed, with Plaintiffs allowing Ty to continue to sell the accused products, amounting to an admission that Plaintiffs' claimed rights could not extend to those products or any others of similar appearance to them. Below is an image from Ty's current website:[4]



Similarly, Plaintiffs had sued toy company Dan-Dee in this District in 2019. *Kellytoy USA, Inc. et al v. Dan-Dee International, Ltd. et al.*, 2:18-cv-05399-JAK ("Dan-Dee Case"), accusing Dan-Dee's plush toys of infringing Plaintiffs' alleged trade dress and copyrights. Dan-Dee moved to dismiss the complaint under Rule 12(b)(6) arguing (as Zuru now argues in the present Motion) that Plaintiffs had failed to adequately define their purported trade dress in the Squishmallows. The Court granted Dan-Dee's motion, ruling that "in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw." (Dan-Dee Case, Dkt. 39, "Dan-Dee Order," copy attached as Ciardullo Ex. 1.)

Plaintiffs amended their complaint, but Dan-Dee moved to dismiss again on the same grounds. (Dan-Dee Case, Dkt. 57.) The case was then dismissed before the Court could rule on the second motion. (*Id.*, Dkt. 74.) An online search shows that Dan-Dee is

---

[4] The Court may take judicial notice of the products that Ty continues to sell on its website at shop.ty.com. See concurrent Request for Judicial Notice, Exhibit E.

7

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 63 of 135

4889-2439-3108.5

401 of 671

apparently still selling the product shown here.[5]

## B.    Zuru and Snackles



Zuru, LLC is the United States arm of the ZURU Group, a group of family-owned toy and consumer products companies founded in Cambridge, New Zealand in 2004. The ZURU Group is one of the fastest growing toy brands in the world and is known for their creativity and new-age manufacturing techniques. The ZURU Group has successfully built their own global brands such as Bunch O Balloons™, X-Shot™, Robo Alive™, Mayka™, Fidget Cube™, Tangle™, ZURU Smashers™, 5 Surprise™, and Metal Machines™. The toy industry has recognized these and other Zuru brands with numerous awards and honors. The ZURU Group also has partnerships with entertainment properties, including Nickelodeon, Disney, Universal Studios, and DreamWorks. The ZURU Group now employs hundreds of staff, has numerous offices worldwide, produces hundreds of thousands of toys a day, and supplies most major retailers in more than a hundred countries.

As the Compliant notes, Zuru announced the release of the accused Snackles around June 2023. (Complaint, ¶3.) As is evident from the Complaint, Snackles are a co-branding effort with several major snack brands like Hershey's® and Pringles®, and Zuru has long-standing licensing arrangements with these brands.[6] In contrast to the Squishmallows, Snackles have prominent noses and limbs projecting forwardly from the bodies of the toys and embracing large plush versions of famous branded snacks, which are paired thematically with the toys that are holding them. The essence of the Snackles brand – from

---

[5] The Court may take judicial notice of the products that Dan-Dee continues to sell. See concurrent Request for Judicial Notice, Exhibit F.

[6] In fact, Zuru is known among consumers for its co-branding with well-known food brands, such as in its popular Mini Brands™ lineup: https://zurutoys.com/brands/mini-brands/foodie-mini-brands.

<center>8</center>

1  its very name to its overall appearance – is centered on famous snack foods.

2       Snackles are sold under a prominent stylized logo reading "*ZURU SNACKLES*," that

3  is clearly displayed on product hangtags, store displays, and websites:[7]




[7] The image of the bin is from Plaintiffs' Complaint, p.30; the other image is from Zuru's online listings. *See* concurrent Request for Judicial Notice.

9

4889-2439-3108.5

### III.  **APPLICABLE LAW**

#### A.  **Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A Rule 12(b)(6) motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

#### B.  **Trade Dress**

The Lanham Act provides for the protection of trademarks and trade dress used to identify and distinguish a producer's goods from those manufactured or sold by others and to indicate the source of the goods. *See* 15 U.S.C. § 1127.

In an action for purported infringement of unregistered trade dress, not only is it the plaintiff's burden to plead non-functionality and secondary meaning as to the claimed trade dress elements, but the plaintiff must also adequately define those trade dress elements. *Greenberg v. Johnston*, No. CV-14-046505-MWF (VBKx), 2014 WL 12586252, at *2 (C.D. Cal. Oct. 22, 2014); *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Without an adequate definition, the defendant is not on proper notice of what does or does not infringe, or what elements of the design are purported to be the subject of the validity and infringement analysis in the case. *Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010). This ambiguity can lead to gamesmanship, with the plaintiff changing their definition and characterization of the trade

10

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 66 of 135

4889-2439-3108.5

404 of 671

dress to suit their needs over the course of the litigation. *See* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3 (4th ed. 2014) ("there is no reason why the plaintiff cannot define a list of elements…Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement."). On a broader level, the motivation for requiring a clear definition is that "trade dress claims raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.'" *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp. 2d 1168, 1175-76 (N.D. Cal. 2007) (citations omitted).

The plaintiff's burden increases where trade dress is claimed in a diverse line-up of products. 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:5.50 (5th ed. 2020) ("[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116-17 (2d Cir. 2001) ("a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress"); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 542 (S.D.N.Y. 2003) (When a plaintiff seeks trade dress protection in a line of products, it must prove that "the trade dress signifies an overall look which is 'consistent' throughout the line.").

In *Rose Art Indus. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000), the court explained that when trade dress is claimed in a line of products, those products must all have a "consistent overall look" "[b]ecause of the broad reach that protection of trade dress for a series or line of products would embrace…" Although the Ninth Circuit has not specifically addressed the "consistent overall look" test in as many words, district courts in this Circuit have been guided by it because it is self-evident and axiomatic that a claimed trade dress across a product line must have a consistent look in order to evoke a single brand. *Interactive Health LLC v. King Kong United States, Inc.*, No. CV 06-1902-VBF(PLAx),

11

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 67 of 135

4889-2439-3108.5

405 of 671

2008 WL 11337393, at *2 (C.D. Cal. Mar. 6, 2008) ("when a plaintiff seeks protection for an entire line of products, the plaintiff must demonstrate the trade dress signifies an overall look that is consistent throughout the entire line.") (citing *Yurman* and other cases); *Apple Inc. v. Samsung Elecs. Co*., 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) ("Although the Ninth Circuit does not appear to have addressed the issue, some circuits have held that where a plaintiff seeks trade dress protection in a line of products, the plaintiff must establish that the line of products has a consistent overall look."); *Crafty Prods. v. Michaels Cos*., 389 F. Supp. 3d 876, 882 (S.D. Cal. 2019) ("To grant such far-reaching, undefined trade dress protection [across a product line not having a consistent look] would unfairly allow inventors to claim any broad design and would leave no room for competition."); *Paramount Farms Int'l LLC v. Keenan Farms Inc*., No. 2:12-cv-01463-SVW-E, 2012 WL 5974169, at *2-3 (C.D. Cal. Nov. 28, 2012) (distinguishing trade dress in a single product from a line of products in view of *Rose Art*).

In the case of product configuration trade dress, the plaintiff must also plead that the claimed trade dress elements comprise a distinctive aesthetic that, unaided by any unclaimed brand identifiers, would in itself convey a single brand source to most relevant consumers. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). Evidence of past sales and publicity are only relevant if driven by the trade dress features that are claimed. *Kellytoy Worldwide, Inc. v. TY, Inc*., No. 20 C 748, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020) ("popularity and engagement with a product do not necessarily suggest a connection between the product and its source.")

With respect to functionality, product features are presumed functional until proven otherwise by the party seeking trade dress protection. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001). The Ninth Circuit test for functionality proceeds in two steps. The Court first inquires whether the product feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1067, 1072 (9th Cir. 2006). Generally speaking, the first step looks to utilitarian functionality, *i.e.*, whether or to what extent the

12

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 68 of 135

4889-2439-3108.5

406 of 671

product's appearance is driven by concerns over its ability to perform certain practical functions, and its ease of manufacture. *Id.*

If the product features are not deemed to have utilitarian functional on the first step, the Court proceeds to a second step of inquiring "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold,* 457 F.3d at 1072. This second step generally equates to an assessment of aesthetic functionality, which looks to whether a product feature has become a "stock" element that consumers generally desire and do not associate with a particular brand, such as a heart-shaped box of chocolates. *Id.*; *Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 752 (E.D. Mich. 2002) (heart-shaped box).

## IV. PLAINTIFFS FAIL TO ADEQUATELY DEFINE PROTECTABLE TRADE DRESS ACROSS THEIR LARGE AND VARIED PRODUCT LINE-UP

### A. Plaintiffs' Definition Is Vague And Overreaching

The Court should dismiss Plaintiffs' Lanham Act and state law trade dress claims because they are too vague and overbroad to adequately articulate any cognizable trade dress rights. Plaintiffs make no claim of ownership of any trade dress rights in any one Squishmallow design in isolation. Rather, Plaintiffs' Complaint is premised on something substantially more difficult to prove: that it is the owner of a single broadly defined trade dress encompassing an *entire product category comprising hundreds of different designs*. As shown in the cases cited in Section III.B, and as articulated in *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 380 (2d Cir. 1997):

> a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. [] Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is

13

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 69 of 135

4889-2439-3108.5

407 of 671

acute.

Here, the Complaint defines the relevant trade dress elements ("Claimed Elements") as follows, also using this same language to define the scope of the injunction Plaintiffs ask the Court to impose (Complaint, ¶24; Prayer for Relief Section (a)):

> (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters;
>
> (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys;
>
> (3) embroidered facial features, such as eyes, nostrils, and/or mouths;
>
> (4) distinctive contrasting and non-monochrome coloring; and
>
> (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

Plaintiffs have failed to adequately define any cognizable trade dress that meaningfully encompasses their enormous and highly varied product line-up. Plaintiffs' vague definition is akin to a car company with a diverse line-up of cars trying to claim rights to non-distinctive and unprotectable elements that are common to all their cars, like "sleek styling" and "soft seats." Taken literally, Plaintiffs' Claimed Elements reach far beyond the specific individual toy designs highlighted in their Complaint, and would even sweep up designs Plaintiffs concede do not infringe. As reflected in the Complaint's Prayer for Relief (which ties back to the Claimed Elements) what Plaintiffs are really seeking via their lawsuit is an overbroad injunction that would impermissibly block Zuru from participating in an entire product category of round, multi-colored, plush animal toys with cartoonish faces. There is no basis in trade dress law for such a sweeping monopoly, nor any plausible basis under *Iqbal/Twombly* to find that Plaintiffs have properly defined protectable trade dress with sufficient specificity and narrowness. *See Nat'l Lighting Co.,*

14

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 70 of 135

4889-2439-3108.5

408 of 671

*Inc. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 562 (S.D.N.Y. 2009) ("Judicial reluctance to extend trade dress protection to entire product lines is also motivated by this fear of enabling monopolistic behavior").

Whether the alleged trade dress is read line by line, or taken collectively, it is simply too amorphous to state a claim:

- ***"Substantially Egg/Bell Shaped Plush Toys…"***

As an initial matter, Plaintiffs' term "substantially egg/bell shaped" does not act as a valid limiter of scope because many of Plaintiffs' Squishmallows are in fact circular, like the ones below.



Secondly, Plaintiffs cannot lay claim to "fanciful renditions of animals/characters," as that describes virtually any stuffed toy animal. The term "fanciful" is undefined and conclusory.

Third, the motif of a stuffed animal/character with an egg shape is a stock aesthetically functional feature dating back to Russian Nesting Dolls that is universally used to convey a smaller "head" atop a larger "body." As with heart-shaped boxes of chocolate, no one company could monopolize such a common aesthetic.

Fourth, it is apparent that a chief motivation for a "substantially egg shape" in the context of these toys is so they can double as rounded pillows, also able to stand on one end so that the animal/character is oriented head up, which are all utilitarian functional

15

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

4889-2439-3108.5

EXHIBIT K
Page 71 of 135

409 of 671

considerations.

- ***"Simplified Asian-style Kawaii faces with Rounded/Oval Shaped Graphics"***

Plaintiffs do not define what they mean by "Simplified Asian style Kawaii," nor is it apparent from looking at the pictures of the Squishmallows, whose appearances are highly varied. Some have circular eyes, some have lines for eyes, some have bellies, some do not have bellies, some have noses, some do not, and so on. The Oxford English Dictionary defines "Kawaii" with sweeping breadth as: "[c]ute, esp. in a manner considered characteristic of Japanese popular culture; charming, darling; ostentatiously adorable." (*See* www.oed.com.) Even if "Kawaii" were sufficiently defined in itself, the absence of any consistent look across the product line undercuts the descriptor as-applied. To the extent that Plaintiffs are essentially just claiming simple geometric shapes – like "rounded" "eyes" – those are not distinctive or protectable, and do not even apply to all of Plaintiffs' products.[8] *Shelbyco Inc. v. Western Trimming Corp.*, No. 2:97-CV-196C, 1997 WL 377982, at *4 (D. Utah. May 12, 1997) ("[T]he only consistent feature in [plaintiff's] trade dress is the display of commonplace, ordinary shapes in various colors.").

As explained in *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp. 2d 1168, 1176 (N.D. Cal. 2007):

> plaintiff resorts to empty generalities in the face of more precise alternatives. For instance, to describe the colors of the trade dress, plaintiff should list the actual colors rather than claim a 'palette of colors reminiscent of Provence.' Or instead of defining the three-dimensional relief as 'complex,' plaintiff should provide the magnitude and angle of relief that render plaintiff's tiles distinctive.

Here, as in *Walker*, Plaintiffs have resorted to "empty generalities." *See also Sara*

---

[8] Nor is it plausible that Plaintiffs could claim rights in the Kawaii style, as this is an aesthetic that originated from Japan that pre-dates Squishmallows. Plaintiffs cannot simply appropriate as their own an entire preexisting style: Plaintiffs can no more claim distinctiveness as to Kawaii style than they could to Anime.

16

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 72 of 135

*Designs, Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (high level descriptions like "gradient chain" were inadequate).

- ***"Embroidered Facial Features"***

It is virtually axiomatic that stuffed animal toys have embroidered facial features. Not only is this feature wholly generic and non-distinctive, but it is also legally functional, as embroidery is one of the most common means to apply facial features to stuffed animals.

- ***"Distinctive Contrasting and Non-monochrome Coloring"***

Read literally, the phrase means nothing more than that the toys are multi-colored. The adjective "distinctive" is just conclusory, given that the phrase as a whole fails to explain what is distinctive about the color pattern. Having a stuffed animal be "multi-colored" is just a generic and aesthetically functional attribute that cannot be protectable.

Furthermore, even among Squishmallows, many use the same color tones, such as those below (from Exhibit A):



- ***"Short-pile velvety velour-like…and squeezable marshmallow feel"***

A substantial percentage of all stuffed animal toys could be described this way, so the phrase does not add anything to the overall definition. Soft texture and squeezability are utilitarian functional features that could not be protectable. Just as a car company could not claim a trade dress in "rubbery round tires," Plaintiff cannot enhance their definition of trade dress by adding plainly unprotectable features. *See, e.g., Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co*., 916 F.2d 76, 81 (2d Cir. 1990) (finding that the plaintiff

17

sought trade dress protection "not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain").

Plaintiffs may argue that even if the Claimed Elements are unprotectable in isolation, the combination of them defines a valid trade dress. This argument also fails because the Complaint does not demonstrate how the combination of the Claimed Elements adds up to anything more than the sum of their parts. While it is true that sometimes unprotectable elements can be arranged in an aesthetically distinctive and non-functional way (like stacking building blocks into an artistic sculpture), the Ninth Circuit has also made clear that when the whole of trade dress is nothing more than assemblage of unprotectable elements combined in a predictable way, "it is semantic trickery to say that there is still some sort of separate 'overall appearance'" that is protectable. *Leatherman Tool Grp., Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea.").

When boiled down to their essence, all that the Claimed Elements define in combination is a roundish stuffed animal toy with multiple colors and an embroidered cartoonish face. Taken together, these elements do not yield any protectable whole, but rather just broadly describe attributes of innumerable stuffed toy products that no one company could plausibly monopolize. *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 382 (2d Cir. 1997) ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings").

Nor do the various photographs supplied in the Complaint assist the Claimed Elements because "courts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 747 (E.D. Mich. 2014) (dismissing claims to trade dress in an entire product line up of hockey gear). Here, Plaintiffs'

18

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 74 of 135

4889-2439-3108.5

412 of 671

Complaint does not adequately convey the true scope and diversity of the Squishmallows product line, and even as among the pictures in the Complaint, it is apparent that there is no distinctive and protectable feature of the toys that is consistent across the whole line.

One of the several negative consequences of the overbreadth of Plaintiffs' definition is that it makes it impossible to differentiate between stuffed animals that would be deemed infringing and those that would not be. Indeed, the Claimed Elements on their face extend to the products sold by Dan-Dee and Ty that Plaintiffs had previously accused of infringement before withdrawing their claims and dismissing with prejudice. Those dismissals would bar future infringement claims against such toys under principles of res judicata. Despite this, Plaintiffs now persist in asserting a trade dress definition that includes those non-infringing toys. Such a definition is overreaching and cannot fairly put Zuru on notice of the parameters of Plaintiffs' claimed rights.

Nor should it be assumed that there ultimately is a way to properly define trade dress rights in Squishmallows. Where trade dress is claimed in a product line, "[t]he elements specified as the trade dress must be present in every item in that product line." *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009); *see also Nat'l Lighting Co., Inc.,* 601 F. Supp. 2d at 562 (dismissing under Rule 12(b)(6) where "plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements"). The moment that Plaintiffs made the marketing decision to have hundreds (perhaps thousands) of highly varied product designs – both in terms of very different looking characters, and in terms of different structural variations – they forfeited the ability to use trade dress law to encompass the entire line-up. For purposes of this Motion, at least, the Claimed Elements do not suffice as a trade dress definition.

Returning to the fact that Plaintiffs do not appear to have attempted to obtain any federal registration for the purported Squishmallows trade dress, this can serve as a litmus test for the sufficiency of the trade dress definition. The Trademark Office requires that applicants supply a drawing or image of the claimed trade dress that adequately and

19

specifically puts the public on notice of the design that is claimed. *See* 37 C.F.R. §2.52; Trademark Manual of Examining Procedure ("TMEP") §1202.02(c) – (c)(i). In the case of products that are part of a varied line-up, a single unifying feature may be claimed in solid lines, with variable features shown in dashed lines. *Id*. For example, a car company might seek trade dress protection in the design of a particular front grill used on many different cars, showing it in solid lines and the rest of the car in dashed lines. In the case of Squishmallows, however, it is unclear how Plaintiffs could ever come up with any drawing based on their Claimed Elements that could satisfy regulatory notice requirements. Because there in fact are no common identifying features across the Squishmallows product line, any attempt to represent them visually would devolve into a collection of amorphous dashed lines. If a claimed trade dress is so abstract and so varied across a product line that it could not be feasibly depicted in a federal registration, it must be rejected.

### B. This Court's Past Rulings On Squishmallows Trade Dress

To Zuru's knowledge, this will be the third time that a Central District of California court has been asked to rule on the sufficiency of Plaintiffs' purported trade dress definition for Squishmallows. In a September 23, 2019 ruling in the *Dan-Dee* Case, Judge Kronstadt granted dismissal for many of the same reasons that Zuru now advances (though Zuru has also asserted additional arguments not considered in *Dan-Dee*). In a December 4, 2019 ruling in *Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, Judge Fitzgerald – who, remarkably, was never informed by Plaintiffs of the *Dan-Dee* decision from just a few months earlier – granted dismissal on other grounds, but found the trade dress definition adequate. No. CV-19-07652-MWF, 2019 WL 8064073, at *4-6 (C.D. Cal. Dec. 4, 2019). There are compelling reasons why *Dan-Dee* is more persuasive than *Hugfun*, and why *Hugfun* is otherwise distinguishable from the present case, in which Zuru is presenting new arguments.

Although the trade dress definition in *Dan-Dee* contained fewer words than the definition that Plaintiffs now advance, it was functionally the same:

(1) substantially bell-shaped plush toys embodying fanciful renditions

20

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 76 of 135

4889-2439-3108.5

414 of 671

of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light 'marshmallow,' memory foam-like texture. (Dan-Dee Order, Ciardullo Ex. 1, p.2.)

It is appropriate for the Court to approach Plaintiffs' latest version of the trade dress definition in the same way as the *Dan-Dee* court because Plaintiffs' additions to the definition do not actually convey any new meaning. For example, Plaintiffs have included the phrase "Asian style Kawaii" without defining it, and in looking at all the pictures of Squishmallows, it is apparent that they have highly varied faces. Plaintiffs also add the word "non-monochromatic," which is just a fancy way of saying that the toys have more than one color, but such is true of most stuffed animal toys. Plaintiffs add the phrase "repeating and complementary," but it is unclear what this means, or how it is even reflected across all of the diverse Squishmallows. Likewise, the words "eyes," "snouts," "mouths," "nostrils," and "bellies" do not add anything since most stuffed animals have such features.

In dismissing the trade dress claims in *Dan-Dee*, the Court ruled: "This general description offers little insight into the scope or nature of Kellytoy's claim. [] It is also too broad to form the basis of a plausible claim for trade dress infringement. …in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently." (Dan-Dee Order, Ciardullo Ex. 1, p.9.)

Plaintiffs may argue that this Court should follow *Hugfun* over *Dan-Dee* because the trade dress definition in *Hugfun* was the more wordy one that is also used in the present Complaint. However, there are numerous reasons why this Court should reach a different result. To start, the *Hugfun* ruling is clouded by the fact that neither litigant ever informed

21

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 77 of 135

4889-2439-3108.5

415 of 671

the court of the *Dan-Dee* ruling from only a few weeks earlier,[9] despite such disclosure being ethically required of Plaintiffs' former legal counsel pursuant to their Duty of Candor. *See* California Rule of Professional Conduct 3.3(a)(2): "A lawyer shall not fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel…". The *Hugfun* ruling anomalously makes no mention of *Dan-Dee*, and since the motion was decided only on the papers (*see Hugfun* at *2), it appears that the court never had the opportunity to consider *Dan-Dee*.

Further hampering the Court was the fact that the litigants failed to appropriately convey the sheer numerosity and variety of different-looking Squishmallows.[10] The movant also failed to address the different burden in pleading trade dress in a large line-up of products rather than a single product, and so the court never addressed this important distinction. More generally, the movant did not present the court with many of the arguments that Zuru now presents in this Motion. Finally, there have been important intervening facts: Plaintiffs have since withdrawn infringement claims against Ty and Dan-Dee that otherwise fall within the scope of the trade dress definition. This new development renders Plaintiffs' trade dress definition inherently vague and inconsistent with legal positions that have now become res judicata.[11]

---

[9] *See* briefing at C.D. Cal. Case No. 2:19-cv-07652, Dkts. 13, 19, and 21.

[10] The Court did observe language in the Complaint to the effect that Squishmallows comprise "a broad range of plush toys" (*Hugfun* at *3), but the Court was not otherwise aware of what these were or their surprising numerosity.

[11] Plaintiffs may point to the ruling from the Illinois court in the Ty Case in which, despite denying Plaintiffs' motion for a preliminary injunction, the court stated briefly in conclusory fashion that "the court cannot say that Kellytoy's description fails to put Ty on notice of the contours of its claimed trade dress." Ty Case, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020). This non-substantive assessment from a district court in a different circuit should not be given much weight.

22

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 78 of 135

4889-2439-3108.5

416 of 671

## V. **PLAINTIFFS SHOULD CONFIRM THE ORIGIN OF THE "COPYRIGHTED WORKS" IMAGES**

The Complaint contains a table on Pages 12-13 in which the left column has a heading that reads "Copyrighted Works" above a collection of photographs, while the right hand column purports to have corresponding copyright registration numbers. However, the Complaint contains no allegation that the toys in the photos of the "Copyrighted Works" are the same as the toys whose images were submitted in the deposit copies to the Copyright Office. Put another way, the Complaint provides no assurance that the photos of the "Copyrighted Works" might not be images of some other toys (or versions of toys) that are different than the toys that are actually the subject of the copyright registrations. As explained in *Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023):

> …a copyright protects original material to the extent it is contained in the deposit copy. Copyright Office Compendium § 504 (3d ed. 2017) ("As a general rule, a registration for a work of authorship covers the entire copyrightable content of the authorship that (i) is claimed in the application, (ii) is owned by the claimant, and (iii) is contained in the deposit copy(ies)." (emphasis added)). Thus, a plaintiff must use the deposit copy to establish the ownership component of a copyright infringement claim.

When the parties met and conferred on this issue, Plaintiffs were unclear as to the origin of the photos that purport to reflect the "Copyrighted Works." (Ciardullo Decl. ¶2.) The Copyright Office does not maintain easily accessible records of deposit copies, so Zuru cannot simply look them up online as it would, for example, to see the prosecution history of a patent. Plaintiffs are uniquely in possession of the deposit copy records. While Zuru could ultimately get those records several months from now as part of discovery, Zuru would be "flying blind" until then, uncertain of what the actual toys in the deposit copy images look like, and thus not on sufficient notice of the copyright claim to be able to

23

prepare its defenses. If Plaintiffs are unwilling or unable to allege and show what the copyright deposit copies consist of via amendment, the copyright claim is not properly stated because it is the copyright deposit copy that controls the scope of any protection (and not random photographs). *See Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK (AGRx), 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014) ("the deposit copy or a comparable writing defines the scope of what is protected"). Plaintiffs should be required to amend (if they can) to clarify whether the images shown as the "Copyrighted Works" in the Complaint depict the same toys as are shown in the deposit copies at the Copyright Office, or if they are not, Plaintiffs should supply such images as part of an amended pleading.

## VI.   UNOPPOSED GROUNDS

### A.   Lack Of Standing

In order to have standing to assert a copyright claim, the plaintiff must be either the owner or exclusive licensee of the copyrights at issue. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 887-8 (9th Cir. 2005); *Roblox Corp. v. Wowwee Grp. Ltd.*, 2023 WL 2433970, *10-11 (N.D. Cal. Mar. 9, 2023). Here, the Complaint provides no basis for how any Plaintiff other than Kelly Toys Holdings LLC would have standing under the Copyright claims. (Complaint, ¶14.) In meeting and conferring on this point, Plaintiffs indicted that they did not oppose the argument. (Ciardullo Decl. ¶ 2.) Though not part of this Motion, Zuru reserves the right to challenge Lanham Act standing as the case proceeds.

### B.   Copyright Preemption

State law claims are preempted and must be dismissed to the extent that they seek to vindicate claimed rights that are the same as those already protected by Copyright law. *Lanard Toys Ltd. v. Novelty Inc.*, 511 F. Supp. 2d 1020, 1030–31 (C.D. Cal. 2007); *Aquawood, LLC v. Toys "R" Us-Delaware, Inc.*, No. 215CV05869ABMRWX, 2016 WL 10576620, at *3 (C.D. Cal. Mar. 10, 2016). Here, Plaintiffs' claim under Section 17200 is partially based on the assertion of infringement of the alleged copyrighted works. (Complaint, ¶102, referring to the "Squishmallows Works.") Although Plaintiffs' Fourth

24

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 80 of 135

4889-2439-3108.5

418 of 671

Cause of Action under California common law does not expressly reference copyrights, the Prayer for Relief at Section (f) seeks judgment that the alleged copyright infringement constitutes a violation under the common law. Zuru thus requests that all state law claims be dismissed-in-part to the extent premised on any assertion of copyrights. In meeting and conferring on this point, Plaintiffs indicted that they did not oppose the argument that the state law claims cannot be premised on copyright.

## VII.  **CONCLUSION**

Zuru requests that the Court grant dismissal of Plaintiffs' claims for the reasons set forth above.

DATED:  December 22, 2023          **FOLEY & LARDNER LLP**

/s/ Jean-Paul Ciardullo
Jean-Paul Ciardullo
Jonathan E. Moskin
Ashley Koley

Attorneys for Defendant
ZURU, LLC

25

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 81 of 135

4889-2439-3108.5

419 of 671

# WORD COUNT CERTIFICATION

      I hereby certify that, according to Microsoft Word's Word Count function, the foregoing Memorandum is less than 7,000 words.


*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

26

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 82 of 135

4889-2439-3108.5

420 of 671

1 │ **HUESTON HENNIGAN LLP**
Moez M. Kaba, State Bar No. 257456
2 │ mkaba@hueston.com
Sourabh Mishra, State Bar No. 305185
3 │ smishra@hueston.com
523 West 6th Street, Suite 400
4 │ Los Angeles, CA 90014
Telephone:  (213) 788-4340
5 │ Facsimile:  (888) 775-0898

6 │ *Attorneys for Plaintiffs Kelly Toys*
*Holdings, LLC; Jazwares, LLC; Kelly*
7 │ *Amusement Holdings, LLC; and*
*Jazplus, LLC*

8 │

9 │ **UNITED STATES DISTRICT COURT**

10 │ **CENTRAL DISTRICT OF CALIFORNIA**

11 │ **WESTERN DIVISION**

12 │

13 │ KELLY TOYS HOLDINGS, LLC;
JAZWARES, LLC; KELLY
14 │ AMUSEMENT HOLDINGS, LLC; and
JAZPLUS, LLC,
15 │
            Plaintiffs,
16 │
        vs.
17 │
ZURU, LLC,
18 │
            Defendant.
19 │

Case No. 2:23-cv-09255-MCS(AGRx)

Hon. Mark C. Scarsi

**PLAINTIFFS' OPPOSITION TO
ZURU LLC'S MOTION TO DISMISS**

Date:    February 26, 2024
Time:    9:00 a.m.
Courtroom:  7C

20 │
21 │
22 │
23 │
24 │
25 │
26 │
27 │
28 │

---

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 83 of 135

1

## TABLE OF CONTENTS

2

Page(s)

3
I.    INTRODUCTION AND BACKGROUND .......................................................... 1

4
II.   LEGAL STANDARD ........................................................................................ 5

5
III.  ARGUMENT ..................................................................................................... 6

6
      A.    Plaintiffs' Description of the Identified Trade Dress is
7             Sufficient at the Pleading Stage ............................................................ 6

8             1.    There is No Legal Requirement for Plaintiffs to
                    Detail Every Element of a Protectable Trade Dress at
9                   the Pleading Stage ........................................................................ 6

10            2.    Plaintiffs Have Provided Sufficient Notice of Their
11                  Trade Dress ................................................................................... 8

12            3.    Plaintiffs Have Plausibly Pleaded Trade Dress
                    Infringement Based on the Identified Trade Dress .................... 10

13            4.    Both Courts to Consider the Identified Trade Dress
14                  Have Held It to Be Sufficiently Pleaded .................................. 16

      B.    There is No Legal Requirement to Submit Deposit Images
15            in a Complaint ..................................................................................... 20

16    C.    Plaintiffs Do Not Oppose Zuru's Standing and Preemption
17            Arguments ........................................................................................... 21

18    D.    If Needed, Plaintiffs Should Be Provided Leave to Amend ............... 21

IV.   CONCLUSION ................................................................................................ 21

19

20

21

22

23

24

25

26

27

28

- i -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
5
    768 F. Supp. 2d 1040 (N.D. Cal. 2011) ............................................................ 9

6

*Ashcroft v. Iqbal*,
7
    556 U.S. 662 (2009) ............................................................................................ 5

8

*Atari Interactive, Inc. v. Hyperkin Inc.*,
9
    2020 WL 4287584 (C.D. Cal. July 27, 2020) ................................................. 13

10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 5

11

12

*Clicks Billiards v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ................................................................... passim

13

*Crafty Prods., Inc. v. Michaels Cos., Inc.*,
14
    389 F. Supp. 3d 876 (S.D. Cal. 2019) ....................................................... 9, 21

15

*Creative Co-Op, Inc. v. Elizabeth Lucas Co.*,
16
    2012 WL 761736 (D. Idaho Mar. 7, 2012) .................................................... 21

17

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
18
    2015 WL 12731929 (C.D. Cal. May 8, 2015) ........................................ 3, 8, 10

19

*DocMagic, Inc. v. Ellie Mae, Inc.*,
20
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) .......................................................... 7

21

*Erickson v. Pardus*,
22
    551 U.S. 89 (2007) .............................................................................................. 5

23

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987) ............................................................................ 7

24

25

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ........................................................................ 16

26

*Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Institute*,
27
    481 F. Supp. 3d 941 (D. Ariz. 2020) ............................................................. 10

28

- ii -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

*Herman Miller, Inc. v. Blumenthal Distributing, Inc.*,
2019 WL 1416472 (C.D. Cal. Mar. 4, 2019) ................................................. 13

*Hudspeth v. CIR*,
914 F.2d 1207 (9th Cir. 1990) ....................................................................... 19

*IMEX Leader, Inc. v. Zest US Wholesale, Inc.*,
2023 WL 2626968 (C.D. Cal. Feb. 15, 2023) ............................................. 8, 10

*Interactive Health LLC v. King Kong USA, Inc.*,
2008 WL 11337393 (C.D. Cal. Mar. 6, 2008) ................................................ 10

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
58 F.3d 27 (2d Cir. 1995) .............................................................................. 13

*Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*,
2019 WL 8064073 (C.D. Cal. Dec. 4, 2019). .............................................. 5, 17

*Kellytoy Worldwide, Inc. v. Ty, Inc.*,
2020 WL 5026255 (N.D. Ill. Aug. 25, 2020) ............................................. 17, 18

*Kellytoy Worldwide, Inc. v. Ty, Inc.*,
2020 WL 5891386 (N.D. Ill. Oct. 5, 2020) ................................................. 5, 18

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997) ........................................................................... 13

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*,
199 F.3d 1009 (9th Cir. 1999) ....................................................................... 13

*Lepton Labs, LLC v. Walker*,
55 F. Supp. 3d 1230 (C.D. Cal. 2014) ...................................................... passim

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ......................................................................... 5

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,
57 F. Supp. 3d 1203 (C.D. Cal. 2014) ....................................................... 15, 16

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
2021 WL 922074 (C.D. Cal. Jan. 7, 2021) ...................................................... 7

*Nat'l Prods., Inc. v. Arkon Resources, Inc.*,
2017 WL 5499801 (W.D. Wash. Nov. 16, 2017) ........................................... 13

- iii -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

*Pac. Gas and Elec. Co. v. Lynch*,
216 F. Supp. 2d 1016 (N.D. Cal. 2002) ........................................................ 19

*Paramount Farms Int'l, LLC v. Keenan Farms Inc.*,
2012 WL 5974169 (C.D. Cal. Nov. 28, 2012) ........................................... 9, 15

*Parker v. Hinton*,
2023 WL 370910 (6th Cir. Jan. 24, 2023) ................................................... 20

*R&A Synergy LLC v. Spanx, Inc.*,
2019 WL 8137706 (C.D. Cal. Sept. 4, 2019) .............................................. 8, 20

*Sleep Science Partners v. Lieberman*,
2010 WL 1881770 (N.D. Cal. May 10, 2010) ............................................... 10

*Therabody, Inc. v. DJO, LLC*,
2022 WL 17360133 (C.D. Cal. June 1, 2022) ............................................. 3, 7

*Vans, Inc. v. ACI Int'l*,
2023 WL 6930323 (C.D. Cal. Oct. 11, 2023) ............................................... 14

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
549 F. Supp. 2d 1168 (N.D. Cal. 2007) .......................................................... 9

*Williams v. Bridgeport Music, Inc.*,
2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) ............................................... 20

*WMX Techs., Inc. v. Miller*,
104 F.3d 1133 (9th Cir. 1997) ....................................................................... 19

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 5

Federal Rules of Civil Procedure 15(a)(2) ..................................................... 21

**Regulations**

37 C.F.R. § 2.52 .............................................................................................. 16

**Other Authorities**

1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
Competition ........................................................................................... 11, 16

- iv -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

EXHIBIT K
Page 87 of 135

# I.    **INTRODUCTION AND BACKGROUND**

Plaintiffs' Squishmallows toys have skyrocketed to fame, topping sales charts and rapidly becoming coveted collectors' items.  They have been described by the *Washington Post* as "the hottest toy on the market," (ECF 1, "Compl." ¶ 34) and have surpassed other well-known mega brands like Lego and Hot Wheels to become the most popular toy brand in the country.  (*Id.* ¶ 38.)  Squishmallows' meteoric rise is further demonstrated through its online popularity, with branded videos being viewed more than 11 billion times on TikTok.  (*Id.* ¶ 31.)  Put simply, consumers love Squishmallows.  (*Id.* ¶ 1.)

In a crowded toy market with many available plush toys, Squishmallows has become a runaway success with a distinctive look.  As described in paragraph 24 of the Complaint (the "Identified Trade Dress"), the popular trade dress associated with many Squishmallows is a fanciful rendition of a unique animal with simplified Asian style Kawaii faces in an egg/bell shape in combination with other features that create a distinguishing aesthetic look.  Due to the immense popularity of the toys, the look associated with this trade dress has grown synonymous with the Squishmallows brand.  (*Id.* ¶¶ 28-39.)

Witnessing Plaintiffs' success with Squishmallows in the toy market, competing toy company Defendant Zuru, LLC ("Zuru") decided to release products that copy the Asserted Trade Dress.  (*Id.* ¶¶ 42-46.)  In June 2023, Zuru launched "Snackles," a line of plush toys that undeniably seeks to usurp the benefits and trade off of the reputation and goodwill of the Plaintiffs' Identified Trade Dress:

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

| Plaintiffs' Original Products | Zuru's Infringing Products |
|---|---|
|  |  |

(*Id.* ¶ 43.)  Indeed, there is already substantial *actual* evidence of consumer confusion between Plaintiffs' Squishmallows and Zuru's Snackles.  (*Id.* ¶¶ 47-60.)  For example, consumers have remarked about Zuru's Snackles: "They look like Squishmallows"; "yo, these look like squishmallows"; "Literally a rip off of squishmallows"; "they're 100% trying to trick ppl like your partner"; and "Zuru jumping on the Squishmallows train five years too late."  (*Id.* ¶¶ 55, 57.)

Plaintiffs thus filed this case against Zuru to stop the ongoing infringement of the Identified Trade Dress; end the infringement of the copyrighted Squishmallows (*id.* ¶ 27, "Copyrighted Works"); and recover damages due to the substantial harm caused by Zuru (*id.* ¶¶ 58-59).

1     In response, Zuru filed a motion to dismiss ("Motion") that does not challenge

2 *any* of the substantive allegations of copyright infringement.  Nor does Zuru argue in

3 the Motion that Plaintiffs have not sufficiently pleaded the required elements of trade

4 dress infringement: non-functionality nature of the *overall* trade dress; secondary

5 meaning; and likelihood of confusion.  *See Clicks Billiards v. Sixshooters, Inc.*, 251

6 F.3d 1252, 1258 (9th Cir. 2001) (listing these elements as the three elements required

7 to establish trade dress infringement).

8     Instead Zuru claims that Plaintiffs have not sufficiently *identified* their trade

9 dress because it opines that certain elements of the Asserted Trade Dress are not

10 protectable.  Zuru's arguments must be rejected for four reasons.

11    *First*, Zuru's argument that Plaintiffs must exhaustively explain the meaning of

12 every word of every element of the Asserted Trade Dress is premature at the motion

13 to dismiss stage.  As Judge Wu held in *Therabody, Inc. v. DJO, LLC*, there are no

14 "published Ninth Circuit or Supreme Court decision identifying [the exhaustive

15 identification of the asserted trade dress] as a pleading requirement for such claims."

16 2022 WL 17360133, at *2 (C.D. Cal. June 1, 2022).  Instead, the plaintiff need only

17 plead the three elements required to state a trade dress claim as outlined by Ninth

18 Circuit precedent.  *Click Billiards*, 251 F.3d at 1258.  Since Zuru "offers no proper

19 argument that any of these elements are missing from Plaintiff[s'] allegations," its

20 motion to dismiss must be denied.  *Therabody*, 2022 WL 17360133, at *2.

21    *Second*, even if Plaintiffs were required to identify the specific trade dress-at-

22 issue, they have met the low bar to identify the trade dress at the pleading stage.  Courts

23 that examine trade dress descriptions at the pleading stage allow them to proceed "[s]o

24 long as a plaintiff has alleged a complete recitation of the concrete elements of its

25 alleged trade dress."  *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D.

26 Cal. 2014).  It can do so by both describing the trade dress in words (*id.*); with pictures;

27 or with both in combination with one another.  *See Deckers Outdoor Corp. v. Fortune

28 Dynamic, Inc.*, 2015 WL 12731929, at *4 (C.D. Cal. May 8, 2015) (finding trade dress

- 3 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1  properly alleged where plaintiffs alleged "the elements of a trade dress and provid[ed]

2  an image of a product"). Plaintiffs here have done both: identified the five elements

3  of the Asserted Trade Dress *and* provided images of the Squishmallows products that

4  practice that trade dress. (Compl. ¶ 24.) Courts routinely deny motions to dismiss

5  where a plaintiff has provided an exhaustive list of the elements of its asserted trade

6  dress. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1240 (denying motion to dismiss).

7      *Third*, in arguing that the Asserted Trade Dress is not protectable, Zuru focuses

8  on *individual terms and words* in *individual elements* of the overall asserted design.

9  This is contrary to law. As controlling Ninth Circuit authority holds, an asserted trade

10  dress "must be examined as a whole, not by its individual constituent parts." *Click*

11  *Billiards*, 251 F.3d at 1259. Zuru's arguments that *some* parts of the Asserted Trade

12  Dress may be functional or non-distinctive are thus irrelevant and cannot justify

13  granting a motion to dismiss. *Id.* ("It is crucial that [courts] focus *not* on the individual

14  elements, but rather on the overall visual impression that the combination and

15  arrangement of those elements create."). And, in any event, Zuru's claim that the

16  Court should undertake fact-intensive inquiries about genericness, distinctiveness, and

17  functionality based on exhibits outside of the Complaint[1] is inappropriate at the motion

18  to dismiss stage when the Court must assume Plaintiffs' allegations as true. *Lepton*

19  *Labs*, 55 F. Supp. 3d at 1237 (courts "must construe all factual allegations set forth in

20  the complaint as true and in the light most favorable to the plaintiff" (cleaned up)).

21

---

22  [1] As discussed in the accompanying Opposition to Zuru's Request for Judicial Notice,

23  Zuru improperly relies on exhibits in its Motion that are neither incorporated by
reference in the Complaint, nor otherwise proper subjects of judicial notice. And it

24  also, in violation of Ninth Circuit precedent, asks this Court to assume the truth of its

25  extraneous exhibits to grant its motion to dismiss. *See Khoja v. Orexigen*

26  *Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("Submitting documents not
mentioned in the complaint to create a defense is nothing more than another way of

27  disputing the factual allegations in the complaint," while failing to give the plaintiff an

28  "opportunity to respond to the defendant's new version of the facts."). The Court
should decline to do so.

<center>- 4 -</center>

<center>PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS</center>

1      *Fourth*, both courts that have considered the Asserted Trade Dress have found

2 it to be sufficient at the pleading stage.  In *Kellytoy Worldwide, Inc. v. Hugfun Int'l,*

3 *Inc.*, Judge Fitzgerald held that the Asserted Trade Dress "satisfies the requirements

4 of Rule 8" because it "describes the [t]rade [d]ress in detail and attaches photos of its

5 line of plush toys."  2019 WL 8064073, at *4 (C.D. Cal. Dec. 4, 2019).  Likewise, in

6 *Kellytoy Worldwide, Inc. v. Ty, Inc.*, the court rejected the *same arguments* Zuru

7 presents here, holding that the Asserted Trade Dress is enough to put the defendant

8 "on notice of the contours of its claimed trades" to proceed to discovery.  2020 WL

9 5891386, at *2 (N.D. Ill. Oct. 5, 2020).  This Court should do the same.

10      Finally, Zuru also requests that Plaintiffs provide the original deposit images of

11 the Copyrighted Works with the Complaint.  Yet Zuru cites no law requiring that

12 Plaintiffs do so at the pleading stage.  This argument, like Zuru's argument about the

13 trade dress description, is yet another attempt to insert fact disputes at the pleading

14 stage.  Plaintiffs respectfully request that the Court deny Zuru's Motion in its entirety.

15 **II.**   **LEGAL STANDARD**

16      A court may only grant dismissal under Federal Rule of Civil Procedure

17 12(b)(6) if the plaintiff fails to present a cognizable legal theory or to allege sufficient

18 facts to support a cognizable legal theory.  *Mendiondo v. Centinela Hosp. Med. Ctr.*,

19 521 F.3d 1097, 1104 (9th Cir. 2008).  In assessing a motion to dismiss, "a judge must

20 accept as true all of the factual allegations contained in the complaint."  *Erickson v.*

21 *Pardus*, 551 U.S. 89, 94 (2007).  To survive a Rule 12(b)(6) motion, a complaint need

22 only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

23 is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

24 *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

25

26

27

28

- 5 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

# III.   ARGUMENT

## A.   Plaintiffs' Description of the Identified Trade Dress is Sufficient at the Pleading Stage

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards*, 251 F.3d at 1257-58 (cleaned up). "To sustain a claim for trade dress infringement, [a plaintiff] must prove: (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Id.*

Here, Zuru does not directly challenge functionality, secondary meaning, nor the likelihood (and substantial actual evidence of) consumer confusion. (*See generally* ECF 23.)  It instead focuses exclusively on whether Plaintiffs' *trade dress description* is sufficient to proceed to discovery. (*Id.* at 13 ("Plaintiffs Fail to Adequately Define Protectable Trade Dress").)

Zuru's arguments fail for four reasons: (1) there is no requirement to identify a specific trade dress definition at the pleading stage; (2) Plaintiffs' Identified Trade Dress provides sufficient notice of the asserted trade dress; (3) Zuru's arguments are meritless and, in any event, present fact disputes not ripe for adjudication at this stage; and (4) every court to consider Plaintiffs' Identified Trade Dress has found it sufficient at the pleading stage.

### 1.   There is No Legal Requirement for Plaintiffs to Detail Every Element of a Protectable Trade Dress at the Pleading Stage

Zuru argues that the Identified Trade Dress is "too vague and overbroad to adequately articulate any cognizable trade dress rights." (ECF 23 at 13.)  This argument improperly assumes that, at the pleading stage, a plaintiff must plead, and a court must assess, all elements of its trade dress.  The law is otherwise.

- 6 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1    Judge Wu's decision in *Therabody* is directly on point.  There, the defendant

2    argued, as Zuru does here, that "to state a claim for trade dress infringement, a plaintiff

3    must first identify the trade dress at issue."  2022 WL 17360133, at *2.  But, as Judge

4    Wu held, neither the parties nor the Court "located any published Ninth Circuit or

5    Supreme Court decision identifying this as a pleading requirement for such claims."

6    *Id.*  Instead, the plaintiff need only plead non-functionality, secondary meaning, and

7    likelihood of confusion.  *Id.*  If the plaintiff does so, the trade dress claim proceeds

8    beyond the pleading stage and "[t]o the extent [d]efendant believes there is a

9    problematic uncertainty in [p]laintiff's trade dress claims beyond those required

10    allegations, that is one permissible aim of discovery."  *Id.*

11    The same analysis applies here.  Plaintiffs have sufficiently pleaded non-

12    functionality (Compl. ¶ 25); secondary meaning (*id.* ¶¶ 28-39); and likelihood of

13    confusion (*id.* ¶¶ 47-57.)  Zuru does not challenge the sufficiency of these allegations.[2]

14    (*See generally* ECF 23.)  Accordingly, Plaintiffs' trade dress claims must proceed to

15    discovery and Zuru's motion to dismiss should be denied.  *Therabody*, 2022 WL

16

---

17    [2] Zuru's only references to the functionality are in the context of disputing *some*

18    *individual* elements of the Identified Trade Dress.  (*See, e.g.*, ECF 23 at 15 ("egg shape

19    is a stock aesthetically functional feature"); *id.* at 17 ("embroidered facial features" are

      "legally functional").)    Zuru never addresses Plaintiffs' detailed allegations

20    establishing the functionality of the, as required under the law, *overall trade dress*

21    in paragraph 25 of the Complaint.  (*Id.*)  *See Clicks Billiards*, 251 F.3d at 1259 (holding

      that "in evaluating functionality," courts must "focus not on the individual elements,

22    but rather on the overall visual impression that the combination and arrangement of

23    those elements create")  And even if Zuru had challenged the functionality of the

      overall trade dress, courts routinely hold that whether "trade dress is functional or

24    nonfunctional is a factual one that cannot be resolved on a motion to dismiss."

25    *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1141 (N.D. Cal. 2010);

      *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987)

26    ("Functionality is a question of fact."); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 2021

27    WL 922074, at *4 (C.D. Cal. Jan. 7, 2021) ("Defendant primarily argues that the

      elements of the [] trade dress are functional [], but whether the elements are functional

28    are factual issues that the Court cannot resolve at the motion to dismiss stage.").

---

- 7 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1   17360133, at *2 (denying motion to dismiss trade dress claims for failure to identify a

2   trade dress).

3               2.       Plaintiffs Have Provided Sufficient Notice of Their Trade Dress

4        Even if it were required, Plaintiffs have provided a sufficient recitation of the

5   trade dress at issue under the standard employed by courts who have examined the

6   trade description at the pleading stage.

7        District courts in the Ninth Circuit hold that "[s]o long as a plaintiff has alleged

8   a complete recitation of the concrete elements of its alleged trade dress, it should be

9   allowed to proceed." *Lepton Labs*, 55 F. Supp. 3d at 1240. Even if "[a] defendant

10  may very well believe that a [trade dress description] does not make out a claim for

11  protectable trade dress," "granting a dismissal motion based upon that belief would

12  turn the litigation process on its head." *Id.* The time to test the "legal merits" of the

13  trade dress description is "at summary judgment or trial when the parties provide with

14  all relevant, admissible evidence—not at the pleading stage when the court has little

15  more than the plaintiff's allegations and the defendant's summary denial of them." *Id.*

16       Here, Zuru does not dispute that Plaintiffs have pleaded a complete recitation of

17  the concrete elements of the Identified Trade Dress. (ECF 23 at 14 (admitting that

18  "the Complaint defines the relevant trade dress elements").) Indeed, Plaintiffs include

19  both the elements of its Identified Trade Dress and *pictures* of the relevant products.

20  (Compl. ¶ 24.) They also include pictures of the *infringing* products side-by-side with

21  Plaintiffs' products. (*Id.* ¶ 43.) This is sufficient at the pleading stage. *See, e.g., R&A

22  Synergy LLC v. Spanx, Inc.*, 2019 WL 8137706, at *2 (C.D. Cal. Sept. 4, 2019)

23  (holding that the plaintiff provided a "plausible claim for trade dress infringement"

24  where it "has identified specific designs that are allegedly being infringed [] and has

25  pleaded exhibits providing a visual comparison of the allegedly infringing designs");

26  *Deckers*, 2015 WL 12731929, at *4 ("[The] listing [of] the elements of a trade dress

27  and providing an image of a product bearing the dress sufficiently identifies the trade

28  dress over which [Plaintiffs claim] exclusive rights."); *IMEX Leader, Inc. v. Zest US

*Wholesale, Inc.*, 2023 WL 2626968, at \*6 (C.D. Cal. Feb. 15, 2023) (trade dress description was sufficient where the alleged trade dress consisted of "nonfunctional artwork, designs, various character names and faces, and/or art depicting stories on . . . egg-shaped containers," and plaintiff "provide[d] a multitude of images and examples").

Zuru's gripe is instead with the *merits* of the Identified Trade Dress, arguing that it is somehow both too narrow and too broad. (ECF 23 at 14 (arguing both that the description "reach[es] far beyond the specific individual toy designs highlighted in their Complaint" and does not "encompass their enormous and highly varied product line-up").) Yet Zuru does not cite a *single published case* from the Ninth Circuit that dismissed trade dress claims at the pleading stage based on the alleged deficiencies in a description that includes exhaustive elements of an asserted trade dress. (ECF 23 at 16 (citing *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1175-76 (N.D. Cal. 2007) (granting a motion for *summary judgment* and only after examining "the evidence submitted by the parties," including a 30(b)(6) deposition)); *id.* at 12 (citing *Paramount Farms Int'l, LLC v. Keenan Farms Inc.*, 2012 WL 5974169, at \*3 (C.D. Cal. Nov. 28, 2012) (denying defendant's *summary judgment* argument because "Plaintiff is only seeking trade protection over the bins that bear the five indicia of the Claimed Trade Dress"); *Crafty Prods., Inc. v. Michaels Cos., Inc.*, 389 F. Supp. 3d 876, 881-83 (S.D. Cal. 2019) (dismissing and providing leave to amend where, unlike here, plaintiff did not include an exhaustive list of elements and instead claimed their trade dress encompassed "all of the designs and products depicted" in exhibits); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) (denying motion to compel expedited discovery because "a plaintiff generally is permitted to define a product line as it sees fit" (cleaned up))).)[3]

---

[3] The unpublished cases Zuru cites from the Ninth Circuit likewise do not help Zuru because they either involve vastly different facts, were summary judgment orders,

(Continued...)

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 96 of 135

Instead, where, as here, the plaintiff only presents *merits* challenges to a trade dress description, courts routinely deny motions to dismiss trade dress claims. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1240-41 (denying motion to dismiss and holding that defendant's argument that it is not on sufficient notice of the trade dress because the description is too vague "is an issue better tested at a later stage in the litigation"); *IMEX*, 2023 WL 2626968, at *6 (denying motion to dismiss where plaintiff included a trade dress description and holding that "these allegations [are] sufficient at this stage of the proceedings"); *Deckers*, 2015 WL 12731929, at *4 (rejecting argument that dismissal is warranted simply because an element of the trade dress description is "too general"); *Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Institute*, 481 F. Supp. 3d 941, 952 (D. Ariz. 2020) (sufficient notice where trade dress alleged was "9-digit alphanumeric identifier for trading partners in the healthcare industry, including the animal health industry").

### 3. Plaintiffs Have Plausibly Pleaded Trade Dress Infringement Based on the Identified Trade Dress

Even if the Court were to examine the merits of Zuru's arguments against the Identified Trade Dress, Plaintiffs' trade dress description and pictures are sufficient to put Zuru on notice under Rule 8. *See IMEX*, 2023 WL 2626968, at *7 (test on a motion to dismiss is whether the complaint "plausibly alleges" trade dress infringement).

"The Ninth Circuit has emphasized that '[t]rade dress is the composite tapestry of visual effects.'" *Lepton Labs*, 55 F. Supp. 3d at 1240 (quoting *Clicks Billiards*, 251 F.3d at 1259). That is why "[c]ourts have repeatedly cautioned that, in trademark-and especially trade dress-cases," the trade dress "must be examined as a whole, not by its

---

and/or found the trade dress description *sufficient*. *See, e.g.*, *Sleep Science Partners v. Lieberman*, 2010 WL 1881770, at *3-4 (N.D. Cal. May 10, 2010) (finding description insufficient because, unlike here, "Plaintiff employs language suggesting that these components are only some among many"); *Interactive Health LLC v. King Kong USA, Inc.*, 2008 WL 11337393, at *2-3 (C.D. Cal. Mar. 6, 2008) (holding at summary judgment that the trade description was *not* "impermissibly vague").

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

individual constituent parts." *Clicks Billiards*, 251 F.3d at 1259 (citing 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:2 (4th ed. 2000) ("[T]he issue is not whether defendant's package or trade dress is identical to plaintiff's in each and every particular. Rather, it is the similarity of the total, overall impression that is to be tested . . . .")).

Here, as detailed in the Complaint, there are substantial allegations establishing the plausibility that the overall, visual impression of the Identified Trade Dress is distinct and infringed by Zuru's products. The Squishmallows that practice the Identified Trade Dress incorporate the enumerated elements which creates a distinct, overall visual impression. (Compl. ¶ 24.) Indeed, as detailed by articles and consumer comments, the consuming public recognizes the Identified Trade Dress as belonging to Squishmallows. (*Id.* ¶¶ 32-33 (detailing success of the products); *id.* ¶¶ 34-38 (articles by leading publications like the *New York Times* and *Washington Post*, celebrity fans, and awards).) In fact, the Identified Trade Dress is so distinctive that consumers who saw the Zuru Infringing Products *believed that* the Zuru products were actually Squishmallows. (*Id.* ¶¶ 54-57 (consumer "thought [Zuru's Infringing Products] were [Squishmallows] at a glance").) This is not a surprise: the Zuru Infringing Products clearly resemble the overall impression and visual effects of the Identified Trade Dress. For example:

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

| Plaintiffs' Original Product | Zuru's Infringing Product |
|---|---|
|  |  |
|  |  |

(Compl. ¶ 43.)

Despite the widespread recognition and popularity of the Identified Trade Dress, Zuru asks this Court to hold that the Identified Trade Dress is insufficient for four reasons. All fail.

*First*, Zuru spends the bulk of its brief arguing, in isolation, that specific terms in specific elements are too vague. (*E.g.*, ECF 23 at 15-17 (arguing that individual words in individual elements are vague or could be functional).) This is contrary to Ninth Circuit law.

In the Ninth Circuit, the court must examine the trade dress "as a whole," not the sufficiency of each "individual constituent part[]" on its own. *Clicks Billiards*, 251 F.3d at 1259. Indeed, "[t]he fact that individual elements of the trade dress may be[, for example,] functional does not necessarily mean that the trade dress *as a whole* is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." *Id.* (cleaned up) (emphasis in original).[4]

---

[4] Contrary to this controlling Ninth Circuit law, Zuru argues that "Plaintiff[s] cannot enhance their definition of trade dress by adding plainly unprotectable features." (ECF 23 at 17.) The Court should reject these misstatements of law.

- 12 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1 Therefore, "it is crucial that [courts] focus *not* on the individual elements, but rather

2 on the overall visual impression that the combination and arrangement of those

3 elements create." *Id.* (emphasis in original).[5]

4      Therefore, Zuru's arguments about how an individual word or term in an

5 element is undefined, generic, non-distinctive,[6] or functional are irrelevant and cannot

6 be a basis to dismiss Plaintiffs' trade dress claims. (*See* ECF 23 at 15-17 (addressing

7 each element in isolation).)  Indeed, courts routinely refuse to, *even at the summary*

8 *judgment stage*, engage in the element-by-element analysis that Zuru employs in its

9 Motion.  *See, e.g.*, *Herman Miller, Inc. v. Blumenthal Distributing, Inc.*, 2019 WL

10 1416472, at *9 (C.D. Cal. Mar. 4, 2019) (rejecting argument at summary judgment

11 that "certain elements" "are functional" because the court "must focus on the overall

12 effect of the combination of elements included in the asserted trade dress"); *Atari*

---

14 [5] None of Zuru's cited cases were on a motion to dismiss and, in any event, are
15 consistent with the Ninth Circuit's controlling precedent in *Clicks Billiards*.  (ECF 23
   at 18 (citing *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013
16 (9th Cir. 1999) (holding, *after a jury verdict*, that even though "trade dress must be
   viewed as a whole," there was no protectable trade dress because, unlike here, the
17 elements were all functional, just an assemblage of tools like pliers, a serrated blade,
18 and a screwdriver); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32
   (2d Cir. 1995) (holding on a *preliminary injunction motion* that "it is the combination
19 of elements that should be the focus of the distinctiveness inquiry"); *Landscape Forms,*
20 *Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381-82 (2d Cir. 1997) (remarking on a
   *preliminary injunction motion* that "we still recognize that there is no question that
21 trade dress may protect the 'overall look' of a product").)

22 [6] For example, Zuru asserts that because there may be other products that meet *some*
23 of the elements of the Identified Trade Dress, Plaintiffs cannot maintain their claim
   here.  (ECF 23 at 19.)  This argument improperly relies on documents outside of the
24 pleadings that the Court cannot take judicial notice of and demands that the Court
25 resolve a factual dispute rather than assume the truth of Plaintiffs' substantial
   allegations showing that the Identified Trade Dress has become distinctive and
26 popular.  (Compl. ¶¶ 28-39.)  In any event, this is a fact dispute for discovery and trial.
27 *C.f. Nat'l Prods., Inc. v. Arkon Resources, Inc.*, 2017 WL 5499801, at *7-8 (W.D.
   Wash. Nov. 16, 2017) (holding that third party products may be introduced at trial "in
28 an attempt to argue that [plaintiff]'s trade dress is not distinctive").

- 13 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

EXHIBIT K
Page 100 of 135

*Interactive, Inc. v. Hyperkin Inc.*, 2020 WL 4287584, at *10 (C.D. Cal. July 27, 2020) (rejecting summary judgment argument based on the alleged functionality of individual elements and holding that "overall [] impression" is a fact issue "even assuming that *individual* elements" are functional (emphasis in original)).

This Court should likewise, as required by Ninth Circuit authority, examine the "overall visual impression" of the Identified Trade Dress, not the individual components on which Zuru focuses. *Clicks Billiards*, 251 F.3d at 1259.

*Second*, Zuru claims that the elements of the Identified Trade Dress "just broadly describe attributes of innumerable stuffed toy products." (ECF 23 at 18.) Not so.

The Identified Trade Dress identifies a list of the *specific* attributes of Plaintiffs' products that are *intentional design choices* to differentiate the Identified Trade Dress from other products available on the market. For example, the pictures in the Complaint show that the Identified Trade Dress *chose* to incorporate "Asian style Kawaii faces," which are a simplified, visual rendition of a face evoking a likeness with Japanese emoticons. (Compl. ¶ 24.) This is distinct from typical stuffed animals that attempt to faithfully recreate an animal's likeness, with eyes that match how they may appear in the wild. Likewise, the Identified Trade Dress *chose* to incorporate egg/bell shapes, rather than the shape of the animal in the wild as other toys do. (*Id.*) These *design choices*, combined with the other design choices detailed in the Identified Trade Dress, create the overall visual impression that consumers associate with Plaintiffs' products. (*Id.* ¶¶ 28-39.) *See Vans, Inc. v. ACI Int'l*, 2023 WL 6930323, at *8 (C.D. Cal. Oct. 11, 2023) (finding particularity requirement satisfied where trade dress was defined as "visible stitching, including where the eyestay meets the vamp" and "visible stitching, including separating the individual ankle collar corrugations").

At the motion to dismiss stage, the Court must assume these allegations to be true and thereby deny Zuru's motion to dismiss. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1237 ("A court is generally limited to the pleadings and must construe all factual

- 14 -

1 allegations set forth in the complaint as true and in the light most favorable to the

2 plaintiff." (cleaned up)).

3      *Third*, Zuru claims that *every* product branded "Squishmallows" must practice

4 the Identified Trade Dress for the trade dress to be protectable. (ECF 23 at 18-19.)

5 This is not the law.

6      As numerous district courts in the Ninth Circuit have recognized, "the Ninth

7 Circuit has not yet adopted the 'consistent overall look' test for trade dress claims

8 based upon a line of products." *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,

9 57 F. Supp. 3d 1203, 1223-24 (C.D. Cal. 2014); *Paramount*, 2012 WL 5974169, at *2-

10 3 (similar). But even courts applying that test recognize that "[t]his standard do[es]

11 not require that the appearance of the series or line of products or packaging be

12 identical." *Moroccanoil*, 57 F. Supp. 3d at 1223-24 (internal quotation omitted).

13 Instead, "a plaintiff generally is permitted to define a product line as it sees fit." *Id.*

14 "The issue is [simply] whether the trade dress conveys a single and continuing

15 commercial expression." *Id.* at 1224.

16      Here, Zuru's argument confuses the Identified Trade Dress with the

17 Squishmallows *trademark*. The fact that Plaintiffs' Squishmallows *trademark* applies

18 to a variety of products is irrelevant as to whether the *Identified Trade Dress* is

19 protectable. Plaintiffs no more lose the right to the Identified Trade Dress by releasing

20 other designs for Squishmallows than Coca-Cola would lose the right to the iconic

21 Coca-Cola bottle trade dress by releasing alternative product designs. Indeed, courts

22 allow plaintiffs to "only seek[] trade protection over the [products] that bear the []

23 indicia of the" claimed trade dress because "even if plaintiff distributed the same

24 products in fifteen different package designs for each of fifteen different customers,

25 this fact alone would not prevent plaintiff from obtaining trade dress protection for one

26 of the fifteen different packaging styles." *Paramount*, 2012 WL 5974169, at *3

27 (cleaned up). That is precisely the case here: Plaintiffs seek protection only for the

28

- 15 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Identified Trade Dress, *not* designs for every Squishmallows-branded product ever sold.

Regardless, Zuru's argument is premature.  Courts routinely hold, even on *summary judgment*, that whether a line of products have a "consistent overall look" is a triable jury issue.  *See, e.g.*, *Moroccanoil*, 57 F. Supp. 3d at 1224 ("Viewing the [] line of products in the light most favorable to Plaintiff, there is a triable issue of fact as to whether [the] products present a 'consistent overall look.'").

*Fourth*, Zuru argues, with no legal support, that "Plaintiffs do not appear to have obtained any federal registration" for the Identified Trade Dress, which "can serve as a litmus test for the sufficiency of the trade dress definition."  (ECF 23 at 19-20 (citing only 37 C.F.R. § 2.52 (which *allows*, rather than mandates, registration of trade dress).)  This is, again, not the law.  Section 43 of the Lanham Act—the provision at issue here—"protects against infringement of *unregistered* marks and *trade dress* as well as registered marks."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.3 (9th Cir. 2000) (emphasis added) (noting that "the same standard applies to both registered and unregistered trademarks" (cleaned up)); McCarthy on Trademarks and Unfair Competition § 8:1 (5th ed.) ("These days, unregistered trade dress is protected under federal Lanham Act § 43(a)(1)(A) under essentially the same rules as are trademarks.").

### 4.   Both Courts to Consider the Identified Trade Dress Have Held It to Be Sufficiently Pleaded

Even if Plaintiffs were required to identify all elements of its trade dress at the pleading stage, this Court should follow *both of the other district courts* to consider the Identified Trade Dress and hold that it is sufficient to proceed to discovery.

Plaintiffs pleaded a five-element trade dress definition in their Complaint.  (Compl. ¶ 24.)  As detailed below, the same Identified Trade Dress has been presented to two other district courts by a different company that previously owned

---

- 16 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Squishmallows.[7]  Both courts to consider the Identified Trade Dress have found it to be sufficient.

In *Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, Judge Fitzgerald addressed the sufficiency of the same trade dress pleaded in the Complaint in this case.  (*Compare* 2019 WL 8064073, at *2 (quoting asserted trade dress description), *with* Compl. ¶ 25 (asserting same trade dress description).)  He held that the Identified Trade Dress "satisfies the requirements of Rule 8" because it "describes the [t]rade [d]ress in detail and attaches photos of its line of plush toys." *Hugfun*, 2019 WL 8064073, at *4.  He rejected defendant's arguments, the same as Zuru's here, that individual elements of the Identified Trade Dress are "vague and overbroad" because the focus must be on the "composite tapestry of visual effects," not a "feature on its own." *Id.* (cleaned up).  Accordingly, Judge Fitzgerald held that "the overall description of the [Identified] Trade Dress gives [d]efendants sufficient notice to survive dismissal." *Id.*[8]

The decision in *Kellytoy Worldwide, Inc. v. Ty, Inc.* is in accord.[9]  There, the plaintiff asserted the same trade dress at issue here.  2020 WL 5026255, at *2 (detailing

---

[7]  As explained in the Complaint, non-party Kellytoy Worldwide, Inc. previously owned the copyrights and trade dress rights at issue.  (Compl. ¶ 13.)  On March 31, 2020, those rights were fully assigned and transferred to Plaintiff Kelly Toys Holdings, LLC. (*Id.*)

[8] Though Judge Fitzgerald in *Hugfun* did dismiss the trade dress claims with a right to amend for failure to plead non-functionality, the complaint there only included a "conclusory statement that 'the Squishmallow Trade Dress is non-functional,'" 2019 WL 8064073, at *5, as opposed to the detailed non-functionality allegations in paragraph 25 of the Complaint in this case.  And in addition to providing leave to amend, the court in *Hugfun* "s[aw] no reason to deviate from the well-established approach that functionality should not be resolved at this stage" and thus refused to "entertain the merits of functionality at this stage." 2019 WL 8064073, at *5.

[9] In denying the defendant's motion to dismiss, the court relied on its findings in its prior ruling on the plaintiff's preliminary injunction motion. 2020 WL 5026255, at *1 ("Having recognized that Kellytoy had some likelihood of success on its Squishmallows-related claims, it would be odd for the court now to close its eyes to

(Continued...)

---

- 17 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1    the asserted trade dress).  Like Zuru here, the defendant there argued that "the

2    Squishmallows' trade dress is not articulated with sufficient particularity, both because

3    the operative complaint's description of the trade dress is too vague and because the

4    claimed trade dress is not used consistently."  2020 WL 5891386, at *2.  The court

5    rejected these arguments, holding that "when read in the light of the images of the

6    Squishmallows toys at issue, the court could not say that [the] description fails to put

7    [defendant] on notice of the contours of its claimed trade dress."  *Id.* (cleaned up).  And

8    the court additionally found, contrary to Zuru's argument here, that "a plaintiff is

9    entitled to claim trade dress protection for a subset of its products."  2020 WL 5026255,

10   at *3.

11        Zuru asks this Court to ignore these prior rulings on the *same* Identified Trade

12   Dress and instead follow the order in *Kellytoy USA, Inc. v. Dan-Dee Int'l, Ltd.*, which

13   addressed a *different* trade dress description.  (ECF 23 at 20 (submitting the order in

14   Case No. 2:18-cv-05399-JAK (C.D. Cal. Feb. 7, 2019) as ECF 23-2).)  Not so.

15        In *Dan-Dee*, the court addressed a trade dress description that was far less

16   detailed with fewer elements than in this case.  (ECF 23-2 at 2.)  Indeed, a side-by-

17   side comparison plainly shows the significant differences between the description in

18   *Dan-Dee* and the description in this case:

| ***Dan-Dee* Case** (ECF 23-2 at 2) | **This Case** (Compl. ¶ 25) |
|---|---|
| (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture. | (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall |

27   the evidence it considered in reaching that conclusion and to hold, without considering

28   that evidence, that those claims fail as a matter of law." (citing *Ty, Inc.*, 2020 WL
     5891386, at *2 (N.D. Ill. Aug. 25, 2020)).

- 18 -

**PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS**

| | egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel |
|---|---|

It was the above description on the left with *far less detail* that the *Dan-Dee* court held provided "little insight into the scope or nature of [plaintiff's] claim" because the description "can reasonably be construed as substantially broader than the trade dress protection [plaintiff] actually seeks." (ECF 23-2 at 9.) Then, after the court provided leave to amend, the plaintiff filed an amended complaint with the same Identified Trade Dress as in this case. (Mishra Decl. Ex. A ¶ 23.) Significantly, the *Dan-Dee* court *never* evaluated or issued any decision about the sufficiency of the Identified Trade Dress. (Mishra Decl. ¶ 3.)

Finally, Zuru argues, without any legal support, that because the plaintiff in *Dan-Dee* (as well as in *Hugfun* and *Ty, Inc.*) settled before final judgment, the court's decision on the less-detailed trade dress description "have now become res judicata." (ECF 23 at 22 (citing zero cases).) This argument defies logic and is contrary to black letter law. None of those cases gives rise to res judicata in this case because there was no final judgment on the merits *of the trade dress claims* in any of the cases, just a settlement between those specific parties, none of which are before this Court today. *See Pac. Gas and Elec. Co. v. Lynch*, 216 F. Supp. 2d 1016, 1026 (N.D. Cal. 2002) ("evidence of a settlement is generally not relevant, because settlements may be motivated by a variety of factors unrelated to liability" (citing *Hudspeth v. CIR*, 914 F.2d 1207, 1213-14 (9th Cir. 1990)). And, in any event, the *Dan-Dee* order cannot have any res judicata effect because the dismissal was with *leave to amend*, it was not a final judgment. *See WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136-37 (9th Cir.

- 19 -

1997) ("[W]hen a district court expressly grants leave to amend, it *is* plain that the order is not final." (emphasis in original)).

In sum, Zuru has not cited *any case* holding that the Identified Trade Dress is insufficient to provide notice at the pleading stage. Instead, both of the cases that evaluated the Identified Trade Dress found it to be sufficient and allowed the plaintiff's trade dress claims to proceed to discovery. This Court should do the same.

## B. There is No Legal Requirement to Submit Deposit Images in a Complaint

Zuru requests that Plaintiffs provide the original images submitted with the deposit copies of the Copyrighted Works to the United States Copyright Office. Zuru cites only one case, the out-of-circuit *Parker v. Hinton*, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023), for this request. *Parker* is inapplicable to the facts of this case. In *Parker*, the plaintiffs "did not file a deposit copy" at all with the Copyright Office, and "conceded that no such deposit copies existed." *Id.* at *3 (internal punctuation omitted). In contrast, here, deposit copies of the Copyrighted Works were filed with the Copyright Office and will be available through discovery. (Mishra Decl. ¶ 4.)

Moreover, *Parker* was decided on a motion for summary judgment, and found that because the plaintiffs "never produced a deposit copy of their sheet music," they "failed to meet their burden on summary judgment." *Id.* at *4.[10] However, "[a] motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint," not materials outside the complaint such as deposit copy images. *R & A Synergy LLC*, 2019 WL 8137706, at *1. *Parker* does not discuss the production of deposit copies on a motion to dismiss, and Defendant's attempt to require Plaintiffs to provide these images at the pleadings stage is premature.

---

[10] Defendant also cites *Williams v. Bridgeport Music, Inc.*, 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014), which was also decided on a motion for summary judgment. For the same reasons as *Parker*, *Williams* is inapposite.

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1  **C.   Plaintiffs Do Not Oppose Zuru's Standing and Preemption**
2  **Arguments**

3      The parties have met and conferred regarding the issues Zuru identifies as "Lack
4  of Standing" and "Copyright Preemption."  (ECF 23 at 24–25.)  Plaintiffs do not
5  oppose Zuru's argument on these two points and, in fact, offered to stipulate to them
6  before Zuru filed its motion to dismiss.  Plaintiffs clarify that the only plaintiff
7  asserting a claim for federal copyright infringement is Kelly Toys Holdings, LLC.
8  Plaintiffs also agree that none of their state law claims will be premised on copyright
9  infringement.

10      **D.   If Needed, Plaintiffs Should Be Provided Leave to Amend**

11      If the Court finds that Plaintiffs have not adequately articulated a protectable
12  trade dress or should have included deposit copies in their Complaint, Plaintiffs request
13  leave to amend the Complaint.

14      Leave to amend should be freely given "when justice so requires," Fed. R. Civ.
15  P. 15(a)(2), and courts frequently "allow leave to amend to re-state the trade dress
16  allegations in detail."  *Creative Co-Op, Inc. v. Elizabeth Lucas Co.*, 2012 WL 761736,
17  at *3 (D. Idaho Mar. 7, 2012) (collecting cases).  Accordingly, to the extent that the
18  Court finds Plaintiffs have not alleged a protectable trade dress, Plaintiffs request leave
19  to amend to restate the trade dress allegations in greater detail to address those
20  deficiencies, and likewise include deposit copies of the Copyrighted Works.  Indeed,
21  even the cases cited by Zuru that dismissed trade dress claims allowed leave to amend.
22  *See, e.g.*, *Crafty*, 389 F. Supp. 3d at 881-83 ("And although Defendants ask the Court
23  not to do so, the Court will grant Plaintiffs leave to amend, to the extent Plaintiffs can
24  more clearly describe the trade dress they seek to protect.").

25  **IV.   <u>CONCLUSION</u>**

26      Zuru's Motion relies on inapplicable law and disputed facts, many outside of
27  the record, in an attempt to escape liability for its decision to prey on unwitting
28  consumers by trading on Plaintiffs' distinctive trade dress.  Zuru's arguments are

- 21 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 108 of 135

inconsistent with controlling law and effectively demand that the Court hold that Plaintiffs' detailed trade dress description to be insufficient simply because Zuru disagrees that it is protectable.  In reality, Plaintiffs have done more than enough to identify their trade dress at this stage and Zuru's arguments to the contrary must be resolved at summary judgment or trial, not the pleading stage.  Zuru's motion to dismiss should be denied.

Dated:  January 22, 2024

Respectfully submitted,

**HUESTON HENNIGAN LLP**

By:  /s/ Moez M. Kaba
       Moez M. Kaba

*Attorneys for Plaintiffs
Kelly Toys Holdings, LLC;
Jazwares, LLC; Kelly Amusement
Holdings, LLC; and Jazplus, LLC*

- 22 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Plaintiffs certifies that this brief contains 6,920 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 22, 2024

/s/ Moez M. Kaba
Moez M. Kaba

*Attorneys for Plaintiffs*
*Kelly Toys Holdings, LLC;*
*Jazwares, LLC; Kelly Amusement*
*Holdings, LLC; and Jazplus, LLC*

- 23 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 110 of 135

# EXHIBIT A

1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  MARK B. MIZRAHI (BAR NO. 179384)
   mark.mizrahi@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1900
4  Los Angeles, California 90067
   Telephone:  (310) 255-6100
5  Facsimile:  (310) 255-6200

6  *Attorneys for Plaintiffs Kellytoy (USA),*
   *Inc. and Kellytoy Worldwide, Inc.*
7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11 KELLYTOY (USA), INC., a California          Case No.  2:18-cv-05399 JAK (AGRx)
   corporation; and KELLYTOY
12 WORLDWIDE, INC., a California               **SECOND AMENDED COMPLAINT**
   corporation;                                **FOR:**
13
              Plaintiffs,                       1.  **FEDERAL COPYRIGHT**
14                                                  **INFRINGEMENT (17 U.S.C.**
       vs.                                          **§ 501);**
15                                              2.  **FEDERAL TRADEMARK**
   DAN-DEE INTERNATIONAL, LTD.,                     **INFRINGEMENT, FALSE**
16 a Delaware corporation; RITE AID                 **DESIGNATION OF ORIGIN**
   CORPORATION, a Delaware                          **AND FALSE DESCRIPTION**
17 corporation, and DOES 1 through 10,              **(15 U.S.C. § 1125);**
   inclusive,                                   3.  **COMMON LAW TRADEMARK**
18                                                  **INFRINGEMENT;**
              Defendants.                       4.  **CALIFORNIA COMMON LAW**
19                                                  **UNFAIR COMPETITION; AND**
                                                5.  **CALIFORNIA STATUTORY**
20                                                  **UNFAIR COMPETITION.**
21
                                                **DEMAND FOR JURY TRIAL**
22

23

24       Plaintiffs KELLYTOY (USA), INC., a California corporation and

25 KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

26 "Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

27 LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

28 Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

Case 2:24-cv-08355-JAK-AGR   Document 26-2   Filed 09/03/24   Page 345 of 671   Page ID #:872
Case 2:23-cv-03599-JAK-AGR   Document 46   Filed 09/03/23   Page 3 of 57   Page ID #:578
#:578

"Defendants") for injunctive relief and damages under the laws of the United States and the State of California as follows:

## JURISDICTION AND VENUE

1.     This action arises under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*, the trademark laws of the United States, 15 U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress infringement and unfair competition.

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

3.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.     This Court has personal jurisdiction over Defendants, as Defendants are doing business in California and this District and are subject to the jurisdiction of this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout the state of California and this District.  Similarly, defendant Rite Aid has numerous retail stores within the state of California and this District.  In addition, defendants Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade dress, knowing that Kellytoy is a California resident, and thereby purposefully directed their activities towards California.

## NATURE OF THE ACTION

5.     This is an action for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*; and trade dress infringement, trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), California Bus. & Prof. Code § 17200, *et seq.*, and the common law.

6.     Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress, which Kellytoy pioneered and

created.  Kellytoy actively markets its Squishmallows through numerous media outlets, including, without limitation, on social media, at tradeshows, through Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com, and on Kellytoy's website, depicting images of its proprietary Squishmallows line of plush toys.

7.     The explosion in popularity of Kellytoy's Squishmallows and  the resulting and widespread customer and industry recognition, has unfortunately led to illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid, which Rite Aid has re-sold, numerous units of two knock-off products for distribution within this state and district that both infringe upon Kellytoy's trade dress and one of which infringes upon Kellytoy's copyrighted design in its Squishmallows.

8.     Accordingly, to prevent and remediate the rampant consumer confusion and misappropriation of Kellytoy's copyrighted designs in its Squishmallows resulting from Defendants' unauthorized use, promotion and sale of the Infringing Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks immediate and permanent injunctive relief, compensatory damages, disgorgement of Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable attorneys' fees and expenses, a product recall, and corrective advertising sufficient to address Defendants' wrongdoing.

## **THE PARTIES**

9.     Kellytoy (USA), Inc. is a California corporation with its principal place of business located in Los Angeles, California.

10.     Kellytoy Worldwide, Inc. is a California corporation with its principal place of business located in Los Angeles, California.

11.     Kellytoy is in the business of developing, manufacturing and selling children's toys including, among other things, plush toys.

1    12.    On information and belief, defendant Dan-Dee International, LTD.

2  ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

3    13.    Dan-Dee is in the business of manufacturing and selling children's toys

4  including, among other things, plush toys.

5    14.    On information and belief, defendant Rite Aid Corporation ("Rite

6  Aid") is a Delaware corporation with a place of business in Pennsylvania and

7  numerous stores in this judicial district.

8    15.    Rite Aid owns and operates drug stores and pharmacies throughout the

9  United States and, on information and belief, this District that sell various

10  merchandise, including plush toys bearing third-party trademarks and under its own

11  private label, RITE STUFF.

12    16.    The true names and capacities of defendants sued herein as DOES 1-

13  10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such

14  fictitious names.  Kellytoy will amend this Complaint to allege their true names and

15  capacities when the same are ascertained.

16    17.    Upon information and belief, at all relevant times mentioned in this

17  Complaint, Defendants, and each of them, were acting in concert and active

18  participation with each other in committing the wrongful acts alleged herein, and

19  were the agents of each other and were acting within the scope and authority of that

20  agency and with the knowledge, consent and permission of one another.

21              **BACKGROUND FACTS**

22      **Kellytoy and Its Protected Intellectual Property Rights**

23    18.    Kellytoy is an innovative and highly successful creator, manufacturer,

24  distributor and seller of unique plush toys, including, without limitation, its

25  Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,*

26  **Exhibit 1**.)

27    19.    Kellytoy has been in business for approximately 35 years and in that

28  time has developed a reputation for producing high quality, unique, creative and

4080086.2

-4-

Case 2:34-cv-08359-JAK-AGR Document 26-2 Filed 09/08/24 Page 454 of 671 Page ID #:835
Case 2:23-cv-08359-JAK-AGR Document 46 Filed 09/03/25 Page 116 of 135 Page ID
#:581

1  innovative plush toys that are highly prized in the industry.

2       20.    Kellytoy devotes extensive time and resources  promoting and

3  preserving its image identity and the image and identity of its high quality plush

4  toys, including by creating distinctive designs and marks for use on its products and

5  seeking U.S. trademark and copyright registrations for such designs and marks,

6  including those at issue in this Complaint.

7       21.    In 2016, Kellytoy conceived of and began creating its Squishmallows

8  line of plush toy designs – ultimately marketed in connection with the

9  SQUISHMALLOW trademark – that share common, unique features that

10  distinguish them from the goods of others.  These designs are wholly original to

11  Kellytoy and comprise copyrightable subject matter under the laws of the United

12  States.

13       22.    Indeed, Kellytoy has been and is the sole owner of all right, title and

14  interest in and to the copyrights in the individual "characters" in the Squishmallows

15  line and the distinguishing, unique, and recognizable features that are common

16  across the Squishmallows line.  From 2016 to the present, Kellytoy has expended

17  large sums of money in developing, advertising and promoting these product

18  designs through the United States.  In fact, Kellytoy is spending approximately

19  $50,000 per month in direct to consumer and business-to-business advertising in

20  connection with its SQUISHMALLOW branded goods.

21       23.    Kellytoy sells a broad range of SQUISHMALLOW branded plush toys

22  featuring the brand's iconic trade dress, and whose overall look, feel and image –

23  and in particular but without limitation its shapes, colors, textures and graphics –

24  serve as a distinctive source identifier to the consuming public.  Though not easily

25  reduced to writing, these features include: (1) substantially egg/bell shaped plush

26  toys depicting various similarly shaped fanciful renditions of animals/characters; (2)

27  simplified Asian style Kawaii faces with repeating and complementary rounded/oval

28  shaped graphics depicting features on the characters themselves (such as eyes,

-5-

snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils, mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. These features, and the resulting overall look and feel of these toys, are more fully depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

24.     The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which were created by or assigned to Kellytoy (the "Squishmallow Designs"). As explained in greater detail below, these Squishmallow Designs are the subject of Copyright Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C. §101 *et seq.*

25.     Continuously and without interruption, beginning in 2016, Kellytoy has expended a great deal of time, effort, and money in the promotion of its Squishmallows. And due to Kellytoy's unique design, robust marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. Indeed, because of Kellytoy's extensive promotional activities and widespread display of its Squishmallows directed to the public, and as a consequence of Kellytoy's fair and honorable dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy. The Squishmallow Trade Dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

-6-

SECOND AMENDED COMPLAINT

Case 2:34-cv-08359-JAK-AGR   Document 76-22   Filed 09/03/24   Page 456 of 67 Page ID #:27
Case 2:13-cv-05395-JAK-AGR   Document 48   Filed 09/03/13   Page 667 of 573 Page ID #:141
#:583

26.     In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 1,140,000 "hits" for the search term "Squishmallows."

27.     In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

28.     Further adding to their recognizability and secondary meaning in the marketplace, Squishmallows have been featured in numerous magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto, including many mainstream media outlets such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, Squishmallows have been also recognized by The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized Squishmallows in its October 2017 issue, under the "Products We Love" section; and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21, 2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."

29.     Kellytoy's Squishmallows have also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.     Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 4**. In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

31.     Kellytoy's Squishmallows have also, as alleged above, been the subject of consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently have nearly 44,300 Instagram followers, more than 60,000 Facebook

followers – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy regularly publishes photographs of its Squishmallows.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page is attached as **Exhibit 5**.

32.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares."

33.     Squishmallows' legion of loyal fans have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Squishmallows, with the average Squishmallows post likes on Instagram hovering over 1000+ per post and 45-100 average comments per post.

34.     Kellytoy's Squishmallow website traffic has grown exponentially since its launch in 2017 to an average of 4,313 visits per day.

35.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

36.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target

1  stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts
2  Berry Farms and numerous others.

3      37.    Since the summer of 2017, Kellytoy has sold approximately a
4  whopping 22 million (22,000,000) units of Squishmallows with no indication that
5  sales will be slowing down anytime soon.  Kellytoy's Squishmallows products
6  embodying the Squishmallows Trade Dress have yielded tens of millions of dollars
7  of sales in the U.S. over the past year.

8      38.    In fact, Kellytoy's Squishmallows sold out through Walgreens.com
9  during their Gift of the Week promotion in early November 2017, as well as
10  exceeding all sales goals for the campaign, both online and in stores.

11     39.    Because of Squishmallows' massive success and popularity, consumers
12  have come to associate Kellytoy's high-quality Squishmallows plush toys with the
13  Squishmallows Trade Dress and, conversely, have come to recognize the
14  Squishmallow Trade Dress as a designation of source.

15                    **Defendants' Unlawful Conduct**

16     40.    At the outset, none of the defendants to this action is licensed or
17  otherwise authorized by Kellytoy to market or distribute products bearing or
18  embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

19     41.    Upon information and belief, sometime in spring of 2018, notably well
20  after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant
21  Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell
22  and supply to Rite Aid various plush toys bearing substantially similar copies of
23  Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter
24  referred to as "Infringing Plush") for distribution by Rite Aid through its United
25  States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's
26  trademarks are collectively attached hereto as **Exhibit 6**.

27     42.    Upon information and belief, Dan-Dee offered to sell the Infringing
28  Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid

in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43.     Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush.  Upon information and belief, Rite Aid has indeed sold the Infringing Plush in interstate commerce.

44.     Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because, rather than investing in creating its own designs and identity, Dan Dee has copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45.     In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46.     Kellytoy is informed and believes that Defendants, without Kellytoy's consent or permission, intend to sell, advertise, promote, display, and distribute, toys bearing Squishmallow Designs and Squishmallow Trade Dress in United States commerce.

47.     The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress

embodied in the Infringing Plush – including by copying wholesale the shape and look – constitute false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that Defendants' plush toys originate from Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such activities of Defendants are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of the toys bearing the Squishmallow Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of 15 U.S.C. §1125(a).

48.     Upon information and belief, the activities of Defendants were done willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, with the intent to trade on the enormous goodwill Kellytoy has earned in its Squishmallows, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy.

49.     As further evidence of Dan-Dee's intent to trade upon Kellytoy's goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush.

50.     Defendants, by their unauthorized copying and use of Kellytoy's Squishmallow Designs and Squishmallow Trade Dress, have engaged and will engage in acts of copyright infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works.  Defendants' activities have damaged and will continue to damage

the reputation, business and good will of Kellytoy nationally and in this judicial district.

51.     Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

52.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

### **(Federal Copyright Infringement -- 17 U.S.C. §501)**

(Against all Defendants)

53.     Kellytoy repeats and realleges each and every allegation above as though fully set forth herein.

54.     Kellytoy owns a valid copyright in the Squishmallow Designs. The Squishmallow Designs are original, decorative, and non-functional.  After having had access to Kellytoy's Squishmallow Designs, Defendants, without authorization from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a design that Defendants copied from the Squishmallow Designs.

55.     All of the Squishmallow Designs were originally created by Kellytoy or were assigned to and are owned by Kellytoy.

56.     The Squishmallow Designs comprise original works of authorship that may be copyrighted under United States law.  In fact, Kellytoy has complied with requirements of Title 17 of the United States Code with respect to the registration of Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by United States Copyright Registration Nos. VA0002096020 and VA0002093075, entitling Kellytoy to the exclusive rights and privileges in and to the above-referenced copyrights.  These copyright registrations are valid and subsisting.

57.   Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.   Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106. Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.   Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.   On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.   On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.   As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law. Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur. Accordingly, Kellytoy is entitled to preliminary and permanent injunctions restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

## SECOND CAUSE OF ACTION

**(Trademark Infringement, False Designation of Origin and False Description -- 15 U.S.C. §1125)**

(Against All Defendants)

63.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 52 above as if fully set forth herein.

64.     The Squishmallow Trade Dress is non-functional and highly distinctive, and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

65.     Kellytoy owns all right, title and interest in and to the Squishmallow Trade Dress.

66.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will soon commence importation, distribution, advertising, offers for sale, and sale of replicas of the Squishmallow Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

67.     The Infringing Plush designs are confusingly similar to the Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

68.     Defendants' use and further threatened uses of the Squishmallow Trade Dress thus constitutes trade dress infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

69.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants.  Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

70.     Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products.

71.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## **THIRD CAUSE OF ACTION**

### **(Common Law Trademark Infringement)**

(Against all Defendants)

72.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

73.     Defendants have violated Kellytoy's exclusive common law rights in the Squishmallow Trade Dress.

74.     Kellytoy has continuously used its Squishmallow Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin.  As such, Kellytoy has common law rights to the Squishmallow Trade Dress.

75. Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

**FOURTH CAUSE OF ACTION**

**(California Common Law Unfair Competition)**

(Against all Defendants)

76. Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77. This claim arises under the common law of the State of California relating to unfair competition.

78. Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress. Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79. Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

80. By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81. Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

82.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.

83.     Upon information and belief, Defendants have engaged in their unlawful conduct alleged herein intentionally, maliciously, fraudulently and oppressively entitling Kellytoy to punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### (California Statutory Unfair Competition –

### California Bus. & Prof. Code § 17200, *et seq.*)

(Against all Defendants)

84.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set forth herein.

85.     By reason of the foregoing, Defendants have been, and are, engaged in "unlawful, unfair or fraudulent business practices" in violation of California Business and Professional Code Section 17200 *et seq.*

86.     Said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy has no adequate remedy at law for these wrongs and injuries.  The damage to Kellytoy includes harm to its goodwill and reputation in the marketplace that money cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any

products. Kellytoy is further entitled to restitutionary disgorgement of all of Defendants' ill-gotten gains pursuant to California Business and Professions Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

1. That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i) Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the Squishmallow Designs and/or Squishmallow Trade Dress;

(ii) Using the Squishmallow Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii) Using the Squishmallow Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

(iv) Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers created by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the Squishmallow Trade Dress or Squishmallow Designs;

(v) Copying, distributing, displaying or making derivative works of the Squishmallow Designs;

Case 2:22-cv-08909-MSA-BRD Document 16-2 Filed 08/05/24 Page 473 of 671 Page ID
Case 2:23-cv-08993-AK-AGR Document 16-2 Filed 08/08/19 Page 26 of 37 Page ID #:290
#:290

(vi)    Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress or Squishmallow Designs; and

(vii)   Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

2.    That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

3.    That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the Squishmallow Trade Dress or Squishmallow Designs.

4.    That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of the Squishmallow Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

5.    Adjudge that each of the Defendants, by its unauthorized use of Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it

may have undertaken relating to the Squishmallow Trade Dress, have violated Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade Dress;

6. Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the Squishmallow Designs and/or Squishmallow Trade Dress in the United States on Defendants' behalf and inform them that they must immediately cease such use;

7. Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity under the Squishmallow Trade Dress or Squishmallow Designs;

8. Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, and all plates, molds, matrices, programs and other means of making same;

9. Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of Defendants' products that infringe Kellytoy's copyrights in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

10. Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction of all copies of Defendants' products that infringe Kellytoy's copyright in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other

-21-

SECOND AMENDED COMPLAINT

articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

     11.    That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under the Squishmallow Trade Dress or Squishmallow Designs:

     (i)    the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

     (ii)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

     12.    Direct Defendants to pay the costs of corrective advertising;

     13.    Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

     14.    Direct Defendants to pay punitive damages and exemplary damages according to proof;

     15.    That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

     16.    That the Court award enhanced profits and treble damages;

     17.    That Kellytoy be awarded statutory damages;

     18.    That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

     19.    That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

     20.    That Defendants be ordered to disgorge all of their ill-gotten gains pursuant to California Business and Professions Code § 17203; and

1    21.    For such other and further relief as the Court may deem just and

2  proper.

3                                Respectfully submitted,

4  DATED: March 5, 2019          FREEMAN, FREEMAN & SMILEY, LLP

5

6

7                      By:    _____/ s / Mark B. Mizrahi_____

8                             TODD M. LANDER
                              MARK B. MIZRAHI
9                             Attorneys for Plaintiffs
                              KELLYTOY (USA), INC. and
10                            KELLYTOY WORLDWIDE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand and request a trial by jury of all issues raised that are triable by jury.

Respectfully submitted,

DATED: March 5, 2019        FREEMAN, FREEMAN & SMILEY, LLP


By:        _/ s / Mark B. Mizrahi_
                TODD M. LANDER
                MARK B. MIZRAHI
                Attorneys for Plaintiffs
                KELLYTOY (USA), INC. and
                KELLYTOY WORLDWIDE, INC.

4080086.2

-24-

# EXHIBIT L

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Filing # 190722631 E-Filed 01/29/2024 11:44:39 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

JAZWARES, LLC, a Delaware
Limited Liability Company, KELLY
TOY HOLDINGS, LLC, a Delaware
Limited Liability Company, KELLY
AMUSEMENT HOLDINGS, LLC, a
Delaware Limited Liability Company,
And JAZPLUS, LLC, a Delaware
Limited Liability Company,

     Plaintiff,

vs.

BUILD-A-BEAR WORKSHOP, INC.,
a Delaware Corporation,

     Defendant.

_____/

## VERIFIED *EX PARTE* EMERGENCY MOTION FOR TEMPORARY INJUNCTION

     Plaintiffs, Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC,

and Jazplus, LLC (collectively, "Plaintiffs" or "Kelly Toys"), by and through the undersigned

counsel, and pursuant to Rule 1.610(a) of the Florida Rules of Civil Procedure and Florida Statute

§ 501.211, respectfully move this Court to enter an emergency temporary injunction preventing

the continued use and misappropriation of Plaintiffs' trade dress by Defendant, Build-A-Bear

Workshop, Inc. ("Defendant" or "Build-A-Bear").  In support thereof, Plaintiffs state as follows:

[2533354/4]

1

EXHIBIT L
Page 1 of 78

475 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## I.      BACKGROUND

The conduct here is egregious.  After being told its conduct was improper by the product manufacturer it used to carry out its bad-acts, Defendant Build-A-Bear has taken and is misusing Plaintiffs' most valuable trade dress.  Defendant must be stopped.

### a.  The World Famous Squishmallows

Plaintiffs (who are either affiliated entities, governed by common ownership, governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows) are among the world's leading manufacturers and distributors of high-quality plush toys and other consumer products.  In 2016, their distinctive line of plush toys branded "Squishmallows" was released.   Squishmallows share common, unique features distinguishing them from the goods of others.  Often referred to as just "Squish," these soft, huggable toys immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Squishmallows are some of the most well-known and fastest growing toys in the world.

In essence, Kelly Toys' creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.  Plaintiff Kelly Toys

EXHIBIT L
Page 2 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the

Squishmallows products that possess unique, recognizable, and distinguishing features that are

common across much of the Squishmallows line.   From 2016 to the present, Kelly Toys has

expended large sums of money in developing, advertising, and promoting the Squishmallows trade

dress, and the product designs embodying Squishmallows, throughout the United States. In fact,

Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-

business advertising in connection with its Squishmallows products that are well known (and well

loved) for their distinctive look.

Squishmallows have become a phenomenon—they have turned into a collectors' item, with

their avid fanbase of all ages searching high and low to collect as many of the over 3,000 different

Squishmallows characters as possible.   Due to Squishmallows' massive success and popularity,

consumers associate the high-quality Squishmallows toys with the Squishmallows distinctive trade

dress. For example, The New York Times has proclaimed that "Squishmallows are Taking Over,"[1]

Forbes named them "2022's Must-Have Christmas Toy,"[2] and The Guardian has recognized the

toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to

top Christmas toy."[3]   And In September of 2022, Squishmallows was awarded the coveted "Toy

of the Year," "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation.

Squishmallows are so popular that they have been identified as the most popular toy brand across

---

[1] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021),
https://www.nytimes.com/2021/03/16/style/squishmallows.html.
[2] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,*  Forbes  (Dec.  13,  2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.
[3] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022),  https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

[2533354/4]                                    3

EXHIBIT L
Page 3 of 78

477 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

41% of the U.S. states—far ahead of other well-known mega brands such as Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh. There are only just a few of the countless recognitions received by Squishmallows.

Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade dress, and whose overall look and image—and in particular but without limitation its shapes, colors, textures, and graphics—serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile exterior (collectively, the "Squishmallows Trade Dress"). Simply stated, the Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look that is *uniquely* associated with Squishmallows.

Due to the distinctive Squishmallows Trade Dress, coupled with the unique designs, extensive marketing efforts, media coverage, and market penetration, the Squishmallows trade dress has acquired distinctiveness in the marketplace when applied to plush toys. In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered by Kelly Toys. As a result, the Squishmallows

[2533354/4]

4

EXHIBIT L
Page 4 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Trade Dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kelly Toys.

**b. Plaintiffs Vigilantly Protect Their Intellectual Property**

As the creators of sought-after toys such as Squishmallows, Kelly Toys takes steps to ensure that their intellectual property is protected. And, when this information is misappropriated, Kelly Toys will stop at no length to prevent the dissemination of its sought-after information. As recently as July 2021, Plaintiff Jazwares, LLC (a partial owner and affiliate of Kelly Toys) secured an emergency injunction **in this Court** against a former employee after the former employee stole Jazwares, LLC's protected trade secrets. *Jazwares, LLC v. Cymonda Wilson*, CACE21014464 (Fla. 17th Jud. Cir.).

This case is no different. Kelly Toys Holdings, LLC contracted with a Chinese Manufacturer that has the sole rights to manufacture Squishmallows (the "Manufacturer Contract"). A true and correct copy of the Manufacturer Contract is attached hereto as **Exhibit 1.** As seen by the Manufacturer Contract, Kelly Toys Holdings, LLC included robust trade dress protections. Little did Kelly Toys Holdings, LLC know that Build-A-Bear would clandestinely discover the identity of Kelly Toys' Squishmallows manufacturer and ask the manufacturer to use Squishmallows Trade dress to create a near identical Squishmallows copycat under the Build-A-Bear brand. Consequently, Build-A-Bear had previously used this manufacturer and used its monetary influence over the manufacturer to pressure the manufacturer into building the copycat goods. But, the manufacturer knew that creating Skoosherz was wrong and initially pushed back. It told Build-A-Bear that the products it was asking for were very close to the famed and protected Squishmallows. Build-A-Bear ignored this caution, asserting that it was not improper to copy these items because they were sold to the public, directing the manufacturer to build the copycat goods.

[2533354/4]                                                5

EXHIBIT L
Page 5 of 78

479 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Uneasy about the situation, the manufacturer reached out to a Kelly Toys representative and informed them about the above referenced correspondence, which the manufacturer claims is memorialized in three (3) emails that Build-A-Bear wants hidden from Kelly Toys (thus highlighting the need for the *ex parte* nature of this Motion).

### c.   Build-A-Bear's Blatant Misappropriation of Squishmallows

Rather than competing fairly in the marketplace by creating its own unique concepts and products, Defendant Build-A-Bear, a company worth over 300 million dollars, decided that it would be easier to simply copy, imitate, and profit off of the popularity and goodwill of Squishmallows. Its goal: confuse consumers into buying Build-A-Bear's products instead of Kelly Toys' products. Specifically, in January 2024, Defendant Build-A-Bear announced the release of its "Skoosherz" plush toys—toys that look exactly like the well-known Squishmallows:



Further demonstrating the misconduct here is the fact that Build-A-Bear is not even in the business of selling completely assembled plush toys like Squishmallows. Instead, Build-A-Bear is best known for providing a place for people to create their own customizable toys, offering a

EXHIBIT L
Page 6 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

number of unstuffed plush animals and characters that consumers can stuff themselves to build their own toy.  Nonetheless, n January 11, 2024, Build-A-Bear launched "Skoosherz," a line of already complete (stuffed, stitched, etc.) plush toys that copies and imitates Squishmallows. Build-A-Bear does not just copy the shape, material and general characteristics of Squishmallows, Build-A-Bear went design by design and made an almost exact replica of each Squishmallows design; Squishmallows has a rainbow bear, Build-A-Bear made a rainbow Skoosherz; Squishmallows has a green frog, Build-A-Bear made a green frog Skoosherz; Squishmallows has a pink cow, Build-A-Bear made a pink cow Skoosherz. This list goes on and is not complete.  Dinosaurs, axolotls, and soon vegetables—Build-A-Bear made sure that each of its original five Skoosherz was an exact copy of a popular Squishmallows character. This includes the beloved and extremely unique Squishmallows axolotl, which Build-A-Bear ensured to copy with precision.  Simply stated, instead of maintaining its original business practice of allowing consumers to create their own toys, Build-A-Bear now seeks to trade off the goodwill of Squishmallows by marketing obvious copycat products—plush toys that look almost identical to popular Squishmallows.

Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior. Side by side comparisons of Squishmallows and the copycat Skoosherz products plainly show how striking the similarities are:

EXHIBIT L
Page 7 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|
|  |  |

EXHIBIT L
Page 8 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|



EXHIBIT L
Page 9 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|
|  | |

Even worse, and as briefly detailed above, Build-A-Bear not only parroted Squishmallows,

but it also tricked Squishmallows' manufacturer into creating the infringing Skoosherz copycat

products. Specifically, Build-A-Bear reached out to the Squishmallows manufacturer (with whom

Kelly Toys has an airtight confidentiality contract) and asked the manufacturer to create a

Squishmallows look-alike. Plaintiffs are informed and believe that when the manufacturer

expressed concerns that the Skoosherz sought to be manufactured were Squishmallows copycats,

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Build-A-Bear brazenly ignored this caution, instead asserting, contrary to law, that its copycat products were permitted. Build-A-Bear then told the manufacturer to proceed with producing the violative goods. There can only be one explanation for Build-A-Bear's insistence on both using the same manufacturer as Squishmallows and proceeding with its copycat product despite the manufacturer's warning: Build-A-Bear intended on misappropriating the Squishmallows Trade Dress and hoped to leverage Squishmallows' confidential information in the manufacturer's possession.

**d. Build-A-Bear's Actions Have Caused Great Customer Confusion**

Not only has Build-A-Bear created Skoosherz to visually and tactilely mirror Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") are mistaken by the confusingly similarly named Skoosherz instead.

Build-A-Bear has sought to market off of this confusion by portraying its Skoosherz as the "most squishable," and advertising that consumers can "Squish Em," plainly seeking to create an association between the infringing Skoosherz and the wildly popular Squishmallows, or "Squish:"

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



Build-A-Bear's descriptions of individual Skoosherz toys similarly seek to associate with Squishmallows, noting that they are "squishable." For example, the product details for Build-A-Bear's axolotl (a copy of the unique animal that is one of Squishmallows' most popular characters) state:



Product Details    Specifications    Gift Options    Store Availability

Skoosherz are our most squishable, lovable and huggable friends! Our fan favorite pink axolotl gets the Skoosherz treatment with this adorable plush. The large, round plush has the axolotl's signature smiley face with fuzzy pink gills on its side. Make a splash with this ultra huggable axolotl friend!

[2533354/4]                              13

EXHIBIT L
Page 13 of 78

487 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Skoosherz products create a likelihood of confusion with Squishmallows products.  In fact, there is evidence of *actual* consumer confusion.  For example, on a recent promotional Skoosherz Instagram post, a user asked whether Build-A-Bear was now making Squishmallows:



Other consumers have also noted how similar Skoosherz are to Squishmallows.  Indeed, as shown below, the official Build-A-Bear Instagram account was forced to clarify that these were indeed Skoosherz, not Squishmallows, when a commenter posted "SQUISHMALLOW!? !?" to Build-A-Bear's promotional video of Skoosherz:



[2533354/4]                                        14

EXHIBIT L
Page 14 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

These users were not alone. Build-A-Bear's Instagram post announcing its new Skoosherz line is riddled with posts calling them "knockoff Squishmallows" and noting the obvious similarities between these new products and the well-known Squishmallows:





[2533354/4]

15

EXHIBIT L
Page 15 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 17 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 18 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC66B499



EXHIBIT L
Page 19 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 20 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Other consumers noted that Skoosherz are "like a worse Squishmallow," even noting that Skoosherz chose to copy several of the most popular Squishmallows characters. Still others highlight the fact that Skoosherz represent a radical departure from Build-A-Bear's traditional model of building a custom toy, referring to them as "soulless ripoff[s]":

 **lairviniaa** · 10 hr. ago

I'm sorry but I really can't see the appeal 😂 like I collect both squishmallows and bab but these designs are just lazy and look like cheap squishmallow knockoffs (they literally used the most popular squishmallow animals/designs) and like I don't understand why they'd make these (besides wanting an easy cash grab) they have none of the features that make babs special and unique, they didn't even make clothes for them and they're overpriced too (and imo they're not even cute 😕) I mean if you enjoy them I'm happy for you i don't wanna ruin the fun but its just a no from me

 **stabby_coffin_salt** · 2 days ago

It's like a worse Squishmallow. I'd rather just get one of those Squishem's or whatever they're called (they have one that's a plague doctor).

These knockoffs remind me of those TY squish things. Can't stand the lack of quality or thought.

The cow is kinda cute I guess?

⊖ ⇧ 177 ⇩   💬 Reply   ⬆ Share   ···

 **saredarebear** · 4 hr. ago

I feel like if they were going to make something resembling squishmallows they could at least make it so you "build" it and make a line of clothing for it so it does not feel like such a a soulless ripoff. It's cute, but Build a Bear has something that is pretty unique and I do not understand why these were released the way they were.

 ⇧ 3 ⇩   💬 Reply   ⬆ Share   ···

Even Build-A-Bear's photos and ad campaigns directly mirror Squishmallows:

[2533354/4]                                      21

EXHIBIT L
Page 21 of 78

495 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

<u>Squishmallows</u>                    <u>Skoosherz</u>



### e. Build-A-Bear Has New Copycats in the Works

Kelly Toys also has reason to believe that Build-A-Bear is working to roll out multiple new Skoosherz characters by mid-2024, including fruits and vegetables Skoosherz (which it will likely accelerate if notice is given).  As seen below, Squishmallows' has long produced a popular line of fruit and vegetable Squishmallows:



It is evident that Build-A-Bear's actions have caused and will continue to cause significant harm.  As a result of consumer confusion, Kelly Toys has lost and will continue to lose potential customers, sales, and market share.  It is important to note that Skoosherz have only been around for just over two weeks.  If the foregoing confusion ensued within this short time, imagine what would happen if Skoosherz remained on the market indefinitely.

[2533354/4]                          22

EXHIBIT L
Page 22 of 78

496 of 671

## II.    STANDARD ON AN EX PARTE TEMPORARY INJUNCTION

### a. Notice Standard

Rule 1.610 of the Florida Rules of Civil Procedure governs the imposition of temporary injunctions and states "[a] temporary injunction may be granted without written or oral notice to the adverse party only if: (A) it appears from the specific facts shown by affidavit or verified pleading that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts that have been made to give notice and the reasons why notice should not be required." Fla. R. Civ. P. 1.610(a)(1).

"To satisfy the rule's mandate of establishing why notice should not be required, a Plaintiff seeking an ex parte temporary injunction must demonstrate (1) how and why the giving of notice would accelerate *or* precipitate the injury or (2) that the time required to notice a hearing would actually permit the threatened irreparable injury to occur." *Smith v. Knight,* 679 So. 2d 359, 361 (Fla. 4th DCA 1996) *(citing Dixie Music Co. v. Pike,* 135 Fla. 671, 185 So. 441, 446 (1938); *Lieberman v. Marshall,* 236 So. 2d 120, 125 (Fla. 1970); *Minimatic Components, Inc. v. Westinghouse Elec. Corp.,* 494 So. 2d 303, 304 (Fla. 4th DCA 1986); *Shouman v. American Express Travel Related* Servs. Co., 566 So. 2d 875 (Fla. 3d DCA 1990). "Examples of such a showing are where notice of a hearing will prompt a defendant to destroy records, cause unsecured assets to be liquidated in the context of a fraudulent enterprise, or precipitate the disposal of the major asset of a partnership subject to an accounting." *Smith,* at 361-62 (footnotes omitted). *See also Tobin et al v. Hanna et al,* 2012 WL 12335474 (Fla. 17th Cir., August 8, 2012) (ruling that permitting the defendant to receive notice will likely precipitate additional fraudulent activities and stated grounds for an *ex parte* preliminary injunction).

[2533354/4]                                      23

EXHIBIT L
Page 23 of 78

497 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

### b. Injunction Standard

In seeking a temporary injunction, the movant must show: (1) irreparable harm if the status quo is not maintained; (2) no adequate remedy at law; (3) a clear legal right to the relief requested; (4) that any public interest will not be disserved; and (5) a substantial likelihood of success on the merits. *Shafer v. Shafer*, 898 So. 2d 1053, 1055 (Fla. 4th DCA 2005) (citing to *Wexler v. Lepore*, 878 So. 2d 1276, 1281 (Fla. 4th DCA 2004), *rev. denied*, 888 So. 2d 625).

### III. DEFENDANT'S ACTIONS ARE SUFFICIENT TO ENTITLE KELLY TOYS TO AN *EX PARTE* TEMPORARY INJUNCTION

### a. Injunctions Are Justified to Protect intellectual Property

Injunctions are viable relief in the context of trademark infringement or misappropriation, and because trade dress claims are a form of trademark claim, state common law trade dress claims draw largely upon the state common law for infringement of trademarks. *See M&E Distributors v. Worley*, 840 So. 2d 457, 459 (Fla. 4th DCA 2003) (finding that enjoining a competitor's use of a registered mark will protect the public interest and constitutes an irreparable injury as a matter of law) (citing to *Callaway Golf Co. v. Golf Clean, Inc.*, 915 F. Supp. 1206, 1215 (M.D. Fla. 1995) ("In trademark infringement cases, irreparable harm is presumed."); *Laboratorios Roldan, C. por A. v. Tex Int'l, Inc.*, 902 F. Supp. 1555, 1571 (S.D. Fla. 1995) (granting a temporary injunction for unfair competition and trademark infringement, recognizing that the likelihood of confusion constitutes irreparable injury as a matter of law); *Stagg Shop of Miami, Inc. v. Moss*, 120 So. 2d 39, 40–41 (Fla. 2d DCA 1960) (explaining that monetary damages an insufficient remedy for trademark infringement). Common law trade dress claims are evaluated under a similar analysis as claims under the Lanham Act. *See, e.g., Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (evaluating common law unfair competition/trademark claim under Lanham Act framework and noting "[c]ourts may use an analysis of federal infringement claims

[2533354/4]                                      24

EXHIBIT L
Page 24 of 78

498 of 671

as a 'measuring stick' in evaluating the merits of state law claims of unfair competition"). The term trade dress refers to "the appearance of a product when that appearance is used to identify the producer." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197 (11th Cir. 2004). "'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color . . . , texture, graphics, or even particular sales techniques." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986). To prevail on a claim for trade dress infringement, a party must prove that: "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." *Dippin' Dots*, Inc., 369 F.3d 1197.

That the elements of infringement are met here is unquestionable. **First**, the similarity of these products is irrefutable. The photos referenced herein make clear that Skoosherz are Squishmallows by a different name. **Second**, the features are non-functional. The items at issue are plush toys—functionality is not a focus. The unique shape and design of Squishmallows are are not essential to their "use" and do not increase their cost or quality. *See e.g.*, *Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1318 (S.D. Fla. 2001)("A functional characteristic is one that is 'essential to the use or purpose of the article or [one that] affects the cost or quality of the article.' 'There is no bright line test for functionality.' 'The question of whether features are nonfunctional is one of fact.'") citing *Epic Metals Corp. v. Souliere*, 99 F.3d at 1039. **Third,** Squishmallows have taken the world by storm because of their creative, cute, and quite original Asian-style Kawaii faces, rounded shape, embroidered facial features, bright colors, small facial features, small appendages, and overall unique minimalistic depiction of cute animals and shapes. The onslaught of consumers correctly identify Skoosherz as Squishmallows in the many social media posts herein. The fact that consumers are referring to Build-A-Bear's copycat product as

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Squishmallows leaves little doubt that Squishmallows have a secondary meaning in the marketplace.

By way of example, in *M&E Distributors*, the court affirmed the entry of an injunction after the defendant began producing a product that "utilized the same distinctive color, shaped bottle, and label appearance as" the plaintiff's product. 840 So. 2d at 458–49. Similarly here, an injunction should be granted because (as noted above) Build-A-Bear infringed on the Squishmallows Trade Dress by creating and selling Skoosherz, which share the same or substantially similar appearance as Squishmallows.

**b. An Injunction is Proper Under Florida's Deceptive and Unfair Trade Practices Act**

A party is entitled to an injunction as a result of a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). § 501.211(1), Fla. Stat. ("Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action . . . to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."). FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" § 501.204(1), Fla. Stat. "Trade dress or trademark infringement is an 'unfair and deceptive trade practice that constitutes a violation of FDUTPA.'" *Lanard Toys Ltd. v. Dolgencorp, LLC*, 2021 WL 8200197, at *32 (M.D. Fla. Aug. 20, 2021), as corrected (Oct. 19, 2021), supplemented, 3:15-CV-849-MMH-PDB, 2022 WL 1597276 (M.D. Fla. Feb. 2, 2022) citing Commodores Ent. Corp. v. McClary, 324 F. Supp. 3d 1245, 1252 (M.D. Fla. 2018) (trademark), aff'd, 822 F. App'x 904 (11th Cir. 2020); *see also Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1317 (S.D. Fla. 2001). The Eleventh Circuit has explained, "[c]ommon law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion*, 261 F.3d at

EXHIBIT L
Page 26 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

1193 n.5; *see also TracFone Wireless, Inc. v. GSM Group, Inc.*, 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) (citing *Laboratorios Roldan v. Tex Int'l Inc.*, 902 F. Supp. 1555, 1569–70 (S.D. Fla. 1995) (explaining that intentionally palming off or passing off products is the type of behavior which FDUTPA was meant to protect against); *see also Niles Audio Corp.*, 174 F. Supp. 2d at 1318(plaintiff stated a claim for FDUTPA violation based upon trade dress infringement).

In *Laboratorios Roldan*, the court found that the plaintiff had a substantial likelihood of success on the merits in its FDUTPA claim stemming from the defendants' trademark and trade dress infringement of plaintiffs' cosmetics products that were sold in commerce. 902 F. Supp. 1555. In granting the plaintiff's motion for preliminary injunction, the court expressly found that the defendants' "intentional[] palming or passing off their products as those of Plaintiff or someone associated with Plaintiff . . . is the type of behavior which [FDUTPA] was designed to protect." 902 F. Supp. at 1570.

Plaintiffs are similarly entitled to injunctive relief here based on Build-A-Bear's deceptive and unfair practice of misleading consumers by misappropriating the Squishmallows Trade Dress. Build-A-Bear launched "Skoosherz," a line of plush toys that perfectly copies and imitates Squishmallows. The resulting deception in the marketplace is not a secondary result, but rather, was Build-A-Bear's primary goal. Skoosherz toys have the same distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; and distinctive and non-monochrome coloring. As a result of Defendant's infringement, Plaintiffs have suffered and continue to suffer irreparable harm.

EXHIBIT L
Page 27 of 78

**c. Defendant's Actions will Result in Continuing and Irreparable Harm to Plaintiffs' Name and Business**

Defendant's actions have caused Kelly Toys substantial harm. Harm, which is irreparable, ongoing, and for which there is no adequate remedy at law. In the short amount of time Defendant has been marketing and selling Skoosherz, Kelly Toys has already lost business and public confusion is at an all-time high. If Defendant is permitted to continue its conduct, it will undoubtedly cause continued irreparable harm. Kelly Toys respectfully request that this Court enter an injunction to preserve the Squishmallows Trade Dress.

Defendant is knowingly misappropriating the Squishmallows Trade Dress. Defendant is improperly advertising in a way to trick consumers into believing Build-A-Bear is part of the Squishmallows brand. It is not. Through these actions, Defendant is causing consumer confusion and misleading the public by selling Skoosherz with the infringed Squishmallows Trade Dress.

There is little to no chance that an injunction will cause Defendant any damage whatsoever. Every day that Defendant is permitted to continue its deceptive actions gives Kelly Toys customers reason to purchase Skoosherz instead of Squishmallows. Giving Defendant notice of Kelly Toys' request for an injunction against Build-A-Bear's prohibited activities may well cause Build-A-Bear to destroy any evidence of using the Squishmallows Trade Dress and/or hide evidence of harmful conduct.

An injunction will not disserve the public interest. Instead, it will protect the public from the wide spread confusion caused by Build-A-Bears bad acts. If these two products were side by side, a consumer would not be able to tell the difference. In fact, if a consumer were to perform a web-search to see if Build-A-Bear sells Squishmallows, the search result would yield both products side by side and indistinguishable, with some retailers calling Skoosherz, "Build-A-Bear Squishmallows:"

[2533354/4]                                   28

EXHIBIT L
Page 28 of 78

502 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



Kelly Toys has a substantial likelihood of success on the merits of their case against Build-A-Bear. In fact, Build-A-Bear's misappropriation and deceptive tactics here are more blatant than actions that this Court's has previously found to lead to a substantial likelihood of success on the merits in intellectual property misappropriation. *See, e.g., Designer Eyes, Inc. v. Sevan Ayvazian, et al.*, CACE22002457 (Fla. 17th Jud. Cir. March 4, 2022); *Jazwares, LLC v. Cymonda Wilson*, CACE21014464 (Fla. 17th Jud. Cir. July 21, 2021); *Designer Eyes, Inc. v. Michael Goodfriend, et al.*, CACE1911361 (Fla. 17th Jud. Cir. June 3, 2019). If Build-A-Bear is permitted to continue copying Squishmallows, it would turn trade dress law on its head. The jury in this case will be made up of the same people who have expressed confusion about these products in social media

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

posts. There is a substantial likelihood that the ultimate verdict in this case will affirm that confusion and yield positive results for Kelly Toys.

Kelly Toys has an absolute legal right to enforce its intellectual property rights and demand the cease of the use of the Squishmallows Trade Dress. If Defendant is given notice of this Motion and Plaintiffs' Complaint, the danger of Defendant taking additional fraudulent actions designed to harm Plaintiffs and the public is "real and not merely speculative." *Tobin,* 2012 WL 12335474 at *2.

## IV.  CONCLUSION

Plaintiffs are entitled to emergency *ex parte* relief. The harm caused by Defendant's actions to Plaintiffs greatly outweighs any potential harm to Defendant. In addition, Plaintiffs have no adequate remedy at law as their damages will result from the destruction of a meticulously built brand with near impossible consumer recognition. Therefore, monetary damages will not sufficiently compensate Plaintiffs for their losses.

**WHEREFORE,** Plaintiffs respectfully requests this Court and enter an emergency *ex parte* temporary injunction, requiring that Defendant:

1. Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

2. Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

[2533354/4]

30

EXHIBIT L
Page 30 of 78

504 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

3. Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4. Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5. Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6. Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7. Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8. Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

[2533354/4]                                   31

EXHIBIT L
Page 31 of 78

505 of 671

9. Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

## STATEMENT OF WHY NO NOTICE SHOULD BE REQUIRED

The undersigned counsel hereby certifies on this 29th day of January, 2024, pursuant to Rule 1.610 of the Florida Rules of Civil Procedure, that Plaintiffs have made no attempt to provide notice to Defendant, and that this Motion is made *ex parte* for the reasons stated below.

Kelly Toys suffers immeasurable and insurmountable harm is every day that Build-A-Bear is permitted to sell these misappropriated products. The social media posts about Skoosherz on Instagram alone have over sixteen thousand (16,000) likes and 300 comments in just over two weeks. This means that between other marketing, social media, and retail marketing, every day that passes yields tens of thousands of people who are subject to confusion. Providing notice would cause additional incalculable harm.

In addition (and concerningly) Build-A-Bear has already shown a willingness proceed with producing its Skoosherz products, despite warnings from its manufacturer that these were Squishmallows copycats. As noted above, Build-A-Bear reached out to the manufacturer of Squishmallows (in China) and asked the manufacturer to make the violative products. When the manufacturer expressed concerns that the items were a Squishmallows copycat, Build-A-Bear first incorrectly represented that such copycat products were permitted because the products were sold

[2533354/4]                                          32

EXHIBIT L
Page 32 of 78

506 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

in the public domain, and then sent another correspondence directing the manufacturer and produce the violative goods. The manufacturer indicated that emails were confidential.

In other words, the last time Build-A-Bear was given notice of potential wrongdoing, they pushed ahead and demanded the production of more products—86,000 units to be exact. The communications between Build-A-Bear and the manufacturer are only within the possession of Build-A-Bear and a Chinese manufacturer. While the manufacturer told Kelly Toys of Build-A-Bear's conduct, it would be near impossible to force the manufacturer produce the correspondence. Moreover, there is a concern that once Build-A-Bear receives notice it will try to improperly remove the case to federal court to temporarily divest this Court of jurisdiction pending remand, in order to delay the process. Simply stated, because of (1) the fact that the last time Build-A-Bear was given notice, it proceeded in-spite of the notice it to produce and launch nearly 90,000 of the violative products (2) the potential that Build-A-Bear may destroy information that is otherwise unobtainable if it is given notice, and (3) the risk that Build-A-Bear will attempt to delay any hearing by (improperly) removing the case to federal court before any hearing, this motion must be heard and considered *ex-parte*.

EXHIBIT L
Page 33 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## VERIFICATION

I declare under penalty of perjury that I have read the foregoing Verified *Ex Parte* Emergency Motion For Temporary Injunction, and the facts contained herein, are true and correct to the best of my knowledge.

January 29, 2024 | 11:07 AM EST

Jazwares, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Toys Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Amusement Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Jazplus, LLC
By: Jack Elum
Its: Authorized Representative

[2533354/4]

34

EXHIBIT L
Page 34 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Respectfully submitted this 29th of January, 2024, contemporaneous with Plaintiff's
Complaint Verified by:

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781
Primary: jshaw@zpllp.com; zludens@zpllp.com;
lpalen@zpllp.com; ezebersky@zpllp.com
Secondary: mlomastro@zpllp.com;
lgrealy@zpllp.com; kgonzalez@zpllp.com

___/s/ Jordan A. Shaw_____
EDWARD H. ZEBERSKY, ESQ.
Fla. Bar No.: 908370
JORDAN A. SHAW, ESQ.
Fla. Bar No.: 111771
ZACHARY D. LUDENS, ESQ.
Fla. Bar No.: 111620
LAUREN N. PALEN, ESQ.
Fla. Bar No.: 1038877

Filing # 190722631 E-Filed 01/29/2024 11:44:39 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

JAZWARES, LLC, a Delaware
Limited Liability Company, KELLY
TOYS HOLDINGS, LLC, a Delaware
Limited Liability Company, KELLY
AMUSEMENT HOLDINGS, LLC, a
Delaware Limited Liability Company,
And JAZPLUS, LLC, a Delaware
Limited Liability Company,

      Plaintiff,

vs.

BUILD-A-BEAR WORKSHOP, INC.,
a Delaware Corporation,

      Defendant.

_____/

## **VERIFIED COMPLAINT**

    Plaintiffs, Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC,

and Jazplus, LLC (collectively, "Plaintiffs" or "Kelly Toys"), by and through the undersigned

counsel, hereby sue Defendant, Build-A-Bear Workshop, Inc. ("Defendant" or "Build-A-Bear"),

and, for their Complaint, Plaintiffs state the following:

## **INTRODUCTION**

    1.    The facts of this case are truly concerning.

    2.    Plaintiffs (who are either affiliated entities, governed by common ownership,

governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute

Squishmallows) are among the world's leading manufacturers and distributors of high-quality toys

and other consumer products.    In 2016, their distinctive line of plush toys branded

[2532761/4]                 1

EXHIBIT L
Page 36 of 78

510 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

"Squishmallows" was released.  Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media.  And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide.  As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]

3.      Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase. Rather than competing fairly in the marketplace by creating its own  unique concepts and product lines, Defendant Build-A-Bear, a company worth over 300 million dollars, decided that it would be easier to simply copy, imitate, and profit off of the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying Build-A-Bear's

---

[1]  Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[2532761/4]                                   2

EXHIBIT L
Page 37 of 78

511 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

products instead. Build-A-Bear is even using the same manufacturer as Squishmallows in an attempt to gain access to the Squishmallows trade dress.

4. In January 2024, Build-A-Bear announced the release of its "Skoosherz" plush toys. As seen herein, the Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters;



Squishmallows Original Product  Skoosherz Copycat Product

simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior. And, likely noticing that consumers refer to Squishmallows as Squish, Build-A-Bear named its line Skoosherz to evoke an association with the word "Squish."

5. Even worse, Build-A-Bear has been trying to trick customers in the marketplace who are looking for Squishmallows into buying their own Skoosherz instead. Indeed, the similarities have not gone unnoticed—immediately upon the launch of Skoosherz, multiple media outlets have already referred to Skoosherz as "Squishmallow-like" and "Squishmallow-adjacent."[2] Consumers have likewise taken no time to identify Build-A-Bear's attempt to replicate the

---

[2] Josh Coulson, *Build-a-Bear Reveals Its Squishmallow-Like Skoosherz Line,* (Jan. 11, 2024), https://www.thegamer.com/build-a-bear-squishmallow-like-skoosherz/.

[2532761/4] 3

EXHIBIT L
Page 38 of 78

512 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Squishmallows trade dress, commenting that Skoosherz are "like a worse Squishmallow" and that Build-A-Bear is "just trying to copy Squishmallow[s]" and is "ripping off Kellytoys." Others have noted that Skoosherz "look like cheap squishmallow knockoffs," even expressing that "they literally used the most popular squishmallow animals/designs."

6.   Build-A-Bear's efforts have created substantial and actual confusion even in the short time that they have been available.   For example, a confused consumer asked on the Build-A-Bear Instagram post announcing its newest line, Skoosherz, "so now ur making squishmallows?"

7.   Build-A-Bear's actions have already caused significant harm.   For example, customer confusion has and will continue to lead to lost potential customers, sales, and market share.

8.   For these reasons and those that follow, this is a straightforward case of trade dress infringement.   Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows, and Build-A-Bear is willfully infringing those trade dress rights.   Through this action, Kelly Toys seeks monetary and injunctive relief to stop Build-A-Bear's copycat efforts and put an end to consumer confusion.

## PARTIES, JURISDICTION, & VENUE

9.   This is an action for injunctive relief and damages in excess of fifty thousand dollars ($50,000.00), exclusive of attorneys' fees and costs.

10.   Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

11.   Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

[2532761/4]                                  4

EXHIBIT L
Page 39 of 78

513 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

12.     Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

13.     Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

14.     Plaintiffs are either affiliated entities, governed by common ownership, governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows.

15.     Defendant Build-A-Bear is a consumer toy corporation company organized under the laws of Delaware with its principal place of business in St. Louis, Missouri.

16.     Defendant Build-A-Bear is subject to the jurisdiction of this Court pursuant to Florida Statutes Section 48.193(1)(a)(1) because it operates, conducts, engages in, and carries on a business venture in Broward County, Florida.  Specifically, Build-A-Bear is registered to do business in Florida and has over twenty locations in Florida where Build-A-Bear sells its products, including the infringing Skoosherz.  The infringing Skoosherz are also available for order online via Build-A-Bear's website and pick up at physical locations in Florida.  In order to sell Skoosherz in Build-A-Bear's Florida branches, the infringing articles were either manufactured in or shipped to Florida.

17.     Venue is proper in this Court pursuant to Florida Statute § 47.051 in that Defendant Build-A-Bear has numerous stores located in this county and in that Plaintiff Jazwares, LLC is headquartered in this county, giving rise to injuries sustained in this county.

## FACTS

**A. World Famous Squishmallows**

[2532761/4]          5

EXHIBIT L
Page 40 of 78

514 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

18.    Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the Squishmallows brand.



19.    In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others.    In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.

20.    From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising, and promoting the Squishmallows trade dress, and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products that are well known (and well loved) for their distinctive look.

21.    On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products to Plaintiff Kelly Toy Holdings, LLC.    Accordingly, Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products (including the Squishmallows trade dress discussed herein) that possess

[2532761/4]                                              6

EXHIBIT L
Page 41 of 78

515 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

unique, recognizable, and distinguishing features that are common across much of the
Squishmallows line.

22.    Kelly Toy Holdings, LLC provides the rights to the remaining Plaintiffs, Jazwares,
LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the
Squishmallows products.  Plaintiffs are all related companies that each independently have the
ability to inspect and monitor the Squishmallows products and to maintain the products' quality.
Each Plaintiff thus has a cognizable interest in the infringement at issue.

**B. Squishmallows Has a Distinctive Trade Dress**

23.    Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade
dress, and whose overall look and image—and in particular but without limitation its shapes,
colors, textures and graphics—serve as a distinctive source identifier to the consuming public.
Though not easily reduced
to writing, these features
include: (1) substantially
egg/bell shaped plush toys
depicting various similarly
shaped fanciful renditions of
animals/characters;     (2)
simplified  Asian  style
Kawaii faces with repeating



and complementary rounded/oval shaped graphics depicting features on the characters themselves
(such as eyes, snouts, and bellies) and which conform to and support the overall egg/bell shape of
the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive

[2532761/4]                                    7

EXHIBIT L
Page 42 of 78

516 of 671

contrasting and non-monochrome coloring; and (5) short-pile exterior (collectively, the "Squishmallows Trade Dress").

24.     The Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look that is *uniquely* associated with Squishmallows.  The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions); (iii) myriad alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

25.     Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors.  Competitors have successfully used innumerable alternative design elements and combinations of those

[2532761/4]                                          8

EXHIBIT L
Page 43 of 78

517 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish—and has succeeded in distinguishing—the source of products embodying the Squishmallows Trade Dress from the source of other toys. Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source: Squishmallows.

### C. Squishmallows Are Distinctive and Popular

26.     Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of the Squishmallows line. And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kelly Toys' extensive promotional activities and widespread display of Squishmallows directed to the public and as a result of Kelly Toys' fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered only by Plaintiffs. The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it. As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize a secondary meaning of the exemplary reputation of Kelly Toys.

[2532761/4]                                        9

EXHIBIT L
Page 44 of 78

518 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

27.     In addition to being original and inherently distinctive, the Squishmallows Trade Dress is also widely recognized by consumers. A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

28.     Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, which each feature dozens of photographs of its plush toys and models holding its Squishmallows—some of which were directly copied by Build-A-Bear.

29.     Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook, and Twitter. Indeed, Kelly Toys' legion of loyal fans of its line of Squishmallows have been extremely engaged on social media, including TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows. Squishmallows videos have been viewed more than 11 billion times on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

30.     Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase of all ages searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

31.     Indeed, sales of Squishmallows increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

EXHIBIT L
Page 45 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

32.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others.  By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[3]





33.     The New York Times has proclaimed that "Squishmallows are Taking Over,"[4] Forbes named Squishmallows "2022's Must-Have Christmas Toy,"[5] and The Guardian has

---

[3] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

[4] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[5] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy*, Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[2532761/4]                                     11

EXHIBIT L
Page 46 of 78

recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[6]

34.     Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken over the toy world," and that "as toy stores go, the marshmallow-like plush toy's meteoric rise to the top of the $100 billion global toy market is one for the ages."[7]

35.     Squishmallows' fandom ranges across all ages, from children to teens to adults. Even celebrities like Kim Kardashian and Lady Gaga have identified themselves as avid devotees of the brand, and have published messages and photos of their Squishmallows collections on their social media accounts:



---

[6] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

[7] Mark Caldwell, *Soft Sell*, Costco Connection, Oct. 2023, at 22, https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-23/US_October_Connection_2023.pdf.

[2532761/4]                                         12

EXHIBIT L
Page 47 of 78

521 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



36.     In September of 2022, Squishmallows was awarded the coveted "Toy of the Year,"
"Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation.
Squishmallows are so popular that they have been identified as the most popular toy brand across
41% of the U.S. states—far ahead of other well-known mega brands such as Hot Wheels, Lego,
Nintendo Switch, Nerf, and Play-Doh.

37.     Due to Squishmallows' massive success and popularity, Squishmallows have
created a secondary meaning in the marketplace and consumers associate the high-quality
Squishmallows toys with Kelly Toys and the Squishmallows Trade Dress.

### D. Build-A-Bear's Skoosherz as a Copycat of Squishmallows

38.     True to its name, Build-A-Bear is best known for providing a place for people to
create their own customizable toys.  Build-A-Bear offers a number of premade, unstuffed plush
animals and characters that consumers can stuff themselves to build their own toy.  Consumers

[2532761/4]                                    13

EXHIBIT L
Page 48 of 78

522 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

can also customize their plush toy by purchasing audio recordings to incorporate inside the plush toy, clothing for the plush toy, and other accessories.

39.     On January 11, 2024, Build-A-Bear launched Skoosherz, a line of already complete (stuffed, stitched, etc.) plush toys that copies and imitates Squishmallows. The Skoosherz products are a radical departure from Build-A-Bear's typical products. Indeed, Skoosherz lack all the customizable aspects that Build-A-Bear is known for. Consumers cannot go into a Build-A-Bear Workshop and build their own Skoosherz. Instead, Skoosherz are pre-made and available for purchase in the same way any traditional manufacturer would sell a toy—and the same way Squishmallows are sold.

40.     In other words, instead of maintaining its original business practice of allowing consumers to create their own toys, Build-A-Bear now seeks to trade off the goodwill of Squishmallows by marketing obvious copycat products—plush toys that look almost identical to popular Squishmallows. To be clear, Build-A-Bear is not licensed or otherwise authorized by Kelly Toys to market or distribute products embodying the Squishmallows Trade Dress.

41.     Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

42.     Build-A-Bear does not just copy the shape, material and general characteristics of Squishmallows, Build-A-Bear went design by design and made an almost exact replica of each Squishmallows design; Squishmallows has a rainbow bear, Build-A-Bear made a rainbow Skoosherz; Squishmallows has a green frog, Build-A-Bear made a green frog Skoosherz; Squishmallows has a pink cow, Build-A-Bear made a pink cow Skoosherz. This list goes on and is not complete.

[2532761/4]                                14

EXHIBIT L
Page 49 of 78

523 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

43.    Dinosaurs, axolotls, and soon vegetables—Build-A-Bear made sure that each of its original five Skoosherz was an exact copy of a popular Squishmallows character. This includes the beloved and extremely unique Squishmallows axolotl, which Build-A-Bear ensured to copy with precision.   Side by side comparisons of Squishmallows and just a few of the copycat Skoosherz products plainly show how striking the similarities are:

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|
|  |  |

EXHIBIT L
Page 50 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|



EXHIBIT L
Page 51 of 78



| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|

44.    Build-A-Bear is already working on creating additional infringing Skoosherz characters, including characters that copy the widely-popular fruit and vegetable Squishmallows.

45.    Even worse, Build-A-Bear not only parroted Squishmallows, but it also tricked Squishmallows' manufacturer into creating the infringing Skoosherz copycat products. Specifically, Build-A-Bear reached out to the Squishmallows manufacturer (with whom Kelly Toys has an airtight confidentiality contract "Manufacturer Contract") and asked the manufacturer

[2532761/4]                                17

EXHIBIT L
Page 52 of 78

526 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

to create a Squishmallows look-alike. A true and correct copy of Pursuant to the Manufacturer Contract is attached hereto as **Exhibit 1**.

46. Plaintiffs are informed and believe that when the manufacturer expressed concerns that the Skooserz sought to be manufactured were Squishmallows copycats, Build-A-Bear first incorrectly represented that such copycat products were permitted because the products were sold in the public domain, and then sent another correspondence directing the manufacturer and produce the violative goods.

47. There can only be one explanation for Build-A-Bear's insistence on both using the same manufacturer as Squishmallows and proceeding with its copycat product despite the manufacturer's warning: Build-A-Bear intended on misappropriating the Squishmallows Trade Dress and hoped to leverage Squishmallows' confidential information in the manufacturer's possession.

### E. Build-A-Bear's Actions Have Caused Great Consumer Confusion

48. Not only has Build-A-Bear created Skooserz to visually and tactilely mirror Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skooserz instead. By naming its products that so closely resemble Squishmallows Skooserz, Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skooserz instead.

49. Build-A-Bear has sought to market off of this confusion by portraying its Skooserz as the "most squishable," and advertising that consumers can "Squish Em," plainly seeking to create an association between the infringing Skooserz and the wildly popular Squishmallows, or "Squish:"

[2532761/4]                                    18

EXHIBIT L
Page 53 of 78

527 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





[2532761/4]                              19

EXHIBIT L
Page 54 of 78

528 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



50. Build-A-Bear's descriptions of individual Skoosherz toys similarly seek to associate with Squishmallows, noting that they are "squishable." For example, the product details for Build-A-Bear's axolotl (a copy of the unique animal that is one of Squishmallows' most popular characters) state:



| Product Details | Specifications | Gift Options | Store Availability |

Skoosherz are our most squishable, lovable and huggable friends! Our fan favorite pink axolotl gets the Skoosherz treatment with this adorable plush. The large, round plush has the axolotl's signature smiley face with fuzzy pink gills on its side. Make a splash with this ultra huggable axolotl friend!

51. Skoosherz products create a likelihood of confusion with original Squishmallows products. In fact, there is evidence of *actual* consumer confusion. For example, on a recent promotional Skoosherz Instagram post, a user asked whether Build-A-Bear was now making Squishmallows:

[2532761/4]                                20

EXHIBIT L
Page 55 of 78

529 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



52.     Other consumers have also noted how similar Skoosherz are to Squishmallows. Indeed, the official Build-A-Bear Instagram account was forced to clarify that these were indeed Skoosherz, not Squishmallows, when a commentor posted "SQUISHMALLOW!? !?" to Build-A-Bear's promotional video of Skoosherz.



53.     This post is not only conclusive evidence of consumer confusion, but it is also evidence of Squishmallows' above-described secondary meaning. When consumers saw Skoosherz characteristics, they did not refer to them as a build a bear, plush toy, or pink cow, they referred to them as "Squishmallow."

[2532761/4]                                    21

EXHIBIT L
Page 56 of 78

530 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

54.      These users were not alone.  Build-A-Bear's Instagram post announcing its new Skoosherz line is riddled with posts calling them "knockoff Squishmallows" and noting the obvious similarities between these new products and the well-known Squishmallows:





EXHIBIT L
Page 57 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





[2532761/4]                                        23

EXHIBIT L
Page 58 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 59 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 60 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 61 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



55.    Other consumers noted that Skoosherz are "like a worse Squishmallow," even noting that Skoosherz chose to copy several of the most popular Squishmallows characters.  Still

[2532761/4]                                   27

EXHIBIT L
Page 62 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

others highlight the fact that Skoosherz represent a radical departure from Build-A-Bear's traditional model of building a custom toy, referring to them as "soulless ripoff[s]":



**lairviniaa** · 10 hr. ago

I'm sorry but I really can't see the appeal 😭 like I collect both squishmallows and bab but these designs are just lazy and look like cheap squishmallow knockoffs (they literally used the most popular squishmallow animals/designs) and like I don't understand why they'd make these (besides wanting an easy cash grab) they have none of the features that make babs special and unique. they didn't even make clothes for them and they're overpriced too (and imo they're not even cute 😭) I mean if you enjoy them I'm happy for you i don't wanna ruin the fun but its just a no from me



**stabby_coffin_salt** · 2 days ago

It's like a worse Squishmallow. I'd rather just get one of those Squishem's or whatever they're called (they have one that's a plague doctor).

These knockoffs remind me of those TY squish things. Can't stand the lack of quality or thought.

The cow is kinda cute I guess?

⊖   ⇧ 177 ⇩   💬 Reply   ⬆ Share   ⋯



**saredarebear** · 4 hr. ago

I feel like if they were going to make something resembling squishmallows they could at least make it so you "build" it and make a line of clothing for it so it does not feel like such a a soulless ripoff. It's cute, but Build a Bear has something that is pretty unique and I do not understand why these were released the way they were.

⇧ 3 ⇩   💬 Reply   ⬆ Share   ⋯

56.   Even Build-A-Bear's photos and ad campaigns directly mirro Squishmallows:

<u>**Squishmallows**</u>                    <u>**Skoosherz**</u>




57.   Defendant Build-A-Bear has never had common law trade dress rights to the Squishmallows Trade Dress.

[2532761/4]                              28

EXHIBIT L
Page 63 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

58.     Build-A-Bear's actions have caused and will continue to cause significant harm to Kelly Toys.  As a result of consumer confusion, Kelly Toys has lost and will continue to lose potential customers, sales, and market share.

59.     In sum, Build-A-Bear's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys.  And, as can be seen from Build-A-Bear's plans to release additional infringing Skoosherz, unless enjoined, Build-A-Bear will continue to further escalate their infringing activities.

60.     All conditions precedent to the filing of this Action have been performed, have occurred, have been excused, and/or have been waived or otherwise satisfied.

61.     Plaintiffs have retained the undersigned counsel to prosecute this action and is obligated to pay them attorneys' fees for their services in bringing this action and costs associated with the same.

## COUNT I
## COMMON LAW TRADE DRESS INFRINGEMENT

62.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully stated herein.

63.     Kelly Toys owns the Squishmallows Trade Dress.

64.     Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                                29

EXHIBIT L
Page 64 of 78

538 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

65.     Simply stated, the Squishmallows Trade Dress has a secondary meaning that, when viewed as a whole, presents a non-functional look that is uniquely associated with Squishmallows and Kelly Toys.

66.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

67.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.  Simply stated, the design of Squsihmallows and Skoosherz are confusingly similar.

68.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows.  It is not.

69.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

70.     Defendant Build-A-Bear's continued marketing and distribution of "Skoosherz" that so closely resemble Squishmallows has and will continue to cause a likelihood of confusion, mistake, and deception in the marketplace and among customers, causing irreparable harm to Plaintiffs and in violation of Plaintiffs' common law trade dress rights.

[2532761/4]                                30

EXHIBIT L
Page 65 of 78

539 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

71.     As a result of Defendant's infringement, Plaintiffs have been damaged by the resulting confusion.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

<div align="center">

**COUNT II**
**COMMON LAW UNFAIR COMPETITION**

</div>

72.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

73.     Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress. Defendant's unauthorized use of Kelly Toys' Squishmallows Trade Dress constitutes unfair competition and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of Defendant's products and to cause purchasers to believe that Defendant's products are authentic products of Kelly Toys when in fact, they are not.

74.     Defendant has intentionally appropriated Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent of palming off Defendant's goods as those of Kelly Toys. Defendant has thus committed unfair competition under the common law of the State of Florida.

75.     By its actions in infringing Kelly Toys' Squishmallows Trade Dress, Defendant is improperly trading upon the reputation and goodwill, and impairing valuable rights in, the Squishmallows Trade Dress.

76.     Said activities of Defendant have caused irreparable harm and damage to the rights in the Squishmallows Trade Dress and to Kelly Toys' business reputation and goodwill.

77.     As a result of Defendants' conduct, Plaintiffs have suffered damages.

[2532761/4]                                    31

EXHIBIT L
Page 66 of 78

540 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

### COUNT III
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
Florida Statute § 501.021, *et seq.*

78.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

79.     This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute Section 501.201, *et seq.* ("FDUTPA").

80.     A primary purpose of FDUTPA is "[t]o protect the consuming public and ***legitimate business enterprises*** from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. (emphasis added).

81.     Plaintiffs have standing to sue under FDUTPA because they are legitimate business enterprises that were directly harmed by Defendant's unfair business practices.

82.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress. Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line. In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                                   32

EXHIBIT L
Page 67 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

83.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

84.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

85.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

86.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

87.     Even further, Build-A-Bear infringed on the Squishmallows Trade Dress when Build-A-Bear tricked Squishmallows' manufacturer into making Skoosherz.  Build-A-Bear knew or had reason to know that the Squishmallows Trade Dress was improperly obtained and copied. In fact, the Squishmallows manufacturer told Build-A-Bear that its designs too closely resembled Squishmallows. Nonetheless, Build-A-Bear used the same manufacturer in an attempt to benefit from the goodwill and brand recognition associated with Squishmallows.

[2532761/4]                                 33

EXHIBIT L
Page 68 of 78

542 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

88.     Defendant's actions as indicated herein were and are willful and constitute an unfair method of competition, an unconscionable act or practice, and/or an unfair or deceptive act or practice in violation of § 501.204, Fla. Stat.

89.     Further, Defendant's actions are likely to mislead (and have actually mislead) the consumer acting reasonably in the circumstances, to the consumer's detriment.

90.     Defendant's actions have directly caused actual damage to the Squishmallows brand and Plaintiffs individually.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant, award Plaintiffs attorneys fees and costs pursuant to § 501.2105, Fla. Stat., award injunctive relief pursuant to § 501.222(1), Fla, Stat., and award other and further relief as this Court deems just and proper.

## COUNT IV
## PRELIMINARY INJUNCTION

91.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

92.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                                         34

EXHIBIT L
Page 69 of 78

543 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

93.    At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

94.    Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

95.    Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

96.    Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead.  Importantly, there is evidence of *actual* customer confusion.

97.    Defendant's actions have caused direct damage to the Squishmallows brand and Plaintiffs individually.  Defendant's actions must be stopped.

98.    Plaintiffs have no adequate remedy at law.  If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

99.    Monetary damages alone will not correct or remedy the damages caused by Defendant.

100.    Plaintiffs have a substantial likelihood of success on the merits.

[2532761/4]                                35

EXHIBIT L
Page 70 of 78

544 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

101.    Plaintiffs have a clear legal right to the relief sought.

102.    Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

103.    If Defendant is allowed to continue to improperly use the Squishmallows Trade Dress, the injury to Plaintiffs would outweigh any alleged harm an injunction may cause Defendant.

104.    An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skoosherz" are associated with Squishmallows.  They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary injunction, requiring that Defendant:

1.    Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

2.    Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3.    Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4.    Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

[2532761/4]                                    36

EXHIBIT L
Page 71 of 78

545 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

5.  Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6.  Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7.  Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8.  Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9.  Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

[2532761/4]                                    37

EXHIBIT L
Page 72 of 78

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

11. And any further relief this Court deems just and proper.

## COUNT V
## PERMANENT INJUNCTION

105.    Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

106.    Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

107.    At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

108.    Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

109.    Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

110.    Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying

[2532761/4]                                          38

EXHIBIT L
Page 73 of 78

547 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

111.   Defendant's actions have caused direct damage to the Squishmallows brand and to Plaintiffs individually. Defendant's actions must be stopped.

112.   Plaintiffs have no adequate remedy at law. If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

113.   Monetary damages alone will not correct or remedy the damages caused by Defendant.

114.   Plaintiffs have a substantial likelihood of success on the merits.

115.   Plaintiffs have a clear legal right to the relief sought.

116.   Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

117.   An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skoosherz" are associated with Squishmallows. They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a permanent injunction, requiring that Defendant:

1. Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

[2532761/4]                                           39

EXHIBIT L
Page 74 of 78

548 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

2. Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3. Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4. Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5. Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6. Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7. Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

[2532761/4]                          40

EXHIBIT L
Page 75 of 78

549 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

8. Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9. Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

[2532761/4]                                41

EXHIBIT L
Page 76 of 78

550 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## VERIFICATION

I declare under penalty of perjury that I have read the foregoing Verified Complaint, and the facts contained herein, are true and correct to the best of my knowledge.

January 29, 2024 | 11:07 AM EST

Jazwares, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Toys Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM ES

Kelly Amusement Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM ES

Jazplus, LLC
By: Jack Elum
Its: Authorized Representative

[2532761/4]

42

EXHIBIT L
Page 77 of 78

551 of 671

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Respectfully submitted this 29th day of January, 2024, by:

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL  33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781
Email: ezebersky@zpllp.com; jshaw@zpllp.com;
zludens@zpllp.com; lpalen@zpllp.com;
mlomastro@zpllp.com

 /s/ Jordan A. Shaw
EDWARD H. ZEBERSKY, ESQ.
Fla. Bar No.: 908370
JORDAN A. SHAW, ESQ.
Fla. Bar No.: 111771
ZACHARY D. LUDENS, ESQ.
Fla. Bar No.: 111620
LAUREN N. PALEN, ESQ.
Fla. Bar No.: 1038877

[2532761/4]                              43

EXHIBIT L
Page 78 of 78

# EXHIBIT M

Case 2:24-cv-01169-MWF-MAR   Document 21-2   Filed 03/05/24   Page 554 of 671   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 21-2   Filed 10/14/19   Page 1 of 25   Page ID
#:681

1   TODD M. LANDER (BAR NO. 173031)
    todd.lander@ffslaw.com
2   MARK B. MIZRAHI (BAR NO. 179384)
    mark.mizrahi@ffslaw.com
3   FREEMAN, FREEMAN & SMILEY, LLP
    1888 Century Park East, 15th Floor
4   Los Angeles, California 90067
    Telephone:  (310) 255-6100
5   Facsimile:  (310) 255-6200

6   *Attorneys for Plaintiff Kellytoy*
    *Worldwide, Inc.*

7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11  KELLYTOY WORLDWIDE, INC., a            Case No. 19-cv-07652-MWF-MAA
    California corporation,
12                                         **PLAINTIFF KELLYTOY**
                  Plaintiff,               **WORLDWIDE, INC.'S**
13                                         **OPPOSITION TO MOTION TO**
          vs.                              **DISMISS**
14
    HUGFUN, INTERNATIONAL, INC.
15  a/k/a Hugfun Int'l Inc., a Hong Kong   Date:   November 4, 2019
    entity of unknown form, BJ'S           Time:   10:00 a.m.
16  WHOLESALE CLUB, INC., a                Place:  Courtroom 5A
    Massachusetts corporation, and DOES 1          350 W. First Street
17  through 10, inclusive,                         Los Angeles, CA  90012

18                Defendants.

19                                         Date Filed:   September 6, 2019
                                           Trial Date:   None
20

21

22

23

24

25

26

27

28

                                    1

Case 2:24-cv-01169-MWF-MAA   Document 21-2   Filed 03/05/24   Page 555 of 671   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 21-2   Filed 10/14/19   Page 2 of 25   Page ID #:121
#:682

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................. 6

II.   FACTUAL BACKGROUND ................................................................ 7

    A.   KELLYTOY DEVELOPS THE SQUISHMALLOW PLUSH
        TOYS .......................................................................................... 7

    B.   HUGFUN'S INFRINGING CONDUCT ............................................. 9

    C.   PROCEDURAL HISTORY .............................................................. 10

III.  DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED ............. 10

    A.   STANDARDS ON A MOTION TO DISMISS .................................... 10

    B.   KELLYTOY'S CLAIM FOR TRADE DRESS
        INFRINGEMENT IS SUPPORTED BY THE ALLEGATIONS
        IN THE COMPLAINT ................................................................... 11

        1.   Kellytoy's Allegations as to Non-Functionality Are
           Sufficient .......................................................................... 12

        2.   "Functionality" Is Not Properly Decided on a Motion to
           Dismiss ............................................................................. 14

        3.   Kellytoy's Trade Dress Is Not Functional ..................... 14

        4.   Kellytoy Adequately Identifies Its Trade Dress ............ 20

    C.   KELLYTOY SHOULD BE GRANTED LEAVE TO AMEND ......... 24

IV.  CONCLUSION .................................................................................. 25

EXHIBIT M
Page 2 of 58

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5 *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006) ............................................................ 13, 16

6
7 *Aurora World, Inc. v. Ty Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................................ 18, 19

8
9 *Auster Oil & Gas, Inc. v. Stream*,
    764 F.2d 381 (5th Cir. 1985) ...................................................................... 10

10
11 *Balistreri v. Pacifica Police Dep't.*,
    901 F.2d 696 (9th Cir. 1990) ...................................................................... 11

12
13 *Clicks Billiards, Inc. v. SixShooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ...............................11, 14, 15, 17, 18, 23

14 *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*,
    911 F.2d 242 (9th Cir. 1990) ...................................................................... 24

15
16 *Dean v. Cortes*,
    No. CV 2:18-02335-CAS, 2018 WL 3425016 (C.D. Cal. July 12,
17    2018) ........................................................................................................... 23

18 *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
    No. CV 15-769 PSG, 2015 WL 12731929 (C.D. Cal. May 8, 2015).
19    (Mot. 10:15-20.) .........................................................12, 14, 18, 21

20 *Dehoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) ...................................................................... 12

21
22 *Disc Golf Ass'n v. Champion Discs, Inc.*,
    158 F.3d 1002 (9th Cir. 1998) .................................................................... 15

23
24 *DO Denim, LLC v. Fried Denim, Inc.*,
    634 F. Supp. 2d 403 (S.D.N.Y. 2009) ........................................................ 12

25
26 *Five Star Gourmet Foods, Inc. v. Ready Pac Foods, Inc.*,
    CV 18-2436 ................................................................................................. 14

27

28

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
  826 F.2d 837 (9th Cir. 1987) ........................................................ 15, 17

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir. 1997) ................................................................ 10

*Glassybaby, LLC v. Provide Gifts, Inc.*,
  No. C 11-380 MJP, 2011 WL 2218583 (W.D. Wash. Jun. 6, 2011) ................. 12

*Greenberg v. Johnson*,
  2014 WL 12586252 (C.D. Cal. 2014) ................................................. 21, 22

*H.I.S.C., Inc. v. Franmar International Importers, Ltd.*,
  CV 3:16-00480-BEN-WVG, 2016 WL 7439355 (S.D. Cal. 2016) .................... 20

*Hall v. City of Santa Barbara*,
  833 F.2d 1270 (9th Cir. 1986) ............................................................... 10

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F.3d 819 (9th Cir. 1993) .................................................................... 11

*Lepton Labs, LLC v. Walker*,
  55 F. Supp. 3d 1230 (C.D. Cal. 2014) .................................................... 20

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ............................................................... 11

*Mercado Latino, Inc. v. Indio Prods.*,
  No. CV 13-01027 DDP, 2017 WL 1356315 (C.D. Cal. Apr. 11,
  2017) .......................................................................................... 17, 19, 22

*Millennium Labs. v. Ameritox, Ltd.*,
  817 F.3d 1123 (9th Cir. 2016) .................................... 11, 13, 14, 15, 16, 17, 18, 19

*Morton v. Rank Am., Inc.*,
  812 F. Supp. 1062 (C.D. Cal. 1993) ................................................... 14, 17

*One Indus., LLC v. Jim O'Neal Distrib.*,
  578 F.3d 1154 (9th Cir. 2009) ............................................................... 11

*Pareto v. FDIC*,
  139 F.3d 696 (9th Cir. 1998) ................................................................ 10

4311236.2

-4-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

557 of 671

EXHIBIT M
Page 4 of 58

*Parks Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480 (9th Cir. 1995) .................................................................. 10

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*,
  806 F.2d 1393 (9th Cir. 1986) ................................................................ 24

*Sleep Science Partners v. Lieberman*,
  CIV. No. 09–04200 CW, 2010 WL 1881770 ...................................... 22

*Spirit Clothing Co. v. N.S. Enters.*,
  No. CV 13-2203-RGK, 2013 WL 12144107 (C.D. Cal. July 23,
  2013) ............................................................................................................ 23

*Stephen W. Boney, Inc. v. Boney Servs., Inc.*,
  127 F.3d 821 (9th Cir. 1997) .................................................................. 15

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
  532 U.S. 23 (2001) ...................................................................... 13, 16

*U.S. v. Redwood City*,
  640 F.2d 963 (9th Cir. 1981) .................................................................. 10

*Wal-Mart Stores, Inc., v. Samra Brothers, Inc.*,
  529 U.S. at 216 ........................................................................................... 23

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
  419 F.3d 925 (9th Cir. 2005) .................................................................. 22

*Yurman Design v. PAJ, Inc.*,
  262 F.3d 101 (2nd. Cir. 2001) ................................................................ 23

**Other Authorities**

Federal Rule of Civil Procedure 8(a)(2) .................................................... 10

Federal Rule of Civil Procedure Rule 12(b)(6) ...................................... 10

Federal Rule of Civil Procedure 15(a)(2) .................................................. 24

4311236.2

-5-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

558 of 671

EXHIBIT M
Page 5 of 58

# I.

## INTRODUCTION

Defendant Hugfun International, Inc. ("Hugfun" or "Defendant") moves to dismiss the complaint filed by Plaintiff Kellytoy Worldwide, Inc. ("Kellytoy") on the grounds that Kellytoy's trade dress and related claims fail to state a cause of action.  But the Motion must be denied because it relies principally on unsupported factual assertions that have no place in a motion to dismiss, and expansive legal assertions that are almost uniformly overreaching. Beyond that, Defendant repeatedly mischaracterizes Kellytoy's Squishmallow Trade Dress by improperly analyzing each of its individual elements in isolation, rather than assessing the totality of its elements as the law requires.  The myriad fatal defects demand only one result – the  Motion fails and must be denied.

This conclusion is more clear when these shortcomings are addressed more specifically.  First, Defendant argues that the trade dress alleged in Kellytoy's Complaint is comprised solely of functional elements common to plush toys.  That issue, however, is one that courts have repeatedly held is a question of fact not appropriate for resolution on a motion to dismiss.  Defendants tacitly acknowledging that fact, but nonetheless attempt to circumvent this legal proscription by characterizing its unsupported opinions as indisputable facts.  It then proceeds to compound the problem by similarly misapplying the law governing the question of functionality, which requires that the Court view the trade dress as a whole – i.e., the visual representations viewed in conjunction with all of the various verbal descriptions – not as a catalogue of discrete elements.  But when the appropriate legal standard is applied and the Squishmallow Trade Dress is viewed "as a whole," it cannot reasonably be characterized as functional.

Second, Defendant argues that Kellytoy fails to plead the precise elements of its trade dress and then attempts to *prove* that Kellytoy cannot do so.  This argument ignores the fact that Kellytoy's description explains in great detail the elements of

-6-

Case 2:24-cv-01169-WLS-MAR Document 21-2 Filed 03/05/24 Page 560 of 671 Page ID
Case 2:19-cv-07652-MWF-MAA Document 35-2 Filed 10/14/19 Page 7 of 25 Page ID #:126
#:687

1  the Squishmallow Trade Dress, both verbally and graphically – detail that

2  sufficiently articulates the design elements that compose the trade dress. And

3  contrary to Defendant's suggestion, the cases cited by Defendant do not indicate

4  otherwise. Whether a product of genuine intellectual befuddlement or deliberate

5  distraction, Defendant is confusing a lack of adequate description with the breadth

6  of description. That confusion is critical here, because the latter issue is one better

7  considered a question of genericness rather than specificity, something that likewise

8  is a question of fact that cannot be addressed or resolved on a motion to dismiss.

9      Accordingly, and based on the arguments set forth in greater detail below,

10 Defendant's motion to dismiss should be denied in its entirety.

11                              **II.**

12                    **FACTUAL BACKGROUND**

13 A.   <u>KELLYTOY DEVELOPS THE SQUISHMALLOW PLUSH TOYS</u>

14      Kellytoy creates, manufactures, distributes and sells unique plush toys.

15 (Complaint ¶ 17.) In 2016, Kellytoy conceived and began creating its

16 Squishmallows line of plush toy designs, ultimately marketed in connection with the

17 SQUISHMALLOW trademark (collectively, "Squishmallows"). (*Id.* ¶ 20.) From

18 2016 to the present, Kellytoy expended large sums of money to develop, advertise,

19 and promote these product designs throughout the United States. (*Id.* ¶ 21.)

20 Kellytoy spends in excess of $1,000,000 annually in direct to consumer and

21 business-to-business advertising in connection with its Squishmallows. (*Id.*)

22      Kellytoy sells a wide range of Squishmallows that feature the brand's iconic

23 trade dress. (Complaint ¶ 22.) This trade dress includes, without limitation:

24           (1) substantially egg/bell shaped plush toys

25           depicting various similarly shaped fanciful renditions of

26           animals/characters; (2) simplified Asian style Kawaii faces

27           with repeating and complementary rounded/oval shaped

28           graphics depicting features on the characters themselves

4311236.2                           -7-

1    (such as eyes, snouts and bellies) and which conform to
2    and support the overall egg/bell shape of the toys; (3)
3    embroidered facial features, such as eyes, nostrils, and/or
4    mouths; (4) distinctive contrasting and non-monochrome
5    coloring; and (5) short-pile velvety velour-like textured
6    exterior with a light and silky memory foam-like stuffing
7    providing an extremely soft and squeezable marshmallow
8    feel.  These features, and the resulting overall look and
9    feel of the toys bearing them, are more fully depicted,
10   without limitation, in **Exhibit 1** hereto – features common
11   to Kellytoy's line of Squishmallows (collectively together
12   with **Exhibit 1** the "Squishmallow Trade Dress").

13  (*Id.*)

14       Beginning in 2016, Kellytoy expended a great deal of time, effort, and money
15  in the promotion of its Squishmallows.  Due to Kellytoy's unique design, extensive
16  marketing efforts, media coverage, and market penetration, the Squishmallow Trade
17  Dress acquired distinctiveness in the marketplace when applied to plush toys.
18  (Complaint ¶ 23.)   The relevant consuming public has come to recognize and
19  associate plush toys bearing the Squishmallow Trade Dress as high quality goods
20  connected with or offered by a single source, Kellytoy.  (*Id.*)  The Squishmallow
21  Trade Dress has valuable goodwill and consumer recognition associated with it and
22  has come to symbolize the valuable goodwill and reputation of Kellytoy.  (*Id.*)

23       Squishmallows have been featured in numerous magazines, press articles,
24  reviews, and videos; have appeared in multiple holiday and other gift guides; have
25  been the subject of numerous industry awards and product recommendation lists;
26  and have tens of thousands of social media followers.  (Complaint ¶¶ 27-38.)  In
27  addition, hundreds of well-known YouTube influencers and vloggers have shared
28  and posted images and videos of themselves holding Squishmallow products, and

4311236.2                                    -8-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

561 of 671

EXHIBIT M
Page 8 of 58

Case 2:24-cv-01169-MWF-MAR   Document 21-2   Filed 03/05/24   Page 562 of 671   Page ID
#:689
Case 2:19-cv-07652-MWF-MAR   Document 21-2   Filed 10/14/19   Page 9 of 25   Page ID #:128

1   tens of thousands of consumers have done the same through numerous media

2   platforms, including, Facebook, Instagram, Pinterest and YouTube. (*Id.* ¶¶ 39-40.)

3        Squishmallows are listed among the leading global brands and toys such as

4   Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry

5   publications. (Complaint ¶ 41.) They are sold through hundreds of retailers

6   including Costco, Walmart, Walgreens, Kroger, Target, and Party City, among

7   others. (*Id.* ¶ 42.) Since the summer of 2017, alone, Kellytoy has sold

8   approximately 40 million (40,000,000) million Squishmallows with no indication

9   that sales will slow down anytime soon. (*Id.* ¶ 43.)

10       In fact, Kellytoy's Squishmallows branded toys have become so popular

11  among, sought after by, and recognizable as a brand by the public that some

12  members of the public have been selling unauthorized non-toy merchandise, such as

13  T-shirts and jewelry, bearing the images of some of Kellytoy's most popular

14  Squishmallows branded toys – a distinction typically reserved for famous brands

15  such as Disney and Looney Tunes. (Complaint ¶ 44.) In fact, because of the

16  immense popularity – no, ubiquity – of Kellytoy's Squishmallows line of plush toys,

17  Kellytoy has recently embarked on a global licensing initiative to license these

18  designs to include diverse categories of merchandise, including apparel, sleepwear,

19  accessories, headwear, home decor, health and beauty, back to school, stationery

20  and paper goods, games and puzzles, novelty, publishing and magazines, food and

21  beverage, and mobile gaming. (Complaint ¶ 45.)

22  B.   HUGFUN'S INFRINGING CONDUCT

23       Sometime in 2019, and notably well after Kellytoy established its reputation

24  in its Squishmallow Trade Dress, Hugfun entered into an agreement with defendant

25  BJ's Wholesale Club, Inc. to have Hugfun supply BJ's with plush toys copying the

26  Squishmallow Trade Dress (the "Infringing Plush"). (Complaint ¶ 48.) Hugfun was

27  able to sell the Infringing Plush to BJ's at lower prices than those charged by

28  Kellytoy for the Squishmallows because, rather than investing in the creation and

4311236.2                          -9-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
562 of 671

EXHIBIT M
Page 9 of 58

Case 2:24-cv-04129-WLS-MAR   Document 21-2   Filed 03/05/24   Page 563 of 671   Page ID
#:690
Case 2:19-cv-07054-MWF-MAR   Document 19-2   Filed 10/34/19   Page 10 of 29   Page ID #:129

1   development of its own designs and brand identity, Hugfun simply copied the

2   Squishmallow Trade Dress and produced a lower-quality (and thus cheaper)

3   product.  (*Id.* ¶ 50.)

4   C.      PROCEDURAL HISTORY

5         Kellytoy filed its complaint against Hugfun and BJ's on September 6, 2019.

6   (Docket No. 1.)   Kellytoy alleges claims against Defendants for statutory and

7   common law trademark infringement, and statutory and common law unfair

8   competition.  (Complaint ¶¶ 57-80.)  Defendant Hugfun filed the motion to dismiss

9   opposed herein and defendant BJ's has failed to timely respond, resulting in the

10   Clerk of the Court entered default against it.  (Docket Entry No. 17.)

11                                       **III.**

12              **DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED**

13   A.      STANDARDS ON A MOTION TO DISMISS

14         The Federal Rules of Civil Procedure require that a complaint set forth "a

15   short and plain statement of the claim showing that the pleader is entitled to relief."

16   Fed. R. Civ. P. 8(a)(2).   This rule "contains 'a powerful presumption against

17   rejecting pleadings for failure to state a claim.'"  *Gilligan v. Jamco Dev. Corp.*, 108

18   F.3d 246, 249 (9th Cir. 1997) (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d

19   381, 386 (5th Cir. 1985)).  It is "axiomatic" that motions to dismiss are viewed with

20   disfavor and rarely granted.  *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274

21   (9th Cir. 1986).  Indeed, dismissal is proper only in "extraordinary" circumstances.

22   *U.S. v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

23         In keeping with this policy, a court considering a motion to dismiss must view

24   the complaint in the light most favorable to the plaintiff.  *Parks Sch. of Bus., Inc. v.*

25   *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  The court must liberally construe

26   the complaint, accepting all material allegations as true and providing plaintiff with

27   all reasonable inferences to be drawn from those allegations.  *Pareto v. FDIC*, 139

28   F.3d 696, 699 (9th Cir. 1998).   Thus, a dismissal pursuant to Rule 12(b)(6) is

4311236.2

-10-

1  "appropriate only where the complaint lacks a cognizable legal theory or sufficient

2  facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med.*

3  *Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citing *Balistreri v. Pacifica Police Dep't.*,

4  901 F.2d 696, 699 (9th Cir. 1990)).

5

6  B.  KELLYTOY'S CLAIM FOR TRADE DRESS INFRINGEMENT IS

7      SUPPORTED BY THE ALLEGATIONS IN THE COMPLAINT

8      Trade dress refers to the "total image, design, and appearance of a product,"

9  including features such as its size, shape, color, color combinations, texture and

10  graphics. *Clicks Billiards, Inc. v. SixShooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.

11  2001) (citing *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.

12  1993)).  In order to state a claim for trade dress infringement, the plaintiff must

13  plead that (1) its trade dress is nonfunctional; (2) its trade dress serves a source-

14  identifying role either because it is inherently distinctive or has acquired secondary

15  meaning; and (3) the defendant's product creates a likelihood of consumer

16  confusion. *Millennium Labs. v. Ameritox, Ltd.*, 817 F.3d 1123, 1126 n.1 (9th Cir.

17  2016) (citing *Clicks Billiards, Inc.*, 251 F.3d at 1258; *One Indus., LLC v. Jim*

18  *O'Neal Distrib.*, 578 F.3d 1154, 1166 (9th Cir. 2009) (citation omitted).

19      Kellytoy alleges each of the elements above.  In particular, Kellytoy alleges

20  that (1) its trade dress is nonfunctional (Complaint ¶¶ 22, 58, Ex. 1); (2) its trade

21  dress serves a source-identifying role because it is both inherently distinctive and

22  has acquired secondary meaning (*Id*. ¶¶ 21-46); and (3) the Defendants' products at

23  issue create a likelihood of consumer confusion (*Id*. ¶ 48-52).

24      Nonetheless, Defendant argues that Kellytoy is required to plead *how* its trade

25  dress is non-functional and that, regardless, Kellytoy's trade dress is demonstrably

26  functional as a matter of law.  Defendant further argues that Kellytoy's trade dress is

27  insufficiently pled.  Defendant's arguments are meritless.

28

-11-

1   **1.    Kellytoy's Allegations as to Non-Functionality Are Sufficient**

2   The United States Supreme Court made it clear in *Ashcroft v. Iqbal* that in

3   order to survive a motion to dismiss, "a complaint must contain sufficient factual

4   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

5   *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   Ignoring the

6   Supreme Court's clear direction, Hugfun argues that Kellytoy must explain *how* its

7   trade dress is non-functional in its complaint, rather than simply including sufficient

8   factual matter which, if accepted as true, would render Kellytoy's trade dress claim

9   plausible on its face.   (Mot. 10:14-14:23.)   There are multiple problems with this

10  approach.

11  First, Defendant's argument is inexplicably premised solely on the

12  unpublished Central District decision in *Deckers Outdoor Corp. v. Fortune*

13  *Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3-4 (C.D. Cal.

14  May 8, 2015).   (Mot. 10:15-20.)   The requirement supposedly imposed by *Deckers*

15  *Outdoor Corp.* is not remotely settled law.   The opinion itself relies solely on the

16  unpublished decisions of other out-of-state district courts.   *Deckers Outdoor Corp.*,

17  2015 WL 12731929, at *3-4 (citing *Glassybaby, LLC v. Provide Gifts, Inc.*, No. C

18  11-380 MJP, 2011 WL 2218583 (W.D. Wash. Jun. 6, 2011); *DO Denim, LLC v.*

19  *Fried Denim, Inc.*, 634 F. Supp. 2d 403, 407-408 (S.D.N.Y. 2009).)

20  In addition, the "rule" announced in *Deckers Outdoor Corp.* has never been

21  adopted by the Ninth Circuit or the United States Supreme Court which, again,

22  require only that factual allegations support a claim that is plausible on its face.   *See,*

23  *e.g., Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018)

24  (*Iqbal* and *Twombly* are the standard); *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S.

25  at 570.   Setting aside the impracticality of requiring a plaintiff to plead "how a trade

26  dress is non-functional"– essentially to prove a negative – at the pleading stage, it is

27  evident from the afore-cited case law that, the holding in *Deckers Outdoor Corp.* is

28

4311236.2

-12-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

EXHIBIT M
Page 12 of 58

565 of 671

Case 2:34-cv-01129-WS-MAR   Document 21-2   Filed 03/05/24   Page 566 of 671   Page ID
Case 2:13-cv-07032-MWF-MAR   Document 19-2   Filed 10/14/19   Page 13 of 29   Page ID #:132
#:693

1  simply an unjustified overstatement as to the pleading requirements imposed by

2  *Iqbal/Twombly.*

3      Third, Kellytoy *does* allege the facts necessary to state a claim for relief for

4  trade dress infringement that is plausible on its face (at the very least), including

5  whether the trade dress at issue is non-functional.  (Complaint ¶ 22, 58-64, Ex. 1.)

6  The assessment of trade dress functionality is, in that regard,  a two-step analysis

7  explained thoroughly below but which generally requires that a court determine

8  whether the trade dress is essential to the use or purpose of the article or affects its

9  cost or quality and, if not, whether protection of the trade dress as a trademark

10  would  impose  a  "significant  non-reputation-related  competitive  disadvantage."

11  *Millennium Labs. v. Ameritox, Ltd.*, 817 F.3d 1123, 1128-29 (citing *Au-Tomotive*

12  *Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006)).

13      In this case, the Squishmallow Trade Dress thoroughly described in paragraph

14  22 and depicted in Exhibit 1 to the Complaint is not *essential* to the use or purpose

15  of a plush toy in general, nor affects its cost or quality -- at least not in the sense

16  intended by the relevant authority, given that this test is most often applied in cases

17  involving "utilitarian, physical devices."   *Millennium Labs.*, 817 F.3d at 1128-29

18  (report  graphically  charting  whether  patients  are  taking  the  pain  medications  as

19  prescribed and to assess whether the patients are taking any non-prescribed drugs);

20  *see also TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 25-26

21  (2001) (trade dress claimed for temporary road signs with spring mechanisms).  It is

22  equally true that the protection afforded to the Squishmallow Trade Dress would not

23  impose a significant non-reputation-related competitive disadvantage on other toy

24  makers, since there are obviously an infinite number of forms, features, and textures

25  in which to design a plush toy – the vast majority of which do not infringe upon

26

27

28

4311236.2

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

EXHIBIT M
Page 13 of 58

1  Kellytoy's alleged Squishmallow Trade Dress.[1]  Kellytoy's allegations in this regard

2  are sufficient.

3  **2.  "Functionality" Is Not Properly Decided on a Motion to Dismiss**

4  At the outset, the issue of "functionality" of trade dress is not appropriately

5  determined at the pleading stage.  Indeed, the Ninth Circuit has also made it clear

6  that the question as to whether trade dress is functional is "an *intensely* factual

7  issue."  *Millennium Labs.*, 817 F.3d at 1129 (emphasis added); *see also Clicks*

8  *Billiards, Inc.*, 251 F.3d at 1258 (functionality is question fact).  Indeed, even the

9  district court in *Deckers Outdoor Corp.* held that it was "a question of fact, not of

10  law, that is generally not suitable to disposition on a motion to dismiss."  *Deckers*

11  *Outdoor Corp.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *5; *accord*

12  *Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1069 (C.D. Cal. 1993) (holding that

13  question of functionality is a question of fact and cannot be decided as a matter of

14  law at the motion to dismiss stage); *accord Five Star Gourmet Foods, Inc. v. Ready*

15  *Pac Foods, Inc.*, CV 18-2436 DDP (KKx), 2019 WL 1260634 (C.D. Cal. 2019).

16  Therefore, based on this fact alone, the Court should deny Defendant's motion to

17  dismiss premised on the issue of "functionality."

18  **3.  Kellytoy's Trade Dress Is Not Functional**

19  In addition to improperly raising the issue of functionality on a motion to

20  dismiss, Defendant's analysis utterly misapplies the functionality analysis, by

21  ignoring the fact that it is *the design as a whole* of an article that must be non-

22  functional for it to serve as a trademark – Defendant instead improperly

23  disaggregates the features of Kellytoy's claimed trade dress for the analysis,

24  divorcing each such feature from the overall visual impression of the products at

25  issue.  (Mot. § 3.B.1-5, 12:1-14:5.)  Again, the Ninth Circuit has expressly rejected

26  this piecemeal approach to trade dress analysis.  *Clicks Billiards, Inc.*, 251 F.3d at

27  ────────────────
[1] For example, traditional teddy bears – arguably one of the most ubiquitous plush toys –

28  do not fit within the Squishmallow Trade Dress.

4311236.2

Case 2:24-cv-01169-WLS-MAR Document 21-2 Filed 03/05/24 Page 568 of 671 Page ID
Case 2:13-cv-07032-MWF-MAR Document 13-2 Filed 10/24/14 Page 15 of 29 Page ID
#:695

1261; *see also Fuddruckers, Inc.*, 826 F.2d at 843, n. 7 ("We examine trade dress as

a whole to determine its functionality, [citation omitted]; functional elements that

are separately unprotectable can be protected together as part of a trade dress.").

Indeed, the Ninth Circuit has explained that "'[t]rade dress is the *totality* of

elements in which a product or service is packaged or presented.'" *Stephen W.

Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th Cir. 1997) (emphasis

added) (quoting 1 McCarthy on Trademarks and Unfair Competition § 8:1 (4th ed.

1996)). This includes, as set forth above, features such as the product's size, shape,

color, color combinations, texture or graphics. *Clicks Billiards, Inc.*, 251 F.3d at

1257.

Notwithstanding that, and contrary to Defendant's suggestion that each

element of the trade dress at issue must be evaluated and analyzed separately and in

isolation from each other, courts are required to focus on the overall visual

impression of a product, rather than its individual elements, in evaluating whether

the trade dress at issue is functional. *Clicks Billiards, Inc.*, 251 F.3d at 1259. This

is because elements which might otherwise be considered functional may be

protected together as a product's trade dress. *Fuddruckers, Inc. v. Doc's B.R.

Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987).

The Ninth Circuit applies a two-step test in order to determine whether a

particular trade dress is functional. First, the court must determine: (1) whether the

design yields a utilitarian advantage; (2) whether alternative designs are available;

(3) whether advertising touts the utilitarian advantages of the design; and (4)

whether the particular design results from a comparatively simple or inexpensive

method of manufacture. *Millennium Labs.*, 817 F.3d at 1128-30. Again, "'[n]o one

factor is dispositive; all should be weighed collectively.'" *Id.* at 1130 (citing *Disc

Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).

If the court determines that the trade dress at issue is not functional, it

proceeds to the second step in order to determine "'whether the protection of the

-15-

1    feature as a trademark would impose a significant non-reputation-related

2    competitive disadvantage.'" *Id.* at 1128 (quoting *TrafFix Devices, Inc.*, 532 U.S. at

3    33). This analysis only applies, however, to "'product features that serve an

4    aesthetic function wholly independent of any source identifying function.'" *Id.* at

5    1130 (quoting *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062,

6    1073 (9th Cir. 2006). If the feature serves *any* source identifying function, the

7    determination as to whether protecting it would impose a significant non-reputation-

8    related competitive disadvantage is a question of fact.[2] *Id.* at 1131 (evidence that

9    graphical format served, in part, a source-identifying function was sufficient to

10   allow jury to assess question of aesthetic functionality).

11       This two-step analysis is best exemplified in *Millennium Laboratories*, itself –

12   predictably, a case wholly ignored by Defendant. The trade dress at issue was

13   Millennium's design of a report (the "R.A.D.A.R.® Report") associated with a test

14   for healthcare providers to use with chronic pain patients who have been prescribed

15   pain medications. *Id.* at 1125. Millennium described its trade dress as including,

16   among other things, a "graphical form" with a side-by-side presentation of a bell

17   curve on the left, a historical plot graph on the right, and a combination of bold and

18   dashed lines on the bell curve graph and a combination of numbers and letters on the

19   plot graph on the right. *Id.* at 1129.

20       The court held that genuine issues of material fact precluded summary

21   judgment as to whether the claimed trade dress had any utilitarian advantage since a

22   jury could conclude that elements of the design were purely aesthetic in nature, that

23   there were many alternatives to the design of the R.A.D.A.R.® Report, that

24   Millennium's advertising did not focus on the utility of the layout of its report, and

25

26   _____

        [2] Defendant makes no reference to this test or the limitations on the doctrine

27   of aesthetic functionality in their moving papers. Instead, Defendant wrongly
     suggests that aesthetic features of products are *inherently* functional and thus

28   ineligible for trade dress protection. (Mot. 10:21-11:1-16; 12:1-14:23.)

EXHIBIT M
Page 16 of 58

Case 2:34-cv-04529-WS-MAR   Document 21-2   Filed 03/05/24   Page 570 of 671   Page ID
#:697
Case 2:13-cv-07032-MWF-MAR   Document 19-1   Filed 10/24/19   Page 17 of 29   Page ID #:136

that the design actually increased the cost of the product. *Id.* at 1130. The court held that, since the design of the test results was "at least in part, crafted to distinguish the R.A.D.A.R.® Report from its competitors, and not simply to attract consumers," the question of "aesthetic functionality" was best left to the jury. *Id.* at 1131.

The Squishmallow Trade Dress (as a whole) does not offer a utilitarian advantage under step one of the *Millennium Laboratories* analysis since, as in *Millennium*, a jury could conclude that many (if not all) elements of the design are purely aesthetic in nature. (Complaint ¶ 22.) This is particularly obvious when the specific features analyzed separately in Defendant's motion are viewed in the aggregate, as required. The shape, appearance, texture, and feel of the product are all aesthetic features as to which there are innumerable alternatives and which, indeed, were specifically designed to distinguish the Squishmallows from other toys. (*Id.* ¶¶ 20-21.) Such a finding is all the more appropriate where, as here, the matters being considered at the motion to dismiss stage, rather than on summary judgment.

The determination under step two of the test, viz., whether the protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage, presents a question of fact as much as the rest of the functionality analysis.[3] *Mercado Latino, Inc. v. Indio Prods.*, No. CV 13-01027 DDP (RNBx), 2017 WL 1356315, at *3 (C.D. Cal. Apr. 11, 2017) (citing *Fuddruckers, Inc.*, 826 F.2d at 842-43). Kellytoy would have no difficulty amending the Complaint to supplement its allegations as they relate to either step in the analysis but this remains a factual issue that is not appropriate for resolution on a motion to dismiss. *Id.*; *Clicks Billiards, Inc.*, 251 F.3d at 1258; *Morton v. Rank Am., Inc.*, 812 F. Supp. at 1069.

---

[3] Kellytoy will have no trouble introducing evidence at summary judgment or trial as to the myriad alternative designs for plush toys in the marketplace which embody one or more elements of the Squishmallow Trade Dress without infringing on the trade dress as a whole, in contrast to Hugfun's accused infringing goods.

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

Indeed, even putting aside the numerous flaws discussed above, Defendant's motion depends upon a series of unsubstantiated *factual* assertions concerning (i) the "essentiality" and purpose of the Squishmallow egg/bell shape; (ii) the "essential selling features of the toys"; (iii) the impact on competition of protecting the anime-inspired facial features of the Squishmallow; (iv) the necessity of the Squishmallow textured exterior; (v) the essential qualities of stuffed toys, generally[4]; (vi) the precise stuffing in the Squishmallow, in particular; and (vi) the design of "[a]ll plush toys that fall into the category of anime-inspired plush toys, Kawaii, or cute." (Mot. 12:1-14:23.) The unstated premise of Defendant's argument appears to be that these assertions are all so obvious that they do not require proof and are, thus, appropriate for determination on a motion to dismiss. Defendant's position is flatly contradicted, however, by the holdings in *Millennium Laboratories*, *Clicks Billiards*, and even *Deckers Outdoor*. *Millennium Labs.*, 817 F.3d at 1130-31; *Clicks Billiards, Inc.*, 251 F.3d at 1258; *Deckers Outdoor Corp.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at fn. 2 ("Accordingly, Defendants' factual arguments for dismissal based on the functional and generic nature of the Bailey Button Boot Trade Dress, see Mot. 10:4-16:10, are not appropriate for this stage of the proceedings."). Likewise, Defendant ignores the fact that Kellytoy need only present a plausible set of facts to state a claim for trade dress infringement rather than address each of Defendant's unsubstantiated factual assertions. *Ashcroft*, 556 U.S. at 678. As stated *supra*, Kellytoy as presented a plausible set of facts to support its obligation of non-functionality.

Defendant's reliance on the Central District's decision in *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115 (C.D. Cal. 2009) is equally misplaced. Defendant

---

[4] Although Kellytoy could rebut the "essential" nature of each of the elements of the Squishmallow Trade Dress, these are factual issues not appropriate for determination here on a motion to dismiss. Regardless, by way of example, contrary to Defendant's bald assertion that "'light and silky' memory foam-like stuffing is likewise an essential property of any stuffed toy" (Mot. 14:1-4), numerous varieties of stuffings are used, beans, polyesters, cottons, hard foam, etc.

4311236.2

-18-

cites the decision for the dual propositions that (a) the aesthetic features of plush toys are functional because they are essential selling features of the toys; and (b) facial features on such toys are functional since they make the toys look like animals. (Mot. 11:1-16; 13:6-19.) *Aurora World* was decided, however, seven (7) years before the Ninth Circuit in *Millennium Laboratories* made it clear that the notion of aesthetic functionality was to be tested *solely* by reference to the question as to whether the protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. *Millennium Labs.*, 817 F.3d at 1128, 1130.

Moreover, the holding in *Millennium Laboratories* would, by its very nature, preclude the application of a *per se* rule as to whether a given aesthetic feature is necessarily functional in all cases, since the determination posed by the second step in the analysis (indeed, the entire analysis) is a question of fact. *Mercado Latino, Inc.*, No. CV 13-01027 DDP (RNBx), 2017 WL 1356315, at *3; *Millennium Labs.*, 817 F.3d at 1129. The decision in *Aurora World* itself concerned a motion for preliminary injunction, the analysis of which required the district court to consider *proof* of Aurora's claims. *Aurora World, Inc.*, 719 F. Supp. 2d at 1124-1125. The record included numerous declarations in support of, and in opposition to, the motion, including testimony and documentary evidence regarding the appearance, development, marketing, and sale of the products at issue, among other things. *Id.* nn.5, 8-9, 11, 13, 15-26, 32-33, 37, 39-40, 46, 49-50, 53, 55, 61, 65-66, 84, 86, 89, 92-96, 106, 114, 115.

The conclusions reached by the court on such a record cannot properly be applied at the pleading stage of *this* action, where Kellytoy expressly alleges that "the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or

4311236.2

-19-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

EXHIBIT M
Page 19 of 58

572 of 671

1   offered by a single source, Kellytoy." (Complaint ¶¶ 23, 46, 58.)  Those are

2   assertions of fact which simply cannot be discounted at the pleading stage of this

3   matter.

4         **4.**     **Kellytoy Adequately Identifies Its Trade Dress**

5        In order to survive a motion to dismiss with respect to the description of its

6   trade dress, a plaintiff need only allege "a complete recitation of the concrete

7   elements of its alleged trade dress."  *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d

8   1230, 1240 (C.D. Cal. 2014).  The defendant's belief that this recitation does not

9   make out a claim for protectable trade dress is not a grounds for dismissal at the

10  pleading state of an action.  *Id.* ("A court must test the legal merits of a plaintiff's

11  alleged trade dress at summary judgment or trial when the parties provide with all

12  relevant, admissible evidence—not at the pleading stage when the court has little

13  more than the plaintiff's allegations and the defendant's summary denial of them.").

14       In this case, the Complaint both depicts and recites the elements of Kellytoy's

15  trade dress and, like the plaintiff in *Lepton Labs*, alleges that the depiction of the

16  trade dress in its totality makes up the "Squishmallow Trade Dress."  (Complaint ¶

17  22, Ex. 1); *Lepton Labs*, 55 F. Supp. 3d at 1241.  The court in *Lepton Labs* found

18  this sufficient, while opining that the Coca-Cola Company could meet this standard

19  by alleging the trade dress of its famous bottle as "a contoured glass or plastic bottle

20  having a plurality of vertical striations extending from the top to the bottom of the

21  bottle and being interrupted by a smooth, horizontal band nearly half way down the

22  bottle."  *Id.* at 1240.  *See also, H.I.S.C., Inc. v. Franmar International Importers,*

23  *Ltd.*, CV 3:16-00480-BEN-WVG, 2016 WL 7439355 (S.D. Cal. 2016)("The

24  combination of Franmar's written description of its claimed trade dress and the

25  images provided is a sufficient 'short and plain statement of the claim' to indicate to

26  Plaintiffs what Franmar alleges is its protectable trade dress [citations omitted].")

27

28

4311236.2

-20-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

573 of 671

EXHIBIT M
Page 20 of 58

1    For this reason, the rhetorical questions posed in Defendant's motion ("What
2  constitutes a 'complementary' shaped graphics for 'eyes, snouts, and bellies'?[5]
3  What about the contrasting coloring is 'distinctive'?  How do the 'simplified Asian
4  style Kawaii faces' 'conform to and support the overall egg/bell-shaped toys'"?) are
5  all answered by reference to the images of the products at issue.[6]  (*Compare* Mot.
6  pp. 8-9 *with* Complaint Ex. 1.)   Defendant's reliance on this Court's opinion in
7  *Greenberg v. Johnson*, 2014 WL 12586252 (C.D. Cal.  2014), does not help its
8  cause, as in that case the plaintiff acting pro se utterly failed to describe or identify
9  the alleged trade dress – not the case here.  Equally misguided, Defendant attempts
10  to show that each element on its own is too broad to constitute protectable trade
11  dress, rather than looking at the combination of all of the elements, as it is required
12  to do under applicable case law.  This alone proves fatal to at Defendant's motion.

13    Regardless, Defendant's argument regarding Kellytoy's description of the
14  claimed trade dress appears to be less a question of articulation, however, than of
15  overbreadth.  For example, on the one hand, Defendant claims to be "at a loss to
16  know what constitutes a 'simplified Asian style Kawaii face'" (Mot. 8:24-25)[7], but
17  then goes on to acknowledge that "Kellytoy appears to be describing an entire genre
18  of products that have flooded the toy market and broader culture."  (Mot. 9:4-6.)
19  Putting aside Defendant's misleading approach of discussing the protectability of

---

20    [5] The relevant portion of Kellytoy's description reads, however, "and
21  complementary rounded/oval shaped graphics depicting features on the characters
22  themselves (such as eyes, snouts and bellies) and which conform to and support the
     overall egg/bell-shaped of the toys."  (*See*, Complaint, at ¶ 22.)

23    [6] Once again, Defendant's own authority supports this conclusion.  The court
24  in *Deckers Outdoor Corp.* held that pictures of a product combined with a list of the
     elements of the trade dress were sufficient to put defendants on notice as to the
25  claimed trade dress.  *Id.* at *3-4.

26    [7] A simple Google search for "Kawaii faces" turns out numerous standard examples
27  thereof under the images tab of the results page.  Anybody in the toy and design fields knows
     exactly what is meant by the term.  This will be subject to proof as the case progresses –
28  something not appropriate for consideration at the pleading stage.

4311236.2
-21-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
574 of 671

EXHIBIT M
Page 21 of 58

Case 2:24-cv-01169-WLS-MAR   Document 24-2   Filed 03/05/24   Page 575 of 671   Page ID
Case 2:23-cv-07032-MWF-MAR   Document 19-2   Filed 10/24/19   Page 22 of 29   Page ID #:741
#:702

1   each individual element of the Squishmallow Trade Dress, in isolation – it well

2   knows that trade dress must be viewed in its entirety, with all of the elements read

3   conjunctively – Defendant goes on to argue that "Kellytoy's claim to have the

4   exclusive right to manufacture *Kawaii*-style animal plush toys is impermissibly

5   vague and overbroad…" (Mot. 9:6-7.)   Similarly, Defendant states "Kellytoy is

6   attempting to use a vague and overly broad definition of a purported trade dress to

7   try and keep Hugfun and other competitors out of the market for plush toys." (Mot.

8   10:3-4.)[8]   As this argument suggests, problems of overbreadth are better considered

9   as questions of genericness rather than specificity. *Mercado Latino, Inc.*, No. CV

10  13-01027 DDP (RNBx), 2017 WL 1356315, at *2.   Questions of genericness,

11  however, are questions of fact.   *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk*

12  *Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005).

13      Similarly, Defendant's claim that "the entire Squishmallow does not have a

14  consistent appearance" is belied by the fact that they all contain all of the numerous

15  elements described at paragraph 22 of the Complaint.

16      Moreover, the case law cited by Defendant supports, rather than undermines,

17  Kellytoy's contention that the description of the Squishmallow Trade Dress set forth

18  in the complaint adequately defines the design elements that compose the asserted

19  trade dress.   In *Greenberg v. Johnston*, CV 14-04606-MWF-VBKx, 2014 WL

20  12586252, cited by Defendant, in contrast to Kellytoy, the pro se plaintiff utterly

21  failed to provide *any* guidance, let alone description, as to the nature of the claimed

22  trade dress.   *Greenberg v. Johnston*, CV 14-04606-MWF-VBKx, 2014 WL

23  12586252, *3 ("The FAC does not describe trade dress, nor does it identify which of

24  these accused actions Defendant Richard Johnson undertook.").   *See also*, *Sleep*

25  *Science Partners v.  Lieberman*, CIV. No. 09–04200 CW, 2010 WL 1881770, *3

26  _____

27      [8] Aside from being overstated, it is also false, as most plush toys do not contain all of the
    various features described in the Squishmallow Trade Dress.  For example, teddy bears – arguably

28  one of the most ubiquitous plush toys – do not fit within the Squishmallow Trade Dress.

Case 2:34-cv-04129-WLS-MAR   Document 21-2   Filed 03/05/24   Page 576 of 671   Page ID
#:703
Case 2:13-cv-07032-MWF-MAR   Document 21-2   Filed 10/24/19   Page 23 of 29   Page ID #:12

("Although it has cataloged several components of its website, Plaintiff has not clearly articulated which of them constitute its purported trade dress."); *Yurman Design v. PAJ, Inc.*, 262 F.3d 101, 117 (2nd. Cir. 2001)("Pressed by PAJ on appeal to provide some description of its trade dress, Yurman produced the following: "the artistic combination of cable [jewelry] with other elements."). There is simply no reasonable comparison between these nondescript descriptions and Kellytoy's detailed multi-element description set forth at paragraph 22 of the Complaint.

Defendant also argues – without evidence – that various features identified by Kellytoy as part of its Squishmallow Trade Dress "cannot possibly serve as a source-identifying function." (*E.g.*, Mot. 12:10-11 and 13:10-12.) This proposition is a gloss on the obligation to prove secondary meaning in cases of trade dress infringement involving product designs, imposed by the Supreme Court in *Wal-Mart. Wal-Mart Stores, Inc., v. Samra Brothers, Inc.,* 529 U.S. at 216. In order to do so, a plaintiff must demonstrate that the primary significance of its trade dress in the minds of the public is to identify the source of the product rather than the product itself. *Id.* at 211.

Like the determination as to whether trade dress is functional, however, the determination as to whether it has acquired secondary meaning is a question of fact. *Clicks Billiards, Inc.*, 251 F.3d at 1262. As a result, the Central District has held that secondary meaning "need only be pled *generally* for purposes of defeating a motion to dismiss." *Dean v. Cortes*, No. CV 2:18-02335-CAS (JPRx), 2018 WL 3425016 (C.D. Cal. July 12, 2018) (emphasis added); *accord Spirit Clothing Co. v. N.S. Enters.*, No. CV 13-2203-RGK (PJWx), 2013 WL 12144107 (C.D. Cal. July 23, 2013).

Moreover, and even if this were not the case, Kellytoy alleges that the Squishmallow Trade Dress has acquired secondary meaning and alleges, in great detail, the manner in which it has done so. (Complaint ¶¶ 21-46, Exhs. 2-5.) Defendant's attempt to prove that the Squishmallow Trade Dress "cannot possibly

1  serve as a source-identifying function" is simply an improper attempt to resolve a

2  question of fact on a motion to dismiss.  *Cook, Perkiss & Liehe, Inc. v. N. Cal.*

3  *Collection Serv.*, 911 F.2d 242, 245 (9th Cir. 1990).

4        Here, Kellytoy's detailed description of its claimed trade dress is adequate to

5  put defendant on notice, particularly in light of Kellytoy's inclusion of images of the

6  claimed trade dress in the Complaint.  Therefore, Defendant's motion to dismiss

7  Kellytoy's claim for trade dress infringement, along with Kellytoy's related claims

8  for trademark infringement and unfair competition, should be denied.

9  C.    <u>KELLYTOY SHOULD BE GRANTED LEAVE TO AMEND</u>

10       It is well-established that, if the court dismisses a complaint for failure to state

11 a claim, leave to amend should be granted unless the court determines that "the

12 allegation of other facts consistent with the challenged pleading could not possibly

13 cure the deficiency."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806

14 F.2d 1393, 1401 (9th Cir. 1986).  Federal Rule of Civil Procedure 15(a)(2) similarly

15 provides that leave to amend should be "freely" granted when justice requires.  Fed.

16 R. Civ. P. 15(a)(2).

17       In this case, there are no deficiencies in the Complaint.  However, if the Court

18 determines that Kellytoy must plead additional facts as to what renders its trade

19 dress non-functional, the specifics of its claimed trade dress, or any other matters,

20 Kellytoy requests leave to amend to cure any defects in its pleading.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

4311236.2

1

**IV.**

2

**CONCLUSION**

3      For the foregoing reasons, Kellytoy respectfully requests that Defendant's

4  motion to dismiss be denied in its entirety.  In the event that the Court is inclined to

5  grant Defendant's motion, in whole or in part, Kellytoy respectfully requests leave

6  to amend the Complaint to cure any defects in its pleading.

7  DATED: October 14, 2019          FREEMAN, FREEMAN & SMILEY, LLP

8

9                                        By:  _____/s/ Mark B. Mizrahi_____

10                                            MARK B. MIZRAHI
                                             Attorneys for Plaintiff
11                                           Kellytoy Worldwide, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4311236.2

-25-

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 09/05/24 Page 579 of 671 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26-2 Filed 12/04/19 Page 1 of 10 Page ID
#:706

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)   **Date: December 4, 2019**

Title:   Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

|  |  |
|---|---|
| Deputy Clerk: | Court Reporter: |
| Rita Sanchez | Not Reported |

|  |  |
|---|---|
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| None Present | None Present |

**Proceedings (In Chambers):**   ORDER GRANTING DEFENDANT HUGFUN INTERNATIONAL, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6) [12]

Before the Court is Defendant Hugfun International, Inc.'s ("Hugfun") Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) (the "Motion") filed on October 2, 2019. (Docket No. 12). Plaintiff Kellytoy Worldwide, Inc. ("Kellytoy") filed an Opposition on October 14, 2019. (Docket No. 19). Defendant filed its Reply on October 21, 2019. (Docket No. 21). Pursuant to the parties' stipulation, Defendant BJ's Wholesale Club, Inc. ("BJ's") is deemed to have joined in the Motion. (Docket No. 25).

The Motion was noticed to be heard on November 4, 2019. The Court has read and considered the papers filed in this matter and deems the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); Local Rule 7-15. The hearing was therefore **VACATED** and removed from the Court's calendar.

For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED with leave to amend**. Although Plaintiff's description of the alleged Squishmallows trade dress is sufficiently pleaded, the Court must dismiss Plaintiff's First Claim for Relief for failing to allege how the trade dress is non-functional. Plaintiff's Second, Third, and Fourth Claims for Relief are also dismissed because they depend on a proper pleading of the First Claim for Relief.

---

**CIVIL MINUTES—GENERAL**   1

EXHIBIT M
Page 26 of 58

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 09/05/24 Page 580 of 671 Page ID
Case 2:19-cv-07652-MWF-MAR Document 26 Filed 12/04/19 Page 2 of 10 Page ID #:172
#:707

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV-19-07652-MWF (MAAx)　　　　　Date: December 4, 2019

Title:　　Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

## I.　BACKGROUND

On September 4, 2019, Plaintiff filed a Complaint alleging various federal and California trade dress infringement and unfair competition claims against the Defendants. (*See generally* Compl. ¶¶ 5-8 (Docket No. 1)). Specifically, Plaintiff asserts four claims for relief: (1) trademark infringement, false designation of origin, and false description under section 43 of the Lanham Act, 15 U.S.C. § 1125; (2) common law trademark infringement; (3) California common law unfair competition; and (4) unfair competition under California Business & Professional Code § 17200, *et seq.* (*Id.* ¶¶ 57-80).

The following facts are based on the Complaint, which the Court assumes are true; the Court further construes any inferences arising from these facts in the light most favorable to Plaintiff. *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (restating generally-accepted principle that "[o]rdinarily, when we review a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept a plaintiff's allegations as true 'and construe them in the light most favorable' to the plaintiff" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009))).

For nearly two decades, Plaintiff has been in the business of manufacturing, distributing, and selling plush toys. (Compl. ¶¶ 17-18). In that time, Plaintiff has developed a reputation for high quality, unique products that are popular with consumers. (*Id.* ¶ 18). In 2016, Plaintiff created its "Squishmallows" line of plush toys, which it markets under the SQUISHMALLOW trademark. (*Id.* ¶ 20). Most of the designs have or are pending approval for U.S. copyright registrations. (*Id.*).

Plaintiff's Squishmallows line includes a broad range of plush toys. (*Id.* ¶ 22). Plaintiff describes its alleged Squishmallows' trade dress (the "Trade Dress") as:

(1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped

---

**CIVIL MINUTES—GENERAL**　　　　　　　　　　　　　　　　**2**

Case 2:21-cv-01169-MWF-MAR   Document 26-2   Filed 02/05/24   Page 581 of 671   Page ID
Case 2:19-cv-07652-MWF-MAR   Document 26-2   Filed 12/04/19   Page 3 of 10   Page ID
#:708

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-19-07652-MWF (MAAx)           Date: December 4, 2019**

Title:     Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

(*Id.*).  Plaintiff also includes several photos depicting the Trade Dress.  (*Id.*, Ex. 1).

Plaintiff is the sole owner of all rights, title, and interest in and to the Squishmallows line of toys.  (*Id.* ¶ 21).  Since their creation, Plaintiff has dedicated substantial time, effort, and resources to the promotion of its Squishmallows toys.  (*Id.* ¶ 23).  For example, Plaintiff is currently spending over $1 million annually in advertising.  (*Id.* ¶ 21).  The Squishmallows have been featured in over 300 publications, including mainstream magazines, news articles, reviews, and videos.  (*Id.* ¶ 28).  The toys have also earned numerous industry awards and recommendations.  (*Id.* ¶ 31).  Since the summer of 2017, Plaintiff has shipped approximately 40 million units of Squishmallows, and the toys have generated tens of millions of dollars in sales over the past year alone.  (*Id.* ¶ 43).

Plaintiff alleges that sometime in 2019, Defendants began selling and distributing plush toys substantially and confusingly similar to Plaintiff's Trade Dress.  (*Id.* ¶ 48).  Defendant Hugfun allegedly sells the infringing plush toys to Defendant BJ's at a fraction of the price that Plaintiff charges for its toys.  (*Id.* ¶ 50).  Plaintiff alleges that Defendant Hugfun can do so because it copied the Trade Dress instead of spending resources developing its own product, and because Defendant Hugfun's toys are of inferior quality.  (*Id.*).  Plaintiff also alleges that Defendants' activities "are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of the toys."  (*Id.* ¶ 52).  Thus, Defendants' acts constitute "trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on

---

**CIVIL MINUTES—GENERAL                                    3**

EXHIBIT M
Page 28 of 58

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-19-07652-MWF (MAAx)            Date: December 4, 2019**
Title:    Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

Kellytoy's good will and the public acceptance of Kellytoy's original works."  (*Id.* ¶ 54).

## II.    **LEGAL STANDARD**

In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their Ninth Circuit progeny.

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Court must disregard allegations that are legal conclusions, even when disguised as facts.  *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' . . . plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'"  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 556-57).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief.  *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).  Where the facts as pleaded in the complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also

---

**CIVIL MINUTES—GENERAL**                                          4

EXHIBIT M
Page 29 of 58

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-19-07652-MWF (MAAx)          Date: December 4, 2019
Title:    Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

consistent with the alternative explanation.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."  *Eclectic Props.*, 751 F.3d at 996-97.

## III.   **DISCUSSION**

Defendants raise three main arguments in their Motion to Dismiss: (1) the First Claim for Relief should be dismissed because Plaintiff failed to meet its Rule 8 obligation to provide sufficient facts in describing the Trade Dress and alleging that it is non-functional; (2) the First Claim for Relief should be dismissed with prejudice because Plaintiff cannot state a claim under the Lanham Act at all given that the alleged Trade Dress is functional; and (3) the Second, Third, and Fourth Claims for Relief should be dismissed because they are substantially congruent to the First Claim for Relief.  (Mot. at 11-21).

### A.   **First Claim for Relief: Lanham Act**

To state an infringement claim under section 43(a) of the Lanham Act—whether it be a trademark claim or a trade dress claim—a plaintiff must identify the dress and allege three basic elements: (1) distinctiveness, (2) non-functionality, and (3) likelihood of confusion.  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046-47 (9th Cir. 1998) (upholding summary judgment ruling that grape leaves are generic emblem for wine and so not subject to trademark protection). Plaintiff is also required to adequately define the trade dress for which it claims protection.  *Sleep Sci. Partners v. Lieberman*, No. 09–04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) ("Without an adequate definition of the elements comprising the website's 'look and feel,' [defendant] is not given adequate notice."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116–17, (2d Cir. 2001) ("[W]e hold that a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress."); *see also* 1 *McCarthy on Trademarks and Unfair Competition* § 8:3 (4th ed. 2014) ("While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features. . . .  Only then can the court

---

**CIVIL MINUTES—GENERAL**                                    5

EXHIBIT M
Page 30 of 58

Case 2:24-cv-01169-MWF-MAR   Document 26-2   Filed 09/05/24   Page 584 of 671   Page ID
#:711
Case 2:19-cv-07652-MWF-MAA   Document 26-2   Filed 12/04/19   Page 6 of 10   Page ID #:176

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  **CV-19-07652-MWF (MAAx)**           **Date: December 4, 2019**
Title:     Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.").

"Trade dress is the total image of a product, including features such as size, shape, color, texture, and graphics." *Moldex-Metric, Inc. v. Mckeon Prods., Inc.*, 891 F.3d 878, 881 (9th Cir. 2018) (internal quotation marks and citation omitted). In evaluating a trade dress claim, a court must not focus on individual elements, "but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001). "Trade dress is the composite tapestry of visual effects." *Id.*

## 1.  Description of the Alleged Trade Dress

Defendants allege that "Kellytoy's Complaint fails to provide Hugfun and the Court with a detailed and precise description of its alleged 'Squishmallow Trade Dress.'" (Mot. at 11). According to Defendants, the description of the Trade Dress "offers only superficial insight into the scope or nature of Kellytoy's alleged trade dress." (*Id.* at 8). For example, Defendants question the meaning of Plaintiff's reference to a "simplified Asian style Kawaii face," or its description of "complementary rounded/oval shaped graphics." (*Id.* at 8-9). Defendants argue that these terms are too broad and vague to give sufficient notice under Rule 8. (*Id.*). Finally, Defendants point out that the images that Plaintiff filed as Exhibit 1 to the Complaint reveal that there is no "sufficiently precise trade dress that covers the entire line." (*Id.* at 9).

In response, Plaintiff argues that its Complaint "both depicts and recites the elements of Kellytoy's trade dress and . . . alleges that the depiction of the trade dress in its totality makes up the 'Squishmallow Trade Dress.'" (Opp'n at 20). Plaintiff dismisses Defendants' arguments as misguided for focusing on individual elements instead of assessing them in their combined form. (*Id.* at 21).

The Court finds that Plaintiff's Trade Dress description satisfies the requirements of Rule 8. In its Complaint, Plaintiff describes the Trade Dress in detail

---

**CIVIL MINUTES—GENERAL**                                        6

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 09/05/24 Page 585 of 671 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26-2 Filed 12/04/19 Page 7 of 10 Page ID
#:712

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)　　　　**Date: December 4, 2019**
**Title:**　　Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

and attaches photos of its line of plush toys. (Compl. ¶ 22 & Ex. 1). Specifically, the Complaint includes a description of the Trade Dress's shape ("substantially egg/bell shaped"); color combinations ("distinctive contrasting and non-monochrome coloring"); and texture ("short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel"). (*Id.* ¶ 22).

　　Plaintiff also describes the Trade Dress's graphics as "simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys." (*Id.*). Defendants argue that this description is vague and overbroad, and that Plaintiff is attempting to claim the exclusive right to manufacture plush toys with "Asian style Kawaii faces." (Mot. at 12; Reply at 7). Defendants err in focusing on this feature on its own instead of the "composite tapestry of visual effects" that it creates along with the Trade Dress's shape, colors, and texture. *See Clicks*, 251 F.3d at 1259 ("[I]t is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."). For example, the Trade Dress as described does not appear to cover monochromatic animal plush toys with "Asian style Kawaii faces" that have proportionally-sized limbs.

　　In short, the Court finds that the overall description of the Trade Dress gives Defendants sufficient notice to survive dismissal. *See, e.g.*, *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3-4 (C.D. Cal. May 8, 2015) (accepting description listing several elements of the alleged trade dress accompanied by photographs). The question now is whether the Court should nonetheless dismiss Plaintiff's Complaint due to defects in claiming non-functionality.

## 2. Non-functionality

　　Defendants raise two different issues with Plaintiff's allegation of non-functionality. First, Defendants argue that Plaintiff failed to plead non-functionality adequately as required by *Iqbal*. (Mot. at 14; Reply at 5). Second, Defendants urge

---

**CIVIL MINUTES—GENERAL**　　　　　　　　　　　　　　　　　　　7

EXHIBIT M
Page 32 of 58

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 09/05/24 Page 586 of 671 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26-2 Filed 12/04/19 Page 8 of 10 Page ID
#:713

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES—GENERAL

| | |
|---|---|
| **Case No.** CV-19-07652-MWF (MAAx) | **Date:** December 4, 2019 |
| Title: Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al. | |

the Court to evaluate the Trade Dress's functionality at this stage and conclude that Plaintiff cannot state a claim for trade dress protection. (Mot. at 15) (quoting *Iqbal*, 556 U.S. at 679).

As previously noted, a plaintiff must allege non-functionality to state a claim for trade dress protection under the Lanham Act. *See Moldex-Metric*, 891 F.3d at 881 ("No protection under the Lanham Act is available if the claimed trade dress is functional." (citing *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001))). Defendants argue that Plaintiff's non-functionality assertion in the Complaint is conclusory and devoid of factual support. (Mot. at 14; Reply at 8-10). Citing to *Deckers*, Defendants argue that Plaintiff must allege "how" the Trade Dress is non-functional. 2015 WL 12731929, at *4 (citing cases). Plaintiff counters that it has alleged sufficient facts regarding non-functionality. (Opp'n at 13) (citing Compl. ¶¶ 22, 58-64, Ex. 1).

Plaintiff failed to plead sufficient facts in support of its assertion that the Trade Dress is non-functional. Plaintiff's only mention of functionality in the Complaint is the conclusory statement that "[t]he Squishmallow Trade Dress is non-functional." (Compl. ¶ 58). Although Plaintiff does not have to plead "detailed factual allegations" in its Complaint, Rule 8 does require sufficient facts to "state a claim to relief that is plausible on its face," including how the Trade Dress is non-functional. *Iqbal*, 556 U.S. at 678 (citation omitted). Multiple courts in this district have adopted this approach. *See, e.g., Deckers*, 2015 WL 12731929, at *3-4 ("The Court holds that Plaintiff's conclusory statement of non-functionality fails to sufficiently allege the element."); *Green Crush LLC v. Paradise Splash I, Inc.*, No. CV 17-1856 CJC (JDEx), 2018 WL 4940824, at *4 (C.D. Cal. Mar. 8, 2018) (same); *Virgin Scent, Inc. v. Bel Air Naturals Care Corp.*, No. CV 17-8284 AB (RAOx), 2018 WL 5264145, at *4 (C.D. Cal. Feb. 8, 2018) (same).

Defendants appear to be advocating for dismissal without leave to amend based on their contention that the Trade Dress is functional, and thus, not entitled to protection under the Lanham Act. The Court rejects Defendants' arguments for two reasons. First, simply because Plaintiff has *yet* to plead non-functionality adequately

---

**CIVIL MINUTES—GENERAL**      **8**

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 09/05/24 Page 587 of 671 Page ID
#:714
Case 2:19-cv-07652-MWF-MAA Document 26 Filed 12/04/19 Page 9 of 10 Page ID #:179

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)          **Date:** December 4, 2019
Title:      Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

does not mean that Plaintiff could not possibly do so. It is premature to ask the Court to rule on the issue without an understanding of what Plaintiff's "claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted).

Second, to the extent that Defendants are claiming that functionality is obvious from the face of the Complaint, the Court disagrees with their conclusion. "Functionality is generally viewed as an intensely factual issue." *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1129 (9th Cir. 2016) (alteration and citation omitted). The Court sees no reason to deviate from the well-established approach that functionality should not be resolved at this stage. *See Five Star Gourmet Foods, Inc. v. Ready Pac Foods, Inc.*, No. CV 18-2436, 2019 WL 1260634, at *4 (C.D. Cal. Mar. 18, 2019) ("[C]ourts have held that [functionality] cannot be resolved at the motion to dismiss stage." (citing cases)); *see also Virgin Scent*, 2018 WL 5264145, at *5 ("The Court agrees that functionality is a question of fact that is generally not suitable to disposition on a motion to dismiss." (citing cases)); *Deckers*, 2015 WL 12731929, at *5 (same). Indeed, a quick glance at the Parties' pleadings reveal numerous disputes of fact and law interwoven into each prong of the multi-step functionality analysis established by the Supreme Court and Ninth Circuit. Thus, the Court will not entertain the merits of functionality at this stage.

Accordingly, because Plaintiff failed to plead non-functionality adequately, Defendants' Motion is **GRANTED** *without prejudice* as to Plaintiff's First Claim for Relief under the Lanham Act.

### B.    Second, Third, and Fourth Claims for Relief

Defendants argue that Plaintiff's common law trademark infringement and state law claims fail because Plaintiff has not stated a claim for protection under the Lanham Act. (Mot. at 21). The Court agrees that these claims are not adequately pled unless Plaintiff corrects the defect in pleading non-functionality. *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) ("The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion." (citation omitted)); *Cleary v. News Corp.*, 30 F.3d 1255,

---

**CIVIL MINUTES—GENERAL**                                    9

Case 2:34-cv-04169-WS-MAR   Document 24-2   Filed 03/05/24   Page 588 of 671   Page ID
Case 2:19-cv-07652-MWF-MAR   Document 26-2   Filed 12/04/19   Page 10 of 10   Page ID
#:715

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES—GENERAL

**Case No.** **CV-19-07652-MWF (MAAx)**         **Date: December 4, 2019**

Title:      Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

---

1262-63 (9th Cir. 1994) ("[A]ctions pursuant to California Business and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act." (citations omitted)).  Therefore, Defendants' Motion is likewise **GRANTED *with leave to amend*** as to the Second, Third, and Fourth Claims for Relief.

Accordingly, Defendants' Motion is **GRANTED *with leave to amend*** to cure the defect as to the non-functionality claim.  Plaintiff shall file a First Amended Complaint on or before **December 20, 2019.**  Defendant shall file a response to the operative Complaint by **January 10, 2020**.

IT IS SO ORDERED.

---

**CIVIL MINUTES—GENERAL**                                    **10**

1   TODD M. LANDER (BAR NO. 173031)
    todd.lander@ffslaw.com
2   MARK B. MIZRAHI (BAR NO. 179384)
    mark.mizrahi@ffslaw.com
3   FREEMAN, FREEMAN & SMILEY, LLP
    1888 Century Park East, 15th Floor
4   Los Angeles, California 90067
    Telephone: (310) 255-6100
5   Facsimile: (310) 255-6200

6   *Attorneys for Plaintiff Kellytoy*
    *Worldwide, Inc.*

7

8                    **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

10  KELLYTOY WORLDWIDE, INC., a          Case No. 2:19-cv-07652-MWF-MAA
    California corporation,
11                                        **FIRST AMENDED COMPLAINT FOR:**
                  Plaintiff,              1.  **FEDERAL TRADEMARK**
12                                            **INFRINGEMENT, FALSE**
            vs.                               **DESIGNATION OF ORIGIN**
13                                            **AND FALSE DESCRIPTION**
    HUGFUN, INTERNATIONAL, INC.               **(15 U.S.C. § 1125);**
14  a/k/a Hugfun Int'l Inc., a Hong Kong  2.  **COMMON LAW TRADEMARK**
    entity of unknown form, BJ'S              **INFRINGEMENT;**
15  WHOLESALE CLUB, INC., a              3.  **CALIFORNIA COMMON LAW**
    Massachusetts corporation, and DOES 1     **UNFAIR COMPETITION; AND**
16  through 10, inclusive,               4.  **CALIFORNIA STATUTORY**
                                              **UNFAIR COMPETITION.**
17                Defendants.

18                                        **DEMAND FOR JURY TRIAL**

19

20        Plaintiff KELLYTOY WORLDWIDE, INC., a California corporation

21  ("Kellytoy") brings this action against defendant HUGFUN, INTERNATIONAL,

22  INC. a/k/a Hugfun Int'l Inc., a Hong Kong entity of unknown form ("Hugfun"),

23  BJ'S WHOLESALE CLUB, INC., a Massachusetts corporation, and DOES 1

24  through 10 (collectively, "Defendants") for injunctive relief and damages under the

25  laws of the United States and the State of California as follows:

26                    <u>**JURISDICTION AND VENUE**</u>

27        1.    This action arises under the trademark laws of the United States, 15

28  U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress

1   infringement and unfair competition.

2       2.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367,

3   and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

4       3.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391.

5       4.    This Court has personal jurisdiction over Defendants, as they are doing

6   business in California and this District and are subject to the jurisdiction of this

7   Court. Indeed, Hugfun is headquartered in and actively distributes plush toys

8   throughout the state of California and this District. And, BJ's purchases goods,

9   including the Infringing Plush, from defendant Hugfun, a California resident, and

10   operates a website through which it offers for sale and sells numerous goods,

11   including the Infringing Plush, to customers within the state of California and this

12   District. In addition, defendants Hugfun and BJ's knowingly infringed on

13   Kellytoy's trade dress, knowing that Kellytoy is a California resident and knowing

14   that Kellytoy would suffer harm, particularly, in the State of California, and thereby

15   purposefully directed and expressly aimed their activities towards California.

16                      **NATURE OF THE ACTION**

17       5.    This is an action for trade dress infringement, trademark infringement,

18   unfair competition and false designation of origin under the Lanham Act, 15 U.S.C.

19   § 1125(a), California Bus. & Prof. Code § 17200, *et seq*., and the common law.

20       6.    Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows")

21   – representative samples of which are depicted in **Exhibit 1** hereto – are one of the

22   world's hottest plush toy lines. Kellytoy's Squishmallows feature a highly

23   distinctive and widely recognized trade dress, which Kellytoy pioneered and

24   created. Kellytoy actively markets its Squishmallows through numerous media

25   outlets, including, without limitation, on social media, at tradeshows, through

26   Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

27   and on Kellytoy's website and social media accounts, depicting images of its

28   proprietary Squishmallows line of plush toys.

Case 2:24-cv-01169-MWF-MAR Document 21-2 Filed 03/05/24 Page 591 of 671 Page ID
#:718
Case 2:13-cv-07552-MWF-MAR Document 21-2 Filed 12/20/13 Page 3 of 52 Page ID #:193

7.      The explosion in popularity of Kellytoy's Squishmallows and the
resulting and widespread customer and industry recognition, has unfortunately led to
illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that
defendant Hugfun has been manufacturing and offering for sale to customers,
including, on information and belief, BJs, (which they have re-sold), numerous units
of seven knock-off products for distribution within this state and district that
infringe upon Kellytoy's trade dress.

8.      Accordingly, to prevent and remediate the rampant consumer confusion
and misappropriation of Kellytoy's reputation and identity resulting from
Defendants' unauthorized use, promotion and sale of the Infringing Plush (defined
below), and to compensate Kellytoy for its injuries, Kellytoy seeks immediate and
permanent injunctive relief, compensatory damages, disgorgement of Defendants'
profits, statutory damages, punitive damages, Kellytoy's reasonable attorneys' fees
and expenses, a product recall, and corrective advertising sufficient to address
Defendants' wrongdoing and its resulting damage to Kellytoy.

## THE PARTIES

9.      Kellytoy Worldwide, Inc. is a California corporation with its principal
place of business located in Los Angeles, California.

10.      Kellytoy is in the business of developing, manufacturing and selling
children's toys including, among other things, plush toys.

11.      On information and belief, defendant Hugfun, International, Inc. a/k/a
Hugfun Int'l Inc. ("Hugfun") is a Hong Kong entity of unknown form with an
established place of business in the City of Industry, California

12.      Hugfun is in the business of manufacturing and selling children's toys
including plush toys.

13.      On information and belief, defendant BJ's Wholesale Club, Inc.
("BJ's") is a Massachusetts corporation with a corporate address in Massachusetts.

14.      BJ's is in the business of operating brick-and-mortar retail stores and an

1   online e-commerce website that sell various merchandise, including plush toys.

2         15.     The true names and capacities of defendants sued herein as DOES 1-

3   10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such

4   fictitious names. Kellytoy will amend this Complaint to allege their true names and

5   capacities when the same are ascertained.

6         16.     Upon information and belief, at all relevant times mentioned in this

7   Complaint, Defendants, and each of them, were acting in concert and active

8   participation with each other in committing the wrongful acts alleged herein, and

9   were the agents of each other and were acting within the scope and authority of that

10   agency and with the knowledge, consent and permission of one another.

11         **BACKGROUND FACTS**

12         **Kellytoy and Its Protected Intellectual Property Rights**

13         17.     Kellytoy is an innovative and highly successful creator, manufacturer,

14   distributor and seller of unique plush toys, including, without limitation, its

15   Squishmallows line of plush under the SQUISHMALLOW brand. (*See, e.g.,*

16   **Exhibit 1**.)

17         18.     Kellytoy has been in business for nearly two decades and in that time

18   has developed a reputation for producing high quality, unique, creative and

19   innovative plush toys that are highly prized in the industry and in widespread

20   demand by the consuming public.

21         19.     Kellytoy devotes extensive time and resources promoting and

22   preserving its image and identity and the image and identity of its high quality plush

23   toys. That includes, without limitation, creating distinctive designs and marks for

24   use on its products and seeking U.S. trademark and copyright registrations for such

25   designs and marks, including those at issue in this Complaint.

26         20.     In 2016, Kellytoy conceived of and began creating its Squishmallows

27   line of plush toy designs – ultimately marketed in connection with the

28   SQUISHMALLOW trademark – that share common, unique features distinguishing

them from the goods of others. Most of these designs are the subject of United States Copyright Registrations or pending applications therefor.

21. Indeed, Kellytoy has been and is the sole owner of all right, title and interest in and to the Squishmallows line that possesses unique, recognizable and distinguishing features that are common across much of the Squishmallows line. From 2016 to the present, Kellytoy has expended large sums of money in developing, advertising and promoting these product designs through the United States. In fact, Kellytoy is spending over $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its SQUISHMALLOW branded goods.

22. Consistent with that advertising and marketing scope, Kellytoy sells a broad range of SQUISHMALLOW branded plush toys featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its shapes, colors, textures and graphics – serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

23. Kellytoy has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its

Case 2:24-cv-01169-JLS-MAR   Document 21-2   Filed 03/05/24   Page 594 of 671   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 21-2   Filed 12/20/19   Page 6 of 62   Page ID #:106
#:721

1   Squishmallows.  And due to Kellytoy's unique design, robust marketing efforts,

2   media coverage, and market penetration, the Squishmallow Trade Dress has

3   acquired distinctiveness in the marketplace when applied to plush toys.  Indeed,

4   because of Kellytoy's extensive promotional activities and widespread display of its

5   Squishmallows directed to the public, and as a consequence of Kellytoy's fair and

6   honorable dealings with its customers, the relevant consuming public has come to

7   recognize and associate plush toys bearing the Squishmallow Trade Dress as high

8   quality goods connected with or offered by a single source, Kellytoy.  The

9   Squishmallow Trade Dress thus embodies valuable goodwill and consumer

10  recognition associated with it and has come to symbolize the valuable goodwill and

11  reputation of Kellytoy.

12       24.     In addition to being original and inherently distinctive, the

13  Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet

14  search using the Google search engine yields about 1,210,000 "results" for the

15  search term "Squishmallows."

16       25.     In addition to marketing and selling them through thousands of retail

17  stores nationwide, Kellytoy markets and sells its Squishmallows on its website

18  <squishmallows.com> featuring dozens of copyright-protected photographs of its

19  plush toys and models holding its Squishmallows.  Copies of the homepage and

20  other representative pages from <squishmallows.com> are attached as **Exhibit 2**.

21       26.     Kellytoy's Squishmallow website traffic has, not surprisingly, grown

22  exponentially since its launch in 2017, and has now reached an average in excess of

23  5,500 visits per day.

24       27.     Kellytoy also actively engages in promoting its line of Squishmallows

25  branded plush toys through its numerous social media accounts, including on

26  Instagram, Facebook, and Twitter.  Indeed, Kellytoy's legion of loyal fans of its line

27  of Squishmallows branded plush toys have been extremely engaged on social media,

28  including Facebook and Instagram, demonstrating their awareness and affection for

Case 2:24-cv-01169-MLS-MAR   Document 21-2   Filed 03/05/24   Page 595 of 671   Page ID
#:722
Case 2:19-cv-07652-MWF-MAA   Document 27   Filed 12/20/19   Page 7 of 52   Page ID #:107

1   Kellytoy's Squishmallows.  For example, the average Squishmallows post likes on

2   Instagram, for example, hovering over 2000+ per post and 45-100 average

3   comments per post.  In fact, Kellytoy's Squishmallows branded plush toys have

4   garnered over 200 Million media impressions.

5        28.    Further adding to their recognition and secondary meaning in the

6   marketplace, Squishmallows have been featured in over 300 publications, including

7   magazines, press articles, reviews, and videos, as set forth in greater detail in

8   **Exhibit 3** hereto, including many mainstream media publications such as the

9   *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among

10   others.  By way of example only, Squishmallows have been also recognized by: (1)

11   The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2)

12   *LA Parent* in its October 2017 issue, under the "Products We Love" section, which

13   specifically identified Squishmallows; and (3)  *OK!* Magazine in its August 21,

14   2017 issue, which, as depicted below, featured Squishmallows and described them

15   in flattering terms, stating "Cuddly as they are cute, they make great couch pals,

16   pillows and bedtime buddies in any home.  Collect the whole squad!

17   squishmallows.com."

18
19
20
21
22
23   
24
25
26
27
28

Case 2:24-cv-01169-MWF-MAR Document 21-2 Filed 03/05/24 Page 596 of 671 Page ID
#:723
Case 2:19-cv-07652-MWF-MAR Document 1 Filed 12/20/19 Page 8 of 62 Page ID #:198

29.     There are many additional examples of the popularity and market penetration of the Squishmallow line.  Squishmallows were also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.     In fact, Kellytoy's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

31.     Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 3**.  In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

32.     The popular blog *Trendy Mom Reviews* listed Squishmallows as one of The Best Gifts for 2018!"  Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy's Squishmallows branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

33.     Squishmallows was also named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!

34.     *Gifts & Decorative Accessories* also selected Kellytoy's Squishmallows branded toys among its "5 Editor's Picks From Toy Fair" 2019.

35.     *The Toy Insider* featured Kellytoy's Squishmallows branded toys in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress."

36.   Kellytoy's Squishmallows were featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue. *The Toy Book* also featured Kellytoy's upcoming Halloween Squishmallows line on August 5, 2019 and featured Kellytoy's Squishmallows branded turtle on May 15, 2019.

37.   *TFE Toys & Family Entertainment* also featured Kellytoy's Squishmallows branded toys in its NYC Toy Fair 2019 issue.

38.   Kellytoy's Squishmallows branded toys have also won the *Parent and Teacher Choice Award* for 2019 from HowtoLearn.com.

39.   This widespread publicity and recognition has occurred in conjunction with Kellytoy's advertising efforts concerning Squishmallows, which, as alleged above, have comprised consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising. Kellytoy's Squishmallows currently more than 96,000 Instagram followers, more than 77,000 Facebook followers – more than many longer-existing and well-known plush brands. To its followers, Kellytoy regularly publishes photographs of its Squishmallows. Many of these followers, in turn, share these posts with their friends and social media followers. A copy of Squishmallows Instagram page is attached as **Exhibit 4**.

40.   In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products. Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube. These posts have generated millions of "likes" and "shares."

41.   Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

42.   As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating

1  substantial demand for and interest in Squishmallows, and generating enormous

2  goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the

3  United States and around the world.  In fact, Kellytoy's Squishmallows are sold

4  through hundreds of retailers including some of the largest retailers in the country,

5  including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500

6  Walgreens stores, 6200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer

7  stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other

8  outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

9       43.    Since the summer of 2017, Kellytoy has shipped approximately a

10  whopping 40 million (40,000,000) units of Squishmallows and there is no indication

11  that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products

12  embodying the Squishmallows Trade Dress have yielded tens of millions of dollars

13  of sales in the U.S. over the past year.

14       44.    The pace of sales of Kellytoy's Squishmallows branded toys has been

15  steadily increasing in there is no indication of their popularity waning any time

16  soon.  In fact, Kellytoy's Squishmallows branded toys have become so popular

17  among, sought after by, and recognizable as a brand by the public that some

18  members of the public have been selling unauthorized merchandise, such as T-shirts

19  and jewelry, bearing the images of some of Kellytoy's most popular Squishmallows

20  branded toys.  Few plush lines can boast having third parties attempt to

21  "merchandise" its copyrighted designs – something typically reserved for Disney,

22  Looney Tunes, and the like.  While Kellytoy has since put a stop to such

23  unauthorized uses, it has preserved exemplars of some such infringements by three

24  different infringers, as depicted below:

25
26    
27
28

Case 2:34-cv-04169-JLS-MAR   Document 21-2   Filed 02/05/24   Page 599 of 671   Page ID
Case 2:19-cv-07053-MWF-MAR   Document 21-2   Filed 12/20/19   Page 1 of 62   Page ID#:191
#:726



45.     In fact, because of the immense popularity – no, ubiquity – of

Kellytoy's Squishmallows line of plush toys, including those set forth on **Exhibit 1**,

Kellytoy has recently embarked on a global licensing initiative to license these

designs to include diverse categories of merchandise, including apparel, sleepwear,

accessories, headwear, home decor, health and beauty, back to school, stationery

and paper goods, games and puzzles, novelty, publishing and magazines, food and

beverage, and mobile gaming.  (*See*, *e.g.*, **Exhibit 5** hereto.)

46.     Because of Squishmallows' massive success and popularity, consumers

have come to associate Kellytoy's high-quality Squishmallows plush toys with the

Squishmallows Trade Dress and, conversely, have come to recognize the

Squishmallow Trade Dress as a designation of source.

### **Defendants' Unlawful Conduct**

47.     At the outset, none of the defendants to this action is licensed or

otherwise authorized by Kellytoy to market or distribute products bearing or

embodying Kellytoy's Squishmallow Trade Dress.

48.     Upon information and belief, sometime in 2019, notably well after

Kellytoy established its reputation in its Squishmallow Trade Dress and that Trade

Dress acquired distinctiveness in the marketplace, Defendant Hugfun began offering

for sale and supplying various plush toys bearing substantially and confusingly

Case 2:24-cv-01129-WLS-MAR   Document 21-2   Filed 02/05/24   Page 600 of 671   Page ID
Case 2:23-cv-07032-MWF-MAR   Document 21-2   Filed 12/20/23   Page 26 of 62   Page ID #:192
#:727

similar copies of Kellytoy's Squishmallow Trade Dress (hereinafter referred to as "Infringing Plush") to customers throughout the United States.  Photographs of the Infringing Plush bearing Hugfun's trademarks are collectively attached hereto as **Exhibit 6**.

49.     Upon information and belief, Defendants manufactured in, and imported from, China the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows branded plush.  On information and belief, Hugfun has in fact sold the Infringing Plush to, among others, the popular big box retailer BJs which has in turn sold and is currently selling the Infringing Plush in interstate commerce.

50.     Upon information and belief, Hugfun has agreed to sell the Infringing Plush to its customers, including defendant BJ's, at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Hugfun is able to undercut Kellytoy's sales prices because, rather than investing in creating its own designs and identity, Hugfun has instead copied and infringed Kellytoy's proprietary Squishmallow Trade Dress and otherwise because its Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

51.     Kellytoy is further informed and believes that Defendants, without Kellytoy's consent or permission, sell, advertise, promote, display, and distribute, toys bearing Squishmallow Trade Dress in United States commerce.

52.     The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress embodied in the Infringing Plush – including by copying wholesale of the shape and look – constitute false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that Defendants' plush toys originate from

Case 2:24-cv-04129-WLH-MAR Document 21-2 Filed 12/20/24 Page 601 of 671 Page ID
#:728
Case 2:13-cv-07032-MWF-MAR Document 21-2 Filed 12/20/24 Page 36 of 62 Page ID #:193

Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or
licensed by Kellytoy, or in some way affiliated or connected with Kellytoy. Such
activities of Defendants are likely to confuse, mislead, and deceive Defendants'
customers, purchasers, and members of the public as to the origin of the toys bearing
the Squishmallow Trade Dress, or to cause such persons to believe that Defendants'
Infringing Plush and/or Defendants have been sponsored, approved, authorized, or
licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in
violation of, among other laws, 15 U.S.C. §1125(a).

53.     Upon information and belief, the activities of Defendants were done
willfully with full knowledge of the falsity of such designations of origin and false
descriptions or representations, with the intent to trade on the enormous goodwill
Kellytoy has earned in its Squishmallows, and with the intent to cause confusion,
and to mislead and deceive the purchasing public into believing that the products
Defendants sell are directly sponsored by, authorized, by, associated with, or
originate from Kellytoy.

54.     Defendants, by their unauthorized copying and use of Kellytoy's
Squishmallow Trade Dress, have engaged and will engage in acts of trademark
infringement, unfair competition, unlawful appropriation, unjust enrichment,
wrongful deception of the purchasing public, and unlawful trading on Kellytoy's
good will and the public acceptance of Kellytoy's original works. Defendants'
activities have damaged and will continue to damage the reputation, business and
good will of Kellytoy nationally and in this judicial district.

55.     Upon information and belief, unless enjoined by the Court, Defendants
will continue and further escalate their infringing activities.

56.     Kellytoy has no adequate remedy at law. Thus, these activities of
Defendants have caused and, if not enjoined, will continue to cause irreparable,
immediate and impending harm and damage to Kellytoy's business, and to the
business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

### **(Trademark Infringement, False Designation of Origin and False Description - - 15 U.S.C. §1125)**

(Against All Defendants)

57.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 56 above as if fully set forth herein.

58.     The Squishmallow Trade Dress – comprised of a proprietary combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – is non-functional and highly distinctive, and has become associated in the minds of the consuming public with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.  Indeed, the Squishmallow Trade Dress when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with Kellytoy's Squishmallows. The non-functional nature of these aesthetic features are evidenced and clear, in part, by reference to the following:  (1) the unique combination of stylistic elements yielding no utilitarian advantage; (2) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, cube shaped plush toys, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, cotton, hard foam, etc.); furthermore, when the features of the Squishmallow Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (3) Kellytoy's not

1    touting or marketing utilitarian advantages of its Squishmallow Trade Dress, and (4)

2    the Squishmallow Trade Dress not resulting from a comparatively simple or

3    inexpensive method of manufacture vis-à-vis other plush toys.  Moreover, protection

4    of the Squishmallow Trade dress as a trademark would not impose a non-reputation-

5    related competitive disadvantage.  Regardless, however, the product features of the

6    Squishmallow Trade Dress do not serve an aesthetic function wholly independent of

7    any source identifying function.  To the contrary, the Squishmallow Trade Dress

8    was specifically designed to distinguish – and has succeeded in distinguishing – the

9    source of products embodying the Squishmallow Trade Dress from the source of

10   other toys. Kellytoy owns all right, title and interest in and to the Squishmallow

11   Trade Dress.

12        59.    Without Kellytoy's authorization or consent, and having knowledge of

13   Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed,

14   manufactured, imported, distributed, advertised, offered for sale and/or sold and/or

15   will continue to import, distribute, advertise, offer for sale, and sell replicas of the

16   Squishmallow Trade Dress to the consuming public in direct competition with

17   Kellytoy, in or affecting interstate commerce.

18        60.    The Infringing Plush designs are confusingly similar to the

19   Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has

20   caused and, unless enjoined by this Court, will continue to cause a likelihood of

21   confusion and deception of members of the public and, additionally, injury to

22   Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

23        61.    Defendants' use and further threatened uses of the Squishmallow Trade

24   Dress thus constitutes trade dress infringement, false designation of origin and

25   unfair competition in violation of 15 U.S.C. § 1125(a).

26        62.    As a direct and proximate result of Defendants' unlawful conduct,

27   Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

28   Dress, as well as the goodwill associated therewith, and have diverted sales and

1  profits from Kellytoy to Defendants. Thus, as a direct and proximate result of

2  Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer

3  damage to its valuable brand and reputation, and other damages in an amount to be

4  proven at trial, including Defendants' profits and Kellytoy's lost profits.

5      63.    Defendants' actions described above will cause, have caused, and will

6  continue to cause irreparable damage to Kellytoy, unless Defendants are restrained

7  by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants'

8  infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and

9  permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining

10  Defendants' and their agents, servants, and employees, and all persons acting

11  thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow

12  Trade Dress, or any colorable imitation or variation thereof, in connection with the

13  sale and/or marketing of any products.

14      64.    Defendants' aforesaid acts are exceptional within the meaning of 15

15  U.S.C § 1117.

### SECOND CAUSE OF ACTION

**(Common Law Trademark Infringement)**

(Against all Defendants)

19      65.    Kellytoy repeats and re-alleges each and every allegation of paragraphs

20  1 through 61 as though fully set forth herein.

21      66.    Defendants have violated Kellytoy's exclusive common law rights in

22  the Squishmallow Trade Dress.

23      67.    Kellytoy has continuously used its Squishmallow Trade Dress to

24  identify its goods in California and elsewhere, and to distinguish them from goods

25  of a different origin.  As such, Kellytoy has common law rights to the Squishmallow

26  Trade Dress.

27      68.    Defendants' acts described above constitute trade mark infringement

28  under the common laws of the United States, including California.

# THIRD CAUSE OF ACTION

## (California Common Law Unfair Competition)

(Against all Defendants)

69.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 61, 67, and 68 as though fully set forth herein.

70.     This claim arises under the common law of the State of California relating to unfair competition.

71.     Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress.  Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

72.     Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy.  Defendants have thus committed unfair competition under the common law of the State of California.

73.     By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

74.     Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

75.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business

Case 2:24-cv-01169-WLS-MAR   Document 21-2   Filed 02/05/24   Page 606 of 671   Page ID
#:733
Case 2:23-cv-07032-MWF-MAR   Document 21-2   Filed 12/20/19   Page 606 of 671   Page ID #:198

1    reputation and good will.

2        76.     Upon information and belief, Defendants have engaged in their unlawful

3    conduct alleged herein intentionally, maliciously, fraudulently and oppressively

4    entitling Kellytoy to punitive damages in an amount to be determined at trial.

5                       **<u>FOURTH CAUSE OF ACTION</u>**

6           **(California Statutory Unfair Competition –**

7           **California Bus. & Prof. Code § 17200, *et seq.*)**

8                 (Against all Defendants)

9        77.     Kellytoy repeats and re-alleges each and every allegation of paragraphs

10    1 through 61, 67 through 69, and 71 through 75, as though fully set forth herein.

11        78.     By reason of the foregoing, Defendants have been, and are, engaged in

12    "unlawful, unfair or fraudulent business practices" in violation of California

13    Business and Professional Code Section 17200 *et seq.*

14        79.     Kellytoy's Squishmallows Trade Dress constitutes a protectable

15    property right, and the Defendants' conduct – including without limitation their

16    infringement of the Squishmallows Trade Dress – will and has caused an

17    impairment and diminishment of that property right. Indeed, the activities of

18    Defendants have caused and, if not enjoined, will continue to cause irreparable harm

19    and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its

20    business reputation and good will. Kellytoy has no adequate remedy at law for

21    these wrongs and injuries. The damage to Kellytoy includes harm to its goodwill

22    and reputation in the marketplace that money cannot compensate. Accordingly,

23    Kellytoy is entitled to a preliminary and permanent injunction restraining and

24    enjoining Defendants' and their agents, servants, and employees, and all persons

25    acting thereunder, in concert with, or on their behalf, from using Kellytoy's

26    Squishmallow Trade Dress, or any colorable imitation or variation thereof, in

27    connection with the sale and/or marketing of any products. Kellytoy is further

28    entitled to restitutionary disgorgement of all of Defendants' ill-gotten gains pursuant

Case 2:34-cv-04129-JWS-MAR   Document 21-2   Filed 02/05/24   Page 607 of 671   Page ID
Case 2:13-cv-07032-MWF-MAR   Document 21-2   Filed 12/20/19   Page 56 of 62   Page ID #:199
#:734

to California Business and Professions Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

### **PRAYER FOR RELIEF**

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

1.     That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i)     Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the Squishmallow Trade Dress;

(ii)     Using the Squishmallow Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii)     Using the Squishmallow Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

(iv)     Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers created by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the Squishmallow Trade Dress;

(v) Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress; and

(vi)     Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (v) above, or effecting any assignments

4266850.2

-19-

Case 2:34-cv-04159-JVS-MAR   Document 21-2   Filed 02/05/24   Page 608 of 671   Page ID
#:735
Case 2:13-cv-07032-MWF-MAR   Document 21-2   Filed 12/20/13   Page 608 of 671   Page ID #:200

or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (v) above.

2. That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

3. That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the Squishmallow Trade Dress.

4. That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of the Squishmallow Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

5. Adjudge that each of the Defendants, by its unauthorized use of Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it may have undertaken relating to the Squishmallow Trade Dress, have violated Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade Dress;

6. Direct Defendants to provide Kellytoy with an identification in writing

1    of any and all entities that are presently using the Squishmallow Trade Dress in the

2    United States on Defendants' behalf and inform them that they must immediately

3    cease such use;

4         7.    Direct Defendants to immediately recall any and all merchandise

5    previously provided to any United States entity under the Squishmallow Trade

6    Dress;

7         8.    Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to

8    deliver for destruction all products, brochures, marketing materials, decals, stickers,

9    signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their

10   possession or under their control, bearing any unauthorized copy of any of the

11   Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy,

12   confusingly similar likeness, or colorable imitation thereof, and all plates, molds,

13   matrices, programs and other means of making same;

14        9.    That each Defendant provide Kellytoy in writing with the following

15   information relating to Defendants' goods marketed, advertised, offered for sale, or

16   sold under the Squishmallow Trade Dress:

17             (i)    the name, address and telephone number of each and every

18                    United States entity to whom Defendants have made available or

19                    otherwise provided any such products; and

20             (ii)   a full accounting as to the precise dollar amount of such products

21                    made available or provided and the profits recognized by

22                    Defendants in connection with such actions;

23        10.   Direct Defendants to pay the costs of corrective advertising;

24        11.   Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred

25   in initiating and prosecuting this action;

26        12.   Direct Defendants to pay punitive damages and exemplary damages

27   according to proof;

28        13.   That Kellytoy recover its actual damages, Kellytoy's lost profits, and

4266850.2

Case 2:24-cv-01169-JLS-MAR   Document 21-2   Filed 02/05/24   Page 610 of 671   Page ID
#:737
Case 2:19-cv-07053-MWF-MAR   Document 21-2   Filed 12/20/19   Page 22 of 62   Page ID #:202

1  Defendant's profits arising from Defendants' conduct complained-of herein;

2       14.    That the Court award enhanced profits and treble damages;

3       15.    That Kellytoy be awarded interest, including pre-judgment

4  interest, on the foregoing sums;

5       16.    That the Court direct such other actions as the Court may deem just and

6  proper to prevent the public from deriving the mistaken impression that any

7  products or services offered, advertised, or promoted by or on behalf of Defendants

8  are authorized by Kellytoy or related in any way to Kellytoy's products or services;

9       17.    That Defendants be ordered to disgorge all of their ill-gotten gains

10  pursuant to California Business and Professions Code § 17203; and

11       18.    For such other and further relief as the Court may deem just and

12  proper.

13                           Respectfully submitted,

14  DATED: December 20, 2019        FREEMAN, FREEMAN & SMILEY, LLP

15

16                           By:  _____/ s / Mark B. Mizrahi_____
                                   TODD M. LANDER
17                                 MARK B. MIZRAHI
18                                 Attorneys for Plaintiff,
                                   KELLYTOY WORLDWIDE, INC.
19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff hereby demands and requests a trial by jury of all issues raised that

3 are triable by jury.

4                                    Respectfully submitted,

5 DATED: December 20, 2019          FREEMAN, FREEMAN & SMILEY, LLP

6

7                                    By:  _____/ s / Mark B. Mizrahi_____

8                                          TODD M. LANDER
                                           MARK B. MIZRAHI
9                                          Attorneys for Plaintiff,
                                           KELLYTOY WORLDWIDE, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4266850.2

-23-

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| BUILD-A-BEAR WORKSHOP, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| KELLY TOYS HOLDINGS, LLC, | ) | |
| KELLY AMUSEMENT HOLDINGS, LLC, | ) | **JURY TRIAL DEMANDED** |
| JAZWARES, LLC, and JAZPLUS, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Build-A-Bear Workshop, Inc. ("Plaintiff" or "Build-A-Bear") brings this declaratory judgment action against Kelly Toys Holdings, LLC ("Kelly Toys"), Kelly Amusement Holdings, LLC ("Kelly Amusement"), Jazwares, LLC ("Jazwares"), and Jazplus, LLC ("Jazplus") (collectively "Defendants") pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, and alleges as follows:

## NATURE OF THE CASE

1.      This is a declaratory judgment action seeking a ruling that: (a) Defendants' claimed trade dress rights in their Squishmallows products are invalid, unenforceable, and unprotectable under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.; and (b) Build-A-Bear's SKOOSHERZ™ plush toys do not infringe any of Defendants' claimed trade dress rights in their Squishmallows products under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Build-A-Bear is a Delaware corporation with its principal place of business located at 415 South 18th Street, St. Louis, Missouri 63103.

EXHIBIT N
Page 1 of 54

3.     Upon information and belief, Defendant Kelly Toys is a Delaware limited liability company with its principal place of business located at 4811 South Alameda Street, Los Angeles, California 90058.

4.     Upon information and belief, Defendant Kelly Amusement is a Delaware limited liability company with its principal place of business located at 350 Michael Drive, Syosset, New York 11791.

5.     Upon information and belief, Defendant Jazwares is a Delaware limited liability company with its principal place of business located at 1067 Shotgun Road, Sunrise, Florida 33326.

6.     Upon information and belief, Defendant Jazplus is a Delaware limited liability company with its principal place of business located at 7284 West Palmetto Park Road, Boca Raton, Florida 33433.

7.     Defendants assert that they are either affiliated entities, governed by common ownership and/or intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows products.

8.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

10.     This Court has personal jurisdiction over Defendants because Defendants performed acts within the Eastern District of Missouri subjecting Defendants to the laws of this District, including entering into contracts and transacting business in this District.  Among other things, Defendants' Squishmallows products with their claimed trade dress are available for

2

EXHIBIT N
Page 2 of 54

purchase in physical retail stores in this District, including but not limited to: Target stores in the City of St. Louis, Kirkwood, Town and Country, and Cape Girardeau, Missouri; Walgreens stores in the City of St. Louis, Kirkwood, Des Peres, and Cape Girardeau, Missouri; and Walmart stores in the City of St. Louis, Kirkwood, Maplewood, and Cape Girardeau, Missouri.  Additionally, Defendants' Squishmallows products are available for order online through Defendant Jazware's website at https://shop.jazwares.com/pages/squishmallows and on https://www.Amazon.com for delivery to physical addresses and customers in this District.  In order to sell Squishmallows products in and to these Missouri locations, the Squishmallows products with the claimed trade dress were shipped to Missouri by one or more Defendants or their agents.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendants' Squishmallows products with the claimed trade dress are sold in competition with Build-A-Bear's SKOOSHERZ™ plush toys in this District, Build-A-Bear's SKOOSHERZ™ plush toys were designed and conceived of in this District, and Defendants can otherwise be found in this District by virtue of the acts identified above.

12.    There is an actual, ripe, and justiciable controversy between Build-A-Bear and Defendants concerning whether Defendants have valid and enforceable trade dress rights under the Lanham Act in their Squishmallows products and whether Plaintiff Build-A-Bear's SKOOSHERZ™ plush toys infringe any trade dress rights associated with Defendants' Squishmallows products under the Lanham Act.  One or more Defendants have previously or are currently asserting trade dress rights in their Squishmallows products under the Lanham Act against multiple manufacturers and sellers of plush toys, including Ty, Inc., Dan-Dee International, and Zuru, LLC, among others.  Additionally, Defendants sued Build-A-Bear on January 29, 2024,

EXHIBIT N
Page 3 of 54

in the 17th Judicial District Circuit Court for Broward County, Florida (*Jazwares, LLC, et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221), attempting to assert Florida state law claims of trade dress infringement and unfair competition relating to Build-A-Bear's SKOOSHERZ™ plush toys. Also on January 29, 2024, Defendants filed an *ex parte* emergency motion for preliminary injunction, in which Defendants asserted injuries purportedly occurring across the country and not limited or specific to Florida (which motion was subsequently denied by the Broward County, Florida court later in the day).

### FACTS RELATING TO BUILD-A-BEAR AND ITS SKOOSHERZ™ PLUSH TOYS

13. Founded in 1997, Build-A-Bear is a multi-generational global brand focused on its mission to "add a little more heart to life" appealing to a wide array of consumer groups who enjoy the personal expression in making their own "furry friends" to celebrate and commemorate life moments.

14. Build-A-Bear currently has nearly 500 interactive brick-and mortar experience locations across the country and around the world, where a variety of formats provide guests of all ages a hands-on entertaining experience and foster a lasting and emotional brand connection.

15. Build-A-Bear also offers engaging e-commerce/digital purchasing experiences on www.buildabear.com including its online "Bear-Builder", the animated "Bear Builder 3D Workshop" and its age-gated, adult-focused "Bear Cave".

16. Although Build-A-Bear started with consumers building their own stuffed plush toys, for many years Build-A-Bear has also sold pre-stuffed plush toys in its retail stores and online at www.buildabear.com and its Build-A-Bear store on Amazon.com.

EXHIBIT N
Page 4 of 54

17.     From humble beginnings and a single retail store in St. Louis, Missouri, Build-A-Bear has emerged as one of the world's leaders in high-quality plush toys, innovative store experiences, and engaging, family-friendly entertainment.

18.     In January 2024, and in anticipation of Valentine's Day celebrations, Build-A-Bear introduced on a global basis its new line of collectible plush friends – SKOOSHERZ<sup>TM</sup> – uniquely styled for optimal hugging benefits.  Displaying a trademarked, unique name evoking their huggability, the adorable SKOOSHERZ<sup>TM</sup> spherical plush friends are made with an ultra-soft plush and stuffing perfect for hugging.

19.     Build-A-Bear's first five SKOOSHERZ<sup>TM</sup> plush toys are all based on original, popular Build-A-Bear plush animals, including:



Build-A-Bear's **SKOOSHERZ<sup>TM</sup>** Pink Axolotl



Build-A-Bear's **SKOOSHERZ<sup>TM</sup>** Strawberry Cow



Build-A-Bear's **SKOOSHERZ™** Spring Green Frog



Build-A-Bear's **SKOOSHERZ™** Rainbow Sparkles Teddy Bear



Build-A-Bear's **SKOOSHERZ™** Red Raptor

20.    Build-A-Bear's SKOOSHERZ™ plush toys are distinctly round or spherical in shape, with bright coloring and features matching Build-A-Bear's original, full animal designs (which it continues to sell).

6

21.     Shown below is a visual comparison of Build-A-Bear's current SKOOSHERZ™ plush toys to its original plush animals on which the SKOOSHERZ™ plush toys are based.





Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl

Build-A-Bear's Original
Pink Axolotl





Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow

Build-A-Bear's Original
Strawberry Cow





Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog

Build-A-Bear's Original
Spring Green Frog

7



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Build-A-Bear's Original
Rainbow Sparkle Teddy Bear



Build-A-Bear's **SKOOSHERZ™**
Red Raptor



Build-A-Bear's Original
Red Raptor

22.    Each SKOOSHERZ™ plush toy not only has labels and/or hang tags depicting Build-A-Bear's long-standing common law and federally registered Build-A-Bear Workshop® name and logo (shown below), but every SKOOSHERZ™ plush toy also has right and left arms, with one arm bearing Build-A-Bear's common law, federally registered, and iconic BAB® heart-shaped paw pad logo (also shown below).

8



23. Build-A-Bear's advertising and marketing of its new SKOOSHERZ™ plush toys consistently and prominently include references to Build-A-Bear as the sole and exclusive source

9

of the SKOOSHERZ™ plush toys.  This includes references to the Build-A-Bear name, the Build-A-Bear Workshop logo, the BAB logo, and other brand indicators on the products, on its website at www.buildabear.com, and in product displays in its physical retail locations, as shown by example below:






EXHIBIT N
Page 10 of 54

24.     Currently, Build-A-Bear's SKOOSHERZ™ plush toys can only be purchased in a Build-A-Bear physical retail store or online through Build-A-Bear's website at www.buildabear.com or the Build-A-Bear store on Amazon.com and are not available for purchase in third-party stores, such as Walgreen's, Walmart, or Target.

## FACTS RELATING TO KELLY TOYS' SQUISHMALLOWS PRODUCTS

25.     Defendants claim to be the sole and exclusive owners of claimed trade dress rights in their Squishmallows product line.

26.     Defendants' descriptions of the features purportedly comprising their claimed trade dress have changed greatly over the years and as applied to various third parties accused by Defendants of trade dress infringement.  Moreover, none of those purported features are consistently used by Defendants as an identifier of source, but instead constitute a mere product design aimed to aesthetically appeal to consumers.

27.     Over time, Defendants and apparently related entities have asserted at least twelve (12) different descriptions of the combined features purportedly make up their claimed trade dress in the Squishmallows product line, including the following descriptions and the respective cases where such assertions were made (With varying descriptions sometimes found even within the same pleadings!):

(1)     *Kellytoy USA, Inc., et al. v. Dan-Dee Int'l, Ltd., et al.*, Case No. 2:18-cv-05399 (C.D. Cal.), at ECF No. 16, First Amended Complaint (filed Aug. 24, 2018), ¶23:

   a.  substantially bell-shaped plush toys embodying fanciful renditions of animals/characters
   b.  embroidered anime-inspired minimalist, whimsical facial features
   c.  a velvety velour-like textured exterior, and
   d.  stuffing with a light "marshmallow," memory foam-like texture

(2)     *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 21, Memorandum in Support of Motion for Preliminary Injunction (filed Feb. 21, 2020), p. 3:

11

      a. specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs
      b. abstract, embroidered facial features based on the Japanese Kawaii style
      c. oval/rounded graphic features
      d. ultra-soft shell and mooshy, silky stuffing

(3) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 24, Declaration of Jeanne Yoon in Support of Kelly Toys' Motion for Preliminary Injunction (filed Feb. 21, 2020), ¶10

      a. The specific shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs
      b. Kawaii abstract, embroidered facial features
      c. Oval/rounded graphic features
      d. An ultra-soft shell and mooshy, silky stuffing

(4) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 24, Declaration of Jeanne Yoon in Support of Kelly Toys' Motion for Preliminary Injunction (filed Feb. 21, 2020), ¶28:

      a. egg/bell-like shape
      b. absence of proportionate/pronounced limbs
      c. simplified Kawaii-inspired aesthetics
      d. short pile silky shell
      e. airy, silky stuffing

(5) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 69, First Amended Complaint (filed May 21, 2020), ¶32:

      a. Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
      b. Simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
      c. Embroidered facial features, such [as] nostrils, and/or mouths
      d. Distinctive contrasting and non-monochrome coloring
      e. Short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(6) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 105, Second Amended Complaint (filed Oct. 21, 2020), ¶34:

   a. Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
   b. Simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
   c. Embroidered facial features, such as nostrils, eyes and/or mouths
   d. Distinctive contrasting and non-monochrome coloring
   e. Short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(7)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 1, Complaint (filed Nov. 2, 2023), ¶3:

   a. Shaped fanciful renditions of animals/characters
   b. Simplified Asian style Kawaii faces
   c. Embroidered facial features
   d. Distinctive and non-monochrome coloring
   e. Velvety velour-like textured exterior

(8)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 26-2, Exhibit A to Jazplus Opposition to Motion to Dismiss (filed Jan. 22, 2024), ¶23:

   a. substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
   b. simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
   c. embroidered two-dimensional facial features, such as eyes, nostrils, mouths
   d. distinctive contrasting and non-monochrome coloring
   e. short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(9)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 26, Jazplus Opposition to Motion to Dismiss (filed Jan. 22, 2024), p. 1:

   a. fanciful rendition of a unique animal with simplified Asian style Kawaii faces in an egg/bell shape in combination with other features that create a distinguishing aesthetic look

13

EXHIBIT N
Page 13 of 54

(10) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 4:

    a. Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

    b. simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

    c. embroidered facial features, such as eyes, nostrils, and/or mouths

    d. distinctive contrasting non-monochrome coloring

    e. short-pile exterior

(11) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 7:

    a. Shaped fanciful renditions of animals/characters

    b. simplified Asian style Kawaii faces

    c. embroidered facial features

    d. distinctive and non-monochrome coloring

    e. short-pile exterior

(12) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 25:

    a. Asian-style Kawaii faces

    b. Rounded shape

    c. embroidered facial features

    d. bright colors

    e. small facial features

    f. small appendages

    g. overall unique minimalistic depiction of cute animals and shapes

(any and all combinations of the foregoing are hereinafter referred to as the "Claimed Squishmallows Trade Dress").

28. Most recently, Defendants have asserted infringement of trade dress descriptions (10) – (12) by Build-A-Bear in Florida state court under Florida common law, but Defendants'

litigation history against third parties suggests that Defendants will likely also claim features found in descriptions (1) – (9) but not found in descriptions (10) – (12), to be identifiers of source for purposes of the Claimed Squishmallows Trade Dress vis-à-vis Build-A-Bear.  For these reasons and others set forth herein, Build-A-Bear is seeking declarations of invalidity, unenforceability, and non-infringement under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, for all features of the Claimed Squishmallows Trade Dress.

29.     The various features Defendants have claimed as components of the Claimed Squishmallows Trade Dress are not all consistently present throughout the entire Squishmallows product line, undermining the assertion of a total product image recognizable by the consuming public as an identifier of a single source.  Defendants contend that their various claimed trade dress features are not easily reduced to writing and that the overall look and image of the Claimed Squishmallows Trade Dress are not limited to specific shapes, colors, textures and graphics.  In fact, Defendants and apparently related entities have previously filed complaints alleging trade dress infringement that included images of the wide variety of Squishmallows products and designs, which images do not consistently display any total product image or commercial impression, such as the following:





30.     No consistent overall look and feel or stable visual appearance can be discerned from Defendants' Squishmallows products.  For example, the snouts are all different (*e.g.*, circular, oval, triangular, and "comma" shaped), with some containing a nose attached to a curved mouth (*e.g.*, dog, leopard, bear, sheep and mouse), one containing a nose and a separate mouth (*e.g.*, sloth), some containing nostrils only (*e.g.*, unicorn, pig, frog, and giraffe), one with lines to resemble an elephant trunk, and some toys lacking a snout altogether (*e.g.*, penguin, which has a beak, and monkey).  One cannot discern distinctive contrasting and non-monochrome coloring in the depicted toys, which run the gamut from various shades of black, brown, tan, white, pink, blue and gray, and including colors and prints found in nature, such as black for the bat, brown for the dog, sloth, bear and monkey, green for the frog, pink for the pig, grey for the mouse and elephant, and leopard and giraffe prints for the corresponding animals.  Even the embroidered, Asian style

16

eyes have no discernible consistency: some eyes have eyelashes (*e.g.*, pink unicorn), some are placed on contrasting fabric bands or face masks (*e.g.*, sloth, monkey and blue sheep), and some even have "closed" eyes (*e.g.*, penguin and blue dog). Some of the toys have contrasting, semi-circular "bellies" whereas others do not, and some have a contrasting irregularly-shaped panel covering the face and belly of the toy (sloth and penguin). The various "appendages" also differ between the toys depicted above, with horns, manes, and differently shaped ears placed on different parts of the toys (floppy, round, folded, not folded, elephant-shaped, or no ears at all).

31. Additional examples of Squishmallows purportedly featuring Defendants' claimed trade dress have been submitted in other cases, and further demonstrate that the Claimed Squishmallows Trade Dress features are not consistently found in every Squishmallows product and accordingly do not create a commercial impression of a single source. For example, not all Squishmallows have "short-pile" fabric or "velvety velour-like textured exterior" because some are made with longer pile fabric (lion's mane and bird's feathers) and some are made with scratchy sequined fabric:



32. All of Defendants' Squishmallows products do not have "rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys". Instead, Defendants' Squishmallows products have all manner of features and graphics that are linear (snowman and

gingerbread man scarf, mummy tape, elf and nutcracker belts, butterfly belly, witch's bodice),
squiggled (clownfish lines, gingerbread man trim and unicorn hair), triangular (elf's collar,
pumpkin eyes, and dinosaur mane), or pointed (fox facial features), while others have details not
"kawaii" in style (nutcracker, jack-o-lantern, witch):





33.     Defendants' ever-changing claimed trade dress features are essential to the use or
purpose of plush products and affect the cost or quality of the products.  If Defendants were granted
the exclusive use of any or all of the Claimed Squishmallows Trade Dress used in any combination
and/or variation, their competitors would be put at a significant non-reputation-related
disadvantage with regard to generic, functional, and non-source identifying features.  Moreover,
the claimed trade dress features constitute the actual benefit that the consumer wishes to purchase,
as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product.

34.     The main messages communicated by Defendants' advertising for its Squishmallows product line are softness/squeezability – and collectability.  Defendants also frequently advertise that their Squishmallows can be used as pillows, which message is mentioned in dozens of marketing materials for the products, demonstrating the functionality of the products. Advertising for Defendants' Squishmallows has touted the fact that "[s]ince 2017, the Squishmallows … have offered comfort, support and warmth as … pillow pals" and Kelly Toys' CEO Jonathan Kelly has also declared that Squishmallows can be used as pillows (among other things) in a news release about the toy:  "Squishy and comforting, they are great … pillows." Because Squishmallows function as pillows, those aspects of the products that render them useful as pillows are functional.  The functional "pillow" features of Squishmallows include, at least, the egg/bell shape, the embroidered facial features (hard or plastic features can be too uncomfortable for a pillow), the short-pile, ultra-soft, velvety velour-like textured exterior, and the light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

35.     These same elements have been advertised by Defendants as being washable – another functional feature, including in exhibits to Defendants' own complaints against alleged third party infringers, including advertising about the Squishmallows products stating that "the unique line is made of super soft spandex EF and polyester stuffing, similar to memory foam, for crazy, cuddly fun.  Caring for Squishmallows is easy:  give them lots of love, wash in warm water and tumble dry on medium heat."

36.     Defendants also advertise the fact that Squishmallows serve the function of offering comfort and "helping to relieve stress and anxiety."  These claims, along with statements about the tactile appeal of the toys and how the products assist those with sensory issues, have been repeated in numerous marketing materials for the products.

37.     Tags, packages, displays and advertisements for Defendants' Squishmallows products tout the functionality of the fact that the toys are "soft", "squishable" and "huggable," with slogans like "SQUEEZE AND CUDDLE ME":



38.     Upon information and belief, Defendants do not own any trademark registrations or exclusive, common law trademark rights to the terms "SQUISH", "SQUISHY", "SQUISHABLE", or "HUGGABLE" in connection with plush toys.

39.     If each aspect of the claimed trade dress were in fact protected trade dress, it would be virtually impossible for competitors to create alternative designs.  For example, Defendants claim as trade dress those elements of its plush products that make the product resemble an animal, including "eyes, snouts and bellies" and "nostrils, and/or mouths."  However, features like eyes, nostrils, ears, and noses are essential to the purpose of creating animal or character figures and are, therefore, functional.  Indeed, many of the asserted elements that are necessary to make Squishmallows resemble their counterparts in nature or a fanciful character (such as eyes, ears, snouts, bellies, nostrils, mouths, coloring, etc.) are functional, and therefore cannot be protectable trade dress.

20

40.     Defendants' claimed "distinctive contrasting non-monochrome coloring" is also functional.  Fanciful coloring of toy and the overall design of plush toys is aesthetically functional in that it is the toys' aesthetic that drives the consumer to purchase them, and this functionality exists independently of any source-identifying function.

41.     If features such as an egg/bell shape, Asian style Kawaii faces with rounded/oval shaped graphics, embroidered facial features, distinctive contrasting non-monochrome coloring, or short-pile fabric exterior were protected trade dress, it would be virtually impossible for competitors to create alternative toy designs for this item's purpose.  From a toy designer's perspective, each of these claimed trade dress features is necessary to either depict the various characters or animals, or is necessary to create this category of pillow-type plush that is currently trending.

## **NUMEROUS SQUISHY PLUSH TOYS EXISTED BEFORE SQUISHMALLOWS ENTERED THE MARKETPLACE IN 2017**

42.     Long before Defendants introduced their Squishmallows product line allegedly featuring the claimed trade dress in 2017, third parties offered for sale and sold (and continue to sell) across the United States a number of products featuring all of the elements of Defendants' claimed trade dress, including but not limited to Squishable's plush animal line starting in 2008, Ty's 2011 and 2012 BEANIE BALLZ, Ty's 2013 BABY BALLZ, and KidRobot's Yummy World products starting in 2015:

EXHIBIT N
Page 21 of 54







YUMMY WORLD Large Macaroon $ 29.99

YUMMY WORLD Large Pea Pod $ 29.99

43.     Long before Defendants introduced their Squishmallows product line featuring the claimed trade dress, each of the claimed trade dress elements, either alone or combined, was prevalent in the U.S. toy market and offered for sale and sold by third parties in interstate commerce.  Many of such toys (or variations thereof) are still sold today, including for example:



23

44.     Moreover, Defendants or related entities have dismissed their complaints against multiple major competitors and their plush products with the claimed trade dress elements, either alone or combined, including but not limited to Ty and its Squishaboos (or Squishy Beanies) plush products and Dan-Dee International and its Squishy plush products.  After such lawsuits were dismissed with prejudice, neither Ty nor Dan-Dee publicly identify that their use is licensed by or affiliated with Defendants in any manner.  Therefore, the product features of these third parties (previously alleged to infringe Defendants' claimed trade dress) do not and cannot identify Defendants as the sole and exclusive source of such trade dress elements, either alone or in combination.

45.     In other words, Defendants have, by their own actions, permitted major third-party competitors like Ty and Dan-Dee to use, without any attribution to Defendants, the same trade dress features that Defendants now claim Build-A-Bear infringes.  Defendants are thereby prevented from acquiring any distinctiveness or secondary meaning in Defendants' Claimed Squishmallows Trade Dress due to a crowded field of products utilizing the very same features Defendants currently claim as trade dress.  Defendants' repeated dismissals with prejudice amounts to admissions that Defendants' claimed rights cannot extend to those products or any others with a similar appearance.  Examples of Ty's current Squishy Beanies and Dan-Dee's current Squishy plush toy are respectively shown below:

**Ty's Squishy Beanies**

**Dan-Dee's Squishy plush toy**



46.     Because third parties have been selling their squishy plush products as identified above before 2017 and for many years thereafter, consumers do not identify any features of the Claimed Squishmallows Trade Dress exclusively with Defendants as the sole source.  Moreover, Defendants' marketing activities and associated expenditures have not established secondary meaning in any trade dress asserted in the Squishmallows product line, because the advertising did not encourage consumers to identify the claimed trade dress solely and exclusively with Defendants.     Indeed, Defendants' own advertising of its product line as the "Original" Squishmallows implicitly acknowledges that there are many other products with similar aesthetic and functional features.

47.     Any commercial success of the Squishmallows product line is attributable to the desirability of the product configuration and functionality rather than the source-designating capacity of the claimed trade dress.

## BUILD-A-BEAR'S SKOOSHERZ™ PLUSH TOYS ARE EASILY DISTINGUISHED FROM DEFENDANTS' SQUISHMALLOWS PRODUCTS

48.     Soft, pillow-like squishie-type products have been trending in the toy industry for a number of years.  Build-A-Bear's SKOOSHERZ™ plush toys are simply the most recent example of pillow-type products in this space, including Squishables, Dan-Dee's Squishy toys,

Ty's Squishaboos, and toys made by Gund, Fiesta, First and Main, Rhode Island Novelty, Moosh, and others, all predating and/or sold contemporaneously in interstate commerce with Defendants' Squishmallows products such that Defendants cannot have acquired any distinctiveness or secondary meaning in the marketplace.

49. As described above, Build-A-Bear's SKOOSHERZ™ plush toys were not copied from Defendants' Squishables but are based upon, and derive from, preexisting Build-A-Bear toys which have been sold for a number of years. Moreover, Build-A-Bear's SKOOSHERZ™ plush toys demonstrate functional revisions (in a pillow-like presentation) to its preexisting Build-A-Bear toys, creating a consistent product offering by Build-A-Bear, and not copied or derived from any source-identifying feature purportedly in Defendants' Squishmallows products. The features present in each of Build-A-Bear's SKOOSHERZ™ plush toys including, for example, the coloration, fabric patterns, facial features, and ear shape and placement come directly from Build-A-Bear's preexisting plush animal products of the same name and design:



Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl



Build-A-Bear's Original
Pink Axolotl



Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow



Build-A-Bear's Original
Strawberry Cow



Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog



Build-A-Bear's Original
Spring Green Frog



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Build-A-Bear's Original
Rainbow Sparkle Teddy Bear

27

EXHIBIT N
Page 27 of 54

 

Build-A-Bear's **SKOOSHERZ™**
Red Raptor

Build-A-Bear's Original
Red Raptor

50.     The design features on Build-A-Bear's SKOOSHERZ™ plush toys come from Build-A-Bear, not Defendants.

51.     There is no confusing similarity between Build-A-Bear's SKOOSHERZ™ plush toys and Defendants' claimed trade dress.  In terms of overall appearance of the products, Build-A-Bear's SKOOSHERZ™ are distinctly spherical or rounded in shape, in contrast to the claimed egg/bell-shaped design of Defendants' Squishmallows product line.  Build-A-Bear's facial features match their preexisting designs and do not mimic Defendants' facial features, including eyes and mouth features that are specifically distinguished in terms of shape (for example, round eyes vs. oval or moon-shaped eyes).  The coloration of Build-A-Bear's products functionally matches the specific animal depicted, including the distinctive yellow colored belly in its original Build-A-Bear "raptor" design and which is a functionally accurate part of this dinosaur depiction.  The parties' respective source-identifying labels and tags are prominently displayed on their respective toys as well.  A visual contrast of Build-A-Bear's SKOOSHERZ™ plush toys and Defendants' Squishmallows products is shown below:

28



Defendants' Archie the Pink Axolotl
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl



Defendants' Evangelica Cow
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow



Defendants' Wendy Green Frog
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog

29

EXHIBIT N
Page 29 of 54



Defendants' Marley Rainbow Bear
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Defendants' Red Snowflake Dinosaur
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Red Raptor

52.   Defendants' Claimed Squishmallows Trade Dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features.  That is, Defendants' claimed trade dress is nonexistent, because product shape and feel and the cosmetic depiction of animals almost invariably serves purposes other than source identification, because the claimed trade dress lacks commercial strength in the form of secondary meaning, and because the features alleged to be Defendants' trade dress were used (and continue to be used) by multiple competitors in interstate commerce long before Defendants offered for sale and/or attempted to acquire trade dress rights in its Squishmallows products.

53.   Upon information and belief, Defendants consistently and prominently offer for sale and sell their Squishmallows products utilizing their federally registered SQUISHMALLOWS

30

trademarks, and to the extent the consuming public identifies the source of Defendants' products, it does so by such registered trademarks, and not the overall shape, size, or commercial appearance of any of Defendants' products. Indeed, Defendants have not even attempted to register trade dress at the federal level in any of their Claimed Squishmallows Trade Dress designs, presumably because they know the U.S. Trademark Office would not approve of Defendants' shifting, vague, and overbroad descriptions of their purported trade dress, and because Defendants know they cannot prove acquired distinctiveness, secondary meaning, and/or sole and exclusive rights to their Claimed Squishmallows Trade Dress.

54.     Although Defendants want their amorphous trade dress definition to include the entirety of a vast, varied product line, the Squishmallows product line lacks any common features, so Defendants cannot register it. Some Squishmallows are animals, some are not. Some have round eyes, some have slits. Some have mouths, some do not. Some have arms or feet, some do not. Some have bellies, some do not. Some have ears, some do not. Some wear clothes, some do not. Some have noses or snouts, some do not. Some have eyes on the tops of their heads, some do not. Defendants' Squishmallows have no consistent colors or color patterns. Because of this utter lack of consistency, Defendants would not be able to submit a single drawing of the claimed trade dress that could possibly satisfy the U.S. Trademark Office's regulatory requirements for providing notice to the public of Defendants' claimed rights. Even if one found the oval/egg-shaped perimeter to be consistent across the product lineup (which it is not), that would not help Defendants because they cannot register trade dress rights in an oval.

55.     In other words, Defendants have avoided any attempt at federal registration of their claimed trade dress because Defendants do not own a single trade dress encompassing all Squishmallows and therefore cannot properly assert trade dress claims against Build-A-Bear.

31

56.     Additionally, consumers are not likely to be confused between the source of the Build-A-Bear SKOOSHERZ™ plush toys compared to Defendants' Squishmallows products. Adults, as purchasers of the Build-A-Bear SKOOSHERZ™ plush toys, are likely to exercise reasonable care when purchasing the parties' respective plush products and can easily distinguish the sources of the parties' products, which, among other things, are clearly and prominently labeled with the parties' names and trademarks.

57.     By selling its SKOOSHERZ™ plush toys, Build-A-Bear does not seek to confuse any consumer as to the source of its products, and there is in fact no actual confusion. Each of Build-A-Bear's SKOOSHERZ™ plush toys is sold in connection with its source-identifying SKOOSHERZ™ trademark and its famous Build-A-Bear name and logo that clearly and prominently identifies Build-A-Bear as the source of the products, including on the product hang tag, the product label, and even with its iconic "BAB" heart paw logo on the arm of each Build-A-Bear SKOOSHERZ™ plush toy.

58.     The advertising and marketing of Build-A-Bear's SKOOSHERZ™ plush toys always includes references to Build-A-Bear as the sole and exclusive source, including on its website at www.buildabear.com and in product displays in its physical retail locations. Moreover, Build-A-Bear's SKOOSHERZ™ plush toys can only be currently purchased in a Build-A-Bear physical retail store or online through Build-A-Bear's website at www.buildabear.com and the Build-A-Bear store on Amazon.com and are not available for purchase in third-party stores like Walgreen's, Walmart, or Target.

59.     This clarity of labeling in packaging, advertising, and sale avoids any likelihood of consumer confusion as to source stemming from the product's configuration, even if any features

32

of the Claimed Squishmallows Trade Dress could be deemed valid and enforceable against any features of Build-A-Bear's SKOOSHERZ[TM] plush toys.

### COUNT I – DECLARATORY JUDGMENT OF INVALIDITY AND UNENFORCEABILITY OF THE CLAIMED SQUISHMALLOWS TRADE DRESS

60.     Build-A-Bear incorporates by reference Paragraphs 1 through 59 as if fully set forth herein.

61.     Defendants have a history of litigious conduct, wherein Defendants have previously asserted in multiple cases against multiple third parties that Defendants have valid and enforceable trade dress in their Squishmallows product line under the Lanham Act.

62.     Further, Defendants have previously asserted in multiple cases against multiple third parties that those third parties' manufacture, advertising and sale of plush toys infringe Defendants' claimed trade dress rights in their Squishmallows product line.

63.     In particular, Defendants and related entities have filed at least thirty-three (33) federal district court lawsuits regarding Defendants' Squishmallows products against hundreds of defendants under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and/or other federal and common law claims.  Those 33 federal lawsuits have been filed over the course of the last seven (7) years in the United States District Courts for the Southern District of New York, the Northern District of Illinois, and the Central District of California.  Defendants have continued filing such federal Lanham Act infringement lawsuits regarding Defendants' Squishmallows products in just the past few months, including filing a Lanham Act trade dress infringement lawsuit against Zuru, LLC, in the Central District of California on November 2, 2023 (*Kelly Toys Holdings, LLC, et al. v. Zuru, LLC*, Case No. 2:2023cv09255), and a Lanham Act trademark infringement lawsuit against over 135 internet toy sellers in the Northern District of Illinois on January 5, 2024 (*Kelly Toys Holdings,*

*LLC v. The Partnerships and Unincorporated Associations Identified on Schedule A*, Case No. 1:2024cv00165).

64.     Defendants have further asserted that Build-A-Bear's SKOOSHERZ™ plush toys infringe Defendants' claimed trade dress rights in its Squishmallows product line under Florida law, having filed a lawsuit against Build-A-Bear in Broward County, Florida, on January 29, 2024. Although nominally brought under Florida law, Defendants' Complaint against Build-A-Bear and subsequently denied *ex parte* emergency motion for preliminary injunction contain contentions not limited to injuries or activities in Florida.  By their allegations in that Florida state court action, Defendants clearly contend that Build-A-Bear's SKOOSHERZ™ plush toys infringe Defendants' claimed trade dress rights in its Squishmallows product line across the United States and not just Florida, thereby directly implicating Defendants' claimed trade dress rights under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., as Defendants have previously asserted and are currently asserting those Lanham Act trade dress rights against hundreds of defendants.

65.     Defendants have also expressly stated in their Florida state court action that Defendants **Vigilantly Protect Their Intellectual Property**", that "Kelly Toys takes steps to ensure that their intellectual property is protected," and that "Kelly Toys will stop at no length to prevent" misuse of its intellectual property.  Defendants' statements of intent to enforce their claimed intellectual property rights and history of litigious conduct are indicative of an actual controversy.

66.     Build-A-Bear has been actively selling and marketing its SKOOSHERZ™ plush toys across the United States starting in January 2024, and otherwise taking concrete steps to conduct activity that could constitute alleged infringement.

EXHIBIT N
Page 34 of 54

67.     Build-A-Bear has a reasonable apprehension of suit by Defendants in view of, among other things, Defendants' history of litigious conduct in federal court under the Lanham Act with respect to their Squishmallows products, Defendants' statements of intent to enforce their claimed intellectual property rights in their Squishmallows products, Defendants' actual lawsuit against Build-A-Bear in Florida state court alleging infringement of trade dress under Florida law, and Build-A-Bear's active sale and marketing of its SKOOSHERZ™ plush toys across the United States.

68.     Build-A-Bear seeks specific relief through a decree of conclusive character so that Build-A-Bear can remove the cloud of Defendants' asserted trade dress infringement with respect to Build-A-Bear's SKOOSHERZ™ plush toys currently being sold and marketed on a nationwide basis.

69.     An actual and justiciable controversy has arisen between Build-A-Bear and Defendants regarding the validity and enforceability of Defendants' claimed rights in the Claimed Squishmallows Trade Dress under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which controversy between the parties having adverse legal interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in this matter.

70.     Build-A-Bear is entitled to a declaratory judgment under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, declaring that no features of Defendants' Claimed Squishmallows Trade Dress are valid, enforceable, or protectable because, *inter alia*: (1) the claimed trade dress is generic; (2) the claimed trade dress is not specifically articulated but instead uses terms to describe its claimed trade dress that are variable, vague, overbroad, and open-ended; (3) the claimed trade dress is not used across the entire Squishmallows product line to gain any consumer recognition as source-identifying features; (4) the claimed trade dress elements are functional; (5) the claimed

trade dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features; (6) Defendants cannot prove first use of the claimed trade dress; and/or (7) the claimed trade dress lacks secondary meaning in the marketplace, such that Defendants are not recognized by consumers as being the sole and exclusive source of goods bearing any or all of the claimed trade dress elements.

### COUNT II – DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE CLAIMED SQUISHMALLOWS TRADE DRESS

71.     Build-A-Bear incorporates by reference Paragraphs 1 through 70 as if fully set forth herein.

72.     Build-A-Bear's SKOOSHERZ™ plush toys do not infringe Defendants' Claimed Squishmallows Trade Dress because no features of Defendants' Claimed Squishmallows Trade Dress are valid or enforceable because, *inter alia*: (1) the claimed trade dress is generic; (2) the claimed trade dress is not specifically articulated but instead uses terms to describe its claimed trade dress that are variable, vague, overbroad, and open-ended; (3) the claimed trade dress is not used across the entire Squishmallows product line to gain any consumer recognition as source-identifying features; (4) the claimed trade dress elements are functional; (5) the claimed trade dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features; (6) Defendants cannot prove first use of the claimed trade dress; and/or (7) the claimed trade dress lacks secondary meaning in the marketplace, such that Defendants are not recognized by consumers as being the sole and exclusive source of goods bearing any or all of the claimed trade dress elements.

73.     To the extent Defendants own any valid or enforceable trade dress rights, Build-A-Bear's SKOOSHERZ™ plush toys do not create any likelihood of consumer confusion, nor are

<div align="center">36</div>

they likely to cause mistake or deceive, or misrepresent the nature, characteristics, qualities or geographic origin of any goods and/or services.

74.     An actual and justiciable controversy has arisen between Build-A-Bear and Defendants regarding Build-A-Bear's purported infringement of Defendants' Claimed Squishmallows Trade Dress under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which controversy between the parties having adverse legal interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in this matter.

75.     Build-A-Bear has not infringed and does not infringe any valid or enforceable rights in Defendants' Claimed Squishmallows Trade Dress, and Defendants have not been and are not likely to be damaged by Build-A-Bear's conduct.

76.     Build-A-Bear is entitled to a declaratory judgment under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, that its manufacture, marketing, and sale of its SKOOSHERZ™ plush toys does not infringe Defendants' claimed trade dress or any of Defendants' related rights in their Squishmallows product line.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Build-A-Bear Workshop, Inc. prays for judgment as follows:  (a) declaring that any and all claimed trade dress rights by Defendants in their Squishmallows products are invalid and unenforceable under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, including specifically 15 U.S.C. §§ 1114 and 1125, and other applicable federal law; (b) declaring that Build-A-Bear's SKOOSHERZ™ plush toys do not infringe any of Defendants' claimed trade dress rights in its Squishmallows products under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, including specifically 15 U.S.C. §§ 1114 and 1125, and other applicable federal law; (c) awarding Build-A-Bear its attorneys' fees, costs, and other expenses, including as an

exceptional case under 15 U.S.C. § 1117 and other applicable federal law; and (d) awarding Build-A-Bear such other and further relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff Build-A-Bear demands a trial by jury as to all claims and all issues so triable.

Dated:  February 12, 2024

Respectfully submitted,

**LEWIS RICE LLC**

By:    /s/  Michael J. Hickey
         Michael J. Hickey, #47136(MO)
         mhickey@lewisrice.com
         Philip J. Mackey, #48630(MO)
         pmackey@lewisrice.com
         Allison E. Knopp, #74724(MO)
         aknopp@lewisrice.com
         600 Washington Avenue, Suite 2500
         St. Louis, Missouri 63101
         (314) 444-7600
         (314) 241-6056 (fax)

         ***Attorneys for Plaintiff Build-A-Bear***
         ***Workshop, Inc.***

39

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BUILD-A-BEAR WORKSHOP, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:24-cv-00211 |
| | ) | |
| KELLY TOYS HOLDINGS, LLC, | ) | |
| KELLY AMUSEMENT HOLDINGS, LLC, | ) | **JURY TRIAL DEMANDED** |
| JAZWARES, LLC, and JAZPLUS, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MOTION TO ENJOIN DEFENDANTS FROM PROCEEDING WITH BAD FAITH, LATER-FILED LAWSUIT</u>

COMES NOW Plaintiff Build-A-Bear Workshop, Inc. ("Plaintiff" or "Build-A-Bear"), by and through its undersigned counsel, and for its Motion to Enjoin Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, Jazwares, LLC, and Jazplus, LLC (collectively the "Defendants") from Proceeding with Bad Faith, Later-Filed Lawsuit, states as follows:

1.     Build-A-Bear filed its Complaint for Declaratory Judgment on February 12, 2024 at 9:59 a.m. CST, and served the same on all Defendants at 2:05 p.m. CST that same day.

2.     Defendants filed a Complaint for Trade Dress Infringement Under the Lanham Act, Common Law Trade Dress Infringement, Copyright Infringement Under the Copyright Act, Common Law Unfair Competition, and California Statutory Unfair Competition against Build-A-Bear in the United States District Court for the Central District of California (the "California Lawsuit") later on February 12, 2024 and served Build-A-Bear on February 13, 2024.

3.     Pursuant to *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002 (8th Cir. 1993), Defendants should be enjoined from proceeding with the California Lawsuit and this

action should proceed because, among other things, Build-A-Bear was the first to file, and Defendants have engaged in bad faith litigation tactics and blatant forum shopping.

4.    Plaintiff's Memorandum in Support of this Motion to Enjoin Defendants from Proceeding with Bad Faith, Later-Filed Lawsuit is filed contemporaneously herewith and incorporated herein.

WHEREFORE, for all the foregoing reasons, and those more fully set forth in Plaintiff's Memorandum in Support, Plaintiff Build-A-Bear Workshop, Inc. respectfully requests that this Court enjoin Defendants from proceeding in the California Lawsuit in favor of this first-filed action, and grant such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

Dated: February 16, 2024                **LEWIS RICE LLC**

By:    /s/  Michael J. Hickey
       Michael J. Hickey, #47136(MO)
       mhickey@lewisrice.com
       Philip J. Mackey, #48630(MO)
       pmackey@lewisrice.com
       Allison E. Knopp, #74724(MO)
       aknopp@lewisrice.com
       600 Washington Avenue, Suite 2500
       St. Louis, Missouri 63101
       (314) 444-7630
       (314) 612-7630 (fax)

       *Attorneys for Plaintiff*
       *Build-A-Bear Workshop, Inc.*

2

EXHIBIT N
Page 41 of 54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of February 2024, a copy of the foregoing was filed electronically.  Further, I certify that a true and accurate copy of the foregoing will be served on Defendants' Registered Agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808, with a courtesy copy provided by email to:

Moez M. Kaba
Hueston Hennigan LLP
523 West 6th Street
Suite 400
Los Angeles, CA 90014
mkaba@hueston.com

*Attorneys for Defendants*

/s/ Michael J. Hickey

3

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| BUILD-A-BEAR WORKSHOP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:24-cv-00211-MTS |
| | ) | |
| KELLY TOYS HOLDINGS, LLC, | ) | |
| KELLY AMUSEMENT HOLDINGS, LLC, | ) | |
| JAZWARES, LLC, and JAZPLUS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ENJOIN DEFENDANTS FROM PROCEEDING WITH BAD FAITH, LATER-FILED LAWSUIT

Defendants Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, Jazwares, LLC, and Jazplus, LLC (collectively, "Defendants") have engaged in coast-to-coast forum shopping relating to their purported intellectual property rights in their Squishmallows products, draining judicial resources along the way.  This Court can, and should, put an end to it.

Defendants began their latest litigation campaign[1] by filing a lawsuit and seeking an "*emergency*," *ex parte* temporary injunction from a Florida state court against Build-A-Bear Workshop, Inc. ("Build-A-Bear") concerning Defendants' asserted intellectual property rights under Florida law in their Squishmallows products (the "Florida Lawsuit").   Incredibly, Defendants provided *no notice to Build-A-Bear, and in fact, deliberately hid the lawsuit and request for injunctive relief from Build-A-Bear*.  The Florida state court rightly and summarily

---

[1] Over the last seven years, Defendants and related entities have filed 33 lawsuits attempting to assert various intellectual property rights, including common law trade dress rights in their Squishmallows products (they have no federal trade dress registrations or applications pending), historically filing in federal court.  However, it appears that Defendants chose to file their *first* lawsuit against Build-A-Bear in Florida state court due to the "unconventional" approach and relief sought (*i.e.*, a "secret" lawsuit seeking an *ex parte* injunction to stop a global retailer's sales of products).

rejected Defendants' underhanded request. In contrast to the initially asserted "emergency" purportedly justifying secretive, *ex parte* proceedings, Defendants thereafter allowed the Florida Lawsuit to languish. Indeed, to this day, Defendants have not served the Florida Lawsuit on Build-A-Bear or taken any further action in the Florida Lawsuit.

Build-A-Bear properly filed its Complaint in this Court seeking a declaration of its rights under federal law, after learning of the allegations made against it in the Florida Lawsuit and the apparent existence of an intellectual property dispute between the parties, and given Defendants' uncertain intentions and failure to move forward with the Florida Lawsuit after their misguided attempt to "sneak one past the goalie" had failed. Apparently undeterred by their failed *ex parte* attack in Florida and just hours after Build-A-Bear filed its Complaint in this Court, Defendants brazenly attempted to try their luck again, this time across the country on the West Coast, by filing a parallel action against Build-A-Bear in the United States District Court for the Central District of California (the "California Lawsuit").

Longstanding and clear Eighth Circuit law squarely prohibits the blatant forum shopping Defendants are attempting. As discussed more fully below, this action—which was filed and served before Defendants' California Lawsuit—must proceed first, and Defendants should be enjoined from pursuing the California Lawsuit pending entry of a final judgment by this Court.

## BACKGROUND

### A.    The Florida Lawsuit

On January 29, 2024, Defendants filed a Verified Complaint in the Circuit Court of Broward County, Florida alleging, *inter alia*, common law trade dress infringement against Build-

EXHIBIT N
Page 44 of 54

A-Bear for the sale of its Skoosherz™ plush toys. (*See* Exhibit 1.)[2] That same day, Defendants also filed a "Verified *Ex Parte* Emergency Motion for Temporary Injunction" in which they sought to enjoin Build-A-Bear from selling its Skoosherz™ products. (*See* Exhibit 2.) In support of their request for extraordinary, "emergency" relief, Defendants told the Florida state court that no notice of the proceedings or request for an injunction should be provided to Build-A-Bear (or even attempted) because such notice "may well cause Build-A-Bear to destroy . . . and/or hide evidence[.]" (*Id.*, at 28.) In a "Request for Emergency Relief" also filed that day, Defendants purported to express concern that Build-A-Bear might remove the case to federal court if it learned of the lawsuit against it. (*See* Exhibit 3, at 2.) Defendants also claimed they were being irreparably harmed "every day" and therefore were entitled to immediate, *ex parte* relief. (*See id.*, at 1.)

Later that same day, the Florida state court denied Defendants' baseless assertion that an "emergency" existed in the first instance. (*See* Exhibit 4.) As of the filing of this Motion, Defendants have taken no further action in the Florida state court since that denial. (*See* Exhibit 5.)

**B.      This Action**

After Build-A-Bear learned of the apparent existence of a dispute between the parties concerning intellectual property matters (despite Defendants' concerted efforts to conceal it, including filing an unsuccessful motion to seal its Complaint and *Ex Parte* Emergency Motion for Temporary Injunction (*see* Exhibit 6)), Defendants took no action to advance the Florida Lawsuit. Build-A-Bear was therefore uncertain as to Defendants' intentions and took the initiative to seek a comprehensive resolution of the dispute on a national basis by filing the instant action on February 12, 2024, and serving Defendants that same day. (*See* ECF Nos. 1, 7-10.)

---

[2] Because Build-A-Bear has never been served with the Florida Lawsuit, its access is limited to the publicly available pleadings from the court file, which bear a "Not an Official Copy – Public Access – Not an Official Copy" watermark.

3

Resolution of this action will refute Defendants' blatantly false allegations concerning the lawfulness of Build-A-Bear's national sales of its Skoosherz™ products, and remove any cloud Defendants have improperly put on Build-A-Bear's good name.

## C.    The California Lawsuit

Build-A-Bear filed the instant action on February 12, 2024 at 9:59 a.m. CST.  (*See* E-Filing Receipt, Exhibit 7.)  Defendants filed the California Lawsuit later that same day and, at 4:14 p.m. CST, sent each of the three undersigned counsel for Build-A-Bear an email attaching a copy of the California Lawsuit.  (*See* Exhibit 8.)  The California Lawsuit is largely duplicative of the instant action.  In their Complaint, Defendants (who are plaintiffs in the California Lawsuit) attempt to assert claims for trade dress infringement under the Lanham Act and common law, copyright infringement under the Copyright Act, and common law and California statutory unfair competition. *See Kelly Toys Holdings, LLC, et al. v. Build-A-Bear Workshop, Inc.*, 2:24-cv-01169-JLS-MAR, ECF No. 1 (C.D. Cal.).  The allegations and claims in the California Lawsuit arise out of the same facts, transactions, and occurrences as those at issue in Build-A-Bear's earlier-filed Complaint in this Court.  Defendants served Build-A-Bear with the California Lawsuit on February 13, 2024. *See id.*, ECF Nos. 12-13.

## ARGUMENT

Because the instant action was filed before Defendants' parallel California Lawsuit, and because the California Lawsuit itself is flagrant forum shopping designed to further harass Build-A-Bear and waste judicial resources,  Defendants should be enjoined from pursuing the California Lawsuit pending issuance of a final judgment by this Court.

4

## A.   The First-to-File Rule and Injunctive Relief

Where, as here, litigation is commenced by a party after that party was named in a lawsuit and that subsequent litigation concerns substantially similar matters as the earlier-filed lawsuit, the proper remedy is the issuance of an injunction in the first-filed suit that enjoins the party from pursuing later-filed, duplicative litigation. *See Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1004 (8th Cir. 1993).

Indeed, the Eighth Circuit has recognized that, "[t]he discretionary power of the federal court in which the first-filed action is pending to enjoin the parties from proceeding with a later-filed action in another federal court is firmly established." *Id.* (collecting cases). Such injunctions are not the sort governed by the factors set forth in *Dataphase Systems Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). *See Nw. Airlines*, 989 F.2d at 1004. Rather, the issue "is simply whether, as between two courts both having jurisdiction over the parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action." *Id.*

To this end, as the Eighth Circuit has explained, it is "well-established" that "in cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case." *Id.* at 1005 (quoting *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488-49 (8th Cir. 1990) (internal quotation omitted)). While this rule is not "rigid, mechanical, or inflexible" and should be applied "in a manner best serving the interests of justice," the "prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply." *Id.* (quoting *United States Fire Ins. Co.*, 920 F.2d at 488-89 (internal quotations and citation omitted)); *see also Pragmatic Software Corp. v. Antrim Design Sys., Inc.*, No. CIV. 02-2595 (JRT/FL, 2003 WL 244804, at *2 (D. Minn. Jan. 28, 2003) (recognizing that, subject to the

EXHIBIT N
Page 47 of 54

interests of justice, the first-to-file rule is a "relatively firm rule"); *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F. Supp. 1334, 1346 (N.D. Iowa 1996), *aff'd*, 119 F.3d 688 (8th Cir. 1997), *cert. denied*, 522 U.S. 1029 (Dec. 15, 1997) ("The 'first-filed rule' has the benefit of being a relatively firm rule that, while providing for the exceptional case, avoids in the main the need for *ad hoc* balancing of innumerable factors on a case-by-case basis and therefore is both more predictable for litigants . . . and more easily applied by the courts . . . ." (internal quotation and alteration omitted)).

Build-A-Bear filed this action before Defendants filed the California Lawsuit. Build-A-Bear also served Defendants with this action (on February 12, 2024) before Defendants served Build-A-Bear with the California Lawsuit (on February 13, 2024). Thus, this action was the first-filed action.[3] And although both this action and the later-filed (and later-served) California Lawsuit were both filed and served in relatively close proximity to one another, the "rebuttable presumption that the first-filed suit should have priority" still applies. *See, e.g.*, *Aqua-Care Mktg. LLC. v. Hydro Sys., Inc.*, 99 F. Supp. 3d 959, 963–64 (S.D. Iowa 2015) (quoting *Terra Int'l*, 922 F. Supp. at 1353 n.3); *see also Barry-Wehmiller Cos., Inc. v. Marschke*, No. 4:09-CV-760 TIA, 2009 WL 3698009, at *2 (E.D. Mo. Nov. 2, 2009) (holding that the "dead heat" exception to the first-to-file rule did not apply where one suit was filed three hours and seven minutes before the second suit); *Anheuser-Busch, Inc. v. Novelis Corp.*, No. 4:06-CV-1399 RWS, 2007 WL 9805625, at *2 n.1 (E.D. Mo. Jan. 3, 2007) ("Because the Court can determine that the Ohio action was filed almost four hours before this one, the 'dead heat' exception to the first-filed rule does not apply."

---

[3] The Eighth Circuit has not clearly stated whether the first-to-file rule depends on the *filing* of the action or *service* of the action. *See, e.g.*, *Marden's Ark, Inc. v. UnitedHealth Grp., Inc.*, No. 19-CV-1653 (PJS/DTS), 2020 WL 13002517, at *6 n.4 (D. Minn. Aug. 20, 2020) (recognizing that "[t]here is some disagreement" on this issue (collecting cases)). Here, like in *Marden's Ark*, the Court need not resolve this issue because, under both standards, this action was first-filed. *See id.*

6

(quoting *Terra Int'l*, 922 F. Supp. at 1350)); *Elec. Controlled Sys., Inc. v. Winegard Co.*, No. CV 09-2670 (MJD/AJB), 2010 WL 11497066, at *3 (D. Minn. Jan. 25, 2010) ("The Court concludes that, even though the Iowa and Minnesota actions were filed close in time, the first-filed rule still applies because the record is uncontradicted that the Iowa action was filed first." (collecting cases)).

Further, this action and the California Lawsuit are sufficiently similar to trigger the first-to-file analysis. While "[n]o definitive standard exists to determine which cases are sufficiently overlapping or duplicative to apply the first-to-file rule[, m]any courts look to whether there is 'substantial overlap' between the various actions or whether the cases are 'substantially similar.'" *Marden's Ark, Inc.*, 2020 WL 13002517, at *7 n.5 (collecting cases) (internal citations omitted); *see also Anheuser-Busch*, 2007 WL 9805625, at *1 ("The two cases do not have to be identical but must have issues that substantially overlap." (citing *Monsanto Tech. LLC v. Syngenta Crop Prot., Inc.*, 212 F. Supp. 2d 1101, 1103 (E.D. Mo. 2002)). As between this action and the California Lawsuit, there is more than "substantial overlap" or "substantial[] similar[ity]." Among other things: (1) the products in which Defendants assert their intellectual property rights (the Squishmallows products) are the same in both actions; (2) Build-A-Bear's accused products (the Skoosherz™ plush toys) are the same in both cases; (3) the principal claims of infringement and validity center around Defendants' claimed trade dress rights under the Lanham Act; and (4) the parties are identical. Indeed, the only differences are that Defendants' later-filed California Lawsuit adds a federal copyright claim for just two of Build-A-Bear's Skoosherz™ plush toys as well as California state law trade dress and unfair competition claims, which include overlapping issues compared to the Lanham Act claims.

As a result, absent compelling circumstances to the contrary, Defendants must be enjoined from pursuing the California Lawsuit during the pendency of this action. *See, e.g.*, *Nw. Airlines*, 989 F.2d at 1004. As discussed below, the facts of this case do not warrant departure from the first-filed presumption, and indeed further militate in favor of the issuance of the injunction.

## B.  No Compelling Circumstances Warrant Departure from the First-Filed Presumption

In considering whether to depart from the first-filed presumption, the Court must examine the particular facts and circumstances for: (i) the existence of bad faith; (ii) whether a "race to the courthouse" occurred; and (iii) whether any undue burden would result from litigating in the first-filed forum. *See Nw. Airlines*, 989 F.2d at 1007. In the end, the Court must consider whether enjoining later-filed, duplicative litigation is warranted given "the spectre of duplicative efforts and costs and of inconvenience to the parties, together with the waste of judicial resources inherent in parallel litigation." *Id.* As the parties against whom the first-to-file rule would be applied, Defendants bear "the burden of showing compelling circumstances." *Lewis & Clark Reg'l Water Sys., Inc. v. Carstensen Contracting, Inc.*, 339 F. Supp. 3d 886, 892 (D.S.D. 2018). Defendants cannot come close to making such a showing, as the undisputed facts clearly demonstrate that *Defendants—not Build-A-Bear—*have engaged in blatant, bad-faith forum shopping.

First, Defendants engaged in bad faith litigation tactics by filing the Florida Lawsuit, in which they asserted that an "emergency" existed requiring the Florida state court to issue an *ex parte* injunction (with no notice) against Build-A-Bear, only to thereafter apparently abandon that litigation and not even serve Build-A-Bear with the Florida Lawsuit. Moreover, Defendants told the Florida state court that this matter was an "emergency" and they needed immediate injunctive relief, but subsequently filed the California Lawsuit (*after* Build-A-Bear filed this action) in which they seek only a permanent injunction, and are not even alleging the need for preliminary relief,

much less that an "emergency" exists.  This kind of duplicitous conduct evidences bad faith on the part of Defendants.

Second, Build-A-Bear commenced these proceedings only after Defendants appeared to have given up on the Florida Lawsuit after their sneak attack on Build-A-Bear failed.  In other words, despite their best efforts to conceal their litigation conduct, Defendants made known their belief that a dispute exists with Build-A-Bear relating to the Squishmallows products and Skoosherz™ plush toys, but took no further action to resolve that dispute after the Florida state court shut down Defendants' covert scheme.  Build-A-Bear rightly commenced these proceedings to resolve that dispute on a national basis, as the dispute did not appear likely to be resolved in the Florida state court.[4]  *See Nw. Airlines*, 989 F.2d at 1007 (explaining that plaintiff's suit was not filed in anticipation of defendant's lawsuit because defendant's lawsuit "was not truly contemplated until after [plaintiff] had filed its action").  Build-A-Bear was not required to wait by idly to see whether Defendants would pursue the apparent dispute by commencing separate proceedings against Build-A-Bear elsewhere.  *See, e.g.*, *Nw. Airlines, Inc. v. Filipas*, No. CIV 07-4803 JNE/JJG, 2008 WL 1773756, at *4 (D. Minn. Apr. 15, 2008) (agreeing with Washington court's conclusion that party who filed declaratory judgment action "was not under an obligation to sit quietly and wait for plaintiffs to make up their minds" regarding whether or not they would sue).  Build-A-Bear was fully entitled to commence these proceedings, to which the later-filed California Lawsuit must yield.  *See Nw. Airlines*, 989 F.2d at 1007 (affirming the district court's

---

[4] The passage of time has proven Build-A-Bear's belief to be well-founded.  Again, as of the filing of this Motion, Defendants have taken no action to pursue the Florida Lawsuit.  Instead, Defendants improperly filed separate litigation in federal court—the California Lawsuit—after Build-A-Bear filed this action.  As noted, the "emergency" Defendants urged the Florida state court to immediately enjoin without prior notice to Build-A-Bear has apparently subsided, as Defendants seek only permanent injunctive relief in the California Lawsuit.

conclusion that plaintiff did not act in bad faith or race to the courthouse because plaintiff brought its action to remove the chilling effect imposed by defendant's assertion that plaintiff was violating the law).

Third, it was *Defendants'* later-filed litigation—the California Lawsuit—that was reactionary, not the instant Declaratory Judgment Complaint. Defendants filed a lawsuit in Florida, in attempted secrecy, concerning this plush toy product dispute. Defendants then apparently abandoned that lawsuit once their requested relief was denied and they lost credibility with the Florida state court.[5] Then, after Build-A-Bear commenced this action to ensure resolution of the apparent intellectual property dispute, Defendants filed the California Lawsuit. If there was any race to the courthouse, it was by Defendants, not Build-A-Bear.

Given all of the foregoing, the relevant circumstances, including the lack of any plausible undue burden that would result from Defendants litigating this matter in this forum, only reinforce application of the first-filed presumption in favor of Build-A-Bear.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff Build-A-Bear Workshop, Inc. respectfully requests that this Court enjoin the Defendants from proceeding in the California Lawsuit in favor of this first-filed action.

---

[5] In its denial (<u>Exhibit 4</u>) of Defendants' *ex parte* motion as not qualifying as an "emergency," the Florida state court cited its own Administrative Order regarding civil emergency matters (Administrative Order 2021-50-CIV) (*available at* https://www.17th.flcourts.org/wp-content/uploads/2021/09/2021-50-Civ.pdf), which in turn states that "an attorney or party who seeks 'emergency' review loses credibility when the court determines there is no true emergency." (citing *USAA Cas. Ins. Co. v. Pembroke Pines MRI, Inc.*, 24 So. 3d 588 (Fla. 4th DCA 2009)).

10

Respectfully submitted,

Dated: February 16, 2024

**LEWIS RICE LLC**

By:  /s/  Michael J. Hickey
Michael J. Hickey, #47136(MO)
mhickey@lewisrice.com
Philip J. Mackey, #48630(MO)
pmackey@lewisrice.com
Allison E. Knopp, #74724(MO)
aknopp@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

***Attorneys for Plaintiff***
***Build-A-Bear Workshop, Inc.***

11

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of February 2024, a copy of the foregoing was filed electronically. Further, I certify that a true and accurate copy of the foregoing will be served on Defendants' Registered Agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808, with a courtesy copy provided by email to:

> Moez M. Kaba
> Hueston Hennigan LLP
> 523 West 6th Street
> Suite 400
> Los Angeles, CA 90014
> mkaba@hueston.com
>
> *Attorneys for Defendants*

/s/ Michael J. Hickey

12

# EXHIBIT O



Try the **Copyright Public Records System (CPRS)** pilot with enhanced search features and filters.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

---

# Public Catalog

Copyright Catalog (1978 to present) at DC4
Search Request: Left Anchored Copyright Number = VA0002096026
Search Results: Displaying 1 of 1 entries

◄ previous    next ►

---



### *SQUISHMALLOW FROG.*

| | |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VA0002096026 / 2017-02-28 |
| **Application Title:** | SQUISHMALLOW FROG. |
| **Title:** | SQUISHMALLOW FROG. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Kellytoy Worldwide, Inc. Address: 4811 S. Alameda Street, Los Angeles, CA, 90058, United States. |
| **Date of Creation:** | 2017 |
| **Date of Publication:** | 2017-01-02 |
| **Nation of First Publication:** | Hong Kong |
| **Authorship on Application:** | Kellytoy Worldwide, Inc., employer for hire; Citizenship: United States. Authorship: sculpture. |
| **Rights and Permissions:** | Mark B. Mizrahi, 11400 West Olympic Blvd., 9th Floor, Los Angeles, CA, 90064, United States, (310) 478-4100, patentandtrademarks@wrslawyers.com |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Kellytoy Worldwide, Inc. |



**Save, Print and Email ([Help Page](#))**

Select Download Format | Full Record | Format for Print/Save

Enter your email address: [_____] | Email

---

[Help](#)   [Search](#)   [History](#)   [Titles](#)   [Start Over](#)

[Contact Us](#)   |   [Request Copies](#)   |   [Get a Search Estimate](#)   |   [Frequently Asked Questions (FAQs) about Copyright](#)   |   [Copyright Office Home Page](#)   |
[Library of Congress Home Page](#)



Try the **Copyright Public Records System (CPRS)** pilot with enhanced search features and filters.

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present) at DC4

Search Request: Left Anchored Copyright Number = VA0002346938

Search Results: Displaying 1 of 1 entries

◀ previous    next ▶



### *Axolotl Archie.*

| | |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VA0002346938 / 2023-04-14 |
| **Application Title:** | Axolotl Archie. |
| **Title:** | Axolotl Archie. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Kelly Toys Holdings, LLC. Address: 4811 South Alameda Street, Los Angeles, CA, 90058, United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2020-09-28 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Kelly Toys Holdings, LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: sculpture. |
| **Rights and Permissions:** | Isabelle Greenberg, CRGO LAW, 12161 Ken Adams Way, Suite 110-SS, Wellington, FL, 33414, United States, (561) 990-5503 xext200, ijung@crgolaw.com |
| **Names:** | Kelly Toys Holdings, LLC |



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format  Full Record ▾ | Format for Print/Save | |
| Enter your email address: | | Email |

---

**Contact Us**  |  **Request Copies**  |  **Get a Search Estimate**  |  **Frequently Asked Questions (FAQs) about Copyright**  |  **Copyright Office Home Page**  |
**Library of Congress Home Page**