**LEWIS RICE LLC**
Michael J. Hickey, *Pro Hac Vice*
mhickey@lewisrice.com
Philip J. Mackey, *Pro Hac Vice*
pmackey@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

**KEESAL, YOUNG & LOGAN**
Ben Suter, CASB No. 107680
ben.suter@kyl.com
Stacey M. Garrett, CASB No. 155319
stacey.garrett@kyl.com
A Professional Corporation
400 Oceangate, Suite 1400
Long Beach, California 90802
(562) 436-2000
(562) 436-7416 (fax)

*Attorneys for Defendant Build-A-Bear Workshop, Inc.*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY TOYS HOLDINGS, LLC; JAZWARES, LLC; KELLY AMUSEMENT HOLDINGS, LLC; and JAZPLUS, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> BUILD-A-BEAR WORKSHOP, INC., <br><br> Defendant. | Case No. 2:24-cv-01169-JLS-MAR <br><br> **BUILD-A-BEAR WORKSHOP, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** <br><br> Date:    June 28, 2024 <br> Time:    10:30 a.m. <br> Place:   Honorable Josephine L. Staton <br>         Courtroom 8A |

Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant Build-A-Bear Workshop, Inc. ("Build-A-Bear") requests that the Court take judicial notice of, or alternatively deem incorporated by reference into Plaintiffs' Amended Complaint, the following:

- 1 -

1.     Images of Squishmallows taken from Plaintiffs' public pleadings in other lawsuits, as shown in **Exhibit A**;

2.     The results of searches for the term "Squishmallows" on three major e-commerce websites, Amazon.com (last accessed 3/3/2024) (**Exhibit B**), Walmart.com (last accessed 3/3/2024) (**Exhibit C**), and Target.com (last accessed 3/3/2024) (**Exhibit D**);

3.     The fact that Plaintiff Jazwares, LLC's website, www.jazwares.com/pages/squishmallows, displays Squishmallows not shown in Plaintiff's Complaint, including images shown in Build-A-Bear's current Motion to Dismiss;

4.     The fact that non-party, Ty, Inc. currently markets and sells certain plush toy products on its website at (https://shop.ty.com/catalog/sab/?lang=en and https://shop.ty.com/catalog/puffies/?lang=en) (last accessed 3/3/2024), printouts of which are attached hereto as **Exhibit E**;

5.     The fact that non-party, Dan-Dee International Ltd. sold a certain plush toy product through Wal-mart until at least as recent as December 21, 2023, as shown in **Exhibit F** (last accessed 12/21/2023);

6.     The fact that non-party Squishable.com has marketed certain plush toy products since 2008 (https://web.archive.org/web/20081205033257/http:/www.squishable.com:80/), and currently markets certain plush toy products on its website (https://www.squishable.com/category/Big_Animals.html) (last accessed 3/3/2024), attached hereto as **Exhibit G**;

7.     The fact that non-party Kidrobot has marketed certain plush toy products since 2015 (https://web.archive.org/web/20150925074656/https://www.kidrobot.com/collections/yummy-world), and currently markets certain plush toy products on its website (https://www.kidrobot.com/collections/yummy-world) (last accessed 3/3/2024), attached hereto as **Exhibit H**;

8.     Pleadings in *Kellytoy USA, Inc., et al. v. Dan-Dee Int'l, Ltd., et al.*, Case No. 2:18-cv-05399 (C.D. Cal.) attached hereto as **Exhibit I**;

9.      Pleadings in *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.) attached hereto as **Exhibit J;**

10.     Pleadings in *Kellytoy Worldwide, Inc., et al. v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.) attached hereto as **Exhibit K;**

11.     Pleadings in *Kelly Toys Holdings, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.) attached hereto as **Exhibit L;**

12.     Pleadings in *Kellytoy Worldwide, Inc. v. Hugfun International, Inc.*, Case No. CV-19-07652-MWF (C.D. Cal.) attached hereto as **Exhibit M**;

13.     Pleadings in *Build-A-Bear Workshop, Inc. v. Kelly Toys Holdings, et al.*, Case No. 2:24-cv-00211 (E.D. Mo.) attached hereto as **Exhibit N**; and

14.     Compilation of trade dress descriptions set forth in Plaintiffs' pleadings in this case, Case No. 2:24-cv-01169 JLS (MARx), and the pleadings in the cases referenced above (Exhibits I through M), attached hereto as **Exhibit O**.

## I.      <u>LEGAL STANDARD</u>

Judicial notice under Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).  Facts subject to judicial notice may be considered on a motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

Additionally, "[i]f a document is not attached to a complaint, it may be incorporated by reference 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Royal 4 Sys., Inc. v. RLI Ins. Co.*, No. CV 22-05732-RSWLRAO, 2022 WL 19263327, at *3 (C.D. Cal. Dec. 9, 2022) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "'The doctrine

prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken–or doom–their claims.'" *Clement 1 LLC v. Scottsdale Ins. Co.*, No. CV 23-3779 PA (JCX), 2023 WL 4492422, at *2 (C.D. Cal. July 11, 2023) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 889 F.3d 988, 1002 (9th Cir. 2018)).

## II.   **ARGUMENT**

### A.   **Item Nos. 1 and 8 – 14 Relate to Pleadings Filed in Other Judicial Proceedings or Summaries Thereof and Are Proper Subjects for Judicial Notice**

Public pleadings from prior lawsuits filed by Plaintiffs are the proper subject of judicial notice. The Ninth Circuit has consistently held that district courts may take judicial notice of pleadings filed in other courts. *See, e.g., Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("[i]t is well established that we may take judicial notice of judicial proceedings in other courts."); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of, *inter alia*, the plaintiff's briefs from another case reasoning "[w]e may take judicial notice of court filings and other matters of public record" because those documents are "the proper subject of judicial notice"); *Wilkins v. VanDiver*, No. 820CV02417JLSDFM, 2022 WL 18229997 (C.D. Cal. Oct. 25, 2022) (quoting *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007)) ("Courts 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'").

The referenced images of Plaintiffs' various Squishmallows products in Exhibit A attached hereto, filed by Plaintiffs in prior lawsuits, are directly related to Plaintiffs' claims against Build-A-Bear (indeed, the products form the basis of Plaintiffs' claims), and the deficiencies of Plaintiffs' asserted trade dress definition which are highlighted in Build-A-Bear's Motion to Dismiss. Plaintiffs did not merely assert trade dress rights or trade dress infringement of certain specified

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
CASE NO. 2:24-CV-01169-JLS-MAR

Squishmallows products within the entire Squishmallows line.  Instead, Plaintiffs invoked purported trade dress rights in the *entire* product line as part of their Complaint, and images of other products from the line may be considered, especially those that Plaintiffs have themselves asserted in other lawsuits to be representative of the trade dress.

Furthermore, statements made by and photographs asserted by Plaintiffs in other judicial proceedings concerning their purported rights in the Squishmallows are readily verifiable, not subject to reasonable dispute, and are a matter of public record. Plaintiffs not only defined the purported Squishmallows trade dress as that which is shown in their asserted images, but Plaintiffs also presented several different trade dress definitions throughout pleadings in other courts.  Again, as stated with regard to the images Plaintiffs asserted in other courts, Plaintiffs' asserted trade dress definitions are directly related to the rights Plaintiffs claim to own, if any, and Plaintiffs' ability to prove said rights.

The pleadings containing Plaintiffs' claimed trade dress definitions are a matter of public record.  Accordingly, the pleadings which contain images purportedly displaying Plaintiffs' trade dress and Plaintiffs' claimed trade dress definitions are properly subject to judicial notice.  As discussed above, courts routinely take judicial notice of pleadings filed in other courts. *E.g., Rosales-Martinez*, 753 F.3d at 894.

**B.    Items 2 Through 7 Relates to the Existence of Additional Squishmallows Products as Well as the Existence of Prior Products Encompassing Plaintiffs' Asserted Trade Dress**

Items 2 and 3 relates to the existence of numerous Squishmallows products online in the public marketplace at retailers such as Amazon (Exhibit B), Walmart (Exhibit C), and Target (Exhibit D) and on Plaintiff Jazwares, LLC's own website, that are not included in Plaintiffs' Complaint, are properly judicially noticeable.  "It is common 'for courts to take judicial notice of factual information found on the

world wide web.'" *Abundant Living Fam. Church v. Live Design*, Inc., No. 5:22-cv-00140-RSWL-MRWx, 2022 WL 14708949, at *5 (C.D. Cal. Oct. 24, 2022) (internal quotations omitted); *see also   Aguiar v. MySpace LLC*, No. CV-14-05520(SJO)(PJWX), 2017 WL 1856229, at *9 n.6 (C.D. Cal. May 5, 2017) (judicially noticing website screen shots).

The facts presented in Items 2 and 3 (Exhibits B through D and images in Build-A-Bear's Motion to Dismiss) are relevant to Build-A-Bear's argument that Plaintiffs' asserted definition of its trade dress (which Plaintiffs' assert is embodied within its Squishmallows product line) is insufficient where Plaintiffs' definition is overly broad and vague and in fact is not found in every product within the Squishmallows product line.

For similar reasons, Items 4 through 7 relate to the existence of numerous products available in the public marketplace that Plaintiffs previously accused of infringing Plaintiffs' purported rights in the Squishmallows (Items 4 and 5) or exemplify a similar product design to that which Plaintiffs have asserted against Build-A-Bear (Items 6 and 7), and are likewise the appropriate subject of judicial notice.  *See MySpace LLC*, 2017 WL 1856229, at *9 n.6 (taking judicial notice of website screen shots); *see also Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 966 (C.D. Cal. 2005) (taking judicial notice of Amazon webpage and non-party website). Items 3 through 6 are relevant to Build-A-Bear's argument that Plaintiffs' definition of its trade dress is overly broad making it impossible to differentiate between stuffed animals that would be deemed infringing and those that would not be, and Items 6 and 7 are also relevant to Build-A-Bear's arguments that Plaintiffs were not the first entities to use product design elements and features similar to those shown in the Squishmallows product line, *i.e.*, an Asian style, Kawaii face.  Specifically, Items 4 and 5 show that Ty, Inc. and Dan-Dee International Ltd. continued to sell products that were previously accused of trade dress infringement under the same foundation such claims are now brought against Build-A-Bear, calling into question the strength

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
CASE NO. 2:24-CV-01169-JLS-MAR

1    of Plaintiffs' rights, if any.

2          The facts presented in Items 2 through 7 – the existence of numerous other

3    Squishmallows products available on the public market, the existence of products

4    that Plaintiffs previously asserted infringe its purported rights in the Squishmallows,

5    and the existence of numerous products that were marketed and sold (before 2016)

6    and still are marketed and sold today embodying the same or similar product designs

7    to those shown in Plaintiffs' Squishmallows line – are readily verifiable by Plaintiffs

8    and are not subject to any reasonable dispute.

9    **C.      Items 1 – 3 and 8 – 14 Are Properly Incorporated By Reference to**

10   **the Amended Complaint**

11         Additionally, Items 1 – 3 and 8 – 14 may be properly noticed by the Court in

12   view of their incorporation by reference in Plaintiffs' Amended Complaint.

13         **1.      Items 1 – 3 and 8 – 14 Relate to Pleadings and Websites**

14   **Showing or Referencing the Squishmallows Product Line**

15         By asserting its trade dress definition in the Complaint, which allegedly

16   represents a common look across the entire Squishmallows product line, but failing

17   to include the entire line of Squishmallows products, "plaintiffs [are] selecting only

18   portions of [the Squishmallows products] that support their claims, while omitting

19   portions of those very [Squishmallows products] that weaken–or doom–their

20   claims.'" *Clement 1 LLC v. Scottsdale Ins. Co.*, No. CV 23-3779 PA (JCX), 2023

21   WL 4492422, at *2 (C.D. Cal. July 11, 2023) (quoting *Khoja v. Orexigen*

22   *Therapeutics, Inc.*, 889 F.3d 988, 1002 (9th Cir. 2018). Moreover, Plaintiffs' asserted

23   definition of its trade dress, which necessarily includes the entire line of

24   Squishmallows products, forms the basis of Plaintiffs' claim for trade dress

25   infringement. *Interactive Health LLC v. King Kong United States, Inc.*, No. CV 06-

26   1902-VBF(PLAx), 2008 U.S. Dist. LEXIS 126609, at *7 (C.D. Cal. Mar. 6, 2008)

27   ("when a plaintiff seeks protection for an entire line of products, the plaintiff must

28   demonstrate the trade dress signifies an overall look that is consistent throughout the

entire line.").

Thus, under the incorporation by reference doctrine, Items 1 – 3 and 8 – 14 which show additional Squishmallows products in the Squishmallows product line that are not directly shown in the Complaint but which are apparently integral to Plaintiffs' asserted trade dress definition (including those set forth in the pleadings from Items 8 through 13 and 14) and thus should be deemed incorporated by reference into the Amended Complaint.

## III.   <u>CONCLUSION</u>

Based on the foregoing, Build-A-Bear Workshop, Inc. respectfully requests that the Court take judicial notice of, or alternatively deem incorporated by reference into Plaintiffs' Amended Complaint, the facts and exhibits identified above.

Respectfully submitted,

DATED: April 4, 2024                    **LEWIS RICE LLC**

By:   */s/ Michael J. Hickey*

Michael J. Hickey, *Pro Hac Vice*
mhickey@lewisrice.com
Philip J. Mackey, *Pro Hac Vice*
pmackey@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

**KEESAL, YOUNG & LOGAN**
Ben Suter, CASB No. 107680
ben.suter@kyl.com
Stacey M. Garrett, CASB No. 155319
stacey.garrett@kyl.com
A Professional Corporation
400 Oceangate, Suite 1400
Long Beach, California 90802
(562) 436-2000
(562) 436-7416 (fax)

*Attorneys for Defendant Build-A-Bear Workshop, Inc.*

- 8 -

# EXHIBIT A

*Kelly Toys Holdings, LLC et al. v. Build-A-Bear Workshop, Inc.*, 2:24-cv-01169 JLS (MARx) (C.D. Cal.) ECF No. 1 at 2, 4, 8, 10, 14, 18-19 (filed Feb. 12, 2024).





EXHIBIT A
Page 1 of 15





2

EXHIBIT A
Page 2 of 15



3

EXHIBIT A
Page 3 of 15

*Kelly Toys Holdings, LLC et al. v. Zuru, LLC*, 2:23-cv-09255 (C.D. Cal.) ECF No. 1 at 2, 4, 8–10, 12–13, 16 (filed Nov. 2, 2023).



EXHIBIT A
Page 4 of 15



*Kelly Toys Holdings, LLC v. www.axolotlsquishmallow.com.*, 1:23-cv-01382 (AKH) (S.D.N.Y.) ECF No. 6-1 at 1–4 (filed Mar. 6, 2023).



2

EXHIBIT A
Page 5 of 15

*Kelly Toys Holdings LLC v. 19885566 Store*, 1:22-cv-09384-JMF (S.D.N.Y.) ECF No. 6 at 11-13 (filed Dec. 12, 2022).



*Kelly Toys Holdings, LLC v. Chang Sha Zhuo Qian Dian Zi Ke Ji You Xian Gong Si*, 1:22-cv-03739 (JPO) (S.D.N.Y.) ECF No. 8 at 11-12 (filed May 31, 2022).



*Kelly Toys Holdings, LLC v. Top Dep't Store*, 1:22-cv-00558 (PAE) (S.D.N.Y.) ECF No. 6 at 8 (filed Feb. 2, 2022).



5

EXHIBIT A
Page 6 of 15

*Kelly Toys Holdings, LLC v. Alialialill Store*, 1:21-CV-08434 (AKH) (RWL) (S.D.N.Y.) ECF No. 8 at 11-13 (filed Nov. 15, 2021).



*Kelly Toys Holdings, LLC v. www.Squishmallow-Official.Com*, 1:21-cv-08431 (JPC) (S.D.N.Y.) ECF No. 5 at 10 (filed Oct. 27, 2021).



*Kelly Toys Holdings, LLC v. Abderah-54*, 21-cv-8433 (RA) (S.D.N.Y.) ECF No. 7 at 11 (filed Nov. 5, 2021).



6

*Kelly Toys Holdings, LLC v. Airpods Pro Store*, 1:21-cv-08435 (LJL) (S.D.N.Y.) ECF No. 8 at 11, 13 (filed Mar. 16, 2022).



*Kelly Toys Holdings, LLC v. Dongguan Yikang Plusei Toys Co.*, 1:21-CV-08111 (JGK) (S.D.N.Y.) ECF No. 6 at 8 (filed Oct. 13, 2021).



*Kelly Toys Holdings, LLC v. Baoding Mi Xiaomei Trading Co., Ltd., et al.*, 1:21-cv-06029-LGS-SLC (S.D.N.Y.) ECF No. 5 at 12-13 (filed Sep. 13, 2021).



7

*Kellytoy Worldwide, Inc. v. Idea Nuova, Inc. et al.*, 2:20-cv-02040-CBM-JPR (C.D. Cal.) ECF No. 1-1 at 1 (filed Mar. 2, 2020).



8

EXHIBIT A
Page 9 of 15

*Kellytoy Worldwide, Inc. et al v. TY, Inc. et al.*, 1:20-cv-00748 (N.D. Ill.) ECF No. 1-2 at 1-2 (filed Jan. 31, 2020).



*Kellytoy Worldwide, Inc. v. Hugfun, International, Inc. et al.*, 2:19-cv-07652 (C.D. Cal.) ECF No. 1 at 28, 30–33 (filed Sep. 4, 2019).



9

EXHIBIT A
Page 10 of 15



10

EXHIBIT A
Page 11 of 15



**Keychain Packs**
$9.99

Get Keychain Packs!

**Small Baby Squad**

Get Small Baby Squad!

**Small Squads**

Get Small Squads!

**Cameron "Cam"**
$14.99 – $24.99

Get Cameron "Cam"!

**Fifi**
$14.99 – $24.99

Get Fifi!

**Hans**
$14.99 – $24.99

Get Hans!

**Ace**
$14.99 – $24.99

Get Ace!

**Astrid**
$14.99 – $24.99

Get Astrid!

**Stanley**
$14.99 – $24.99

Get Stanley!

**Connor**
$14.99 – $24.99

Get Connor!

**Simon**
$14.99 – $24.99

Get Simon!

**Tim**
$14.99 – $24.99

Get Tim!

11

EXHIBIT A
Page 12 of 15



12

EXHIBIT A
Page 13 of 15



**Bop**
$14.99
Get Bop!

**Bubbles**
$14.99
Get Bubbles!

**Buttons**
$14.99
Get Buttons!

**Charlotte**
$14.99
Get Charlotte!

**Chuck**
$14.99
Get Chuck!

**Sophie**
$14.99
Get Sophie!

13

EXHIBIT A
Page 14 of 15



**Addison**
$14.99
Get Addison!

**Ava**
$14.99
Get Ava!

**Blake**
$14.99
Get Blake!

**Emma**
$14.99
Get Emma!

**Harper**
$14.99
Get Harper!

**Jaxton**
$14.99
Get Jaxton!

**Liam**
$14.99
Get Liam!

**Mia**
$14.99
Get Mia!

**Olive**
$14.99
Get Olive!

**Small Baby Squad**
Get Small Baby Squad!

14

EXHIBIT A
Page 15 of 15

# EXHIBIT B

Delivering to St Louis 63150
Update location

| All | squishmallows |

EN    Hello, sign in
Account & Lists    Returns & Orders    0

All    Medical Care ▾    Groceries ▾    Best Sellers    Amazon Basics    Prime ▾    New Releases    Customer Service    Music        Shop women-owned businesses

1-48 of over 10,000 results for **"squishmallows"**                    Sort by: Featured

**Eligible for Free Shipping**
  Free Shipping by Amazon
Get FREE Shipping on eligible orders shipped by Amazon

**More-sustainable Products**
  Climate Pledge Friendly

**Department**
Toys & Games
  Stuffed Animals & Teddy Bears
  Kids' Plush Toy Pillows
  Plush Figure Toys
  Arts & Crafts Supplies
Home & Kitchen

**Customer Review**
  ⭐ & Up
  ⭐ & Up
  ⭐ & Up
  ⭐ & Up

**Toy Character**
Stitch
Harry Potter
Pokemon
Sonic the Hedgehog
Eeyore
Nightmare Before Christmas
Lilo
▾ See more

**Brands**
Squishmallows
TeeTurtle
Squishville
AIXINI
Niuniu Daddy
Mewaii
Auspicious beginning
▾ See more

**Toy & Game Price**
Under $25
$25 to $50
$50 to $100
$100 to $200
$200 & Above

| $ Min | $ Max | Go |

**Deals & Discounts**
All Discounts
Today's Deals

**Toys Age Range**
Birth to 24 Months
2 to 4 Years
5 to 7 Years
8 to 13 Years
14 Years & Up

**Material**
Plastic
Silicone
Vinyl



**Squish, Collect and Squad Up with Squishmallows**
Shop Squishmallows >



Squishmallows Original
14-Inch Fritz Green
1

Squishmallows Original
8-Inch Empressa Pink
2

Squishmallows Original
12-Inch Elea Grey
1

Sponsored

## Results



Sponsored

Squishmallows Original 14-Inch
Fritz Green Frog with Easter Print
Belly - Official Jazwares Large
Plush
1
300+ bought in past month
$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



Overall Pick

Squishmallows Official Kellytoy
8" Plush Mystery Pack - Styles
Will Vary in Surprise Box That
Includes Three 8" Plush
7,121
5K+ bought in past month
$22⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



Squishmallows Original 12-Inch
Borsa Spotted Highland Cow -
Medium-Sized Ultrasoft Official
Jazwares Plush
519
10K+ bought in past month
$15⁹⁹ Typical: $56.90

FREE delivery on $35 shipped by
Amazon.
Ages: 3 years and up



+2 colors/patterns





EXHIBIT B

Acrylic
Cotton
Nylon
Polycarbonate
∨ See more

**Toy Figure Theme**
Anime
Comic
Fantasy
Horror
Military
Movie
Sports
∨ See more

**Toy Figure Occasion**
Baby Shower
Bridal Shower
Christmas
Easter
Engagement
Halloween
Hanukkah
∨ See more

**Toy Animal Type**
Bears
Birds
Bunnies & Rabbits
Cats
Dinosaurs
Dogs
Elephants
Fish & Sea Life
Frogs & Amphibians
Giraffes
Horses & Ponies
Kangaroos
Koalas
Lions & Big Cats
Monkeys & Apes
Snakes, Turtles & Reptiles
Zebras

**Stuffed Animals & Plush Toys Size**
4.9 Inches & Under
5 to 6.9 Inches
7 to 9.9 Inches
10 to 14.9 Inches
15 to 19.9 Inches
20 Inches & Above

**Business Type**
Small Business

**Animal Theme**
Bear
Bird
Bull
Butterfly
Cat
Caterpillar
Cheetah
∨ See more

**Toy Figure Special Features**
Light
Sound

**All Top Brands**
Top Brands

**International Shipping**
International Shipping Eligible

Squishmallows Original 14-Inch Lyla Vanilla Birthday Cake with Rainbow Sprinkles Embroidery - Official Jazwares Large Plush
27
2K+ bought in past month
$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Original 8-Inch Reina Green Butterfly with Flower Crown - Official Jazwares Large Plush
27
5K+ bought in past month
$12⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Official Kellytoy Plush 12" Maui The Pineapple - Ultrasoft Stuffed Animal Plush Toy
5,034
2K+ bought in past month
$15⁹⁹ List: $22.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

## Trending now
Sponsored





KMUYSL Unicorn Toys for Girls Ages 3 4 5 6 7 8+ Year - Unicorn Mommy Stuffed Animal with 4 Baby Unicorns in Her Tummy,...
1,442
1K+ bought in past month
$29⁹⁹ List: $45.99
Join Prime to buy this item at $26.99

+24 colors/patterns
Auspicious beginning Shiba Inu Plush-19.6" Corgi Plush Dog Plushies Stuffed Animal, Plushie Toy Anime Kawaii Plush Soft...
16,542
300+ bought in past month
$20⁹⁹ List: $24.99
Save 10% with coupon

19.7" Shiba Inu Plush, Soft Corgi Plushies Adorable Throw Pillow, Cute Puppy Anime Dog Stuffed Animals Gifts for Girls Boys Kids...
115
50+ bought in past month
$17⁹⁹ List: $21.99

## More results







Squishmallows Original 14-Inch Peony Unicorn Pancakes with Whipped Cream - Official Jazwares Large Plush
7
1K+ bought in past month
$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**

Squishmallows 12-Inch Daxxon Purple Alien - Medium-Sized Ultrasoft Official Kelly Toy Plush
486
2K+ bought in past month
$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

Squishmallows 5 Inch (Pack of 10) Plush - Diane Bigfoot, Giles Grasshopper, Maritza Cactus, Nico Axolotl, Rachel Mushroom,...
591
5K+ bought in past month
$37⁵⁵ List: $44.99

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**

EXHIBIT B

**Seller**

Wonderful World Collectibles, LLC
Amazon.com
Rare & Cute Collection
Deblieux
GameHavenNC
Barbi's Bargains
Woohooo LLC

**Availability**

Include Out of Stock

Shop now

Sponsored

Ages: 3 years and up

More Buying Choices
$34.95 (7 used & new offers)



New Arrival Pick

Squishmallows Original 16-Inch Ada Cream Cow with Green Floral Print Spots - Official Jazwares Large Plush

22

1K+ bought in past month

$24⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**
Ages: 3 years and up



Sponsored

Claw Machine for Kids,Mini Vending Machines Candy Grabber Prize Dispenser Toys for Girls,Electronic Arcade Claw...

543

900+ bought in past month

Limited time deal

$39⁹⁹ List: $69.99

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 20 years



Sponsored

Mini Claw Machine for Kids, Arcade Games for Home, Large Candy Claw Machine with Toys Inside, Vending Machines Toys,...

28

50+ bought in past month

$28⁹⁹ List: $34.99

Save 10% with coupon

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 18 years



+13 colors/patterns

Sponsored

Niuniu 13.7in Squishy Boba Tea Plush Toy - Great Gift for Kids

2,210

200+ bought in past month

$19⁹⁹

Save 3% at checkout

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 36 months - 3 years



Sponsored

Butter Slime Kit Two-Toned 11 Packed Fidget Toy, Educational Slime Toys, Birthday Gifts Prize Party Favors for Girl Boys Kids 6...

329

1K+ bought in past month

$11⁹⁹ List: $20.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up



+4 colors/patterns

Squishmallows Original 14-Inch Cam Calico Cat - Large Ultrasoft Official Jazwares Plush

3,395

2K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**
Ages: 3 years and up



Sponsored



Squishmallows Original
Disney 14-Inch Simba Plush -
Large Ultrasoft Official...

200+ bought in past month

$24⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items

## More results



Squishmallows Original 5-Inch
Scented Mystery Plush - Little
Ultrasoft Official Jazwares Plush

706

600+ bought in past month

$8⁹⁹ List: $10.99

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 12-Inch
Willoughby Sage Green Possum -
Medium-Sized Ultrasoft Official
Jazwares Plush

297

1K+ bought in past month

$15⁹⁹ Typical: $34.99

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 14-Inch
Sunshine Rainbow with Clouds -
Large Ultrasoft Official Jazwares
Plush

1,454

2K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$17.42 (9 used & new offers)

Ages: 3 years and up



Sponsored

Squishmallows 10" Gigi The Cat
Plush - Official Kellytoy 2024 -
Collectible Soft Squishy Kitty
Stuffed Animal Toy - Add to Yo...

17

1K+ bought in past month

$24⁴⁸ List: $34.99

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 36 months - 8 years

Sponsored

14 Pack Slime,Super Mini Butter
Slime Kit,Funny Scented Slimes
for Girls and Boys,Party Favor
Birthday Gifts,Soft and Non-...

180

300+ bought in past month

$9⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Sponsored

Squishmallows Original 12-Inch
Elea Grey Lamb with Pink Floral
Belly - Official Jazwares Plush

1

300+ bought in past month

$16⁹⁹

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

3/3/24, 11:03 AM    Case 2:24-cv-01169-JLS-MAR    Document 27-2    Filed 04/04/24    Page 30 of 816    Page ID
Amazon.com : squishmallows
#:984



+24 colors/patterns

Sponsored

Auspicious Shiba Inu Stuffed Animal Plush - 15.7" Cute Dog Pillow and Toy, Soft Anime Kawaii Gifts for Boys and Girls

16,542

300+ bought in past month

$18⁹⁹ List: $35.99

Save 10%  with coupon

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**



+8 colors/patterns

Squishmallows Disney Original 10-Inch Stitch HugMees - Medium-Sized Ultrasoft Official Jazwares Plush

424

3K+ bought in past month

$14⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 8-Inch Pierogi Banana Monkey - Official Jazwares Plush

13

2K+ bought in past month

$12⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Stackables Original 12-Inch Truman Blue Leatherback Turtle - Ultrasoft Official Jazwares Plush

30

1K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 5-Inch Mitchard Kiwi Bear - Official Jazwares Plush

2

1K+ bought in past month

$9⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



+2 colors/patterns

Sponsored

Shiba Inu Dog Plush Pillow, Corgi Stuffed Animal Plush Toy Hug Pillow Gifts for Girl Boy (Brown, 11.8in)

782

50+ bought in past month

$16⁹⁹ Typical: $18.99

Save 10%  with coupon

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

Shop now

Sponsored



Sponsored

LUV HER Squishmallow Girls Add A Charm Box Set with 1 Charm Bracelet & 5 Interchangeable Charms - Ages 3+

78



Sponsored

KMUYSL Cat Plush Toy Birthday Kitty Plush Pillow, Soft Cute Birthday Stuffed Animal Cat Plushies Pillow Home Room...

14



Squishmallows 14-Inch Light Brown Otter with Fuzzy Ears Plush - Add RIE to Your Squad, Ultrasoft Stuffed Animal Large...

932

2K+ bought in past month



Squishmallows Original 12-Inch Charles Pickle with Mustache - Medium-Sized Ultrasoft Official Jazwares Plush

379

2K+ bought in past month

$30⁸⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$29.95 (13 used & new offers)

Ages: 3 years and up



Squishmallows Flip-A-Mallows 12-Inch Mint Ice Cream and Toasted Cinnamon Roll Plush - Add Maya and Chanel to Your...

232

500+ bought in past month

$19⁹⁹ Typical: $39.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$15.73 (7 used & new offers)

Ages: 3 years and up



Squishmallows 14-Inch Pace Tan Fennec Fox - Large Ultrasoft Official Kelly Toy Plush

430

1K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



+2 colors/patterns

Squishmallows 10-Inch Bubbles The Purple Bunny Easter Plush - Official Jazwares- Collectible Cute Soft & Squishy Bunny...

10

1K+ bought in past month



Squishmallows 5" Mystery Box Plush 5 Pack - New 2024 Assortment - Various Styles - Official Kellytoy - Collectible So...

2,366

4K+ bought in past month

$34⁹⁹ Typical: $39.99



Squishmallows Original 14-Inch Reshma Light Pink Cow with Purple Bandana - Large Ultrasoft Official Jazwares Plush

2,943

1K+ bought in past month

$19⁹⁹

EXHIBIT B

$27^{99}$

FREE delivery **Mar 7 - 11**
Or fastest delivery **Mar 6 - 7**
More Buying Choices
$24.99 (2 new offers)
Ages: 36 months - 8 years

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$30.78 (4 used & new offers)
Ages: 24 months and up

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$19.19 (14 used & new offers)
Ages: 3 years and up







+4 colors/patterns

Squishmallows Original 14-Inch
Andreina Pink Monarch Butterfly
with White Sparkle Belly - Large
Ultrasoft Official Jazwares Plush
1,184
1K+ bought in past month
$19^{99}$

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

Squishmallows Original 14-Inch
Perry Teal Dolphin with Red
Surfboard - Official Jazwares
Large Plush
10
1K+ bought in past month
$19^{99}$

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

Squishville by Original
Squishmallows Purple Pals Squad
Plush - Six 2-Inch Squishmallows
Plush Including Bashira, Mollie,...
646
200+ bought in past month
$16^{99}$ List: $17.99

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$12.99 (17 new offers)
Ages: 3 years and up







Squishmallows Original 8-Inch
Maudi Marbled Blueberry
Cupcake with Blue Wrapper -
Official Jazwares Plush
3
700+ bought in past month
$12^{99}$

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
Ages: 3 years and up

Squishmallows 16-Inch Rosie
Spotted Pig with Yellow Flower
Crown - Large Ultrasoft Official
Kelly Toy Plush - Amazon...
467
1K+ bought in past month
$24^{99}$

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$22.18 (7 used & new offers)
Ages: 3 years and up

Squishmallows Original 14-Inch
Rutabaga Caterpillar with
Multicolored Stripes - Large
Ultrasoft Official Jazwares Plush
775
600+ bought in past month
$19^{99}$

FREE delivery **Fri, Mar 8** on $35 of
items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$17.17 (8 used & new offers)
Ages: 3 years and up







Squishmallows Original 14-Inch Scarlito Purple Barn Owl - Large Ultrasoft Official Jazwares Plush

219

600+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices

Squishmallows Original 12-Inch Michaela Rainbow Leopard with Pink Bandana - Official Jazwares Plush

25

1K+ bought in past month

$16⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Squishmallows Original 16-Inch Malcolm Mushroom - Official Jazwares Large Plush

9

1K+ bought in past month

$24⁵⁰

FREE delivery **Fri, Mar 8**
Or fastest delivery **Mar 5 - 6**
Only 1 left in stock - order soon.

Ages: 3 years and up







Squishmallows Original 5-Inch Plush 10-Pack - Gigi Tabby Cat, Dolan Dino, Brina Bigfoot, Maui Pineapple, Amal Moth, and Mor...

8

700+ bought in past month

$44⁹⁹

FREE delivery **Fri, Mar 8**
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$41.89 (5 used & new offers)
Ages: 3 years and up

Squishmallows 12-Inch Aldous Teal and Black Fruit Bat - Medium-Sized Ultrasoft Official Kelly Toy Plush

872

1K+ bought in past month

$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$10.50 (23 new offers)
Ages: 3 years and up

Squishmallows Original 12-Inch Ludwig Teal Frog with Mint Green Belly - Medium-Sized Ultrasoft Official Jazwares Plush

1,335

1K+ bought in past month

$15⁹⁹ Typical: $26.91

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**
More Buying Choices
$12.44 (6 used & new offers)
Ages: 3 years and up







Squishmallows Original 14-Inch Afiyah Pink Pot Succulent - Large Ultrasoft Official Jazwares Plush

EXHIBIT B
8/12

Squishmallows Original 16-Inch Woodward Snowshoe Cat with Fuzzy Belly - Official Jazwares Large Plush

15

800+ bought in past month

$24.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**

700

300+ bought in past month

$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$14.99 (6 used & new offers)

Ages: 3 years and up

Squishmallows Original 16-Inch Andres Brown Sheltie with Hearts Headband - Official Jazwares Large Plush

4

1K+ bought in past month

$24.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Tue, Mar 5**



Squishmallows Original 12-Inch Enid Neon Yellow Mushroom - Medium-Sized Ultrasoft Official Jazwares Plush

206

1K+ bought in past month

$12.17 List: $15.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up



Squishmallows Original 14-Inch Sachie Grey Striped Whale Shark with White Belly - Large Ultrasoft Official Jazwres Plush

783

1K+ bought in past month

$19.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$18.90 (6 used & new offers)

Ages: 3 years and up



Squishmallows 12-Inch Fancy Octopus - Add Zobey to Your Squad, Ultrasoft Stuffed Animal Medium-Sized Plush Toy, Officia...

1,840

800+ bought in past month

$15.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$14.72 (32 used & new offers)

Ages: 3 years and up



Squishmallows Official Kellytoy Plush 16" Austin The Avocado - Ultrasoft Stuffed Veggie Toy

4,045

1K+ bought in past month

$24.99

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon

More Buying Choices
$23.99 (8 used & new offers)

Ages: 3 years and up



Squishmallows 20-Inch Diane Peach Bigfoot with Rainbow Hair - Jumbo Ultrasoft Official Kelly Toy Plush - Amazon Exclusive

495

700+ bought in past month

$39.99

FREE delivery **Fri, Mar 8**
Or fastest delivery **Thu, Mar 7**

More Buying Choices
$37.05 (7 used & new offers)

Ages: 3 years and up



Squishmallows Original 12-Inch Rayen Pancake 3-Stack with Butter Flower - Medium-Sized Ultrasoft Official Jazwares Plush

1,879

700+ bought in past month

$15.99

FREE delivery **Mon, Mar 11** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Only 9 left in stock (more on the way).

More Buying Choices
$13.83 (15 used & new offers)

EXHIBIT B

Ages: 3 years and up



**Squishmallows Original 3.5-Inch Clip-On Plush 5-Pack - Ultrasoft Official Jazwares Plush - Amazon Exclusive**

176

1K+ bought in past month

$19⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

More Buying Choices
$19.79 (3 used & new offers)

Ages: 3 years and up



**Squishmallows Original Harry Potter 10-Inch Gryffindor Lion Plush - Medium-Sized Ultrasoft Official Jazwares Plush**

1,233

3K+ bought in past month

$15⁹⁹

FREE delivery **Fri, Mar 8** on $35 of items shipped by Amazon
Or fastest delivery **Wed, Mar 6**

Ages: 3 years and up

+2 colors/patterns

**Squishmallows Sonic The Hedgehog 10-Inch Sonic Plush - Medium-Sized Ultrasoft Official Kelly Toy Plush**

144

1K+ bought in past month

$24⁷⁵ Typical: $30.45

FREE delivery **Mar 6 - 8**
Or fastest delivery **Wed, Mar 6**
Only 2 left in stock - order soon.

More Buying Choices
$21.90 (33 new offers)

Ages: 3 years and up

## Other items to consider

Sponsored    | Based on products bought together



**Magnet Tiles - Clear Magnetic 3D Building Blocks - Educational Toys, Games, Activities, Puzzles - Creativity, Motor Skills, Learnin...**

169

$49⁹⁹



+2 colors/patterns

**Jurassic Dinosaur Micro Blocks Set, 1530pcs Tyrannosaurus Rex Mini Blocks Building Toys for Adults Boys 8-14 14+ Teens**

127

$24⁹⁰



**Kids 600pcs Set Building Blocks Construction Toy - Learning Playset STEM Educational Kit Child Branin Development...**

473

1K+ bought in past month

$19⁹⁹

Save 40% with coupon

## Related searches

| | | |
|---|---|---|
| gift cards | stuffed animals | slime |
| weighted stuffed animals | mini brands | roblox gift card |

< Previous   **1**   2   3   ···   7   Next >

## Brands related to your search

Sponsored

Squish, Collect and Squad Up with Squishmallows
Shop Squishmallows ›

Soft and snuggly Squishmallows pet beds
Shop Squishmallows ›

## Need help?

Visit the help section or contact us

Sponsored

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| About Amazon | Supply to Amazon | Amazon Secured Card | Shipping Rates & Policies |
| Accessibility | Protect & Build Your Brand | Amazon Business Card | Amazon Prime |
| Sustainability | Become an Affiliate | Shop with Points | Returns & Replacements |
| Press Center | Become a Delivery Driver | Credit Card Marketplace | Manage Your Content and Devices |
| Investor Relations | Start a Package Delivery Business | Reload Your Balance | Recalls and Product Safety Alerts |
| Amazon Devices | Advertise Your Products | Gift Cards | Help |
| Amazon Science | Self-Publish with Us | Amazon Currency Converter | |
| | Host an Amazon Hub | | |
| | › See More Ways to Make Money | | |

English          United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |

EXHIBIT B

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info
Entertainment
Professionals
Need

Kindle Direct Publishing
Indie Digital & Print
Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video Direct
Video Distribution
Made Easy

Shopbop
Designer
Fashion
Brands

Amazon
Warehouse
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security
Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart
Security
for Every
Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon Subscription
Boxes
Top subscription boxes –
right to your door

PillPack
Pharmacy
Simplified

Amazon Renewed
Like-new products
you can trust

Conditions of Use     Privacy Notice     Your Ads Privacy Choices
© 1996-2024, Amazon.com, Inc. or its affiliates

# EXHIBIT C



Full-court freshness
Sponsored

Fulfillment Speed | Brand | Price | Sort by | Best Match

Easter toys | Shop All Squishmallows | 12 inch Squishmallows | 16 inch Squishmallows | 20 inch Squishmallows | Cow Squishmallows | Frog Squishmallows | Axolotl Squishmallows | Dog Squishmallows | Cat Squishmallows | Halloween Squishmallows | Easter Squishmallows

- Fulfillment Speed
- Age
- Brand
- Customer Rating
- Price
- Character
- Animal Type
- Color
- Occasion
- Retailer
- Benefit Programs
- Departments
- Availability

**Results for "squishmallows"** (23)

Price when purchased online

+ Add

Now $10.97 $39.99

Squishmallows Plush 10 inch Blue & White Birthday Cake Child's Ultra Soft Plush

950

Pickup today

+ Add

$7.88

Squishmallows Official 8 inch Bubbles the Lavender Bunny with Flower Crown - Child's Ultra Soft Stuffed Plush Toy

4

Pickup today

+ Add

Now $12.98 $28.99

Squishmallows Original Sanrio 8 inch Hello Kitty in a Easter Bunny Suit - Child's Ultra Soft Stuffed Plush Toy

8

Pickup today

+ Add

Now $10.97 $23.25

Squishmallows Official Plush 10 inch Angie the Brown Celebration Dog Child's Ultra Soft Plush Toy

307

Pickup today

Options

$4.98

Squishmallows 3.5" Easter Clip-On Reina the Butterfly

1

Pickup today

+ Add

Now $12.98 $27.99

Squishmallows Official 8 inch Hello Kitty My Melody in a Bunny Suit - Child's Ultra Soft Stuffed Plush Toy

7

Pickup today

+ Add

$9.98

Squishmallows Lavendar Bunny

1

Pickup today

+ Add

$4.98

Squishmallows Official 5 inch Ditty the Salmon Lemur with Flower Pin - Child's Ultra Soft Stuffed Plush Toy

1

Pickup today

+ Add

$4.98

**Lots of toys to love for less**

Their favorite brands at low, low prices!

+ Add

$6.97 $34.85/oz

+ Add

$7.88

Squishmallows Official 5 inch Triston the Yellow Chick Holding a Flower - Child's Ultra Soft Stuffed Plush Toy

Pickup today

**Shop deals**

Squishmallows Molded Lip Balm, 2 Pack, Coconut & Strawberry

⭐⭐⭐⭐ 131

Pickup today

↻ Subscribe

Squishmallows Official 8 inch Bebe the Blue Bird with Bunny Ears - Child's Ultra Soft Stuffed Plush Toy

⭐⭐⭐⭐⭐ 1

Pickup today



# Hop this way

**Break out the baskets**
Bunny-approved toys for every kiddo.

**Shop Easter toys**

+ Add

$9 98
Squishmallows Official Hugmee Plush 10 inch Satine the Peach Bunny with Fuzzy Belly - Child's Ultra Soft Stuffed Toy
Pickup today

+ Add

$19 98
Squishmallows 14 inch Tinley Rainbow Tie-Dye Axolotl Plush
Pickup today

+ Add

$12 98
Squishmallows Official 8 inch Stitch with Bunny Ears - Child's Ultra Soft Stuffed Plush Toy
⭐⭐⭐⭐⭐ 1
Pickup today



+ Add

$19 98
Squishmallows 14 inch Hara the Green Bunny with Carrot Juice - Child's Ultra Soft Stuffed Plush Toy
Pickup today

+ Add

$19 98
Squishmallows 14 inch Keisha - Orange Cupcake W/Orange Frosting
Pickup today

+ Add

$19 98
Squishmallows Official 10 inch Ronnie the Brown Cow Treat Pail - Child's Ultra Soft Stuffed Plush Toy
Pickup today

+ Add

$19 98
Squishmallows Bunny Treat Pail Plush
⭐⭐⭐⭐⭐ 1
Pickup today

+ Add

$10 98
Squishmallows Cotton 2 Piece Towel and Washcloth Set
⭐⭐⭐⭐ 3
Pickup today

+ Add

$9 97
Snackles Small Size Snackle Plush Toy by ZURU Ages 3 and up
⭐⭐⭐⭐ 89
Pickup today

$12 98 $22.99
Squishmallows Official 8 inch Hello Kitty Pompompurin in a Easter Bunny Suit - Child's Ultra Soft Stuffed Plush Toy
⭐⭐⭐⭐⭐ 6
Out of stock
Shop similar

$7 88
Squishmallows Official 8 inch Grant the Tan Goat with Easter Egg - Child's Ultra Soft Stuffed Plush Toy
Out of stock
Shop similar



**Now** $ **5**⁹⁷ $19.99

Squishmallows Original 5-inch Assorted

**Now** $ **34**⁹⁹ $39.99

Squishmallow 5" Plush Mystery Box, 5-Pack -

Squishmallows Official 5 inch Sophie the Cream Lamb with Chocolate Bunny - Child's Ultra Soft Stuffed Plush Toy

$ **27**⁰⁰

Squishmallows Official Plush 8 inch Pink



# EXHIBIT D



Sponsored

## Popular filters

| $15–25 | $0–15 | Up to 11" | New | Easter Squishmallo | Up to 20" |
|---|---|---|---|---|---|
| $15- $25 | $0- $15 | Up to 11" | New | Easter Squishmallo | Up to 20" |

Filter    Sort    Deals    Brand    Height    Price    Featured    Type

## 536 results for "squishmallows"

Pickup    Shop in store    Same Day Delivery    Shipping

| Squishmallov 16" Edwin ... | Squishmallov 16" Aqua... | Squishmallov 5" Plush... | Squishmallov New 10"... |
|---|---|---|---|
| Squishmallows | Squishmallows | Squishmallows | Squishmallows |
| ⭐⭐⭐⭐⭐ 5 | ⭐⭐⭐⭐⭐ 5 | ⭐⭐⭐⭐½ 6 | ⭐⭐⭐⭐⭐ 16 |

EXHIBIT D

$21.99 reg $24.99
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart
Sponsored

$21.99 reg $24.99
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart
Sponsored

$44.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart

$27.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart






Squishmallov
12" Camet...
Squishmallows
★★★★★ 6

$39.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11

Not available in stores

Add to cart

Squishmallov
16" Refalo...
Squishmallows
★★★★★ 121

$24.99
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

Not available in stores

Add to cart

Squishmallov
16" Trinity...
Squishmallows
★★★★★ 17

$21.99 reg $24.99
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart
Sponsored

Squishmallov
16" Dieric...
Squishmallows
★★★★★ 15

$21.99 reg $24.99
Sale
When purchased online

Ships free with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6

In stock at Town And
Country
Ready within 2 hours
with pickup

Add to cart
Sponsored



**Free $15 Target GiftCard** when you spend $50 on select laundry items*

Sponsored



**Squishmallow 16" Purple...**

Squishmallows

⭐⭐⭐⭐⭐ 11

$21.99 reg $24.99
Sale
When purchased online

**Ships free** with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And Country
**Ready within 2 hours** with pickup

Add to cart   Sponsored



**Squishmallow New 8" Zi...**

Squishmallows

⭐⭐⭐⭐⭐ 3

$21.99
When purchased online

**Ships free** with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart



**Kellytoy Squishmal...**

Squishmallows

⭐⭐⭐⭐☆ 3

$62.99 reg $69.99
Sale
When purchased online

**Ships free** with
RedCard or $35 orders
Exclusions Apply.
Get it by Mon, Mar 11
Not available in stores

Add to cart



**Squishmallow Kids'...**

Squishmallows

⭐⭐⭐⭐☆ 25

$20.00
When purchased online

**Ships free** with
RedCard or $35 orders
Exclusions Apply.
Get it by Wed, Mar 6
In stock at Town And Country
**Ready within 2 hours** with pickup

Add to cart



**Girls' Squishmal...**

Squishmallows



**Squishmallow Kids'...**

Squishm...    New at 🎯



**Squishmallow Kids' Throw**

Squishmallows



**Squishmallow 5" Myster...**

Squishmallows

EXHIBIT D

⭐⭐⭐⭐⭐ 243

**$8.99**

When purchased online

Only ships with $35 orders

**Ships free with**

RedCard or $35 orders

Exclusions Apply.

**Get it by Wed, Mar 6**

**In stock** at Town And Country

**Ready within 2 hours** with pickup

Add to cart

⭐⭐⭐⭐☆ 3

**$20.00**

When purchased online

**Ships free with**

RedCard or $35 orders

Exclusions Apply.

**Get it by Wed, Mar 6**

Not available at Town And Country

Check nearby stores

Add to cart

⭐⭐⭐⭐⭐ 37

**$14.99**

When purchased online

**Ships free with**

RedCard or $35 orders

Exclusions Apply.

**Get it by Wed, Mar 6**

**In stock** at Town And Country

**Ready within 2 hours** with pickup

Add to cart

**$47.99**

When purchased online

**Ships free** with

RedCard or $35 orders

Exclusions Apply.

**Get it by Mon, Mar 11**

Not available in stores

Add to cart









**Squishmallo...**
**4" Blind...**

Squishmallows

 ⭐⭐⭐⭐☆ 7

$5.99

**Squishmallo...**
**11" Sakur...**

Squishmallows

⭐⭐⭐⭐⭐ 43

$11.99

**Squishmallo...**
**Fiesta...**

Squishmallows

⭐⭐⭐☆☆ 7

**$24.29** reg ~~$26.99~~

**Squishmallo...**
**11" Neelu...**

Squishmallows

⭐⭐⭐⭐⭐ 14

$11.99

☰                    🎯                

squishmallows

**Get it by Wed, Mar 6**

**In stock** at Town And Country

**Ready within 2 hours** with pickup

Add to cart

**In stock** at Town And Country

**Ready within 2 hours** with pickup

Add to cart

**Get it by Mon, Mar 11**

Not available in stores

Add to cart

**In stock** at Town And Country

**Ready within 2 hours** with pickup

Add to cart

EXHIBIT D



**Free $15 Target GiftCard** when you
spend $50 on select laundry items*

Sponsored









| Squishmallow 8" Sanrio... | Squishmallow 12" Sophi... | Squishmallow 16" Purple... | Squishmallow Collection... |
|---|---|---|---|
| Squishmallows | Squishm...  New at ◎ | Squishmallows | Squishmallows |
| ★★★★☆ 11 | ★★★★★ 3 | ★★★★★ 11 | ★★★★⯪ 14 |
| $14.99 | $14.99 | $21.99 reg $24.99 | $24.99 |
| When purchased online | When purchased online | Sale | When purchased online |
| | | When purchased online | |
| Ships free with RedCard or $35 orders | Ships free with RedCard or $35 orders | Ships free with RedCard or $35 orders | Ships free with RedCard or $35 orders |
| Exclusions Apply. | Exclusions Apply. | Exclusions Apply. | Exclusions Apply. |
| Get it by Wed, Mar 6 | Get it by Wed, Mar 6 | Get it by Wed, Mar 6 | |
| In stock at Town And Country | In stock at Town And Country | In stock at Town And Country | |
| Ready within 2 hours with pickup | Ready within 2 hours with pickup | Ready within 2 hours with pickup | |
| Add to cart | Add to cart | Add to cart | Add to cart |



page 1 of 23 ⌄

## Related searches

EXHIBIT D

| cat stuffed animals | big pikachu plush | plush bear | gund stuffed bear | tigger plush stuffed a |

Sponsored

## Get top deals, latest trends, and more.

| Email address | | Sign up | Privacy policy |

# EXHIBIT E



HOME / SQUISHY BEANIES

**47 Results**

Best Matches

Filter



**HATCH**
EASTER CHICK IN EGG LARGE
**$11.99**

FREE SHIPPING AVAILABLE

**HILDEE**
MULTICOLORED HEDGEHOG
**$9.99** -

Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**SLUSH**
GREY AND WHITE HUSKY
**$9.99**     **$11.99** -

Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE

ADD TO BA          ADD TO BA          ADD TO B





**BITSY**
PURPLE DOG
**$9.99** -

Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**ROXIE**
PINK FOX
**$9.99**     **$11.99** -

Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**FETCH**
DALMATIAN DOG
**$9.99**     **$11.99** -

Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE

EXHIBIT E

ADD TO BA     ADD TO BA     ADD TO B





**CATNIP**
GREY MOUSE
**$9.99**
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**POPPY**
PINK KOALA
**$9.99**     **$11.99**
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**OCTAVIA**
PURPLE OCTOPUS
**$9.99**     **$11.99**
Available In Multiple Sizes
FREE SHIPPING AVAILABLE

ADD TO BA     ADD TO BA     ADD TO B





**NESSA**
MUTLICOLORED CATERPILLAR
**$9.99**
Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**SONNY**
MULTICOLORED CAT
**$9.99**     **$11.99**
 Available In Multiple Sizes
FREE SHIPPING AVAILABLE

**MUFFIN**
PINK AND WHITE CAT
**$9.99**     **$11.99**
Available In Multiple Sizes
FREE SHIPPING AVAILABLE

ADD TO BA     ADD TO BA     ADD TO B




**HEATHER**

**GISELLE**

**HELENA**



PASTEL STRIPED CAT

$9.99        -

  Available In Multiple Sizes

FREE SHIPPING AVAILABLE

MULTICOLOR LEOPARD

$9.99        $11.99        -

Available In Multiple Sizes

FREE SHIPPING AVAILABLE

BLUE HUSKY

$9.99        $11.99

Available In Multiple Sizes

FREE SHIPPING AVAILABLE

| ADD TO BA | ADD TO BA | ADD TO |



**COOPER**
PASTEL SLOTH

$9.99        -

Available In Multiple Sizes

FREE SHIPPING AVAILABLE



**KIRRA**
BLUE CAT

$9.99        $11.99

Available In Multiple Sizes

FREE SHIPPING AVAILABLE



**DUNSTON**
BROWN MONKEY

$9.99        $11.99        -

Available In Multiple Sizes

FREE SHIPPING AVAILABLE

| ADD TO BA | ADD TO BA | ADD TO |



**LINUS**
BROWN AND WHITE LEMUR

$9.99        -

Available In Multiple Sizes

FREE SHIPPING AVAILABLE



**FANTASIA**
PINK UNICORN

$9.99        $11.99

Available In Multiple Sizes

FREE SHIPPING AVAILABLE



**HARMONIE**
WHITE UNICORN

$9.99        $11.99        -

Available In Multiple Sizes

FREE SHIPPING AVAILABLE

| ADD TO BA | ADD TO BA | ADD TO |



**DOTTY**
MULTICOLOR LEOPARD
**$9.99**                    -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**CLOVER**
GREEN BEAR
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**PINKY**
PINK OWL
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



**BAMBOO**
BLACK AND WHITE PANDA
**$9.99**                    -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**HOPE**
PASTEL BEAR
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸



**GILBERT**
PINK GIRAFFE
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|




**WINKS**
PINK OWL
**$9.99**                    -
Ⓜ Ⓛ Available In Multiple Sizes



**KIKI**
GREY STRIPED CAT
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes



**OWEN**
RAINBOW OWL
**$9.99**          **$11.99**      -
Ⓜ Ⓛ Available In Multiple Sizes

FREE SHIPPING AVAILABLE 🇺🇸      FREE SHIPPING AVAILABLE 🇺🇸      FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



Sign in and subscribe to our email list to get Free U.S. Ground Shipping

Sign In    Wishlist    My Bag    En

Holiday   Beanie Boos   Beanies   Bundles   Beanie Bellies   Gift Sets   Squishy Beanies   Beanie Balls   Clips   Ty Fashion   Licensed

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|







**BUTTERCUP**
YELLOW BEAR
**$9.99**
Ⓜ Ⓛ Available In Multiple Sizes
FREE SHIPPING AVAILABLE 🇺🇸

**MUFFIN SQUISH BUNDLE**
MEDIUM AND LARGE
$21.98   **$11.99**
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

**CATNIP SQUISH BUNDLE**
MEDIUM AND LARGE
$21.98
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

| ADD TO BA | ADD TO BA | ADD TO B |
|---|---|---|



**FETCH SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



**OCTAVIA SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



**ROXIE SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BA          ADD TO B



**NESSA SQUISH BUNDLE**
MEDIUM AND LARGE
~~$21.98~~
**$18.99**
FREE SHIPPING AVAILABLE 🇺🇸



**CATNIP AND MUFFIN BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



**BITSY AND KIRRA BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BA          ADD TO B



**DUNSTON AND LINUS BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



**ROXIE AND POPPY BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸



**NESSA AND OCTAVIA BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BA          ADD TO B



**PINKY AND COOPER BUNDLE**
LARGE SQUISHY BEANIES
~~$23.98~~
**$19.99**
FREE SHIPPING AVAILABLE 🇺🇸

**ALL SMILES BUNDLE**
MEDIUM SQUISHY BEANIES
~~$26.97~~
**$23.99**
FREE SHIPPING AVAILABLE 🇺🇸

ADD TO BA          ADD TO BAG

## Squishy Beanies

Ty Squishy Beanies are the soft, huggable friend you can take everywhere you go! Made from colorful, cozy fabric, Squishy Beanies are available in a larger size of many of your favorite Beanie Boos plush characters. These large Beanie Boo squishy plushies have enormous glittery eyes and adorable smiles. Ty Squishy Beanies, sometimes called Squish-a-Boos, will become your child's favorite nap or bedtime squishy pillow animals. Collect all of these squishy, plush animals, and get ready for your Squishy Beanie hugfest!



| ABOUT TY | HOW CAN WE HELP? | POPULAR STYLES | CONNECT |
|---|---|---|---|
| Birthday Calendar | Order Status | Cats | |
| FAQs | Returns and Refund Policy | Disney | |
| Blogs | Contact | Dragons | |
| Privacy Policy | | Unicorns | |
| Terms and Conditions | | Dogs | |
| Distribution Policy | | | |
| CPSIA | | | |

**CONNECT**
🇫 🇹 📷 ▶ 📌

**Email List Subscription**

Subscribe to Ty's email list to receive the latest news about your favorite products!

Enter Your Email    Sign Up

**CUSTOMER SUPPORT**
1-800-876-8000 | M-F 9AM-5PM(CST)

© 2024 Ty - All Rights Reserved

# EXHIBIT F

Toys / Toys for All

 Black-owned beauty.                                                                                    Sponsored ⓘ

Dan Dee

**Dan Dee Unicorn Soft Plush 10-inch Basket All Occasions**

**$29.99**
Price when purchased online ⓘ

[ Add to cart ]

**Up to 60% off gifts**                                                                                    Explore deals

**How do you want your item?**

| 🚚 Shipping<br>Arrives Jan 11<br>$15.99 | 🚗 Pickup<br>Not available | 🛍️ Delivery<br>Not available |

Delivery to  South Gate, 90280

🏬 Sold and shipped by **Revived Retail**

★★★★☆  3 seller reviews
View seller information

ⓘ **Extended holiday returns**  Details
Free Holiday returns until **Jan 31**

♡ Add to list                                         🎁 Add to registry

---

Sponsored
**$14.99**
Plushible Bear 10 Inch (Sitting)
3+ day shipping

[ + Add ]





**500+ bought since yesterday**



[ Options ]

**Now $19.97** $31.99
Bluey Talking 13" Bluey Talking Plush, Ages 3
★★★★☆  691



[ + Add ]

**$29.99**
Dan Dee Large Sparkly Plush Unicorn Dandee Stuffed Animal Gift Present 20" Tall
3+ day shipping



[ + Add ]

**$49.99**
Claire's Club Sound and Dancing Unicorn Soft Toy
3+ day shipping

3+ day shipping



Now $159.99 ~~$209.99~~
Mega Brands MEGA Barbie Dreamhouse
★★★★☆ 29
3+ day shipping

**Best seller**



Options
Sponsored
Now $21.99 ~~$25.99~~
PayUSD Upgrade Kids Selfie Camera, Christmas birthday Gifts for Girls/boys Age 3-9, HD Digital Video Cameras for Toddler, Portable Toy for 3 4 5 6 7 8 Year Old Girl with 32Gb Purple
★★★★☆ 18
2-day shipping





+ Add
Sponsored
Now $21.99 ~~$99.99~~
Dinosaur Toys for 1-2 Year Old Boy, Roar Music and Light Moving Dino Baby Toys with Mist Spray, Electric Dinosaur Birthday Gi
★★★★☆ 475
2-day shipping

## About this item

### Product details ⌄

Dan Dee Unicorn Soft Plush 10-inch Basket All Occasions

ⓘ **We aim to show you accurate product information.** Manufacturers, suppliers and others provide what you see here, and we have not verified it. See our disclaimer

### Specifications ⌄

**Brand**
Dan Dee

**Animal Type**
Unicorn

### Warranty ⌄

**Warranty information**

Please be aware that the warranty terms on items offered for sale by third party Marketplace sellers may differ from those displayed in this section (if any). To confirm warranty terms on an item offered for sale by a third party Marketplace seller, please use the 'Contact seller' feature on the third party Marketplace seller's information page and request the item's warranty terms prior to purchase.

**Earn 5% cash back on Walmart.com.** See if you're pre-approved with no credit risk.    Learn more

★★★★★ (0 reviews)

Write a review

This item doesn't have any reviews yet.

**Debit with rewards.** Get 3% cash back at Walmart, up to $50 a year. See terms for eligibility.    Learn more.

💬 Report incorrect product information

**CeraVe**
New Ultra Light Gel

Sponsored ⓘ

Best seller

Best seller

**1000+ bought since yesterday**



**$26.21**
BLIPPI 16" My Buddy Plush Toy
★★★★☆ 409



Options

+3 options

**$10.99**
Options from $10.99 – $12.89

8",10",12" Rocky Lankybox Merch Stuffed Toys, Lanky Box Toys, Birthday Gift for Kids,

**Now $17.99** ~~$40.00~~ 90.0 ¢/ea
Bluey - Talking Bingo 12" Plush, Ages 3
★★★★☆ 373

---

**Report:** ⓘ Report seller | ⚠ Report suspected stolen goods (to CA Attorney General)

**Related pages**

| | |
|---|---|
| Stuffing Unicorn | Stuffed Emoji |
| Fluffy Unicorn | Unicorn Stuffed Animals |
| Easter Stuffed Animals | Hug Emojis |
| Unicorn Duck | Unicorn Pod |
| Other Unicorn Toys | Unicorn Toys |
| Unicorn Plush | Unicorn Games |

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20081205033257/http://www.squishable.com:80/




**home** | **help** | **us** | **gallery** | **contact**     login! | order tracking | cart
*your basket is empty and sad!*

## Big Squishable Animals

They're giant, round, fuzzy, stuffed animals. Hug them.

### Squishable Pig

$38 | View
**Add to Cart**

### Squishable Alligator

$38 | View
**Add to Cart**

### Squishable Snail

$42 | View
**Add to Cart**

### Squishable Rhino

$38 | View
**Add to Cart**

### Squishable Whale

$38 | View
**Add to Cart**

### Squishable Zebra

$38 | View
**Add to Cart**

### Squishable Puppy

$38 | View
**Add to Cart**

### Squishable Hippo

$38 | View
**Add to Cart**

### Squishable Leopard

$38 | View
**Add to Cart**

### Squishable Giraffe

$38 | View
*Back Early Dec!*

### Squishable Elephant
$38 | View
*Back Early Dec!*

### Squishable Bunny

$38 | View
*Back Early Dec!*

## Join Our Mailing List

Hear about new and back-in-stock stuff!

Email     Submit

## Squishy Travel Blog

Horace the Nomadic Monkey is in:
**Juneau, Alaska**



## Squishable News

**Holiday Shipping Deadlines!**

Orders placed by 5 pm on Tue, 12/16 are guaranteed to arrive by 12/24 via **Standard Shipping.**

**Waiting for a restock?**

All the squishables are expected back in stock in time for holiday shipping! Join our mailing list and we'll let you know the minute they're back!

*28 November 2008*
What do we do all day? You really wanna know? Check the Squishable Twitter Feed to keep tabs on Zoe, Aaron, and our new email guru, Beth

*10 October 2008*
Woohoo! Bundle of Bunnies are back!

*9 October 2008*
You know what we've got? A squishable lion scarf to fend off the impending cold! Scared of lions, how 'bout a giraffe or an alligator!

*18 September 2008*
Are you heading to New York Anime Festival 2008? So are the squishables! If you're in NYC Sept 26-28, come by booth 535 in the dealers room and say "Heeeeeey!"

EXHIBIT G
1/3
Page 1 of 30

3/3/24, 11:33 AM · Case 2:24-cv-01169-JLS-MAR · Document 27-2 · Filed 04/04/24 · Page 64 of 816 · Page ID
#:1018

squishable.com : they're giant! and they are made out of win!

### Squishable Penguin



$38 | View
*Back Early Dec!*

### Squishable Octopus



$44 | View
*Back Early Dec!*

### Squishable Tiger
$38 | View
*Back Early Dec!*

### Squishable Duck
$38 | View
*Back Early Dec!*

### Squishable Shark



$38 | View
*Back Early Dec!*

### Squishable Tortoise



$42 | View
*Back Early Dec!*

### Squishable Panda
$38 | View
*Back Early Dec!*

### Squishable Cow
$38 | View
*Back Early Dec!*

### Squishable Rooster



$38 | View
*Back Early Dec!*

### Squishable Sheep
$38 | View
*Back Early Dec!*

### Squishable Monkey
$38 | View
*Back Early Dec!*

### Squishable Hedgehog
$42 | View
*Back Early Dec!*

---

**On the Bench:** *The run for these Squishables has ended. We might have a couple left...or we might not!* Dalmatian, Frog

## Squishable Wardrobe

### Fuzzy Lion Scarf
$15 | View
**Add to Cart**

### Fuzzy Frog Scarf
$15 | View
**Add to Cart**

### Fuzzy Giraffe Scarf
$15 | View
**Add to Cart**

## Squishable Understudies

### Giant Turtle Understudy
$88 | View
**Add to Cart**

### Giant Chocolate Moose Understudy
$98 | View
**Add to Cart**

### Bundle of Bunnies Understudy
$15 | View
**Add to Cart**

### Meerkat Understudy
$19 | View
**Add to Cart**

### T-bone Steak Understudy
$20 | View
**Add to Cart**

### Carrot Bunny Understudy
$15 | View
**Add to Cart**

### Fuzzy Kiwi Understudy
$48 | View
**Add to Cart**

### Box of Donuts Understudy
$35 | View
**Add to Cart**

### Surrealist Rat Understudy
$38 | View
**Add to Cart**

---

*13 June 2008*
Pandas, people, Pandas are now in stock, along with their chromatic cousins, Zebras!

*30 May 2008*
Hedgehogs! We've got some! Also Octopuses, Alligators, Piggies, and Sheep are all back in stock! Crazy!

*11 May 2008*
We're heading to AnimeCentral from May 16-18! Stop by booth 836 and hug a squishable!

*3 May 2008*
Best fan video. Ever. I want to be this guy when I grow up.

*20 March 2008*
Squishy fan Michael wins my personal Photoshop admiration with this freakishly awesome picture.

*4 March 2008*
It's another Squishy Fan Video! "Lamborghini" the Leopard and "Lion", the Tiger, valiantly defend themselves against some Supersonic Crushing!! Thanks guys!

*27 November 2007*
Ohmygodohmygodohmygod. Someone made a squishable fan video!!! Holy crap! Check it out on youtube.

## Charities We Dig!

Electronic Frontier Foundation September/October user-picture drive

DC Central Kitchen The very last Panda auction

The YES Fund July user-picture drive

The Comic Book Legal Defense Fund - August user-picture drive

Wolong Giant Panda Breeding Center - June user-picture drive

The Heifer Foundation - May user-picture drive

Tipitina's Foundation - April user-picture drive

The Esther Honey Foundation - February user-picture drive

Donors Choose - Buy Nothing

Day fundraiser

Operation Smile - Winter user-picture drive

DC Central Kitchen - The very last octopus auction

We're not endorsed or affiliated with these charities, we just like 'em!

privacy policy | terms of use | contact us

All Content © 2007-2008 Squishable.com, Inc. | Site Design by Binaryspark



$59 = Free U.S. Shipping
(Https://www.squishable.com/mm5/merchant.mvc?
Screen=FAQS#free_shipping)

Try SQUEE Club!
(Https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=PGSQUEE)



squishable®
EST. 2007 • NYC
(https://www.squishable.com/mm5/merchant.mvc?
Screen=SFNT)

(https://www.squishable.com/mm5

HOME (HTTPS://WWW.SQUISHABLE.COM/MM5/MERCHANT.MVC?SCREEN=SFNT) >

**STANDARD SQUISHABLES! (HTTPS://WWW.SQUISHABLE.COM/MM5/MERCHANT.MVC?**
**SCREEN=CTGY&CATEGORY_CODE=BIG_ANIMALS)**

# Categories



In-Stock only

Newest Items ▼



Squishable Wolf

$54.00



Squishable Dragon Roll

$52.00





https://www.squishable.com/category/Big_Animals.html

66 of 816

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_wolf)

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_drag





Squishable Demon
Plague Doctor

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=demon_plague_doctor)

Squishable Spooky
Wreath

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=spooky_wre





Squishable Flocked
Wreath

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=flocked_wreath)

Squishable Loves: Reptar

💗 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishloves





Comfort Food Christmas
Tree Cookie

🥑 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=christmas_tree_cookie)

Squishable Death's-head
Hawkmoth

$58.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=deaths_hea



Squishable Baby
Mothman

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_mothman)



Squishable Tie Dye
Reaper

$52.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=tie_dye_reap



Squishable Alligator

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_alligator)



Squishable Hen

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable Queen Bee

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_queen_bee)



Squishable Palm Tree

$45.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_palm



Comfort Food Soy Sauce

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_soy_sauce)



NEW!

Comfort Food Mustard

 $48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



NEW!

Comfort Food Ketchup

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_ketchup)



Squishable Lich

$55.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable Caterpillar

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_caterpillar)



Comfort Food Christmas
Star Cookie

 $45.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=christmas_s

EXHIBIT G
Page 7 of 30





Squishable Oyster

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_oyster_15)

Squishable Flocked
Christmas Tree

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=flocked_chr





Comfort Food Sushi Roll
II

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_sushi_roll_ii)

Comfort Food Smoothie

 $46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_smo





Squishable Baby Goat

$48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_baby_goat)

Squishable Cotton
Candy Baby Unicorn

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cotto



Squishable Hydra

$58.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_hydra_15)



Squishable Apatosaurus

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable T-Rex II

$52.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squishable_t_rex_ii)



Comfort Food
Strawberry Jam

$46.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Squishable Arctic
Narwhal

$45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_arctic_narwhal)



Squishable Triceratops

$49.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Squishable Go! Ship

$35.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=go_ship)



Comfort Food Cotton
Candy

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Squishable Water
Dragon

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_water_dragon)



Squishable Strawberry
Cow

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squishable_



Comfort Food Red
Velvet Cupcake

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_red_velvet_cupcake)

Squishable GO!
Spaceship

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=go_spacesh





Comfort Food Mac 'n
Cheese

 $52.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_mac_and_cheese)

Squishable Coral
Octopus

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cora





Comfort Food Cold Brew

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_cold_brew)

Squishable GO! Airplane

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=go_airplane





Comfort Food Iced Tea

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_iced_tea)

Comfort Food
Peppermint Mocha

 $48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Succulent

$52.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_succulent_15)

Squishable Baby Axolotl

$50.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_baby





Squishable Wizard

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_wizard_15)

Squishable Gargoyle

$55.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_garg





Squishable Hati

$55.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_hati_15)

Comfort Food Cheeseburger

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food
Sourdough

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_sourdough_15)

 Comfort Food Ham
Musubi

 $46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Gumball
Machine

 $49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_gumball_machine_15)



Squishable Blue Jay

$48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_blue



Squishable Rose

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_rose_15)



Squishable Cuddly
Kangaroo

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cudd





Squishable Shadow Dragon

$52.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_shadow_dragon_15)

Squishable Baphomet

$55.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_bapl





Comfort Food Buttered Toast

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_buttered_toast_15)

Comfort Food Coffee Pot

 $48.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=comfortfoo



Squishable Cauldron

$55.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_cauldron_15)

Squishable Rattlesnake

$48.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_rattl

EXHIBIT G
Page 14 of 30 11/28



Squishable Venus Flytrap

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_venus_fly_trap_15)



Squishable Poodle Moth

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_poodle_moth_15)



Comfort Food Unicorn
Latte

 $48.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_unicorn_latte_15)

Squishable Lunar Lion

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_luna



Squishable Rosy Maple
Moth

$55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_rosy



Comfort Food Dipped
Ice Cream Pop

 $46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfoo

EXHIBIT G
Page 15 of 30    12/28





Squishable Baby Red
Panda

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_red_panda_15)

Squishable Piggy

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_pig_





Squishable GO!
Ambulance

$39.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_ambulance_12)

Comfort Food Kabob

 $52.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food
Lemonade

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_lemonade_15)

Squishable Reaper

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_reap



Squishable Plague Nurse

$49.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_plague_nurse_15)



Squishable Snowy Owl

$45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_snov



Comfort Food Cereal
Box

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_cereal_box_15)

 $55.00

Comfort Food Ramen

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Loaf of
Bread

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_loaf_of_bread_15)



Squishable Ladybug II

$48.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_lady

EXHIBIT G          14/28
Page 17 of 30





Comfort Food Unicorn
Cake

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_unicorn_cake_15)

Squishable Mushroom

$48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_mus





Squishable Spooky
Ghost

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_spooky_ghost_15)

Squishable GO! Train

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_go_t





Squishable GO! Fire
Truck

$39.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_firetruck_12)

Squishable GO! Dump
Truck

$39.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_go_c



Squishable GO! Front
Loader

$39.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_go_frontloader_18)



Squishable Plague
Doctor

$49.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_plag



Comfort Food Peanut
Butter Jar

 $46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_pb_jar_15)



Squishable Dolphin III

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_dolp



Squishable Baby Corgi

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_corgi_15)



Squishable Orca

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_orca





Squishable Jellyfish II

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_jellyfish_15_ii)

Comfort Food Broccoli

 $55.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Baby Panda

$46.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_panda_15)

Comfort Food America
Ice Pop

 $45.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food Grapes

 $55.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_grapes_15)

Squishable Red Dragon

$52.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_red_



Squishable Snuggly
Sloth

$45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_snuggly_sloth_15)



Squishable Sunflower

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Squishable NHL®
Philadelphia Flyers®
Gritty™ Mascot

$60.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=nhl_gritty_15)



Comfort Food Soup
Dumpling

 $48.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Popcorn

$48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_popcorn)



Comfort Food Hot Sauce

$44.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Comfort Food Pumpkin Spice Latte

 $48.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_pumpkin_spice_latte)

Squishable Sakura Dragon

$49.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_saku





Comfort Food Matcha Tea

$45.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_matcha_latte)

Squishable Mint Octopus

$49.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_mint





Comfort Food Bubble Tea

 $49.00 (https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=comfortfood_bubble_tea)

Squishable Dachshund Hot Dog

$46.00 (https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_hot_





Squishable Baby Owl

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_owl_15)

Comfort Food Onigiri

 $46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo





Squishable Baby Penguin

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_baby_penguin_15)

Squishable Baby Koala

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_baby





Comfort Food Avocado Toast

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_avocado_toast)

Squishable Cute Octopus

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_cute



Squishable Fluffy Bunny

$49.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_fluffy_bunny_15)



Squishable Baby Raccoon

$46.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_baby



Squishable Baby Unicorn

$48.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squish_baby_unicorn_15)



Comfort Food Cherries

$48.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=opensquish



Squishable Stegosaurus III

$52.00

(https://www.squishable.com/mm5/merchant.mvc?Screen=PROD&Product_Code=squishable_stegosaurus_15)



Squishable Rainbow

$45.00

(https://www.squishable.com/mm5/mercha Screen=PROD&Product_Code=squish_rainl



Comfort Food Corn

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_corn)



Comfort Food Carrot

 $40.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Banana

 $42.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_banana_15)



Squishable Comfort
Food Taco

 $42.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_taco



Comfort Food Pineapple

 $45.00

(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_pineapple_15)



Comfort Food Pizza Slice

 $40.00

(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Comfort Food Avocado

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=opensquish_avocado_9636)



Comfort Food Hot Dog

 $42.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food
Gingerbread Man

 $45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=comfortfood_gingerbread_man)



Comfort Food
Watermelon

 $45.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=comfortfoo



Comfort Food Shrimp
Sushi

 $42.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_shrimp_sushi_15)



Squishable Fuzzy
Bumblebee

$49.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=opensquish



Comfort Food
Hamburger

 $45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_hamburger_15)



Squishable Baby Fox

$48.00
(https://www.squishable.com/mm5/merchant
Screen=PROD&Product_Code=squish_baby



Squishable S'more

 $48.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_smore_15)



Squishable Sea Turtle

$48.00
(https://www.squishable.com/mm5/merchant
Screen=PROD&Product_Code=squish_sea_



Squishable Pink Donut

 $45.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=opensquish_squish_pink_donut_15)



Squishable Narwhal

$46.00
(https://www.squishable.com/mm5/merchant
Screen=PROD&Product_Code=squish_narv





Squishable Heart

$42.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_heart_15)

Squishable Great White Shark

$46.00
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_grea





Squishable Corgi

$46.00
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROD&Product_Code=squish_corgi_15)

Mystery Squishable

Was $47 Now $34.99
(https://www.squishable.com/mm5/mercha
Screen=PROD&Product_Code=squish_mys

**JOIN THE NEWSLETTER!**

---

**CONNECT!**







s://www.facebook.com/squishabledotcom)    (https://www.instagram.com/squishables/)    (https://twitter.com/squish



(https://www.tiktok.com/@squishable.com)



(merchant.mvc?
Screen=MAIL)



(https://discord.com/invite/squishable)

## SHOP SQUISHABLES

Standard Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=Big_Animals)
Comfort Foods
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=comfort_food)
Mini Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=Squishable_Mini)
Undercovers
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=undercover)
Micro Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=Squishable_Micro)
Massive Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=squishable_massive)
Alter Egos
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=alter_egos)
Snackers
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=snackers)
Retiring Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=Retiring_Animals)
Plague Doctor
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=plague_doctor)

## SHOP OTHER STUFF

Squishable Loves
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=squishloves)

## PARTICIPATE

Vote on New Designs
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=voting_category)
Submit a New Design
(https://www.squishable.com/mm5/merchant.mvc?
Screen=PROS)
Open Squish FAQ
(https://www.squishable.com/mm5/merchant.mvc?
Screen=FFAQ)
Squish Designers
(https://www.squishable.com/mm5/merchant.mvc?
Screen=OSDE)
In-process Designs
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=prototypes)
Retired Squishables
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=retired_squishables)
Fan Art
(https://www.squishable.com/mm5/merchant.mvc?
Screen=FANA)
Activities 4U
(https://www.squishable.com/mm5/merchant.mvc?
Screen=ACTY)

## INFO

Visit an official Squishable store!
(https://www.squishable.com/mm5/merchant.mvc?
Screen=POPU)
Help Me!
(https://www.squishable.com/mm5/merchant.mvc?
Screen=FAQS)
Contact Us
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTUS)

Picnic Baby
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=picnic_baby)

Squishable GO
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=squishable_go)

Sparkles Blind Box
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=sparkles)

Bags
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=squishswag)

Crafts and games
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=arts)

Boozy Buds
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=boozy_buds)

The Yay Team
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CTGY&Category_Code=Yay_Team)

Squee Club
(https://www.squishable.com/mm5/merchant.mvc?
Screen=FAQS#squee)

Squee Central
(https://www.squishable.com/mm5/merchant.mvc?
Screen=SQEC)

About Us
(https://www.squishable.com/mm5/merchant.mvc?
Screen=ABUS)

Hire Me
(https://www.squishable.com/mm5/merchant.mvc?
Screen=JOBS)

Philanthropy
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CRTY)

Blog
(https://www.squishable.com/mm5/merchant.mvc?
Screen=BLOG)

**WHOLESALE**

Wholesale Login (http://wholesale.squishable.com/)

Wholesale Inquiries
(https://www.squishable.com/mm5/merchant.mvc?
Screen=WHQY)

Custom Products
(https://www.squishable.com/mm5/merchant.mvc?
Screen=CUST)

International
(https://www.squishable.com/mm5/merchant.mvc?
Screen=INTL)

Official Retailers
(https://www.squishable.com/mm5/merchant.mvc?
Screen=SLOC)

---

 (https://ssl.comodo.com/ev-ssl-certificates.php)

privacy notice (https://www.squishable.com/mm5/merchant.mvc?Screen=PRPO)

cookie settings

terms of use (https://www.squishable.com/mm5/merchant.mvc?Screen=TOUS)

warranty info (https://www.squishable.com/mm5/merchant.mvc?Screen=WRTY)

**Do Not Sell My Info** (https://www.squishable.com/mm5/merchant.mvc?Screen=CCPA)

# EXHIBIT H

# kidrobot™

SHOP  BLOG  FORUM  LIMITED  LICENSED  BLANK TOYS  **YUMMY WORLD**  LABBIT LAND  .  ☐



# kidrobot™

SHOP  BLOG  FORUM  LIMITED  LICENSED  BLANK TOYS  YUMMY WORLD  LABBIT LAND

Sort by: Alphabetically: A-Z

## COLLECTIONS

Accessories
Adventure Time x Kidrobot
All
Apparel
Art Giants by Kidrobot
Art Toys
Best Fiends x Kidrobot
Blind Boxes
Bots
DC Comics x Kidrobot
Dunny
Family Guy x Kidrobot
Frank Kozik
Happy Labbit
Kidrobot Black
Licensed
Limited Edition
Marvel x Kidrobot
Mega Man x Kidrobot
Munny World
New Arrivals
Santa Cruz x Kidrobot
SDCC Releases
Smorkin' Labbit
The Simpsons x Kidrobot
TMNT x Kidrobot
Tristan Eaton
Yummy World

# YUMMY WORLD

Yummy World is a deliciously fun world made up of a unique cast of characters. Yummy World is set in the town of Tree, a magically yummy place where food is fun and fresh baked friendships and adventures meet!!! Come along an the softer side of Kidrobot!


YUMMY WORLD 4" Melony Watermelon Plush
$ 5.99


Yummy World Backpack Sandy
$ 24.99


YUMMY WORLD Blue Juice Bo Keychain
$ 4.99


Yummy World Bookmark Cheezy Pie
$ 5.99


Yummy World Bookmark Cocoa
$ 5.99


Yummy World Bookmark Dbl Twins
$ 5.99


Yummy World Bookmark Sandy
$ 5.99


Yummy World Chair Allover Print
$ 89.99


Yummy World Chair Yummy
$ 89.99


YUMMY WORLD Cheezey Pie Small Plush
$ 5.99

EXHIBIT H
Page 2 of 21
2/6

# kidrobot™

SHOP    BLOG    FORUM    LIMITED    LICENSED    BLANK TOYS    YUMMY WORLD    LABBIT LAND



YUMMY WORLD Cheezy Pie Pizza Lg
Plush
$ 11.99



Yummy World Cheezy Pie Backpack
$ 24.99



YUMMY WORLD Coco Small Plush
$ 5.99



Yummy World Coin Purse Sprinkles
$ 8.99



Yummy World Coin Purse Yummy
$ 8.99



YUMMY WORLD Double Scoop Ice
Cream Cone Keychain
$ 4.99



YUMMY WORLD Cookie W/Lt. Blue
Frosting Keychain
$ 4.99



YUMMY WORLD Franky the Hot Dog
Small Plush
$ 5.99



Yummy World Hat- Dbl Scoop Twins



Yummy World Hat- Sassy



Yummy World Hat- Sprinkles

# kidrobot™

SHOP   BLOG   FORUM   LIMITED   LICENSED   BLANK TOYS   **YUMMY WORLD**   LABBIT LAND   ☐   ☐

YUMMY WORLD Hotdog Keychain
$ 4.99

YUMMY WORLD Ice Cream Sandwich Keychain
$ 4.99



YUMMY WORLD Large Dipped Marshmallow
$ 29.99





YUMMY WORLD Large Peppermint
$ 29.99

YUMMY WORLD Large Macaroon
$ 29.99

YUMMY WORLD Large Pea Pod
$ 29.99

YUMMY WORLD Large Pink Lemonade
$ 29.99

YUMMY WORLD Large Taco
$ 29.99

NEW

YUMMY WORLD Melony the Watermelon Backpack
$ 24.99

Yummy World Pencil Bag-Franky
$ 9.99





YUMMY WORLD PB&J; Keychain
$ 4.99

Yummy World Pencil Bag-Sprinkles
$ 9.99



SHOP   BLOG   FORUM   LIMITED   LICENSED   BLANK TOYS   YUMMY WORLD   LABBIT LAND    

YUMMY WORLD Pink Cupcake
Keychain – Kidrobot – 1

YUMMY WORLD Pink Cupcake Keychain

$ 4.99

YUMMY WORLD Pink Donut 10"
Keychain – Plush

YUMMY WORLD Pink Donut 10" Plush

$ 11.99



Yummy World Pencil Bag–Yummyworld

$ 9.99



YUMMY WORLD Pizza Keychain – Kidrobot – 1

YUMMY WORLD Pizza Keychain

$ 4.99

YUMMY WORLD Pudding Cup Chocolate Keychain – Kidrobot – 1

YUMMY WORLD Pudding Cup Chocolate Keychain

$ 4.99



YUMMY WORLD Purple Pudding Pop Keychain

$ 4.99

YUMMY WORLD Rocket Pop Keychain – Kidrobot – 1

YUMMY WORLD Rocket Pop Keychain

$ 4.99

YUMMY WORLD Sandy the Ice Cream Sandwich Small Plush – Kidrobot – 1

YUMMY WORLD Sandy the Ice Cream Sandwich Small Plush

$ 11.99

YUMMY WORLD Small Cherry – Kidrobot – 1

YUMMY WORLD Small Cherry

$ 5.99

YUMMY WORLD Small Chile Pepper – Kidrobot – 1

YUMMY WORLD Small Chile Pepper

$ 5.99

YUMMY WORLD Small Cotton Candy – Kidrobot – 1

YUMMY WORLD Small Cotton Candy

$ 5.99

YUMMY WORLD Small Kiwi – Kidrobot – 1

YUMMY WORLD Small Kiwi

$ 5.99

YUMMY WORLD Small Latte – Kidrobot – 1

YUMMY WORLD Small Latte

$ 5.99

YUMMY WORLD Small Pistachio – Kidrobot – 1

YUMMY WORLD Small Pistachio

$ 5.99

YUMMY WORLD Strawberry 10" Plush – Kidrobot

YUMMY WORLD Strawberry 10" Plush

$ 11.99

1   2   Next »

EXHIBIT H
Page 5 of 21
5/6



kidrobot™

SHOP BLOG FORUM LIMITED LICENSED BLANK TOYS YUMMY WORLD LABBIT LAND

MY ACCOUNT

Shipping / Taxes
Return Policy
WTF?
Legal Notice
Wholesale Inquiries
Careers
About Us

Help / Contact
Find A Store
My Profile
My Cart

Sign up to get the latest on sale releases and more …

Enter your email address...

SIGN UP

© 2015 Kidrobot. Designed by Kidrobot. Website template by Shopify

PayPal VISA AMERICAN EXPRESS DISCOVER

Case 2:24-cv-01169-JLS-MAR   Document 27   Filed 04/04/24   Page 100 of 816   Page ID
#:1054

FREE USA SHIPPING ON $75+* | Learn more

0

## YUMMY WORLD

Welcome to Yummy World. Yummy World is the softer side of the iconic Kidrobot brand featuring a selection of deliciously unique and trendy Yummy World plush toys, soft plush food pillows, collectible vinyl keychains, food plushies and more. Yummy World is loved by everyone from celebrities to fashionistas to kids and parents. Jump into Yummy World and start collecting today! Share your Yummy selfies with #yummyworld on Instagram or upload them here:

GET OUR APP

Submit Your Photo



Sort: ⌄





Yummy World Cecily the Scented Cinnamon
Roll Interactive Plush (PRE-ORDER)
$39.99

Yummy World & Coca-Cola® Classic 10"
Coca-Cola Can Plush with Sound (PRE-
ORDER)

GET OUR APP

No Reviews

$ 29.99

No Reviews





Yummy World Camille the Yummy Meal XL
Interactive Plush by Kidrobot

$ 59.99

72 reviews

Yummy World XL Cheesy Puffs Interactive
Food Plush

$ 59.99

71 reviews





Yummy World Ernest Eggplant & Georgia
Plush 2-Pack

$ 39.99

Yummy World Zoey and the YumYumables XL
Interactive Plush

$ 54.99

GET OUR APP

3 reviews

61 reviews





Yummy World Canned Ham 10" Plush (PRE-ORDER)

$ 34.99

No Reviews

Yummy World Yummy Bears 10" Interactive Plush by Kidrobot

$ 39.99

19 reviews





Yummy World Gourmet Snacks Blind Box Vinyl Mini Series

$ 10.99

16 reviews

Yummy World Tasty Treats Blind Box Vinyl Figures

$ 10.99



16 reviews





Yummy World Nicole the Ramen Bowl Plush

$ 34.99

19 reviews

Yummy World Crunchy Pickle in a Bag 10"
Interactive Plush

$ 19.99

6 reviews





Yummy World Pizza Supreme 12" Interactive
Plush

$ 39.99

2 reviews

Yummy World Bonnie Burger 13" Interactive
Plush

$ 39.99

1 review


GET OUR APP



Yummy World Chicken Sandwich Chicky Meal 11" Interactive Plush

$ 54.99

1 review



Yummy World Bertha Bucket of Fried Chicken Interactive Plush

$ 54.99

7 reviews



Yummy World Dante the Dragon Fruit 13" Interactive Plush

$ 45.99

1 review



Yummy World Large Flaco Taco Plush by Kidrobot

$ 34.99

22 reviews



EXHIBIT H
Page 12 of 21

6/15





Yummy World Conversation Hearts 10"
Interactive Plush

$ 34.99

2 reviews



Yummy World Haylee Heart Cookie 10" Plush

$ 19.99

14 reviews





Yummy World 16" French Fries Plush with
Interactive Plushie Fries

$ 34.99

reviews

Yummy World Breezy and the Twists Licorice
Candy Plush

$ 34.99

16 reviews

GET OUR APP

EXHIBIT H          7/15
Page 13 of 21



### Yummy World Chips and Guac Large Interactive Plush

$ 34.99

20 reviews



### Yummy World 16" Avocado Plush with Interactive Plushie Pit

$ 36.99

22 reviews



### Yummy World Milk and Cookies Interactive Plush

$ 54.99

reviews



### Yummy World Sweet and Savory Blind Box Keychains

from $ 6.99

13 reviews

GET OUR APP





Yummy World Attack of the Donuts Keychain Series by Kidrobot

from $ 5.99

6 reviews

Yummy World Parker & Jayden Peanut Butter and Jelly Sandwich Plush

$ 34.99

24 reviews





Yummy World 10" Pink Donut Plush Pillow

$ 24.99

11 reviews

Yummy World XL Victorio Veggie Taco Plush Set

$ 54.99

13 reviews

GET OUR APP

EXHIBIT H
Page 15 of 21

9/15





Yummy World Bubba the Shrimp Nigiri Sushi Interactive Plush

$ 34.99

3 reviews

Yummy World 10" Pancake Plush Pillow

$ 24.99

15 reviews





Yummy World Smores Samantha S'more Plush Toy by Kidrobot

$ 34.99

reviews

Yummy World Bruce the Banana Interactive Plush by Kidrobot

$ 34.99

17 reviews

GET OUR APP





Yummy World Patsy the Pop Art Pastry Tart Plush

$ 19.99

12 reviews

Yummy World Collectible Mystery Enamel Pins

$ 6.99

9 reviews





Yummy World Medium Bunford Burger Plush

$ 24.99

14 reviews

Yummy World Franky 10" Hotdog Plush by Kidrobot

$ 19.99

9 reviews







Yummy World Jeni and the Jelly Beans XL
Interactive Plush

$ 54.99

10 reviews

Yummy World 10" Sandy the Ice Cream
Sandwich Plush Pillow

$ 24.99

13 reviews





Yummy World Jack O'Lantern Interactive
Pumpkin Plush with Candy Corns

$ 39.99

reviews

Yummy World 16" Gingerbread Man Jimmy
Interactive Plush

$ 36.99

5 reviews


GET OUR APP

EXHIBIT H
Page 18 of 21

12/15





Yummy World Hanz Pretzel 10" Plush

$ 19.99

3 reviews

Yummy World Strawberry 10" Plush Pillow

$ 19.99

3 reviews





Yummy World Walter Waffle Cone Ice Cream
Scoop Plush

$ 24.99

6 reviews

Yummy World Gus the Gummy Worm Plush
Toy

$ 24.99

2 reviews







### Yummy World Lola Lollipop Small Carnival Plush

$ 6.99

4 reviews

### Yummy World Rainbow Soft Serve Sally Ice Cream Cone Plush

$ 36.99

3 reviews

‹          ›

# NEWS & UPDATES

Sign up to get the latest on sales, new releases and more…

Enter your email address...

**SIGN UP**

 GET OUR APP





# EXHIBIT I

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 116 of 816   Page ID
#:1070
Case 2:18-cv-05399-JAK-AGR   Document 16-2   Filed 08/24/18   Page 1 of 23   Page ID #:156

1  MARK B. MIZRAHI (CA State Bar No. 179384)
     mmizrahi@wrslawyers.com
2  MAX N. WELLMAN (CA State Bar No. 291814)
     mwellman@wrslawyers.com
3  WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
   11400 W. Olympic Boulevard, 9th Floor
4  Los Angeles, California 90064-1582
   Telephone:   (310) 478-4100
5  Facsimile:    (310) 479-1422

6  *Attorneys for Plaintiffs Kellytoy (USA),*
   *Inc. and Kellytoy Worldwide, Inc.*
7

8                    UNITED STATES DISTRICT COURT
9         CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION
10

11  KELLYTOY (USA), INC., a California          Case No.  2:18-cv-05399 JAK (AGRx)
12  corporation; and KELLYTOY
    WORLDWIDE, INC., a California               **FIRST AMENDED COMPLAINT**
13  corporation;                                **FOR:**

14            Plaintiffs,                        **1.  FEDERAL COPYRIGHT**
                                                 **INFRINGEMENT (17 U.S.C. § 501);**
15       vs.                                     **2.  FEDERAL TRADEMARK**
                                                 **INFRINGEMENT, FALSE**
16  DAN-DEE INTERNATIONAL, LTD.,                 **DESIGNATION OF ORIGIN AND**
    a Delaware corporation; RITE AID            **FALSE DESCRIPTION (15 U.S.C. §**
17  CORPORATION, a Delaware                      **1125);**
    corporation, and DOES 1 through 10,         **3.  COMMON LAW TRADEMARK**
18  inclusive,                                   **INFRINGEMENT**
                                                 **4.  CALIFORNIA COMMON LAW**
19            Defendants.                        **UNFAIR COMPETITION;  AND**
20                                               **5.  CALIFORNIA STATUTORY**
                                                 **UNFAIR COMPETITION**
21

22                                               **DEMAND FOR JURY TRIAL**
23

24       Plaintiffs KELLYTOY (USA), INC., a California corporation and

25  KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

26  "Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

27  LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

28  Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

EXHIBIT I
Page 1 of 81

1  "Defendants") for injunctive relief and damages under the laws of the United States
2  and the State of California as follows:

3  **<u>JURISDICTION AND VENUE</u>**

4      1.      This action arises under the copyright laws of the United States, 17
5  U.S.C. § 101 *et seq*., the trademark laws of the United States, 15 U.S.C. § 1125(a),
6  and under the statutory and common law of trademark/tradedress infringement and
7  unfair competition.

8      2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367,
9  and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

10     3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and
11  1400(a).

12     4.      This Court has personal jurisdiction over Defendants, as Defendants are
13  doing business in California and this District and are subject to the jurisdiction of
14  this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout
15  the state of California and this District.  Similarly, defendant Rite Aid has numerous
16  retail stores within the state of California and this District.  In addition, defendants
17  Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade
18  dress, knowing that Kellytoy is a California resident, and thereby purposefully
19  directed their activities towards California.

20  **<u>NATURE OF THE ACTION</u>**

21     5.      This is an action for copyright infringement under the Copyright Act,
22  17 U.S.C. §§ 101, *et seq*.; and trade dress infringement, trademark infringement,
23  unfair competition and false designation of origin under the Lanham Act, 15 U.S.C.
24  § 1125(a), California Bus. & Prof. Code § 17200, *et seq*., and the common law.

25     6.      Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows")
26  – representative samples of which are depicted in **Exhibit 1** hereto – are one of the
27  world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly
28  distinctive and widely recognized trade dress, which Kellytoy pioneered and

1    created.  Kellytoy actively markets its Squishmallows through numerous media

2    outlets, including, without limitation, on social media, at tradeshows, through

3    Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

4    and on Kellytoy's website, depicting images of its proprietary Squishmallows line of

5    plush toys.

6        7.    Now that Kellytoy's Squishmallows have exploded in popularity and

7    have garnered much customer and industry recognition, Kellytoy discovered that

8    defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid two

9    knock-off products for distribution within this state and district that both infringe

10   upon Kellytoy's trade dress and one of which infringes upon Kellytoy's copyrighted

11   design in its Squishmallows.

12       8.    Accordingly, to prevent and remediate the rampant consumer confusion

13   and misappropriation of Kellytoy's copyrighted designs in its Squishmallows

14   resulting from Defendants' unauthorized use, promotion and sale of the Infringing

15   Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks

16   immediate and permanent injunctive relief, compensatory damages, disgorgement of

17   Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable

18   attorneys' fees and expenses, a product recall, and corrective advertising sufficient

19   to address Defendants' wrongdoing.

20                          **THE PARTIES**

21       9.    Kellytoy (USA), Inc. is a California corporation with its principal place

22   of business located in Los Angeles, California.

23       10.   Kellytoy Worldwide, Inc. is a California corporation with its principal

24   place of business located in Los Angeles, California.

25       11.   Kellytoy is in the business of developing, manufacturing and selling

26   children's toys including, among other things, plush toys.

27       12.   On information and belief, defendant Dan-Dee International, LTD.

28   ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

EXHIBIT I
Page 3 of 81

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 119 of 816   Page ID
#:1073
Case 2:23-cv-05339-JAR-NGR   Document 16   Filed 08/24/16   Page 4 of 23   Page ID #:59

13.     Dan-Dee is in the business of manufacturing and selling children's toys including, among other things, plush toys.

14.     On information and belief, defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with a place of business in Pennsylvania and numerous stores in this judicial district.

15.     Rite Aid is in the business of owning and operating drug stores and pharmacies throughout the United States and, on information and belief, this District that sell various merchandise, including plush toys bearing third-party trademarks and under its own private label, RITE STUFF.

16.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

17.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## **BACKGROUND FACTS**

### **Kellytoy and Its Protected Intellectual Property Rights**

18.     Kellytoy is engaged in the business of creating, manufacturing, distributing and selling unique plush toys, including, without limitation, its Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,* **Exhibit 1**.)

19.     Kellytoy has been in business for approximately 35 years and in that time has developed a reputation for producing high quality, unique, creative and innovative plush toys that are highly prized in the industry.

20.     Kellytoy exerts great efforts to promote and preserve its image identity

Case 2:24-cv-04169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 120 of 816   Page ID
#:1074
Case 2:23-cv-03399-JAK-NCR   Document 16   Filed 08/24/16   Page 5 of 23   Page ID #:70

1   and the image and identity of its high quality plush toys, including by creating

2   distinctive designs and marks for use on its products and seeking U.S. trademark

3   and copyright registrations for such designs and marks, including those at issue in

4   this Complaint.

5        21.    In 2016, Kellytoy conceived of and began creating its Squishmallows

6   line of plush toy designs, ultimately marketed in connection with the

7   SQUISHMALLOW trademark, that share common, unique features that distinguish

8   them from the goods of others. These designs are wholly original to Kellytoy and

9   comprise copyrightable subject matter under the laws of the United States.

10        22.    Kellytoy has been and is the sole owner of all right, title and interest in

11   and to the copyrights in the individual "characters" in the Squishmallows line and

12   the distinguishing, unique, and recognizable features that are common across the

13   Squishmallows line.  From 2016 to the present, Kellytoy has expended large sums

14   of money in developing, advertising and promoting these product designs through

15   the United States.  In fact, Kellytoy is spending approximately $50,000 per month in

16   direct to consumer and business-to-business advertising in connection with its

17   SQUISHMALLOW branded goods.

18        23.    Kellytoy sells a broad range of Squishmallows that feature the brand's

19   iconic trade dress, which is not easily reduced to writing, but includes, without

20   limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of

21   animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial

22   features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light

23   "marshmallow," memory foam-like texture – as more fully depicted in **Exhibit 1**

24   hereto – features common to Kellytoy's line of Squishmallows (collectively together

25   with **Exhibit 1** the "Squishmallow Trade Dress").

26        24.    The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of

27   Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which

28   were created by or assigned to Kellytoy (the "Squishmallow Designs").  As set forth

3222901.1

Case 2:24-cv-04169-JLS-MAR Document 27-2 Filed 04/04/24 Page 121 of 816 Page ID
Case 2:23-cv-03399-JAK-AGR Document 16-2 Filed 08/24/16 Page 6 of 23 Page ID
#:1075

in greater detail below, these Squishmallow Designs are the subject of Copyright Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C. §101 *et seq.*

25.     Continuously and without interruption, beginning in 2016, Kellytoy has expended a great deal of time, effort, and money in the promotion of its Squishmallows.  Due to Kellytoy's unique design, extensive marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  Indeed, because of Kellytoy's extensive promotional activities and widespread display of its Squishmallows directed to the public, and a consequence of Kellytoy's fair and honorable dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy.  The Squishmallow Trade Dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

26.     In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 140,000 "hits" for the search term "Squishmallows."

27.     In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

28.     Further adding to their recognizability and secondary meaning in the marketplace, Squishmallows have been featured in numerous magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto,

1  including many mainstream media outlets such as the *Washington Post*, the *Chicago*
2  *Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example
3  only, Squishmallows have been also recognized by The *Washington Post* and
4  *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized
5  Squishmallows in its October 2017 issue, under the "Products We Love" section;
6  and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21,
7  2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows
8  and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."



22      29.     Kellytoy's Squishmallows have also been featured in the October 2017
23  issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family*
24  *Magazine* and included in the 2017 gift guides for various publications, including in
25  *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.
26      30.     Kellytoy's Squishmallows have also been the subject of numerous
27  industry awards and product recommendation lists, including by the National
28  Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in

Case 2:24-cv-04169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 123 of 816   Page ID
Case 2:23-cv-03399-JAR-NGR   Document 16   Filed 09/24/16   Page 3 of 23   Page ID #173
#:1077

**Exhibit 4**.  In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of
the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book
Magazine*, and have been featured in numerous other trade magazines, such as,
*Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

31.     Kellytoy's Squishmallows have also been the subject of extensive
marketing campaigns, including email campaigns, social media posts, and direct to
consumer advertising.  Kellytoy's Squishmallows currently have nearly 21,000
Instagram followers, more than 30,000 Facebook followers – more than many
longer-existing and well-known plush brands.  To its followers, Kellytoy regularly
publishes photographs of its Squishmallows.  Many of these followers, in turn, share
these posts with their friends and social media followers.  A copy of Squishmallows
Instagram page is attached as **Exhibit 5**.

32.     In addition, hundreds of well-known YouTube influencers and vloggers
have shared and posted images and videos of themselves holding plush toys in
Kellytoy's line of Squishmallows products. Tens of thousands of consumers have
done the same through numerous media platforms, including, Facebook, Instagram,
Pinterest and YouTube. These posts have generated millions of "likes" and "shares."

33.     Fans have been extremely engaged on social media, including
Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's
Squishmallows, with the average Squishmallows post likes on Instagram hovering
over 1000+ per post and 45-100 average comments per post.

34.     Kellytoy's Squishmallow website traffic has grown exponentially since
its launch in 2017 to an average of 4,313 visits per day.

35.     Kellytoy's Squishmallows are listed amongst the leading global brands
and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by
several industry publications.

36.     As a direct result of Kellytoy's efforts at promoting and building its
brand, Kellytoy's Squishmallows line has exploded in popularity, creating

substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

37.     Since the summer of 2017, Kellytoy has sold a whopping 11 million (11,000,000) units of Squishmallows with no indication that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products embodying the Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

38.     In fact, Kellytoy's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

39.     Because of Squishmallows' massive success and popularity, consumers have come to associate Kellytoy's high-quality Squishmallows plush toys with the Squishmallows Trade Dress and, conversely, have come to recognize the Squishmallow Trade Dress as a designation of source.

### Defendants' Unlawful Conduct

40.     At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

41.     Upon information and belief, sometime in spring of 2018, notably well after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell and supply to Rite Aid various plush toys bearing substantially similar copies of

Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter referred to as "Infringing Plush") for distribution by Rite Aid through its United States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's trademarks are collectively attached hereto as **Exhibit 6**.

42.     Upon information and belief, Dan-Dee offered to sell the Infringing Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43.     Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush.

44.     Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because Dan-Dee has, rather than investing in creating its own designs and identity, copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45.     In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46.     Kellytoy is informed and believes that Defendants, without Kellytoy's

consent or permission, intend to sell, advertise, promote, display, and distribute, toys bearing Squishmallow Designs and Squishmallow Trade Dress in United States commerce.

47.     The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress embodied in the Infringing Plush – including by wholesalely copying the shape and look – constitute false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that Defendants' plush toys originate from Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such activities of Defendants are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of the toys bearing the Squishmallow Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of 15 U.S.C. §1125(a).

48.     Upon information and belief, the activities of Defendants were done willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, with the intent to trade on the enormous goodwill Kellytoy has earned in its Squishmallows, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy.

49.     As further evidence of Dan-Dee's intent to trade upon Kellytoy's goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush.

50.     Defendants, by their unauthorized copying and use of Kellytoy's

Case 2:24-cv-03390-JLS-AGR  Document 27-2  Filed 04/04/24  Page 127 of 816  Page ID
Case 2:18-cv-08395-JAK-AGR  Document 16-7  Filed 08/24/18  Page 12 of 23  Page ID #:17
#:1081

1 Squishmallow Designs and Squishmallow Trade Dress, have engaged and will

2 engage in acts of copyright infringement, unfair competition, unlawful

3 appropriation, unjust enrichment, wrongful deception of the purchasing public, and

4 unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's

5 original works.  Defendants activities will damage the reputation, business and good

6 will of Kellytoy nationally and in this judicial district.

7      51.     Upon information and belief, unless enjoined by the Court, Defendants

8 will continue and further escalate their infringing activities.

9      52.     Kellytoy has no adequate remedy at law.  Thus said activities of

10 Defendants have caused and, if not enjoined, will continue to cause irreparable,

11 immediate and impending harm and damage to Kellytoy's business, and to the

12 business, business reputation and good will of Kellytoy.

13 **<u>FIRST CAUSE OF ACTION</u>**

14 **(Federal Copyright Infringement -- 17 U.S.C. §501)**

15 (Against all Defendants)

16      53.     Kellytoy repeats and realleges each and every allegation above as

17 though fully set forth herein.

18      54.     Kellytoy owns a valid copyright in the Squishmallow Designs. The

19 Squishmallow Designs are original, decorative, and non-functional.  After having

20 had access to Kellytoy's Squishmallow Designs, Defendants, without authorization

21 from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale

22 and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a

23 design that Defendants copied from the Squishmallow Designs.

24      55.     All of the Squishmallow Designs were originally created by Kellytoy

25 or were assigned to and are owned by Kellytoy.

26      56.     The Squishmallow Designs comprise original works of authorship that

27 may be copyrighted under United States law.  In fact, Kellytoy has complied with

28 requirements of Title 17 of the United States Code with respect to the registration of

Case 2:24-cv-01169-JLS-AGR Document 27-2 Filed 08/04/24 Page 128 of 816 Page ID
Case 2:18-cv-08389-JAK-AGR Document 16-7 Filed 08/04/18 Page 13 of 23 Page ID #:178
#:1082

Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by United States Copyright Registration Nos. VA0002096020 and VA0002093075, entitling Kellytoy to the exclusive rights and privileges in and to the above-referenced copyrights.  These copyright registrations are valid and subsisting.

57.  Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.  Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106.  Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.  Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.  On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.  On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.  As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law.  Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur.  Accordingly, Kellytoy is entitled to preliminary and permanent injunctions

Case 2:24-cv-01169-JLS-AGR Document 27-2 Filed 03/24/24 Page 129 of 816 Page ID
#:1083
Case 2:24-cv-03390-JAK-AGR Document 17-2 Filed 03/24/24 Page 14 of 23 Page ID #:179

1  restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

2  **SECOND CAUSE OF ACTION**

3  **(Trademark Infringement, False Designation of Origin and False Description --**

4  **15 U.S.C. §1125)**

5  (Against All Defendants)

6  63.  Kellytoy repeats and realleges each and every allegation of paragraphs

7  1 through 52 above as if fully set forth herein.

8  64.  The Squishmallow Trade Dress is non-functional and highly

9  distinctive, and has become associated in the public mind with plush toy products of

10  the highest quality and reputation finding their origin in a single source, Kellytoy.

11  65.  Kellytoy owns all right, title and interest in and to the Squishmallow

12  Trade Dress.

13  66.  Without Kellytoy's authorization or consent, and having knowledge of

14  Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed,

15  manufactured, imported, distributed, advertised, offered for sale and/or sold and/or

16  will soon commence importation, distribution, advertising, offers for sale, and sale

17  of replicas of the Squishmallow Trade Dress to the consuming public in direct

18  competition with Kellytoy, in or affecting interstate commerce.

19  67.  The Infringing Plush designs are confusingly similar to the

20  Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has

21  caused and, unless enjoined by this Court, will continue to cause a likelihood of

22  confusion and deception of members of the public and, additionally, injury to

23  Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade

24  Dress.

25  68.  Defendants' use and further threatened uses of the Squishmallow Trade

26  Dress thus constitutes trade dress infringement, false designation of origin and

27  unfair competition in violation of 15 U.S.C. § 1125(a).

28  69.  As a direct and proximate result of Defendants' unlawful conduct,

Case 2:24-cv-03169-JLS-AGR Document 27-2 Filed 04/04/24 Page 130 of 816 Page ID
Case 2:18-cv-08590-JAK-AGR Document 47-2 Filed 08/24/18 Page 15 of 23 Page ID #:190
#:1084

1   Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

2   Dress, as well as the goodwill associated therewith, and have diverted sales and

3   profits from Kellytoy to Defendants. Thus, as a direct and proximate result of

4   Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer

5   damage to its valuable brand and reputation, and other damages in an amount to be

6   proven at trial, including Defendants' profits and Kellytoy's lost profits.

7       70.     Defendants' actions described above will cause, have caused, and will

8   continue to cause irreparable damage to Kellytoy, unless Defendants are restrained

9   by this Court. Kellytoy has no adequate remedy at law with regard to Defendants'

10   infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and

11   permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining

12   Defendants' and their agents, servants, and employees, and all persons acting

13   thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow

14   Trade Dress, or any colorable imitation or variation thereof, in connection with the

15   sale and/or marketing of any products.

16       71.     Defendants' aforesaid acts are exceptional within the meaning of 15

17   U.S.C § 1117.

18                     **THIRD CAUSE OF ACTION**

19            **(Common Law Trademark Infringement)**

20                 (Against all Defendants)

21       72.     Kellytoy repeats and re-alleges each and every allegation of paragraphs

22   1 through 52 and 64 through 67 as though fully set forth herein.

23       73.     Defendants have violated Kellytoy's exclusive common law rights in

24   the Squishmallow Trade Dress.

25       74.     Kellytoy has continuously used its Squishmallow Trade Dress to

26   identify its goods in California and elsewhere, and to distinguish them from goods

27   of a different origin. As such, Kellytoy has common law rights to the Squishmallow

28   Trade Dress.

3222901.1

75.     Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

## **FOURTH CAUSE OF ACTION**

### **(California Common Law Unfair Competition)**

(Against all Defendants)

76.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77.     This claim arises under the common law of the State of California relating to unfair competition.

78.     Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress.  Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79.     Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy.  Defendants have thus committed unfair competition under the common law of the State of California.

80.     By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81.     Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

82.     Kellytoy has no adequate remedy at law.  Thus said activities of

1   Defendants have caused, if not enjoined, will continue to cause irreparable harm and

2   damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business

3   reputation and good will.

4          83.    Upon information and belief, Defendants have engaged in their

5   unlawful conduct alleged herein intentionally, maliciously, fraudulently and

6   oppressively entitling Kellytoy to punitive damages in an amount to be determined

7   at trial.

8   **<u>FIFTH CAUSE OF ACTION</u>**

9   **(California Statutory Unfair Competition –**

10  **California Bus. & Prof. Code § 17200, *et seq*.)**

11  (Against all Defendants)

12         84.    Kellytoy repeats and re-alleges each and every allegation of paragraphs

13  1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set

14  forth herein.

15         85.    By reason of the foregoing, Defendants have been, and are, engaged in

16  "unlawful, unfair or fraudulent business practices" in violation of California

17  Business and Professional Code Section 17200 *et seq*.

18         86.    Said activities of Defendants have caused and, if not enjoined, will

19  continue to cause irreparable harm and damage to the rights of Kellytoy in its

20  Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy

21  has no adequate remedy at law for these wrongs and injuries.  The damage to

22  Kellytoy includes harm to its goodwill and reputation in the marketplace that money

23  cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and

24  permanent injunction restraining and enjoining Defendants' and their agents,

25  servants, and employees, and all persons acting thereunder, in concert with, or on

26  their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable

27  imitation or variation thereof, in connection with the sale and/or marketing of any

28  products.  Kellytoy is further entitled to restitutionary disgorgement of all of

Case 2:24-cv-01169-JLS-MAR  Document 27-2  Filed 04/04/24  Page 133 of 816  Page ID
Case 2:18-cv-03399-JAK-AGR  Document 16-2  Filed 08/24/18  Page 18 of 33  Page ID
#:1087

1  Defendants' ill-gotten gains pursuant to California Business and Professions Code §

2  17203 and to recover its costs and attorneys' fees incurred in bringing and

3  prosecuting this action.

4

5                    **PRAYER FOR RELIEF**

6        WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

7        1.     That Defendants, their officers, members, directors, agents, servants,

8  employees, successors, licensees, representatives, successors, assigns, and all

9  persons acting in concert or participation with them, be permanently enjoined and

10  restrained from:

11        (i) Manufacturing, importing, distributing, advertising, offering to

12             sell or selling the Infringing Plush or any colorable imitations of

13             the Squishmallow Designs and/or Squishmallow Trade Dress;

14        (ii)  Using the Squishmallow Trade Dress or any confusingly

15             similar trade dress in connection with plush or other toys;

16        (iii) Using the Squishmallow Trade Dress, or any confusingly

17             similar mark, in connection with the advertisement, offer to sell

18             or sale of any toy products;

19        (iv) Using any false designation of origin, or representing or

20             suggesting directly or by implication that Defendants, or any

21             brands or other sources identifiers created by Defendants, or

22             their toys, are affiliated with, associated with, authorized by, or

23             otherwise connected to Kellytoy, or that Defendants are

24             authorized by Kellytoy to use the Squishmallow Trade Dress or

25             Squishmallow Designs;

26        (v)  Copying, distributing, displaying or making derivative works of

27             the Squishmallow Designs;

28        (vi) Engaging in any other activity constituting unfair competition

3222901.1

Case 2:24-cv-01169-JLS-AGR   Document 27-2   Filed 08/04/24   Page 134 of 816   Page ID
Case 2:18-cv-03399-JAK-AGR   Document 16-7   Filed 08/24/18   Page 19 of 23   Page ID
#:1088

with Kellytoy, or constituting infringement of the
Squishmallow Trade Dress or Squishmallow Designs; and

(vii) Assisting, aiding, or abetting any other person or business entity
in engaging or performing any of the activities referred to in
subparagraphs (i) through (vi) above, or effecting any
assignments or transfers, forming new entities or associations,
or utilizing any other device for the purpose of circumventing
or otherwise avoiding the prohibitions set forth in
subparagraphs (i) through (vi) above.

2.      That Defendants be directed to file with the Court and serve on
Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing
under oath setting forth in detail the manner and form in which Defendants have
complied with the injunction.

3.      That the Court direct any third parties providing services to
Defendants in connection with any infringing and/or enjoined conduct, including
social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces
(*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment
providers, including credit card companies (*e.g.*, PayPal, Visa) and other service
providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services
to Defendants in connection with the offer for sale and sale of the Infringing Plush
or any other products using or embodying the Squishmallow Trade Dress or
Squishmallow Designs.

4.      That Defendants be required to pay Kellytoy such damages as it has
sustained as a consequence of Defendants' infringement of the of the Squishmallow
Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

5.      Adjudge that each of the Defendants, by its unauthorized use of
Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it
may have undertaken relating to the Squishmallow Trade Dress, have violated

1  Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including,
2  without limitation, Cal. Bus. & Prof. Code § 17200 *et seq*.), and under common law,
3  and that they have done so willfully and for the purpose of violating Kellytoy's
4  rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade
5  Dress;

6       6.     Direct Defendants to provide Kellytoy with an identification in writing
7  of any and all entities that are presently using the Squishmallow Designs and/or
8  Squishmallow Trade Dress in the United States on Defendants' behalf and inform
9  them that they must immediately cease such use;

10       7.     Direct Defendants to immediately recall any and all merchandise
11  previously provided to any United States entity under the Squishmallow Trade
12  Dress or Squishmallow Designs;

13       8.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to
14  deliver for destruction all products, brochures, marketing materials, decals, stickers,
15  signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their
16  possession or under their control, bearing any unauthorized copy of any of the
17  Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy,
18  confusingly similar likeness, or colorable imitation thereof, and all plates, molds,
19  matrices, programs and other means of making same;

20       9.     Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of
21  Defendants' products that infringe Kellytoy's copyrights in the Squishmallow
22  Designs, as well as any plates, molds, matrices, programs, or other articles by means
23  of which copies of the works embodied in the Squishmallow Designs may be
24  produced;

25       10.     Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction
26  of all copies of Defendants' products that infringe Kellytoy's copyright in the
27  Squishmallow Designs, as well as any plates, molds, matrices, programs, or other
28  articles by means of which copies of the works embodied in the Squishmallow

3222901.1

-20-

**FIRST AMENDED COMPLAINT**

Case 2:24-cv-01169-JLS-MAR Document 27-2 Filed 04/04/24 Page 136 of 816 Page ID
Case 2:18-cv-08393-JAK-AGR Document 16-2 Filed 08/24/18 Page 21 of 23 Page ID #:106
#:1090

Designs may be produced;

11.     That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under the Squishmallow Trade Dress or Squishmallow Designs:

(i)     the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

(ii)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.     Direct Defendants to pay the costs of corrective advertising;

13.     Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded statutory damages;

18.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

19.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

20.     That Defendants be ordered to disgorge all of their ill-gotten gains pursuant to California Business and Professions Code § 17203; and

Case 2:24-cv-01169-JLS-MAR Document 27-2 Filed 04/04/24 Page 137 of 816 Page ID
#:1091
Case 2:18-cv-08393-JAK-AGR Document 16-2 Filed 08/24/18 Page 22 of 23 Page ID #:107

21. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: August 24, 2018

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: ____/s/ Mark B. Mizrahi____
MARK B. MIZRAHI
MAX N. WELLMAN
Attorneys for Plaintiffs
KELLYTOY (USA), INC. and
KELLYTOY WORLDWIDE, INC.

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand and request a trial by jury of all issues raised that are triable by jury.

Respectfully submitted,

Dated: August 24, 2018

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: _____/s/ Mark B. Mizrahi_____
MARK B. MIZRAHI
MAX N. WELLMAN
Attorneys for Plaintiffs
KELLYTOY (USA), INC. and
KELLYTOY WORLDWIDE, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANTS' MOTION TO DISMISS (DKT. 24)**

## I. Introduction

On June 15, 2018, Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc. (collectively, "Kellytoy" or "Plaintiffs") brought this action against Dan-Dee International, Ltd. ("Dan-Dee"), Rite Aid Corporation ("Rite Aid") (collectively, "Defendants") and Does 1-10. Dkt. 1. Kellytoy filed an amended complaint on August 24, 2018 ("FAC" (Dkt. 16)). The FAC presents five causes of action: (i) federal copyright infringement; (ii) federal trademark / trade dress infringement; (iii) common law trademark / trade dress infringement; (iv) California common law unfair competition; and (v) California statutory unfair competition.

On September 7, 2018, Defendants filed a motion to dismiss the FAC ("Motion" (Dkt. 24)). Plaintiffs filed an opposition, and Defendants filed a reply. Dkts. 32, 34. A hearing was held on the Motion on January 28, 2019, and the matter was taken under submission. Dkt. 37.

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART.**

## II. Factual Background

### A. Parties

Kellytoy develops, manufactures and sells children's toys, including a line of plush toys that are marketed and sold under the SQUISHMALLOW brand ("Squishmallows"). FAC ¶¶ 6, 11, 18. Dan-Dee also manufactures and sells children's toys, including plush toys. *Id.* ¶ 13. Rite Aid sells merchandise at its retail stores, including plush toys bearing third-party trademarks and under its own label, RITE STUFF. *Id.* ¶ 15. Dan-Dee has produced and sold to Rite Aid certain plush toys that allegedly infringe Kellytoy's intellectual property rights. *Id.* ¶¶ 7, 41, 42.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

B.     Trade Dress Infringement Allegations

1.     Squishmallow Trade Dress

Kellytoy began developing its Squishmallows line of plush toy designs in 2016. *Id.* ¶ 21. Since that time, it has made substantial financial investments to develop, advertise and promote these product designs throughout the United States. *Id.* ¶ 22. The FAC alleges that "[d]ue to Kellytoy's unique design, extensive marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys," and "the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy." *Id.* ¶ 25. The FAC alleges that "[t]he Squishmallow Trade Dress is non-functional." *Id.* ¶ 64.

The FAC alleges that the Squishmallow trade dress includes the following non-exhaustive list of features:

> (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

*Id.* ¶ 23. It is also alleged that the Squishmallow trade dress is "more fully depicted" in the images attached to the FAC and reproduced below. *Id.*; Ex. 1 to FAC.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 141 of 816   Page ID
#:1095
Case 2:19-cv-05399-JAK-AGR   Document 39-2   Filed 02/07/19   Page 3 of 10   Page ID #:414

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

**Squishmallow Designs**



EXHIBIT I
Page 26 of 81

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 142 of 816   Page ID
Case 2:23-cv-05399-JAK-AGR   Document 37-2   Filed 02/07/19   Page 94 of 100   Page ID #:415
#:1096

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

2.   <u>Allegedly Infringing Product</u>

In spring 2018, Dan-Dee entered an agreement with Rite Aid, which called for the production and sale of various plush toys that would be distributed in Rite Aid stores in the United States. FAC ¶ 41. The FAC alleges that these plush toys feature "substantially similar" designs to the Squishmallows. *Id.* The FAC further alleges that, because Dan-Dee's plush toys are of lesser quality than the Squishmallows, they are sold at lower prices. *Id.* ¶ 44.

In 2017, Kellytoy met with representatives of Rite Aid, and showed the Rite Aid representatives its Squishmallows line of products. *Id.* 45. The FAC states that "Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof." *Id.* The FAC also alleges that "Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush." *Id.* ¶ 49. It is alleged that the designs of Dan-Dee's plush toys "are confusingly similar to the Squishmallow Trade Dress." *Id.* ¶ 67. Photographs of Dan-Dee's plush toys are attached to the FAC and reproduced below. *Id.* ¶ 41; Ex. 6 to FAC.

 

C.   Allegations as to Copyright Infringement

Kellytoy holds copyrights in the Squishmallow designs. FAC ¶¶ 24, 54. The unicorn Squishmallow design is registered with the U.S. Copyright Office under registration numbers VA0002096020 and VA0002093075. *Id.* ¶ 56. The FAC alleges that the Squishmallow designs are original works, each of which was created by or assigned to Kellytoy. *Id.* ¶¶ 54-56.

The FAC alleges that Defendants had access to the Squishmallow designs prior to Defendants' development and distribution of their unicorn plush toy. *Id.* ¶ 54. The FAC further alleges that Defendants copied the design from the Squishmallow unicorn to create their competing product. *Id.* It is alleged that Defendants infringed Kellytoy's exclusive rights to the Squishmallow unicorn design in connection with Defendants' production, promotion and sale of a similar unicorn plush toy. *Id.* ¶¶ 57-58. A photograph of Dan-Dee's unicorn plush toy is attached to the FAC and reproduced below, next to images of the Squishmallow unicorns. *Id.* ¶ 57; Ex. 7 to FAC.

Case 2:24-cv-01169-JLS-MAR   Document 37-2   Filed 04/04/24   Page 143 of 816   Page ID
#:1097
Case 2:23-cv-05399-JAK-AGR   Document 37-2   Filed 02/07/19   Page 5 of 10   Page ID #:416

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

 

### III.    Request for Judicial Notice

Defendants request judicial notice of three documents in connection with the Motion ("Request" (Dkt.
24-1)). Each document is a printout of a portion of a publicly available website that features images of
third-party products. Exhibit A is a printout from the website Instagram.com. Exhibits B and C are
printouts accessed from archive.org, or the "Wayback Machine." Pursuant to Fed. R. Evid. 201, a court
may take judicial notice of facts that are either (1) "generally known within the trial court's territorial
jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot
reasonably be questioned." Fed. R. Evid. 201(b).

Defendants seek judicial notice "of the existence of the three third party products discussed in their
motion to dismiss, namely Pusheen, Sumikko Gurashi, and Squishable Pig." Dkt. 24-1 at 2. It appears
that Defendants also seek judicial notice of the fact that each third-party product "existed and w[as]
public[ly] available at least as early as the dates shown" on the corresponding printout. *Id.* Plaintiffs
object to the Request on three grounds: (i) the documents have not been authenticated; (ii) they do not
come from a reliable source; and (iii) they are irrelevant to the issues presented by the Motion. Dkt. 33.

The facts for which Defendants seek judicial notice are not generally known within this jurisdiction. In
addition, there are sufficient concerns as to the authenticity of the documents that contain the
information at issue. Moreover, the facts as to which the Request has been made are not material to
the resolution of the Motion. For these reasons, the Request is **DENIED.**

### IV.    Analysis

####     A.    Legal Standards

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and
plain statement of the claim showing that the pleader is entitled to relief." The complaint must state
facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 570 (2007). The complaint need not include detailed factual allegations but must provide
more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility

Case 2:23-cv-05399-JAK-AGR Document 39-2 Filed 02/07/13 Page 3 of 10 Page ID #:417

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | | Date | February 7, 2019 |
|---|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | | |

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim. Such a motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations of the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

    B.    Application

        1.    <u>Copyright Infringement</u>

            a)    Legal Standards

To establish copyright infringement, a plaintiff must show (i) "ownership of a valid copyright," and (ii) "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). The Ninth Circuit has recently clarified that the second element of copyright infringement involves two distinct components: "copying" and "unlawful appropriation." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018) (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164-65 (9th Cir. 1977)). Proof of copying is required because "independent creation is a complete defense to copyright infringement." *Id.* (citing *Feist*, 499 U.S. at 345-46). Proof of unlawful appropriation is required because certain copying – including the reproduction of "ideas" or "concepts" used in the plaintiff's work – is not prohibited by the Copyright Act. *Id.* (citing 17 U.S.C. § 102(b)).

The proof of copying and unlawful appropriation "involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)). Infringement may also be established by demonstrating that the alleged infringers violated any of the exclusive rights granted to copyright holders under 17 U.S.C. § 106. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|----------|--------------------------|------|------------------|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

The Ninth Circuit uses "a two-part test to determine whether two works are substantially similar: an extrinsic test and an intrinsic test." *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 637 (9th Cir. 2008). The history of the application of the substantial similarity tests has been described as follows:

> As originally adopted in [*Krofft*], the extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.

*Id.* (citations omitted). "The intrinsic test is left to the trier of fact." *Benay v. Warner Bros. Entm't,* 607 F.3d 620, 624 (9th Cir. 2010).

        b)     Application

The FAC alleges that Kellytoy holds registered copyrights in the Squishmallow unicorn designs. Registration of a copyright is prima facie evidence of the validity of the copyright. *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002); 17 U.S.C. § 410(c). The FAC also alleges that Defendants had access to the Squishmallow designs before Defendants' developed and distributed their unicorn plush toy. It further alleges that Defendants copied the design for their unicorn plush toy from the Squishmallow unicorn. The FAC also includes images of the Squishmallow unicorns and of the Dan-Dee unicorn plush toy.

Defendants argue that these allegations are insufficient to state a claim for copyright infringement. They contend that Kellytoy was required, but failed to identify the specific similarit(ies) between the parties' works. Defendants also argue that Kellytoy alleges copyright infringement as to an unprotectable idea, not as to a protectable expression. Defendants assert that, at most, Kellytoy would be entitled to "thin" copyright protection for the Squishmallow unicorn. However, Defendants argue that the Kellytoy and Dan-Dee designs are not "virtually identical" as required under that standard.

Kellytoy is not entitled to copyright protection for the idea of a unicorn plush toy "or to elements of expression that necessarily follow from the idea of such dolls," such as "any similarity in expression resulting from either the [imagined] physiognomy of [unicorns] or from the nature of stuffed animals." *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir. 1987). However, Kellytoy states that it does not claim protection for those ideas, but rather the particular expression of those ideas in the Squishmallow unicorn design. As shown by the photographs, the Squishmallow unicorn does not bear a strong resemblance to a "realistic" representation of a unicorn. Rather, it is an artistic interpretation of a unicorn character, the design of which required using creativity that resulted in variations from the traditional image of a unicorn. Accordingly, the Squishmallow unicorn design contains expressive elements that extend beyond pure protected ideas. Further, in light of the allegations of complete copying by Defendants and the inclusion of images of both parties' designs in the FAC, it is not necessary that the FAC identify with particularity each alleged similarity between the works at the pleading stage.

Case 2:24-cv-01169-JLR-MAR   Document 37-2   Filed 04/04/24   Page 146 of 816   Page ID
#:1100
Case 2:18-cv-05399-JAK-AGR   Document 35-2   Filed 02/07/19   Page 31 of 81   Page ID #:419

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

Construing the allegations in the light most favorable to Kellytoy, the FAC states a plausible claim for copyright infringement. The FAC presents allegations that, if assumed to be true, would be sufficient to establish all of the following: (i) ownership of a valid copyright; (ii) copying; and (iii) unlawful appropriation. For the foregoing reasons, the Motion is **DENIED** as to the copyright cause of action.[1]

> 2.    Trademark Infringement
>
> a)    Legal Standards

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir. 1993)). To prove trade dress infringement, "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Entm't Inc.,* 581 F.3d 1138, 1145 (9th Cir. 2009) (citing *Disc Golf Ass'n v. Champion Discs,* 158 F.3d 1002, 1005 (9th Cir. 1998)).

Under the traditional definition of functionality, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Moldex-Metric, Inc. v. McKeon Prod., Inc.,* 891 F.3d 878, 881 (9th Cir. 2018) (citations omitted). The "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Id.* at 881-82. "[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that [courts] focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards,* 251 F.3d at 1259.

The Ninth Circuit has identified four factors as significant in assessing functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantage of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir. 1998). In addition to these four factors, courts inquire "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1072 (9th Cir. 2006).

The Ninth Circuit has described the framework for functionality as a two-part test. *See Millennium Labs., Inc. v. Ameritox, Ltd.,* 817 F.3d 1123, 1128-29 (9th Cir. 2015) ("[T]he test for functionality proceeds in two steps.") (quoting *Au-Tomotive Gold,* 457 F.3d at 1072). At "Step One," courts apply the *Disc Golf* factors to determine whether the asserted trade dress is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Id.* at 1129; *see also TrafFix Devices, Inc. v. Marketing*

---

[1]  This is not a final determination as to the validity or scope of the claimed copyrights, or whether the Dan-Dee design is infringing. These issues concern fact-based matters that were not presented through the Motion.

EXHIBIT I
Page 31 of 81

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 147 of 816   Page ID
Case 2:23-cv-05399-JAK-AGR   Document 35-2   Filed 02/07/19   Page 9 of 10   Page ID
#:1101

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

*Displays, Inc.*, 532 U.S. 23, 32-33 (2001). "If the claimed trade dress is determined to be functional under Step One, then 'the inquiry is over.'" *Millennium Labs.*, 817 F.3d at 1129 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072). If not, the analysis proceeds to "Step Two," which addresses whether trade dress protection would impose a significant non-reputation-related competitive advantage. *Id.*

> b)   Application

Defendants argue that Kellytoy's claimed trade dress is described insufficiently through vague allegations in the FAC. Consequently, they contend that the allegations are not sufficient to provide notice of the claim. They assert that the description in the FAC is "so vague that the alleged trade dress covers nearly the entire market for anime-inspired plush toys." Dkt. 34 at 3. Defendants further argue that, because the claimed trade dress is functional, it is not eligible for trade dress protection. Defendants acknowledge that the FAC contains a conclusory pleading of non-functionality, but contend that is inadequate under the applicable standards absent more specific factual allegations.

Kellytoy responds that the written description of its trade dress in the FAC must be read in light of the attached images, and that together they provide a sufficient description. Kellytoy adds that it is not required to plead non-functionality of its claimed trade dress, although it claims to have done so.

Kellytoy is correct that "pictures of a product combined with a list of the elements of the trade dress" can be sufficient to put defendants on notice as to the claimed trade dress. *See* Dkt. 32 at 19 n.4. However, the mere presence of pictures and a written list is not *per se* sufficient, and must be evaluated on a case-by-case basis. The written description of the claimed trade dress in the FAC does not provide sufficient specificity as to the nature and scope of Kellytoy's claim. It states that the claimed trade dress

> includes, without limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

FAC ¶ 23.

This general description offers little insight into the scope or nature of Kellytoy's claim. In addition, the written description in the FAC can reasonably be construed as substantially broader than the trade dress protection Kellytoy actually seeks. It is also too broad to form the basis of a plausible claim for trade dress infringement.

Kellytoy argues that any ambiguities in its written description are "answered by reference to the images of the products at issue." Dkt. 32 at 19. However, in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|----------|--------------------------|------|------------------|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

There has been no showing that any amendment to the Complaint would be futile. In light of the well accepted principle that leave to amend should be freely given, it is appropriate to do so here. This outcome is confirmed by the representations in the Opposition to the Motion and at the hearing that Kellytoy can provide a more detailed statement in support of its trade dress allegations. *See id.* at 26-27.

For the foregoing reasons, the Motion is **GRANTED** without prejudice as to the federal trademark infringement causes of action.

3. <u>Remaining Causes of Action</u>

Defendants assert that the third, fourth and fifth causes of action are derivative of the federal trademark causes of action and should be dismissed for the same reasons. Kellytoy did not respond to this argument in its brief or at the hearing.

The third, fourth and fifth causes of action arise from the same underlying allegations of trade dress infringement. Therefore, a parallel analysis to what has been stated above applies to these causes of action. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). Therefore, the Motion is **GRANTED** without prejudice as to the third, fourth and fifth causes of action.

**V.** <u>**Conclusion**</u>

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to the first cause of action. The Motion is **GRANTED** as to the second through fifth causes of action. Any amended complaint shall be filed no later than February 21, 2019.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak

EXHIBIT I
Page 33 of 81

1 | TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
2 | MARK B. MIZRAHI (BAR NO. 179384)
mark.mizrahi@ffslaw.com
3 | FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
4 | Los Angeles, California 90067
Telephone:  (310) 255-6100
5 | Facsimile:  (310) 255-6200

6 | *Attorneys for Plaintiffs Kellytoy (USA),*
*Inc. and Kellytoy Worldwide, Inc.*

7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10 |

11 | KELLYTOY (USA), INC., a California corporation; and KELLYTOY
12 | WORLDWIDE, INC., a California corporation;
13 |
                  Plaintiffs,
14 |
        vs.
15 |
DAN-DEE INTERNATIONAL, LTD.,
16 | a Delaware corporation; RITE AID
CORPORATION, a Delaware
17 | corporation, and DOES 1 through 10, inclusive,
18 |
                  Defendants.
19 |
20 |
21 |
22 |

Case No.  2:18-cv-05399 JAK (AGRx)

**SECOND AMENDED COMPLAINT FOR:**

1. **FEDERAL COPYRIGHT INFRINGEMENT (17 U.S.C. § 501);**
2. **FEDERAL TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTION (15 U.S.C. § 1125);**
3. **COMMON LAW TRADEMARK INFRINGEMENT;**
4. **CALIFORNIA COMMON LAW UNFAIR COMPETITION; AND**
5. **CALIFORNIA STATUTORY UNFAIR COMPETITION.**

**DEMAND FOR JURY TRIAL**

23 |

24 |        Plaintiffs KELLYTOY (USA), INC., a California corporation and

25 | KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

26 | "Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

27 | LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

28 | Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

"Defendants") for injunctive relief and damages under the laws of the United States and the State of California as follows:

## JURISDICTION AND VENUE

1.      This action arises under the copyright laws of the United States, 17 U.S.C. § 101 *et seq*., the trademark laws of the United States, 15 U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress infringement and unfair competition.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.      This Court has personal jurisdiction over Defendants, as Defendants are doing business in California and this District and are subject to the jurisdiction of this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout the state of California and this District.  Similarly, defendant Rite Aid has numerous retail stores within the state of California and this District.  In addition, defendants Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade dress, knowing that Kellytoy is a California resident, and thereby purposefully directed their activities towards California.

## NATURE OF THE ACTION

5.      This is an action for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*.; and trade dress infringement, trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), California Bus. & Prof. Code § 17200, *et seq*., and the common law.

6.      Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress, which Kellytoy pioneered and

4080086.2

EXHIBIT I
Page 35 of 81

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 151 of 816   Page ID
Case 2:23-cv-03399-JAR-MAR   Document 46   Filed 03/05/15   Page 3 of 37   Page ID #457
#:1105

1  created.  Kellytoy actively markets its Squishmallows through numerous media

2  outlets, including, without limitation, on social media, at tradeshows, through

3  Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

4  and on Kellytoy's website, depicting images of its proprietary Squishmallows line of

5  plush toys.

6       7.     The explosion in popularity of Kellytoy's Squishmallows and  the

7  resulting and widespread customer and industry recognition, has unfortunately led to

8  illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that

9  defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid, which

10  Rite Aid has re-sold, numerous units of two knock-off products for distribution

11  within this state and district that both infringe upon Kellytoy's trade dress and one

12  of which infringes upon Kellytoy's copyrighted design in its Squishmallows.

13       8.     Accordingly, to prevent and remediate the rampant consumer confusion

14  and misappropriation of Kellytoy's copyrighted designs in its Squishmallows

15  resulting from Defendants' unauthorized use, promotion and sale of the Infringing

16  Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks

17  immediate and permanent injunctive relief, compensatory damages, disgorgement of

18  Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable

19  attorneys' fees and expenses, a product recall, and corrective advertising sufficient

20  to address Defendants' wrongdoing.

21                 **THE PARTIES**

22       9.     Kellytoy (USA), Inc. is a California corporation with its principal place

23  of business located in Los Angeles, California.

24

25       10.     Kellytoy Worldwide, Inc. is a California corporation with its principal

26  place of business located in Los Angeles, California.

27       11.     Kellytoy is in the business of developing, manufacturing and selling

28  children's toys including, among other things, plush toys.

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 152 of 816   Page ID
Case 2:23-cv-05399-JAK-MAR   Document 46   Filed 03/05/19   Page 94 of 37   Page ID #458
#:1106

12.     On information and belief, defendant Dan-Dee International, LTD. ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

13.     Dan-Dee is in the business of manufacturing and selling children's toys including, among other things, plush toys.

14.     On information and belief, defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with a place of business in Pennsylvania and numerous stores in this judicial district.

15.     Rite Aid owns and operates drug stores and pharmacies throughout the United States and, on information and belief, this District that sell various merchandise, including plush toys bearing third-party trademarks and under its own private label, RITE STUFF.

16.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

17.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## **BACKGROUND FACTS**
### **Kellytoy and Its Protected Intellectual Property Rights**

18.     Kellytoy is an innovative and highly successful creator, manufacturer, distributor and seller of unique plush toys, including, without limitation, its Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,* **Exhibit 1**.)

19.     Kellytoy has been in business for approximately 35 years and in that time has developed a reputation for producing high quality, unique, creative and

-4-

EXHIBIT I
Page 37 of 81

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 153 of 816   Page ID
Case 2:23-cv-05339-JAK-AGR   Document 46   Filed 03/05/10   Pages 357 of 81   Page ID
#:1107

innovative plush toys that are highly prized in the industry.

20.    Kellytoy devotes extensive time and resources  promoting and preserving its image identity and the image and identity of its high quality plush toys, including by creating distinctive designs and marks for use on its products and seeking U.S. trademark and copyright registrations for such designs and marks, including those at issue in this Complaint.

21.    In 2016, Kellytoy conceived of and began creating its Squishmallows line of plush toy designs – ultimately marketed in connection with the SQUISHMALLOW trademark – that share common, unique features that distinguish them from the goods of others.  These designs are wholly original to Kellytoy and comprise copyrightable subject matter under the laws of the United States.

22.    Indeed, Kellytoy has been and is the sole owner of all right, title and interest in and to the copyrights in the individual "characters" in the Squishmallows line and the distinguishing, unique, and recognizable features that are common across the Squishmallows line.  From 2016 to the present, Kellytoy has expended large sums of money in developing, advertising and promoting these product designs through the United States.  In fact, Kellytoy is spending approximately $50,000 per month in direct to consumer and business-to-business advertising in connection with its SQUISHMALLOW branded goods.

23.    Kellytoy sells a broad range of SQUISHMALLOW branded plush toys featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its shapes, colors, textures and graphics – serve as a distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes,

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 154 of 816   Page ID
#:1108
Case 2:23-cv-03399-JAK-NCR   Document 46   Filed 03/05/15   Page 3 of 57 of 81e   Page 440

snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils, mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of these toys, are more fully depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

24.     The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which were created by or assigned to Kellytoy (the "Squishmallow Designs").  As explained in greater detail below, these Squishmallow Designs are the subject of Copyright Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C. §101 *et seq*.

25.     Continuously and without interruption, beginning in 2016, Kellytoy has expended a great deal of time, effort, and money in the promotion of its Squishmallows.  And due to Kellytoy's unique design, robust marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  Indeed, because of Kellytoy's extensive promotional activities and widespread display of its Squishmallows directed to the public, and as a consequence of Kellytoy's fair and honorable dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy.  The Squishmallow Trade Dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

26.    In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 1,140,000 "hits" for the search term "Squishmallows."

27.    In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

28.    Further adding to their recognizability and secondary meaning in the marketplace, Squishmallows have been featured in numerous magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto, including many mainstream media outlets such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, Squishmallows have been also recognized by The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized Squishmallows in its October 2017 issue, under the "Products We Love" section; and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21, 2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 156 of 816   Page ID
Case 2:19-cv-05399-JAR-NGR   Document 46   Filed 03/05/15   Page 93 of 57 of 816   Page ID #:442
#:1110

29.    Kellytoy's Squishmallows have also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.    Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 4**. In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

31.    Kellytoy's Squishmallows have also, as alleged above, been the subject of consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently have nearly 44,300 Instagram followers, more than 60,000 Facebook

Case 2:24-cv-01169-JLR-MAR   Document 27-2   Filed 04/04/24   Page 157 of 816   Page ID
#:1111
Case 2:23-cv-05399-JAR-NGR   Document 46-2   Filed 03/05/10   Page 3 of 37   Page ID #:443

followers – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy regularly publishes photographs of its Squishmallows.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page is attached as **Exhibit 5**.

32.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares."

33.     Squishmallows' legion of loyal fans have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Squishmallows, with the average Squishmallows post likes on Instagram hovering over 1000+ per post and 45-100 average comments per post.

34.     Kellytoy's Squishmallow website traffic has grown exponentially since its launch in 2017 to an average of 4,313 visits per day.

35.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

36.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target

1   stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts
2   Berry Farms and numerous others.

3       37.    Since the summer of 2017, Kellytoy has sold approximately a
4   whopping 22 million (22,000,000) units of Squishmallows with no indication that
5   sales will be slowing down anytime soon.  Kellytoy's Squishmallows products
6   embodying the Squishmallows Trade Dress have yielded tens of millions of dollars
7   of sales in the U.S. over the past year.

8       38.    In fact, Kellytoy's Squishmallows sold out through Walgreens.com
9   during their Gift of the Week promotion in early November 2017, as well as
10  exceeding all sales goals for the campaign, both online and in stores.

11      39.    Because of Squishmallows' massive success and popularity, consumers
12  have come to associate Kellytoy's high-quality Squishmallows plush toys with the
13  Squishmallows Trade Dress and, conversely, have come to recognize the
14  Squishmallow Trade Dress as a designation of source.

15  **<u>Defendants' Unlawful Conduct</u>**

16      40.    At the outset, none of the defendants to this action is licensed or
17  otherwise authorized by Kellytoy to market or distribute products bearing or
18  embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

19      41.    Upon information and belief, sometime in spring of 2018, notably well
20  after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant
21  Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell
22  and supply to Rite Aid various plush toys bearing substantially similar copies of
23  Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter
24  referred to as "Infringing Plush") for distribution by Rite Aid through its United
25  States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's
26  trademarks are collectively attached hereto as **Exhibit 6**.

27      42.    Upon information and belief, Dan-Dee offered to sell the Infringing
28  Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid

4080086.2

-10-

Case 2:24-cv-03169-JLS-AGR Document 47-2 Filed 04/04/24 Page 159 of 816 Page ID
Case 2:18-cv-08393-JAK-AGR Document 46-2 Filed 03/05/19 Page 11 of 37 Page ID #:445
#:1113

in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43.     Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush.  Upon information and belief, Rite Aid has indeed sold the Infringing Plush in interstate commerce.

44.     Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because, rather than investing in creating its own designs and identity, Dan Dee has copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45.     In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46.     Kellytoy is informed and believes that Defendants, without Kellytoy's consent or permission, intend to sell, advertise, promote, display, and distribute, toys bearing Squishmallow Designs and Squishmallow Trade Dress in United States commerce.

47.     The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress

Case 2:24-cv-01609-JLS-AGR   Document 47-2   Filed 04/04/24   Page 160 of 816   Page ID
Case 2:18-cv-08590-JAK-AGR   Document 46   Filed 03/05/19   Page 12 of 37   Page ID #:446
#:1114

1  embodied in the Infringing Plush – including by copying wholesale the shape and

2  look – constitute false designation of origin regarding sponsorship of those plush

3  toys and falsely represent to the public that Defendants' plush toys originate from

4  Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or

5  licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such

6  activities of Defendants are likely to confuse, mislead, and deceive Defendants'

7  customers, purchasers, and members of the public as to the origin of the toys bearing

8  the Squishmallow Trade Dress, or to cause such persons to believe that Defendants'

9  Infringing Plush and/or Defendants have been sponsored, approved, authorized, or

10  licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in

11  violation of 15 U.S.C. §1125(a).

12       48.    Upon information and belief, the activities of Defendants were done

13  willfully with full knowledge of the falsity of such designations of origin and false

14  descriptions or representations, with the intent to trade on the enormous goodwill

15  Kellytoy has earned in its Squishmallows, and with the intent to cause confusion,

16  and to mislead and deceive the purchasing public into believing that the products

17  Defendants sell are directly sponsored by, authorized, by, associated with, or

18  originate from Kellytoy.

19       49.    As further evidence of Dan-Dee's intent to trade upon Kellytoy's

20  goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed

21  one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very

22  different plush toys for use in connection with the Infringing Plush.

23       50.    Defendants, by their unauthorized copying and use of Kellytoy's

24  Squishmallow Designs and Squishmallow Trade Dress, have engaged and will

25  engage in acts of copyright infringement, unfair competition, unlawful

26  appropriation, unjust enrichment, wrongful deception of the purchasing public, and

27  unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's

28  original works.  Defendants' activities have damaged and will continue to damage

1  the reputation, business and good will of Kellytoy nationally and in this judicial

2  district.

3      51.      Upon information and belief, unless enjoined by the Court, Defendants

4  will continue and further escalate their infringing activities.

5      52.      Kellytoy has no adequate remedy at law.  Thus said activities of

6  Defendants have caused and, if not enjoined, will continue to cause irreparable,

7  immediate and impending harm and damage to Kellytoy's business, and to the

8  business, business reputation and good will of Kellytoy.

9                        **FIRST CAUSE OF ACTION**

10              **(Federal Copyright Infringement -- 17 U.S.C. §501)**

11                          (Against all Defendants)

12     53.      Kellytoy repeats and realleges each and every allegation above as

13  though fully set forth herein.

14     54.      Kellytoy owns a valid copyright in the Squishmallow Designs. The

15  Squishmallow Designs are original, decorative, and non-functional.  After having

16  had access to Kellytoy's Squishmallow Designs, Defendants, without authorization

17  from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale

18  and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a

19  design that Defendants copied from the Squishmallow Designs.

20     55.      All of the Squishmallow Designs were originally created by Kellytoy

21  or were assigned to and are owned by Kellytoy.

22     56.      The Squishmallow Designs comprise original works of authorship that

23  may be copyrighted under United States law.  In fact, Kellytoy has complied with

24  requirements of Title 17 of the United States Code with respect to the registration of

25  Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by

26  United States Copyright Registration Nos. VA0002096020 and VA0002093075,

27  entitling Kellytoy to the exclusive rights and privileges in and to the above-

28  referenced copyrights.  These copyright registrations are valid and subsisting.

Case 2:24-cv-01169-JLS-MAR Document 47-2 Filed 04/04/24 Page 162 of 816 Page ID
Case 2:18-cv-08393-JAK-AGR Document 46-2 Filed 03/05/19 Page 44 of 57 Page ID 448
#:1116

57.     Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.     Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106. Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.     Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.     On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.     On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law. Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur. Accordingly, Kellytoy is entitled to preliminary and permanent injunctions restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

**SECOND CAUSE OF ACTION**

**(Trademark Infringement, False Designation of Origin and False Description -- 15 U.S.C. §1125)**

(Against All Defendants)

63.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 52 above as if fully set forth herein.

64.     The Squishmallow Trade Dress is non-functional and highly distinctive, and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

65.     Kellytoy owns all right, title and interest in and to the Squishmallow Trade Dress.

66.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will soon commence importation, distribution, advertising, offers for sale, and sale of replicas of the Squishmallow Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

67.     The Infringing Plush designs are confusingly similar to the Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

68.     Defendants' use and further threatened uses of the Squishmallow Trade Dress thus constitutes trade dress infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

69.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

1  Dress, as well as the goodwill associated therewith, and have diverted sales and

2  profits from Kellytoy to Defendants. Thus, as a direct and proximate result of

3  Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer

4  damage to its valuable brand and reputation, and other damages in an amount to be

5  proven at trial, including Defendants' profits and Kellytoy's lost profits.

6       70.    Defendants' actions described above will cause, have caused, and will

7  continue to cause irreparable damage to Kellytoy, unless Defendants are restrained

8  by this Court. Kellytoy has no adequate remedy at law with regard to Defendants'

9  infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and

10  permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining

11  Defendants' and their agents, servants, and employees, and all persons acting

12  thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow

13  Trade Dress, or any colorable imitation or variation thereof, in connection with the

14  sale and/or marketing of any products.

15       71.    Defendants' aforesaid acts are exceptional within the meaning of 15

16  U.S.C § 1117.

17  <div align="center">**THIRD CAUSE OF ACTION**</div>

18  <div align="center">**(Common Law Trademark Infringement)**</div>

19  <div align="center">(Against all Defendants)</div>

20       72.    Kellytoy repeats and re-alleges each and every allegation of paragraphs

21  1 through 52 and 64 through 67 as though fully set forth herein.

22       73.    Defendants have violated Kellytoy's exclusive common law rights in

23  the Squishmallow Trade Dress.

24       74.    Kellytoy has continuously used its Squishmallow Trade Dress to

25  identify its goods in California and elsewhere, and to distinguish them from goods

26  of a different origin. As such, Kellytoy has common law rights to the Squishmallow

27  Trade Dress.

28

4080086.2

75.     Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

## **FOURTH CAUSE OF ACTION**

### **(California Common Law Unfair Competition)**

(Against all Defendants)

76.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77.     This claim arises under the common law of the State of California relating to unfair competition.

78.     Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress. Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79.     Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

80.     By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81.     Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

82.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.

83.     Upon information and belief, Defendants have engaged in their unlawful conduct alleged herein intentionally, maliciously, fraudulently and oppressively entitling Kellytoy to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (California Statutory Unfair Competition –
### California Bus. & Prof. Code § 17200, *et seq.*)

(Against all Defendants)

84.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set forth herein.

85.     By reason of the foregoing, Defendants have been, and are, engaged in "unlawful, unfair or fraudulent business practices" in violation of California Business and Professional Code Section 17200 *et seq.*

86.     Said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy has no adequate remedy at law for these wrongs and injuries.  The damage to Kellytoy includes harm to its goodwill and reputation in the marketplace that money cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any

Case 2:24-cv-01169-JLS-MAR Document 67-2 Filed 04/04/24 Page 167 of 816 Page ID
Case 2:18-cv-08396-JAK-AGR Document 47-1 Filed 03/05/19 Page 19 of 57 Page ID #:453
#:1121

1  products.  Kellytoy is further entitled to restitutionary disgorgement of all of

2  Defendants' ill-gotten gains pursuant to California Business and Professions Code §

3  17203 and to recover its costs and attorneys' fees incurred in bringing and

4  prosecuting this action.

5  ## **PRAYER FOR RELIEF**

6  WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

7  1.  That Defendants, their officers, members, directors, agents, servants,

8  employees, successors, licensees, representatives, successors, assigns, and all

9  persons acting in concert or participation with them, be permanently enjoined and

10  restrained from:

11  (i)  Manufacturing, importing, distributing, advertising, offering to

12      sell or selling the Infringing Plush or any colorable imitations of

13      the Squishmallow Designs and/or Squishmallow Trade Dress;

14  (ii)  Using the Squishmallow Trade Dress or any confusingly similar

15      trade dress in connection with plush or other toys;

16  (iii)  Using the Squishmallow Trade Dress, or any confusingly similar

17      mark, in connection with the advertisement, offer to sell or sale of

18      any toy products;

19  (iv)  Using any false designation of origin, or representing or

20      suggesting directly or by implication that Defendants, or any

21      brands or other sources identifiers created by Defendants, or their

22      toys, are affiliated with, associated with, authorized by, or

23      otherwise connected to Kellytoy, or that Defendants are

24      authorized by Kellytoy to use the Squishmallow Trade Dress or

25      Squishmallow Designs;

26  (v)  Copying, distributing, displaying or making derivative works of

27      the Squishmallow Designs;

28

     (vi)    Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress or Squishmallow Designs; and

     (vii)   Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

2.     That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

3.     That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the Squishmallow Trade Dress or Squishmallow Designs.

4.     That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of the Squishmallow Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

5.     Adjudge that each of the Defendants, by its unauthorized use of Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it

1  may have undertaken relating to the Squishmallow Trade Dress, have violated

2  Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including,

3  without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law,

4  and that they have done so willfully and for the purpose of violating Kellytoy's

5  rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade

6  Dress;

7        6.     Direct Defendants to provide Kellytoy with an identification in writing

8  of any and all entities that are presently using the Squishmallow Designs and/or

9  Squishmallow Trade Dress in the United States on Defendants' behalf and inform

10  them that they must immediately cease such use;

11        7.     Direct Defendants to immediately recall any and all merchandise

12  previously provided to any United States entity under the Squishmallow Trade

13  Dress or Squishmallow Designs;

14        8.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to

15  deliver for destruction all products, brochures, marketing materials, decals, stickers,

16  signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their

17  possession or under their control, bearing any unauthorized copy of any of the

18  Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy,

19  confusingly similar likeness, or colorable imitation thereof, and all plates, molds,

20  matrices, programs and other means of making same;

21        9.     Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of

22  Defendants' products that infringe Kellytoy's copyrights in the Squishmallow

23  Designs, as well as any plates, molds, matrices, programs, or other articles by means

24  of which copies of the works embodied in the Squishmallow Designs may be

25  produced;

26       10.     Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction

27  of all copies of Defendants' products that infringe Kellytoy's copyright in the

28  Squishmallow Designs, as well as any plates, molds, matrices, programs, or other

Case 2:24-cv-01169-JLS-AGR   Document 67-2   Filed 04/04/24   Page 170 of 816   Page ID
Case 2:18-cv-03390-JAK-AGR   Document 46-7   Filed 03/05/19   Page 42 of 57   Page ID #:456
#:1124

1  articles by means of which copies of the works embodied in the Squishmallow
2  Designs may be produced;

3      11.    That each Defendant provide Kellytoy in writing with the following
4  information relating to Defendants' goods marketed, advertised, offered for sale, or
5  sold under the Squishmallow Trade Dress or Squishmallow Designs:

6      (i)    the name, address and telephone number of each and every United
7             States entity to whom Defendants have made available or otherwise
8             provided any such products; and

9      (ii)   a full accounting as to the precise dollar amount of such products made
10            available or provided and the profits recognized by Defendants in
11            connection with such actions;

12     12.    Direct Defendants to pay the costs of corrective advertising;

13     13.    Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred
14  in initiating and prosecuting this action;

15     14.    Direct Defendants to pay punitive damages and exemplary damages
16  according to proof;

17     15.    That Kellytoy recover its actual damages, Kellytoy's lost profits, and
18  Defendant's profits arising from Defendants' conduct complained-of herein;

19     16.    That the Court award enhanced profits and treble damages;

20     17.    That Kellytoy be awarded statutory damages;

21     18.    That Kellytoy be awarded interest, including pre-judgment
22  interest, on the foregoing sums;

23     19.    That the Court direct such other actions as the Court may deem just and
24  proper to prevent the public from deriving the mistaken impression that any
25  products or services offered, advertised, or promoted by or on behalf of Defendants
26  are authorized by Kellytoy or related in any way to Kellytoy's products or services;

27     20.    That Defendants be ordered to disgorge all of their ill-gotten gains
28  pursuant to California Business and Professions Code § 17203; and

21.   For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED: March 5, 2019          FREEMAN, FREEMAN & SMILEY, LLP


By:    */s / Mark B. Mizrahi*
      TODD M. LANDER
      MARK B. MIZRAHI
      Attorneys for Plaintiffs
      KELLYTOY (USA), INC. and
      KELLYTOY WORLDWIDE, INC.

4080086.2

-23-

SECOND AMENDED COMPLAINT

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 172 of 816   Page ID
Case 2:18-cv-08939-JAK-AGR   Document 46-2   Filed 03/05/19   Page 24 of 37   Page ID #:458
#:1126

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand and request a trial by jury of all issues raised that

3

are triable by jury.

4

Respectfully submitted,

5

DATED: March 5, 2019          FREEMAN, FREEMAN & SMILEY, LLP

6

7

8

By:    _/ s / Mark B. Mizrahi_____

TODD M. LANDER

9

MARK B. MIZRAHI

Attorneys for Plaintiffs

10

KELLYTOY (USA), INC. and

11

KELLYTOY WORLDWIDE, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Scott P. Shaw, Bar No. 223592
   Sshaw@calljensen.com
2  L. Lisa Sandoval, Bar No. 310380
   Lsandoval@calljensen.com
3  CALL & JENSEN
4  A Professional Corporation
   610 Newport Center Drive, Suite 700
5  Newport Beach, CA  92660
   Tel:   (949) 717-3000
6  Fax:  (949) 717-3100

7

8  Neil Zipkin (admitted *pro hac vice*)
   Nzipkin@arelaw.com
9  Jessica Capasso (admitted *pro hac vice*)
   Jcapasso@arelaw.com
10 AMSTER, ROTHSTEIN & EBENSTEIN LLP
11 90 Park Avenue, 21st Floor
   New York, NY 10016
12 Tel:   (212) 336-8120
   Fax:  (212) 336-8001
13

14 Attorneys for Defendants Dan-Dee International, Ltd.
15 and Rite Aid Corporation

16             **UNITED STATES DISTRICT COURT**

17             **CENTRAL DISTRICT OF CALIFORNIA**

18

| 19  KELLYTOY (USA), INC., a California corporation; and KELLYTOY WORLDWIDE, INC., a California corporation, | Case No.  2:18-cv-05399-JAK (AGRx) |

19 KELLYTOY (USA), INC., a California corporation; and KELLYTOY WORLDWIDE, INC., a California corporation,

Case No.  2:18-cv-05399-JAK (AGRx)

**DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

20

21             Plaintiffs,

22             vs.

23

24 DAN-DEE INTERNATIONAL, LTD., a Delaware corporation; RITE AID CORPORATION, a Delaware corporation, and DOES 1 through 10, inclusive,

25

26

27             Defendants.

Date:   June 17, 2019
Time:  8:30
Ctrm:  10B

Complaint Filed:   June 15, 2018
Trial Date:   None Set

28

DAN06-01:2449390_1:4-2-19

CALL & JENSEN

173 of 816
EXHIBIT I
Page 58 of 81

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 17, 2019 at 8:30 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 350 W. 1st Street, Los Angeles, California, 90012, Courtroom 10B, Defendants Dan-Dee International, Ltd. and Rite Aid Corporation (together, "Defendants") will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), to dismiss Counts 2 through 5 of Plaintiffs Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc.'s (together, "Plaintiffs'") Second Amended Complaint for failure to state a claim.

This motion is made on the ground that Plaintiffs have failed to state a claim for federal trade dress infringement, common law trademark infringement, California common law unfair competition, and California statutory unfair competition.

This Motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed concurrently herewith, and such further arguments and papers as may be presented to the Court before or during the hearing.

Dated:  April 2, 2019                    CALL & JENSEN
                                         A Professional Corporation
                                         Scott P. Shaw
                                         L. Lisa Sandoval


                                         By: /s/ L. Lisa Sandoval
                                             L. Lisa Sandoval

                                         Attorneys for Defendants Dan-Dee International, Ltd. and Rite Aid Corporation

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.   LEGAL STANDARDS .............................................................................. 2

      A.    Motion to Dismiss .......................................................................... 2

      B.    Trade Dress..................................................................................... 3

III.  ARGUMENT............................................................................................. 6

      A.    Kellytoy Fails to Adequately Identify Protectable Trade
            Dress ............................................................................................... 6

      B.    Kellytoy's Alleged Trade Dress is Functional ............................... 9

      C.    The Remaining Causes of Action Must Fail Because There
            Is No Protectable Trade Dress...................................................... 13

IV.   CONCLUSION........................................................................................ 15

APPENDIX ........................................................................................................ 16

CALL &
JENSEN

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 60 of 81

# TABLE OF AUTHORITIES

Page

Federal Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................................................2, 10

*Aurora World, Inc. v. TY Inc.,*
  719 F. Supp. 2d 1115 (C.D. Cal. 2009) ...............................3, 4, 10, 11, 12

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...............................................................................................2

*Cleary v. News Corp.,*
  30 F.3d 1255 (9th Cir. 1994) .........................................................................15

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
  251 F.3d 1252 (9th Cir. 2001) .........................................................................4

*Continental Laboratory Products, Inc. v. Medax International, Inc.,*
  114 F. Supp. 2d 992 (S.D. Cal. 2000) ............................................................4

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.,*
  No. CV 15-769 PSG, 2015 U.S. Dist. LEXIS 188274 (C.D. Cal.
  May 8, 2015).....................................................................................4, 6, 9, 15

*Diamond Foods, Inc. v. Hottrix, LLC,*
  No. 14-cv-03162-BLF, 2016 U.S. Dist. LEXIS 93247 (N.D. Cal July 18, 2016)........9

*Global Manufacturing Group, LLC v. Gadget Universe.Com,*
  417 F. Supp. 2d 1161 (S.D. Cal. 2006) .......................................................12

*Homeland Housewares, LLC v. Euro-Pro Operating LLC,*
  No. CV 14-03954 DDP, 2014 U.S. Dist. LEXIS 156675 (C.D. Cal. Nov. 5, 2014) ....4

*Leatherman Tool Grp. v. Cooper Indus.,*
  199 F.3d 1009 (9th Cir. 1999) .......................................................................12

DAN06-01:2449390_1:4-2-19

- ii -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I

176 of 816

Page 61 of 81

**TABLE OF AUTHORITIES (cont'd)**

Page

*Mercado Latino, Inc. v. Indio Prods.*,
  No. CV 13-01027 DDP, 2017 U.S. Dist. LEXIS 55304 (C.D. Cal. Apr. 11, 2017).....4

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995)..................................................................................5, 10, 11

*R.F.M.A.S., Inc. v. So*,
  619 F. Supp. 2d 39 (S.D.N.Y. 2009) .................................................................8

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
  668 F.3d 677 (9th Cir. 2012) .........................................................................12

*Sherman-Bey v. Marshall*,
  No. CV 09-06494 RGK (RZ), 2011 U.S. Dist. LEXIS 73801 (C.D. Cal.
  Apr. 25, 2011)................................................................................................2

*Traffix Devices v. Mktg. Displays*,
  532 U.S. 23 (2001)................................................................................ 3, 5, 10-12

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992)........................................................................................3

*Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*,
  644 F.2d 769 (9th Cir. 1981) .....................................................................5, 12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000)..................................................................................3, 4, 5


Federal Statutes

15 U.S.C. § 1125(a) ...........................................................................................3

15 U.S.C. § 1125(a)(3) ......................................................................................4

15 U.S.C. § 1127 ...............................................................................................3

17 U.S.C. § 91 .................................................................................................16

CALL &
JENSEN

EXHIBIT I
Page 62 of 81

1

**TABLE OF AUTHORITIES (cont'd)**

2

Page

3

State Statutes

4  Cal. Bus. and Prof. Code § 17200 ........................................................................... 14

5  Cal. Bus. and Prof. Code § 17203 ........................................................................... 14

6

7

Federal Rules

8  Fed. R. Civ. P. 8 ........................................................................................................ 2

9  Fed. R. Civ. P. 8(a)(2) ............................................................................................... 2

10  Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 63 of 81

CALL & JENSEN

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Dan-Dee International, Ltd. ("Dan-Dee") and Rite Aid Corporation ("Rite Aid") (collectively, "Defendants") move this Court for an Order dismissing counts two through five of the Second Amended Complaint ("Second Amended Complaint," Dkt. 46) filed by Plaintiffs Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc. (collectively, "Kellytoy" or "Plaintiffs"), with prejudice.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on Thursday, March 21, 2019.

## I.   INTRODUCTION

After this Court dismissed Kellytoy's First Amended Complaint, Kellytoy revised its description of its trade dress for a second time.  However, little has changed, and Kellytoy's description of its trade dress remains "too broad to form the basis of a plausible claim for trade dress infringement."  (Order on Motion to Dismiss, Dkt. 39, at 9).[1]  Kellytoy's revisions make clear that it simply cannot articulate a trade dress that covers its entire line of Squishmallows and at the same time shoehorn Dan-Dee's products into that description.  The Second Amended Complaint is the third time Kellytoy has unsuccessfully tried to describe a trade dress that can act as a source indicator.  However, since its products lack uniformity, Kellytoy's description is so broad it encompasses a wide variety of existing products of others and impermissibly covers an entire product category.  Finally, since each and every element of Kellytoy's purported trade dress is functional (and the arrangement of those elements is dictated by the function of a particular looking stuffed toy), the trade dress is not protectable as a matter of law, and Kellytoy fails to state any actionable claim.

---

[1] For convenience, paragraph 23 of Kellytoy's original Complaint (Dkt. 1, ¶ 23), the First Amended Complaint (Dkt. 16, ¶ 23), and the Second Amended Complaint (Dkt. 46, ¶ 23) are attached as an Appendix to this Memorandum.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 64 of 81

CALL & JENSEN

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of claims for "failure to state a claim upon which relief can be granted."  In *Bell Atlantic Corporation v. Twombly*, the Supreme Court concluded that, to survive a motion to dismiss for failure to state a claim, a complaint must advance "allegations plausibly suggesting (not merely consistent with)" a successful claim for relief.  550 U.S. 544, 557 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss . . . ."  *Iqbal*, 556 U.S. at 679.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]'-- 'that the pleader is entitled to relief.'"  *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Under this standard, Plaintiffs must allege facts which, if proven, would plausibly entitle it to the relief it seeks.  Plaintiffs' Second Amended Complaint must contain allegations "respecting all the material elements necessary to sustain recovery under some viable legal theory." *Sherman-Bey v. Marshall*, No. CV 09-06494 RGK (RZ), 2011 U.S. Dist. LEXIS 73801, at *12 (C.D. Cal. Apr. 25, 2011).  As discussed more fully below, since Plaintiffs have not alleged (and cannot allege) the existence of trade dress in the entire Squishmallows product line that is protectable, it is impossible to



DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 65 of 81

180 of 816

allege facts that would entitle Plaintiffs to relief under the Lanham Act, common law, or the law of the State of California.

### B.     Trade Dress

The Lanham Act provides for the protection of trademarks and trade dress used to identify and distinguish a producer's goods from those manufactured or sold by others and to indicate the source of the goods.  *See* 15 U.S.C. § 1127.  Pertinent to this case, the Lanham Act provides a cause of action for infringement of unregistered trade dress, a category that includes both packaging design and product design.  *See* 15 U.S.C. § 1125(a).  The trade dress of a product refers to its "total image and overall appearance." *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1141 (C.D. Cal. 2009) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70 (1992)).

Here, Plaintiffs assert infringement of the Squishmallows trade dress embodied in the design of its **product**, not the packaging, contending that the product design of their varying assortment of products constitutes a source identifier.  The Supreme Court has cautioned against misuse or over-extension of trade dress to products, noting that "product design almost invariably serves purposes **other than** source identification . . ." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000) (emphasis added).  This is a recognition that the purpose of product design is generally functional and aesthetic and falls outside the scope of trade dress protection.[2]  *See id.* ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs -- such as a cocktail shaker shaped like a penguin -- is intended not to identify the source, but to render the product itself more useful or more appealing.").  Therefore, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products.  In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29 (2001).  For this very

---

[2] Functional or aesthetic features fall under the purview of patent and copyright law.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 66 of 81

CALL &
JENSEN

1  reason, "the Ninth Circuit has advised courts to evaluate such [product design] claims

2  with greater scrutiny than claims involving other forms of trade dress." *Aurora World*,

3  719 F. Supp. 2d at 1152 (citing *Continental Laboratory Products, Inc. v. Medax*

4  *International, Inc.*, 114 F. Supp. 2d 992, 997 (S.D. Cal. 2000)).

5      The Ninth Circuit has set forth three pleading requirements for a valid claim of

6  trade dress infringement of a product under the Lanham Act.  A plaintiff must allege:

7          (1) that its claimed dress is nonfunctional; (2) that its claimed
           dress serves a source-identifying role[,] either because it is
8          inherently distinctive or has acquired secondary meaning;[3]
           and (3) that the defendant's product . . . creates a likelihood of
9          consumer confusion.

10

11  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).

12  Moreover, a plaintiff must describe its claimed trade dress with sufficient detail and

13  clarity to give a defendant and the court sufficient notice of the plaintiff's claim.  *See*

14  *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015

15  U.S. Dist. LEXIS 188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly

16  articulate its claimed trade dress to give a defendant sufficient notice."); *Homeland*

17  *Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954 DDP (MANx), 2014

18  U.S. Dist. LEXIS 156675, at *8-9 (C.D. Cal. Nov. 5, 2014); *Mercado Latino, Inc. v.*

19  *Indio Prods.*, No. CV 13-01027 DDP (RNBx), 2017 U.S. Dist. LEXIS 55304, at *4-6

20  (C.D. Cal. Apr. 11, 2017).  Here, Plaintiffs' trade dress claim fails for two reasons -- the

21  claimed trade dress is functional and it continues to be described in far too broad terms

22  to give Defendants or the Court notice of its claim.

23      The burden of proof is on Plaintiffs to prove non-functionality.  15 U.S.C. §

24  1125(a)(3) ("In a civil action for trade dress infringement under this Act for trade dress

25  _____

26  [3] Since Plaintiffs are alleging product design trade dress they must meet the higher burden to prove
    secondary meaning as product design cannot be inherently distinctive.  *See Wal-Mart Stores, Inc. v.*

27  *Samara Bros., Inc.*, 529 U.S. 205, 216 (2000) ("[I]n an action for infringement of unregistered trade
    dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectable, only
    upon a showing of secondary meaning.").

28

DAN06-01:2449390_1:4-2-19                    - 4 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 67 of 81

182 of 816

CALL &
JENSEN

not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); *see also Wal-Mart Stores*, 529 U.S. at 210 (Section 43(a) "require[s] that a producer show that the allegedly infringing feature is not 'functional.'"). There is a "statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection." *Traffix Devices*, 532 U.S. at 30.

Functional elements of a product cannot be granted trade dress protection. According to the Supreme Court, "a product feature is functional, and cannot serve as a [protectable trade dress], if it is ***essential to the use or purpose*** of the article or it affects the cost or quality of the article. . . . [A] functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Traffix Devices*, 532 U.S. at 32 (emphasis added) (internal quotations and citations omitted). Courts also consider whether the feature at issue "constitute[s] the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981). The functionality doctrine prevents trademark and trade dress law, which seek to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.

> It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended ***forever*** (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164-165 (1995) (emphasis added).

By seeking to use the functional aspects of their products as trademarks, Plaintiffs are diving head first into the very forbidden waters described by the Supreme Court.

CALL & JENSEN

DAN06-01:2449390_1:4-2-19          - 5 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 68 of 81

183 of 816

III.  **ARGUMENT**

A.  **Kellytoy Fails to Adequately Identify Protectable Trade Dress**

In its Second Amended Complaint, Kellytoy still fails to provide Dan-Dee and the Court with a detailed and precise description of its trade dress.  Instead, Kellytoy has simply added more words to its trade dress description resulting in a more confusing definition.  Kellytoy's alleged trade dress remains impermissibly vague and broad, and Kellytoy has not met its burden.  *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 U.S. Dist. LEXIS 188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice.").  Paragraph 23 of the Second Amended Complaint defines Kellytoy's alleged trade dress as follows:

> (1) substantially egg/bell-shaped shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters;
>
> (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped toys;
>
> (3) embroidered two-dimensional facial features, such as eyes nostrils, mouths;
>
> (4) distinctive contrasting and non-monochrome coloring; and
>
> (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

(Dkt. 46, at ¶ 23).

Dan-Dee is at a loss to know what constitutes a "simplified Asian style Kawaii face."  Does it mean a "cute" face based on the Japanese-English translation of "Kawaii?"  Moreover, what would constitute a "complementary" shaped graphic for eyes, snouts, and bellies?"  What about the contrasting coloring is "distinctive?"  How



EXHIBIT I
Page 69 of 81

do the "simplified Asian style Kawaii faces" "conform to and support the overall
egg/bell shaped toys?"

After attempting to describe its trade dress in words, Kellytoy, in paragraph 23 of
the Second Amended Complaint, references the depictions in Exhibit 1. As it argued
previously in opposition to the Motion to Dismiss the First Amended Complaint,
Kellytoy asserts again that the written descriptions must be read in light of the attached
images.

However, the revisions to the Second Amended Complaint are telling. In both
the First Amended Complaint and the Second Amended Complaint, Kellytoy included
an Exhibit 1, which purportedly showed the individual products that comprise the
Squishmallows line. Notably, in Exhibit 1 to the Second Amended Complaint, Kellytoy
has quietly removed the following images from the list:[4]



However, as shown in Exhibit 3 to the Second Amended Complaint, these items remain
in Kellytoy's Squishmallow line as do other products not previously listed in Exhibit 1.
*See* Dkt. 46, Ex. 3. For instance, the Squishmallows line also includes the following,
which are also missing from Exhibit 1:



---

[4] The panda and frog were specifically referred to in Defendants' Reply Memorandum (Dkt. 34, at 2-
3) as examples of toys having very different features than many of the other products.

DAN06-01:2449390_1:4-2-19                                                                  - 7 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES
                                                                         EXHIBIT I
                                                                         Page 70 of 81
185 of 816

CALL & JENSEN

1   Thus, Dan-Dee is left to wonder were these products left out because Kellytoy
2   has admitted that they do not incorporate the alleged trade dress?  Or because the so-
3   called fox, elephant, bunny, and lamb ears are not round?  Or because the fox, lamb,
4   chick, and elephant's noses are not round?  Or perhaps because the cow, frog, fox,
5   lamb, and elephant do not have "Asian style Kawaii faces"?  Or is it because the lamb's
6   coloring is monochrome without "distinctive contrasting coloring"?  It is clear that
7   Kellytoy cannot describe its alleged trade dress in precise terms because the entire
8   Squishmallows line does not have a consistent appearance and thus, the enumerated
9   elements (even when combined with the photographs) still "do not provide the level of
10  clarity about the nature and scope of the claimed trade dress as is required by the
11  caselaw." (Dkt. 39, at 9.)

12      Again, Kellytoy does not explain which Squishmallows features are source
13  identifying.  As this Court noted, there are "substantial differences among the designs of
14  the products in the Squishmallows line."  (Dkt. 39, at 9).  In fact, due to the lack of
15  consistency in the Squishmallows line, Plaintiff simply cannot articulate a trade dress
16  that covers the entire line.  This is fatal to Kellytoy's claim of trade dress rights.  *See*
17  *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009) ("The elements
18  specified as the trade dress must be present in every item in that product line.").  In the
19  Second Amended Complaint, Kellytoy has cherry picked certain products from its line
20  that it believes conform to its described trade dress and left out the others.  However,
21  Plaintiff cannot pick and choose.  Either Plaintiff has a trade dress that covers the entire
22  line of Squishmallows or it does not.  Defendants assert it does not.

23      In the Second Amended Complaint, Kellytoy has introduced a new term "Asian
24  style Kawaii face" in place of the similarly vague term "anime-inspired."  The use of
25  impermissibly broad and vague terms continues to describe an entire genre of products
26  that have flooded the toy market both before and after Plaintiffs' introduction of its
27  Squishmallow line.  Kellytoy is attempting to use that broad definition to belatedly seek

28



1   to keep Dan-Dee out of that broad market.  This is improper.  *See Deckers Outdoor*
2   *Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 U.S. Dist. LEXIS
3   188274, at *8 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed
4   trade dress to give a defendant sufficient notice."); *Diamond Foods, Inc. v. Hottrix,*
5   *LLC*, No. 14-cv-03162-BLF, 2016 U.S. Dist. LEXIS 93247, at *30 (N.D. Cal. July 18,
6   2016) (Plaintiff must "plead the 'precise expression of the character and scope of the
7   claimed trade dress.'").

8        For the reasons discussed above, Plaintiffs' claims of trade dress rights still do
9   not provide sufficient notice of what constitutes the alleged trade dress and do not state
10  a valid claim for relief because Plaintiffs' claims are so broad and vague that they cover
11  an entire product category and a general idea.  Defendants are at a loss to know what
12  Plaintiffs are claiming to own and the trade dress claims asserted in the Second
13  Amended Complaint should be dismissed on this ground alone.

14        **B.    Kellytoy's Alleged Trade Dress is Functional**

15       The elements of the alleged "Squishmallow Trade Dress" are set forth in
16  paragraph 23 of the Second Amended Complaint.  *See* Appendix attached hereto.  Aside
17  from adding the gratuitous, conclusory, and patently false statement in paragraph 64 of
18  the Amended Complaint that the "Squishmallow Trade Dress is non-functional,"
19  Plaintiffs continue to provide no support for such contention.  On this basis alone,
20  Plaintiffs fail to adequately plead a claim for trade dress infringement.  *See Deckers*
21  *Outdoor Corp.*, 2015 U.S. Dist. LEXIS 188274, at *12-13 ("In light of the standard
22  pleading requirement that plaintiffs support the elements of their claims with more than
23  conclusory statements, the Court is persuaded by the approach of district courts that
24  require plaintiffs to allege how a trade dress is non-functional. . . . The Court holds that
25  Plaintiff's conclusory statement of non-functionality fails to sufficiently allege the
26  element, particularly because some features of the claimed trade dress do perform a
27  utilitarian function . . . .").

28

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
187 of 816
Page 72 of 81

The trade dress elements articulated by Plaintiffs are set forth above. "[D]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Here, each of the elements of alleged trade dress asserted by Kellytoy is functional, "constitutes the actual benefit that the consumer wishes to purchase," and thus, is not entitled to trade dress protection.

### 1. "substantially egg/bell-shaped shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters"

Here, Plaintiffs have added the term "egg" to its prior description of the shape of its Squishmallow trade dress.  Referring to Exhibit 1 of the Second Amended Complaint for examples of what is meant by "egg/bell shaped,"[5] to the extent the shapes are consistent, "substantially egg/bell-shaped" is believed to mean substantially oval in shape with a flattened bottom.  The flattened bottom is essential to allowing the product, a plush toy, to stand upright and is undeniably functional.[6]  Moreover, most stuffed toys depict animals or characters.

### 2. "simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped toys"

The claimed "simplified Asian style Kawaii faces," while aesthetic, are functional since the right to use them exclusively "would put competitors at a significant non-reputation-related disadvantage" and exclusive rights would preclude others from competing for a broad range of stuffed toys. *Traffix Devices*, 523 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165).  In fact, this Court has made clear that "the

---

[5] The dictionary definition of "bell-shaped" is something having the shape of a bell such as the flared end of a wind instrument (*see* https://www.merriam-webster.com/dictionary/bell) which does not apply to the shape of the products shown in Plaintiffs' Exhibit 1.
[6] A stuffed toy having a bell-shaped or an oval body portion can hardly be viewed as distinctive.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

CALL &
JENSEN

EXHIBIT I
Page 73 of 81

aesthetic features of plush toys . . . are essential selling features of the toys" and therefore, functional. *See Aurora World*, 719 F. Supp. 2d at 1149. Moreover, as in *Aurora World*, facial features "are essential to the goal of making the plush toys look like animals." *Id.* at 1147. To the extent the facial features "support the overall egg/bell shaped toys," is further evidence of functionality.

### 3. "embroidered two-dimensional facial features, such as eyes nostrils, mouths"

Here again, facial features such as eyes, nostrils, and mouths "are essential to the goal of making the plush toys look like animals." *Id.* at 1147. That they are embroidered is insignificant as it is a common and safe way to affix features on stuffed animals.

### 4. "distinctive contrasting and non-monochrome coloring"

This is a newly added element of the purported trade dress, first appearing in the Second Amended Complaint. A "non-monochrome" and "distinctive" color scheme are aesthetic features which "are essential selling features" of plush toys and therefore, functional. *See Aurora World*, 719 F. Supp. 2d at 1149. The exclusive right to manufacture plush toys in "non-monochrome coloring" would certainly "put competitors at a significant non-reputation-related disadvantage." *Traffix Devices*, 523 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165).

### 5. "short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel"

The velvety velour-like textured exterior is an essential property of any "plush" toy. Plaintiffs' addition that it is "short-pile" does nothing to change this. The exterior must be soft and plush for a toy to fall into the category of a stuffed animal or plush toy and this is what the consumer is seeking to buy. Where a feature "constitutes the actual



- 11 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 74 of 81

1    benefit that the consumer wishes to purchase" it is functional.  *Vuitton et Fils S.A. v. J.*

2    *Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981).

3          The "light and silky" memory foam-like stuffing is likewise an essential property

4    of any "stuffed" toy.[7]  Again, this is what consumers are seeking to buy -- a stuffed toy -

5    - and that is how such toys are made and how they look.  A "velvety" exterior with

6    stuffing cannot possibly constitute trade dress for a stuffed or plush toy regardless of

7    how many adjectives are used to describe it.  Moreover, trade dress protection extends

8    to the overall image or look of a product design, not the tactile properties that cannot be

9    seen by the consumer.  *See Aurora World*, 719 F. Supp. 2d at 1141 (citing *Global*

10   *Manufacturing Group, LLC v. Gadget Universe.Com*, 417 F. Supp. 2d 1161, 1166 (S.D.

11   Cal. 2006)).

12         Here, once again, Plaintiffs have "merely listed attributes of its products that are

13   common to many plush toys and asserted they are not utilitarian."  *Aurora World*, 719

14   F. Supp. 2d at 1150.  This is not enough to survive a motion to dismiss.  *Id.*  All plush

15   toys that fall into the category of anime-inspired, Kawaii or "cute" faced plush toys are

16   stuffed, have soft velvety exteriors, and substantially flat bottoms so that they do not

17   topple over.  Some are egg shaped; others are bell shaped.  The right to use these

18   features exclusively, as belatedly sought by Plaintiffs, "would put competitors at a

19   significant non-reputation-related disadvantage."  *Traffix Devices*, 532 U.S. at 32.  This

20   is fatal to Plaintiffs' trade dress claim of which "the whole is nothing other than the

21   assemblage of functional parts."  *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668

22   F.3d 677, 684 (9th Cir. 2012) (citing *Leatherman Tool Grp. v. Cooper Indus.,* 199 F.3d

23   1009, 1013 (9th Cir. 1999)).  In sum, Plaintiffs' entire product design is functional and

24   thus, cannot be recognized as a trademark.  *See Aurora World*, 719 F. Supp. 2d at 1146

25   ("For an overall product configuration to be recognized as a trademark, the entire design

26

27   ───────────────────
     [7] In fact, like most toys, Plaintiffs' stuffed toys are stuffed with ordinary polyester fill rather than

28   "marshmallow" or memory foam.  The stuffing is conventional.

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 75 of 81

CALL &
JENSEN

must be nonfunctional.").  The combination of the above-recited elements commonly found in plush toys is functional and is incapable of serving as a source of origin. Instead, these elements combine to form the very product a consumer wishes to purchase.

### C.  The Remaining Causes of Action Must Fail Because There Is No Protectable Trade Dress

Besides asserting causes of action for trade dress and copyright infringement, Plaintiffs continue to assert the following in the Second Amended Complaint: (1) common law trademark infringement; (2) California common law unfair competition; and (3) California statutory unfair competition.  As pled by Plaintiffs, each of these causes of action is based on Defendants' alleged copying of the Squishmallow Trade Dress.  (*See* Dkt. 46, ¶¶ 73-74, 78-80, 86).  In particular, in their third cause of action for common law trademark infringement Plaintiffs allege:

> 73. Defendants have violated Kellytoy's exclusive common law rights in the *Squishmallow Trade Dress*.
>
> 74. Kellytoy has continuously used its Squishmallow *Trade Dress* to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin.  As such, Kellytoy has common law rights to the *Squishmallow Trade Dress*.

(Dkt. 46, ¶¶ 73-74) (emphasis added).  In their fourth cause of action for California common law unfair competition Plaintiffs allege:

> 78. Defendants' Infringing Plush incorporate [*sic*] matter constituting reproduction, copies and colorable imitation of Kellytoy's *Squishmallow Trade Dress*.  Defendants' unauthorized use of Kellytoy's *Squishmallow Trade Dress* constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

///

///



DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 76 of 81

79. Upon information and belief, Defendants have intentionally appropriated Kellytoy's **Squishmallow Trade Dress** with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

(Dkt. 46, ¶¶ 78-79) (emphasis added). In their fifth cause of action for California statutory unfair competition under California Business and Professions Code § 17200 Plaintiffs allege:

86. Said activities of Defendants have caused, if not enjoined, and will continue to cause irreparable harm and damage to the rights of Kellytoy in its **Squishmallow Trade Dress** and to its business reputation and good will. Kellytoy has no adequate remedy at law for these wrongs and injuries. The damage to Kellytoy includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's **Squishmallow Trade Dress**, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. Kellytoy is further entitled to restitutional disgorgement of all of Defendants' ill-gotten gains pursuant to California Business and Professional Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

(Dkt. 46, ¶ 86) (emphasis added).

While the specific language differs from claim to claim, each is based upon Defendants' unauthorized use of Plaintiffs' alleged exclusive rights in the claimed Squishmallow Trade Dress. Since the Squishmallow Trade Dress is not protectable, and since each of these claims is based on the copying of a protectable trade dress, Plaintiffs' third, fourth, and fifth causes of action fail to state a claim and should be dismissed. The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 77 of 81

192 of 816

§ 17200 are 'substantially congruent' to claims made under the Lanham Act." *Deckers Outdoor Corp.*, 2015 U.S. Dist. LEXIS 188274, at *22 (citing *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)); *see also* this Court's Order on Motion to Dismiss, Dkt. 39, at 10. Thus, because Plaintiffs have "failed to plead trade dress infringement, [their claims] premised on the same theory are likewise insufficiently pled . . . ." *Id.* at 23.

## IV.   CONCLUSION

None of Plaintiffs' causes of action two through five state a claim upon which relief can be granted. Further, in light of Kellytoy's continued inability to describe its purported trade dress in terms having sufficient clarity about the nature and scope of its claimed trade dress, Defendants respectfully request that the second, third, fourth and fifth causes of action in the Second Amended Complaint be dismissed with prejudice.


Dated:  April 2, 2019                          CALL & JENSEN
                                               A Professional Corporation
                                               Scott P. Shaw
                                               L. Lisa Sandoval


                                               By: */s/ L. Lisa Sandoval*
                                                    L. Lisa Sandoval

                                               Attorneys for Defendants Dan-Dee International, Ltd. and Rite Aid Corporation

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION
AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
AUTHORITIES

EXHIBIT I
Page 78 of 81

# APPENDIX

23.     Kellytoy sells a broad range of Squishmallows that feature the brand's iconic trade dress, which is not easily reduced to writing, but includes, without limitation: (1) substantially bell-shaped plush toy animals/characters (i.e. substantially oval in shape with substantially flat bottoms), (2) Japanese-inspired minimalist and whimsical facial features, (3) a velvety velour-like-plush exterior, and (4) stuffed with a "spongy," memory foam-like stuffing -- as more fully depicted in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively the "Squishmallow Trade dress") which are the subjects of numerous United States copyright registrations.  The plush designs depicted **in Exhibit 2** -- a subset of Kellytoy's line of Squishmallows -- comprise some of Kellytoy's most popular Squishmallows, which were created by or assigned to Kellytoy (the "Squishmallow Designs").  As set forth in greater detail below, these Squishmallow Designs are the subject of Copyright Registrations issued by the United States Copyright Office, pursuant to 17 U.S.C. 91 *et seq*.

(Compl., Dkt. 1 ¶ 23).

23.     Kellytoy sells a broad range of Squishmallows that feature the brand's iconic trade dress, which is not easily reduced to writing, but includes, without limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture -- as more fully depicted in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

(FAC, Dkt. 16 ¶ 23).

23.     Kellytoy sells a broad range of SQUISHMALLOW branded plush toys featuring the brand's iconic trade dress, and whose overall look, feel and image -- and in particular but without limitation in shapes, colors, textures and graphics -- serve as a distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped

graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils, mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of these toys, are more fully depicted, without limitation, in **Exhibit 1** hereto -- features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

(Second Amended Complaint, Dkt. 46 ¶ 23).



- 17 -

DEFENDANTS DAN-DEE INTERNATIONAL, LTD.'S AND RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT I
Page 80 of 81

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 196 of 816   Page ID
#:1634
Case 2:18-cv-05399-JAK-AGR   Document 71-2   Filed 09/23/19   Page 1 of 1   Page ID #:1150

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:18–cv–05399–JAK–AGR          Date   9/23/2019

Title    KELLYTOY USA, INC. ET AL V. DAN–DEE INTERNATIONAL, LTD. ET AL

Present    The Honorable  JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

_____Andrea Keifer_____                    _____Not Reported_____
Deputy Clerk                               Court Reporter / Recorder

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                                Not Present

**Proceedings:**        **(IN CHAMBERS) ORDER DISMISSING CASE WITHOUT PREJUDICE (JS-6)**

In light of the parties' Notice of Settlement, the Court orders that this action is dismissed without prejudice. The Court retains jurisdiction to vacate this Order and to reopen the action within 45 days from the date of this Order, provided, however, any request by any party(ies) that the Court do so, shall make a showing of good cause as to why the settlement has not been completed within the 45-day period, what further settlement processes are necessary, and when the party(ies) making such a request reasonably expect the process to be concluded. This Order does not preclude the filing of a stipulation of dismissal with prejudice pursuant to Fed. R. Civ. P. 41, which does not require the approval of the Court. Such stipulation shall be filed within the aforementioned 45-day period, or by such later date ordered by the Court pursuant to a stipulation by the parties that conforms the requirements of a showing of good cause stated above.

:00
Initials of Preparer:  ake

EXHIBIT I
Page 81 of 81

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) Case No. 1:20-cv-00748 )<br>) Honorable Gary Feinerman |
| Plaintiffs, | ) )|
| vs. | ) )|
| TY INC., and DOES 1-10, | ) )|
| Defendants. | ) )|

## PLAINTIFF KELLY TOY WORLDWIDE, INC.'S MEMORANDUM OF LAW IN

## SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Dean D. Niro
Oliver D. Yang
VITALE, VICKREY, NIRO, SOLON & GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
Telephone: (312) 236-0733
dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC.

## TABLE OF CONTENTS

I.     **INTRODUCTION** ............................................................................ 1

II.    **STATEMENT OF FACTS** .............................................................. 2

III.   **ANALYSIS** .................................................................................... 6

    A.    **The Preliminary Injunction Standards** ............................... 6

    B.    **Kellytoy Is Likely To Succeed On The Merits** ...................... 6

        1.    **The Squishmallows Trade Dress has developed a secondary meaning** ............................................................... 7

        2.    **The Squishmallows Trade Dress is non-functional** ................. 12

            a.    *The Squishmallows Trade Dress does not have any design elements that have been subject to a utility patent* ............ 13

            b.    *The Squishmallows Trade Dress provides no utilitarian advantage* ........................................................ 14

            c.    *Kellytoy has not advertised utilitarian advantages of Squishmallows* ....................................................... 16

            d.    *Many alternate designs for stuffed animals exist* .............. 16

            e.    *The Squishmallows Trade Dress does not affect quality or costs* ................................................... 16

        3.    **Customers are likely to be Confused** ................................... 17

            a.    *The Squishmallows Trade Dress and the Infringing Plush are similar in appearance and suggestion* ........................ 18

            b.    *Squishmallows and the Infringing Plush are similar goods* ................................... 19

            c.    *Squishmallows and the Infringing Plush are sold in the same area* ........................................ 20

            d.    *The consumer's degree of care* .......................................... 20

            e.    *The Squishmallows Trade Dress is strong* ......................... 21

            f.    *Actual confusion* ............................................................... 21

            g.    *Ty intended to palm off its products as Squishmallows* ..... 22

    C.    **Kellytoy Will Suffer Irreparable Harm Absent A Preliminary Injunction** ............................................... 22

        **D.**      **The Irreparable Harm to Kellytoy Outweighs**
                   **The Potential Harm Ty Would Suffer Were**
                   **A Preliminary Injunction Wrongfully Granted**......................................24

        **E.**      **The Public Interest Will be Served By Granting the Injunction**.........24

        **F.**      **Injunction Bond** ......................................................................................25

**IV.**    **CONCLUSION** .................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### Federal Cases

*Badger Meter, Inc. v. Grinnell Corp.*,
    13 F.3d 1145 (7th Cir. 1994) ...................................................................7, 12, 17, 18, 20, 21

*Bodum USA, Inc. v. A Top New Casting Inc.*,
    927 F.3d 486 (7th Cir. 2019) ...................................................................7, 12, 13, 15, 16

*Cae, Inc. v. Clean Air Engineering, Inc.*,
    267 F. 3d 660 (7th Cir. 2001) ...................................................................21

*Deckers Outdoor Corporation v. The Partnerships, et al.*,
    2013 WL 1337616 (N.D. Ill. March 27, 2013)........................................25

*Eli Lilly & Co. v. Natural Answers, Inc.*,
    233 F.3d 456 (7th Cir. 2000) .....................................................................25

*Ferrari S.P.A. v. Roberts*
    944 F.2d 1235 (6th Cir. 1991) ....................................................................8

*Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*,
    647 F.3d 723 (7th Cir. 2011) .....................................................................13

*Gurglepot, Inc. v. New Shreve, Crump & Low LLC*,
    153 F.Supp.3d 441 (D. Mass 2015) ............................................................8

*Health O Meter Inc. v. Terraillon Corp.*,
    873 F.Supp. 1060 ........................................................................................7

*Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*,
    560 F.2d 1325 (7th Cir. 1977) ..................................................................22

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
    846 F.2d 1079 (7th Cir.1988) ........................................................6, 18, 23

*KJ Korea, Inc. v. Health Korea, Inc.*,
    66 F. Supp. 3d 1005 (N.D. Ill. 2014) ............................................19, 20, 21

*Logan Graphic Prod., Inc. v. Textus USA, Inc.*,
    No. 02 C 1823, 2003 WL 21011746 (N.D. Ill. May 5, 2003) ....................12, 15, 16

*Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule
    "A,"*
    2015 WL 3818622 (N.D. Ill. 2015) ..........................................................22

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2nd Cir. 2005)....................................................................18

EXHIBIT J
Page 4 of 168

*Michalic v. Cleveland Trankers, Inc.*,
   364 U.S. 325, 81 S.Ct. 6 (1960) ...................................................................8

*Minemyer v. B-Roc Representatives, Inc.*,
   678 F. Supp. 2d 691 (N.D. Ill. 2009) .........................................................8

*Packman v. Chicago Tribune Co.*,
   267 F.3d 628 (7th Cir. 2001) ....................................................................17

*Promatek Indus., Ltd. v. Equitrac Corp.*,
   300 F.3d 808 (7th Cir. 2002) ....................................................................19

*Qualitex Co. v. Jacobson Products Co.*,
   514 U.S. 159 (1995) ............................................................................8, 13

*Re/Max N. Cent., Inc. v. Cook*,
   272 F.3d 424 (7th Cir. 2001) ....................................................................22

*Roulo v. Russ Berrie & Co.*,
   886 F.2d 931 (7th Cir. 1989) .....................................................................7

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) ..................................................................25

*Service Ideas, Inc. v. Traex Corp.*,
   846 F.2d 1118 (7th Cir. 1988) ..................................................................15

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
   695 F.3d 676 (7th Cir. 2012) .....................................................................6

*Sylvester v. SOS Children's Villages Illinois, Inc.*,
   453 F.3d 900 (7th Cir. 2006) .....................................................................8

*Thomas & Betts Corp., v. Panduit Corp.*,
   138 F.3d 277 (7th Cir. 1998) .............................................................7, 9, 10

*Top Tobacco v. Fantasia Distribution Inc.*,
   101 F. Supp. 3d 783 (N.D. Ill. 2015) ...........................................17, 19, 20, 21

*Trans Union LLC v. Credit Research, Inc.*,
   142 F. Supp. 2d 1029 (N.D. Ill. 2001) .........................................................7

*Turnell v. CentiMark Corp.*,
   796 F.3d 656 (7th Cir. 2015) .....................................................................6

*Ty, Inc. v. Jones Grp., Inc.*,
   237 F.3d 891 (7th Cir. 2001) .............................................................6, 17, 18, 19, 24

*Wal-Mart Stores, Inc. v. Samara Bros.*,
   529 U.S. 205 (2000) ..................................................................................7

**Federal Statutes**

11 U.S.C. § 1125 ................................................................................................6, 17

# I.   **INTRODUCTION**

Imitation may indeed by the height of flattery, but in nakedly imitating the distinctive look and feel of Kellytoy Worldwide, Inc.'s ("Kellytoy") Squishmallow's plush toys, Ty, Inc. ("Ty") has accelerated past the line of permissible competition and into an obvious infringement of the Squishmallows trade dress.  And given the transparent nature of the infringement and the clear resulting risk to Squishmallows' hard earned goodwill, only a preliminary injunction can prevent Kellytoy from suffering irreparable harm.

The facts and law demanding this result are straightforward.  Kellytoy introduced the Squishmallows line – a series of plush toys with abstract depictions of popular animals – in 2017, and did so after a lengthy design process focused on creating a line of toys that maintained a unique combination of features heretofore not seen in the U.S. marketplace.  It succeeded.  In fact, Kellytoy's designers and an independent industry expert confirm below that assembly of non-functional characteristics – namely, an egg/bell shape without discrete limbs and no torso, embroidered facial features based on the Japanese Kawaii style, and a soft shell with a squishy stuffing – are not found on other plush toys in the United States.  Nor is there any doubt that the overwhelming consumer and industry reaction to Squishmallows give rise to clear secondary meaning under applicable law, affording Squishmallows durable trade dress rights.  The assembly of evidence set out below, including extensive advertising and marketing, 40 million units shipped to national retailers in three years, widespread consumer engagement on social media and otherwise, all put that question firmly to rest.

Ty, against that backdrop, now seeks to misappropriate that goodwill by selling competing goods that unambiguously copy the particular look and feel of Squishmallows.  That Ty is deliberately converting the unique combination of elements defining the Squishmallows trade dress cannot be the subject of any reasonable dispute.  A simple review of two of the parties' respective products confirms the intentional nature of this infringement:

Kellytoy Squishmallow



Ty's Squish-a-Boo



Beyond that, the concurrently filed declaration of an established industry expert – Richard Gottlieb – echoes that inevitable conclusion, making this a garden variety infringement case: Squismallows embody protectable trade dress that Ty is knowingly infringing.

That much resolves the likelihood that Kellytoy will ultimately prevail on the merits of its claims – it will. But it will also suffer clear irreparable harm if Ty is not enjoined as requested. Specifically, Ty intends to market its infringing toys nationwide – and has already exhibited them at toy industry trade shows – and the imminent threat of that full throated infringement campaign cannot be overstated. Ty should not be permitted to trade off of the Squishmallows goodwill and in the process confuse the public into believing that Ty's Infringing Plush[1] originates from or is associated with Kellytoy's originals. Kellytoy has the exclusive right – indeed, the duty – to control its reputation, but it cannot control the quality of infringing goods, be they Ty's or another competitor's. And the more the public is exposed to Ty's competing products, ones incorporating the features of the Squishmallows Trade Dress (shape, etc.), the less resonant and valuable will be the trade dress in functioning as indicia of product source. Left with no other option in protecting its rights, Kellytoy now moves this court for a preliminary injunction to prevent Ty from distributing the Infringing Plush until this case is resolved.

## II.     STATEMENT OF FACTS

Kellytoy creates, manufactures, distributes, and sells unique plush toys. (Declaration of Jeanne Yoon ("Decl. Yoon") ¶ 8.) This includes the highly successful and famous Squishmallows line of plush animals, which Kellytoy created Squishmallows in 2016. (*Id*. ¶ 9.)

---

[1] *See* Exhibit I to the Mizrahi Declaration attaching photographs of the Infringing Plush.

EXHIBIT J
Page 8 of 168

That creation introduced a new class of plush toys and carved a previously non-existent niche in the marketplace, and the public has enthusiastically embraced Squishmallows – Kellytoy has shipped approximately 40 million units of Squishmallows since the summer of 2017, resulting in tens of millions of dollars in revenue to Kellytoy. (*Id.* ¶ 23.)

The scope of this success is the product of deliberate design decisions intended to distinguish Squishmallows from other plush toys. Jeanne Yoon – Kellytoy's Vice-President of Sales and Development – explains in her declaration, for example, that Kellytoy's designers settled on the particular elements of the Squishmallows design to create an identifiable look and feel that would distinguish Kellytoy's goods from others in the marketplace. (*Id.* ¶ 10.) Those elements include: (1) a specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs; (2) abstract, embroidered facial features based on the Japanese Kawaii style; (4) oval/rounded graphic features; and (5) an ultra-soft shell and mooshy, silky stuffing, as more fully described at Paragraph 31 of the Complaint (the "Squishmallows Trade Dress"). (*Id.*) And Ms. Yoon attaches, as Exhibit 1 to her declaration, examples of Squishmallows reflecting the unmistakable trade dress they embody. (*Id.*, Ex. 1.) Beyond that, the commercial peculiarity of that combination of features, and the fact that Squishmallows are the only plush toy line embodying them, is confirmed by Richard Gottlieb – an experienced toy industry expert – whose accompanying declaration makes clear that these toys "possess a distinctive overall look and feel that is not shared by the plush toys of others in the marketplace." (Gottlieb Decl. ¶ 16.) Mr. Gottlieb's expert conclusion is based on his review of thousands of plush toys – constituting a representative sample of the marketplace – as a means of testing the distinctive nature of Squishmallows. (*Id.* ¶ 13.)

That singularity of combined features has facilitated the undeniable popularity of Squishmallows, and the resonance of their design with the consuming public and the industry at large. These goods are sold nationwide and in the country's largest retailers, including Costco, Walmart, Walgreens, CVA, Kroger, Fred Meyer, Target, Party City, Dave & Busters and Knotts Berry Farm. (*Id.* ¶ 22.) Squishmallows have also been featured in various national media – Ok! Magazine, E! News, the Chicago Tribune, the Washington Post, the Pittsburgh Post-Gazette and

3

EXHIBIT J
Page 9 of 168

the Houston Chronicle, a mere sampling of the media attention generated – and have received

numerous industry awards, *e.g.,* by the National Parenting Product Awards, Toys Tots Pets &

More, Parents' Choice, HowToLearn.com, Creative Child, The Mom's Choice Awards, and The

National Parenting Center.  (*Id.* ¶¶ 10, 22 and 23.)  Given this consumer buzz, industry insiders

have not surprisingly recognized Squishmallows in myriad ways, *e.g.,* Toy Insider named

Squishmallows as one of the top holiday toys, Toy Book Magazine featured them in a cover

story, and Teddy Bear and Friends Magazine and Animal Tales Magazine likewise featured them

and their market success.  (Declaration of Elisa Vazquez ("Decl. Vazquez") ¶¶ 32-33).)

Perhaps the most compelling evidence of Squishmallows' trade dress, however, is the

demonstrable public appetite for information concerning and access to these goods.  Dan Grody,

a longtime public relations executive Kellytoy retained to coordinate the marketing of

Squishmallows, explains more particularly that – in decades of managing PR campaigns – he has

never seen the level of consumer engagement Squishmallows has realized since 2017.  (Grody

Decl. ¶ 9.)  Mr. Grody recounts, for example, that a review of Google Trends – tracking search

terms and topics – over the past twelve months reveals the significant global force

Squishmallows has become, one that in the fall of 2019 surpassed the highly successful Ty's

Beannie Boos and Aurora's YouHoo & Friends in search volume.  (*Id.* ¶ 13.)  And that

engagement is particularly telling given the limited time Squishmallows have been in the market.

Mr. Grody again provides important context in this regard, noting that the metrics he relies upon

show that Squishmallows are continuing to expand in popularity at a time (three years post

launch) when most brands experience declines, and that the return on marketing investment

Kellytoy is enjoying exceeds that of other lines that have devoted far more in resources and time.

(*Id.* ¶ 14.)  Kellytoy is, in other words, spending less and receiving more on Squishmallow than

other toy manufacturers have achieved concerning other brands, a fact Mr. Grody assigns to the

distinctive characteristics and look and feel of the goods themselves.  (*Id.*)

Mr. Grody's conclusions are echoed by the evidence of direct consumer engagement of

their fans on social media specifically.  Those legions of fans share Kellytoy's social media posts

with their followers on Facebook, Instagram, Pinterest, YouTube, and other sites, resulting in

millions of "likes."  (Decl. Vazquez ¶ 15.)  A simple Google search for the term *Squishmallows*, for example, returns more than a million results, and countless user-created videos appear on YouTube of fans using and collecting Squishmallows plush toys.  (Decl. Yoon ¶ 16; Decl. Vazquez ¶ 27).  These fans even put the Squishmallows to transformative uses, such tutorials on how to draw Squishmallows or stop-motion videos.  (Decl. Vazquez ¶ 27.)  Nor is there any doubt that these consumers identify Squishmallows' look and feel as source identifiers.  Mr. Grody's Declaration includes, for example, a sampling of recent social media posts from consumers explaining generally their effort to locate Squishmallows, and their disappointment in discovering that some of what they discover are knock-offs.  (Decl. Grody ¶ 16.)  Those posts are revealing in multiple respects, but most tellingly they reflect the consumers' understanding that there are "official" Squishmallows and, by corollary, imitation goods whose origins they do not recognize.  And that recognition, in turn, establishes that the combination of features Kellytoy designed is operating precisely as intended – to identify the source of origin of Squishmallows.

That consumer recognition, like the product design, did not occur by accident.  To the contrary, Kellytoy has spent handsomely advertising and promoting Squishmallows since their 2017 launch, and indeed maintains an annual marketing budget of $1,000,000 devoted specifically to these goods.  (Yoon Decl., ¶ 14.) This includes advertisements to consumers and business-to-business advertisements and, as mentioned above, a robust social media presence dedicated to Squishmallows – these goods have more than 109,000 Instagram followers, 82,000 Facebook followers, and 12,000 Twitter followers, more than many longer-existing and well-known plush brands.  (Decl. Vazquez ¶ 14.)  Through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions and close to another 100 MILLION impressions through paid placements on Facebook and Instagram.  (Decl. Grody ¶ 12.)

All of which is to reiterate what is apparent from the record – Kellytoy could have chosen alternate designs for Squishmallows, but instead chose the elements of the Squishmallows Trade Dress to create an easily-identifiable line of toys to distinguish it from the goods of others.  Those decisions were not motivated by cost – Kellytoy could have chosen alternative designs

that are less expensive to produce and, in fact, it produces numerous plush toys that cost less to produce than Squishmallows. (Decl. Yoon ¶ 11.) And that fact is important, because Ty, or other Kellytoy competitors, could create plush toys with alternate designs without any disadvantage – other than the disadvantage of not riding on the Squishmallows good will. (*Id*.) For the reasons explained below, however Ty's intentional decision to misappropriate that good will presents a case where the very essence of trade dress protection is implicated, and where nothing less than injunctive relief will assure that justice is done.

### III.   ANALYSIS

#### A.   The Preliminary Injunction Standards

To obtain a preliminary injunction, a plaintiff must show: (1) the plaintiff has a reasonable likelihood of success on the merits; and (2) the plaintiff will suffer irreparable harm absent a preliminary injunction and has no adequate remedy at law. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the plaintiff makes this showing, the court considers (3) the irreparable harm the defendant will suffer if preliminary relief is granted balanced against the irreparable harm the plaintiff will suffer if relief is denied; and (4) the public interest in granting or denying the preliminary injunction. *Id.*

#### B.   Kellytoy Is Likely To Succeed On The Merits

A plaintiff satisfies the first requirement if it shows that it has "some likelihood" of success on the merits. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896 (7th Cir. 2001) ("Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits.") This requires only a "better than negligible" chance of succeeding on the merits. *Id*. (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988)). To succeed on the merits of a trademark action, a plaintiff must prove (1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product. *Id*. at 897; *see also* 11 U.S.C. § 1125(a).[2] Trade dress encompasses the overall "look

---

[2] Kellytoy's trademark infringement and unfair competition claims alleged in the complaint, under Illinois

(Continued…)

and feel" of a product, including its size, color or color combinations, texture, graphics, packaging or other visual features that connote the source of such goods in the minds of consumers – essentially serving the function of a trademark.  *See e.g., Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir. 1989); *see also Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994).  That is, in certain circumstances, trade dress may extend to features (e.g., shape, texture etc.) of the product itself.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000).  A plaintiff has a protectable trademark in a product's design if it has acquired a secondary meaning and is non-functional.  *Id*. at 211; *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019).  As explained below, Kellytoy meets this test and is more than likely to prevail on the merits.

### 1.  <u>The Squishmallows Trade Dress has developed a secondary meaning</u>

The Seventh Circuit employs a several-factor factual analysis to determine whether a particular product design has acquired secondary meaning, including: (a) the amount and manner of advertising; (b) the volume of sales; (3) the length and manner of use; (4) consumer surveys; (5) evidence of intentional copying; and (6) unsolicited media coverage.  *See Thomas & Betts Corp., v. Panduit Corp.,* 138 F.3d 277, 293 (7th Cir. 1998).  The ultimate import of these factors is to determinate when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself."  *Id.* at 291.  The *Thomas & Betts* Court observed, for example, that a mark holder may establish secondary meaning by means of "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying."  *Id*. at 291.[3]  Nor does the law make any distinction between the weight to be given to either direct or circumstantial evidence and, indeed, circumstantial evidence may often be "more

---

statutory and common law, are subject to the same analysis as its Lanham Act claim for purposes of determining likelihood of success on the merits. *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) (granting preliminary injunction).

[3]    We note that the Seventh Circuit has long held that survey evidence is not required to prove secondary meaning.  *See e.g., Health O Meter Inc. v. Terraillon Corp.,* 873 F.Supp. 1060. 1173 (N.D. Ill. 1995).

---

certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Trankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11 (1960); *see also Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704-05 (N.D. Ill. 2009); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); *and see* Federal Civil Jury Instructions of the Seventh Circuit 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence.")

These general principles aside, trade dress protection supports a specific and important policy consideration striking at the heart of intellectual property law – namely, advancing the economic policies of trademark law, a principal one of which is to reduce consumers' search costs by "quickly and easily assur[ing] a potential customer that *this* item – the item with this mark – is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995).  Beyond that, trade dress emphasizes the law's encouragement of investment in brand development and, by corollary, the discouragement of free-riding.  Specifically, trade dress protection "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.*  And it likewise and conversely discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale.  *Id.* at 164.

The enforcement of that policy ensures that source identifying characteristics are afforded the protection they deserve and the consuming public expects.  The Sixth Circuit found in *Ferrari S.P.A. v. Roberts*, for example, that the shape and design of specific Ferrari models had penetrated the marketplace sufficiently to preclude the defendant from selling fiberglass kits that would allow one to make a non-Ferrari car look like a Ferrari model: "Ferrari charges, and the district court found, that the unique and distinctive shape and design of the Daytona Spyder and the Testarossa are protected trade dress which Roberts has infringed by copying them and marketing his replicas."  944 F.2d 1235, 1239 (6th Cir. 1991); *see also Gurglepot, Inc. v. New Shreve, Crump & Low LLC,* 153 F.Supp.3d 441, 449 (D. Mass 2015) (public association with distinctive shape and appearance of plaintiff's goods render it protectable trade dress).

Kellytoy has plainly established a secondary meaning under these principles. It has created certain finite and distinguishable characteristics that are consistent through its line of Squishmallow toys, and which serve a clear source identifying function to the consuming public. Those features are described above, and include the egg/bell shape with no proportionate, pronounced limbs (the absence of which amplifies the distinctive shape), the Asian Kawaii faces and complementary rounded graphics, embroidered facial features, distinctive monochrome coloring and short pile velvety texture and silky memory-foam-like stuffing. (Decl. Yoon ¶ 10.)

The fact that these characteristics were the product of deliberate design decisions emphasizes the uniqueness of the Squishmallows' look and feel. As Ms. Yoon explains in her declaration, the product creators at Kellytoy consciously crafted the shape and look of the Squishmallow line to reflect a specific artistic expression that would immediately be identifiable by the consuming public, and would in turn identify Squishmallows to the exclusion of all other plush toys. (*Id.* ¶ 12.) And they did so by surveying the marketplace for purposes of tracking the standard features of these toys and designing products that maintained consistent and combined qualities that *are not* found on competing toys. (*Id.* ¶ 13.) Nor is there any reasonable doubt that Squishmallows' combination of features is unique in the marketplace. As noted above, Richard Gottlieb, the toy industry expert, explained – as noted above – he has "never seen a single plush toy incorporating all of these features and otherwise being expressed quite the way they appear in the Squishmallows." (Decl. Gottlieb, ¶ 16.) The Squishmallows features, in other words, present an abstract, and yet identifiable, expression of the animals that are included in the line, and they consequently reflect a look and feel that is unique to Kellytoy's plush goods.

That commercial reality is a matter of undeniable fact in the marketplace, nor is there any doubt that Squishmallows have penetrated the consciousness of the consumer, and acquired durable secondary meaning.

***The amount and volume of advertising.*** As a starting point, Kellytoy's advertising campaign evidences the extent to which consumers have embraced the look and feel of Squishmallows as source identifying features under *Thomas & Betts, supra.* Mr. Grody – a principal at Tellum Grody Public Relations, Inc. ("TGPR") – and Elisa Vazquez of Kellytoy

establish, among other things, that TGPR has overseen the Squishmallows marketing campaign since 2017 and has been stunned by the level of consume recognition and engagement with the campaign. Mr. Grody recounts, for example, that (1) the dedicated Squishmallows.com website receives in excess of 5,500 visits *per day* on its website traffic consistently ranks in the top 50,000 for U.S. sites (and top 125,000 for global sites) and recorded as high as 14,162 in the U.S. in December 2019[4]; (2) Squishmallows currently has over 104,000 Instagram followers, over 80,000 Facebook followers, and more than 10,000 Twitter followers; (3) Squishmallows has more than 28.5K organic posts on Instagram that use the official hashtag (#Squishmallows), and the average Squishmallows post likes on Instagram hovers at over 3000+ per post and 100+ average comments per post; (4) through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions, including paid placement on Facebook and Instagram since July 21, 2017 that total 23.6 MILLION unique individuals and 83.7 MILLION impressions; and (5) digital advertisements used by Kellytoy to advertise its Squishmallows plush toys in conjunction with specific retailers have yielded average click through rates of 30+%, while the industry average is about 1-2%. (Dec. Grody ¶ 10-13.)

*Volume of Sales.* Mr. Grody emphasizes that the extent of consumer response to the Squishmallows campaign in such a short time is unprecedented in his experience, and the data to which he testifies – and the testimony of Mr. Gottlieb, the toy industry expert – establish that the Squishmallows trade dress has acquired secondary meaning. (Decl. Grody ¶ 9; Decl. Gottlieb ¶ 16.) And the remaining *Thomas & Betts* factors merely serve to confirm that obvious legal conclusion. The volume of Squishmallows sales, to take one particularly apropos example, squares directly with the data and observations of Messrs. Grody and Gottlieb. Squishmallows have sold and shipped approximately 40,000,000 (40 million) units since 2017, a figure in

---

[4] To put this into context, there are nearly 1 3/4 billion websites available on the World Wide Web. (Mizrahi Decl., at ¶ 2.) As one might expect, the most popular websites the United States are Google, YouTube, Facebook, Amazon – with Apple.com being at number 30. (Mizrahi Decl., at ¶ 3.)

harmony with the consumer response Mr. Grody recites and the particularized characteristics Mr. Gottlieb focused upon. (Decl. Grody ¶¶ 13-14; Decl. Gottlieb ¶ 10.) Ms. Yoon amplifies those facts, explaining that in twenty years as a primary toy manufacturer Kellytoy has never experienced anything like the explosion of Squishmallows popularity. (Decl. Yoon ¶ 27.)

*Length and manner of use.* The Grody and Yoon Declarations demonstrate that Squishmallows have been consistently and continuously been sold in the marketplace since 2017, and they have always included the features discussed above and which embody the product's trade dress. It is those abstract features and the consistency of their use that distinguishes Kellytoy's Squishmallows from its competitors. And Kellytoy's advertising educates the consuming public concerning those features through "look for" advertising. Ms. Yoon explains in her declaration, for example, that Kellytoy's press releases, social media sites, marketing materials and stationary all expressly states that the "shape, look, feel, and texture of Squishmallows® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress." (Decl. Yoon ¶¶ 18-21.)

*Consumer Evidence.* The widespread evidence discussed above is substantiated by direct consumer evidence of source identifying recognition. Ms. Yoon again provides particulars, including among other things that the Google search engine yields over 1,370,000 "hits" for Squishmallows, and Mr. Grody additionally recounts the voracious consumer appetite for these products in his declaration. (Decl. Yoon ¶ 16, Grody ¶¶ 13-14.) But within the perpetual stream of public commentary on social media concerning Squishmallows is specific consumer recognition that there are "official" Squishmallows. A sampling of Facebook posts demonstrate in fact the products' many fans search high and low for Squishmallows they have not previously seen and which they want to add to their collection – and knock off brands that are the product of competitors' efforts to confuse the public into believing that their imitation goods are in fact made by the same manufacturer as Squishmallows. This evidence, in short, demonstrates that: (1) the consuming public has identified Squishmallows resolutely; (2) a sub-culture of Squishmallows followers has formed, and which communicates with one another about Squishmallows through social media; and (3) this degree of devotion and continuous

commentary is, in the plush toy industry, particular to Squishmallows. (Decl. Vazquez ¶ 15.)

*Media Coverage/Industry Recognition.* Squishmallows have been the subject of repetitive and extensive media coverage. Ms. Vazquez sets out in her declaration, for example, a long list traditional and internet press coverage that has focused on these goods, coupled with a steady stream of media events and trade publications that likewise have focused on Squishmallows. (Decl. Vazquez ¶¶ 20-31.) To name just a few, Squishmallows were featured in issues of *OK! Magazine, L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017, 2018, and 2019 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, E! News, and *L.A. Parent*. (Decl. Vazquez ¶ 22.) That is in addition to the numerous industry awards these goods have received, and which are mentioned above. (*Id.* ¶ 10.) This collectively supplements the myriad evidence already assembled concerning secondary meaning, and serves to confirm what that evidence makes obvious – Squishmallows possess protectable trade dress.

*Deliberate Copying.* That Ty deliberately copied the Squishmallows Trade Dress is beyond any reasonable dispute. Ty transparently and self-consciously copied that trade dress in its effort to convert the goodwill Kellytoy has generated in its Squishmallows plush toys. Lest there be any doubt, Mr. Gottlieb – the industry expert – makes clear that Ty decided to "fully duplicate the look and feel of the Squishmallows trade dress." (Decl. Gottlieb ¶ 22.) Indeed, Ty has not merely created an outwardly similar product, but Ty has self-consciously copied details that relate "specifically to the combined characteristics that make Squishmallows unique in the marketplace." (*Id.* ¶ 21.) This is, in short, deliberate and willful copying. (*Id.* ¶ 20.)

### 2. <u>The Squishmallows Trade Dress is non-functional</u>

To be protectable, trade dress, *as a whole*, cannot be solely functional. *See Bodum*, 927 F.3d at 491. Functionality must be analyzed by reference to the overall combination and arrangement of the various features – not on the functionality of each of the individual features. *Badger*, 13 F.3d at 1154; *Logan Graphic Prod., Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2003 WL 21011746, at *4 (N.D. Ill. May 5, 2003).

That said, a product's trade dress may have a "function" in the everyday meaning of the

term without being "functional" within the meaning of trademark law.  *See Bodum*, 927 F.3d at 492.  A French press coffeemaker has, for example, protectable trade dress in the product's overall appearance even though all of the product design elements have functions, including a handle, lid, feet at the bottom, and a round knob for the strainer.  *Id.* ("[T]o establish it has a valid trade dress, [the plaintiff] did not have to prove that something like a handle does not serve any function. It merely needed to prove that preventing competitors from copying the [French press's] particular design would not significantly disadvantage them from producing a competitive and cost-efficient French press coffeemaker.").  Thus, the defendant may not copy the plaintiff's combination of these elements even where the plaintiff could not claim trade dress in an individual element. *Id.* at 493.

Functionality may not, in that regard, be used to defeat trade unless that trade dress *as a whole* is "'essential to the use or purpose of the article or if it affects the cost or quality of the article,'" or if its use is "a competitive necessity" because not using the trade dress would put competitors at a significant non-reputation-related disadvantage.  *Id.* at 491 (quoting *Qualitex*, 514 U.S. at 165).  In assessing that question, the Seventh Circuit courts consider: (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.  *Id.* (citing *Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011)).  No single factor is dispositive and courts consider each factor separately.  *Id.*

> a.  *The Squishmallows Trade Dress does not have any design elements that have been subject to a utility patent*

The first factor weighs in favor of non-functionality.  Kellytoy has never filed for a utility patent for the Squishmallows plush toy as a whole, or for any element thereof.  (Decl. Yoon ¶ 41.)

b.   *The Squishmallows Trade Dress provides no utilitarian advantage*

When viewed as a whole – as required under applicable law – the Squishmallows Trade Dress cannot reasonably be characterized as providing a utilitarian advantage. The subject goods comprise plush toys, rather than utilitarian goods such as tools, chairs, etc. In addition, the claimed trade dress does not include clasps or other functional features. Rather, it is comprised of elements of design and aesthetics, calculated to provide a unique/distinguishing "look and feel" across a line of plush toys to identify them as genuine Squishmallows.

As explained above, and in light of their overall shape, the Squishmallows plush toys embodying the Squishmallows Trade Dress lack a discrete head or torso or pronounced/proportionate limbs. They are, in fact, highly abstracted renditions of animals or other creatures, designed to conjure images of the creatures they depict but without accurately representing their physiognomy. The limbless egg/bell shape of Squishmallows does not provide any utilitarian advantage over the countless alternative shapes available, such as round, square, oblong, or realistic to an animal's shape.

Despite that, Ty suggested in prior correspondence that "the oval pillow shape of Kellytoy's products is functional for the additional reason that the oval shape permits the product to sit upright for display or play, while still maintaining a pillow like appearance with a tapered and smaller area for display of the head portion of the product." Setting aside for the moment that the capacity to sit upright provides **no net advantage**, this self-serving assertion ignores the fact that, if designing a toy that could sit in this manner was the purpose, Kellytoy could easily have achieved the same goal by shaping them as flat bottomed and flat topped ovals, squares, rectangles, spheres, etc. Stated another way, having them taper towards the top represents a design choice, not a utilitarian/functional choice.

Regardless, Squishmallows do not reliably stand. It takes little if anything to knock them over, and the fact that they are typically handled by children while sitting on the retailer's shelves will all but ensure that they will not be standing upright for very long, unless independently supported. More to the point, if standing upright provided a utilitarian advantage, Kellytoy would have designed Squishmallows to stand up more stably, e.g., as squares,

rectangles, triangles, spheres, cylindrical, oblong/lateral pillows, etc. or with a much wider base relative to the upper portion.  (Decl. Yoon ¶ 37.)  The same holds true for having them stand up for purposes of play – they lack the stability to support the allegation that their shape was dictated by utilitarian considerations.  (*Id*.)

In any event, an ability to stand does not make the Squishmallows Trade Dress functional because consumers do not select Squishmallows for their ability to stand.  Indeed, numerous social media posts by Squishmallows consumers show the products on their sides, backs, and being held by users as does numerous posts/advertisements placed by Kellytoy.  (*See* Decl. Vazquez ¶ 35, Ex. F.)  Thus, standing is not essential to the use or purpose of Squishmallows.[5]

Even if eyes, mouths, or coloring have a function in stuffed animals, Ty is not free to copy the look and feel created by Kellytoy's selection of the combination of these features.  *See Bodum*, 927 F.3d at 492.  The Squishmallows Trade Dress expresses those features in its own way giving Kellytoy's Squishmallows a distinctive overall look and feel, especially when viewed in combination with the other features of the Squishmallows Trade Dress.  If a plaintiff "seeks to protect the overall look of its product – the combination and arrangement of the various features – the appropriate inquiry focuses on the overall trade dress and not on the individual features." *Logan*, 2003 WL 21011746, at *4.  In our case, rather than copying the overall look and feel of Squishmallows, Ty could have employed countless other features that would not infringe Kellytoy's trade dress.  *See supra; see also Bodum*, 927 F.3d at 492 (combination of functional elements still trade dress because competitor could have used alternative designs of the elements); *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123–24 (7th Cir. 1988).

This merely serves to confirm what it obvious – no particular element of the Squishmallows Trade Dress provides a utilitarian advantage, much less all the elements in

---

[5]    The remaining elements of the Squishmallows Trade Dress are likewise nonfunctional.  In addition to their unusual shape (with the absence of discrete head and torso or proportionate limbs), further supporting their abstracted overall appearance, they also possess simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring.

combination. Rather, Kellytoy designed the Squishmallow Trade Dress – with its unitary aesthetic across its Squishmallows line – to distinguish the source of products embodying the Squishmallow trade dress from the source of other toys. (Decl. Yoon ¶ 48.)

c. *Kellytoy has not advertised utilitarian advantages of Squishmallows*

Kellytoy has never advertised any utilitarian advantages of its Squishmallows, other than the fact that the Squishmallows can be used as pillows – something that holds true for the vast majority of plush toys. (Decl. Yoon ¶ 42.) Kellytoy has never advertised that the Squishmallows stand or sit on their bottoms. (Decl. Vazquez ¶ 34.)

d. *Many alternate designs for stuffed animals exist*

The existence of competing product designs indicates a trade dress is non-functional. *See Logan*, 2003 WL 21011746, at *4 ("[I]t is appropriate at [the preliminary injunction] stage to consider the existence of alternative designs in the marketplace when determining whether product features are functional."). As noted above, alternate and non-infringing designs are not just available, but are in wide use in the marketplace. (Decl. Yoon ¶ 46.) Ty itself sells, in fact, numerous lines of plush toys that do not co-opt the Squishmallows Trade Dress. (*Id*. ¶ 43.) It cannot reasonably be disputed as a result that ample alternate designs are available. *See Bodum*, 927 F.3d at 493 (concluding that "ample evidence" exists of alternate designs where both litigants manufactured products with different design elements).

The shape, appearance, texture, and feel of the Squishmallows plush toys are all aesthetic features as to which there are innumerable alternatives. (Decl. Yoon ¶¶ 42–44.) Kellytoy designed the Squishmallows shape, appearance, texture, and feel to distinguish the Squishmallows from other toys. (Decl. Yoon ¶ 9.) There are also numerous alternative designs in the marketplace that abstractly depict animals and other creatures – without discrete heads and torsos and without proportionate limbs – that do not infringe upon the Squishmallows Trade Dress. While they possess some of the elements of the Squishmallows Trade Dress, they critically differ in shape and thus avoid infringement. (*See* Decl. Yoon ¶¶ 42–44 for examples.)

e. *The Squishmallows Trade Dress does not affect quality or costs*

Kellytoy did not select the features of the Squishmallows Trade Dress for purposes of

increasing quality or reducing costs. Kellytoy could have, as noted, chosen alternative designs that are less expensive to produce. (Decl. Yoon ¶¶ 11-12.) Kellytoy uses an ultra-silky polyester fill for the Squishmallows stuffing, for example, and alternate fillings are available for stuffed toys that are less expensive, such as regular polyester stuffing and 3D light weight stuffing. (*Id*.) Likewise, Kellytoy could have chosen ways to depict nostrils, mouths, and other features that are less expensive than embroidering those features. (*Id*.) Less expensive alternatives to embroidery include printing and sublimation printing. (*Id*.) The short-pile velvety velour-like textured exterior provides no cost savings. Other less expensive available exterior materials include Tricot, EF Velboa and Velboa. (*Id*.) And Ty, for its part, could have selected any number of alternatives designs that would have worked equally well from a cost of goods and ease of manufacture standpoint but would not have provided the overall look and appearance that Kellytoy sought for its Squishmallows plush toy line. (*Id*.) The same holds true for the Squishmallows egg/bell shape. That shape provides no manufacturing cost savings; other shapes such as squares, circles, triangles are equally, or less, expensive to manufacture. (*Id*.)

### 3. Customers are likely to be Confused

A defendant's product infringes the plaintiff's trade dress if the plaintiff shows that similarity of the defendant's trade dress to that of the plaintiff's creates a likelihood of confusion on the part of consumers as to the source of the goods. 15 U.S.C. § 1125; *Badger*, 13 F.3d at 1151; *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015).

Courts in the Seventh Circuit consider seven factors when analyzing the likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another. *Top Tobacco*, 101 F. Supp. 3d at 789 (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)). No single factor is dispositive, and a plaintiff need not allege facts for all factors. (*See id*.) The weight a court assigns to any factor will depend on the facts and circumstances of the case. *See Ty*, 237 F.3d at 898 (affirming preliminary injunction obtained by maker of beanie baby plush toys).

a. *The Squishmallows Trade Dress and the Infringing Plush are similar in appearance and suggestion*

The first factor weighs in favor of a likelihood of confusion if the plaintiff's and the defendant's products outwardly are similar in appearance. *See Badger*, 13 F.3d at 1152. Here, the Infringing Plush toys are outwardly similar in appearance to Squishmallows. As can be readily seen from an inspection of the Infringing Plush, the Infringing Plush contain all of the visual elements of the Squishmallows Trade Dress, including the overall bell/egg shape without distinct heads and torsos, both depict animals/creatures without proportionate and pronounced appendages; abstract, Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics and embroidered facial features; and contrasting and non-monochrome coloring. (Decl. Mizrahi, Ex. I.) One can also tell through visual inspection and that the Infringing Plush contain a very soft, short pile outer shell similar to the Squishmallows. (*Id.*) As can readily inferred from the name assigned by Ty to the Infringing Plush, namely, Squish-a-Boos, that they possess a mooshy filling. (*Id.*) A buyer who had access to Ty's Squish-a-Boos during a recent tradeshow confirmed to Kellytoy that the Infringing Plush possess a similar shell material and "mooshy" feel reasonably Squishmallows. (Decl. Rauch ¶ 3.) Mr. Gottlieb puts the question to rest, opining that when coupled "with a sounds-like name, Squish-A-Boo, makes for a product that consumers will easily confuse with the Squishmallows product." (Decl. Gottlieb ¶ 22.)

Significantly, Mr. Gottlieb confirms that Ty took the features that distinguish the Squishmallows line from the goods of others (e.g., the shape, the lack of limbs, and the abstract features) and incorporated them into the Infringing Plush. (Decl. Gottlieb ¶ 19.)

Nonetheless, to the extent the products may contain minor differences, such as Ty using larger eyes, those differences do not defeat the likelihood of confusion because the courts, in analyzing similarity, do not consider the products side-by-side, but instead consider the conditions of the marketplace. *See Ty*, 237 F.3d at 899; *Int'l Kennel Club*, 846 F.2d at 1088; *see also Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2nd Cir. 2005) (reversing denial of preliminary injunction because district court compared the products side-by-side rather than considering the market conditions).

4436524.4

18

Here, consumers are unlikely to distinguish between genuine Squishmallows and the Infringing Plush based on the larger eyes or other minor differences. As discussed more below, the target customer for Squishmallows are children between 5 and 14. (Decl. Gottlieb ¶ 23.) Those children are unlikely to remember the details of the product, aside from the general look and feel, and they might request Squishmallows from their parents, who later purchase the products without the children present. The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush.

Even if consumers later notice differences between Squishmallows and the Infringing Plush, "[i]nitial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002), as amended (Oct. 18, 2002). The similarities discussed above allow Ty to profit from customers' initial interest confusion.

b. *Squishmallows and the Infringing Plush are similar goods*

The plaintiff's and defendant's products are considered similar in type if the buying public would reasonably think they come from the same source, or are affiliated with, connected to, or sponsored by, the same source. *Ty*, 237 F.3d at 900; *Top Tobacco*, 101 F. Supp. 3d at 790; *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014). For example, the public may presume products come from the same source when "the objects are similar in that they are small stuffed objects that are soft, pellet-filled, eight to nine inch plush toys made from velboa-type fabric." *Ty*, 237 F.3d at 899–900. This factor is further supported if the plaintiff and defendant are in the same industry. *Top Tobacco*, 101 F. Supp. at 790.

In this case, the Infringing Plush and the Squishmallows comprise the same types of goods. As described above, Squishmallows and the Infringing Plush are both similar sized plush toys, of similar shape and feel, and marketed to the same consumers. Thus, this factor further supports the conclusion that the buying public is likely to think Squishmallows and the Infringing Plush are associated or originate from a common source.

       c.    *Squishmallows and the Infringing Plush are sold in the same area*

For the third factor, courts consider the products' geographical areas of distribution; whether the products directly compete with each other; whether products are sold to consumers in the same type of store; and whether the products are sold through the same marketing channels. *Top Tobacco*, 101 F. Supp. 3d at 790–91. Facts supporting the third factor include both products being advertised nationwide (*KJ Korea*, 66 F. Supp. 3d at 1016); that both products being sold in the same city (*id.*); both products being sold in the same type of retail stores or same sections of stores (*Top Tobacco*, 101 F. Supp. 3d at 791). The area and manner of concurrent use favors a finding of likelihood of confusion if the products directly compete for customers. *See Badger*, 13 F.3d at 1152.

Squishmallows and the Infringing Plush are sold in the same area. In fact, Squishmallows are sold in hundreds of retailers nationwide, including the largest retailers in the country, such as Walgreens, Fred Meyer, Kroger, and CVS, among others, many of the same nationwide retailers through which Ty has historically sold its plush toys. (Decl. Yoon ¶¶ 22, 31.) Squishmallows and the Infringing Plush have even appeared at the same trade show, the Atlanta International Gift & Home Furnishings Market. (*See* Declaration of Andrew J. Rauch ("Decl. Rauch") ¶ 3.) Kellytoy is also informed that Ty intends to display the Infringing Plush at Toy Fair New York, scheduled to take place February 22–25, 2020, considered the most important and most attended tradeshow in the United States. (*See* Decl. Yoon ¶ 334) This factor, too, weighs in favor of a finding of "likelihood of confusion."

       d.    *The consumer's degree of care*

Although people of all ages purchase Squishmallows, the target customers are children between 5 and 14. (Decl. Gottlieb ¶ 23.) While children can be expected to recall the overall "look and feel" of a product or product line, one outside of the presence of such toys, children are unlikely to remember the fine details of the product. (*Id.*) Moreover, the children often request toys from their parents, who in many cases later purchase the products without the children present. (*Id.*) The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush. Moreover, Squishmallows are not expensive, generally

ranging from $2.99 to $19.99, and are frequently impulse buys. (Decl. Yoon ¶ 38.) The more widely advertised, accessible and inexpensive the products, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *See Cae, Inc. v. Clean Air Engineering, Inc.*, 267 F. 3d 660, 683 (7th Cir. 2001). These factors, according to Mr. Gottlieb, increase the likelihood of consumer confusion. (Decl. Gottlieb, ¶ 24.)

e.   *The Squishmallows Trade Dress is strong*

To determine the strength of the plaintiff's trade dress, courts "examine the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Top Tobacco*, 101 F. Supp. 3d at 791. Relevant evidence includes the amount of advertising and the amount of sales. *See id.*; *KJ Korea,* 66 F. Supp. 3d at 1016.

Here, the Squishmalows Trade Dress is strong for all the reasons described above. Indeed, the evidence assembled and recited in demonstrating that these goods have attained secondary meaning establishes, by corollary, the obvious strength of the Trade Dress and its resonence with the consuming public. *See supra.* Finally, to maintain its strength, Kellytoy has vigorously protected it in the marketplace against infringements via multiple lawsuits (not to mention disputes resolved through demand letters). (Decl. Mizrahi ¶ 4.)

f.   *Actual confusion*

"Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *KJ Korea*, 66 F. Supp. 3d at 1016. A lack of evidence of **actual** confusion is not dispositive of the **likelihood** of confusion, and a plaintiff need no introduce, for example, a market survey evidencing likelihood of confusion. *Top Tobacco*, 101 F. Supp. 3d at 792 (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)); *see also Badger*, 13 F.3d at 1153. Here, Ty's infringing goods have not yet been released for general public sale, and thus no evidence of actual confusion can or could be available. That said, Kellytoy already has direct evidence demonstrating that actual confusion almost certainly will ensue if Ty's products are permitted to go to market. Specifically, Andrew Rauch, a Kellytoy Vice-President, testifies by

21

way of his Declaration that a Kellytoy customer (i.e., a retail buyer) informed him on January 15, 2020 – while attending a trade show in Atlanta – that Ty was selling or promoting products "very similar" to Squishmallows.  (Decl. Rauch ¶ 3.)  The import of that testimony is clear – if a Kellytoy customer/buyer is taking the time to identify the similarity of these goods to Kellytoy, before Ty's infringing goods are in release, subsequent and actual customer confusion is a practical inevitability if Ty ultimately releases its products on a widespread basis.

g.    *Ty intended to palm off its products as Squishmallows*

Ty has a history in the toy market of entering after a market is established and competing with confusing products.  Rather than innovate, Ty looks to competitors for new product ideas and, in many cases, undercuts the pricing for the originals and used its well-established distribution network and significant capital to establish itself as the market leader for its knockoff products – essentially drowning out the originals in the marketplace.  (Decl. Yoon ¶ 53.)  By way of example, a competitor created the Jellycat® Pom Poms toy, and Ty copied the look and feel with a toy under its Beanie Boo line, as depicted in the Yoon declaration.  (*Id*. ¶¶ 55-56.)  A competitor created the YooHoo & Friends toys, and Ty copied the look and feel under its Beanie Boos line, as depicted in the declaration.  (*Id*. ¶¶ 57-58.)  A competitor created the Tsum Tsum toy, and and Ty copied the look and feel with a toy under its Teeny Tys line, as depicted in the declaration.  (*Id*. ¶ 59.)  Thus, Ty intended to enter the market that Kellytoy established for Squishmallows and trade of the Squishmallows good will.

C.    **Kellytoy Will Suffer Irreparable Harm Absent A Preliminary Injunction**

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy."  *Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2015 WL 3818622 (N.D. Ill. 2015), citing *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001).  Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages."  *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted).

If a preliminary injunction is not granted, Kellytoy will suffer loss for which there is no adequate remedy at law because: (1) Ty's infringement connects the Infringing Plush to genuine Squishmallows by causing consumer confusion regarding source and affiliation; (2) Kellytoy has no control over the manufacturing or quality control of the Infringing Plush – therefore, any quality problems related to Ty's products would be attributed to Kellytoy, resulting in damaged goodwill and undetectable lost sales; and (3) the ongoing advertising and sale of the Infringing Plush by Ty decreases the distinctiveness of the Squishmallows Trade Dress.

As detailed above, Kellytoy has made substantial investment in – and succeeded in – establishing its significant reputation and goodwill in its Squishmallows Trade Dress. In the absence of an injunction, Kellytoy will lose the value of that investment. The net result will be damage to Kellytoy in the form of lost profits and business opportunities, which amount cannot be measured or compensated by monetary damages alone. Further, unabated infringement will encourage others to use Kellytoy intellectual property without a license.

In addition, Ty has hijacked that reputation to sell competing products over which Kellytoy has no control. Trademarks identify their owners and in them resides the reputation and goodwill of their owners. Thus, if Ty is permitted to infringe upon the Squishmallows Trade Dress, Ty is borrowing Kellytoy's reputation for its own goods, whose quality no longer lies within Kellytoy's control. A trademark owner's loss of the ability to control its mark, thus, creates a high likelihood for damage to its reputation. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club*, 846 F.2d at 1092.

Kellytoy employs rigorous quality controls over its Squishmallows. (Decl. Yoon ¶ 29.) But Kellytoy has no control over the quality of Ty's directly competitive Infringing Plush. Quality control does not solely relate to durability, but also to aesthetics. As close as Ty's designs are to Kellytoy's authentic Squishmallows designs, Kellytoy would never release Squishmallows bearing Ty's specific designs: they do not comport with the Squishmallows aesthetic. (Decl. Yoon ¶ 50.)

There is also the issue of safety. Plush toys are most often provided to children. If

23

something untoward were to occur in connection with Ty's Infringing Plush, such "bad will" would likely be imputed to Kellytoy's Squishmallows. Once there is a safety scare concerning a product, in the age of social media and the Internet, news in the marketplace spreads like wildfire often without the measured reflection necessary to properly distinguish Ty's Infringing Plush from Kellytoy's Squishmallows. The fact that Kellytoy is powerless over the design and quality of the Infringing Plush further supports a finding of irreparable harm.

### D. The Irreparable Harm to Kellytoy Outweighs The Potential Harm Ty Would Suffer Were A Preliminary Injunction Wrongfully Granted

Comparatively, the potential harm to Ty is insignificant.  First, Ty will simply be prevented from willfully infringing Kellytoy's Squishmallows Trade Dress and from trading on Kellytoy's goodwill – actions Ty never had the right to do in the first place.  *See Ty*, 237 F.3d at 903 (When assessing the harm to the alleged infringer, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.")  In fact, Ty's wrongful conduct towards Kellytoy is part of its modus operandi in the marketplace, where it has done the same thing to others. (Decl. Yoon ¶¶ 53-59.) It should not be allowed to succeed, again, here.

Second, Ty, in contrast to Kellytoy, is a newcomer to the market with its Infringing Plush, without an established market position and brand strength. An injunction barring Ty from violating the Squishmallows Trade Dress will not substantially impede Ty's ability to do business.  It could simply change the design of the Infringing Plush – which, to Kellytoy's knowledge, has not yet been distributed to Ty's customers.  Kellytoy wrote to Ty on January 16, 2020 informing it of Kellytoy's claims to the Squishmallows Trade Dress; to the extent that Ty continued to invest in the Infringing Plush and take orders therefor, it should only have itself to blame.  (Decl. Mizrahi ¶ 5.)  Regardless, Ty will not be put out of business: Ty sells numerous other successful lines of plush toys and can continue to sell those to its customers – it simply cannot infringe on the Squishmallows Trade Dress.  This balance, in short, favors granting injunctive relief.  *See Ty*, 132 F.3d at 1172.

### E. The Public Interest Will be Served By Granting the Injunction

The public interest will be served by granting Kellytoy's request for a preliminary

injunction, as it will prevent consumer confusion.  *Eli Lilly & Co. v. Natural Answers, Inc.*, 233

F.3d 456, 469 (7th Cir. 2000) ("[T]he public interest is served by the injunction because

enforcement of the trademark laws prevents consumer confusion.").  Indeed, the gravamen of

trademark protection is the right of the public to be free of confusion, along with the right of the

trademark owner to control its reputation and its products' reputation; therefore, preventing Ty

from infringing the Squishmallows Trade Dress and other of Kellytoy's rights promotes the

interests of the public.  *See id.* Granting of the requested injunction is in the public's interest.

### F.      **Injunction Bond**

The amount of the security bond under Federal Rule of Civil Procedure 65(c) is in the

discretion of the Court.  *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). The Seventh

Circuit has determined that a strong likelihood of success is a major factor which could weigh

heavily in favor of waiving a bond requirement.  *Id*.  Because of the strong and unequivocal nature

of Kellytoy's evidence of trade dress infringement, and the fact that Ty will retain possession of

its inventory and thus could sell it at a later date, Kellytoy asks this Court to require Kellytoy post

a bond of no more than ten thousand U.S. dollars ($10,000.00).  *See, e.g., Deckers Outdoor*

*Corporation v. The Partnerships, et al.*, 2013 WL 1337616 (N.D. Ill. March 27, 2013) (setting

$10,000 bond).

### IV.     **CONCLUSION**

For the reasons set forth above, Kellytoy asks this Court to grant the Motion, enter the

proposed order submitted to the Court, and enjoin Ty from selling, offering to sell, causing to be

sold, disseminating, importing, distributing, circulating, promoting, marketing, advertising, or in

any way commercially exploiting the Infringing Plush within the United States.

Dated: February 21, 2020                    Respectfully submitted,

                                            By:    */s/ Dean D. Niro*
                                            _____

                                               Dean D. Niro
                                               Oliver D. Yang
                                               VITALE, VICKREY, NIRO, SOLON &
                                               GASEY LLP
                                               311 S. Wacker Dr., Suite 2470
                                               Chicago, IL  60606
                                               Telephone:  (312) 236-0733

dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander (*pro hac pending*)
Mark B. Mizrahi (*pro hac pending*)
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA  90067
Telephone:  (310) 255-6100
Facsimile:     (310) 255-6200
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and
KELLYTOY (USA), INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) Case No. 1:20-cv-00748 ) |
| | ) Honorable Gary Feinerman |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| TY INC., and DOES 1-10, | ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF JEANNE YOON IN SUPPORT OF PLAINTIFF'S

## MOTION FOR PRELIMINARY INJUNCTION

I, Jeanne Yoon, declare and state as follows:

1.      I am over eighteen years of age and I have personal knowledge of the facts set forth herein.  If called upon to testify I would do so to the same effect.

2.      I am an employee of Kellytoy Worldwide, Inc. ("Kellytoy Worldwide") and a resident of Los Angeles County, California.

3.      I make this declaration in support of Kellytoy Worldwide, Inc.'s Motion for Preliminary Injunction against Ty Inc.

4.      I have been employed by Kellytoy since May 2003 as serve as its Senior Vice President of Sales and Product Development.

5.      As the Senior Vice President of Sales and Development of Kellytoy Worldwide, I am responsible for managing and overseeing Kellytoy Worldwide's design of its plush toys and its retail development activity of the various brands distributed by Kellytoy Worldwide, particularly in the United States and China.  My responsibilities also include sales, including sales presentation, pricing, and all follow-ups, for a majority of the

1

EXHIBIT J
Page 33 of 168

mass market, including drug store chains, grocery, and club stores. I also oversee import and domestic sales for Kellytoy Worldwide.

6. Unless stated herein to the contrary, each document relied on or referenced in this declaration has been kept in the course of a regularly conducted business activity, and it has been the regular practice of Kellytoy to create and maintain these records as part of its regularly conducted business activity.

7. Due to my position as Senior Vice President of Sales and Product Development, I am generally familiar with the facts of this case.

8. Kellytoy Worldwide is engaged in the business of creating, manufacturing, distributing and selling unique plush toys, including, without limitation, its highly successful and famous Squishmallows line of plush under the SQUISHMALLOWS brand ("Squishmallows"). Among Kellytoy Worldwide's Squishmallows branded line of plush toys are the specific Squishmallows designs set forth in **Exhibit 1** hereto.

**Kellytoy Worldwide and Its Protected Intellectual Property Rights**

9. In 2016, together with one of Kellytoy Worldwide's other designers, I conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features that distinguish them from the goods of others (the "Squishmallows Trade Dress"). The Squishmallows line possesses unique, recognizable and distinguishing features that are common across much of the Squishmallows line.

10. We chose the specific combination of design elements comprising the Squishmallows Trade Dress for the express purpose of creating a uniquely identifiable look and feel that would distinguish Kellytoy Worldwide's line of goods from the goods of others in the marketplace and to make them identifiable to consumers as a line coming from Kellytoy Worldwide, such as the combination of: (1) the specific shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs; (2) Kawaii, abstract, embroidered facial features; (4) oval/rounded graphic features; and (5) an ultra

2

EXHIBIT J
Page 34 of 168

soft shell and mooshy, silky stuffing.

11.    Using alternate design elements from the ones discussed above would not disadvantage a competitor—other than competitors attempting to benefit from the goodwill Kellytoy has achieved in its Sqishmallows Trade Dress.  In fact, we did not select the features of the Squishmallows Trade Dress for purposes of increasing quality or reducing costs. We could have chosen alternative designs that are less expensive to produce.  In fact, Kellytoy Worldwide has numerous plush toys that cost significantly less to produce than the plush toys in its Squishmallows line.  For example, Kellytoy Worldwide uses an ultra-silky polyester fill for the Squishmallows stuffing.  Alternate fillings are available for stuffed toys that are less expensive, such as regular polyester stuffing and 3D light weight stuffing.  Likewise, Kellytoy Worldwide could have chosen ways to depict nostrils, mouths, and other features that are less expensive than embroidering those features, such as printing and sublimation printing. Likewise, the short-pile velvety velour-like textured exterior provides no cost savings, as numerous other less expensive available exterior materials include Tricot, EF Velboa and Velboa.  The same holds true for the Squishmallows egg/bell shape.  The egg/bell shape provides no substantial manufacturing or other cost savings.  Other shapes such as squares, spheres, triangles are equally or less expensive to manufacture.

12.    The specific features that comprise the Squishmallows Trade Dress together (including the materials and other design choices) with the resulting overall look and feel thereof were the result of deliberate design decisions made by Kellytoy Worldwide in order to create a distinctive line of plush toys that would distinguish the toys in that line from the plush toys of others.  Any of the material or design alternatives described above would have worked equally well from a cost of goods and ease of manufacture standpoint, though they would not have provided the overall look and appearance that Kellytoy Worldwide sought for its Squishmallows plush toy line.¶

13.    In essence, Kellytoy Worldwide – by designing goods that included this

3

particular combination of characteristics – created an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace. And that newly created niche has spawned a cultural craze in which numerous imitators have emerged, including the Defendant.

**A.** **Kellytoy's Extensive Advertising and Promotional Activities**

14. From 2016 to the present, Kellytoy Worldwide has embarked on a consistent campaign to develop, advertise and promote its Squishmallows through the United States. That campaign has been expensive and, in fact, Kellytoy Worldwide is spending approximately $500,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows line of plush toys with a total annual Squishmallows marketing budget nearing $1,000,000. Advertising and promotion of its Squishmallows line of plush toys has been a high priority for Kellytoy Worldwide and for which Kellytoy Worldwide has expended much time and effort, in addition to money.

15. As detailed below, Kellytoy Worldwide did not just market and sell its Squishmallows line has one of many Kellytoy Worldwide plush toy offerings. Rather, it made a deliberate effort to distinguish that line has an entirely separate offering by creating a website, Facebook page, Instagram account, Twitter account, etc. dedicated solely to its Squishmallows line.

16. A simple Internet search using the Google search engine yields over 1,370,000 "hits" for the search term "Squishmallows." Attached hereto as **Exhibit 2** is a true and correct copy of a screenshot of the first page of Google showing 1,370,000 hits returned on January 28, 2020 for the search term "Squishmallows."

17. In an effort to inform the public that overall "look and feel" of Kellytoy Worldwide's Squishmallows plush toys comprise Kellytoy Worldwide's proprietary trade dress, Kellytoy Worldwide includes an explicit statement to that effect on many of its marketing materials, such as its Squishmallows specific website, social media accounts, press releases, and stationary used to correspond directly with customers. Specifically, as

4

set forth in the below referenced exemplars from Kellytoy Worldwide's Squishmallows.com website, press releases, social media accounts, and stationery, each of these materials contains the following statement along the following lines: "The shape, look, feel, and texture of Squishmallow® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

18. Indeed, in addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy Worldwide markets and sells its Squishmallows on its website dedicated to its Squishmallows <squishmallows.com> featuring dozens of photographs of its plush toys and models holding its Squishmallows. This is true in spite of the fact that Kellytoy Worldwide has numerous other lines of branded plush toys. True and correct copies of printouts of pages from <squishmallows.com> are attached hereto as **Exhibit 3**. As part of Kellytoy Worldwide's marketing strategy, in order to inform the public of the fact that the "look and feel" Squishmallows comprise Kellytoy Worldwide's proprietary trade dress, Kellytoy Worldwide states as much in various marketing materials, including on the footer of its website.

19. Kellytoy Worldwide also frequently releases press releases which are picked up and published by numerous media outlets such as Yahoo! Finance, Ask.com, BusinessWire.com, HaroldOnline, among numerous others. In one such press release, Kellytoy Worldwide highlighted the fact that that Kellytoy Worldwide goes to great lengths to "emphasize inform consumers that the overall shape, look, feel, and texture of its Squishmallows branded plush toy constitutes Kellytoy's proprietary trade dress." A true and correct copy of a February 10, 2020 press release published by Yahoo! Finance is attached hereto as **Exhibit 4**.

20. Kellytoy Worldwide also promotes its Squishmallows plush toys through dedicated social media accounts under the Squishmallows brand, such as Facebook, Instagram, twitter etc. True and correct copies of printouts of pages, captured on June 28, 2019, from Kellytoy Worldwide's Squishmallows Instagram page are attached hereto as

5

EXHIBIT J
Page 37 of 168

**Exhibit 5**. A true and correct copy of a printout of the "About" page, captured on June 17, 2019, from Kellytoy Worldwide's Squishmallows Facebook page is attached hereto as **Exhibit 6**. A true and correct copy of a printout of the Squishmallows Twitter page, captured on June 17, 2019, is attached hereto as **Exhibit 7**. On each of these social media accounts, Kellytoy Worldwide expressly informs the public that "The shape, look, feel, and texture of Squishmallow® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

21. In fact, Kellytoy Worldwide includes a similar statement in its marketing materials, including (1) its marketing circular, a true and correct exemplar of which is attached hereto as **Exhibit 8** (distributed to numerous expected buyers and other attendees in advance of the upcoming New York Toy Fair), and (2) Kellytoy Worldwide's stationary it uses to communicate directly to Squishmallows plush customers, a true and correct copy of which is attached hereto as **Exhibit 9**.

22. As a direct result of these and other efforts at promoting and building its recognition in the marketplace, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and designs in the United States and around the world. In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 6200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

23. Since the summer of 2017, Kellytoy has shipped approximately a 40 million (40,000,000) units of traditionally shaped Squishmallows and, based on the product trajectory, there is no indication that sales will be slowing down anytime soon. Kellytoy's Squishmallows products embodying the Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

6

24.     In fact, Kellytoy Worldwide's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

25.     Kellytoy's Squishmallows have become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts, flasks, and jewelry, bearing the images of some of Kellytoy Worldwide's most popular Squishmallows branded toys. But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by numerous different infringers, as depicted below:

 



7



26.     Because of the immense popularity of Kellytoy Worldwide's Squishmallows line of plush toys, Kellytoy Worldwide has recently embarked on a global initiative with Evolution USA to license the Squishmallows designs and trademark to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming.  (Attached as **Exhibit 10** hereto is a true and correct copy of an article published by ToyBook.com announcing the launch of Kellytoy Worldwide's global licensing program with Evolution USA.)

27.     Because of Kellytoy Worldwide's efforts to distinguish its Squishmallows line and the resulting massive success and popularity of that line, consumers have come to associate Kellytoy Worldwide's high-quality Squishmallows plush toys with Kellytoy Worldwide or at least a single source.  I know this from my discussions with customers, the wide press coverage and awards relating to Squishmallows, and by reviewing hundreds of social media posts (on Instagram, Facebook, etc.) from end consumers.  Kellytoy Worldwide has had many successful product offerings over the years, but come close to

8

EXHIBIT J
Page 40 of 168

Squishmallows in terms of market penetration, press coverage, social media buzz, and customer recognition. Squishmallows have outperformed any other product and all of these categories by double-digit orders of magnitude.

28. Also from my discussions with customers, my review of numerous press mentions, and my review of numerous social media posts from end consumers, it is evident that Kellytoy Worldwide's Squishmallows are instantly recognizable by the combination of their egg/bell-like shape, absence of proportionate/pronounced limbs, simplified Kawaii-inspired aesthetics, short pile silky shell, and airy, silky stuffing – features common among all of Kellytoy Worldwide's traditional Squishmallows.

29. I am informed and believe that Kellytoy Worldwide's Squishmallows branded plush toys owe their popularity, in part, due to the high quality of these goods and the rigorous quality control procedures that they undergo.

30. In order to protect the goodwill Kellytoy Worldwide has accumulated in its Squishmallows trade dress, Kellytoy Worldwide has often had to enforce its rights vis-à-vis third parties who have, in Kellytoy Worldwide's view, infringed upon those rights. In certain instances, Kellytoy Worldwide managed to resolve such disputes to its satisfaction short of litigation. In other instances, Kellytoy Worldwide filed complaints against such third parties. In those cases no longer pending, Kellytoy Worldwide entered into confidential settlement agreements with the defendants on terms consistent with Kellytoy Worldwide's goal of protecting its rights in its Squishmallows trade dress. In fact, besides this litigation, Kellytoy Worldwide has two other litigations pending concerning the infringement of Kellytoy Worldwide's Squishmallows Trade Dress.

31. As part of my duties as Kellytoy Worldwide's Senior Vice President of Sales and Product Development, I routinely visit retail stores throughout the country. During those visits, I have observed Ty branded plush toys being sold in many of the same large retailers through which Kellytoy Worldwide's goods are sold, such as Walgreens, Fred Meyer, Kroger, and CVS, among others.

9

EXHIBIT J
Page 41 of 168

32.     I am also informed and believe that Ty has been offering to sell its "Squish-a-Boos" plush line to customers at prices that are significantly lower than the prices charged by Kellytoy Worldwide for its authentic Squishmallows branded plush.  Such sales tactics will significantly harm Kellytoy Worldwide's ability to make a profit on its authentic Squishmallows line of plush toys, as Kellytoy Worldwide will have no choice but to try to match Ty's pricing in order to compete in the marketplace.  With Ty's significant distribution network in the marketplace, this will cause great harm to Kellytoy Worldwide's market share and profitability for its authentic Squishmallows plush toys.

33.     It is clear, based on my experience in the industry and at Kellytoy Worldwide, that Ty's conduct threatens to significantly undercut Kellytoy Worldwide's pricing for Kellytoy Worldwide's authentic Squishmallows.  That is because Ty has waited on the sidelines for two and half years to launch its highly similar "Squish-a-Boos" plush line, after Kellytoy Worldwide had established extensive goodwill in the Squishmallows trade dress.  In other words, now that Kellytoy Worldwide has invested so significantly in the development, advertising, and promotion of its Squishmallows line of toys, Ty can ride Kellytoy Worldwide's proverbial coattails without having to undertake those same investments.

34.     The next big industry tradeshow in the United States is Toy Fair New York, scheduled to take place on February 22-25, 2020 – considered the most important and most attended tradeshow in the United States.  I am informed and believe that Ty plans to show its "Squish-a-Boos" plush line at the upcoming Toy Fair New York.

35.     As part of Kellytoy Worldwide's campaign to highlight to customers that the overall "look and feel" of its Squishmallows is meant to distinguish them from the plush toys of others and to indicate a single source, renderings of various Squishmallows designs appear on the hangtags for the Squishmallows plush toys.  A true and correct photograph of a hangtag typically affixed to Kellytoy Worldwide's authentic Squishmallows are attached collectively hereto as **Exhibit 11**.

10

36.     Similarly, even though the product displays naturally contain actual specimens of Squishmallows plush goods, Kellytoy Worldwide also includes graphic depictions of various Squishmallows designs on the displays. Kellytoy Worldwide does this to emphasize and educate the customers that the overall "look and feel" of the Squishmallows line is intended to communicate a single source. True and correct photographs of product displays for the Squishmallows line of toys, in various sizes, are attached hereto collectively as **Exhibit 12**.

37.     If standing upright provided a utilitarian advantage, Kellytoy would have designed Squishmallows to stand up more stably, e.g., as squares, rectangles, triangles, spheres, cylindrical, oblong/lateral pillows, etc. or with a much wider base relative to the upper portion.

38.     Squishmallows generally retail, depending on the size, from $2.99 to $19.99.

39.     As part of my duties, I also participate in overseeing the production of Kellytoy Worldwide's Squishmallows plush line. In that capacity, I have regular exposure to different materials and manufacturing processes used in connection with the production of plush toys, including the materials and manufacturing processes used in connection with the development of the Squishmallows line.

40.     In addition, as part of my duties, I routinely visit retailers and trade shows nationwide to familiarize myself with the plush toy offerings of Kellytoy Worldwide's competitors in the marketplace.

41.     At no time has Kellytoy Worldwide filed for a utility patent for the Squishmallows plush as a whole or any element thereof.

42.     None of Kellytoy Worldwide's advertising touts the utilitarian advantages of the Squishmallows, other than the fact that the Squishmallows can be used as pillows – a characteristic of many, if not most, plush toys.

43.     All of the elements of the Squishmallows plush design are aesthetic

11

EXHIBIT J
Page 43 of 168

in nature, none of them providing any particular function, other than to distinguish these plush toys from those of others. In fact, the shape, appearance, texture, and feel of the Squishmallows plush toys are all aesthetic features as to which there are innumerable alternatives and which, indeed, were specifically designed to distinguish the Squishmallows from other toys. For example, there are countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, cube shaped plush toys, rectangular shaped plush toys, spherical shaped plush toys, cylindrical shaped plush toys, etc.), such as:



12

EXHIBIT J
Page 44 of 168



13



44. Likewise, set forth above, there are numerous alternative means to depict body and facial features, e.g., traditional plush toy body and facial features often have prominent and proportionate limbs and facial features appear in three dimensions, such as protruding snouts, etc.

45. In addition, there are a myriad of alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), as depicted below:



14

EXHIBIT J
Page 46 of 168

 

46.     Similarly, there are countless alternative stuffing materials available (e.g., beans, cotton, hard foam, etc.). Regardless, when the features of the Squishmallow plush toys are viewed collectively, it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace.

47.     Also, there are also a myriad of alternative designs for plush toys in the marketplace which, while embodying some of the Squishmallow features, do not include all of them in a single plush toy. There are an infinite number of forms, features, and textures in which to design a plush toy – the vast majority of which do not infringe upon Kellytoy Worldwide's Squishmallow trade dress.

48.     The selection of the particular shape, materials, and design of Kellytoy Worldwide's Squishmallows do not result from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys. Although the Squishmallows plush are made with high-quality materials, the particular design has nothing to do with the quality – something determined by the quality of the materials chosen and the manufacturer's machinery, skill and care with which the products are manufactured, in line with Kellytoy Worldwide's quality control standards. The ultimate quality results from the material and

15

manufacturing choices made by the Kellytoy and is not related to the design aesthetic or the particular combination of features that give rise to the overall "look and feel" of Kellytoy Worldwide's Squishmallows plush.

49. Moreover, protection of the Squishmallow trade dress as a trademark would not impose a non-reputation-related competitive disadvantage on Ty Inc. To the contrary, the Squishmallow trade dress – with its unitary aesthetic across its Squishmallows line – was specifically designed to distinguish the source of products embodying the Squishmallow trade dress from the source of other toys. As set forth above, there are numerous alternative designs available to Ty Inc. to compete in the marketplace without trading off of the goodwill garnered by Kellytoy Worldwide in its Squishmallows plush.

50. From correspondence received by Kellytoy Worldwide's attorneys from Ty's attorneys, we are informed that Ty will be using the Squish-a-Boos trademark in connection with the accused infringing goods. As close as Defendant's designs are to Kellytoy Worldwide's authentic Squishmallows designs, Kellytoy Worldwide would never release Squishmallows bearing Defendant's specific designs: They simply do not comport with the aesthetic that Kellytoy Worldwide wishes to associate with its Squishmallows branded goods.Through my visual inspection of photographs of the Ty Squish-a-Boos, it is apparent that they possess a very soft, short pile outer shell similar to Kellytoy Worldwide's Squishmallows line.

51. Due to my long-standing experience in the plush toy market and my efforts to monitor the activities of Kellytoy Worldwide's competitors, including through my discussions with various colleagues, I am familiar with Ty Inc.'s launch of various plush toy lines including the ones discussed herein below.

52. Ty Inc. is one of the largest manufacturers of stuffed plush toys in the world. Its first major product success was Ty Beanie Babies.

53. As sales of Beanie Babies began to wane, Ty sought to add new product lines. Rather than innovate, however, Ty Inc. looked to its competitors for new product

16

EXHIBIT J
Page 48 of 168

ideas and, in many cases, undercut the pricing for the originals and used its well-established distribution network and significant capital to establish itself as the market leader for its knockoff products – essentially drowning out the originals in the marketplace.

54.     To illustrate, I am setting forth a few nonexhaustive examples of Ty Inc.'s afore-described conduct.

<u>Jellycat® Pom Poms</u>

55.     Some years ago, a plush toy manufacturer operating under the trademark Jellycat® released the below depicted ostrich design named Pom Poms:



56.     Soon thereafter, Ty released an extremely close copy of Pom Poms under its Beanie Boo line, essentially the same basic design with larger eyes, set forth below:



17

EXHIBIT J
Page 49 of 168

Aurora® Yoohoo Lemur

57.     In or about January 2007, Aurora launched its YooHoo & Friends brand of plush toy characters, including the below depicted lemur:



58.     At some point in 2009, after Aurora's YooHoo & Friends established the market for such goods, Ty released a line of plush animal toys called the Beanie Boos, which copied the overall "look and feel" of Aurora's YooHoo & Friends, exemplified by the below-depicted lemur:



Although Aurora was unsuccessful in obtaining a preliminary injunction against Ty Inc. in connection with Ty's Beanie Boos, that fact does not take away from the fact that this establishes a modus operandi for Ty Inc., i.e., wait for a competitor to establish a market for an innovative designer line and then undercut the price (e.g., Ty's Beanie Boos at approximately $4.50 vs. Aurora's YooHoo's at approximately $6.50) and flood the marketplace with goods that co-opt the overall look and feel of that line.

18

EXHIBIT J
Page 50 of 168

<u>Disney's Tsum Tsum</u>

    59.    A similar thing happened with Disney's Tsum Tsum line.  A mere six months after Disney launched this line, Ty Inc. launched its TY Teeny Ty line copying the same overall look and feel and adapting it to its Beanie Boos designs.



Disney's Tsum Tsum



TY Teeny Ty

///

19

EXHIBIT J
Page 51 of 168

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of February, 2020, at Vernon, California.

JEANNE YOON

20

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KELLYTOY WORLDWIDE, INC. and | ) | |
| KELLYTOY (USA), INC., | ) | |
| | ) | |
| Plaintiffs. | ) | Case No. 1:20-cv-00748 |
| | ) | |
| v. | ) | Hon. Gary Feinerman |
| | ) | |
| TY INC. and DOES 1-10 | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

## TY'S MOTION TO DISMISS COUNTS 3–6 OF THE
## COMPLAINT AND MEMORANDUM IN SUPPORT THEREOF

J. Aron Carnahan
Don J. Mizerk
Michael D. Hayes
Laurie A. Haynie
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
Fax: 312.655.1501
aron.carnahan@huschblackwell.com
don.mizerk@huschblackwell.com
michael.hayes@huschblackwell.com
laurie.haynie@huschblackwell.com

## MOTION AND INTRODUCTION

Defendant Ty Inc. ("Ty") moves this Court, pursuant to FED.R.CIV.P. 12(b)(6), to dismiss Counts 3-6 of the complaint ("Compl.," Dkt. 1), for failure to state a claim upon which relief can be granted. The claims in Counts 3-6, which require plaintiff to properly plead ownership of valid trade dress rights in its Squishmallows, should be dismissed because the Complaint fails to include sufficient factual matter to support a plausible claim in this regard. Particularly lacking is a legally sufficient description of the character and scope of the claimed trade dress, as well as facts supporting the perfunctory allegations that the claimed trade dress is nonfunctional and has obtained secondary meaning. Plaintiff Kellytoy Worldwide, Inc. ("Kellytoy") simply cannot articulate a valid trade dress that covers its entire line of Squishmallows and which, at the same time, describes Ty's products. In fact, another federal court has already dismissed a similar trade dress claim brought by Kellytoy because, like here, the claimed trade dress was "too broad to form the basis of a plausible claim for trade dress infringement . . . ." *Kellytoy USA, Inc. v. Dan-Dee Int'l, Ltd.*, No. CV 2:18-CV-05399 JAK (C.D. Cal. Feb. 7, 2019) at p. 9 (Ex. A, attached).

## ARGUMENT

### I. LEGAL STANDARDS

**A.     Rule 12(b)(6).** Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss on this basis, a complaint must advance "allegations plausibly suggesting (not merely consistent with)" a successful claim for relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' . . . To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Twombly*, 550 U.S. at 557, 570). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED.R.CIV.P. 8(a)(2)).

1

EXHIBIT J
Page 54 of 168

**B.      Trade Dress.**  Counts 3-6 of Kellytoy's complaint are all grounded on infringement of alleged trade dress rights. *See* Compl.¶¶ 94, 107, 115 and 120. Such purported rights stem from the Lanham Act, which "establishes a cause of action against 'any person who . . . in connection with any goods or services' uses 'any word, term, name, symbol, or device' which 'is likely to cause confusion' as to the good or service's source." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017) (quoting 15 U.S.C. § 1125(a)(1)(A)). "That protection can extend to trade dress such as the design . . . of a product that is so distinctive as to identify the manufacturer or source." *Id*. The Supreme Court has cautioned that where, as here, the alleged trade dress is the product design itself, "consumer predisposition to equate the feature with the source does not exist." *Wal-Mart Stores, Inc. v. Samara Bros., Inc*., 529 U.S. 205, 213 (2000). Instead, consumers view even unusual product designs as something other than a designation of source: "[c]onsumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* Moreover, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).

In order to properly plead trade dress infringement under Rule 12(b)(6), Kellytoy must allege facts which plausibly establish, *inter alia*, that it owns valid trade dress rights; its claimed trade dress is nonfunctional; and its claimed trade dress has acquired secondary meaning. *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005). The complaint should be dismissed under Rule 12(b)(6) because Kellytoy: (1) cannot articulate a specific trade dress with the level of specificity demanded under the Lanham Act or allege facts which plausibly establish that it has consistently used that trade dress across its entire Squishmallows product line; (2) does not allege facts which plausibly suggest that its claimed trade dress is nonfunctional; and (3) does not allege facts which plausibly suggest that its claimed trade dress has acquired secondary meaning.

<div align="center">2</div>

## II.  KELLYTOY DOES NOT DESCRIBE ITS CLAIMED TRADE DRESS WITH REQUISITE PARTICULARITY.

Kellytoy claims trade dress protection in its entire family of Squishmallows toys. *See* Compl. ¶ 28 ("In 2016, Kellytoy conceived of and began creating its **Squishmallows line of plush toy designs that shares common, unique features distinguishing them from the goods of others**."); and *id.* ¶ 31 (Kellytoy "sells a **broad range of Squishmallows** branded plush toys **featuring the brand's iconic trade dress** . . . .") (emphasis added). However, Seventh Circuit law is clear that "one claiming [such] family trade dress protection **must articulate a specific trade dress** and **demonstrate that it has consistently used that trade dress**, and even then, 'courts consider these broader product line claims with an "acute" concern for protecting competition given that any remedy could potentially cover a wide range of products.'" *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814-15 (7th Cir. 2002) (emphasis added; citations omitted). "Unless the trade dress for which protection is sought is **specifically defined with a stable visual appearance**, the party seeking protection might obtain a right to monopolize a variety of dress far beyond what the plaintiff might ever use." *Id.* n. 6 (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997)). *See also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:3 (5th ed. 2020) ("All courts agree that the elements of the alleged trade dress must be clearly listed and described. Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement."). Kellytoy's complaint fails to "articulate a specific trade dress" that meets the Seventh Circuit's strict standards and fails to allege facts which plausibly suggest that Kellytoy "has consistently used that trade dress" across its entire Squishmallows product line. *AM Gen.*, 311 F.3d at 814-15.

### A.  The Complaint Fails to Articulate A Specific Trade Dress.

Although required to "articulate a specific trade dress" in its Squishmallows toys, Kellytoy itself admits that its trade dress is "not easily reduced to writing." Compl. ¶ 31. The trade dress elements listed by Kellytoy are far from specific, and "include" the following:

(1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters;

3

EXHIBIT J
Page 56 of 168

(2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to support the overall egg/bell shape of the toys;
(3) embroidered facial features, such [sic] nostrils, and/or mouths;
(4) distinctive contrasting and non-monochrome coloring; and
(5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

*Id.* ¶ 31. This vague description, however, does not permit the Court or Ty to define exactly of what the trade dress consists, especially with imprecise, open-ended words such as "include," "substantially," "Asian-style," "various," "such as" and "distinctive." Ty is at a loss to know, for instance, what constitutes "simplified Asian style Kawaii faces" or "repeating and complementary rounded/oval shaped graphics" depicting "eyes, snouts and bellies," and does not know what is meant by "distinctive contrasting and non-monochromatic coloring."  Neither can Ty tell what is meant by a "velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel." *Id.*[1] These are meaningless descriptions that, taken alone or together, lack the required specificity to form a claim for trade dress infringement that is "plausible on its face." *Twombly*, 550 U.S. at 570. In fact, the Central District of California just last year dismissed Kellytoy's similar claim against another party for this very reason: "[t]his general description **offers little insight into the scope or nature of Kellytoy's claim**. . . . **It is also too broad to form the basis of a plausible claim for trade dress infringement**." *Dan-Dee*, Ex. A p. 9 (emphasis added).[2]

---

[1] To the extent Kellytoy claims trade dress protection in "soft and squeezable" elements, they describe tactile properties that are not entitled to trade dress protection in any event. Trade dress protection extends to the visual aspects of a product relating to its design or style, not the tactile properties that cannot be seen by the consumer. *See Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1141 (C.D. Cal. 2009). *See also Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989)("'Trade dress' refers to the **total image** of a product . . . .") (emphasis added).

[2] In *Dan-Dee*, Kellytoy described its trade dress as including "(1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light 'marshmallow' memory foam-like texture." Ex. A p. 9. Although another court reached a different conclusion concerning the sufficiency of Kellytoy's trade dress description in *Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.,* No. CV-19-07652-MWF (MAAx) (C.D. Cal. Dec. 4, 2019), the court in *Hugfun* nevertheless dismissed the complaint for failure to sufficiently plead non-functionality. In any event, the *Dan-Dee* court's ruling rejecting Kellytoy's trade dress description as inadequate is the better decision and more in keeping with Seventh Circuit precedent governing trade dress claims in an entire product line, wherein the Court considers such claims with "acute" concern for protecting competition, and requires that a party claiming family trade dress protection must "articulate a specific trade dress and demonstrate that it has consistently used that trade dress . . . ." *AM Gen.*, 311 F.3d at 814-15.

Kellytoy's list of claimed trade elements is "overbroad," and amounts to "empty generalities in the face of more precise alternatives," and should be rejected for the reasons stated in *Walker & Zanger, Inc. v. Paragon Indus., Inc.* when considering claimed trade dress in decorative tiles:

> [T]o describe the colors of the trade dress, plaintiff should list the actual colors rather than claim a "palette of colors reminiscent of Provence." Or instead of defining the three-dimensional relief as "complex," plaintiff should provide the magnitude and angle of relief that renders plaintiff's tiles distinctive. Finally, some terms leave the boundary of plaintiff's trade dress rights unclear, such as the terms "rustic look," "weathered look," "architectural character," or even "Old World handiwork." These terms fail to provide adequate notice to competitors in the decorative tile business regarding the breadth of plaintiff's exclusivity rights.

549 F.Supp.2d 1168, 1176 (N.D. Cal. 2007). Likewise, Kellytoy's complaint should describe the actual colors it seeks to protect rather than "distinctive contrasting and non-monochrome coloring;" should define precisely the specific artistic elements it claims to own rather than referring to amorphous "Asian style Kawaii faces;" should describe the exact shapes and specific design of the claimed "embroidered facial features" and "oval/rounded features" that make up its trade dress; and should give detailed criteria for the "velvety velour-like" fabric and "silky memory foam-like" stuffing used in the toys, which are not likely protectable trade dress in any event. *See* n. 1. Like the plaintiff in *Walker & Zanger*, the terms used by Kellytoy "leave the boundaries of plaintiff's rights unclear" and "fail to provide adequate notice" to competitors like Ty "regarding the breadth" of its claimed rights. 549 F. Supp. at 1176.

Kellytoy cannot escape the improperly vague description of its trade dress by claiming protection in the "overall look and feel" of its toys. Compl. ¶ 31. Indeed, "focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress." *Landscape Forms*, 113 F.3d at 381 (plaintiff failed to articulate its claimed trade dress with sufficient particularity). *See also Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 6626018 *4 (N.D. Ill. Dec. 28, 2017), *aff'd* 927 F.3d 486 ("To assert a claim for trade dress infringement concerning overall appearance of a product . . . courts have typically required plaintiffs to articulate the specific, tangible elements that, together comprise that claimed "overall appearance" trade dress."). Neither can Kellytoy rely on images of

5

its products purportedly featuring the claimed trade dress attached to its complaint, because "courts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." *Nat'l Lighting Co. v. Bridge Metal Indus., LLC*, 601 F.Supp.2d 556, 562-63 (S.D.N.Y. 2009) (a "trade dress claim is not rescued by mere attachment of brochures [and] photographs" to amended complaint). *See also Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954 DDP MANX, 2014 WL 6892141 at *3 (C.D. Cal. Nov. 5, 2014) (vague description of trade dress combined with photograph did not "sufficiently identify the particular elements" of the trade dress plaintiffs sought to protect). The photos are also unhelpful here because, as explained in Part B below, they do not depict consistent use of the claimed trade dress in any event.

Courts have not hesitated to dismiss trade dress complaints under Rule 12(b)(6) where, as here, the plaintiff has failed to identify the claimed trade dress with particularity. *See Mighty Deer Lick, Inc. v. Morton Salt, Inc.*, No. 17-cv-05875, 2020 WL 635904 *8 (N.D. Ill. Feb. 11, 2020) (Plaintiff's products "may well be 'uniquely designed,' but without more factual detail, neither the Court nor Morton can identify the distinct features that would comprise a protectible trade dress. . . . simply stating that a product is unique is not sufficient to state a claim for trade dress infringement."); *Homeland Housewares,* 2014 WL 6892141 at *3 (trade dress claim dismissed where complaint described the trade dress as "the color, scheme, fonts, phraseology, and overall look and feel," along with a photograph of the trade dress, because "Plaintiffs have not clearly articulated what comprises their claimed trade dress."); *Int'l Leisure Prods., Inc. v. FUNBOY LLC*, 747 Fed.Appx. 23, 25-26 (2d Cir. 2018) (plaintiff's use of subjective descriptors for its swan pool float like "pleasing appearance," "aesthetic proportion," and "optional" or alternative features, was "impermissibly overbroad," even with a photo of the item attached to the complaint); and *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309-10 (3d Cir. 2014) (trade dress consisting of the combination of catamaran vessels, unique teaching curriculum, student testimonials and registered domain name was "simply a hodgepodge of unconnected pieces of its business, which together do not comprise any sort of composite visual effect. * * * Because Fair Wind has failed to give Defendants adequate notice of what overall look it wishes to protect, its

6

EXHIBIT J
Page 59 of 168

trade dress claim cannot survive Defendants' motion to dismiss."). The complaint here should dismissed for the same reasons.

### B. The Complaint Fails To Allege Consistent Use Of The Claimed Trade Dress.

A party claiming trade dress rights across a line of products, like Kellytoy here, must "demonstrate that it has consistently used that trade dress," which must be "specifically defined with a stable visual appearance." *AM Gen.*, 311 F.3d at 814-15 and n.6. Kellytoy contends that its claimed trade dress features, "and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1**" to its complaint. Compl. ¶ 31. Exhibit 1 depicts the following toys:



However, no consistent "overall look and feel" or "stable visual appearance" can be discerned from these photographs. If anything, these images only add to the confusion, because the toys have differing features claimed to be elements of the trade dress. For instance, the snouts are all different (circular, oval, triangular, and "comma" shaped), with some containing a nose attached to a curved mouth (dog, leopard, bear, sheep and mouse), one containing a nose and a separate mouth (sloth), some containing nostrils only (unicorn, pig and giraffe), one with lines to resemble an elephant trunk, and some toys lack a snout altogether (monkey and penguin, which has a beak). Also, there is nothing "distinctive" about the coloring of the toys, which runs the gamut from various shades of brown, tan, white, pink, blue and gray, and includes colors and prints found on the actual animal depicted, such as brown for the dog, sloth, bear and monkey, pink for the pig, grey for the mouse and elephant, and leopard and giraffe prints for the corresponding animals. And some eyes have eyelashes (pink unicorn) some are placed on contrasting fabric

EXHIBIT J
Page 60 of 168

bands or face masks (sloth, monkey and blue sheep) and one even has "closed" eyes (penguin). The various appendages are also different, with horns, manes, and differently shaped ears placed on different parts of the toys (floppy, round, folded, not folded, elephant-shaped, or no ears at all). Some of the toys have contrasting, semi-circular "bellies" whereas others do not, and some have a contrasting irregularly-shaped panel covering the face and belly of the toy (sloth and penguin).

Additional images of Squishmallow variations purportedly featuring the claimed trade dress are also found in Exhibits 4-6 to the complaint, and further demonstrate that the claimed trade dress features are not consistently found in every Squishmallows product.[3] For example, not all Squishmallows are "substantially egg/bell shaped," but rather some stand upright with separate heads, and some are "pancake" shaped:"



**Compl. Ex. 4 p. 2**

And not all Squishmallows have "short-pile velvety velour-like textured exterior" because some are made with longer pile fabric (lions' manes and the bird's feathers) and some are made with scratchy sequined fabric (cat):




**Compl. Ex. 4 p. 2**                                   **Compl. Ex. 6 p. 2**

---

[3] In its recent Reply Brief in Support of its Motion for Preliminary Injunction, Kellytoy incredibly suggests, for the first time, and without citation to any legal authority, that it only claims trade dress rights in "a particular subset of products: its famous and best-selling traditionally shaped Squishmallows." Dkt. 57 p. 7. If this is the case, the complaint should be dismissed for the additional reason that it fails to assert such a limited claim or even identify this "subset" of products. Indeed, every allegation in, and exhibit to, the complaint directed to the claimed trade dress rights is based on the **entire** Squishmallows product line, and not a "particular subset of products." *See* Compl. ¶¶ 21, 28-51, 62-63, 65 and Compl. Exs. 4-6. Kellytoy can't have it both ways, by limiting trade dress claims in a subset of products that purportedly depict particular "look and feel" while relying on sales, advertising and social media presence of its entire product line to support trade dress claims in the limited subset.

Neither do all Squishmallows have "repeating and complementary rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to support the overall egg/bell shape of the toys" but rather they have all manner of features and graphics that are linear (snowman and ginger man scarf, mummy tape, elf and nutcracker belts, butterfly belly), squiggled (clownfish lines and gingerbread man trim), triangular (elf's collar, pumpkin eyes, and dinosaur mane), pointed (fox facial features), while others have details that are anything but "kawaii" (nutcracker, pumpkin):



**Compl. Ex. 4 p. 2**  **Ex. 4 p. 11**  **Ex. 6 p. 2**  **Ex. 6 p.3**  **Ex. 5 p. 31**

**Ex. 5 p. 13**  **Ex. 5 p. 34**  **Ex. 5 p. 117**  **Compl. Ex. 5 p. 38**

"When it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:5.50 (5th ed. 2020). Since the Squishmallow images attached to the complaint and relied on by Kellytoy to support its claimed trade dress rights do not, on their face, demonstrate that the claimed combination of trade dress elements is "common to all items" in the Squishmallows product line, the complaint should be dismissed for this reason as well. Indeed, the Central District of California rejected Kellytoy's assertion that any ambiguities in its written description of the claimed trade dress were answered by references to the images of the products for this very reason:

> [I]n light of the **substantial differences among the designs of the products in the Squishmallows line**, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by

9

the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently.

Ex. A p. 9 (emphasis added). Because Kellytoy has not plausibly alleged that its trade dress features are present throughout its entire Squishmallows line, the complaint here should be dismissed for this reason as well. *See Nat'l Lighting,* 601 F. Supp. 2d at 562 (dismissing trade dress claim in a line of lighting fixtures where "plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements."); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 550 (S.D.N.Y. 2003) (no trade dress where plaintiff could not prove a reasonable consistency in a line of garments, whose design varied from product to product).

## III. KELLYTOY HAS FAILED TO PROPERLY PLEAD THAT ITS CLAIMED TRADE DRESS IS NONFUNCTIONAL.

Kellytoy asserts infringement of a nonregistered trade dress. As a result, it "has the burden of proving that the matter sought to be protected is not functional." *TrafFix*, 532 U.S. at 29; 15 U.S.C. §1125(a)(3). A product feature will be deemed functional "if it is essential to the use or purpose of the article or affects the cost or quality of the article. . . . [A] functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Id.* at 32 (citations omitted). Courts will also consider whether the feature at issue "constitute[s] the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 774 (9th Cir. 1981). A design is functional where a product "looks the way it does in order to be a better [product], not in order to be a better way of identifying who made it . . . ." *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010).

Kellytoy makes a perfunctory allegation in this regard, stating only that "[t]he Squishmallows Trade Dress is nonfunctional." Compl. ¶ 98. *See also id.* ¶ 96. This is not enough to withstand a motion to dismiss. *See Hugfun* p. 8 ("Plaintiff failed to plead sufficient facts to

10

support its assertion that the Trade Dress is non-functional. Plaintiff's only mention of functionality in the Complaint is the conclusory statement that '[t]he Squishmallow Trade Dress is non-functional.'") "The failure to plead non-functionality with factual particularity establishes merely the possibility and not the plausibility of [relief] and is therefore fatal to Plaintiff's trade dress claim." *ID7D Co., Ltd. v. Sears Holding Corp.*, No. 3:11cv1054 (VLB), 2012 WL 1247329 *7 (D. Conn. April 13, 2012). *See also Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 746-47 (E.D. Mich. 2014) (granting motion to dismiss where the allegations of functionality "are conclusory and therefore not entitled to the presumption of truth . . . [a]nd the complaint contains no factual allegations otherwise supporting this element; to the contrary, the plaintiff's exhibits describe the plaintiff's products in entirely functional terms.") (citation omitted); *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) (dismissing trade dress claim where the "Amended Complaint includes a conclusory assertion that the [trade dress] is 'unique and nonfunctional,' but proffers no factual allegations demonstrating that the design is not aesthetically or otherwise functional."); *Eliya, Inc. v. Steven Madden, Ltd.*, No. 15-1272 (DRH)(SIL), 2018 WL 1027157 *3 (E.D.N.Y. Feb. 22, 2018) ("no specific facts are plead that plausibly support the non-functionality of the claimed trade dress.").

Moreover, courts have dismissed complaints where, as here, the claimed trade dress is clearly functional on its face. In *Fair Winds*, the Third Circuit upheld the motion to dismiss a trade dress claim because, among other things, the alleged trade dress was "clearly functional, and therefore not protectable." 764 F.3d at 310. The court observed that the claimed trade dress features, such as "[s]tudent feedback procedures, catamarans, teaching itineraries and curriculum all affect[ed] the quality" of the plaintiff's sailing school business and "play a critical role in the consumer demand for [plaintiff's] services, rather than merely identifying [plaintiff] as the source of the sailing instruction." *Id.* at 311. And in *Eliya*, the claimed trade dress in a shoe design was also deemed functional on a motion to dismiss: "features such as the strap, the raised heel appendage and woven uppers are functional in that such features help the user put them on and keep them on; similarly, grooved soles provide traction for the wearer. Moreover, the ornamental features of the claimed trade dress . . . 'serve to enhance the aesthetic appeal of the shoes rather

11

than to identify [their] source.'" 2018 WL 1027157 at *3 (citation omitted). The same is true here. The alleged trade dress features of egg/bell shaped plush toys, rounded/oval shaped graphics depicting eyes, snouts and bellies (which are rounded/oval by nature), embroidered facial features, non-monochrome coloring, soft exteriors and squeezable stuffing all affect the quality and aesthetic appeal of plaintiff's stuffed toys and play a critical role in consumer demand for plush products, rather than identifying the source of Squishmallows.

Moreover, as in *Mike Vaughn*, the exhibits to Kellytoy's complaint "describe the plaintiff's products in entirely functional terms." 15 F. Supp. 3d at 747. In the marketing materials attached to the complaint, Kellytoy itself touts that the toys can be used as pillows and to relieve stress and anxiety: "Squishmallows are super soft, cuddly plush toys that come in a variety of sizes, animals and colors with unique bios to cuddle, collect, gift, **and even use as a pillow**." Compl. Ex. 4 p. 5 (emphasis added). Squishmallows "are **great . . . pillows**" and are "friends in time of need, **helping to relieve stress and anxiety**." Compl. Ex. 5 p. 37 (emphasis added). The fact that Squishmallows can be used as pillows is mentioned in dozens of advertisements and marketing materials for these products attached to the complaint, picking up on Kellytoy's original marketing language. *See, e.g.,* Compl. Ex. 5 p. 9 ("this . . . **insanely squishable pillow** is going to be a huge hit in your house"); p. 13 ("Squishmallows . . . **make great** . . . **pillows . . . .**"); p. 31 ("You can play with one or **use it as a pillow**. . . .") and p. 41 ("they **double as a pillow**") (emphasis added). Since Kellytoy cannot deny that it widely advertises that its Squishmallows function as pillows, this means that those aspects of the toys that render them useful as pillows are functional, including the egg/bell shape, the embroidered facial features, the ultra-soft exterior, and the light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. The complaint should be dismissed for this reason as well.

**IV.  KELLYTOY HAS NOT PROPERLY PLED SECONDARY MEANING IN ANY TRADE DRESS.**

To establish secondary meaning, Kellytoy must allege facts that plausibly suggest that consumers identify its claimed trade dress with the source of the product rather than the product itself. *Wal-Mart*, 529 U.S. at 211. As explained by the Seventh Circuit, the "proper legal standard" in this regard is whether "in the minds of consumers," the "primary significance" of the

12

claimed Squishmallows trade dress is to identify the trade dress as a Kellytoy product. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 661 (7th Cir. 1995).

In its complaint, Kellytoy alleges that "[d]ue to Kellytoy Worldwide's distinctive trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and marketing penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys." Compl. ¶ 30. *See also id.* ¶ 53 ("due to Squishmallows' massive success and popularity, consumers have come to . . . recognize the Squishmallows trade dress as a designation of source."). In an effort to support these naked assertions of secondary meaning, Kellytoy attaches images and text from its own website, social media accounts, and magazines. *Id.* Exs. 4-7. However, even if this Court were to accept as true that the Squishmallows product line has attained a certain amount of popularity among a discrete group of consumers, this is not secondary meaning. "It is well-established that evidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning." *Continental Lab. Prods., Inc. v. Medax Int'l, Inc.* 114 F. Supp. 2d 992, 1002 (S.D. Cal. 2000). This is especially true in a product configuration case because "the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature . . . ." *Id.* at 1003 (citations omitted). Indeed, "[l]arge sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark." *Id. See also Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*, No. CV-06-187-RGK (JTLx), 2007 WL 1438114, at *3 (C.D. Cal. Feb. 23, 2007) (plaintiff's "millions" in revenues alone did little or nothing to establish secondary meaning).

In *Thomas & Betts*, the Seventh Circuit rejected plaintiff's "substantial advertising with pictures of its product" as evidence of secondary meaning because the advertising did not encourage consumers to identify the claimed trade dress with the plaintiff, for example, by encouraging consumers to "look for" the trade dress features:

> **Advertising that touts a product feature for its desirable qualities** and not primarily as a way to distinguish the producer's brand is not only **not evidence that the feature has acquired secondary meaning, it directly undermines such**

13

**a finding**. It supports instead the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source.

65 F.3d at 662 (emphasis added). Likewise Kellytoy's social media and other references featuring images of Squishmallows do not plausibly suggest that all five trade dress features listed in paragraph 31 of the complaint were advertised as a way to distinguish the producer's brand, because the references make no effort to emphasize or call attention to all five elements of the claimed trade dress. If anything, these references tout the product features for their desirable qualities such as "softness" and "squeezability." Kellytoy's allegations, at most, "support[] . . . the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source." *Thomas & Betts*, 65 F.3d at 662

"In cases of product design, the evidence provided to establish acquired distinctiveness must relate to the **promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general**." *In re Koninklijke Philips Elecs. N.V.*, 2014 WL 5035509, at *4 (T.T.A.B. Sept. 26, 2014) (emphasis added). The allegations and materials relied on by Kellytoy involve simple product mentions of Squishmallows in general (not the claimed trade dress features) by the press or third parties, which do nothing to connect the specific trade dress features with a brand name or source in the eyes of consumers. Indeed, the allegations in the complaint speak in terms of advertising, sales, awards, etc. relating to the entire line of "Squishmallows" plush toys—not the claimed trade dress. *See* Compl. ¶¶ 32, 34-51. As explained in Part II(B) above, the claimed trade dress elements (albeit vague) are not present in the entire line of Squishmallows plush toys, so any allegations referencing the entire product line do not support a claim of secondary meaning in the trade dress as a whole. And to the extent that the materials attached to the complaint tout the functional features of Squishmallows (*see* Part III above), this is not evidence of secondary meaning. *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1992 WL 511694, at *7 (M.D.N.C. Sept. 15, 1992), *aff'd*, 998 F.2d 1008 (4th Cir. 1993) ("When advertisements promote the functional and decorative features of a product without promoting an association between good and producer, it is not helpful in establishing secondary meaning.").

<div align="center">14</div>

A number of courts have dismissed trade dress complaints for failure to properly allege secondary meaning in comparable situations. In *AJB Enters., LLC v. Backjoy Orthotics, LLC*, No. 3;16-CV-00758 (VAB), the court noted that "[s]ubstantial sales of a product, if (as here) unaccompanied by a concomitant effort on the seller's part to associate the product's trade dress with the source of the product rather than the product itself, do not establish that a product's trade dress has acquired secondary meaning." 2016 WL 7341702 at *6 (D. Conn. Dec. 18, 2016). The court concluded, "[a]s the Complaint does not include any factual allegations that would connect the claimed dress to [plaintiff] as the source of the trade dress, rather than simply connecting the trade dress to this particular genre of cane massager, [plaintiff] has failed to establish this element of its trade dress infringement claim for motion to dismiss purposes." *Id.*

In *ID7D*, the plaintiff alleged that it "used and continues to use its distinctive Trade Dress and, by virtue of widespread sales, the Trade Dress has come to indicate origin with Plaintiff;" that it "has incurred great expense and has devoted substantial resources to make the barbeque grill famous and/or readily recognizable to consumers;" and that "Plaintiff's investments and efforts have been successful as the Trade Dress had become highly distinctive in the marketplace and denotes to purchasers a line of goods which originate with Plaintiff." 2012 WL 1247329 at *2. These allegations, however, could not withstand a motion to dismiss because "plaintiff has failed to plead facts regarding secondary meaning that would state a claim to relief that is plausible on its face." *Id.* at *8. *See also Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSX), 2015 WL 12731929, at *5 (C.D. Cal. May 8, 2015) (Plaintiff's "allegations implicating public exposure, sales and establishment in the market, and intentional copying" were "conclusorily plead," where plaintiff claimed that its boot was one of its "most well recognized and commercially successful styles;" that Plaintiff had spent "substantial time, effort and money promoting and advertising items embodying the trade dress;" that it made "extensive sales;" and sold a "substantial amount" of boots bearing the design.).

Likewise, Kellytoy's conclusory allegations about the popularity and commercial success of Squishmallows, absent specific facts that would connect the entire trade dress with the source of the product, are insufficient to withstand a motion to dismiss on this basis as well.

15

EXHIBIT J
Page 68 of 168

# CONCLUSION

For the foregoing reasons, Ty respectfully moves that Counts 3-6 of Kellytoy's complaint be dismissed for failure to state a claim upon which relief can be granted, since all claims in these causes of action are premised on the existence of valid trade dress rights, and Kellytoy has failed to state a claim for relief based on trade dress that is plausible on its face.

Dated: April 30, 2020                                      Respectfully submitted,

                                                           **TY INC.**

                                                           /**s**/ *J. Aron Carnahan*
                                                           _____
                                                                    *One of its attorneys*

J. Aron Carnahan
Don J. Mizerk
Michael D. Hayes
Laurie A. Haynie
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
Fax: 312.655.1501
aron.carnahan@huschblackwell.com
don.mizerk@huschblackwell.com
michael.hayes@huschblackwell.com
laurie.haynie@huschblackwell.com

16

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the public version of the foregoing document was served upon all counsel of record via filing with CM/ECF on April 30, 2020.

/s/ *J. Aron Carnahan*

J. Aron Carnahan
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
aron.carnahan@huschblackwell.com

17

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE DEFENDANTS' MOTION TO DISMISS (DKT. 24)**

## I.    Introduction

On June 15, 2018, Kellytoy (USA), Inc. and Kellytoy Worldwide, Inc. (collectively, "Kellytoy" or "Plaintiffs") brought this action against Dan-Dee International, Ltd. ("Dan-Dee"), Rite Aid Corporation ("Rite Aid") (collectively, "Defendants") and Does 1-10. Dkt. 1. Kellytoy filed an amended complaint on August 24, 2018 ("FAC" (Dkt. 16)). The FAC presents five causes of action: (i) federal copyright infringement; (ii) federal trademark / trade dress infringement; (iii) common law trademark / trade dress infringement; (iv) California common law unfair competition; and (v) California statutory unfair competition.

On September 7, 2018, Defendants filed a motion to dismiss the FAC ("Motion" (Dkt. 24)). Plaintiffs filed an opposition, and Defendants filed a reply. Dkts. 32, 34. A hearing was held on the Motion on January 28, 2019, and the matter was taken under submission. Dkt. 37.

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART.**

## II.    Factual Background

###    A.    Parties

Kellytoy develops, manufactures and sells children's toys, including a line of plush toys that are marketed and sold under the SQUISHMALLOW brand ("Squishmallows"). FAC ¶¶ 6, 11, 18. Dan-Dee also manufactures and sells children's toys, including plush toys. *Id.* ¶ 13. Rite Aid sells merchandise at its retail stores, including plush toys bearing third-party trademarks and under its own label, RITE STUFF. *Id.* ¶ 15. Dan-Dee has produced and sold to Rite Aid certain plush toys that allegedly infringe Kellytoy's intellectual property rights. *Id.* ¶¶ 7, 41, 42.

EXHIBIT J
Page 72 of 168

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

B.     Trade Dress Infringement Allegations

1.     <u>Squishmallow Trade Dress</u>

Kellytoy began developing its Squishmallows line of plush toy designs in 2016. *Id.* ¶ 21. Since that time, it has made substantial financial investments to develop, advertise and promote these product designs throughout the United States. *Id.* ¶ 22. The FAC alleges that "[d]ue to Kellytoy's unique design, extensive marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys," and "the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy." *Id.* ¶ 25. The FAC alleges that "[t]he Squishmallow Trade Dress is non-functional." *Id.* ¶ 64.

The FAC alleges that the Squishmallow trade dress includes the following non-exhaustive list of features:

> (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

*Id.* ¶ 23. It is also alleged that the Squishmallow trade dress is "more fully depicted" in the images attached to the FAC and reproduced below. *Id.*; Ex. 1 to FAC.


/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

**Squishmallow Designs**



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

2.    Allegedly Infringing Product

In spring 2018, Dan-Dee entered an agreement with Rite Aid, which called for the production and sale of various plush toys that would be distributed in Rite Aid stores in the United States. FAC ¶ 41. The FAC alleges that these plush toys feature "substantially similar" designs to the Squishmallows. *Id.* The FAC further alleges that, because Dan-Dee's plush toys are of lesser quality than the Squishmallows, they are sold at lower prices. *Id.* ¶ 44.

In 2017, Kellytoy met with representatives of Rite Aid, and showed the Rite Aid representatives its Squishmallows line of products. *Id.* 45. The FAC states that "Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof." *Id.* The FAC also alleges that "Defendants repurposed one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very different plush toys for use in connection with the Infringing Plush." *Id.* ¶ 49. It is alleged that the designs of Dan-Dee's plush toys "are confusingly similar to the Squishmallow Trade Dress." *Id.* ¶ 67. Photographs of Dan-Dee's plush toys are attached to the FAC and reproduced below. *Id.* ¶ 41; Ex. 6 to FAC.

 

C.    Allegations as to Copyright Infringement

Kellytoy holds copyrights in the Squishmallow designs. FAC ¶¶ 24, 54. The unicorn Squishmallow design is registered with the U.S. Copyright Office under registration numbers VA0002096020 and VA0002093075. *Id.* ¶ 56. The FAC alleges that the Squishmallow designs are original works, each of which was created by or assigned to Kellytoy. *Id.* ¶¶ 54-56.

The FAC alleges that Defendants had access to the Squishmallow designs prior to Defendants' development and distribution of their unicorn plush toy. *Id.* ¶ 54. The FAC further alleges that Defendants copied the design from the Squishmallow unicorn to create their competing product. *Id.* It is alleged that Defendants infringed Kellytoy's exclusive rights to the Squishmallow unicorn design in connection with Defendants' production, promotion and sale of a similar unicorn plush toy. *Id.* ¶¶ 57-58. A photograph of Dan-Dee's unicorn plush toy is attached to the FAC and reproduced below, next to images of the Squishmallow unicorns. *Id.* ¶ 57; Ex. 7 to FAC.

EXHIBIT J
Page 75 of 168

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |




## III.  Request for Judicial Notice

Defendants request judicial notice of three documents in connection with the Motion ("Request" (Dkt. 24-1)). Each document is a printout of a portion of a publicly available website that features images of third-party products. Exhibit A is a printout from the website Instagram.com. Exhibits B and C are printouts accessed from archive.org, or the "Wayback Machine." Pursuant to Fed. R. Evid. 201, a court may take judicial notice of facts that are either (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Defendants seek judicial notice "of the existence of the three third party products discussed in their motion to dismiss, namely Pusheen, Sumikko Gurashi, and Squishable Pig." Dkt. 24-1 at 2. It appears that Defendants also seek judicial notice of the fact that each third-party product "existed and w[as] public[ly] available at least as early as the dates shown" on the corresponding printout. *Id.* Plaintiffs object to the Request on three grounds: (i) the documents have not been authenticated; (ii) they do not come from a reliable source; and (iii) they are irrelevant to the issues presented by the Motion. Dkt. 33.

The facts for which Defendants seek judicial notice are not generally known within this jurisdiction. In addition, there are sufficient concerns as to the authenticity of the documents that contain the information at issue. Moreover, the facts as to which the Request has been made are not material to the resolution of the Motion. For these reasons, the Request is **DENIED**.

## IV.  Analysis

### A.  Legal Standards

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim. Such a motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations of the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

    B.    Application

        1.    <u>Copyright Infringement</u>

            a)    Legal Standards

To establish copyright infringement, a plaintiff must show (i) "ownership of a valid copyright," and (ii) "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). The Ninth Circuit has recently clarified that the second element of copyright infringement involves two distinct components: "copying" and "unlawful appropriation." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018) (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164-65 (9th Cir. 1977)). Proof of copying is required because "independent creation is a complete defense to copyright infringement." *Id.* (citing *Feist*, 499 U.S. at 345-46). Proof of unlawful appropriation is required because certain copying – including the reproduction of "ideas" or "concepts" used in the plaintiff's work – is not prohibited by the Copyright Act. *Id.* (citing 17 U.S.C. § 102(b)).

The proof of copying and unlawful appropriation "involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)). Infringement may also be established by demonstrating that the alleged infringers violated any of the exclusive rights granted to copyright holders under 17 U.S.C. § 106. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|----------|--------------------------|------|------------------|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

The Ninth Circuit uses "a two-part test to determine whether two works are substantially similar: an extrinsic test and an intrinsic test." *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 637 (9th Cir. 2008). The history of the application of the substantial similarity tests has been described as follows:

> As originally adopted in [*Krofft*], the extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.

*Id.* (citations omitted). "The intrinsic test is left to the trier of fact." *Benay v. Warner Bros. Entm't,* 607 F.3d 620, 624 (9th Cir. 2010).

        b)     Application

The FAC alleges that Kellytoy holds registered copyrights in the Squishmallow unicorn designs. Registration of a copyright is prima facie evidence of the validity of the copyright. *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002); 17 U.S.C. § 410(c). The FAC also alleges that Defendants had access to the Squishmallow designs before Defendants' developed and distributed their unicorn plush toy. It further alleges that Defendants copied the design for their unicorn plush toy from the Squishmallow unicorn. The FAC also includes images of the Squishmallow unicorns and of the Dan-Dee unicorn plush toy.

Defendants argue that these allegations are insufficient to state a claim for copyright infringement. They contend that Kellytoy was required, but failed to identify the specific similarit(ies) between the parties' works. Defendants also argue that Kellytoy alleges copyright infringement as to an unprotectable idea, not as to a protectable expression. Defendants assert that, at most, Kellytoy would be entitled to "thin" copyright protection for the Squishmallow unicorn. However, Defendants argue that the Kellytoy and Dan-Dee designs are not "virtually identical" as required under that standard.

Kellytoy is not entitled to copyright protection for the idea of a unicorn plush toy "or to elements of expression that necessarily follow from the idea of such dolls," such as "any similarity in expression resulting from either the [imagined] physiognomy of [unicorns] or from the nature of stuffed animals." *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir. 1987). However, Kellytoy states that it does not claim protection for those ideas, but rather the particular expression of those ideas in the Squishmallow unicorn design. As shown by the photographs, the Squishmallow unicorn does not bear a strong resemblance to a "realistic" representation of a unicorn. Rather, it is an artistic interpretation of a unicorn character, the design of which required using creativity that resulted in variations from the traditional image of a unicorn. Accordingly, the Squishmallow unicorn design contains expressive elements that extend beyond pure protected ideas. Further, in light of the allegations of complete copying by Defendants and the inclusion of images of both parties' designs in the FAC, it is not necessary that the FAC identify with particularity each alleged similarity between the works at the pleading stage.

Case 2:24-cv-01169-JLR-BAT    Document 135-11    Filed 02/07/2025    Page 272 of 816    Page ID
Case 2:18-cv-05399-JAK-AGR    Document 39    Filed 02/07/19    Page 8 of 10    Page ID
#:1230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

Construing the allegations in the light most favorable to Kellytoy, the FAC states a plausible claim for copyright infringement. The FAC presents allegations that, if assumed to be true, would be sufficient to establish all of the following: (i) ownership of a valid copyright; (ii) copying; and (iii) unlawful appropriation. For the foregoing reasons, the Motion is **DENIED** as to the copyright cause of action.[1]

    2.   <u>Trademark Infringement</u>

    a)   Legal Standards

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir. 1993)). To prove trade dress infringement, "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Entm't Inc.,* 581 F.3d 1138, 1145 (9th Cir. 2009) (citing *Disc Golf Ass'n v. Champion Discs,* 158 F.3d 1002, 1005 (9th Cir. 1998)).

Under the traditional definition of functionality, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Moldex-Metric, Inc. v. McKeon Prod., Inc.,* 891 F.3d 878, 881 (9th Cir. 2018) (citations omitted). The "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Id.* at 881-82. "[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that [courts] focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards,* 251 F.3d at 1259.

The Ninth Circuit has identified four factors as significant in assessing functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantage of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir. 1998). In addition to these four factors, courts inquire "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1072 (9th Cir. 2006).

The Ninth Circuit has described the framework for functionality as a two-part test. *See Millennium Labs., Inc. v. Ameritox, Ltd.,* 817 F.3d 1123, 1128-29 (9th Cir. 2015) ("[T]he test for functionality proceeds in two steps.") (quoting *Au-Tomotive Gold,* 457 F.3d at 1072). At "Step One," courts apply the *Disc Golf* factors to determine whether the asserted trade dress is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Id.* at 1129; *see also TrafFix Devices, Inc. v. Marketing*

---

[1] This is not a final determination as to the validity or scope of the claimed copyrights, or whether the Dan-Dee design is infringing. These issues concern fact-based matters that were not presented through the Motion.

EXHIBIT J
Page 79 of 168

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

*Displays, Inc.*, 532 U.S. 23, 32-33 (2001). "If the claimed trade dress is determined to be functional under Step One, then 'the inquiry is over.'" *Millennium Labs.*, 817 F.3d at 1129 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072). If not, the analysis proceeds to "Step Two," which addresses whether trade dress protection would impose a significant non-reputation-related competitive advantage. *Id.*

       b)     Application

Defendants argue that Kellytoy's claimed trade dress is described insufficiently through vague allegations in the FAC. Consequently, they contend that the allegations are not sufficient to provide notice of the claim. They assert that the description in the FAC is "so vague that the alleged trade dress covers nearly the entire market for anime-inspired plush toys." Dkt. 34 at 3. Defendants further argue that, because the claimed trade dress is functional, it is not eligible for trade dress protection. Defendants acknowledge that the FAC contains a conclusory pleading of non-functionality, but contend that is inadequate under the applicable standards absent more specific factual allegations.

Kellytoy responds that the written description of its trade dress in the FAC must be read in light of the attached images, and that together they provide a sufficient description. Kellytoy adds that it is not required to plead non-functionality of its claimed trade dress, although it claims to have done so.

Kellytoy is correct that "pictures of a product combined with a list of the elements of the trade dress" can be sufficient to put defendants on notice as to the claimed trade dress. *See* Dkt. 32 at 19 n.4. However, the mere presence of pictures and a written list is not *per se* sufficient, and must be evaluated on a case-by-case basis. The written description of the claimed trade dress in the FAC does not provide sufficient specificity as to the nature and scope of Kellytoy's claim. It states that the claimed trade dress

> includes, without limitation: (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture.

FAC ¶ 23.

This general description offers little insight into the scope or nature of Kellytoy's claim. In addition, the written description in the FAC can reasonably be construed as substantially broader than the trade dress protection Kellytoy actually seeks. It is also too broad to form the basis of a plausible claim for trade dress infringement.

Kellytoy argues that any ambiguities in its written description are "answered by reference to the images of the products at issue." Dkt. 32 at 19. However, in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-05399 JAK (AGRx) | Date | February 7, 2019 |
|---|---|---|---|
| Title | Kellytoy USA, Inc., et al. v. Dan-Dee International, Ltd., et al. | | |

There has been no showing that any amendment to the Complaint would be futile. In light of the well accepted principle that leave to amend should be freely given, it is appropriate to do so here. This outcome is confirmed by the representations in the Opposition to the Motion and at the hearing that Kellytoy can provide a more detailed statement in support of its trade dress allegations. *See id.* at 26-27.

For the foregoing reasons, the Motion is **GRANTED** without prejudice as to the federal trademark infringement causes of action.

> 3.    Remaining Causes of Action

Defendants assert that the third, fourth and fifth causes of action are derivative of the federal trademark causes of action and should be dismissed for the same reasons. Kellytoy did not respond to this argument in its brief or at the hearing.

The third, fourth and fifth causes of action arise from the same underlying allegations of trade dress infringement. Therefore, a parallel analysis to what has been stated above applies to these causes of action. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). Therefore, the Motion is **GRANTED** without prejudice as to the third, fourth and fifth causes of action.

**V.    Conclusion**

For the reasons stated in this Order, the Motion is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to the first cause of action. The Motion is **GRANTED** as to the second through fifth causes of action. Any amended complaint shall be filed no later than February 21, 2019.

**IT IS SO ORDERED.**

_____   :   _____

Initials of Preparer    ak

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TY INC. and DOES 1- 10, <br><br> Defendants. | Case No. 1:20-cv-00748 |

## FIRST AMENDED COMPLAINT

Plaintiffs KELLYTOY WORLDWIDE, INC., a California corporation ("Kellytoy Worldwide") and KELLYTOY (USA), INC., a California corporation ("Kellytoy USA") (together, "Kellytoy") bring this action against defendant TY INC. ("Ty") and DOES 1 through 10 (collectively, "Defendants") for injunctive relief and damages under the laws of the United States and the State of Illinois, as follows:

## JURISDICTION AND VENUE

1.      This action arises under the trademark laws of the United States, 15 U.S.C. §§ 1114 and 1125(a), under the statutory and common law of trademark/trade dress infringement and unfair competition.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.      This Court has personal jurisdiction over Defendants, as Defendants are doing business in the State of Illinois and this District and are subject to the jurisdiction of this Court.

EXHIBIT J <br> Page 82 of 168

5.      Ty has purposely and willfully directed its intentional misuse and infringement of the Kellytoy trademark and trade dress in the State of Illinois with the knowledge that the actions have caused damage within the State of Illinois.

6.      By transacting business with customers in this District, and by using the goodwill and reputation built by Kellytoy, in this district, Ty has purposely availed itself of the privilege of conducting business in this judicial district and has established sufficient contacts with the State of Illinois such that it is subject to jurisdiction in Illinois.

7.      To the extent Kellytoy's claims arise from Illinois statutory and/or common law, this Court has proper jurisdiction because it bears a logical relationship to the aggregate core of operative facts relating to Kellytoy's claims under the Lanham Act.

8.      Defendant Ty is a corporation organized under the laws of the state of Delaware with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

## NATURE OF THE ACTION

9.      This action, as alleged below, arises specifically because defendant Ty has embarked on a transparent campaign to hijack Kellytoy USA and Kellytoy Worldwide's longstanding and well-earned goodwill in the plush toy marketplace by infringing on Kellytoy USA's registered trademark and Kellytoy Worldwide's distinctive trade dress.  Ty, in its haste to sow customer confusion and consequently draw business from Kellytoy USA, has employed a name, PUFFIES, that is a virtual and linguistic replica of Kellytoy USA's registered PUFFY® trademark.  Indeed, the Ty mark sounds the same, looks the same, means essentially the same thing, and is used for similar goods as Kellytoy USA uses in connection with its long established PUFFY® mark.  That duplication is plainly deliberate – Ty is attempting to confuse customers into believing, falsely, that its goods are associated with and derive from the same source of origin as Kellytoy USA's products.  Beyond all that, Ty is offering for sale its competing plush

4548394.1
27183-838

2

EXHIBIT J
Page 83 of 168

toys (bearing the infringing PUFFIES mark) in the same tradeshows as Kellytoy USA's

products, all but assuring the intended and expected customer confusion.

10.     In addition, Kellytoy Worldwide's SQUISHMALLOW branded plush toys

("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one

of the world's hottest plush toy lines.  Kellytoy Worldwide's Squishmallows feature a highly

distinctive and widely recognized trade dress (described below), which Kellytoy Worldwide

pioneered and created.  Kellytoy Worldwide actively markets its Squishmallows through

numerous media outlets, including, without limitation, on social media, at tradeshows, through

Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com, and on

Kellytoy Worldwide's website and social media accounts, depicting images of its proprietary

Squishmallows line of plush toys.

11.     The explosion in popularity of Kellytoy Worldwide's Squishmallows, and the

resulting and widespread customer and industry recognition, has unfortunately led to illegal

imitation by some of Kellytoy Worldwide's competitors.  Defendants are merely the latest,

though most brazen and capable, of the intellectual property pirates seeking to conscript Kellytoy

Worldwide's goodwill for unfair competitive purposes.  Indeed, Kellytoy Worldwide has

discovered that defendant Ty has been making and offering for sale to customers nine (9) knock-

off products under the moniker Squish-A-Boos that incorporate Kellytoy Worldwide's Original

Squishmallows Trade Dress (defined below) for distribution to customers throughout the United

States and within this state and district that infringe upon Kellytoy Worldwide's Original

Squishmallows Trade Dress.

12.     Accordingly, Kellytoy has no alternative but to take steps to preserve and protect

its intellectual property from this naked attack, and it thus has filed this action for trademark

infringement, trade dress infringement, unfair competition and false designation of origin under

the Lanham Act, 15 U.S.C. § 1125(a), Illinois unfair competition laws, Illinois Deceptive Trade Practices Law pursuant to 815 ILCS §§ 510/1, *et seq*. and the common law trade dress infringement.

## THE PARTIES

13.     Kellytoy (USA), Inc. is a California corporation with its principal place of business located in Los Angeles, California.

14.     Kellytoy Worldwide, Inc. is a California corporation with its principal place of business located in Los Angeles, California.  (Kellytoy USA and Kellytoy Worldwide will sometimes be referred to collectively herein as "Kellytoy.")

15.     Kellytoy is in the business of developing, manufacturing and selling children's toys including, among other things, plush toys.

16.     Defendant Ty Inc. ("Ty") is a Delaware corporation with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

17.     Ty is in the business of manufacturing and selling children's toys, including plush toys.

18.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

19.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## **BACKGROUND FACTS**

### **Kellytoy and Its Protected Intellectual Property Rights**

20.     Kellytoy USA and Kellytoy Worldwide are innovative and highly successful creators, manufacturers, distributors and sellers of unique plush toys.

21.     Kellytoy USA has been in business for approximately three decades and in that time has developed a reputation for producing high quality, unique, and creative plush toys that are highly prized in the industry and in widespread demand by the consuming public.  Similarly, Kellytoy Worldwide has been in business for nearly two decades and developed its own reputation for producing high quality, unique, and creative plush toys, including, most recently, its highly successful Squishmallows line of plush toys in connection with the SQUISHMALLOW® and SQUISHMALLOWS brands.  (*See, e.g.,* **Exhibit 1**.)

22.     Kellytoy devotes extensive time and resources promoting and preserving its image and identity and the image and identity of its high-quality plush toys.  That includes, without limitation, creating distinctive designs and marks for use on its products, seeking U.S. trademark and copyright registrations for such marks and designs, and taking all steps necessary to preserve and protect its intellectual property.

### **Kellytoy USA's PUFFY® TRADEMARK**

23.     In particular, Kellytoy USA is the sole and exclusive owner of United States Federal Trademark Registration No. 4517007 for the trademark PUFFY (the "PUFFY Mark") for "plush toys, not intended for pets."  A true and correct copy of United States Certificate of Registration No. 4517007 for the PUFFY Mark is attached as **Exhibit 2**.

24.     Kellytoy USA has been and is the sole owner of all right, title and interest in and to the PUFFY Mark and the United States trademark registration therefor (occasionally referred to as the "Mark").

4548394.1
27183-838

5

EXHIBIT J
Page 86 of 168

25. Kellytoy USA has made widespread and prominent use of the PUFFY Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2009, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source, Kellytoy USA.  As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy USA's goods sold in connection with the PUFFY Mark, the PUFFY Mark has attained goodwill among consumers nationally.

### Kellytoy Worldwide's SQUISHMALLOW® TRADEMARK

26. Kellytoy Worldwide is the sole and exclusive owner of United States Federal Trademark Registration No. 5454574 for the trademark SQUISHMALLOW, often also designated as SQUISHMALLOWS, (the "SQUISHMALLOW Mark") for "plush toys."  A true and correct copy of United States Certificate of Registration No. 5454574 for the SQUISHMALLOW Mark is attached as **Exhibit 3**.

27. Kellytoy Worldwide has made widespread and prominent use of the SQUISHMALLOW Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2017, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source, Kellytoy Worldwide.  As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy Worldwide's goods sold in connection with the SQUISHMALLOW Mark, the SQUISHMALLOW Mark has attained goodwill among consumers nationally.

### Kellytoy Worldwide's Squishmallows Trade Dress

28. In 2016, Kellytoy conceived of and began creating its original Squishmallows line of plush toy designs that shares common, unique features distinguishing them from the goods of others (the "Original Squishmallows line"), representative examples of which are depicted on

**Exhibit 1** hereto.  Most of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the Squishmallows brand. In essence, Kellytoy created  a distinctive line of plush toys that has spawned a cultural craze in which numerous imitators have emerged, not the least of which are Defendants.

29.    Since that time, in addition to its Original Squishmallows line, Kellytoy has introduced various other lines of Squishmallows branded plush toys, such as its Squishmallows Stackables line, its Squishmallows Hugmees line, among others.  In this action, Kellytoy only asserts its trade dress rights garnered in its Original Squishmallows line of plush toys, as more fully described herein below, which has comprised approximately 95% of the total Squishmallows branded plush toys sold by Kellytoy Worldwide to date.

30.    In that regard, however, Kellytoy Worldwide has been and is the sole owner of all right, title and interest in and to the Original Squishmallows line that possesses unique, recognizable and distinguishing features that are common across much of the Original Squishmallows line.  From 2016 to the present, Kellytoy Worldwide has expended large sums of money in developing, advertising and promoting the Original Squishmallows Trade Dress (defined below), and the product designs bearing it, through the United States.  In fact, Kellytoy Worldwide has an annual marketing budget of approximately $1,000,000 and is spending approximately $500,000  annually in direct to consumer and business-to-business advertising in connection with its Squishmallows branded goods.

31.    Due to Kellytoy Worldwide's distinctive trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  In fact, because of Kellytoy Worldwide's extensive promotional activities and widespread display of plush toys bearing the Original Squishmallows Trade Dress directed to the

public, and a consequence of Kellytoy Worldwide's well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing embodying the trade dress as high quality goods connected with or offered by Kellytoy Worldwide.  As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kellytoy Worldwide.

32.    Consistent with that advertising and marketing scope, Kellytoy Worldwide sells a broad range of Squishmallows branded plush toys in its Original Squishmallows line featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its distinctive combination of shapes, colors, textures and graphics – serve as a distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto (collectively, together with **Exhibit 1**, the "Original Squishmallows Trade Dress").

33.    Kellytoy Worldwide has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Original Squishmallows line.  And due to Kellytoy Worldwide's distinctive designs, robust marketing efforts, media

coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kellytoy Worldwide's extensive promotional activities and widespread display of its Original Squishmallows line directed to the public and as a result of the fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys bearing the Original Squishmallows Trade Dress as high quality goods connected with or offered by a single source, Kellytoy Worldwide. The Original Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy Worldwide.

34. Beyond merely being original and inherently distinctive, the Original Squishmallows Trade Dress is also widely recognized by consumers. A simple Internet search using the Google search engine yields, for example, about 1,370,000 "hits" for the search term "Squishmallows."

35. The scope of Kellytoy Worldwide's sales reflects the market penetration of its intellectual property. The company markets and sells its Squishmallows branded plush not only through thousands of retail stores nationwide, but additionally on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of selected pages from website located at <squishmallows.com> are attached as **Exhibit 4**, which specifically call out the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Worldwide's proprietary trade dress." Kellytoy Worldwide's Squishmallow website traffic has, not surprisingly, grown exponentially since its launch in 2017, and has now reached an average in excess of 5,500 visits per day.

36.     Kellytoy Worldwide also actively engages in promoting its Original Squishmallows line of branded plush toys through its numerous social media accounts, including on Instagram, Facebook, and Twitter.  Indeed, Kellytoy Worldwide's legion of loyal fans of its line of Original Squishmallows line of branded plush toys have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy Worldwide's Original Squishmallows line.  For example, the average Squishmallows post likes on Instagram, for example, hovering over 2000+ per post and 45-100 average comments per post.  In fact, Kellytoy Worldwide's Squishmallows branded plush toys have garnered over 200 Million media impressions and since July 21, 2017, Kellytoy Worldwide's paid placements on Facebook and Instagram campaigns have reached more than 23.6 MILLION unique individuals and 83.7 MILLION impressions.

37.     Kellytoy Worldwide uses digital ads to advertise its Original Squishmallows line of plush toys.  Owing to their immense popularity, these ads promoting specific retailers have average click through rates of 30+% (the industry average is rates of 30+% (the industry average is 1-2%).

38.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 5** hereto, including many mainstream media publications such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, the Original Squishmallows line has been also recognized by: (1) The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2) *LA Parent* in its October 2017 issue, under the "Products We Love" section, which specifically identified designs from the Original Squishmallows line; and (3) *OK! Magazine* in its August 21, 2017 issue, which, as depicted below, featured Squishmallows and described them

in flattering terms, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."

39.     There are myriad further examples of the popularity and market penetration of the Original Squishmallows line.  To name just a few, designs from the Original Squishmallows line were featured in the October 2017 issues of *L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

40.     In fact, Kellytoy Worldwide's Original Squishmallows line sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.



41.     Reflecting the quality of the goods, Kellytoy Worldwide's Original Squishmallows line has also received numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more

EXHIBIT J
Page 92 of 168

fully set out in **Exhibit 5**.  Thus, for example, Kellytoy Worldwide's Original Squishmallows line was named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

42.    The popular blog *Trendy Mom Reviews* listed Kellytoy Worldwide's Original Squishmallows line as one of "The Best Gifts for 2018!"  Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy Worldwide's Original Squishmallows line of branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

43.    The Original Squishmallows line of branded toys were also:  (1) named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!; (2) selected as among the "5 Editor's Picks From Toy Fair" 2019 by *Gifts & Decorative Accessories*; (3) featured by *The Toy Insider* in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress"; (4) featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue, in *The Toy Book's* August 5, 2019 issue (specifically featuring the upcoming Halloween Squishmallows line), and in *The Toy Book's* issue (specifically featuring the Squishmallows branded turtle) on May 15, 2019; (5) featured in *TFE Toys & Family Entertainment's* NYC Toy Fair 2019 issue; and (6) won the *Parent and Teacher Choice Award* for 2019 from HowtoLearn.com.

44.    Kellytoy Worldwide's Original Squishmallows line has become so popular that a selection of designs were included in the celebrity gift bags distributed to the celebrity attendees in connection with the 2019 Teen Choice Awards, including Jenn Ortega, Lucy Hale, Lil Nas X, Sarah Hyland, One Republic, among numerous others.

45.     This widespread publicity and recognition has occurred in conjunction with Kellytoy Worldwide's advertising efforts concerning the Original Squishmallows line, which, as alleged above, have comprised consistent and robust marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy Worldwide's Squishmallows currently have over 128,000 Instagram followers, over than 85,000 Facebook followers, and more than 28,000,000 views on the popular TikTok video app – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy Worldwide regularly publishes photographs of its Squishmallows plush toys.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page, bearing photographs of Squishmallows plush toys, is attached as **Exhibit 6**, which specifically calls out the fact that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."

46.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy Worldwide's Original Squishmallows line of products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Twitter, TikTok, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares" and all feature, among other things, depictions of Kellytoy Worldwide's Original Squishmallows line of plush toys.  In fact, several members of the public have created their own Instagram fan accounts and Facebook groups, all bearing content featuring the Original Squishmallows line of branded plush toys.

47.     Kellytoy Worldwide's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

48.     As a direct result of Kellytoy Worldwide's efforts at promoting and building its brand, Kellytoy Worldwide's Original Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Original Squishmallows Trade Dress in the United States and around the world.  In fact, Kellytoy Worldwide's Original Squishmallows line is sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1,000 Costco stores, 5,500 Wal-Mart stores, 8,500 Walgreens stores, 6,200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Justice, Hallmark stores, Albertson's, Knotts Berry Farms and numerous others.

49.     Furthermore, during several summer 2019 grand openings for Costco, the highly coveted 24 inch Original Squishmallows plush sold out within two days, exceeding store expectations and projected demand.

50.     Since the summer of 2017, Kellytoy Worldwide has shipped approximately a whopping 45 million (45,000,000) units of its Original Squishmallows line and there is no indication that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products embodying the Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

51.     Nor has the pace of sales of Kellytoy Worldwide's Original Squishmallows line of branded toys slowed.  To the contrary, sales of the Original Squishmallows line of plush have been steadily increasing and there is no indication of their popularity waning any time soon. These goods have, in fact, become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts and jewelry, bearing the images of some of Kellytoy Worldwide's

most popular Original Squishmallows branded toys. Few plush lines can boast having third parties attempt to "merchandise" its copyrighted designs and goods generally bearing its trademark – something typically reserved for Disney, Looney Tunes, and the like. But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by three different infringers, as depicted below:

  





52.     The immense popularity – indeed ubiquity – of Kellytoy Worldwide's Original Squishmallows line of plush toys, including those set forth on **Exhibit 1**, has now reached the point where Kellytoy Worldwide has recently embarked on a global initiative to license the Original Squishmallows designs and trademark to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming.  (*See, e.g.*, **Exhibit 7** hereto.)

53.     As a result of the extensive efforts to promote, advertise and sell the products embodying the Original Squishmallows Trade Dress and its deliberate efforts to specifically publicize the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy Wordlwide, Inc.'s proprietary trade dress," consumers have come to associate the Original Squishmallows Trade Dress with a designation of source and the products are inherently distinctive and/or have acquired secondary meaning.

54.     All of which is to reiterate that due to the Original Squishmallows line's massive success and popularity, consumers have come to associate Kellytoy Worldwide's high-quality

EXHIBIT J
Page 97 of 168

Original Squishmallows line of plush toys with the Original Squishmallows Trade Dress and, conversely, have come to recognize the Original Squishmallows Trade Dress as a designation of source. But that success has come at a price – the popularity of Kellytoy's Original Squishmallows line of branded goods has attracted many imitators, such as Defendants, all of whom are attempting to benefit from Kellytoy Worldwide's hard earned goodwill, and to do so illegally. In fact, Kellytoy has pursued numerous third-party infringers who have co-opted the Original Squishmallows Trade Dress and succeeded in stemming such infringements. Defendants, however, are uniquely positioned in the marketplace – through their massive marketing and distribution network – to capitalize upon Kellytoy Worldwide's Original Trade Dress, as discussed in greater detail below.

### Defendants' Unlawful Conduct

55.     At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy USA's PUFFY Mark or Kellytoy Worldwide's Original Squishmallows Trade Dress. Ty is a direct competitor of Kellytoy in the plush toy market.

56.     Ty has made a career out of copying the original designs of others and using its large market share to usurp the goodwill of its competitors. Ty is a serial copier of the original designs of others.

57.     Most recently, during the week of the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Kellytoy USA learned that, in spite of Kellytoy USA's prior use and registration of the PUFFY Mark, Ty had a pending United States trademark application, based on intent to use, for the trademark TY PUFFIES. During that same show, Kellytoy Worldwide learned that Ty was offering for sale at that same tradeshow goods that embody the Original Squishmallows Trade Dress.

EXHIBIT J
Page 98 of 168

58.     Consequently, by letter dated January 15, 2020, Kellytoy wrote directly to defendant Ty demanding that it cease-and-desist from using Kellytoy USA's PUFFIES trademark and copying Kellytoy Worldwide's Original Squishmallows Trade Dress.  Ty responded by denying its wrongful conduct and essentially stating its intention to continue to infringe Kellytoy's proprietary rights by continuing to offer the Infringing Plush (defined below) for sale, including at the upcoming New York Toy Fair – the biggest toy tradeshow in the country, if not the world.

59.     Kellytoy is informed and believes that sometime in 2019, and notably well after Kellytoy USA established its reputation in its PUFFY Mark and Kellytoy Worldwide established its reputation in its Original Squishmallows Trade Dress – and after the Mark and Trade Dress acquired distinctiveness in the marketplace – Defendant Ty began offering for sale various plush toy lines bearing a trademark and trade dress that are substantially and confusingly similar to Kellytoy USA's PUFFY Mark and to Kellytoy Worldwide's Original Squishmallows Trade Dress.

60.     Specifically, Kellytoy USA is informed and believes that, at the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Ty used the PUFFIES trademark in connection with its plush toys (hereinafter collectively referred to as the "Infringing Puffies") that bears close similarity, in sight, sound, and meaning with Kellytoy USA's PUFFY Mark and, as set forth below:



61.     Making matters even worse, at the same tradeshow, Ty displayed and marketed plush toys under the moniker "Squish-a-Boos" bearing the Original Squishmallows Trade Dress (hereinafter collectively referred to as the "Infringing Squish Plush") – plush toys that so closely resemble the unique "look and feel" of the Original Squishmallows Trade Tress that manifest customer confusion was plainly intended and is certain to occur.  Photographs of the Infringing Squish Plush are collectively attached hereto as **Exhibit 8**.

62.     Defendants' Infringing Puffies and Infringing Squish Plush shall hereinafter be referred to collectively as the "Infringing Plush."

63.     Kellytoy is specifically informed and believes, for example, that Defendants manufactured in, and imported from, China the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy USA sells its

PUFFY branded plush and Kellytoy Worldwide sells its Original Squishmallows line. Indeed, both Kellytoy and Ty sell plush toys to many of the same retailers, such as Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS.

64. In fact, Kellytoy Worldwide currently sells its authentic SQUISHMALLOWS branded plush to Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS and expects that Ty will make attempts to sell to its copies of Kellytoy's Original Squishmallows at prices lower than Kellytoy Worldwide sells its authentic Original Squishmallows.

65. Such unauthorized activities are clearly intended to draw on the goodwill Kellytoy USA has garnered in its PUFFY Mark and that Kellytoy Worldwide has garnered in its Original Squishmallows Trade Dress, and to compete unfairly and illegally for Kellytoy's customers through trademark confusion, trade dress confusion, and predatory tactics.

66. Kellytoy is informed and believes, for example, that Ty has been offering to sell the Infringing Squishy Plush to customers at prices that are lower than the prices charged by Kellytoy Worldwide for its authentic Original Squishmallows line of branded plush. Kellytoy Worldwide is further informed and believes that Ty is able to undercut Kellytoy Worldwide's sales prices because, rather than investing in creating its own designs and identity, Ty has instead copied and infringed Kellytoy Worldwide's proprietary Original Squishmallows Trade Dress and otherwise because its Infringing Squishy Plush are of inferior quality as compared to Kellytoy Worldwide's Original Squishmallows branded plush.

67. Kellytoy is additionally informed and further believes that Defendants, without Kellytoy's consent or permission, advertise, promote, and display, and intend to sell and distribute, the Infringing Plush in United States commerce and that Defendants' Infringing Plush are marketed and will be sold in the same channels of trade as Kellytoy's authentic plush toys.

68.     The Defendants' deliberate misconduct in copying, advertising, and, offering for sale and otherwise using the PUFFY Mark trademark and the Original Squishmallows Trade Dress in connection with the Infringing Plush – including by copying wholesale the shape and look of Kellytoy Worldwide's Original Squishmallows Trade Dress – constitute trademark infringement, trade dress infringement, and false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that the Infringing Plush originate from a common source with Kellytoy's authentic PUFFY branded and Original Squishmallows plush toys, and/or that Defendants' Infringing Plush have been sponsored, approved or licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.

69.     These activities are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of Defendants' toys bearing the PUFFIES trademark and the Original Squishmallows Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of, among other laws, 15 U.S.C. §§ 1114 and 1125(a).

70.     Kellytoy is informed and believes that the Defendants' activities were conducted willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, with the intent to trade on the enormous goodwill Kellytoy USA has earned in its PUFFY Mark and Kellytoy Worldwide has garnered in its Original Squishmallows Trade Dress, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants offer for sale and sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy or, at the very least, from a common source as Kellytoy's PUFFY and Original Squishmallows lines of branded plush toys.

71.      Defendants, by their unauthorized infringement, copying and use of Kellytoy's

PUFFY Mark and Original Squishmallows Trade Dress, have engaged and will engage in acts of

trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful

deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public

acceptance of Kellytoy's original works.  Defendants' activities have damaged and will continue

to damage the reputation, business and good will of Kellytoy nationally and in this judicial

district.

72.      Upon information and belief, unless enjoined by the Court, Defendants will

continue and further escalate their infringing activities.

73.      Kellytoy has no adequate remedy at law.  Thus, these activities of Defendants

have caused and, if not enjoined, will continue to cause irreparable, immediate and impending

harm and damage to Kellytoy's business, and to the business, business reputation and good will

of Kellytoy.

### **FIRST CAUSE OF ACTION**

**(Federal Trademark Infringement – 15 U.S.C. § 1114(1)-(2))**
(All Defendants)

74.      Kellytoy USA repeats, realleges and incorporates each of the allegations made

above as if fully set forth herein.

75.      Kellytoy USA owns and has a protectable interest in the registered PUFFY Mark.

76.      As the owner of all rights, title and interest in and to the PUFFY Mark, Kellytoy

USA has standing to maintain in action for trademark infringement under the Lanham Act,

including 15 U.S.C. §1114.

77.      Without Kellytoy USA's authorization or consent, and having knowledge of

Kellytoy USA's prior rights in the PUFFY Mark, Defendants have designed, manufactured,

distributed, advertised, offered for sale and/or sold highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy USA, in or affecting interstate commerce.

78.     Defendants have caused actual confusion, a likelihood of confusion, mistake and deception as to the source of origin, sponsorship, authorization, association, or affiliation of Defendants' goods, such that the public has been confused and there is a likelihood that the public will be confused into believing that the products Defendants promote, distribute, and sell are directly sponsored by, associated with, or originate from the same source as Kellytoy USA's plush toys sold in connection with the PUFFY Mark.

79.     Defendants' use of the PUFFY Mark violates sections 32(1) and (2) of the Lanham Act, 15 U.S.C. § 1114(1)-(2), because it constitutes unauthorized, willful and/or deliberate use in commerce of reproductions, counterfeits, copies, and/or colorable imitations of Kellytoy USA's federally-registered mark in connection with the sale, offering for sale, distribution, and advertising of products and services in a manner likely to cause confusion, mistake, and deception.

80.     On information and belief, Defendants' acts have been willful and deliberate.

81.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy USA's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy USA to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy USA has suffered damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy USA's lost profits.

82.     Defendants' actions described above have caused and will continue to cause irreparable damage to Kellytoy USA, unless Defendants are restrained by this Court.  Kellytoy

4548394.1

27183-838

23

USA has no adequate remedy at law with regard to Defendants' infringing conduct.

Accordingly, Kellytoy USA is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy USA's PUFFY Mark, or any colorable imitation or variation thereof, including PUFFIES, in connection with the sale and/or marketing of any products.

83.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

### (Trademark Infringement and
### False Designation of Origin and False Description -- 15 U.S.C. §1125)
#### (All Defendants)

84.     Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

85.     Kellytoy USA owns and has a protectable interest in the registered PUFFY Mark. As the owner of all rights, title and interest in and to PUFFY Mark, Kellytoy USA has standing to maintain an action for false designation of origin and unfair competition under the Lanham Act, including 15 U.S.C. § 1125.

86.     The PUFFY Mark is highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy USA.

87.     Kellytoy USA owns all right, title and interest in and to the PUFFY Mark.

88.     Without Kellytoy USA's authorization or consent, and having knowledge of Kellytoy USA's prior rights in the PUFFY Mark, Defendants have imported, distributed, advertised, offered for sale and sold, and/or will continue to import, distribute, advertise, offer

4548394.1
27183-838

EXHIBIT J
Page 105 of 168

for sale, highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy USA, in or affecting interstate commerce.

89.     Defendants' PUFFIES trademark is confusingly similar to the PUFFY Mark. Defendants' use of the PUFFY Mark has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy USA's goodwill and reputation as symbolized by the PUFFY Mark.

90.     Defendants' use and further threatened uses of the PUFFY Mark thus constitutes trademark infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

91.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy USA's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy USA to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy USA has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy USA's lost profits.

92.     Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy USA, unless Defendants are restrained by this Court. Kellytoy USA has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy USA is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the PUFFY Mark, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

93.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C

§ 1117.

## THIRD CAUSE OF ACTION

**(Trademark Infringement, Trade Dress Infringement,**
**False Designation of Origin and False Description -- 15 U.S.C. §1125)**
(All Defendants)

94.     Kellytoy Worldwide repeats, realleges and incorporates each and every allegation

made above as if fully set forth herein.

95.     Kellytoy Worldwide owns and has a protectable interest in the Original

Squishmallows Trade Dress.

96.     As owner of all rights, title and interest in and to the Original Squishmallows

Trade Dress, Kellytoy Worldwide has standing to maintain an action for trade dress infringement

under the Lanham Act including, 15 U.S.C. § 1125.

97.     The Original Squishmallows Trade Dress is non-functional and highly distinctive

and has each become associated in the public mind with plush toy products of the highest quality

and reputation finding their origin in a single source, Kellytoy Worldwide.

98.     Original The Squishmallows Trade Dress has acquired secondary meaning based

upon, at least in part to, the amount and manner of advertising of products embodying the

Squishmallows Trade Dress, the volume of sales, as well as, the length and manner of use of the

products.

99.     The Original Squishmallows Trade Dress – comprised of a proprietary combination

of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture

and graphics– is non-functional and highly distinctive, and has become associated in the minds of

the consuming public with plush toy products of the highest quality and reputation finding their

origin in a single source, Kellytoy Worldwide.  Indeed, the Original Squishmallows Trade Dress

when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with Kellytoy's Original Squishmallows line. The non-functional nature of these features are evidenced and clear, in part, by reference to the following: (1) the Original Squishmallows Trade Dress is not the subject of an expired or unexpired utility patent; (2) the unique combination of stylistic elements yielding no utilitarian advantage; (3) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy Worldwide's whimsical, abstract renditions of animals, and rectangular shaped plush toys, spherical shaped plush toys, cube shaped plush toys, realistic plush toy animals, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, pvc pellets, cotton, hard foam, etc.); furthermore, when the features of the Original Squishmallows Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (4) Kellytoy Worldwide's not touting or marketing utilitarian advantages of its Original Squishmallows Trade Dress, and (5) the Original Squishmallows Trade Dress not resulting from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys, e.g., the egg/bell shape provides no manufacturing cost savings (other shapes such as squares, circles, triangles are equally, or less, expensive to manufacture) and there are numerous less expensive shell materials (e.g., Tricot, EF Velboa and Velboa), stuffings (e.g., regular polyester stuffing and 3D light weight stuffing), and ways to depict the facial features other than embroidery (e.g., printing and sublimation printing). In fact, Defendants sell numerous lines of plush toys that do not co-opt the Original Squishmallows

100.   Trade Dress, such as its Beanie-Boos line of plush toys. Moreover, protection of the Original Squishmallows Trade Dress as a trademark would not impose a non-reputation-

related competitive disadvantage, as there are many ways to design an equally pleasing plush toy without copying the Original Squishmallows Trade Dress. Regardless, however, the product features of the Original Squishmallows Trade Dress do not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Original Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Original Squishmallows Trade Dress from the source of other toys.

101.    Without Kellytoy Worldwide's authorization or consent, and having knowledge of Kellytoy Worldwide's prior rights in the Original Squishmallows Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will continue to import, distribute, advertise, offer for sale, and sell replicas of the Original Squishmallows Trade Dress to the consuming public in direct competition with Kellytoy Worldwide, in or affecting interstate commerce.

102.    The Infringing Squishy Plush designs are, each alone and together, confusingly similar to the Original Squishmallows Trade Dress. Defendants' use of the Original Squishmallows Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Original Squishmallows Trade Dress.

103.    Defendants' use and further threatened uses of the Original Squishmallows Trade Dress thus constitute trademark infringement, trade dress infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

104.    As further evidence of Ty's intent to trade upon Kellytoy Worldwide's goodwill in Kellytoy Worldwide's Original Squishmallows Trade Dress, in order to ensure consumer confusion, Defendants adopted a mark – for use in connection with the Infringing Squishy Plush,

4548394.1
27183-838

28

namely Squish-A-Boos – that includes the same "squish" prefix and that has same number of syllables and sound as the SQUISHMALLOW Mark.

105.    As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy Worldwide's rights in the Original Squishmallows Trade Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy worldwide to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy Worldwide has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy Worldwide's lost profits.

106.    Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy Worldwide, unless Defendants are restrained by this Court. Kellytoy Worldwide has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy Worldwide is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using Kellytoy Worldwide's Original Squishmallows Trade Dress, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

107.    Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## **FOURTH CAUSE OF ACTION**

### **(Common Law Trade Dress Infringement)**
(All Defendants)

108.    Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

4548394.1
27183-838

109.     This claim arises under the common law of this State relating to trade dress infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

110.     Kellytoy Worldwide is the owner of all right, title, and interest in and to the Original Squishmallows Trade Dress used by Kellytoy Worldwide by virtue of its extensive manufacture and sale of products bearing such trademarks and trade dress as set forth in the preceding paragraphs of this Complaint.  In particular, because of their enormous sales and publicity, Kellytoy Worldwide has acquired common law trade dress rights in and to the Original Squishmallows Trade Dress. Kellytoy Worldwide's common law trade dress is distinctive, and furthermore, have acquired secondary meaning.

111.     The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy Worldwide's common law trade dress. Such unauthorized use by Defendants of Kellytoy Worldwide's common law trade dress constitutes common law trade dress infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy Worldwide when, in fact, they are not.

112.     Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy Worldwide's common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kellytoy Worldwide and to place others in the position to

palm off its goods as those of Kellytoy Worldwide, and as such, Defendants have committed trade dress infringement and unfair competition under the common law.

113.     By such actions in infringing' Kellytoy Worldwide's common law trade dress, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy Worldwide and impairing' Kellytoy Worldwide's valuable rights in and to such trade dress.

114.     Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy Worldwide's rights, and Kellytoy Worldwide is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

115.     Kellytoy Worldwide has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy Worldwide's rights in and to its trade dress, and to Kellytoy Worldwide's business, reputations, and goodwill.

## **FIFTH CAUSE OF ACTION**

### **(Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq.*)**
(All Defendants)

116.     Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

117.     Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the Original

Squishmallows Trade Dress and using deceptive representations or designations of origin in connection with Defendants' products.

118.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy Worldwide is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy Worldwide, in that the public will likely associate Defendants' goods with Kellytoy Worldwide and/or Kellytoy Worldwide's goods, and cause the dilution of the distinctive quality of Kellytoy Worldwide's Original Squishmallows Trade Dress, and Kellytoy Worldwide's common law trade dress in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy Worldwide is entitled to injunctive relief.

119.    The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy Worldwide, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy Worldwide is entitled to injunctive relief.

120.    The unauthorized use by Defendants of the Original Squishmallows Trade Dress is causing and is likely to cause substantial injury to the public and to Kellytoy Worldwide.

## **SIXTH CAUSE OF ACTION**

### **(Illinois Common Law Unfair Competition)**
(All Defendants)

121.    Kellytoy Worldwide repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

122.     Defendants' acts constitute common law trade dress infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trade dress infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

123.     Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

124.     Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy Worldwide, and Kellytoy Worldwide is left with no adequate remedy at law such that the damage to Kellytoy Worldwide will continue unless and until enjoined by the Court.

## SEVENTH CAUSE OF ACTION

### (Common Law Trademark Infringement)
(All Defendants)

125.     Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if full set forth herein.

126.     This claim arises under the common law of this State relating to trademark infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

127.     Kellytoy USA is the owner of all right, title, and interest in and to the PUFFY Mark used by Kellytoy USA by virtue of its extensive manufacture and sale of products bearing such trademark as set forth in the preceding paragraphs of this Complaint.  In particular, because of their enormous sales and publicity, Kellytoy USA has acquired common law trademark rights

in and to the PUFFY Mark. Kellytoy USA's common law trademark is distinctive, and furthermore, has acquired secondary meaning.

128.     The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy USA's common law trademark. Such unauthorized use by Defendants of Kellytoy USA's common law trademark constitutes common law trademark infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy USA when, in fact, they are not.

129.     Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy USA's common law trademark with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off their goods as those of Kellytoy USA and to place others in the position to palm off its goods as those of Kellytoy USA, and as such, Defendants have committed trademark infringement and unfair competition under the common law.

130.     By such actions in infringing' Kellytoy USA's common law trademark, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy USA and impairing' Kellytoy USA's valuable rights in and to such trademark.

131.     Kellytoy USA is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy USA's rights, and Kellytoy USA is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

132.     Kellytoy USA has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy USA's rights

in and to its trademark, and to Kellytoy USA's business, reputation, and goodwill.

## EIGHTH CAUSE OF ACTION

### (Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq*)
(All Defendants)

133.    Kellytoy USA repeats, realleges and incorporates each and every allegation made above as if set forth herein.

134.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the PUFFY Mark and using deceptive representations or designations of origin in connection with Defendants' products.

135.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy USA is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy USA, in that the public will likely associate Defendants' goods with Kellytoy USA and/or Kellytoy USA's goods, and cause the dilution of the distinctive quality of Kellytoy USA's PUFFY Mark in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq*., for which Kellytoy USA is entitled to injunctive relief.

136.    The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection

of Defendants with Kellytoy USA, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy

USA is entitled to injunctive relief.

137.     The unauthorized use by Defendants of the PUFFY Mark is causing and is likely

to cause substantial injury to the public and to Kellytoy USA.

## NINTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)
(All Defendants)

138.     Kellytoy USA repeats, realleges and incorporates each and every allegation made

above as if fully set forth herein.

139.     Defendants' acts constitute common law trademark infringement in violation of

state common law, including the common law of the State of Illinois. Such acts of common law

trademark infringement constitute unfair competition within the meaning of the common law,

including the common law of the State of Illinois.

140.     Upon information and belief, Defendants' conduct was and continues to be

willful, intentional, and in bad faith.

141.     Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy

USA, and Kellytoy USA is left with no adequate remedy at law such that the damage to Kellytoy

Worldwide will continue unless and until enjoined by the Court.

## JURY DEMAND

Kellytoy Worldwide and Kellytoy USA demand a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Kellytoy Worldwide and Kellytoy USA pray for judgment against

Defendants as follows:

1.      That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be preliminarily and permanently enjoined and restrained from:

(i)      Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the PUFFY Mark or the Original Squishmallows Trade Dress;

(ii)      Using the Original Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii)      Using the PUFFY Mark or any confusingly similar mark, including without limitation PUFFIES, in connection with plush toys or other goods;

(iii)      Using the Original Squishmallows Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

(iv)      Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers used by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the PUFFY Mark or the Original Squishmallows Trade Dress;

(v)  Infringing or contributing to the infringement of any of Kellytoy's trademarks or trade names, including without limitation the PUFFY Mark and/or Original Squishmallows Trade Dress, or otherwise engaging in unfair competition with Kellytoy in any manner or engaging in any conduct

tending to falsely represent or likely to confuse, mislead or deceive

suppliers, purchasers, or any member of the public into thinking that

Defendants or any of their products are affiliated with Kellytoy or that

Kellytoy has otherwise sponsored, approved, or licensed any products or

services of Defendants;

(vi)    Engaging in any other activity constituting unfair competition with

Kellytoy, or constituting infringement of the PUFFY Mark or the Original

Squishmallows Trade Dress; and

(vii)    Assisting, aiding, or abetting any other person or business entity in

engaging or performing any of the activities referred to in subparagraphs

(i) through (vi) above, or effecting any assignments or transfers, forming

new entities or associations, or utilizing any other device for the purpose of

circumventing or otherwise avoiding the prohibitions set forth in

subparagraphs (i) through (vi) above;

2.     That Defendants be directed to file with the Court and serve on Kellytoy, within

thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in

detail the manner and form in which Defendants have complied with the injunction;

3.     That Kellytoy USA has superior rights to exclusive use in the PUFFY Mark and

that Kellytoy Worldwide has superior rights to exclusive use in the Original Squishmallows

Trade Dress in connection with toys and/or pillows vis-à-vis Defendants;

4.     That Defendants shall not in the future file or maintain an application for

registration or registration of any mark that includes "puffy" or "puffies" or any designation(s)

confusingly similar thereto with the United States Patent and Trademark Office or any other

governmental or state authority;

5.   That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the PUFFY Mark, the Original Squishmallows Trade Dress, or any design, word or designation confusingly similar to the PUFFY Mark and/or the Original Squishmallows Trade Dress, including without limitation, PUFFIES, or any alternate spellings thereof;

6.   That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of each of the Original Squishmallows Trade Dress and the PUFFY Mark and trebling of those damages under 15 U.S.C. § 1117;

7.   Adjudge that each of the Defendants, by their unauthorized use of Kellytoy's PUFFY Mark and the Original Squishmallows Trade Dress for plush toys, and such other acts as it may have undertaken relating to the PUFFY Mark and/or Original Squishmallows Trade Dress, have violated Kellytoy's rights under 15 U.S.C. §§ 1114, 1125(a) and 1125(d), under Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq., Illinois* state law, and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the PUFFY Mark and the Original Squishmallows Trade Dress;

8.   Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the PUFFY Mark or the Original Squishmallows Trade Dress

in the United States on Defendants' behalf and inform them that they must immediately cease such use;

9.     Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity bearing or using the PUFFY Mark (including, e.g., the PUFFYIES mark), or the Original Squishmallows Trade Dress;

10.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the PUFFY Mark or the Original Squishmallows Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, including without limitation the PUFFIES designation, and all plates, molds, matrices, programs and other means of making same;

11.     That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under either or both of the PUFFY Mark and/or the Original Squishmallows Trade Dress:

        (i)     the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

        (ii)     the total number of units distributed and sold; and

        (iii)     the total number of units remaining in inventory; and

        (iv)     a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.     Direct Defendants to pay the costs of corrective advertising;

13.     Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

18.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

19.     Providing that Defendants' conduct constitutes willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

20.     Providing that Defendants' conduct will create a likelihood of dilution and injury to Kellytoy's business reputation in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

21.     Providing that Defendants used Kellytoy USA's PUFFY Mark and/or Kellytoy Worldwide's Original Squishmallows Trade Dress with the intent to cause confusion and to deceive the public in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

4548394.1
27183-838

41

22.    Providing that Defendants have injured Kellytoy by depriving it of sales of its genuine goods and services, by injuring its business reputation, and by passing off Defendants' goods as Kellytoy's goods and/or created a likelihood of confusion and/or false designation of origin, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

23.    Providing that Defendants' willfully misappropriated and used the PUFFY Mark and/or Original Squishmallows Trade Dress and such conduct constitutes misappropriation, unfair competition and unjust enrichment, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law; and

24.    For such other and further relief as the Court may deem just and proper.

DATED: May 21, 2020                    Respectfully sutmitted,

                                       _____/ s / Dean D. Niro_____
                                       Dean D. Niro
                                       Olivan D. Yang
                                       VITALE, VICKREY, NIRO, SOLON & GASEY LLP
                                       311 S. Wacker Dr., Suite 2470
                                       Chicago, IL 60606
                                       (312) 236-0733
                                       dniro@vvnlaw.com
                                       oyang@vvnlaw.com


DATED: May 21, 2020                    _____/ s / Mark B. Mizrahi_____
                                       Todd M. Lander
                                       Mark B. Mizrahi
                                       FREEMAN, FREEMAN & SMILEY, LLP
                                       1888 Century Park East, Suite 1500
                                       Los Angeles, CA 90067
                                       (310) 255-6100
                                       todd.lander@ffslaw.com
                                       mark.mizrahi@ffslaw.com
                                       *Admitted Pro Hac Vice*

                                       Attorneys for Plaintiffs KELLYTOY WORLDWIDE,
                                       INC. and KELLYTOY (USA), INC.

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was served upon all counsel of record via filing with CM/ECF on May 21, 2020.

_____ */ s / Mark B. Mizrahi* _____
Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
(310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| KELLY TOYS HOLDINGS, LLC, KELLYTOY WORLDWIDE, INC., and KELLYTOY (USA), INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TY INC. and DOES 1- 10, <br><br> Defendants. | Case No. 1:20-cv-00748 |

## SECOND AMENDED COMPLAINT

Plaintiffs KELLY TOYS HOLDINGS, LLC, a Delaware limited liability company ("Kellytoy Holdings"), KELLYTOY WORLDWIDE, INC., a California corporation ("Kellytoy Worldwide") and KELLYTOY (USA), INC., a California corporation ("Kellytoy USA") (collectively, "Kellytoy") bring this action against defendant TY INC. ("Ty") and DOES 1 through 10 (collectively, "Defendants") for injunctive relief and damages under the laws of the United States and the State of Illinois, as follows:

## JURISDICTION AND VENUE

1.     This action arises under the trademark laws of the United States, 15 U.S.C. §§ 1114 and 1125(a), under the statutory and common law of trademark/trade dress infringement and unfair competition.

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.

3.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.     This Court has personal jurisdiction over Defendants, as Defendants are doing

4697917.2
27183-838

1

business in the State of Illinois and this District and are subject to the jurisdiction of this Court.

5.     Ty has purposely and willfully directed its intentional misuse and infringement of Kellytoy's trademark and trade dress rights in the State of Illinois with the knowledge that the actions have caused damage within the State of Illinois.

6.     By transacting business with customers in this District, and by using the goodwill and reputation built by Kellytoy, in this district, Ty has purposely availed itself of the privilege of conducting business in this judicial district and has established sufficient contacts with the State of Illinois such that it is subject to jurisdiction in Illinois.

7.     To the extent Kellytoy's claims arise from Illinois statutory and/or common law, this Court has proper jurisdiction because it bears a logical relationship to the aggregate core of operative facts relating to Kellytoy's claims under the Lanham Act.

8.     Defendant Ty is a corporation organized under the laws of the state of Delaware with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

## NATURE OF THE ACTION

9.     This action, as alleged below, arises specifically because defendant Ty has embarked on a transparent campaign to hijack Kellytoy's longstanding and well-earned goodwill in the plush toy marketplace by infringing on Kellytoy's registered trademark and distinctive trade dress.  Ty, in its haste to sow customer confusion and consequently draw business from Kellytoy, has employed a name, PUFFIES, that is a virtual and linguistic replica of Kellytoy's registered PUFFY® trademark.  Indeed, the Ty mark sounds the same, looks the same, means essentially the same thing, and is used for similar goods as Kellytoy uses in connection with its long established PUFFY® mark.  That duplication is plainly deliberate – Ty is attempting to confuse customers into believing, falsely, that its goods are associated with and derive from the same source of origin as Kellytoy's products.  Beyond all that, Ty is selling and/or offering for

EXHIBIT J
Page 126 of 168

sale its competing plush toys (bearing the infringing PUFFIES mark) in the same tradeshows and trade channels as Kellytoy's products, all but assuring the intended and expected customer confusion.

10.     In addition, Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress (described below), which Kellytoy Worldwide pioneered and created. Kellytoy actively markets its Squishmallows through numerous media outlets, including, without limitation, on social media, at tradeshows, through Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com, and on Kellytoy's website and social media accounts, depicting images of its proprietary Squishmallows line of plush toys.

11.     The explosion in popularity of Kellytoy's Squishmallows, and the resulting and widespread customer and industry recognition, has unfortunately led to illegal imitation by some of Kellytoy's competitors.  Defendants are merely the latest, though most brazen and capable, of the intellectual property pirates seeking to conscript Kellytoy's goodwill for unfair competitive purposes.  Indeed, Kellytoy has discovered that defendant Ty has been making and offering for sale to customers nine (9) knock-off products under the moniker Squish-A-Boos that incorporate Kellytoy's Original Squishmallows Trade Dress (defined below) for distribution to customers throughout the United States and within this state and district that infringe upon the Original Squishmallows Trade Dress.

12.     Accordingly, Kellytoy has no alternative but to take steps to preserve and protect its intellectual property from this naked attack, and it thus has filed this action for trademark infringement, trade dress infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), Illinois unfair competition laws, Illinois Deceptive Trade

Practices Law pursuant to 815 ILCS §§ 510/1, *et seq*. and the common law trade dress infringement.

## THE PARTIES

13.     Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business located in Los Angeles, California.

14.     Kellytoy (USA), Inc. is a California corporation with its principal place of business located in Los Angeles, California.

15.     Kellytoy Worldwide, Inc. is a California corporation with its principal place of business located in Los Angeles, California.  (Kellytoy Holdings, Kellytoy USA and Kellytoy Worldwide will sometimes be referred to collectively herein as "Kellytoy.")

16.     Kellytoy is in the business of developing, manufacturing and selling children's toys including, among other things, plush toys.

17.     After the initial complaint in this action was filed, Kellytoy Holdings acquired ownership of the intellectual property rights at issue in this action from Kellytoy Worldwide and Kellytoy USA.  After Kelly Toys Holdings acquisition of the intellectual property rights, Kellytoy Worldwide and Kellytoy USA continue to operate and use the intellectual property rights with Kelly Toys Holdings, LLC's consent, such that Kellytoy Worldwide and Kellytoy USA continue have a beneficial interest therein.

18.     Defendant Ty Inc. ("Ty") is a Delaware corporation with its principal place of business in 250 Chestnut Avenue, Westmont, Illinois 60559.

19.     Ty is in the business of manufacturing and selling children's toys, including plush toys.

20.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy

will amend this Complaint to allege their true names and capacities when the same are ascertained.

21.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## BACKGROUND FACTS

### Kellytoy and Its Protected Intellectual Property Rights

22.     Kellytoy USA and Kellytoy Worldwide are innovative and highly successful creators, manufacturers, distributors and sellers of unique plush toys.

23.     Kellytoy USA has been in business for approximately three decades and in that time has developed a reputation for producing high quality, unique, and creative plush toys that are highly prized in the industry and in widespread demand by the consuming public.  Similarly, Kellytoy Worldwide has been in business for nearly two decades and developed its own reputation for producing high quality, unique, and creative plush toys, including, most recently, its highly successful Squishmallows line of plush toys in connection with the SQUISHMALLOW® and SQUISHMALLOWS brands.  (*See, e.g.,* **Exhibit 1**.)

24.     Kellytoy devotes extensive time and resources promoting and preserving its image and identity and the image and identity of its high-quality plush toys.  That includes, without limitation, creating distinctive designs and marks for use on its products, seeking U.S. trademark and copyright registrations for such marks and designs, and taking all steps necessary to preserve and protect its intellectual property.

## Kellytoy's PUFFY® TRADEMARK

25.     In particular, by assignment from Kellytoy USA, Kellytoy Holdings is the sole and exclusive owner of United States Federal Trademark Registration No. 4517007 for the trademark PUFFY (the "PUFFY Mark") for "plush toys, not intended for pets." A true and correct copy of United States Certificate of Registration No. 4517007 for the PUFFY Mark is attached as **Exhibit 2**.

26.     Prior to the assignment in favor of Kellytoy Holdings, Kellytoy USA was the sole owner of all right, title and interest in and to the PUFFY Mark and the United States trademark registration therefor (occasionally referred to as the "Mark"), which is now owned by Kellytoy Holdings.

27.     Kellytoy made widespread and prominent use of the PUFFY Mark in connection with the marketing and sale of its goods under that trademark since at least as early as 2009, such that, in addition to being inherently distinctive, the mark has also acquired distinctiveness in the minds of consumers as designating a single source. As a result of such promotion and sales, coupled with the reputation of the high quality of Kellytoy's goods sold in connection with the PUFFY Mark, the PUFFY Mark has attained goodwill among consumers nationally – such goodwill now being owned by Kellytoy Holdings. There has been continuous goodwill and acquired distinctiveness in the PUFFY Mark regardless of the acquisition by Kellytoy Holdings. Goods bearing the PUFFY Mark continue to be sold in interstate commerce by Kellytoy.

## Kellytoy's SQUISHMALLOW® TRADEMARK

28.     By assignment from Kellytoy Worldwide, Kellytoy Holdings is the sole and exclusive owner of United States Federal Trademark Registration No. 5454574 for the trademark SQUISHMALLOW, often also designated as SQUISHMALLOWS, (the "SQUISHMALLOW Mark") for "plush toys." A true and correct copy of United States Certificate of Registration No.

5454574 for the SQUISHMALLOW Mark is attached as **Exhibit 3**.

29.     Kellytoy has made widespread and prominent use of the SQUISHMALLOW

Mark in connection with the marketing and sale of its goods under that trademark since at least

as early as 2017, such that, in addition to being inherently distinctive, the mark has also acquired

distinctiveness in the minds of consumers as designating a single source.  As a result of such

promotion and sales, coupled with the reputation of the high quality of Kellytoy's goods sold in

connection with the SQUISHMALLOW Mark, the SQUISHMALLOW Mark has attained

goodwill among consumers nationally– such goodwill now being owned by Kellytoy Holdings.

There has been continuous goodwill and acquired distinctiveness  in the SQUISHMALLOW

Mark regardless of the acquisition by Kellytoy Holdings.  Goods bearing the

SQUISHMALLOW Marks continue to be sold in interstate commerce by Kellytoy.

### Kellytoy's Original Squishmallows Trade Dress

30.     In 2016, Kellytoy Worldwide conceived of and began creating its original

Squishmallows line of plush toy designs that shares common, unique features distinguishing

them from the goods of others (the "Original Squishmallows line"), representative examples of

which are depicted on **Exhibit 1** hereto.  Most of these designs are the subject of United States

Copyright Registrations or pending applications therefor, and each is sold in commerce under the

Squishmallows brand.  In essence, Kellytoy created a distinctive line of plush toys that has

spawned a cultural craze in which numerous imitators have emerged, not the least of which are

Defendants.

31.     Since that time, in addition to its Original Squishmallows line, Kellytoy has

introduced various other lines of Squishmallows branded plush toys, such as its Squishmallows

Stackables line, its Squishmallows Hugmees line, among others.  In this action, Kellytoy only

asserts its trade dress rights garnered in its Original Squishmallows line of plush toys, as more

fully described herein below, which has comprised approximately 95% of the total

Squishmallows branded plush toys sold by Kellytoy to date.

32.     Kellytoy Holdings is the sole owner of all right, title and interest in and to the

Original Squishmallows line that possesses unique, recognizable and distinguishing features that

are common across much of the Original Squishmallows line.  From 2016 to the present,

Kellytoy has expended large sums of money in developing, advertising and promoting the

Original Squishmallows Trade Dress (defined below), and the product designs bearing it,

through the United States.  In fact, Kellytoy has an annual marketing budget of approximately

$1,000,000 and is spending approximately $500,000  annually in direct to consumer and

business-to-business advertising in connection with its Squishmallows branded goods.

33.     Due to Kellytoy's distinctive trade dress, coupled with its unique designs,

extensive marketing efforts, media coverage, and market penetration, the Original

Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to

plush toys.  In fact, because of Kellytoy's extensive promotional activities and widespread

display of plush toys bearing the Original Squishmallows Trade Dress directed to the public, and

a consequence of Kellytoy's well-earned reputation for fairness and integrity in dealings with its

customers, the relevant consuming public has come to recognize and associate plush toys bearing

embodying the trade dress as high quality goods connected with or offered by Kellytoy.  As a

result, that trade dress has valuable goodwill and consumer recognition associated with it and has

come to symbolize the exemplary reputation of Kellytoy.

34.     Consistent with that advertising and marketing scope, Kellytoy sells a broad range

of Squishmallows branded plush toys in its Original Squishmallows line featuring the brand's

iconic trade dress, and whose overall look, feel and image – and in particular but without

limitation its distinctive combination of shapes, colors, textures and graphics – serve as a

distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as nostrils, eyes, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto (collectively, together with **Exhibit 1**, the "Original Squishmallows Trade Dress").

35.     Kellytoy has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Original Squishmallows line.  And due to Kellytoy's distinctive designs, robust marketing efforts, media coverage, and market penetration, the Original Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  As a further result of Kellytoy's extensive promotional activities and widespread display of its Original Squishmallows line directed to the public and as a result of the fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys bearing the Original Squishmallows Trade Dress as high quality goods connected with or offered by a single source, Kellytoy.  The Original Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

36.     Beyond merely being original and inherently distinctive, the Original Squishmallows Trade Dress is also widely recognized by consumers.  A simple Internet search

using the Google search engine yields, for example, about 1,370,000 "hits" for the search term "Squishmallows."

37.     The scope of Kellytoy's sales reflects the market penetration of its intellectual property.  The company markets and sells its Squishmallows branded plush not only through thousands of retail stores nationwide, but additionally on its website located at <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.  Copies of selected pages from website located at <squishmallows.com> are attached as **Exhibit 4**, which specifically call out the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kelly Toys Holdings, LLC proprietary trade dress."  Kellytoy's Squishmallow website traffic has, not surprisingly, grown exponentially since its launch in 2017, and has now reached an average in excess of 5,500 visits per day.

38.     Kellytoy also actively engages in promoting its Original Squishmallows line of branded plush toys through its numerous social media accounts, including on Instagram, Facebook, and Twitter.  Indeed, Kellytoy's legion of loyal fans of its line of Original Squishmallows line of branded plush toys have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Original Squishmallows line.  For example, the average Squishmallows post likes on Instagram, for example, hovering over 2000+ per post and 45-100 average comments per post.  In fact, Kellytoy's Squishmallows branded plush toys have garnered over 200 Million media impressions and since July 21, 2017, Kellytoy's paid placements on Facebook and Instagram campaigns have reached more than 23.6 MILLION unique individuals and 83.7 MILLION impressions.

39.     Kellytoy uses digital ads to advertise its Original Squishmallows line of plush toys.

Owing to their immense popularity, these ads promoting specific retailers have average click through rates of 30+% (the industry average is rates of 30+% (the industry average is 1-2%).

40.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 5** hereto, including many mainstream media publications such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, the Original Squishmallows line has been also recognized by: (1) The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2) *LA Parent* in its October 2017 issue, under the "Products We Love" section, which specifically identified designs from the Original Squishmallows line; and (3) *OK!* Magazine in its August 21, 2017 issue, which, as depicted below, featured Squishmallows and described them in flattering terms, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."



41.     There are myriad further examples of the popularity and market penetration of the Original Squishmallows line.  To name just a few, designs from the Original Squishmallows line were featured in the October 2017 issues of *L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

42.     In fact, Kellytoy's Original Squishmallows line sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

43.     Reflecting the quality of the goods, Kellytoy's Original Squishmallows line has also received numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 5**.  Thus, for example, Kellytoy's Original Squishmallows line was named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

44.     The popular blog *Trendy Mom Reviews* listed Kellytoy's Original Squishmallows line as one of "The Best Gifts for 2018!"  Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy's Original Squishmallows line of  branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

45.     The Original Squishmallows line of branded toys were also:  (1) named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!; (2) selected as among the "5 Editor's Picks From Toy Fair" 2019 by *Gifts & Decorative Accessories*; (3) featured by *The Toy Insider* in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress"; (4)

featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue, in

*The Toy Book's* August 5, 2019 issue (specifically featuring the upcoming Halloween

Squishmallows line), and in *The Toy Book's* issue (specifically featuring the Squishmallows

branded turtle) on May 15, 2019; (5) featured in *TFE Toys & Family Entertainment's* NYC Toy

Fair 2019 issue; and (6) won the *Parent and Teacher Choice Award* for 2019 from

HowtoLearn.com.

46.     Kellytoy's Original Squishmallows line has become so popular that a selection of

designs were included in the celebrity gift bags distributed to the celebrity attendees in

connection with the 2019 Teen Choice Awards, including Jenn Ortega, Lucy Hale, Lil Nas X,

Sarah Hyland, One Republic, among numerous others.

47.     This widespread publicity and recognition has occurred in conjunction with

Kellytoy's advertising efforts concerning the Original Squishmallows line, which, as alleged

above, have comprised consistent and robust marketing campaigns, including email campaigns,

social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently have

over 169,000 Instagram followers, over than 95,000 Facebook followers, and more than

60,000,000 views on the popular TikTok video app – more than many longer-existing and well-

known plush brands.  To its followers, Kellytoy regularly publishes photographs of its

Squishmallows plush toys.  Many of these followers, in turn, share these posts with their friends

and social media followers.  A copy of Squishmallows Instagram page, bearing photographs of

Squishmallows plush toys, is attached as **Exhibit 6**, which specifically calls out the fact that the

"shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy

Worldwide, Inc.'s proprietary trade dress."

48.     In addition, hundreds of well-known YouTube influencers and vloggers have

shared and posted images and videos of themselves holding plush toys in Kellytoy's Original

Squishmallows line of products. Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Twitter, TikTok, Pinterest and YouTube. These posts have generated millions of "likes" and "shares" and all feature, among other things, depictions of Kellytoy's Original Squishmallows line of plush toys. In fact, several members of the public have created their own Instagram fan accounts and Facebook groups, all bearing content featuring the Original Squishmallows line of branded plush toys.

49.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

50.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Original Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Original Squishmallows Trade Dress in the United States and around the world. In fact, Kellytoy's Original Squishmallows line is sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1,000 Costco stores, 5,500 Wal-Mart stores, 8,500 Walgreens stores, 6,200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Justice, Hallmark stores, Albertson's, Knotts Berry Farms and numerous others.

51.     Furthermore, during several summer 2019 grand openings for Costco, the highly coveted 24 inch Original Squishmallows plush sold out within two days, exceeding store expectations and projected demand.

52.     Since the summer of 2017, Kellytoy has shipped approximately a whopping 55 million (55,000,000) units of its Original Squishmallows line and there is no indication that sales will be slowing down anytime soon. Kellytoy's Squishmallows products embodying the Trade

Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

53.     Nor has the pace of sales of Kellytoy's Original Squishmallows line of branded toys slowed. To the contrary, sales of the Original Squishmallows line of plush have been steadily increasing and there is no indication of their popularity waning any time soon. These goods have, in fact, become so popular among, sought after by, and recognizable as a brand by the public that some members of the public have been selling unauthorized merchandise, such as T-shirts and jewelry, bearing the images of some of Kellytoy's most popular Original Squishmallows branded toys. Few plush lines can boast having third parties attempt to "merchandise" its copyrighted designs and goods generally bearing its trademark – something typically reserved for Disney, Looney Tunes, and the like. But while Kellytoy has since put a stop to these unauthorized uses, it has preserved exemplars of some such infringements by three different infringers, as depicted below:

  





54.     The immense popularity – indeed ubiquity – of the Original Squishmallows line

of plush toys, including those set forth on **Exhibit 1**, has now reached the point where Kellytoy

has embarked on a global initiative to license the Original Squishmallows designs and trademark

to include diverse categories of merchandise, including apparel, sleepwear, accessories,

headwear, home decor, health and beauty, back to school, stationery and paper goods, games and

puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming.  (*See*, *e.g.*, **Exhibit 7** hereto.)

55.     Moreover, recognizing the fame and proprietary nature of the Squishmallows Trade Dress and its recognition by consumers in the marketplace, famous brands such as Disney, Lucasfilm, among others, have licensed their famous characters (including Mickey Mouse, Winnie the Pooh, Baby Yoda) to Kellytoy Holdings to be adapted to the Squishmallows Trade Dress.  The famous characters include the distinct features of the Sqwishmallows Trade Dress.

56.     As a result of the extensive efforts to promote, advertise and sell the products embodying the Original Squishmallows Trade Dress and its deliberate efforts to specifically publicize the fact that the Squishmallows are the "Original" and that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kelly Toys Holdings, LLC proprietary trade dress," consumers have come to associate the Original Squishmallows Trade Dress with a designation of source and the products are inherently distinctive and/or have acquired secondary meaning.

57.     All of which is to reiterate that due to the Original Squishmallows line's massive success and popularity, consumers have come to associate Kellytoy's high-quality Original Squishmallows line of plush toys with the Original Squishmallows Trade Dress and, conversely, have come to recognize the Original Squishmallows Trade Dress as a designation of source.  But that success has come at a price – the popularity of Kellytoy's Original Squishmallows line of branded goods has attracted many imitators, such as Defendants, all of whom are attempting to benefit from Kellytoy's hard earned goodwill, and to do so illegally.  In fact, Kellytoy has pursued numerous third-party infringers who have co-opted the Original Squishmallows Trade Dress and succeeded in stemming such infringements.  Defendants, however, are uniquely positioned in the marketplace – through their massive marketing and distribution network – to

capitalize upon Kellytoy's Original Trade Dress, as discussed in greater detail below.

## Defendants' Unlawful Conduct

58.     At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's PUFFY Mark or Kellytoy's Original Squishmallows Trade Dress.  Ty is a direct competitor of Kellytoy in the plush toy market.

59.     Ty has made a career out of copying the original designs of others and using its large market share to usurp the goodwill of its competitors.  Ty is a serial copier of the original designs of others.

60.     During the week of the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Kellytoy learned that, in spite of Kellytoy's prior use and registration of the PUFFY Mark, Ty had a pending United States trademark application, based on intent to use, for the trademark TY PUFFIES.  During that same show, Kellytoy learned that Ty was offering for sale at that same tradeshow goods that embody the Original Squishmallows Trade Dress.

61.     Consequently, by letter dated January 15, 2020, Kellytoy wrote directly to defendant Ty demanding that it cease-and-desist from using Kellytoy's PUFFIES trademark and copying Kellytoy's Original Squishmallows Trade Dress.  Ty responded by denying its wrongful conduct and essentially stating its intention to continue to infringe Kellytoy's proprietary rights by continuing to offer the Infringing Plush (defined below) for sale, including at the upcoming New York Toy Fair – the biggest toy tradeshow in the country, if not the world.

62.     Kellytoy is informed and believes that sometime in late-2019/early-2020, and notably well after Kellytoy USA established its reputation in its PUFFY Mark and Kellytoy Worldwide established its reputation in its Original Squishmallows Trade Dress – and after the

Mark and Trade Dress acquired distinctiveness in the marketplace – Defendant Ty began offering for sale various plush toy lines bearing a trademark and trade dress that are substantially and confusingly similar to Kellytoy's PUFFY Mark and Original Squishmallows Trade Dress.

63.     Specifically, Kellytoy is informed and believes that, at the Atlanta International Gift & Home Furnishings Market tradeshow (the "Atlanta Gift Show"), Ty used the PUFFIES trademark in connection with its plush toys (hereinafter collectively referred to as the "Infringing Puffies") that bears close similarity, in sight, sound, and meaning with Kellytoy's PUFFY Mark and, as set forth below:



64.     Making matters even worse, at the same tradeshow, Ty displayed and marketed plush toys under the moniker "Squish-a-Boos" bearing the Original Squishmallows Trade Dress (hereinafter collectively referred to as the "Infringing Squish Plush") – plush toys that so closely resemble the unique "look and feel" of the Original Squishmallows Trade Dress that manifest

customer confusion was plainly intended and is certain to occur. Photographs of the Infringing Squish Plush are collectively attached hereto as **Exhibit 8**.

65.     Defendants' Infringing Puffies and Infringing Squish Plush shall hereinafter be referred to collectively as the "Infringing Plush."

66.     Kellytoy is specifically informed and believes, for example, that Defendants manufactured in, and imported from, China the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its PUFFY branded plush and its Original Squishmallows line. Indeed, both Kellytoy and Ty sell plush toys to many of the same retailers, such as Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS.

67.     In fact, Kellytoy currently sells its authentic SQUISHMALLOWS branded plush to Claire's, Hallmark Stores, Five Below, Learning Express, Party City, Walgreens, Fred Meyer, Kroger, and CVS and expects that Ty has sold or will make attempts to sell to its copies of Kellytoy's Original Squishmallows at prices lower than Kellytoy sells its authentic Original Squishmallows.

68.     Such unauthorized activities are clearly intended to draw on the goodwill Kellytoy has garnered in its PUFFY Mark and its Original Squishmallows Trade Dress, and to compete unfairly and illegally for Kellytoy's customers through trademark confusion, trade dress confusion, and predatory tactics.

69.     Kellytoy is informed and believes, for example, that Ty has been offering to sell the Infringing Squishy Plush to customers at prices that are lower than the prices charged by Kellytoy for its authentic Original Squishmallows line of branded plush. Kellytoy is further informed and believes that Ty is able to undercut Kellytoy's sales prices because, rather than

investing in creating its own designs and identity, Ty has instead copied and infringed Kellytoy's proprietary Original Squishmallows Trade Dress and otherwise because its Infringing Squishy Plush are of inferior quality as compared to Kellytoy's Original Squishmallows branded plush.

70.     Kellytoy is additionally informed and further believes that Defendants, without Kellytoy's consent or permission, advertise, promote, and display, and sell and distribute, the Infringing Plush in United States commerce and that Defendants' Infringing Plush are marketed and sold in the same channels of trade as Kellytoy's authentic plush toys.

71.     The Defendants' deliberate misconduct in copying, advertising, offering for sale, sale and otherwise using the PUFFY Mark trademark and the Original Squishmallows Trade Dress in connection with the Infringing Plush – including by copying wholesale the shape and look of the Original Squishmallows Trade Dress – constitute trademark infringement, trade dress infringement, and false designation of origin regarding sponsorship of those plush toys and falsely represent to the public that the Infringing Plush originate from a common source with Kellytoy's authentic PUFFY branded and Original Squishmallows plush toys, and/or that Defendants' Infringing Plush have been sponsored, approved or licensed by Kellytoy, or are in some way affiliated or connected with Kellytoy.

72.     These activities are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of Defendants' toys bearing the PUFFIES trademark and the Original Squishmallows Trade Dress, or to cause such persons to believe that Defendants' Infringing Plush and/or Defendants have been sponsored, approved, authorized, or licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in violation of, among other laws, 15 U.S.C. §§ 1114 and 1125(a).

73.     Kellytoy is informed and believes that the Defendants' activities were conducted willfully with full knowledge of the falsity of such designations of origin and false descriptions

EXHIBIT J
Page 145 of 168

or representations, with the intent to trade on the enormous goodwill Kellytoy has earned in its PUFFY Mark and its Original Squishmallows Trade Dress, and with the intent to cause confusion, and to mislead and deceive the purchasing public into believing that the products Defendants offer for sale and sell are directly sponsored by, authorized, by, associated with, or originate from Kellytoy or, at the very least, from a common source as Kellytoy's PUFFY and Original Squishmallows lines of branded plush toys.

74.     Defendants, by their unauthorized infringement, copying and use of Kellytoy's PUFFY Mark and Original Squishmallows Trade Dress, have engaged and will engage in acts of trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's original works.  Defendants' activities have damaged and will continue to damage the reputation, business and good will of Kellytoy nationally and in this judicial district.

75.     Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

76.     Kellytoy has no adequate remedy at law.  Thus, these activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## FIRST CAUSE OF ACTION

### (Federal Trademark Infringement – 15 U.S.C. § 1114(1)-(2))

(All Defendants)

77.     Kellytoy repeats, realleges and incorporates each of the allegations made above as if fully set forth herein.

4697917.2
27183-838

78.     Kellytoy owns and/or has a protectable interest in the registered PUFFY Mark.

79.     As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark, Kellytoy has standing to maintain in action for trademark infringement under the Lanham Act, including 15 U.S.C. §1114.

80.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the PUFFY Mark, Defendants have designed, manufactured, distributed, advertised, offered for sale and/or sold highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

81.     Defendants have caused actual confusion, a likelihood of confusion, mistake and deception as to the source of origin, sponsorship, authorization, association, or affiliation of Defendants' goods, such that the public has been confused and there is a likelihood that the public will be confused into believing that the products Defendants promote, distribute, and sell are directly sponsored by, associated with, or originate from the same source as Kellytoy's plush toys sold in connection with the PUFFY Mark.

82.     Defendants' use of the PUFFY Mark violates sections 32(1) and (2) of the Lanham Act, 15 U.S.C. § 1114(1)-(2), because it constitutes unauthorized, willful and/or deliberate use in commerce of reproductions, counterfeits, copies, and/or colorable imitations of Kellytoy's federally-registered mark in connection with the sale, offering for sale, distribution, and advertising of products and services in a manner likely to cause confusion, mistake, and deception.

83.     On information and belief, Defendants' acts have been willful and deliberate.

84.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the PUFFY Mark, as well as the goodwill associated

EXHIBIT J
Page 147 of 168

therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

85. Defendants' actions described above have caused and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court. Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's PUFFY Mark, or any colorable imitation or variation thereof, including PUFFIES, in connection with the sale and/or marketing of any products.

86. Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

### (Trademark Infringement and
### False Designation of Origin and False Description -- 15 U.S.C. §1125)

(All Defendants)

87. Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

88. Kellytoy owns and/or has a protectable interest in the registered PUFFY Mark. As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark, Kellytoy has standing to maintain an action for false designation of origin and unfair competition under the Lanham Act, including 15 U.S.C. § 1125.

89.     The PUFFY Mark is highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

90.     Kellytoy owns all right, title and interest and/or is an authorized user thereof in and to the PUFFY Mark.

91.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the PUFFY Mark, Defendants have imported, distributed, advertised, offered for sale and sold, and/or will continue to import, distribute, advertise, offer for sale, highly similar plush toys bearing the highly similar trademark, PUFFIES, to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

92.     Defendants' PUFFIES trademark is confusingly similar to the PUFFY Mark. Defendants' use of the PUFFY Mark has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the PUFFY Mark.

93.     Defendants' use and further threatened uses of the PUFFY Mark thus constitutes trademark infringement, false designation of origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

94.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the PUFFY Mark, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

95.     Defendants' actions described above will cause, have caused, and will continue to

cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court. Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the PUFFY Mark, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

96.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## THIRD CAUSE OF ACTION

### (Trademark Infringement, Trade Dress Infringement,
### False Designation of Origin and False Description -- 15 U.S.C. §1125)
(All Defendants)

97.     Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

98.     As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the Original Squishmallows Trade Dress, Kellytoy has standing to maintain an action for trade dress infringement under the Lanham Act including, 15 U.S.C. § 1125.

99.     The Original Squishmallows Trade Dress is non-functional and highly distinctive and has each become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

100.     Original The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part to, the amount and manner of advertising of products embodying the

Squishmallows Trade Dress, the volume of sales, as well as, the length and manner of use of the products.

101.    The Original Squishmallows Trade Dress – comprised of a proprietary combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – is non-functional and highly distinctive, and has become associated in the minds of the consuming public with plush toy products of the highest quality and reputation finding their origin in a single source.  Indeed, the Original Squishmallows Trade Dress when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with the Original Squishmallows line.  The non-functional nature of these features are evidenced and clear, in part, by reference to the following:  (1) the Original Squishmallows Trade Dress is not the subject of an expired or unexpired utility patent; (2) the unique combination of stylistic elements yielding no utilitarian advantage; (3) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, and rectangular shaped plush toys, spherical shaped plush toys, cube shaped plush toys, realistic plush toy animals, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, pvc pellets, cotton, hard foam, etc.); furthermore, when the features of the Original Squishmallows Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (4) Kellytoy not touting or marketing utilitarian advantages of its Original Squishmallows Trade Dress, and (5) the Original Squishmallows Trade Dress not resulting from a comparatively simple or inexpensive method of manufacture vis-à-vis other plush toys, e.g., the egg/bell shape provides no manufacturing cost savings (other shapes such as squares, circles, triangles are equally, or less, expensive to

manufacture) and there are numerous less expensive shell materials (e.g., Tricot, EF Velboa and Velboa), stuffings (e.g., regular polyester stuffing and 3D light weight stuffing), and ways to depict the facial features other than embroidery (e.g., printing and sublimation printing). In fact, Defendants sell numerous lines of plush toys that do not co-opt the Original Squishmallows Trade Dress, such as its Beanie-Boos line of plush toys. Moreover, protection of the Original Squishmallows Trade Dress as a trademark would not impose a non-reputation-related competitive disadvantage, as there are many ways to design an equally pleasing plush toy without copying the Original Squishmallows Trade Dress. Regardless, however, the product features of the Original Squishmallows Trade Dress do not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Original Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Original Squishmallows Trade Dress from the source of other toys.

102.    Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Original Squishmallows Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will continue to import, distribute, advertise, offer for sale, and sell replicas of the Original Squishmallows Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

103.    The Infringing Squishy Plush designs are, each alone and together, confusingly similar to the Original Squishmallows Trade Dress. Defendants' use of the Original Squishmallows Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Original Squishmallows Trade Dress.

104.    Defendants' use and further threatened uses of the Original Squishmallows Trade Dress thus constitute trademark infringement, trade dress infringement, false designation of

origin, and/or unfair competition in violation of 15 U.S.C. § 1125(a).

105.     As further evidence of Ty's intent to trade upon Kellytoy's goodwill in the Original Squishmallows Trade Dress, in order to ensure consumer confusion, Defendants adopted a mark – for use in connection with the Infringing Squishy Plush, namely Squish-A-Boos – that includes the same "squish" prefix and that has same number of syllables and sound as the SQUISHMALLOW Mark.

106.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Original Squishmallows Trade Dress, as well as the goodwill associated therewith, and have diverted sales and profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

107.     Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, both from using the Original Squishmallows Trade Dress, or any colorable imitations or variations thereof, in connection with the sale and/or marketing of any products.

108.     Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

## FOURTH CAUSE OF ACTION

### (Common Law Trade Dress Infringement)
(All Defendants)

109.     Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

110.     This claim arises under the common law of this State relating to trade dress infringement.  This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

111.     As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the Original Squishmallows Trade Dress, Kellytoy has standing to maintain an action for trade dress infringement under the common law.  In particular, because of their enormous sales and publicity, Kellytoy has acquired common law trade dress rights in and to the Original Squishmallows Trade Dress.  Kellytoy's common law trade dress is distinctive, and furthermore, have acquired secondary meaning.

112.     The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy's common law trade dress.  Such unauthorized use by Defendants of Kellytoy's common law trade dress constitutes common law trade dress infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy when, in fact, they are not.

113. Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy's common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kellytoy and to place others in the position to palm off its goods as those of Kellytoy, and as such, Defendants have committed trade dress infringement and unfair competition under the common law.

114. By such actions in infringing Kellytoy's common law trade dress, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy and impairing Kellytoy's valuable rights in and to such trade dress.

115. Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy's rights, and Kellytoy is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

116. Kellytoy has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy's rights in and to its trade dress, and to Kellytoy's business, reputations, and goodwill.

## **FIFTH CAUSE OF ACTION**

### **(Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1,** *et seq.***)**
(All Defendants)

117. Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

118. Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or

sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the Original Squishmallows Trade Dress and using deceptive representations or designations of origin in connection with Defendants' products.

119.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Kellytoy, in that the public will likely associate Defendants' goods with Kellytoy and/or Kellytoy's goods, and cause the dilution of the distinctive quality of Kellytoy's Original Squishmallows Trade Dress, and Kellytoy's common law trade dress in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

120.    The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

121.    The unauthorized use by Defendants of the Original Squishmallows Trade Dress is causing and is likely to cause substantial injury to the public and to Kellytoy.

## SIXTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)

(All Defendants)

122.    Kellytoy repeats, realleges and incorporates each and every allegation made above

as if fully set forth herein.

123.    Defendants' acts constitute common law trade dress infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trade dress infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

124.    Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

125.    Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy, and Kellytoy is left with no adequate remedy at law such that the damage to Kellytoy will continue unless and until enjoined by the Court.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**(Common Law Trademark Infringement)**

(All Defendants)

</div>

126.    Kellytoy repeats, realleges and incorporates each and every allegation made above as if full set forth herein.

127.    This claim arises under the common law of this State relating to trademark infringement. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and under 28 U.S.C. § 1367.

128.    As the owner of all rights, title and interest, and/or an owner of an enforceable beneficial interest, in and to the PUFFY Mark , Kellytoy has standing to maintain an action for common law trademark infringement.  Indeed, Kellytoy has undertaken extensive manufacture and sale of products bearing such trademark, as set forth in the preceding paragraphs of this

Complaint. In particular, because of their enormous sales and publicity, Kellytoy has acquired common law trademark rights in and to the PUFFY Mark. Kellytoy's common law trademark is distinctive, and furthermore, has acquired secondary meaning.

129. The infringing products imported, advertised, distributed, offered for sale and sold by Defendants incorporate matter constituting replicas and imitations of Kellytoy's common law trademark. Such unauthorized use by Defendants of Kellytoy's common law trademark constitutes common law trademark infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and to cause purchasers to believe such products are authentic products of Kellytoy when, in fact, they are not.

130. Upon information and belief, Defendants have willfully and intentionally misappropriated one or more aspects of Kellytoy's common law trademark with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off their goods as those of Kellytoy and to place others in the position to palm off its goods as those of Kellytoy, and as such, Defendants have committed trademark infringement and unfair competition under the common law.

131. By such actions in infringing' Kellytoy's common law trademark, Defendants are improperly trading upon the enviable reputation and goodwill of Kellytoy and impairing Kellytoy's valuable rights in and to such trademark.

132. Kellytoy is informed and believes, and thereupon alleges, that Defendants committed the above alleged acts in conscious disregard of Kellytoy's rights, and Kellytoy is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of Illinois.

4697917.2
27183-838

34

133.    Kellytoy has no adequate remedy at law. The conduct of Defendants has caused and, if not enjoined, will continue to cause, irreparable damage to Kellytoy's rights in and to its trademark, and to Kellytoy's business, reputation, and goodwill.

## EIGHTH CAUSE OF ACTION

**(Deceptive Trade Practices Pursuant to 815 ILCS §§ 510/1, *et seq*)**

(All Defendants)

134.    Kellytoy repeats, realleges and incorporates each and every allegation made above as if set forth herein.

135.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.* by causing likelihood of confusion misleading as to the source, origin or sponsorship of the parties' respective products, causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association of Defendants with the PUFFY Mark and using deceptive representations or designations of origin in connection with Defendants' products.

136.    The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.,* for which Kellytoy is entitled to injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and costs.  The foregoing acts of Defendants will create a likelihood of injury to the public  image and business reputation of Kellytoy, in that the public will likely associate Defendants' goods with Kellytoy and/or Kellytoy's goods, and cause the dilution of the distinctive quality of Kellytoy's PUFFY Mark in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq*., for which Kellytoy is entitled to injunctive  relief.

137.     The foregoing acts of Defendants were calculated and designed intentionally to mislead and deceive the public and trade as to the identity of Defendants or as to the connection of Defendants with Kellytoy, in violation of 815 ILCS §§ 510/1 *et seq.*, for which Kellytoy is entitled to injunctive relief.

138.     The unauthorized use by Defendants of the PUFFY Mark is causing and is likely to cause substantial injury to the public and to Kellytoy.

## NINTH CAUSE OF ACTION

### (Illinois Common Law Unfair Competition)

(All Defendants)

139.     Kellytoy repeats, realleges and incorporates each and every allegation made above as if fully set forth herein.

140.     Defendants' acts constitute common law trademark infringement in violation of state common law, including the common law of the State of Illinois. Such acts of common law trademark infringement constitute unfair competition within the meaning of the common law, including the common law of the State of Illinois.

141.     Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

142.     Defendants' acts have caused, and continue to cause, irreparable harm to Kellytoy, and Kellytoy is left with no adequate remedy at law such that the damage to Kellytoy will continue unless and until enjoined by the Court.

## JURY DEMAND

Kellytoy demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

1.     That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be preliminarily and permanently enjoined and restrained from:

(i)      Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the PUFFY Mark or the Original Squishmallows Trade Dress;

(ii)     Using the Original Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii)    Using the PUFFY Mark or any confusingly similar mark, including without limitation PUFFIES, in connection with plush toys or other goods;

(iii)    Using the Original Squishmallows Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

(iv)    Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers used by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the PUFFY Mark or the Original Squishmallows Trade Dress;

(v)   Infringing or contributing to the infringement of any of Kellytoy's trademarks or trade names, including without limitation the PUFFY Mark and/or Original Squishmallows Trade Dress, or otherwise engaging in unfair competition with Kellytoy in any manner or engaging in any conduct

tending to falsely represent or likely to confuse, mislead or deceive
suppliers, purchasers, or any member of the public into thinking that
Defendants or any of their products are affiliated with Kellytoy or that
Kellytoy has otherwise sponsored, approved, or licensed any products or
services of Defendants;

(vi)    Engaging in any other activity constituting unfair competition with
Kellytoy, or constituting infringement of the PUFFY Mark or the Original
Squishmallows Trade Dress; and

(vii)    Assisting, aiding, or abetting any other person or business entity in
engaging or performing any of the activities referred to in subparagraphs
(i) through (vi) above, or effecting any assignments or transfers, forming
new entities or associations, or utilizing any other device for the purpose of
circumventing or otherwise avoiding the prohibitions set forth in
subparagraphs (i) through (vi) above;

2.    That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

3.    That Kellytoy has superior rights to exclusive use in the PUFFY Mark and that Kellytoy has superior rights to exclusive use in the Original Squishmallows Trade Dress in connection with toys and/or pillows vis-à-vis Defendants;

4.    That Defendants shall not in the future file or maintain an application for registration or registration of any mark that includes "puffy" or "puffies" or any designation(s) confusingly similar thereto with the United States Patent and Trademark Office or any other governmental or state authority;

5. That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the PUFFY Mark, the Original Squishmallows Trade Dress, or any design, word or designation confusingly similar to the PUFFY Mark and/or the Original Squishmallows Trade Dress, including without limitation, PUFFIES, or any alternate spellings thereof;

6. That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of each of the Original Squishmallows Trade Dress and the PUFFY Mark and trebling of those damages under 15 U.S.C. § 1117;

7. Adjudge that each of the Defendants, by their unauthorized use of Kellytoy's PUFFY Mark and the Original Squishmallows Trade Dress for plush toys, and such other acts as it may have undertaken relating to the PUFFY Mark and/or Original Squishmallows Trade Dress, have violated Kellytoy's rights under 15 U.S.C. §§ 1114, 1125(a) and 1125(d), under Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq., Illinois* state law, and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the PUFFY Mark and the Original Squishmallows Trade Dress;

8. Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the PUFFY Mark or the Original Squishmallows Trade Dress

4697917.2
27183-838

39

EXHIBIT J
Page 163 of 168

in the United States on Defendants' behalf and inform them that they must immediately cease such use;

9.      Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity bearing or using the PUFFY Mark (including, e.g., the PUFFYIES mark), or the Original Squishmallows Trade Dress;

10.      Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the PUFFY Mark or the Original Squishmallows Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, including without limitation the PUFFIES designation, and all plates, molds, matrices, programs and other means of making same;

11.      That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under either or both of the PUFFY Mark and/or the Original Squishmallows Trade Dress:

(i)      the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

(ii)      the total number of units distributed and sold; and

(iii)      the total number of units remaining in inventory; and

(iv)      a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.      Direct Defendants to pay the costs of corrective advertising;

Case 1:20-cv-01318-MAR Document 105-2 Filed 10/21/04 Page 42 of 462 PageID #:1316
Case 1:24-cv-10747-MAR Document 17-2 Filed 10/21/04 Page 41 of 168 PageID #:2976
#:1316

13.     Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred in initiating and prosecuting this action;

14.     Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.     That the Court award enhanced profits and treble damages;

17.     That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

18.     That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

19.     Providing that Defendants' conduct constitutes willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

20.     Providing that Defendants' conduct will create a likelihood of dilution and injury to Kellytoy's business reputation in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

21.     Providing that Defendants used the PUFFY Mark and/or the Original Squishmallows Trade Dress with the intent to cause confusion and to deceive the public in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

22.     Providing that Defendants have injured Kellytoy by depriving it of sales of its genuine goods and services, by injuring its business reputation, and by passing off Defendants' goods as Kellytoy's goods and/or created a likelihood of confusion and/or false designation of origin, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law;

23.     Providing that Defendants' willfully misappropriated and used the PUFFY Mark and/or Original Squishmallows Trade Dress and such conduct constitutes misappropriation, unfair competition and unjust enrichment, all in violation of the common law of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 et seq. and common law; and

24.     For such other and further relief as the Court may deem just and proper.


DATED: October 21, 2020                 Respectfully submitted,

                                        _____
                                              */ s / Dean D. Niro*
                                        Dean D. Niro
                                        Olivan D. Yang
                                        VITALE, VICKREY, NIRO, SOLON & GASEY LLP
                                        311 S. Wacker Dr., Suite 2470
                                        Chicago, IL 60606
                                        (312) 236-0733
                                        dniro@vvnlaw.com
                                        oyang@vvnlaw.com

DATED: October 21, 2020                        */ s / Mark B. Mizrahi*
                                        Todd M. Lander
                                        Mark B. Mizrahi
                                        FREEMAN, FREEMAN & SMILEY, LLP
                                        1888 Century Park East, Suite 1500
                                        Los Angeles, CA 90067
                                        (310) 255-6100
                                        todd.lander@ffslaw.com
                                        mark.mizrahi@ffslaw.com
                                        *Admitted Pro Hac Vice*

                                        Attorneys for Plaintiffs KELLY TOYS HOLDINGS, LLC, KELLYTOY WORLDWIDE, INC., and KELLYTOY (USA), INC.

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was served upon all counsel of record via filing with CM/ECF on October 21, 2020.


_____*/ s / Mark B. Mizrahi*_____
Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
(310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

# EXHIBIT K

1  HUESTON HENNIGAN LLP
2  Moez M. Kaba, State Bar No. 257456
   mkaba@hueston.com
3  Sourabh Mishra, State Bar No. 305185
   smishra@hueston.com
4  523 West 6th Street, Suite 400
5  Los Angeles, CA 90014
   Telephone:  (213) 788-4340
6  Facsimile:  (888) 775-0898
7
8  *Attorneys for Plaintiffs Kelly Toys Holdings, LLC;*
   *Jazwares, LLC; Kelly Amusement Holdings, LLC;*
9  *and Jazplus, LLC.*
10
11              UNITED STATES DISTRICT COURT
12           FOR THE CENTRAL DISTRICT OF CALIFORNIA
13
                                      |  Case No. 23-9255
14  KELLY TOYS HOLDINGS, LLC;         |
    JAZWARES, LLC; KELLY              |  **COMPLAINT FOR:**
15  AMUSEMENT HOLDINGS, LLC;          |
    and JAZPLUS, LLC,                 |
16                                    |    1. **Trade Dress Infringement Under**
17              Plaintiffs,           |       **the Lanham Act;**
                                      |
18        vs.                         |    2. **Common Law Trade Dress**
                                      |       **Infringement;**
19  ZURU, LLC,                        |
                                      |    3. **Copyright Infringement Under**
20              Defendant.            |       **the Copyright Act;**
21                                    |
                                      |    4. **Common Law Unfair**
22                                    |       **Competition; and**
                                      |
23                                    |    5. **California Statutory Unfair**
                                      |       **Competition.**
24                                    |
                                      |  **DEMAND FOR JURY TRIAL**
25
26
27
28

                              - 1 -
                            COMPLAINT

EXHIBIT K
Page 1 of 231

Plaintiffs KELLY TOYS HOLDINGS, LLC, JAZWARES, LLC, KELLY AMUSEMENT HOLDINGS, LLC, and JAZPLUS, LLC (collectively, "Kelly Toys") bring this action against Defendant ZURU, LLC ("Zuru") for injunctive relief and damages under the laws of the United States and the State of California, as follows:

## **INTRODUCTION**

1.     Plaintiffs are among the world's leading manufacturers and distributors of high-quality plush toys and other consumer products.  In 2016, their distinctive line of plush toys branded "Squishmallows" was released.  Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media.  And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide.  As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]



---

[1] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

- 2 -
COMPLAINT

2.     Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase.  Rather than competing fairly in the marketplace by creating its own unique concepts and product lines, Defendant Zuru, a billion-dollar company, decided that it would be easier to simply copy, imitate, and profit off the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying their products. Zuru is familiar with this business model: it has previously been sued by the LEGO Group for selling toys that are confusingly, strikingly, and substantially similar to the look and feel of LEGO figurines.

3.     In June 2023, Zuru announced the release of its "Snackles" plush toys. As seen below, the Snackles toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and velvety velour-like textured exterior.  And, in marketing Snackles, Zuru likewise urges consumers to, like Squishmallows, "collect' all "12 Snackles" and "start building your Snackle family!"  And, likely noticing that consumers refer to Squishmallows as Squish, Zuru boasts on product listings that Snackles has the "softest, squishiest plush."

COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

4.     In the marketplace, Zuru has been transparently trying to position its products to trick customers looking for Squishmallows to buy Snackles instead.  For example, Snackles products are often found right *next to* Squishmallows products in retail stores.  In addition, when consumers search for "Squishmallows" on retail websites like Amazon.com, paid search results identify Snackles instead.  Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail outlets and pays website operators to appear in search term results, all in an effort to trick consumers into purchasing Snackles even though they are looking to buy Squishmallows.

- 4 -

COMPLAINT

5.     Zuru's efforts have created substantial and actual confusion.  For example, consumer reviews on Snackles products indicate that consumers believe that they were buying Squishmallows instead: "My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce."  Even Squishmallows fans have noted on message boards that they were confused when they first saw Snackles, commenting: "I saw them in a shop earlier and literally had to check the tag to figure out whether they were squishs.  In my defense, they weren't in a box like in the picture, they were on a shelf right next to the squishs."  As one Squishmallows fan observed about Snackles: "they're 100% trying to trick ppl like your partner."

6.     Zuru's actions have already caused significant harm.  For example, customer confusion has led to lost potential customers, sales, and market share.  Plus, Zuru's bidding on search result positioning has caused Kelly Toys to have to spend more money to buy paid search term results for its *own* "Squishmallows" mark.  In short, Kelly Toys is being forced to spend more time and resources to compete with Snackles products that employ Squishmallows' own trade dress and copyrights.

7.     This is a straightforward case of trade dress and copyright infringement.  Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows and Zuru is willfully infringing those trade dress rights.   Courts regularly find trade dress infringement in similar cases.  *See, e.g.*, *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 714 (9th Cir. 2010) (affirming jury verdict finding trade dress infringement); *MGA Entm't, Inc. v. Multitoy, Inc.*, No. CV04-2524, 2005 WL 8156296, at *3-4 (C.D. Cal. Oct. 11, 2005) (finding that defendant infringed plaintiff toy company's trade dress).  Kelly Toys Holdings, LLC also owns copyrights to certain Squishmallows and Zuru is likewise willfully infringing on those copyrights by selling its Snackles products that copy constituent elements of those copyrights.  Through this action, Kelly Toys seeks monetary and injunctive relief to stop Zuru's

latest copycat efforts, put an end to consumer confusion, and vindicate the intellectual property rights in Squishmallows.

### THE PARTIES

8.      Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

9.      Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

10.      Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

11.      Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

12.      Plaintiffs are all affiliated entities, governed by common ownership and intercompany agreements.

13.      On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the copyrights and trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products, as well as all registered copyrights in and related to the Squishmallows products, to Plaintiff Kelly Toys Holdings, LLC.  Accordingly, Plaintiff Kelly Toys Holdings, LLC is the legal owner of registered copyrights in and related to its Squishmallows products and the Squishmallows trade dress.

14.      Kelly Toys Holdings, LLC provides the rights to the remaining plaintiffs, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the Squishmallows products that incorporate the protected intellectual property rights.  Plaintiffs are all related companies that each independently have the ability to inspect and monitor the Squishmallows products and to maintain the products' quality.  Each plaintiff thus has a cognizable interest in the infringement at issue.

15.     Defendant Zuru is a consumer toy limited liability company organized under the laws of California with its principal place of business in California.  Zuru is the United States arm of non-party ZURU Group, a group of toy and consumer products companies founded in Cambridge, New Zealand.  Zuru is in the business of manufacturing and selling children's toys, including plush toys.

## JURISDICTION AND VENUE

16.     This action involves the trademark laws of the United States, 15 U.S.C. § 1125(a), and, specifically, the statutory and common law of trade dress infringement. This action also involves the copyright laws of the United States, 17 U.S.C. § 101, *et seq*.

17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.  Specifically, the Court has federal question jurisdiction in this case over the claims brought under federal law and supplemental jurisdiction over the claims brought under state law.

18.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

19.     This Court has personal jurisdiction over Defendant Zuru because it is a California limited liability company with its principal address listed as: 2121 E. Maple Ave., El Segundo, CA 90245.

## BACKGROUND FACTS

### Kelly Toys Launches Its Squishmallows Products

20.     Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the SQUISHMALLOWS brand.

21.     In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others.  Most of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the

- 7 -
COMPLAINT

Squishmallows brand. In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.



22. Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products that possess unique, recognizable and distinguishing features that are common across much of the Squishmallows line. From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising and promoting the Squishmallows Trade Dress (defined below), and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products.

**<u>Squishmallows Has a Distinctive Trade Dress</u>**

23. Due to the distinctive Squishmallows trade dress, coupled with its unique designs, extensive marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. In fact, because of Kelly Toys' extensive promotional activities

- 8 -
COMPLAINT

and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high quality goods connected with or offered by Kelly Toys. As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kelly Toys.

24.     Consistent with that advertising and marketing scope, Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade dress, and whose overall look, feel and image—and in particular but without limitation its shapes, colors, textures and graphics—serve as a distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel (the "Squishmallows Trade Dress").





25. The Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look and feel that is uniquely associated with Squishmallows. The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions); (iii) myriad alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

26. Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors. Competitors have successfully used innumerable alternative design elements and combinations of those elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Squishmallows Trade Dress from the source of other toys. Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source – Squishmallows.

## Kelly Toys Holdings, LLC Owns Copyrights in Squishmallows

27. Additionally, Kelly Toys Holdings, LLC is also the owner of registered copyrights in and related to its Squishmallows products (the "Squishmallows Works"), including listed those in the below chart:

- 11 -
COMPLAINT

| Copyrighted Works | Copyright Number |
|---|---|
|  | VAU001395927 |
|  | VA0002093073 |
|  | VA0002096023 |
|  | VA0002118285 |
|  | VA0002183993 |
|  | VA0002118286 |

- 12 -
COMPLAINT

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 |  | VA0002093075 |
| 5<br>6<br>7<br>8 |  | VA0002148804 |
| 9<br>10<br>11<br>12<br>13 |  | VAU001395816 |
| 14<br>15<br>16<br>17 |  | VAU001399134 |
| 18<br>19<br>20<br>21 |  | VA0002127224 |
| 22<br>23<br>24<br>25<br>26 |  | VA0002137255 |

27
28

- 13 -

COMPLAINT

## Squishmallows Are Distinctive and Popular

28.     Kelly Toys and its predecessor have, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Squishmallows line.   And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.   As a further result of Kelly Toys' extensive promotional activities and widespread display of its Squishmallows directed to the public and as a result of its fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high quality goods connected with or offered by a single source.   The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize valuable goodwill and reputation.

29.     In addition to being original and inherently distinctive, the Squishmallows Trade Dress is also widely recognized by consumers.   A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

30.     Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.

31.     Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook, and Twitter.   Indeed, Kelly Toys' legion of loyal fans of its line of Squishmallows have been extremely engaged on social media, including TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows.   Squishmallows videos have been viewed more than 11 billion times

- 14 -

COMPLAINT

on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

32.     Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

33.     Indeed, sales of Squishmallows have increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

34.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others.   By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[2]

---

[2] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

- 15 -

COMPLAINT

EXHIBIT K
Page 15 of 231

The Washington Post

BUSINESS

Adults are driving sales of the hottest toy on the market: Squishmallows

The fandom is often likened to the Beanie Baby craze — and on its way to an enduring brand like Hello Kitty and Pokémon

By Jaclyn Peiser

Updated June 25, 2023 at 7:00 a.m. EDT | Published June 24, 2023 at 7:00 a.m. EDT

35.     The New York Times has proclaimed that "Squishmallows are Taking Over,"[3] Forbes named them "2022's Must-Have Christmas Toy,"[4] and The Guardian has recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[5]

36.     Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken

---

[3] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[4] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,* Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[5] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

over the toy world," and that "as toy stores go, the marshmallow-like plush toy's
meteoric rise to the top of the $100 billion global toy market is one for the ages."[6]

37.    Squishmallows' fandom ranges across all ages, from children to teens to
adults.  Celebrities like Kim Kardashian and Lady Gaga have identified themselves as
avid  devotees  of  the  brand,  and  have  published  messages  and  photos  of  their
Squishmallows collections on their social media accounts:



[6] Mark Caldwell, *Soft Sell*, Costco Connection, Oct. 2023, at 22,
https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-
23/US_October_Connection_2023.pdf.

38.    In September of 2022, Squishmallows was awarded the coveted "Toy of the Year, "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation.  Squishmallows are so popular that they have been identified as the most popular toy brand across 41% of the U.S. states—far ahead of other well-known mega brands like Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh.

39.    Due to Squishmallows' massive success and popularity, consumers associate the high-quality Squishmallows toys with the Squishmallows Trade Dress.

**Zuru Has a History of Selling Copycat and Defective Products**

40.    Zuru is a direct competitor of Kelly Toys in the plush toy market. However, unlike Kelly Toys, Zuru has made a business model of copying other well-known products, hoping to trade on the goodwill that those companies spent years garnering.  Zuru and its parent company, Zuru Inc., have been sued in the past for similar forms of infringement, including for infringing on the trade dress of other well-known products.  For example, LEGO sued Zuru, Inc. for its creation of miniature toys and packaging which were strikingly similar to the overall look and feel of LEGO's products thereby deliberately creating consumer confusion:[7]

---

[7] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, Compl., ECF No. 1 at 12 (D. Conn. Dec. 13, 2018).

COMPLAINT

1
2

*Authentic LEGO Product*          *Zuru Copycat Product*

          

          

          

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The court agreed with LEGO, granting a preliminary injunction enjoining Zuru from infringing on LEGO's copyrights and trademarks and denying Zuru's motion to dismiss the complaint, finding that LEGO had sufficiently alleged a claim for trade dress infringement.[8]

26
27
28

[8] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, 2019 WL 13158199, at *2 (D. Conn. July 8, 2019).

41.   Zuru products are also of lesser quality.  Just this year in June 2023, Zuru recalled 7.5 million bath toys after "multiple lacerations and puncture wounds were reported in children playing with them."[9]  According to the United States Consumer Product Safety Commission, there were at least twelve injuries from those toys, nine of which required stitches or medical attention.

### The Infringing Snackles Products

42.   On June 16, 2023, Zuru launched "Snackles," a line of plush toys that copies and imitates Squishmallows.  To be clear, Zuru is not licensed or otherwise authorized by Kelly Toys to market or distribute products embodying the copyrighted designs or the Squishmallows Trade Dress.

43.   Snackles toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and velvety velour-like textured exterior.  Side by side comparisons of Squishmallows and copycat Snackles products plainly show how striking the similarities are:

[9] *7.5 Million Baby Shark Bath Toys are Recalled After They Cut or Stabbed Children*, Associated Press (June 23, 2023), https://apnews.com/article/zuru-baby-shark-bath-toys-recalled-2bace294be48edfb1bfc2bf17d57c097.

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |

- 21 -
COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

- 23 -

COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  | |
|  |  |
|  |  |

## Zuru's Copycat Coco Squishies Products

44.     Zuru has not limited its copying of Squishmallows to its Snackles line; rather, this is just one of several dubious Zuru product lines copying Squishmallows. For example, Zuru also sells a line of egg-shaped plush toys called "Coco Squishies." Not only has Zuru directly copied the name of Squishmallows, the Coco Squishies products also look *strikingly* like authentic Squishmallows.  Zuru is directly trading off of Squishmallows' goodwill and brand name in the hopes that consumers will confuse the products and buy its own thinking they are authentic Squishmallows.

45.     As depicted in the chart below, Zuru's Coco Squishies are direct copies of well-known and beloved Squishmallows characters:

| Squishmallows Original Product | Coco Squishies Copycat Product |
| --- | --- |
|  |  |
|  |  |



46.     The direct resemblance between Coco Squishies and Squishmallows rules out any chance of coincidence.  As shown above, Squishmallows has a pink poodle with curly pink hair atop its head and on its ears; Zuru created a pink poodle with curly pink hair atop its head and on its ears.  Squishmallows has a white bull terrier with a pink belly, pink ears, and large dark spot on its eye; Zuru created a white bull terrier with a pink belly, pink ears, and a large dark spot on its eye.  Squishmallows has a light grey husky with light blue eyes; Zuru created a light grey husky with blue eyes.  Squishmallows has a dalmatian with a large black spot over its left eye; Zuru created a dalmatian with a large black spot over its left eye.

## **Consumer Confusion**

47.     Not only do Snackles visually and tactilely simulate Squishmallows, but Zuru has also been trying to intentionally position its products to trick customers looking for Squishmallows into buying Snackles instead.  Zuru has taken steps to

- 26 -

1  ensure that customers seeking out Squishmallows land upon the confusingly similar
2  Snackles products instead.

3      48.    Upon information and belief, Zuru pays website operators for Snackles to
4  appear when a user searches for "Squishmallows" on retail websites like Amazon.com.
5  As shown below, Zuru is, upon information and belief, purchasing sponsored product
6  and sponsored branded video campaigns under Squishmallows search terms.   For
7  example, when a consumer searches for "Squishmallows" on Amazon.com, some of
8  the very first results they see will be Snackles products instead:



EXHIBIT K
Page 27 of 231

49.     Similarly, when a customer is on a specific Squishmallows product on Amazon.com, Snackles advertising appears on the same page in an effort to confuse a consumer into thinking these are the same line of products:



50.     Zuru has also purchased sponsored branded video campaigns on online retail websites under Squishmallows search terms, so that when a consumer searches for "Squishmallows" they may be met with the following Snackles ad, intermixed with authentic Squishmallows products:



- 28 -
COMPLAINT

51.    Zuru does not limit this practice to online retailers: it also takes steps to confuse customers shopping in brick-and-mortar retail stores.  Snackles products are placed *directly next* to Squishmallows products in retail stores in an effort to trick consumers into purchasing Snackles instead of Squishmallows.  As depicted below, customers looking for Squishmallows were confused by the inclusion—on the very same shelf—of a Snackles cow that visually resembles Connor the Cow, a Squishmallows product.  Moreover, another Snackles product is also mixed in with authentic Squishmallows:





52.     Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail stores in an effort to trick consumers.   For example, the following images show Snackles products displayed directly next to Squishmallows in a Costco store:

 

EXHIBIT K
Page 30 of 231

53. Snackles products also create a likelihood of confusion with original Squishmallows products. In fact, there is evidence of *actual* consumer confusion. For example, consumer reviews on Snackles products show that consumers have purchased Snackles believing that they were buying Squishmallows instead:

prak

★★★★★ **Soooo Cute**

Reviewed in the United States on October 5, 2023

Color: Dragon (Tabasco) | Verified Purchase

My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce. Vibrant colors.

Tammy Huddy

★★★★★ **LOVE! LOVE! LOVE!**

Reviewed in the United States on October 8, 2023

Color: Sloth (Push Pop) | Verified Purchase

First of all, I think I love squishamallows more than my children! This one did not dissapoint! Purchased it as a gift. My child loves it so much that my other girls have requested one as well! Went ahead and purchased the Chicken and we have two mini versions as well!

Priced right and makes a great gift! Highly recommend!

Helpful | Report

- 31 -
COMPLAINT

54. Other consumers have aired their confusion, noting that they "thought [Snackles] were [Squishmallows] at a glance":



55. As the comments on this photo show, other consumers were likewise tricked, again noting that Snackles are being placed "on a shelf right next to the [Squishmallows]" and observing that "they're 100% trying to trick ppl like your partner":



Dangerous_Avocado392 · 3 mo. ago

In his defense they're 100% trying to trick ppl like your partner. The font gives squish vibes but not enough for them to get sued or anything. Some of them are kinda cute tho. I'm so desperate for squish I would maybe get one lol. For some reason my Costco stopped stocking/selling squish? (I don't go every week) but I haven't seen one since ~March😭😭

⬆ 1 ⬇   💬 Reply   ⬆ Share   ⋯

56. Other consumers have also noted how similar Snackles are to Squishmallows, even noting particular Squishmallows characters that have been clearly copied by Snackles:





57. Consumers have noted the obvious similarities between Snackles and Squishmallows in comments of videos presenting Snackles products, including in some cases going so far as to confuse the product names and refer to Snackles products as "Snackmallows," "Snacksquishmallows," and "Snacksquishy":

- 33 -

COMPLAINT

**pawgjade**
Jade · 8-25

**Follow**

Found the snackmallow in @Smyths Toys Superstores

Of course ive only started with one and luckly got lottie the snackmallow i wanted. Do i need the whole collection?

#snackmallow #squishy #squishies #squishi #snacksquishmallow #snacksquishy

**Martina**
They look like squishmallows
8-20    ♡ 34    Reply

View 2 replies ⌄

**shyla(Taylor's_Version)**
yo, these look like squishmallows
8-29    ♡ 0    Reply

**Autumn🍁**
Literally a rip off of squishmallows
9-18    ♡ 1    Reply

**rachel arnold**
SQUISH MELLO DUPEEEE
1d ago    ♡ 0    Reply

**Garfieldhatesmondaysdotorg**
Zuru jumping on the Squishmallows train five years too late. 😊
8-7    ♡ 2    Reply

- 34 -
COMPLAINT

58.    Zuru's actions have already caused significant harm.  As a result of consumer confusion, Kelly Toys has lost potential customers, sales, and market share. For example, customer reviews reveal that customers looking for Squishmallows mistakenly purchased Zuru's Snackles products instead.  And, upon information and belief, even customers who knew the difference between Squishmallows and Snackles before purchase have mistakenly purchased Snackles because of Zuru's use of the Squishmallows Trade Dress and infringement of the Squishmallows products.

59.    Moreover, Zuru's bidding on Squishmallows search terms on online retailer sites has forced Kelly Toys to in turn increase its spend on search terms for its *own* "Squishmallows" mark.  In other words, Kelly Toys has had to spend more money to ensure that when consumers search for "Squishmallows," they will be shown Squishmallows products and not copycat Snackles products strategically placed to confuse them.

60.    In sum, Zuru's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys.  And, unless enjoined, Zuru will continue to further escalate their infringing activities.

### FIRST CAUSE OF ACTION

### (Trade Dress Infringement – 15 U.S.C. § 1125)

61.     Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

62.    Kelly Toys Holdings, LLC owns and has a protectable interest in the Squishmallows Trade Dress.

63.    As owner of all rights, title and interest in and to the Squishmallows Trade Dress, Kelly Toys Holdings, LLC has standing to maintain an action for trade dress infringement under the Lanham Act including, 15 U.S.C. § 1125.

64.    The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, the Squishmallows brand.

65.     The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

66.     The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows brand plush toys would not impose a non-reputation-related competitive disadvantage against competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize.  The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function; rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys products from those of competitors.

67.     Without Kelly Toys' authorization or consent, and having knowledge of Kelly Toys Holdings, LLC's prior rights in the Squishmallows Trade Dress, Defendant has designed, manufactured, distributed, advertised, offered for sale and/or will continue to design, distribute, advertise, offer for sale, and sell replicas of the Squishmallows Trade Dress to the consuming public in direct competition with Kelly Toys, in or affecting interstate commerce.

68.     Zuru's infringing designs are, each alone and together, confusingly similar to the Squishmallows Trade Dress.  Defendant's use of the Squishmallows Trade Dress has caused, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally,

- 36 -

1 irreparable injury to goodwill and reputation associated with the Squishmallows Trade
2 Dress.

3     69.    Defendant's use of the Squishmallows Trade Dress thus constitutes trade
4 dress infringement in violation of 15 U.S.C. § 1125(a).

5     70.    As further evidence of Zuru's intent to trade upon Kelly Toys' goodwill
6 in its Squishmallows Trade Dress, in order to ensure consumer confusion, Zuru not
7 only copied Squishmallows Trade Dress and original designs, but also incorporated
8 product placement with products that Kelly Toys had already licensed for use in
9 collaboration with its Squishmallows toys.

10     71.    As a direct and proximate result of Zuru's unlawful conduct, it has
11 misappropriated Kelly Toys Holdings, LLC's rights in the Squishmallows Trade
12 Dress, as well as the goodwill associated therewith, and has diverted sales and profits
13 from Kelly Toys to Zuru. Thus, as a direct and proximate result of Defendant's acts
14 of willful infringement, Kelly Toys has suffered and/or will suffer irreparable damage
15 to its valuable brand and reputation, and other damages in an amount to be proven at
16 trial, including Defendant's profits and Kelly Toys' lost profits.

17     72.    Defendant's actions described above will cause, have caused, and will
18 continue to cause irreparable damage to Kelly Toys, unless Defendant is enjoined by
19 this Court. Kelly Toys has no adequate remedy at law with regard to Defendant's
20 infringing conduct. Accordingly, Kelly Toys is entitled to a permanent injunction,
21 pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents,
22 servants, and employees, and all persons acting thereunder, in concert with, or on their
23 behalf, from using Kelly Toys' Squishmallows Trade Dress, or any colorable imitation
24 or variation thereof, in connection with the sale and/or marketing of any products.

25     73.    Defendant's aforesaid acts are exceptional within the meaning of 15
26 U.S.C. § 1117.

27

28

- 37 -

COMPLAINT

## SECOND CAUSE OF ACTION

### (California Common Law Trade Dress Infringement)

74. Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

75. Kelly Toys Holdings, LLC is the owner of all right, title, and interest in and to the Squishmallows Trade Dress used by Kelly Toys by virtue of its extensive manufacture and sale of products embodying such trade dress as set forth in the preceding paragraphs of the Complaint.

76. Kelly Toys' common law trade dress is distinctive, and furthermore, has acquired secondary meaning. Kelly Toys has continuously used its Squishmallows Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin. As such, there are common law rights to the Squishmallows Trade Dress.

77. The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kelly Toys.

78. The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

79. The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture. Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows products would not impose a non-reputation-related competitive disadvantage against

competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize. The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. Rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys' plush toys from those of competitors.

80. The infringing products advertised, distributed, offered for sale, and sold by Defendant incorporate matter constituting replicas and imitations of Kelly Toys' common law trade dress. Such unauthorized use by Defendant of Kelly Toys' common law trade dress constitutes common law trade dress infringement and has already caused, and will likely continue to cause, confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and is causing purchasers to believe such products are authentic products of Kelly Toys when, in fact, they are not.

81. Upon information and belief, Defendant has willfully and intentionally misappropriated aspects of Kelly Toys' common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kelly Toys, and as such, Defendant has committed trade dress infringement under the common law.

82. By such actions in infringing Kelly Toys' common law trade dress, Defendants are improperly trading upon the reputation and goodwill, and are impairing valuable rights in, such trade dress.

83. Upon information and belief, Defendant has committed the above alleged acts in conscious disregard of Kelly Toys' rights, and Kelly Toys is therefore entitled to punitive damages pursuant to the common law of the State of California.

84. Kelly Toys has no adequate remedy at law. The conduct of Defendant has caused and, if not enjoined, will continue to cause, irreparable damage to the rights in and business, reputation, and goodwill of the Squishmallows Trade Dress.

- 39 -
COMPLAINT

## **THIRD CAUSE OF ACTION**

### **(Federal Copyright Infringement – 17 U.S.C. § 501(a))**

85.     Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

86.     Kelly Toys Holdings, LLC is the exclusive owner of the Squishmallows Works.

87.     On information and belief, Defendant had actual notice of Plaintiffs' exclusive rights in and to the Squishmallows Works.

88.     Defendant did not attempt and therefore inherently failed to obtain Plaintiffs' consent or authorization to use, manufacture, reproduce, copy, display, prepare derivative works of, distribute, sell, transfer, rent, perform and/or market Plaintiffs' Squishmallows Works.

89.     Without permission, Defendant knowingly and intentionally reproduced, copied, and displayed the Squishmallows Works by manufacturing, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling infringing products which bear such Squishmallows Works, or artwork that is, at a minimum, substantially similar to the Squishmallows Works.  For example:

- 40 -
COMPLAINT

| Copyrighted Works | Copyright Number | Infringing Zuru Product |
|---|---|---|
|  | VAU001395927 |  "Hugh" |
|  | VA0002093073 |  "Daisy" |
|  | VA0002096023 |  "Terry" |
|  | VA0002118285 |  "Terry" |
|  | VA0002183993 |  "Terry" |
|  | VA0002118286 |  "Dani" |

- 41 -

COMPLAINT

| | | |
|---|---|---|
|  | VA0002093075 | <br>"Richard" |
|  | VA0002148804 | <br>"Richard" |
|  | VAU001395816 | <br>"Richard" |
|  | VAU001399134 | <br>"Susie" |
|  | VA0002127224 | <br>"Susie" |

- 42 -
COMPLAINT

|  | VA0002137255 |  |
|---|---|---|
| | | "Lottie" |

90.  Defendant's unlawful and willful actions as alleged herein constitute infringement of the Squishmallows Works, including exclusive rights to reproduce, distribute and/or sell such Squishmallows Works in violation of 17 U.S.C. § 501(a).

91.  Defendant's knowing and intentional copyright infringement, as alleged herein, has caused substantial and irreparable harm to Plaintiffs in an amount as yet unknown but to be proven at trial, for which Plaintiffs have no adequate remedy at law, and unless enjoined, Defendant will continue to cause substantial and irreparable harm to Plaintiffs.

92.  Based on Defendant's wrongful conduct, Plaintiffs are entitled to injunctive relief, Plaintiffs' actual damages and lost profits, and Defendant's profits arising from Defendant's conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages, in an amount to be proven at trial and enhanced discretionary damages for willful copyright infringement, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (California Common Law Unfair Competition)

93.  Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

94.  This claim arises under the common law of the State of California relating to unfair competition.

95.  Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress. Defendant's unauthorized use of Kelly Toys' Squishmallows Trade

- 43 -

Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of Defendant's products and to cause purchasers to believe that Defendant's products are authentic products of Kelly Toys when in fact, they are not.

96.     Upon information and belief, Defendant has intentionally appropriated Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent of palming off their goods as those of Kelly Toys.  Defendant has thus committed unfair competition under the common law of the State of California.

97.     By its actions in infringing Kelly Toys' Squishmallows Trade Dress, Defendant is improperly trading upon the reputation and goodwill, and impairing valuable rights in, the Squishmallows Trade Dress.

98.     Upon information and belief, said activities of Defendant have caused, and if not enjoined, will continue to cause, irreparable harm and damage to the rights in the Squishmallows Trade Dress and to business reputation and goodwill.

99.     Upon information and belief, Defendant has engaged in the unlawful conduct alleged herein intentionally, maliciously, fraudulently, and oppressively entitling Kelly Toys to punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### (California Statutory Unfair Competition –

### Cal. Bus. & Prof. Code § 17200, *et seq.*)

100.    Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

101.    By reason of the foregoing, Defendant has been and is engaged in "unlawful, unfair or fraudulent business practices" in violation of Cal. Bus. & Prof. Code § 17200 *et seq*.

102.     Kelly Toys Holdings, LLC is the exclusive owner of the Squishmallows Works, and its Squishmallows Trade Dress constitutes a protectable property right.

- 44 -

COMPLAINT

Defendant's conduct—including without limitation its infringement of the Squishmallows Trade Dress and Kelly Toys Holdings, LLC's registered copyrights—will and has caused an impairment and diminishment of Kelly Toys' rights. Indeed, the activities of Defendant have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights in the Squishmallows Trade Dress, ownership rights of the Squishmallows Works, and to business reputation and goodwill. Kelly Toys has no adequate remedy at law for these wrongs and injuries. The damage to Kelly Toys includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Accordingly, Kelly Toys is entitled to a permanent injunction restraining and enjoining Defendant and its agents, servants, employees, and all persons acting thereunder, in concert with, or on its behalf, from using Squishmallows Trade Dress or infringing on the Squishmallows Works, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. Kelly Toys is further entitled to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kelly Toys prays for judgment against Defendant as follows:

a. That Defendant, its officers, members, directors, agents, servants, employees, successors, licensees, representatives, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i) Manufacturing, distributing, advertising, offering to sell or selling their infringing products or any colorable imitations of the Squishmallows Trade Dress or the Squishmallows Works;

(ii) Using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii) Using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products;

(iv)   Using imitations of the Squishmallows Works in connection with plush toys or other goods;

(v)   Infringing or contributing to infringement of Kelly Toys Holdings, LLC's copyrights or trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant;

(vi)   Engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress or Squishmallows Works; and

(vii)   Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

b.   That Defendant be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

c.   That Kelly Toys Holdings, LLC has superior rights to exclusive use in the Squishmallows Works and the Squishmallows Trade Dress in connection with toys vis-à-vis Defendant;

d.   That the Court direct any third parties providing services to Defendant in connection with any infringing and/or enjoined conduct, including social media

- 46 -

COMPLAINT

platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Amazon, Etsy, eBay, Alibaba), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendant in connection with the offer for sale and sale of the infringing products or any other products using, infringing, or embodying the Squishmallows Trade Dress or the Squishmallows Works;

e. That Defendant be required to pay Kelly Toys such damages as it has sustained as a consequence of Defendant's infringement of the Squishmallows Trade Dress and the Squishmallows Works and trebling of those damages under 15 U.S.C. § 1117;

f. Adjudge that the Defendant, by its unauthorized use of Kelly Toys' Squishmallows Trade Dress and Squishmallows Works for plush toys, and other acts as it may have undertaken relating to the Squishmallows Trade Dress and/or Squishmallows Works, has violated Kelly Toys' rights under 15 U.S.C. § 1125(a), 17 U.S.C. § 501(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully;

g. Direct Defendant to provide Kelly Toys with an identification in writing of any and all entities that are presently using the Squishmallows Trade Dress or Squishmallows Works on Defendant's behalf and inform them that they must immediately cease such use;

h. Direct Defendant to immediately recall any and all merchandise previously provided to any entity embodying or using the Squishmallows Trade Dress or the Squishmallows Works;

i. Enter an order, pursuant to 15 U.S.C. § 1118, directing Defendant to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, embodying any unauthorized copy of the

1   Squishmallows Trade Dress or any of the Squishmallows Works, or any simulation,

2   reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation

3   therefor, and all plates, molds, matrices, programs, and other means of making the

4   same;

5        j.    That Defendant provide Kelly Toys in writing with the following

6   information relating to Defendant's goods marketed, advertised, offered for sale, or

7   sold under either or both of the Squishmallows Trade Dress and/or Squishmallows

8   Works:

9        (i)    the name, address, and telephone number of each and every United

10      States entity to whom Defendant has made available or otherwise

11      provided any such products;

12      (ii)   the total number of units distributed and sold;

13     (iii)   the total number of units remaining in inventory; and

14     (iv)   a full accounting as to the precise dollar amount of such products

15      made available or provided and the profits recognized by

16      Defendant in connection with such actions;

17      k.    Direct Defendant to pay the costs of corrective advertising;

18      l.    Direct Defendant to pay Plaintiffs' attorneys' fees and costs incurred in

19  initiating and prosecuting this action;

20      m.   Direct Defendant to pay punitive damages and exemplary damages

21  according to proof;

22      n.    That Kelly Toys recover its actual damages, Kelly Toys' lost profits, and

23  Defendant's profits arising from Defendant's conduct complained of herein, including

24  any profits that are attributable to the infringement and are not taken into account in

25  computing the actual damages;

26      o.    That the Court award enhanced and treble damages;

27      p.    That Kelly Toys be awarded interest, including pre-judgment interest, on

28  the foregoing sums;

- 48 -

COMPLAINT

q.     That the Court direct such other actions as it may deem just and proper to prevent the public from deriving the mistaken impression that and products or services offered, advertised, or promoted by or on behalf of Defendant is authorized by Kelly Toys or related in any way to Kelly Toys' products or services; and

r.     For such other and further relief as the Court may deem just and proper.

Dated:  November 2, 2023          **HUESTON HENNIGAN LLP**

By:  */s/ Moez M. Kaba*
     Moez M. Kaba, State Bar No. 257456
      *mkaba@hueston.com*
     Sourabh Mishra, State Bar No. 305185
      *smishra@hueston.com*
     523 West 6th Street, Suite 400
     Los Angeles, CA 90014
     Telephone:     (213) 788-4340
     Facsimile:     (888) 775-0898

     *Attorneys for Plaintiffs*

- 49 -
COMPLAINT

# DEMAND FOR JURY TRIAL

Kelly Toys hereby demands a trial by jury.

Dated: November 2, 2023            **HUESTON HENNIGAN LLP**

By: */s/ Moez M. Kaba*
    Moez M. Kaba, State Bar No. 257456
     *mkaba@hueston.com*
    Sourabh Mishra, State Bar No. 305185
     *smishra@hueston.com*
    523 West 6th Street, Suite 400
    Los Angeles, CA 90014
    Telephone:    (213) 788-4340
    Facsimile:    (888) 775-0898

    *Attorneys for Plaintiffs*

- 50 -
COMPLAINT

6509778

1  JEAN-PAUL CIARDULLO, CA Bar No. 284170
      jciardullo@foley.com
2  ASHLEY M. KOLEY, CA Bar No. 334723
      akoley@foley.com
3  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3300
4  LOS ANGELES, CA 90071-2418
   TELEPHONE: 213.972.4500
5  FACSIMILE:   213.486.0065

6  JONATHAN MOSKIN (*Pro Hac Vice*)
   NY Bar No. 1949031
7     jmoskin@foley.com
   **FOLEY & LARDNER LLP**
8  90 PARK AVENUE
   NEW YORK, NY 10016
9  TELEPHONE: 212.682.7474
   FACSIMILE:   212.687.2329
10
   *Attorneys for Defendant*
11 *ZURU, LLC*

12               **UNITED STATES DISTRICT COURT**

13               **CENTRAL DISTRICT OF CALIFORNIA**

14                    **WESTERN DIVISION**

15
16 | KELLY TOYS HOLDINGS, LLC; | Case No. 2:23-cv-09255 MCS(AGRx) |
   | JAZWARES, LLC; KELLY |  |
17 | AMUSEMENT HOLDINGS, LLC; and | **ZURU, LLC's NOTICE OF MOTION** |
   | JAZPLUS, LLC | **AND MOTION TO DISMISS** |
18 |  |  |
19 |                 *Plaintiffs*, | Hon. Mark C. Scarsi |
   |  |  |
20 |       v. |  |
   |  | Date:     February 12, 2024* |
21 | ZURU, LLC, | Time:     9:00 AM |
   |  | Court:    First Street, 7C |
22 |                 *Defendant*. |  |
23

24
25
26
27       * As noted in the Parties' Stipulation at Dkt. 22, n.2, the Standing Order seemed to
28 impose constraints on the timing of the hearing date. Zuru requests the earliest available
   hearing date consistent with the Parties' proposed briefing schedule at Dkt. 22.

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 51 of 231
4889-2439-3108.5
417 of 816

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on Monday, February 12, 2024, at 9:00 AM (or as determined by the Court consistent with the parties' proposed briefing schedule at Dkt. 22) before the Honorable Mark C. Scarsi at the First Street Courthouse, 350 W. 1st Street, Courtroom 7C, 7th floor, Los Angeles, California 90012, Defendant, Zuru, LLC ("Zuru") will, and hereby does respectfully move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is made on the grounds that Plaintiffs have failed to plausibly articulate protectable trade dress, and Plaintiffs have failed to confirm whether they have supplied deposit copy images of their alleged copyright registrations. Zuru also moves unopposed on two other grounds discussed herein.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 18, 2023, as well as subsequent correspondence. This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the accompanying Declaration of Jean-Paul Ciardullo, the Request for Judicial Notice and exhibits attached thereto, the accompanying Proposed Order, and all pleadings, papers, and records on file in this action, and such matters of which this Court may take judicial notice, and upon such further oral argument and documentary evidence as may be presented at the time of hearing.

Dated: December 22, 2023

Foley & Lardner LLP

*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

*Attorneys for Defendant
ZURU, LLC*

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 52 of 231

4889-2439-3108.5

418 of 816

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    BACKGROUND ........................................................................................ 2

    A.    Plaintiffs and Squishmallows ................................................. 2

    B.    Zuru and Snackles ................................................................. 8

III.   APPLICABLE LAW ................................................................................ 10

    A.    Rule 12(b)(6) ........................................................................ 10

    B.    Trade Dress .......................................................................... 10

IV.    PLAINTIFFS FAIL TO ADEQUATELY DEFINE PROTECTABLE
       TRADE DRESS ACROSS THEIR LARGE AND VARIED PRODUCT
       LINE-UP .................................................................................................. 13

    A.    Plaintiffs' Definition Is Vague And Overreaching ..................... 13

    B.    This Court's Past Rulings On Squishmallows Trade Dress ........... 20

V.     PLAINTIFFS SHOULD CONFIRM THE ORIGIN OF THE
       "COPYRIGHTED WORKS" IMAGES ................................................... 23

VI.    UNOPPOSED GROUNDS ....................................................................... 24

    A.    Lack Of Standing ................................................................. 24

    B.    Copyright Preemption ......................................................... 24

VII.   CONCLUSION ......................................................................................... 25

i

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 53 of 231

4889-2439-3108.5

419 of 816

# TABLE OF AUTHORITIES

<div align="right"><b>Page(s)</b></div>

**Federal Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
  768 F. Supp. 2d 1040 (N.D. Cal. 2011) .........................................................................12

*Aquawood, LLC v. Toys "R" Us-De*laware, Inc.*,
  No. 215CV05869ABMRWX, 2016 WL 10576620 (C.D. Cal. Mar. 10, 2016)...........24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................10

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
  457 F.3d 1062 (9th Cir. 2006) ................................................................................12, 13

*Crafty Prods. v. Michaels Cos.*,
  389 F. Supp. 3d 876 (S.D. Cal. 2019)............................................................................12

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
  No. CV 15-769 PSG (SSx), 2015 WL 12731929 (C.D. Cal. May 8, 2015).................10

*Goscicki v. Custom Brass & Copper Specialties, Inc.*,
  229 F. Supp. 2d 743 (E.D. Mich. 2002)........................................................................13

*Greenberg v. Johnston*,
  No. CV-14-046505-MWF (VBKx), 2014 WL 12586252 (C.D. Cal. Oct. 22, 2014) ...10

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................................10

In *Rose Art Indus. v. Swanson*,
  235 F.3d 165 (3d Cir. 2000)...........................................................................................11

*Interactive Health LLC v. King Kong United States, Inc.*,
  No. CV 06-1902-VBF(PLAx), 2008 WL 11337393 (C.D. Cal. Mar. 6, 2008) ...........12

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995)...............................................................................................18

*Kellytoy Worldwide, Inc. v. TY, Inc.*,
  No. 20 C 748, 2020 WL 5026255 (N.D. Ill. Aug. 25, 2020)...................................passim

<div align="center">ii</div>

*Lanard Toys Ltd. v. Novelty Inc.*,
    511 F. Supp. 2d 1020 (C.D. Cal. 2007) .................................................................. 24

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir. 1997) ...................................................................... 13, 18

*Leatherman Tool Grp., Inc. v. Cooper Indus.*,
    199 F.3d 1009 (9th Cir. 1999) ............................................................................ 18

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
    292 F. Supp. 2d 535 (S.D.N.Y. 2003) ................................................................ 11

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ............................................................................ 10

*Mike Vaughn Custom Sports, Inc. v. Piku*,
    15 F. Supp. 3d 735 (E.D. Mich. 2014) ............................................................... 18

*National Lighting Co., Inc. v. Bridge Metal Industries, LLC*,
    601 F. Supp. 2d 556 (S.D.N.Y. 2009) .......................................................... 15, 19

*Paramount Farms Int'l LLC v. Keenan Farms Inc.*,
    No. 2:12-cv-01463-SVW-E, 2012 WL 5974169 (C.D. Cal. Nov. 28, 2012) ............... 12

*Parker v. Hinton*,
    No. 22-5348, 2023 WL 370910 (6th Cir. Jan. 24, 2023) ..................................... 23

*R.F.M.A.S., Inc. v. So*,
    619 F. Supp. 2d 39 (S.D.N.Y. 2009) .................................................................. 19

*Roblox Corp. v. Wowwee Grp. Ltd.*,
    2023 WL 2433970 (N.D. Cal. Mar. 9, 2023) ....................................................... 24

*Sara Designs, Inc. v. A Classic Time Watch Co.*,
    234 F. Supp. 3d 548 (S.D.N.Y. 2017) ................................................................ 17

*Shelbyco Inc. v. Western Trimming Corp.*,
    No. 2:97-CV-196C, 1997 WL 377982 (D. Utah. May 12, 1997) .......................... 16

*Silvers v. Sony Pictures Entm't, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ............................................................................ 24

*Sleep Sci. Partners v. Lieberman*,
    No. 09-04200 CW, 2010 WL 1881770 (N.D. Cal. May 10, 2010) ........................ 10

iii

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 55 of 231

4889-2439-3108.5

421 of 816

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ................................................................. 10

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001) .............................................................................. 12

*Walker & Zanger, Inc. v. Paragon, Indus*.,
   549 F. Supp. 2d 1168 (N.D. Cal. 2007) ....................................... 11, 16, 17

*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co*.,
   916 F.2d 76 (2d Cir. 1990) ................................................................... 18

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000) ............................................................................ 12

*Williams v. Bridgeport Music, Inc.*,
   No. LA CV13-06004 JAK (AGRx), 2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) ..... 24

*Yurman Design, Inc. v. PAJ, Inc.*,
   262 F.3d 101 (2d Cir. 2001) .......................................................... 11, 12

**Federal Statutes**

15 U.S.C. § 1127 .................................................................................. 10

**State Rules**

California Rule of Professional Conduct 3.3(a)(2) .................................... 22

**Federal Regulations**

37 C.F.R. §2.52 ................................................................................... 20

**Other Authorities**

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3
   (4th ed. 2014) .................................................................................. 11

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIRCOMPETITION  § 8:5.50
   (5th ed. 2020) ............................................................................. 1, 11

iv

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 56 of 231

4889-2439-3108.5

422 of 816

# I.     __INTRODUCTION__

Defendant Zuru, LLC ("Zuru") moves under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Complaint. Specifically, Plaintiffs' trade dress claims under the Lanham Act and state law fail to articulate a plausible and proper definition of the asserted trade dress. Unlike a typical trade dress case in which the plaintiff claims rights in a single product, Plaintiffs overreachingly attempt to claim rights in an entire product category of <u>hundreds</u> (perhaps thousands) of different-looking designs of which Plaintiffs have failed to give proper notice in their Complaint. As observed in the McCarthy treatise, "[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §8:5.50 (5th ed. 2020).

On its face, Plaintiffs' vague and overbroad definition of the trade dress – filled with conclusory and undefined terms like "distinctive" and "Asian style" – goes well beyond the particular toys at issue in this case, and would impermissibly ensnare an entire product category of generic round stuffed animals with cartoonish faces. Significantly, Plaintiffs' definition of the trade dress would even encompass non-party competitors' products for which Plaintiffs previously retracted infringement claims, demonstrating that Plaintiffs' definition fails to give any reasonable guidance as to what would or would not be considered infringing. Undoubtedly aware of the inherent problem in trying to claim trade dress across so many different-looking products, Plaintiffs have not attempted to file for any federal trade dress registration, nor is it plausible that they could provide any coherent drawing of their vaguely-claimed trade dress that could satisfy Trademark Office regulations. In the 2019 *Dan-Dee* case, a Central District of California Court already dismissed Plaintiffs' equivalent trade dress claims on the grounds that Plaintiffs had failed to properly articulate their claimed trade dress. This Court should reach the same result.

Zuru also seeks dismissal on certain other narrower but important grounds discussed herein, some of which Plaintiffs have stated they will not oppose.

1

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 57 of 231

4889-2439-3108.5

423 of 816

## II.   **BACKGROUND**

### A.   **Plaintiffs and Squishmallows**

According to Plaintiffs, Squishmallows were introduced in 2016. (Complaint, ¶1.) The products were originally sold by a predecessor company called Kellytoy Worldwide, Inc., which then transferred all purported intellectual property rights to current plaintiff Kelly Toys Holdings, LLC ("KTH") in March 2020. (*Id*., ¶13.) Plaintiff Jazwares, LLC ("Jazwares") is a separate toy company that acquired KTH (apparently as part of that same transaction), and currently holds KTH as a separate subsidiary. (Dkt. 5.) Jazwares is in turn owned by the insurance company Alleghany Corporation. (*Id*.) The Complaint states that KTH is the owner of all the purported intellectual property at issue and that it "provides the rights to the remaining plaintiffs [] to sell and distribute the Squishmallows products that incorporate the protected intellectual property rights." (Complaint, ¶14.) The Complaint does not otherwise explain the relationship among the four plaintiffs, the substance of any intellectual property licensing arrangement among them, whether such arrangements are exclusive, or what specifically each plaintiff does in the marketplace.

Although the Complaint only shows pictures of a handful of Squishmallows, the Squishmallows product line in fact consists of hundreds (or possibly thousands) of different products comprising vastly different-looking characters, and assuming a variety of different configurations. Examples of these can be found in **Exhibit A** to the concurrent Request for Judicial Notice, which contains images of Squishmallows compiled from Plaintiffs' pleadings in other lawsuits. Further images of Squishmallows from Amazon.com, Walmart.com, and Target.com are included at Exhibits B-D to that Request.[1]

---

[1] As further discussed in Zuru's concurrently filed Request for Judicial Notice, such publicly-available search results may be judicially noticed, and Zuru takes no substantive position on their content beyond that they show Squishmallows.

2

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 58 of 231

4889-2439-3108.5

424 of 816

Samples of some of the images from Exhibit A are shown below:



MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 59 of 231

4889-2439-3108.5

425 of 816

Plaintiffs have even turned Squishmallows into stuffed animal slippers, pet beds, and stackable pillows, as shown below.[2]



In fact, the limitless diversity of different Squishmallows eludes any straightforward listing. The pictures in Plaintiffs' Complaint (*e.g.*, pp. 2, 8) amount to only a small percentage of Squishmallows, failing to adequately convey their diversity of appearance. Indeed, it may be that Plaintiffs have intentionally embraced a certain degree of ambiguity surrounding the full scope of their product line as a marketing tactic. The Jazwares website itself only lists a small percentage of the products, and appears to be in a state of constant flux.

---

[2] These images were collected from the Jazwares website (https://shop.jazwares.com/pages/squishmallows), and from Walmart.com (see Exhibit C to concurrent Request for Judicial Notice). As discussed in Zuru's Request for Judicial Notice, it is permissible to take notice of these.

4

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 60 of 231

4889-2439-3108.5

426 of 816

Squishmallows are sold under a prominent stylized logo reading "*Original Squishmallows*," that is displayed on product hangtags, store displays, and websites: [3]




Although Plaintiffs' present Complaint purports to assert trade dress rights, there is no public record available at the U.S. Trademark Office website of any attempt by Plaintiffs to formally register any trade dress in the Squishmallows, and as part of the meet and confer on this Motion, Plaintiffs confirmed no such applications are pending. (Ciardullo Dec., ¶3.) The fact that Plaintiffs have not sought registration deprives the designs of any presumption of validity, and places a hefty burden of proof on Plaintiffs to establish such rights. Indeed, as discussed *infra*, Zuru does not believe that Plaintiffs could satisfy regulatory requirements for visually depicting their trade dress because there is no consistency across

---

[3] The image of the Squishmallows bin is from the Complaint, p.30. The other images were obtained from the Jazwares website and are properly the subject of judicial notice. See concurrently filed Request for Judicial Notice.

5

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 61 of 231
4889-2439-3108.5
427 of 816

the product line, and hence no way to define the trade dress across the line.

With respect to copyright, although certain of the Squishmallows designs have purportedly been registered, Plaintiffs make no claim of having registered the others, including many that are shown in the Complaint. This belies the supposed importance of the asserted designs.

In fact, Plaintiffs have had difficulty enforcing their purported Squishmallows intellectual property in past litigation, including in this District.

In *Kellytoy Worldwide, Inc. et al v. TY, Inc. et al.*, No. 20-cv-00748 (N.D. Ill. Jan. 31, 2020) ("Ty Case"), Plaintiffs had sued Ty over stuffed toys depicted below:



(Ty Case, Dkt. 1-9.)

The Illinois court denied Plaintiffs' Preliminary Injunction Motion, observing that Plaintiffs had only a "modest likelihood of showing that the Squishmallows trade dress is valid," and that its overall chance of success the case was "weak." *Kellytoy Worldwide, Inc. v. TY, Inc.*, No. 20 C 748, 2020 WL 5026255, at *9-10 (N.D. Ill. Aug. 25, 2020). The

Ty Case was later dismissed, with Plaintiffs allowing Ty to continue to sell the accused products, amounting to an admission that Plaintiffs' claimed rights could not extend to those products or any others of similar appearance to them. Below is an image from Ty's current website:[4]



Similarly, Plaintiffs had sued toy company Dan-Dee in this District in 2019. *Kellytoy USA, Inc. et al v. Dan-Dee International, Ltd. et al.*, 2:18-cv-05399-JAK ("Dan-Dee Case"), accusing Dan-Dee's plush toys of infringing Plaintiffs' alleged trade dress and copyrights. Dan-Dee moved to dismiss the complaint under Rule 12(b)(6) arguing (as Zuru now argues in the present Motion) that Plaintiffs had failed to adequately define their purported trade dress in the Squishmallows. The Court granted Dan-Dee's motion, ruling that "in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw." (Dan-Dee Case, Dkt. 39, "Dan-Dee Order," copy attached as Ciardullo Ex. 1.)

Plaintiffs amended their complaint, but Dan-Dee moved to dismiss again on the same grounds. (Dan-Dee Case, Dkt. 57.) The case was then dismissed before the Court could rule on the second motion. (*Id.*, Dkt. 74.) An online search shows that Dan-Dee is

---

[4] The Court may take judicial notice of the products that Ty continues to sell on its website at shop.ty.com. See concurrent Request for Judicial Notice, Exhibit E.

7

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 63 of 231

4889-2439-3108.5

apparently still selling the product shown here.[5]

### B. Zuru and Snackles

Zuru, LLC is the United States arm of the ZURU Group, a group of family-owned toy and consumer products companies founded in Cambridge, New Zealand in 2004. The ZURU Group is one of the fastest growing toy brands in the world and is known for their creativity and new-age manufacturing techniques. The



ZURU Group has successfully built their own global brands such as Bunch O Balloons™, X-Shot™, Robo Alive™, Mayka™, Fidget Cube™, Tangle™, ZURU Smashers™, 5 Surprise™, and Metal Machines™. The toy industry has recognized these and other Zuru brands with numerous awards and honors. The ZURU Group also has partnerships with entertainment properties, including Nickelodeon, Disney, Universal Studios, and DreamWorks. The ZURU Group now employs hundreds of staff, has numerous offices worldwide, produces hundreds of thousands of toys a day, and supplies most major retailers in more than a hundred countries.

As the Compliant notes, Zuru announced the release of the accused Snackles around June 2023. (Complaint, ¶3.) As is evident from the Complaint, Snackles are a co-branding effort with several major snack brands like Hershey's® and Pringles®, and Zuru has long-standing licensing arrangements with these brands.[6] In contrast to the Squishmallows, Snackles have prominent noses and limbs projecting forwardly from the bodies of the toys and embracing large plush versions of famous branded snacks, which are paired thematically with the toys that are holding them. The essence of the Snackles brand – from

---

[5] The Court may take judicial notice of the products that Dan-Dee continues to sell. See concurrent Request for Judicial Notice, Exhibit F.

[6] In fact, Zuru is known among consumers for its co-branding with well-known food brands, such as in its popular Mini Brands™ lineup: https://zurutoys.com/brands/mini-brands/foodie-mini-brands.

<div align="center">8</div>

1    its very name to its overall appearance – is centered on famous snack foods.

2          Snackles are sold under a prominent stylized logo reading "*ZURU SNACKLES*," that

3    is clearly displayed on product hangtags, store displays, and websites:[7]




7          [7] The image of the bin is from Plaintiffs' Complaint, p.30; the other image is from
     Zuru's online listings. *See* concurrent Request for Judicial Notice.

9

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 65 of 231

4889-2439-3108.5

431 of 816

### III.   APPLICABLE LAW

#### A.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A Rule 12(b)(6) motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

#### B.   Trade Dress

The Lanham Act provides for the protection of trademarks and trade dress used to identify and distinguish a producer's goods from those manufactured or sold by others and to indicate the source of the goods. *See* 15 U.S.C. § 1127.

In an action for purported infringement of unregistered trade dress, not only is it the plaintiff's burden to plead non-functionality and secondary meaning as to the claimed trade dress elements, but the plaintiff must also adequately define those trade dress elements. *Greenberg v. Johnston*, No. CV-14-046505-MWF (VBKx), 2014 WL 12586252, at *2 (C.D. Cal. Oct. 22, 2014); *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Without an adequate definition, the defendant is not on proper notice of what does or does not infringe, or what elements of the design are purported to be the subject of the validity and infringement analysis in the case. *Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010). This ambiguity can lead to gamesmanship, with the plaintiff changing their definition and characterization of the trade

10

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 66 of 231

4889-2439-3108.5

432 of 816

dress to suit their needs over the course of the litigation. *See* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3 (4th ed. 2014) ("there is no reason why the plaintiff cannot define a list of elements…Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement."). On a broader level, the motivation for requiring a clear definition is that "trade dress claims raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.'" *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp. 2d 1168, 1175-76 (N.D. Cal. 2007) (citations omitted).

The plaintiff's burden increases where trade dress is claimed in a diverse line-up of products. 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:5.50 (5th ed. 2020) ("[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116-17 (2d Cir. 2001) ("a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress"); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 542 (S.D.N.Y. 2003) (When a plaintiff seeks trade dress protection in a line of products, it must prove that "the trade dress signifies an overall look which is 'consistent' throughout the line.").

In *Rose Art Indus. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000), the court explained that when trade dress is claimed in a line of products, those products must all have a "consistent overall look" "[b]ecause of the broad reach that protection of trade dress for a series or line of products would embrace…" Although the Ninth Circuit has not specifically addressed the "consistent overall look" test in as many words, district courts in this Circuit have been guided by it because it is self-evident and axiomatic that a claimed trade dress across a product line must have a consistent look in order to evoke a single brand. *Interactive Health LLC v. King Kong United States, Inc.*, No. CV 06-1902-VBF(PLAx),

11

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 67 of 231

4889-2439-3108.5

433 of 816

2008 WL 11337393, at *2 (C.D. Cal. Mar. 6, 2008) ("when a plaintiff seeks protection for an entire line of products, the plaintiff must demonstrate the trade dress signifies an overall look that is consistent throughout the entire line.") (citing *Yurman* and other cases); *Apple Inc. v. Samsung Elecs. Co*., 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) ("Although the Ninth Circuit does not appear to have addressed the issue, some circuits have held that where a plaintiff seeks trade dress protection in a line of products, the plaintiff must establish that the line of products has a consistent overall look."); *Crafty Prods. v. Michaels Cos*., 389 F. Supp. 3d 876, 882 (S.D. Cal. 2019) ("To grant such far-reaching, undefined trade dress protection [across a product line not having a consistent look] would unfairly allow inventors to claim any broad design and would leave no room for competition."); *Paramount Farms Int'l LLC v. Keenan Farms Inc*., No. 2:12-cv-01463-SVW-E, 2012 WL 5974169, at *2-3 (C.D. Cal. Nov. 28, 2012) (distinguishing trade dress in a single product from a line of products in view of *Rose Art*).

In the case of product configuration trade dress, the plaintiff must also plead that the claimed trade dress elements comprise a distinctive aesthetic that, unaided by any unclaimed brand identifiers, would in itself convey a single brand source to most relevant consumers. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). Evidence of past sales and publicity are only relevant if driven by the trade dress features that are claimed. *Kellytoy Worldwide, Inc. v. TY, Inc*., No. 20 C 748, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020) ("popularity and engagement with a product do not necessarily suggest a connection between the product and its source.")

With respect to functionality, product features are presumed functional until proven otherwise by the party seeking trade dress protection. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001). The Ninth Circuit test for functionality proceeds in two steps. The Court first inquires whether the product feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1067, 1072 (9th Cir. 2006). Generally speaking, the first step looks to utilitarian functionality, *i.e*., whether or to what extent the

12

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 68 of 231

4889-2439-3108.5

434 of 816

product's appearance is driven by concerns over its ability to perform certain practical functions, and its ease of manufacture. *Id.*

If the product features are not deemed to have utilitarian functional on the first step, the Court proceeds to a second step of inquiring "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold,* 457 F.3d at 1072. This second step generally equates to an assessment of aesthetic functionality, which looks to whether a product feature has become a "stock" element that consumers generally desire and do not associate with a particular brand, such as a heart-shaped box of chocolates. *Id.*; *Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 752 (E.D. Mich. 2002) (heart-shaped box).

## IV. PLAINTIFFS FAIL TO ADEQUATELY DEFINE PROTECTABLE TRADE DRESS ACROSS THEIR LARGE AND VARIED PRODUCT LINE-UP

### A. Plaintiffs' Definition Is Vague And Overreaching

The Court should dismiss Plaintiffs' Lanham Act and state law trade dress claims because they are too vague and overbroad to adequately articulate any cognizable trade dress rights. Plaintiffs make no claim of ownership of any trade dress rights in any one Squishmallow design in isolation. Rather, Plaintiffs' Complaint is premised on something substantially more difficult to prove: that it is the owner of a single broadly defined trade dress encompassing an *entire product category comprising hundreds of different designs*. As shown in the cases cited in Section III.B, and as articulated in *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997):

> a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. [] Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is

13

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 69 of 231

4889-2439-3108.5

435 of 816

acute.

Here, the Complaint defines the relevant trade dress elements ("Claimed Elements")
as follows, also using this same language to define the scope of the injunction Plaintiffs
ask the Court to impose (Complaint, ¶24; Prayer for Relief Section (a)):

> (1) substantially egg/bell shaped plush toys depicting various similarly
> shaped fanciful renditions of animals/characters;
>
> (2) simplified Asian style Kawaii faces with repeating and
> complementary rounded/oval shaped graphics depicting features on the
> characters themselves (such as eyes, snouts and bellies) and which
> conform to and support the overall egg/bell shape of the toys;
>
> (3) embroidered facial features, such as eyes, nostrils, and/or mouths;
>
> (4) distinctive contrasting and non-monochrome coloring; and
>
> (5) short-pile velvety velour-like textured exterior with a light and silky
> memory foam-like stuffing providing an extremely soft and squeezable
> marshmallow feel.

Plaintiffs have failed to adequately define any cognizable trade dress that
meaningfully encompasses their enormous and highly varied product line-up. Plaintiffs'
vague definition is akin to a car company with a diverse line-up of cars trying to claim
rights to non-distinctive and unprotectable elements that are common to all their cars, like
"sleek styling" and "soft seats." Taken literally, Plaintiffs' Claimed Elements reach far
beyond the specific individual toy designs highlighted in their Complaint, and would even
sweep up designs Plaintiffs concede do not infringe. As reflected in the Complaint's Prayer
for Relief (which ties back to the Claimed Elements) what Plaintiffs are really seeking via
their lawsuit is an overbroad injunction that would impermissibly block Zuru from
participating in an entire product category of round, multi-colored, plush animal toys with
cartoonish faces. There is no basis in trade dress law for such a sweeping monopoly, nor
any plausible basis under *Iqbal/Twombly* to find that Plaintiffs have properly defined
protectable trade dress with sufficient specificity and narrowness. *See Nat'l Lighting Co.,*

14

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 70 of 231

4889-2439-3108.5

436 of 816

*Inc. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 562 (S.D.N.Y. 2009) ("Judicial reluctance to extend trade dress protection to entire product lines is also motivated by this fear of enabling monopolistic behavior").

Whether the alleged trade dress is read line by line, or taken collectively, it is simply too amorphous to state a claim:

- ***"Substantially Egg/Bell Shaped Plush Toys…"***

As an initial matter, Plaintiffs' term "substantially egg/bell shaped" does not act as a valid limiter of scope because many of Plaintiffs' Squishmallows are in fact circular, like the ones below.



Secondly, Plaintiffs cannot lay claim to "fanciful renditions of animals/characters," as that describes virtually any stuffed toy animal. The term "fanciful" is undefined and conclusory.

Third, the motif of a stuffed animal/character with an egg shape is a stock aesthetically functional feature dating back to Russian Nesting Dolls that is universally used to convey a smaller "head" atop a larger "body." As with heart-shaped boxes of chocolate, no one company could monopolize such a common aesthetic.

Fourth, it is apparent that a chief motivation for a "substantially egg shape" in the context of these toys is so they can double as rounded pillows, also able to stand on one end so that the animal/character is oriented head up, which are all utilitarian functional

15

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

4889-2439-3108.5

EXHIBIT K
Page 71 of 231

437 of 816

considerations.

- ***"Simplified Asian-style Kawaii faces with Rounded/Oval Shaped Graphics"***

Plaintiffs do not define what they mean by "Simplified Asian style Kawaii," nor is it apparent from looking at the pictures of the Squishmallows, whose appearances are highly varied. Some have circular eyes, some have lines for eyes, some have bellies, some do not have bellies, some have noses, some do not, and so on. The Oxford English Dictionary defines "Kawaii" with sweeping breadth as: "[c]ute, esp. in a manner considered characteristic of Japanese popular culture; charming, darling; ostentatiously adorable." (*See* www.oed.com.) Even if "Kawaii" were sufficiently defined in itself, the absence of any consistent look across the product line undercuts the descriptor as-applied. To the extent that Plaintiffs are essentially just claiming simple geometric shapes – like "rounded" "eyes" – those are not distinctive or protectable, and do not even apply to all of Plaintiffs' products.[8] *Shelbyco Inc. v. Western Trimming Corp.*, No. 2:97-CV-196C, 1997 WL 377982, at *4 (D. Utah. May 12, 1997) ("[T]he only consistent feature in [plaintiff's] trade dress is the display of commonplace, ordinary shapes in various colors.").

As explained in *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp. 2d 1168, 1176 (N.D. Cal. 2007):

> plaintiff resorts to empty generalities in the face of more precise alternatives. For instance, to describe the colors of the trade dress, plaintiff should list the actual colors rather than claim a 'palette of colors reminiscent of Provence.' Or instead of defining the three-dimensional relief as 'complex,' plaintiff should provide the magnitude and angle of relief that render plaintiff's tiles distinctive.

Here, as in *Walker*, Plaintiffs have resorted to "empty generalities." *See also Sara*

---

[8] Nor is it plausible that Plaintiffs could claim rights in the Kawaii style, as this is an aesthetic that originated from Japan that pre-dates Squishmallows. Plaintiffs cannot simply appropriate as their own an entire preexisting style: Plaintiffs can no more claim distinctiveness as to Kawaii style than they could to Anime.

16

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 72 of 231

4889-2439-3108.5

438 of 816

*Designs, Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (high level descriptions like "gradient chain" were inadequate).

- ***"Embroidered Facial Features"***

It is virtually axiomatic that stuffed animal toys have embroidered facial features. Not only is this feature wholly generic and non-distinctive, but it is also legally functional, as embroidery is one of the most common means to apply facial features to stuffed animals.

- ***"Distinctive Contrasting and Non-monochrome Coloring"***

Read literally, the phrase means nothing more than that the toys are multi-colored. The adjective "distinctive" is just conclusory, given that the phrase as a whole fails to explain what is distinctive about the color pattern. Having a stuffed animal be "multi-colored" is just a generic and aesthetically functional attribute that cannot be protectable.

Furthermore, even among Squishmallows, many use the same color tones, such as those below (from Exhibit A):



- ***"Short-pile velvety velour-like…and squeezable marshmallow feel"***

A substantial percentage of all stuffed animal toys could be described this way, so the phrase does not add anything to the overall definition. Soft texture and squeezability are utilitarian functional features that could not be protectable. Just as a car company could not claim a trade dress in "rubbery round tires," Plaintiff cannot enhance their definition of trade dress by adding plainly unprotectable features. *See, e.g., Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co*., 916 F.2d 76, 81 (2d Cir. 1990) (finding that the plaintiff

17

sought trade dress protection "not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain").

Plaintiffs may argue that even if the Claimed Elements are unprotectable in isolation, the combination of them defines a valid trade dress. This argument also fails because the Complaint does not demonstrate how the combination of the Claimed Elements adds up to anything more than the sum of their parts. While it is true that sometimes unprotectable elements can be arranged in an aesthetically distinctive and non-functional way (like stacking building blocks into an artistic sculpture), the Ninth Circuit has also made clear that when the whole of trade dress is nothing more than assemblage of unprotectable elements combined in a predictable way, "it is semantic trickery to say that there is still some sort of separate 'overall appearance'" that is protectable. *Leatherman Tool Grp., Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea.").

When boiled down to their essence, all that the Claimed Elements define in combination is a roundish stuffed animal toy with multiple colors and an embroidered cartoonish face. Taken together, these elements do not yield any protectable whole, but rather just broadly describe attributes of innumerable stuffed toy products that no one company could plausibly monopolize. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir. 1997) ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings").

Nor do the various photographs supplied in the Complaint assist the Claimed Elements because "courts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 747 (E.D. Mich. 2014) (dismissing claims to trade dress in an entire product line up of hockey gear). Here, Plaintiffs'

18

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 74 of 231

4889-2439-3108.5

440 of 816

Complaint does not adequately convey the true scope and diversity of the Squishmallows product line, and even as among the pictures in the Complaint, it is apparent that there is no distinctive and protectable feature of the toys that is consistent across the whole line.

One of the several negative consequences of the overbreadth of Plaintiffs' definition is that it makes it impossible to differentiate between stuffed animals that would be deemed infringing and those that would not be. Indeed, the Claimed Elements on their face extend to the products sold by Dan-Dee and Ty that Plaintiffs had previously accused of infringement before withdrawing their claims and dismissing with prejudice. Those dismissals would bar future infringement claims against such toys under principles of res judicata. Despite this, Plaintiffs now persist in asserting a trade dress definition that includes those non-infringing toys. Such a definition is overreaching and cannot fairly put Zuru on notice of the parameters of Plaintiffs' claimed rights.

Nor should it be assumed that there ultimately is a way to properly define trade dress rights in Squishmallows. Where trade dress is claimed in a product line, "[t]he elements specified as the trade dress must be present in every item in that product line." *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009); *see also Nat'l Lighting Co., Inc.,* 601 F. Supp. 2d at 562 (dismissing under Rule 12(b)(6) where "plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements"). The moment that Plaintiffs made the marketing decision to have hundreds (perhaps thousands) of highly varied product designs – both in terms of very different looking characters, and in terms of different structural variations – they forfeited the ability to use trade dress law to encompass the entire line-up. For purposes of this Motion, at least, the Claimed Elements do not suffice as a trade dress definition.

Returning to the fact that Plaintiffs do not appear to have attempted to obtain any federal registration for the purported Squishmallows trade dress, this can serve as a litmus test for the sufficiency of the trade dress definition. The Trademark Office requires that applicants supply a drawing or image of the claimed trade dress that adequately and

19

specifically puts the public on notice of the design that is claimed. *See* 37 C.F.R. §2.52; Trademark Manual of Examining Procedure ("TMEP") §1202.02(c) – (c)(i). In the case of products that are part of a varied line-up, a single unifying feature may be claimed in solid lines, with variable features shown in dashed lines. *Id*. For example, a car company might seek trade dress protection in the design of a particular front grill used on many different cars, showing it in solid lines and the rest of the car in dashed lines. In the case of Squishmallows, however, it is unclear how Plaintiffs could ever come up with any drawing based on their Claimed Elements that could satisfy regulatory notice requirements. Because there in fact are no common identifying features across the Squishmallows product line, any attempt to represent them visually would devolve into a collection of amorphous dashed lines. If a claimed trade dress is so abstract and so varied across a product line that it could not be feasibly depicted in a federal registration, it must be rejected.

## B. This Court's Past Rulings On Squishmallows Trade Dress

To Zuru's knowledge, this will be the third time that a Central District of California court has been asked to rule on the sufficiency of Plaintiffs' purported trade dress definition for Squishmallows. In a September 23, 2019 ruling in the *Dan-Dee* Case, Judge Kronstadt granted dismissal for many of the same reasons that Zuru now advances (though Zuru has also asserted additional arguments not considered in *Dan-Dee*). In a December 4, 2019 ruling in *Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, Judge Fitzgerald – who, remarkably, was never informed by Plaintiffs of the *Dan-Dee* decision from just a few months earlier – granted dismissal on other grounds, but found the trade dress definition adequate. No. CV-19-07652-MWF, 2019 WL 8064073, at *4-6 (C.D. Cal. Dec. 4, 2019). There are compelling reasons why *Dan-Dee* is more persuasive than *Hugfun*, and why *Hugfun* is otherwise distinguishable from the present case, in which Zuru is presenting new arguments.

Although the trade dress definition in *Dan-Dee* contained fewer words than the definition that Plaintiffs now advance, it was functionally the same:

(1) substantially bell-shaped plush toys embodying fanciful renditions

20

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 76 of 231

4889-2439-3108.5

442 of 816

of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light 'marshmallow,' memory foam-like texture.

(Dan-Dee Order, Ciardullo Ex. 1, p.2.)

It is appropriate for the Court to approach Plaintiffs' latest version of the trade dress definition in the same way as the *Dan-Dee* court because Plaintiffs' additions to the definition do not actually convey any new meaning. For example, Plaintiffs have included the phrase "Asian style Kawaii" without defining it, and in looking at all the pictures of Squishmallows, it is apparent that they have highly varied faces. Plaintiffs also add the word "non-monochromatic," which is just a fancy way of saying that the toys have more than one color, but such is true of most stuffed animal toys. Plaintiffs add the phrase "repeating and complementary," but it is unclear what this means, or how it is even reflected across all of the diverse Squishmallows. Likewise, the words "eyes," "snouts," "mouths," "nostrils," and "bellies" do not add anything since most stuffed animals have such features.

In dismissing the trade dress claims in *Dan-Dee*, the Court ruled: "This general description offers little insight into the scope or nature of Kellytoy's claim. [] It is also too broad to form the basis of a plausible claim for trade dress infringement. …in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently." (Dan-Dee Order, Ciardullo Ex. 1, p.9.)

Plaintiffs may argue that this Court should follow *Hugfun* over *Dan-Dee* because the trade dress definition in *Hugfun* was the more wordy one that is also used in the present Complaint. However, there are numerous reasons why this Court should reach a different result. To start, the *Hugfun* ruling is clouded by the fact that neither litigant ever informed

21

MOTION TO DISMISS
CASE NO. 2:23-cv-09255

EXHIBIT K
Page 77 of 231

4889-2439-3108.5

443 of 816

the court of the *Dan-Dee* ruling from only a few weeks earlier,[9] despite such disclosure being ethically required of Plaintiffs' former legal counsel pursuant to their Duty of Candor. *See* California Rule of Professional Conduct 3.3(a)(2): "A lawyer shall not fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel…". The *Hugfun* ruling anomalously makes no mention of *Dan-Dee*, and since the motion was decided only on the papers (*see Hugfun* at *2), it appears that the court never had the opportunity to consider *Dan-Dee*.

Further hampering the Court was the fact that the litigants failed to appropriately convey the sheer numerosity and variety of different-looking Squishmallows.[10] The movant also failed to address the different burden in pleading trade dress in a large line-up of products rather than a single product, and so the court never addressed this important distinction. More generally, the movant did not present the court with many of the arguments that Zuru now presents in this Motion. Finally, there have been important intervening facts: Plaintiffs have since withdrawn infringement claims against Ty and Dan-Dee that otherwise fall within the scope of the trade dress definition. This new development renders Plaintiffs' trade dress definition inherently vague and inconsistent with legal positions that have now become res judicata.[11]

---

[9] *See* briefing at C.D. Cal. Case No. 2:19-cv-07652, Dkts. 13, 19, and 21.

[10] The Court did observe language in the Complaint to the effect that Squishmallows comprise "a broad range of plush toys" (*Hugfun* at *3), but the Court was not otherwise aware of what these were or their surprising numerosity.

[11] Plaintiffs may point to the ruling from the Illinois court in the Ty Case in which, despite denying Plaintiffs' motion for a preliminary injunction, the court stated briefly in conclusory fashion that "the court cannot say that Kellytoy's description fails to put Ty on notice of the contours of its claimed trade dress." Ty Case, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020). This non-substantive assessment from a district court in a different circuit should not be given much weight.

22

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 78 of 231

4889-2439-3108.5

444 of 816

## V. PLAINTIFFS SHOULD CONFIRM THE ORIGIN OF THE "COPYRIGHTED WORKS" IMAGES

The Complaint contains a table on Pages 12-13 in which the left column has a heading that reads "Copyrighted Works" above a collection of photographs, while the right hand column purports to have corresponding copyright registration numbers. However, the Complaint contains no allegation that the toys in the photos of the "Copyrighted Works" are the same as the toys whose images were submitted in the deposit copies to the Copyright Office. Put another way, the Complaint provides no assurance that the photos of the "Copyrighted Works" might not be images of some other toys (or versions of toys) that are different than the toys that are actually the subject of the copyright registrations. As explained in *Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023):

> …a copyright protects original material to the extent it is contained in the deposit copy. Copyright Office Compendium § 504 (3d ed. 2017) ("As a general rule, a registration for a work of authorship covers the entire copyrightable content of the authorship that (i) is claimed in the application, (ii) is owned by the claimant, and (iii) is contained in the deposit copy(ies)." (emphasis added)). Thus, a plaintiff must use the deposit copy to establish the ownership component of a copyright infringement claim.

When the parties met and conferred on this issue, Plaintiffs were unclear as to the origin of the photos that purport to reflect the "Copyrighted Works." (Ciardullo Decl. ¶2.) The Copyright Office does not maintain easily accessible records of deposit copies, so Zuru cannot simply look them up online as it would, for example, to see the prosecution history of a patent. Plaintiffs are uniquely in possession of the deposit copy records. While Zuru could ultimately get those records several months from now as part of discovery, Zuru would be "flying blind" until then, uncertain of what the actual toys in the deposit copy images look like, and thus not on sufficient notice of the copyright claim to be able to

<div align="center">23</div>

prepare its defenses. If Plaintiffs are unwilling or unable to allege and show what the copyright deposit copies consist of via amendment, the copyright claim is not properly stated because it is the copyright deposit copy that controls the scope of any protection (and not random photographs). *See Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK (AGRx), 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014) ("the deposit copy or a comparable writing defines the scope of what is protected"). Plaintiffs should be required to amend (if they can) to clarify whether the images shown as the "Copyrighted Works" in the Complaint depict the same toys as are shown in the deposit copies at the Copyright Office, or if they are not, Plaintiffs should supply such images as part of an amended pleading.

## VI.   UNOPPOSED GROUNDS

### A.   Lack Of Standing

In order to have standing to assert a copyright claim, the plaintiff must be either the owner or exclusive licensee the copyrights at issue. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 887-8 (9th Cir. 2005); *Roblox Corp. v. Wowwee Grp. Ltd.*, 2023 WL 2433970, *10-11 (N.D. Cal. Mar. 9, 2023). Here, the Complaint provides no basis for how any Plaintiff other than Kelly Toys Holdings LLC would have standing under the Copyright claims. (Complaint, ¶14.) In meeting and conferring on this point, Plaintiffs indicted that they did not oppose the argument. (Ciardullo Decl. ¶ 2.) Though not part of this Motion, Zuru reserves the right to challenge Lanham Act standing as the case proceeds.

### B.   Copyright Preemption

State law claims are preempted and must be dismissed to the extent that they seek to vindicate claimed rights that are the same as those already protected by Copyright law. *Lanard Toys Ltd. v. Novelty Inc.*, 511 F. Supp. 2d 1020, 1030–31 (C.D. Cal. 2007); *Aquawood, LLC v. Toys "R" Us-Delaware, Inc.*, No. 215CV05869ABMRWX, 2016 WL 10576620, at *3 (C.D. Cal. Mar. 10, 2016). Here, Plaintiffs' claim under Section 17200 is partially based on the assertion of infringement of the alleged copyrighted works. (Complaint, ¶102, referring to the "Squishmallows Works.") Although Plaintiffs' Fourth

24

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 80 of 231
4889-2439-3108.5
446 of 816

Cause of Action under California common law does not expressly reference copyrights, the Prayer for Relief at Section (f) seeks judgment that the alleged copyright infringement constitutes a violation under the common law. Zuru thus requests that all state law claims be dismissed-in-part to the extent premised on any assertion of copyrights. In meeting and conferring on this point, Plaintiffs indicted that they did not oppose the argument that the state law claims cannot be premised on copyright.

## VII.  **CONCLUSION**

Zuru requests that the Court grant dismissal of Plaintiffs' claims for the reasons set forth above.

DATED:  December 22, 2023                **FOLEY & LARDNER LLP**

/s/ Jean-Paul Ciardullo
Jean-Paul Ciardullo
Jonathan E. Moskin
Ashley Koley

Attorneys for Defendant
ZURU, LLC

25

# WORD COUNT CERTIFICATION

I hereby certify that, according to Microsoft Word's Word Count function, the foregoing Memorandum is less than 7,000 words.


*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

26

4889-2439-3108.5

MOTION TO DISMISS
CASE NO. 2:23-cv-09255
EXHIBIT K
Page 82 of 231

448 of 816

1 | **HUESTON HENNIGAN LLP**
2 | Moez M. Kaba, State Bar No. 257456
  | mkaba@hueston.com
3 | Sourabh Mishra, State Bar No. 305185
  | smishra@hueston.com
4 | 523 West 6th Street, Suite 400
  | Los Angeles, CA 90014
5 | Telephone:  (213) 788-4340
  | Facsimile:   (888) 775-0898
6
  | *Attorneys for Plaintiffs Kelly Toys*
7 | *Holdings, LLC; Jazwares, LLC; Kelly*
  | *Amusement Holdings, LLC; and*
8 | *Jazplus, LLC*

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **WESTERN DIVISION**

13 | KELLY TOYS HOLDINGS, LLC;   Case No. 2:23-cv-09255-MCS(AGRx)
   | JAZWARES, LLC; KELLY
14 | AMUSEMENT HOLDINGS, LLC; and   Hon. Mark C. Scarsi
   | JAZPLUS, LLC,
15 |                                **PLAINTIFFS' OPPOSITION TO**
   |            Plaintiffs,         **ZURU LLC'S MOTION TO DISMISS**
16
   |        vs.                     Date:    February 26, 2024
17 |                                Time:    9:00 a.m.
   | ZURU, LLC,                     Courtroom: 7C
18
   |            Defendant.
19

---

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1

# TABLE OF CONTENTS

2

Page(s)

3    I.    INTRODUCTION AND BACKGROUND ........................................................ 1

4    II.   LEGAL STANDARD ..................................................................................... 5

5    III.  ARGUMENT .................................................................................................. 6

6          A.   Plaintiffs' Description of the Identified Trade Dress is
                Sufficient at the Pleading Stage ............................................................. 6
7
8               1.   There is No Legal Requirement for Plaintiffs to
                     Detail Every Element of a Protectable Trade Dress at
9                    the Pleading Stage .......................................................................... 6

10              2.   Plaintiffs Have Provided Sufficient Notice of Their
                     Trade Dress ..................................................................................... 8
11
12              3.   Plaintiffs Have Plausibly Pleaded Trade Dress
                     Infringement Based on the Identified Trade Dress .................... 10

13              4.   Both Courts to Consider the Identified Trade Dress
                     Have Held It to Be Sufficiently Pleaded .................................... 16
14
15         B.   There is No Legal Requirement to Submit Deposit Images
                in a Complaint ..................................................................................... 20

16         C.   Plaintiffs Do Not Oppose Zuru's Standing and Preemption
                Arguments ............................................................................................ 21
17
18         D.   If Needed, Plaintiffs Should Be Provided Leave to Amend ............... 21

19   IV.   CONCLUSION ............................................................................................ 21

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

5
*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    768 F. Supp. 2d 1040 (N.D. Cal. 2011) ............................................. 9

6

7
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................... 5

8

9
*Atari Interactive, Inc. v. Hyperkin Inc.*,
    2020 WL 4287584 (C.D. Cal. July 27, 2020) ................................. 13

10

11
*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 5

12

13
*Clicks Billiards v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) .................................................. passim

14
*Crafty Prods., Inc. v. Michaels Cos., Inc.*,
    389 F. Supp. 3d 876 (S.D. Cal. 2019) ...................................... 9, 21

15

16
*Creative Co-Op, Inc. v. Elizabeth Lucas Co.*,
    2012 WL 761736 (D. Idaho Mar. 7, 2012) ..................................... 21

17

18
*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
    2015 WL 12731929 (C.D. Cal. May 8, 2015).......................... 3, 8, 10

19

20
*DocMagic, Inc. v. Ellie Mae, Inc.*,
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) ........................................... 7

21

22
*Erickson v. Pardus*,
    551 U.S. 89 (2007) ........................................................................... 5

23
*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987).......................................................... 7

24

25
*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000)...................................................... 16

26

27
*Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Institute*,
    481 F. Supp. 3d 941 (D. Ariz. 2020).............................................. 10

28

- ii -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

EXHIBIT K
Page 85 of 231

*Herman Miller, Inc. v. Blumenthal Distributing, Inc.*,
  2019 WL 1416472 (C.D. Cal. Mar. 4, 2019) ................................................. 13

*Hudspeth v. CIR*,
  914 F.2d 1207 (9th Cir. 1990) ..................................................................... 19

*IMEX Leader, Inc. v. Zest US Wholesale, Inc.*,
  2023 WL 2626968 (C.D. Cal. Feb. 15, 2023) ............................................. 8, 10

*Interactive Health LLC v. King Kong USA, Inc.*,
  2008 WL 11337393 (C.D. Cal. Mar. 6, 2008) ................................................ 10

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995) ............................................................................. 13

*Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*,
  2019 WL 8064073 (C.D. Cal. Dec. 4, 2019). ............................................ 5, 17

*Kellytoy Worldwide, Inc. v. Ty, Inc.*,
  2020 WL 5026255 (N.D. Ill. Aug. 25, 2020) ........................................... 17, 18

*Kellytoy Worldwide, Inc. v. Ty, Inc.*,
  2020 WL 5891386 (N.D. Ill. Oct. 5, 2020) ............................................... 5, 18

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
  113 F.3d 373 (2d Cir. 1997) ......................................................................... 13

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*,
  199 F.3d 1009 (9th Cir. 1999) ...................................................................... 13

*Lepton Labs, LLC v. Walker*,
  55 F. Supp. 3d 1230 (C.D. Cal. 2014) ................................................... passim

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ........................................................................ 5

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,
  57 F. Supp. 3d 1203 (C.D. Cal. 2014) ...................................................... 15, 16

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
  2021 WL 922074 (C.D. Cal. Jan. 7, 2021) ...................................................... 7

*Nat'l Prods., Inc. v. Arkon Resources, Inc.*,
  2017 WL 5499801 (W.D. Wash. Nov. 16, 2017) ........................................... 13

- iii -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

*Pac. Gas and Elec. Co. v. Lynch*,
    216 F. Supp. 2d 1016 (N.D. Cal. 2002) ........................................................ 19

*Paramount Farms Int'l, LLC v. Keenan Farms Inc.*,
    2012 WL 5974169 (C.D. Cal. Nov. 28, 2012)............................................ 9, 15

*Parker v. Hinton*,
    2023 WL 370910 (6th Cir. Jan. 24, 2023) .................................................... 20

*R&A Synergy LLC v. Spanx, Inc.*,
    2019 WL 8137706 (C.D. Cal. Sept. 4, 2019)............................................. 8, 20

*Sleep Science Partners v. Lieberman*,
    2010 WL 1881770 (N.D. Cal. May 10, 2010) ............................................... 10

*Therabody, Inc. v. DJO, LLC*,
    2022 WL 17360133 (C.D. Cal. June 1, 2022).............................................. 3, 7

*Vans, Inc. v. ACI Int'l*,
    2023 WL 6930323 (C.D. Cal. Oct. 11, 2023) ................................................ 14

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
    549 F. Supp. 2d 1168 (N.D. Cal. 2007) ......................................................... 9

*Williams v. Bridgeport Music, Inc.*,
    2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) ................................................ 20

*WMX Techs., Inc. v. Miller*,
    104 F.3d 1133 (9th Cir. 1997)....................................................................... 19

## Rules

Federal Rule of Civil Procedure 12(b)(6).................................................................. 5

Federal Rules of Civil Procedure 15(a)(2) ............................................................. 21

## Regulations

37 C.F.R. § 2.52....................................................................................................... 16

## Other Authorities

1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition ............................................................................................ 11, 16

- iv -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

# I.  INTRODUCTION AND BACKGROUND

Plaintiffs' Squishmallows toys have skyrocketed to fame, topping sales charts and rapidly becoming coveted collectors' items.  They have been described by the *Washington Post* as "the hottest toy on the market," (ECF 1, "Compl." ¶ 34) and have surpassed other well-known mega brands like Lego and Hot Wheels to become the most popular toy brand in the country.  (*Id.* ¶ 38.)  Squishmallows' meteoric rise is further demonstrated through its online popularity, with branded videos being viewed more than 11 billion times on TikTok.  (*Id.* ¶ 31.)  Put simply, consumers love Squishmallows.  (*Id.* ¶ 1.)

In a crowded toy market with many available plush toys, Squishmallows has become a runaway success with a distinctive look.  As described in paragraph 24 of the Complaint (the "Identified Trade Dress"), the popular trade dress associated with many Squishmallows is a fanciful rendition of a unique animal with simplified Asian style Kawaii faces in an egg/bell shape in combination with other features that create a distinguishing aesthetic look.  Due to the immense popularity of the toys, the look associated with this trade dress has grown synonymous with the Squishmallows brand.  (*Id.* ¶¶ 28-39.)

Witnessing Plaintiffs' success with Squishmallows in the toy market, competing toy company Defendant Zuru, LLC ("Zuru") decided to release products that copy the Asserted Trade Dress.  (*Id.* ¶¶ 42-46.)  In June 2023, Zuru launched "Snackles," a line of plush toys that undeniably seeks to usurp the benefits and trade off of the reputation and goodwill of the Plaintiffs' Identified Trade Dress:

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

| Plaintiffs' Original Products | Zuru's Infringing Products |
|---|---|



(*Id.* ¶ 43.)  Indeed, there is already substantial *actual* evidence of consumer confusion between Plaintiffs' Squishmallows and Zuru's Snackles.  (*Id.* ¶¶ 47-60.)  For example, consumers have remarked about Zuru's Snackles: "They look like Squishmallows"; "yo, these look like squishmallows"; "Literally a rip off of squishmallows"; "they're 100% trying to trick ppl like your partner"; and "Zuru jumping on the Squishmallows train five years too late."  (*Id.* ¶¶ 55, 57.)

Plaintiffs thus filed this case against Zuru to stop the ongoing infringement of the Identified Trade Dress; end the infringement of the copyrighted Squishmallows (*id.* ¶ 27, "Copyrighted Works"); and recover damages due to the substantial harm caused by Zuru (*id.* ¶¶ 58-59).

- 2 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 89 of 231

In response, Zuru filed a motion to dismiss ("Motion") that does not challenge *any* of the substantive allegations of copyright infringement. Nor does Zuru argue in the Motion that Plaintiffs have not sufficiently pleaded the required elements of trade dress infringement: non-functionality nature of the *overall* trade dress; secondary meaning; and likelihood of confusion. *See Clicks Billiards v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (listing these elements as the three elements required to establish trade dress infringement).

Instead Zuru claims that Plaintiffs have not sufficiently *identified* their trade dress because it opines that certain elements of the Asserted Trade Dress are not protectable. Zuru's arguments must be rejected for four reasons.

*First*, Zuru's argument that Plaintiffs must exhaustively explain the meaning of every word of every element of the Asserted Trade Dress is premature at the motion to dismiss stage. As Judge Wu held in *Therabody, Inc. v. DJO, LLC*, there are no "published Ninth Circuit or Supreme Court decision identifying [the exhaustive identification of the asserted trade dress] as a pleading requirement for such claims." 2022 WL 17360133, at *2 (C.D. Cal. June 1, 2022). Instead, the plaintiff need only plead the three elements required to state a trade dress claim as outlined by Ninth Circuit precedent. *Click Billiards*, 251 F.3d at 1258. Since Zuru "offers no proper argument that any of these elements are missing from Plaintiff[s'] allegations," its motion to dismiss must be denied. *Therabody*, 2022 WL 17360133, at *2.

*Second*, even if Plaintiffs were required to identify the specific trade dress-at-issue, they have met the low bar to identify the trade dress at the pleading stage. Courts that examine trade dress descriptions at the pleading stage allow them to proceed "[s]o long as a plaintiff has alleged a complete recitation of the concrete elements of its alleged trade dress." *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014). It can do so by both describing the trade dress in words (*id.*); with pictures; or with both in combination with one another. *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, 2015 WL 12731929, at *4 (C.D. Cal. May 8, 2015) (finding trade dress

- 3 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1   properly alleged where plaintiffs alleged "the elements of a trade dress and provid[ed]
2   an image of a product"). Plaintiffs here have done both: identified the five elements
3   of the Asserted Trade Dress *and* provided images of the Squishmallows products that
4   practice that trade dress. (Compl. ¶ 24.) Courts routinely deny motions to dismiss
5   where a plaintiff has provided an exhaustive list of the elements of its asserted trade
6   dress. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1240 (denying motion to dismiss).

7        *Third*, in arguing that the Asserted Trade Dress is not protectable, Zuru focuses
8   on *individual terms and words* in *individual elements* of the overall asserted design.
9   This is contrary to law. As controlling Ninth Circuit authority holds, an asserted trade
10  dress "must be examined as a whole, not by its individual constituent parts." *Click
11  Billiards*, 251 F.3d at 1259. Zuru's arguments that *some* parts of the Asserted Trade
12  Dress may be functional or non-distinctive are thus irrelevant and cannot justify
13  granting a motion to dismiss. *Id.* ("It is crucial that [courts] focus *not* on the individual
14  elements, but rather on the overall visual impression that the combination and
15  arrangement of those elements create."). And, in any event, Zuru's claim that the
16  Court should undertake fact-intensive inquiries about genericness, distinctiveness, and
17  functionality based on exhibits outside of the Complaint[1] is inappropriate at the motion
18  to dismiss stage when the Court must assume Plaintiffs' allegations as true. *Lepton
19  Labs*, 55 F. Supp. 3d at 1237 (courts "must construe all factual allegations set forth in
20  the complaint as true and in the light most favorable to the plaintiff" (cleaned up)).

---

22  [1] As discussed in the accompanying Opposition to Zuru's Request for Judicial Notice,
23  Zuru improperly relies on exhibits in its Motion that are neither incorporated by
    reference in the Complaint, nor otherwise proper subjects of judicial notice. And it
24  also, in violation of Ninth Circuit precedent, asks this Court to assume the truth of its
25  extraneous exhibits to grant its motion to dismiss. *See Khoja v. Orexigen
    Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("Submitting documents not
26  mentioned in the complaint to create a defense is nothing more than another way of
27  disputing the factual allegations in the complaint," while failing to give the plaintiff an
    "opportunity to respond to the defendant's new version of the facts."). The Court
28  should decline to do so.

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

1       *Fourth*, both courts that have considered the Asserted Trade Dress have found

2 it to be sufficient at the pleading stage.  In *Kellytoy Worldwide, Inc. v. Hugfun Int'l,*

3 *Inc.*, Judge Fitzgerald held that the Asserted Trade Dress "satisfies the requirements

4 of Rule 8" because it "describes the [t]rade [d]ress in detail and attaches photos of its

5 line of plush toys."  2019 WL 8064073, at *4 (C.D. Cal. Dec. 4, 2019).  Likewise, in

6 *Kellytoy Worldwide, Inc. v. Ty, Inc.*, the court rejected the *same arguments* Zuru

7 presents here, holding that the Asserted Trade Dress is enough to put the defendant

8 "on notice of the contours of its claimed trades" to proceed to discovery.  2020 WL

9 5891386, at *2 (N.D. Ill. Oct. 5, 2020).  This Court should do the same.

10       Finally, Zuru also requests that Plaintiffs provide the original deposit images of

11 the Copyrighted Works with the Complaint.  Yet Zuru cites no law requiring that

12 Plaintiffs do so at the pleading stage.  This argument, like Zuru's argument about the

13 trade dress description, is yet another attempt to insert fact disputes at the pleading

14 stage.  Plaintiffs respectfully request that the Court deny Zuru's Motion in its entirety.

## II.   LEGAL STANDARD

16       A court may only grant dismissal under Federal Rule of Civil Procedure

17 12(b)(6) if the plaintiff fails to present a cognizable legal theory or to allege sufficient

18 facts to support a cognizable legal theory.  *Mendiondo v. Centinela Hosp. Med. Ctr.*,

19 521 F.3d 1097, 1104 (9th Cir. 2008).  In assessing a motion to dismiss, "a judge must

20 accept as true all of the factual allegations contained in the complaint."  *Erickson v.*

21 *Pardus*, 551 U.S. 89, 94 (2007).  To survive a Rule 12(b)(6) motion, a complaint need

22 only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

23 is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

24 *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

25

26

27

28

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

## III.   **ARGUMENT**

###   **A.   Plaintiffs' Description of the Identified Trade Dress is Sufficient at the Pleading Stage**

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards*, 251 F.3d at 1257-58 (cleaned up). "To sustain a claim for trade dress infringement, [a plaintiff] must prove: (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Id.*

Here, Zuru does not directly challenge functionality, secondary meaning, nor the likelihood (and substantial actual evidence of) consumer confusion. (*See generally* ECF 23.)  It instead focuses exclusively on whether Plaintiffs' *trade dress description* is sufficient to proceed to discovery. (*Id.* at 13 ("Plaintiffs Fail to Adequately Define Protectable Trade Dress").)

Zuru's arguments fail for four reasons: (1) there is no requirement to identify a specific trade dress definition at the pleading stage; (2) Plaintiffs' Identified Trade Dress provides sufficient notice of the asserted trade dress; (3) Zuru's arguments are meritless and, in any event, present fact disputes not ripe for adjudication at this stage; and (4) every court to consider Plaintiffs' Identified Trade Dress has found it sufficient at the pleading stage.

###       1.   There is No Legal Requirement for Plaintiffs to Detail Every Element of a Protectable Trade Dress at the Pleading Stage

Zuru argues that the Identified Trade Dress is "too vague and overbroad to adequately articulate any cognizable trade dress rights." (ECF 23 at 13.)  This argument improperly assumes that, at the pleading stage, a plaintiff must plead, and a court must assess, all elements of its trade dress.  The law is otherwise.

- 6 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1    Judge Wu's decision in *Therabody* is directly on point.  There, the defendant

2    argued, as Zuru does here, that "to state a claim for trade dress infringement, a plaintiff

3    must first identify the trade dress at issue."  2022 WL 17360133, at *2.  But, as Judge

4    Wu held, neither the parties nor the Court "located any published Ninth Circuit or

5    Supreme Court decision identifying this as a pleading requirement for such claims."

6    *Id.*  Instead, the plaintiff need only plead non-functionality, secondary meaning, and

7    likelihood of confusion.  *Id.*  If the plaintiff does so, the trade dress claim proceeds

8    beyond the pleading stage and "[t]o the extent [d]efendant believes there is a

9    problematic uncertainty in [p]laintiff's trade dress claims beyond those required

10   allegations, that is one permissible aim of discovery."  *Id.*

11   The same analysis applies here.  Plaintiffs have sufficiently pleaded non-

12   functionality (Compl. ¶ 25); secondary meaning (*id*. ¶¶ 28-39); and likelihood of

13   confusion (*id*. ¶¶ 47-57.)  Zuru does not challenge the sufficiency of these allegations.[2]

14   (*See generally* ECF 23.)  Accordingly, Plaintiffs' trade dress claims must proceed to

15   discovery and Zuru's motion to dismiss should be denied.  *Therabody*, 2022 WL

16

17   [2] Zuru's only references to the functionality are in the context of disputing *some*

18   *individual* elements of the Identified Trade Dress.  (*See, e.g.*, ECF 23 at 15 ("egg shape
     is a stock aesthetically functional feature"); *id.* at 17 ("embroidered facial features" are

19   "legally functional").)    Zuru never addresses Plaintiffs' detailed allegations

20   establishing the functionality of the, as required under the law, *overall trade dress* in
     paragraph 25 of the Complaint. (*Id.*)  *See Clicks Billiards*, 251 F.3d at 1259 (holding

21   that "in evaluating functionality," courts must "focus not on the individual elements,
     but rather on the overall visual impression that the combination and arrangement of

22   those elements create")  And even if Zuru had challenged the functionality of the

23   overall trade dress, courts routinely hold that whether "trade dress is functional or
     nonfunctional is a factual one that cannot be resolved on a motion to dismiss."

24   *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1141 (N.D. Cal. 2010);

25   *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987)
     ("Functionality is a question of fact."); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 2021

26   WL 922074, at *4 (C.D. Cal. Jan. 7, 2021) ("Defendant primarily argues that the

27   elements of the [] trade dress are functional [], but whether the elements are functional

28   are factual issues that the Court cannot resolve at the motion to dismiss stage.").

- 7 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

17360133, at *2 (denying motion to dismiss trade dress claims for failure to identify a trade dress).

2.     Plaintiffs Have Provided Sufficient Notice of Their Trade Dress

Even if it were required, Plaintiffs have provided a sufficient recitation of the trade dress at issue under the standard employed by courts who have examined the trade description at the pleading stage.

District courts in the Ninth Circuit hold that "[s]o long as a plaintiff has alleged a complete recitation of the concrete elements of its alleged trade dress, it should be allowed to proceed." *Lepton Labs*, 55 F. Supp. 3d at 1240.  Even if "[a] defendant may very well believe that a [trade dress description] does not make out a claim for protectable trade dress," "granting a dismissal motion based upon that belief would turn the litigation process on its head." *Id.*  The time to test the "legal merits" of the trade dress description is "at summary judgment or trial when the parties provide with all relevant, admissible evidence—not at the pleading stage when the court has little more than the plaintiff's allegations and the defendant's summary denial of them." *Id.*

Here, Zuru does not dispute that Plaintiffs have pleaded a complete recitation of the concrete elements of the Identified Trade Dress.  (ECF 23 at 14 (admitting that "the Complaint defines the relevant trade dress elements")).  Indeed, Plaintiffs include both the elements of its Identified Trade Dress and *pictures* of the relevant products.  (Compl. ¶ 24.)  They also include pictures of the *infringing* products side-by-side with Plaintiffs' products.  (*Id.* ¶ 43.)  This is sufficient at the pleading stage.  *See, e.g.*, *R&A Synergy LLC v. Spanx, Inc.*, 2019 WL 8137706, at *2 (C.D. Cal. Sept. 4, 2019) (holding that the plaintiff provided a "plausible claim for trade dress infringement" where it "has identified specific designs that are allegedly being infringed [] and has pleaded exhibits providing a visual comparison of the allegedly infringing designs"); *Deckers*, 2015 WL 12731929, at *4 ("[The] listing [of] the elements of a trade dress and providing an image of a product bearing the dress sufficiently identifies the trade dress over which [Plaintiffs claim] exclusive rights."); *IMEX Leader, Inc. v. Zest US*

- 8 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

*Wholesale, Inc.*, 2023 WL 2626968, at *6 (C.D. Cal. Feb. 15, 2023) (trade dress description was sufficient where the alleged trade dress consisted of "nonfunctional artwork, designs, various character names and faces, and/or art depicting stories on . . . egg-shaped containers," and plaintiff "provide[d] a multitude of images and examples").

Zuru's gripe is instead with the *merits* of the Identified Trade Dress, arguing that it is somehow both too narrow and too broad. (ECF 23 at 14 (arguing both that the description "reach[es] far beyond the specific individual toy designs highlighted in their Complaint" and does not "encompass their enormous and highly varied product line-up").) Yet Zuru does not cite a *single published case* from the Ninth Circuit that dismissed trade dress claims at the pleading stage based on the alleged deficiencies in a description that includes exhaustive elements of an asserted trade dress. (ECF 23 at 16 (citing *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1175-76 (N.D. Cal. 2007) (granting a motion for *summary judgment* and only after examining "the evidence submitted by the parties," including a 30(b)(6) deposition)); *id.* at 12 (citing *Paramount Farms Int'l, LLC v. Keenan Farms Inc.*, 2012 WL 5974169, at *3 (C.D. Cal. Nov. 28, 2012) (denying defendant's *summary judgment* argument because "Plaintiff is only seeking trade protection over the bins that bear the five indicia of the Claimed Trade Dress"); *Crafty Prods., Inc. v. Michaels Cos., Inc.*, 389 F. Supp. 3d 876, 881-83 (S.D. Cal. 2019) (dismissing and providing leave to amend where, unlike here, plaintiff did not include an exhaustive list of elements and instead claimed their trade dress encompassed "all of the designs and products depicted" in exhibits); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) (denying motion to compel expedited discovery because "a plaintiff generally is permitted to define a product line as it sees fit" (cleaned up))).)[3]

---

[3] The unpublished cases Zuru cites from the Ninth Circuit likewise do not help Zuru because they either involve vastly different facts, were summary judgment orders,

(Continued...)

- 9 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Instead, where, as here, the plaintiff only presents *merits* challenges to a trade dress description, courts routinely deny motions to dismiss trade dress claims. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1240-41 (denying motion to dismiss and holding that defendant's argument that it is not on sufficient notice of the trade dress because the description is too vague "is an issue better tested at a later stage in the litigation"); *IMEX*, 2023 WL 2626968, at *6 (denying motion to dismiss where plaintiff included a trade dress description and holding that "these allegations [are] sufficient at this stage of the proceedings"); *Deckers*, 2015 WL 12731929, at *4 (rejecting argument that dismissal is warranted simply because an element of the trade dress description is "too general"); *Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Institute*, 481 F. Supp. 3d 941, 952 (D. Ariz. 2020) (sufficient notice where trade dress alleged was "9-digit alphanumeric identifier for trading partners in the healthcare industry, including the animal health industry").

### 3. Plaintiffs Have Plausibly Pleaded Trade Dress Infringement Based on the Identified Trade Dress

Even if the Court were to examine the merits of Zuru's arguments against the Identified Trade Dress, Plaintiffs' trade dress description and pictures are sufficient to put Zuru on notice under Rule 8. *See IMEX*, 2023 WL 2626968, at *7 (test on a motion to dismiss is whether the complaint "plausibly alleges" trade dress infringement).

"The Ninth Circuit has emphasized that '[t]rade dress is the composite tapestry of visual effects.'" *Lepton Labs*, 55 F. Supp. 3d at 1240 (quoting *Clicks Billiards*, 251 F.3d at 1259). That is why "[c]ourts have repeatedly cautioned that, in trademark-and especially trade dress-cases," the trade dress "must be examined as a whole, not by its

---

and/or found the trade dress description *sufficient*. *See, e.g.*, *Sleep Science Partners v. Lieberman*, 2010 WL 1881770, at *3-4 (N.D. Cal. May 10, 2010) (finding description insufficient because, unlike here, "Plaintiff employs language suggesting that these components are only some among many"); *Interactive Health LLC v. King Kong USA, Inc.*, 2008 WL 11337393, at *2-3 (C.D. Cal. Mar. 6, 2008) (holding at summary judgment that the trade description was *not* "impermissibly vague").

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1 individual constituent parts." *Clicks Billiards*, 251 F.3d at 1259 (citing 1 J. Thomas
2 McCarthy, McCarthy on Trademarks and Unfair Competition § 8:2 (4th ed. 2000)
3 ("[T]he issue is not whether defendant's package or trade dress is identical to
4 plaintiff's in each and every particular. Rather, it is the similarity of the total, overall
5 impression that is to be tested . . . .")).

6       Here, as detailed in the Complaint, there are substantial allegations establishing
7 the plausibility that the overall, visual impression of the Identified Trade Dress is
8 distinct and infringed by Zuru's products. The Squishmallows that practice the
9 Identified Trade Dress incorporate the enumerated elements which creates a distinct,
10 overall visual impression. (Compl. ¶ 24.) Indeed, as detailed by articles and consumer
11 comments, the consuming public recognizes the Identified Trade Dress as belonging
12 to Squishmallows. (*Id.* ¶¶ 32-33 (detailing success of the products); *id.* ¶¶ 34-38
13 (articles by leading publications like the *New York Times* and *Washington Post*,
14 celebrity fans, and awards).) In fact, the Identified Trade Dress is so distinctive that
15 consumers who saw the Zuru Infringing Products *believed that* the Zuru products were
16 actually Squishmallows. (*Id.* ¶¶ 54-57 (consumer "thought [Zuru's Infringing
17 Products] were [Squishmallows] at a glance").) This is not a surprise: the Zuru
18 Infringing Products clearly resemble the overall impression and visual effects of the
19 Identified Trade Dress. For example:

20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

| Plaintiffs' Original Product | Zuru's Infringing Product |
|---|---|
|  |  |
|  |  |

(Compl. ¶ 43.)

Despite the widespread recognition and popularity of the Identified Trade Dress, Zuru asks this Court to hold that the Identified Trade Dress is insufficient for four reasons. All fail.

*First*, Zuru spends the bulk of its brief arguing, in isolation, that specific terms in specific elements are too vague. (*E.g.*, ECF 23 at 15-17 (arguing that individual words in individual elements are vague or could be functional).) This is contrary to Ninth Circuit law.

In the Ninth Circuit, the court must examine the trade dress "as a whole," not the sufficiency of each "individual constituent part[]" on its own. *Clicks Billiards*, 251 F.3d at 1259. Indeed, "[t]he fact that individual elements of the trade dress may be[, for example,] functional does not necessarily mean that the trade dress *as a whole* is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." *Id.* (cleaned up) (emphasis in original).[4]

---

[4] Contrary to this controlling Ninth Circuit law, Zuru argues that "Plaintiff[s] cannot enhance their definition of trade dress by adding plainly unprotectable features." (ECF 23 at 17.) The Court should reject these misstatements of law.

- 12 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Therefore, "it is crucial that [courts] focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Id.* (emphasis in original).[5]

Therefore, Zuru's arguments about how an individual word or term in an element is undefined, generic, non-distinctive, [6] or functional are irrelevant and cannot be a basis to dismiss Plaintiffs' trade dress claims. (*See* ECF 23 at 15-17 (addressing each element in isolation).) Indeed, courts routinely refuse to, *even at the summary judgment stage*, engage in the element-by-element analysis that Zuru employs in its Motion. *See, e.g.*, *Herman Miller, Inc. v. Blumenthal Distributing, Inc.*, 2019 WL 1416472, at *9 (C.D. Cal. Mar. 4, 2019) (rejecting argument at summary judgment that "certain elements" "are functional" because the court "must focus on the overall effect of the combination of elements included in the asserted trade dress"); *Atari*

---

[5] None of Zuru's cited cases were on a motion to dismiss and, in any event, are consistent with the Ninth Circuit's controlling precedent in *Clicks Billiards*. (ECF 23 at 18 (citing *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) (holding, *after a jury verdict*, that even though "trade dress must be viewed as a whole," there was no protectable trade dress because, unlike here, the elements were all functional, just an assemblage of tools like pliers, a serrated blade, and a screwdriver); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) (holding on a *preliminary injunction motion* that "it is the combination of elements that should be the focus of the distinctiveness inquiry"); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381-82 (2d Cir. 1997) (remarking on a *preliminary injunction motion* that "we still recognize that there is no question that trade dress may protect the 'overall look' of a product").)

[6] For example, Zuru asserts that because there may be other products that meet *some* of the elements of the Identified Trade Dress, Plaintiffs cannot maintain their claim here. (ECF 23 at 19.) This argument improperly relies on documents outside of the pleadings that the Court cannot take judicial notice of and demands that the Court resolve a factual dispute rather than assume the truth of Plaintiffs' substantial allegations showing that the Identified Trade Dress has become distinctive and popular. (Compl. ¶¶ 28-39.) In any event, this is a fact dispute for discovery and trial. *C.f. Nat'l Prods., Inc. v. Arkon Resources, Inc.*, 2017 WL 5499801, at *7-8 (W.D. Wash. Nov. 16, 2017) (holding that third party products may be introduced at trial "in an attempt to argue that [plaintiff]'s trade dress is not distinctive").

---

- 13 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

*Interactive, Inc. v. Hyperkin Inc.*, 2020 WL 4287584, at *10 (C.D. Cal. July 27, 2020) (rejecting summary judgment argument based on the alleged functionality of individual elements and holding that "overall [] impression" is a fact issue "even assuming that *individual* elements" are functional (emphasis in original)).

This Court should likewise, as required by Ninth Circuit authority, examine the "overall visual impression" of the Identified Trade Dress, not the individual components on which Zuru focuses. *Clicks Billiards*, 251 F.3d at 1259.

*Second*, Zuru claims that the elements of the Identified Trade Dress "just broadly describe attributes of innumerable stuffed toy products." (ECF 23 at 18.) Not so.

The Identified Trade Dress identifies a list of the *specific* attributes of Plaintiffs' products that are *intentional design choices* to differentiate the Identified Trade Dress from other products available on the market. For example, the pictures in the Complaint show that the Identified Trade Dress *chose* to incorporate "Asian style Kawaii faces," which are a simplified, visual rendition of a face evoking a likeness with Japanese emoticons. (Compl. ¶ 24.) This is distinct from typical stuffed animals that attempt to faithfully recreate an animal's likeness, with eyes that match how they may appear in the wild. Likewise, the Identified Trade Dress *chose* to incorporate egg/bell shapes, rather than the shape of the animal in the wild as other toys do. (*Id.*) These *design choices*, combined with the other design choices detailed in the Identified Trade Dress, create the overall visual impression that consumers associate with Plaintiffs' products. (*Id.* ¶¶ 28-39.) *See Vans, Inc. v. ACI Int'l*, 2023 WL 6930323, at *8 (C.D. Cal. Oct. 11, 2023) (finding particularity requirement satisfied where trade dress was defined as "visible stitching, including where the eyestay meets the vamp" and "visible stitching, including separating the individual ankle collar corrugations").

At the motion to dismiss stage, the Court must assume these allegations to be true and thereby deny Zuru's motion to dismiss. *See, e.g.*, *Lepton Labs*, 55 F. Supp. 3d at 1237 ("A court is generally limited to the pleadings and must construe all factual

- 14 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1  allegations set forth in the complaint as true and in the light most favorable to the
2  plaintiff." (cleaned up)).

3      *Third*, Zuru claims that *every* product branded "Squishmallows" must practice
4  the Identified Trade Dress for the trade dress to be protectable.  (ECF 23 at 18-19.)
5  This is not the law.

6      As numerous district courts in the Ninth Circuit have recognized, "the Ninth
7  Circuit has not yet adopted the 'consistent overall look' test for trade dress claims
8  based upon a line of products." *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,
9  57 F. Supp. 3d 1203, 1223-24 (C.D. Cal. 2014); *Paramount*, 2012 WL 5974169, at *2-
10 3 (similar).  But even courts applying that test recognize that "[t]his standard do[es]
11 not require that the appearance of the series or line of products or packaging be
12 identical." *Moroccanoil*, 57 F. Supp. 3d at 1223-24 (internal quotation omitted).
13 Instead, "a plaintiff generally is permitted to define a product line as it sees fit." *Id.*
14 "The issue is [simply] whether the trade dress conveys a single and continuing
15 commercial expression." *Id.* at 1224.

16     Here, Zuru's argument confuses the Identified Trade Dress with the
17 Squishmallows *trademark*.  The fact that Plaintiffs' Squishmallows *trademark* applies
18 to a variety of products is irrelevant as to whether the *Identified Trade Dress* is
19 protectable.  Plaintiffs no more lose the right to the Identified Trade Dress by releasing
20 other designs for Squishmallows than Coca-Cola would lose the right to the iconic
21 Coca-Cola bottle trade dress by releasing alternative product designs.  Indeed, courts
22 allow plaintiffs to "only seek[] trade protection over the [products] that bear the []
23 indicia of the" claimed trade dress because "even if plaintiff distributed the same
24 products in fifteen different package designs for each of fifteen different customers,
25 this fact alone would not prevent plaintiff from obtaining trade dress protection for one
26 of the fifteen different packaging styles." *Paramount*, 2012 WL 5974169, at *3
27 (cleaned up).  That is precisely the case here: Plaintiffs seek protection only for the
28

- 15 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Identified Trade Dress, *not* designs for every Squishmallows-branded product ever sold.

Regardless, Zuru's argument is premature. Courts routinely hold, even on *summary judgment*, that whether a line of products have a "consistent overall look" is a triable jury issue. *See, e.g.*, *Moroccanoil*, 57 F. Supp. 3d at 1224 ("Viewing the [] line of products in the light most favorable to Plaintiff, there is a triable issue of fact as to whether [the] products present a 'consistent overall look.'").

*Fourth*, Zuru argues, with no legal support, that "Plaintiffs do not appear to have obtained any federal registration" for the Identified Trade Dress, which "can serve as a litmus test for the sufficiency of the trade dress definition." (ECF 23 at 19-20 (citing only 37 C.F.R. § 2.52 (which *allows*, rather than mandates, registration of trade dress).) This is, again, not the law. Section 43 of the Lanham Act—the provision at issue here—"protects against infringement of *unregistered* marks and *trade dress* as well as registered marks." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.3 (9th Cir. 2000) (emphasis added) (noting that "the same standard applies to both registered and unregistered trademarks" (cleaned up)); McCarthy on Trademarks and Unfair Competition § 8:1 (5th ed.) ("These days, unregistered trade dress is protected under federal Lanham Act § 43(a)(1)(A) under essentially the same rules as are trademarks.").

### 4. Both Courts to Consider the Identified Trade Dress Have Held It to Be Sufficiently Pleaded

Even if Plaintiffs were required to identify all elements of its trade dress at the pleading stage, this Court should follow *both of the other district courts* to consider the Identified Trade Dress and hold that it is sufficient to proceed to discovery.

Plaintiffs pleaded a five-element trade dress definition in their Complaint. (Compl. ¶ 24.) As detailed below, the same Identified Trade Dress has been presented to two other district courts by a different company that previously owned

- 16 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

Squishmallows.[7]  Both courts to consider the Identified Trade Dress have found it to be sufficient.

In *Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, Judge Fitzgerald addressed the sufficiency of the same trade dress pleaded in the Complaint in this case.  (*Compare* 2019 WL 8064073, at *2 (quoting asserted trade dress description), *with* Compl. ¶ 25 (asserting same trade dress description).)  He held that the Identified Trade Dress "satisfies the requirements of Rule 8" because it "describes the [t]rade [d]ress in detail and attaches photos of its line of plush toys." *Hugfun*, 2019 WL 8064073, at *4.  He rejected defendant's arguments, the same as Zuru's here, that individual elements of the Identified Trade Dress are "vague and overbroad" because the focus must be on the "composite tapestry of visual effects," not a "feature on its own." *Id.* (cleaned up).  Accordingly, Judge Fitzgerald held that "the overall description of the [Identified] Trade Dress gives [d]efendants sufficient notice to survive dismissal." *Id.*[8]

The decision in *Kellytoy Worldwide, Inc. v. Ty, Inc.* is in accord.[9]  There, the plaintiff asserted the same trade dress at issue here.  2020 WL 5026255, at *2 (detailing

---

[7]  As explained in the Complaint, non-party Kellytoy Worldwide, Inc. previously owned the copyrights and trade dress rights at issue.  (Compl. ¶ 13.)  On March 31, 2020, those rights were fully assigned and transferred to Plaintiff Kelly Toys Holdings, LLC.  (*Id.*)

[8] Though Judge Fitzgerald in *Hugfun* did dismiss the trade dress claims with a right to amend for failure to plead non-functionality, the complaint there only included a "conclusory statement that 'the Squishmallow Trade Dress is non-functional,'" 2019 WL 8064073, at *5, as opposed to the detailed non-functionality allegations in paragraph 25 of the Complaint in this case.  And in addition to providing leave to amend, the court in *Hugfun* "s[aw] no reason to deviate from the well-established approach that functionality should not be resolved at this stage" and thus refused to "entertain the merits of functionality at this stage."  2019 WL 8064073, at *5.

[9] In denying the defendant's motion to dismiss, the court relied on its findings in its prior ruling on the plaintiff's preliminary injunction motion.  2020 WL 5026255, at *1 ("Having recognized that Kellytoy had some likelihood of success on its Squishmallows-related claims, it would be odd for the court now to close its eyes to

(Continued...)

- 17 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1  the asserted trade dress).  Like Zuru here, the defendant there argued that "the
2  Squishmallows' trade dress is not articulated with sufficient particularity, both because
3  the operative complaint's description of the trade dress is too vague and because the
4  claimed trade dress is not used consistently."  2020 WL 5891386, at *2.  The court
5  rejected these arguments, holding that "when read in the light of the images of the
6  Squishmallows toys at issue, the court could not say that [the] description fails to put
7  [defendant] on notice of the contours of its claimed trade dress."  *Id.* (cleaned up).  And
8  the court additionally found, contrary to Zuru's argument here, that "a plaintiff is
9  entitled to claim trade dress protection for a subset of its products."  2020 WL 5026255,
10  at *3.

11      Zuru asks this Court to ignore these prior rulings on the *same* Identified Trade
12  Dress and instead follow the order in *Kellytoy USA, Inc. v. Dan-Dee Int'l, Ltd*., which
13  addressed a *different* trade dress description.  (ECF 23 at 20 (submitting the order in
14  Case No. 2:18-cv-05399-JAK (C.D. Cal. Feb. 7, 2019) as ECF 23-2).)  Not so.

15      In *Dan-Dee*, the court addressed a trade dress description that was far less
16  detailed with fewer elements than in this case.  (ECF 23-2 at 2.)  Indeed, a side-by-
17  side comparison plainly shows the significant differences between the description in
18  *Dan-Dee* and the description in this case:

| ***Dan-Dee* Case** (ECF 23-2 at 2) | **This Case** (Compl. ¶ 25) |
|---|---|
| (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light "marshmallow," memory foam-like texture. | (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall |

27  the evidence it considered in reaching that conclusion and to hold, without considering
28  that evidence, that those claims fail as a matter of law." (citing *Ty, Inc.*, 2020 WL
5891386, at *2 (N.D. Ill. Aug. 25, 2020)).

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

It was the above description on the left with *far less detail* that the *Dan-Dee* court held provided "little insight into the scope or nature of [plaintiff's] claim" because the description "can reasonably be construed as substantially broader than the trade dress protection [plaintiff] actually seeks." (ECF 23-2 at 9.) Then, after the court provided leave to amend, the plaintiff filed an amended complaint with the same Identified Trade Dress as in this case. (Mishra Decl. Ex. A ¶ 23.) Significantly, the *Dan-Dee* court *never* evaluated or issued any decision about the sufficiency of the Identified Trade Dress. (Mishra Decl. ¶ 3.)

Finally, Zuru argues, without any legal support, that because the plaintiff in *Dan-Dee* (as well as in *Hugfun* and *Ty, Inc.*) settled before final judgment, the court's decision on the less-detailed trade dress description "have now become res judicata." (ECF 23 at 22 (citing zero cases).) This argument defies logic and is contrary to black letter law. None of those cases gives rise to res judicata in this case because there was no final judgment on the merits *of the trade dress claims* in any of the cases, just a settlement between those specific parties, none of which are before this Court today. *See Pac. Gas and Elec. Co. v. Lynch*, 216 F. Supp. 2d 1016, 1026 (N.D. Cal. 2002) ("evidence of a settlement is generally not relevant, because settlements may be motivated by a variety of factors unrelated to liability" (citing *Hudspeth v. CIR*, 914 F.2d 1207, 1213-14 (9th Cir. 1990)). And, in any event, the *Dan-Dee* order cannot have any res judicata effect because the dismissal was with *leave to amend*, it was not a final judgment. *See WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136-37 (9th Cir.

- 19 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

472 of 816

EXHIBIT K
Page 106 of 231

1997) ("[W]hen a district court expressly grants leave to amend, it *is* plain that the order is not final." (emphasis in original)).

In sum, Zuru has not cited *any case* holding that the Identified Trade Dress is insufficient to provide notice at the pleading stage. Instead, both of the cases that evaluated the Identified Trade Dress found it to be sufficient and allowed the plaintiff's trade dress claims to proceed to discovery. This Court should do the same.

**B. There is No Legal Requirement to Submit Deposit Images in a Complaint**

Zuru requests that Plaintiffs provide the original images submitted with the deposit copies of the Copyrighted Works to the United States Copyright Office. Zuru cites only one case, the out-of-circuit *Parker v. Hinton*, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023), for this request. *Parker* is inapplicable to the facts of this case. In *Parker*, the plaintiffs "did not file a deposit copy" at all with the Copyright Office, and "conceded that no such deposit copies existed." *Id.* at *3 (internal punctuation omitted). In contrast, here, deposit copies of the Copyrighted Works were filed with the Copyright Office and will be available through discovery. (Mishra Decl. ¶ 4.)

Moreover, *Parker* was decided on a motion for summary judgment, and found that because the plaintiffs "never produced a deposit copy of their sheet music," they "failed to meet their burden on summary judgment." *Id.* at *4.[10] However, "[a] motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint," not materials outside the complaint such as deposit copy images. *R & A Synergy LLC*, 2019 WL 8137706, at *1. *Parker* does not discuss the production of deposit copies on a motion to dismiss, and Defendant's attempt to require Plaintiffs to provide these images at the pleadings stage is premature.

---

[10] Defendant also cites *Williams v. Bridgeport Music, Inc.*, 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014), which was also decided on a motion for summary judgment. For the same reasons as *Parker*, *Williams* is inapposite.

- 20 -

PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

1   **C.    Plaintiffs Do Not Oppose Zuru's Standing and Preemption**
2          **Arguments**

3          The parties have met and conferred regarding the issues Zuru identifies as "Lack
4   of Standing" and "Copyright Preemption." (ECF 23 at 24–25.) Plaintiffs do not
5   oppose Zuru's argument on these two points and, in fact, offered to stipulate to them
6   before Zuru filed its motion to dismiss. Plaintiffs clarify that the only plaintiff
7   asserting a claim for federal copyright infringement is Kelly Toys Holdings, LLC.
8   Plaintiffs also agree that none of their state law claims will be premised on copyright
9   infringement.

10         **D.    If Needed, Plaintiffs Should Be Provided Leave to Amend**

11         If the Court finds that Plaintiffs have not adequately articulated a protectable
12  trade dress or should have included deposit copies in their Complaint, Plaintiffs request
13  leave to amend the Complaint.

14         Leave to amend should be freely given "when justice so requires," Fed. R. Civ.
15  P. 15(a)(2), and courts frequently "allow leave to amend to re-state the trade dress
16  allegations in detail." *Creative Co-Op, Inc. v. Elizabeth Lucas Co.*, 2012 WL 761736,
17  at *3 (D. Idaho Mar. 7, 2012) (collecting cases). Accordingly, to the extent that the
18  Court finds Plaintiffs have not alleged a protectable trade dress, Plaintiffs request leave
19  to amend to restate the trade dress allegations in greater detail to address those
20  deficiencies, and likewise include deposit copies of the Copyrighted Works. Indeed,
21  even the cases cited by Zuru that dismissed trade dress claims allowed leave to amend.
22  *See, e.g.*, *Crafty*, 389 F. Supp. 3d at 881-83 ("And although Defendants ask the Court
23  not to do so, the Court will grant Plaintiffs leave to amend, to the extent Plaintiffs can
24  more clearly describe the trade dress they seek to protect.").

25  **IV.    <u>CONCLUSION</u>**

26         Zuru's Motion relies on inapplicable law and disputed facts, many outside of
27  the record, in an attempt to escape liability for its decision to prey on unwitting
28  consumers by trading on Plaintiffs' distinctive trade dress. Zuru's arguments are

1  inconsistent with controlling law and effectively demand that the Court hold that
2  Plaintiffs' detailed trade dress description to be insufficient simply because Zuru
3  disagrees that it is protectable.  In reality, Plaintiffs have done more than enough to
4  identify their trade dress at this stage and Zuru's arguments to the contrary must be
5  resolved at summary judgment or trial, not the pleading stage.  Zuru's motion to
6  dismiss should be denied.

8  Dated:  January 22, 2024            Respectfully submitted,

9                                     **HUESTON HENNIGAN LLP**

12                                     By:  /s/ Moez M. Kaba
13                                          Moez M. Kaba

14                                          *Attorneys for Plaintiffs*
15                                          *Kelly Toys Holdings, LLC;*
                                            *Jazwares, LLC; Kelly Amusement*
16                                          *Holdings, LLC; and Jazplus, LLC*

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Plaintiffs certifies that this brief contains 6,920 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 22, 2024

/s/ Moez M. Kaba
Moez M. Kaba

*Attorneys for Plaintiffs*
*Kelly Toys Holdings, LLC;*
*Jazwares, LLC; Kelly Amusement*
*Holdings, LLC; and Jazplus, LLC*

- 23 -
PLAINTIFFS' OPPOSITION TO ZURU LLC'S MOTION TO DISMISS

6565770

EXHIBIT K
Page 110 of 231

# EXHIBIT A

TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
MARK B. MIZRAHI (BAR NO. 179384)
mark.mizrahi@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone:  (310) 255-6100
Facsimile:  (310) 255-6200

*Attorneys for Plaintiffs Kellytoy (USA),
Inc. and Kellytoy Worldwide, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KELLYTOY (USA), INC., a California corporation; and KELLYTOY WORLDWIDE, INC., a California corporation;<br><br>            Plaintiffs,<br><br>      vs.<br><br>DAN-DEE INTERNATIONAL, LTD., a Delaware corporation; RITE AID CORPORATION, a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>            Defendants. | Case No.  2:18-cv-05399 JAK (AGRx)<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1.  **FEDERAL COPYRIGHT INFRINGEMENT (17 U.S.C. § 501);**<br>2.  **FEDERAL TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTION (15 U.S.C. § 1125);**<br>3.  **COMMON LAW TRADEMARK INFRINGEMENT;**<br>4.  **CALIFORNIA COMMON LAW UNFAIR COMPETITION; AND**<br>5.  **CALIFORNIA STATUTORY UNFAIR COMPETITION.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs KELLYTOY (USA), INC., a California corporation and

KELLYTOY WORLDWIDE, INC., a California corporation (collectively,

"Kellytoy") bring this action against defendant DAN-DEE INTERNATIONAL,

LTD., a Delaware corporation ("Dan-Dee"), RITE AID CORPORATION, a

Delaware corporation ("Rite Aid"), and DOES 1 through 10 (collectively,

Case 2:34-cv-03394-US-AGR   Document 272-2   Filed 07/03/24   Page 379 of 816   Page ID #:872
Case 2:23-cv-03599-JAK-AGR   Document 46   Filed 09/05/23   Page 3 of 573   Page ID #472
#:1433

"Defendants") for injunctive relief and damages under the laws of the United States and the State of California as follows:

## JURISDICTION AND VENUE

1.      This action arises under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*, the trademark laws of the United States, 15 U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress infringement and unfair competition.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

4.      This Court has personal jurisdiction over Defendants, as Defendants are doing business in California and this District and are subject to the jurisdiction of this Court.  Indeed, defendant Dan-Dee actively distributes plush toys throughout the state of California and this District.  Similarly, defendant Rite Aid has numerous retail stores within the state of California and this District.  In addition, defendants Dan-Dee and Rite Aid knowingly infringed on Kellytoy's copyrights and trade dress, knowing that Kellytoy is a California resident, and thereby purposefully directed their activities towards California.

## NATURE OF THE ACTION

5.      This is an action for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*; and trade dress infringement, trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), California Bus. & Prof. Code § 17200, *et seq.*, and the common law.

6.      Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows") – representative samples of which are depicted in **Exhibit 1** hereto – are one of the world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly distinctive and widely recognized trade dress, which Kellytoy pioneered and

1  created.  Kellytoy actively markets its Squishmallows through numerous media

2  outlets, including, without limitation, on social media, at tradeshows, through

3  Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

4  and on Kellytoy's website, depicting images of its proprietary Squishmallows line of

5  plush toys.

6         7.     The explosion in popularity of Kellytoy's Squishmallows and  the

7  resulting and widespread customer and industry recognition, has unfortunately led to

8  illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that

9  defendant Dan-Dee has been manufacturing and offering for sale to Rite Aid, which

10  Rite Aid has re-sold, numerous units of two knock-off products for distribution

11  within this state and district that both infringe upon Kellytoy's trade dress and one

12  of which infringes upon Kellytoy's copyrighted design in its Squishmallows.

13         8.     Accordingly, to prevent and remediate the rampant consumer confusion

14  and misappropriation of Kellytoy's copyrighted designs in its Squishmallows

15  resulting from Defendants' unauthorized use, promotion and sale of the Infringing

16  Plush (defined below), and to compensate Kellytoy for its injuries, Kellytoy seeks

17  immediate and permanent injunctive relief, compensatory damages, disgorgement of

18  Defendants' profits, statutory damages, punitive damages, Kellytoy's reasonable

19  attorneys' fees and expenses, a product recall, and corrective advertising sufficient

20  to address Defendants' wrongdoing.

21                    **THE PARTIES**

22         9.     Kellytoy (USA), Inc. is a California corporation with its principal place

23  of business located in Los Angeles, California.

24

25         10.     Kellytoy Worldwide, Inc. is a California corporation with its principal

26  place of business located in Los Angeles, California.

27         11.     Kellytoy is in the business of developing, manufacturing and selling

28  children's toys including, among other things, plush toys.

12.     On information and belief, defendant Dan-Dee International, LTD. ("Dan-Dee") is a Delaware corporation with a place of business in New Jersey.

13.     Dan-Dee is in the business of manufacturing and selling children's toys including, among other things, plush toys.

14.     On information and belief, defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with a place of business in Pennsylvania and numerous stores in this judicial district.

15.     Rite Aid owns and operates drug stores and pharmacies throughout the United States and, on information and belief, this District that sell various merchandise, including plush toys bearing third-party trademarks and under its own private label, RITE STUFF.

16.     The true names and capacities of defendants sued herein as DOES 1-10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such fictitious names.  Kellytoy will amend this Complaint to allege their true names and capacities when the same are ascertained.

17.     Upon information and belief, at all relevant times mentioned in this Complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and permission of one another.

## **BACKGROUND FACTS**

### **Kellytoy and Its Protected Intellectual Property Rights**

18.     Kellytoy is an innovative and highly successful creator, manufacturer, distributor and seller of unique plush toys, including, without limitation, its Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,* **Exhibit 1**.)

19.     Kellytoy has been in business for approximately 35 years and in that time has developed a reputation for producing high quality, unique, creative and

1   innovative plush toys that are highly prized in the industry.

2        20.    Kellytoy devotes extensive time and resources  promoting and

3   preserving its image identity and the image and identity of its high quality plush

4   toys, including by creating distinctive designs and marks for use on its products and

5   seeking U.S. trademark and copyright registrations for such designs and marks,

6   including those at issue in this Complaint.

7        21.    In 2016, Kellytoy conceived of and began creating its Squishmallows

8   line of plush toy designs – ultimately marketed in connection with the

9   SQUISHMALLOW trademark – that share common, unique features that

10  distinguish them from the goods of others.  These designs are wholly original to

11  Kellytoy and comprise copyrightable subject matter under the laws of the United

12  States.

13       22.    Indeed, Kellytoy has been and is the sole owner of all right, title and

14  interest in and to the copyrights in the individual "characters" in the Squishmallows

15  line and the distinguishing, unique, and recognizable features that are common

16  across the Squishmallows line.  From 2016 to the present, Kellytoy has expended

17  large sums of money in developing, advertising and promoting these product

18  designs through the United States.  In fact, Kellytoy is spending approximately

19  $50,000 per month in direct to consumer and business-to-business advertising in

20  connection with its SQUISHMALLOW branded goods.

21       23.    Kellytoy sells a broad range of SQUISHMALLOW branded plush toys

22  featuring the brand's iconic trade dress, and whose overall look, feel and image –

23  and in particular but without limitation its shapes, colors, textures and graphics –

24  serve as a distinctive source identifier to the consuming public.  Though not easily

25  reduced to writing, these features include: (1) substantially egg/bell shaped plush

26  toys depicting various similarly shaped fanciful renditions of animals/characters; (2)

27  simplified Asian style Kawaii faces with repeating and complementary rounded/oval

28  shaped graphics depicting features on the characters themselves (such as eyes,

1    snouts and bellies) and which conform to and support the overall egg/bell shape of

2    the toys; (3) embroidered two-dimensional facial features, such as eyes, nostrils,

3    mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile

4    velvety velour-like textured exterior with a light and silky memory foam-like

5    stuffing providing an extremely soft and squeezable marshmallow feel.  These

6    features, and the resulting overall look and feel of these toys, are more fully

7    depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's

8    line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow

9    Trade Dress").

10        24.     The plush designs depicted **in Exhibit 2** – a subset of Kellytoy's line of

11   Squishmallows – comprise some of Kellytoy's most popular Squishmallows, which

12   were created by or assigned to Kellytoy (the "Squishmallow Designs").  As

13   explained in greater detail below, these Squishmallow Designs are the subject of

14   Copyright Registrations issued by the United States Copyright Office, pursuant to

15   17 U.S.C. §101 *et seq*.

16        25.     Continuously and without interruption, beginning in 2016, Kellytoy has

17   expended a great deal of time, effort, and money in the promotion of its

18   Squishmallows.  And due to Kellytoy's unique design, robust marketing efforts,

19   media coverage, and market penetration, the Squishmallow Trade Dress has

20   acquired distinctiveness in the marketplace when applied to plush toys.  Indeed,

21   because of Kellytoy's extensive promotional activities and widespread display of its

22   Squishmallows directed to the public, and as a consequence of Kellytoy's fair and

23   honorable dealings with its customers, the relevant consuming public has come to

24   recognize and associate plush toys bearing the Squishmallow Trade Dress as high

25   quality goods connected with or offered by a single source, Kellytoy.  The

26   Squishmallow Trade Dress has valuable goodwill and consumer recognition

27   associated with it and has come to symbolize the valuable goodwill and reputation

28   of Kellytoy.

26.     In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 1,140,000 "hits" for the search term "Squishmallows."

27.     In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows. Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 3**.

28.     Further adding to their recognizability and secondary meaning in the marketplace, Squishmallows have been featured in numerous magazines, press articles, reviews, and videos, as set forth in greater detail in **Exhibit 4** hereto, including many mainstream media outlets such as the *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among others.  By way of example only, Squishmallows have been also recognized by The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; *LA Parent* recognized Squishmallows in its October 2017 issue, under the "Products We Love" section; and, as depicted below, *OK!* Magazine featured Squishmallows in its August 21, 2017 issue, stating "Cuddly as they are cute, they make great couch pals, pillows and bedtime buddies in any home.  Collect the whole squad!  squishmallows.com."

29.    Kellytoy's Squishmallows have also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.    Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 4**. In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

31.    Kellytoy's Squishmallows have also, as alleged above, been the subject of consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising. Kellytoy's Squishmallows currently have nearly 44,300 Instagram followers, more than 60,000 Facebook

followers – more than many longer-existing and well-known plush brands. To its followers, Kellytoy regularly publishes photographs of its Squishmallows. Many of these followers, in turn, share these posts with their friends and social media followers. A copy of Squishmallows Instagram page is attached as **Exhibit 5**.

32. In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products. Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube. These posts have generated millions of "likes" and "shares."

33. Squishmallows' legion of loyal fans have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for Kellytoy's Squishmallows, with the average Squishmallows post likes on Instagram hovering over 1000+ per post and 45-100 average comments per post.

34. Kellytoy's Squishmallow website traffic has grown exponentially since its launch in 2017 to an average of 4,313 visits per day.

35. Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

36. As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating substantial demand for and interest in Squishmallows, and generating enormous goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the United States and around the world. In fact, Kellytoy's Squishmallows are sold through hundreds of retailers including some of the largest retailers in the country, including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500 Walgreens stores, 4,000 Kroger supermarkets and Fred Meyer stores, 2000 Target

stores, 900 Party City stores, amongst other outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

37.    Since the summer of 2017, Kellytoy has sold approximately a whopping 22 million (22,000,000) units of Squishmallows with no indication that sales will be slowing down anytime soon.  Kellytoy's Squishmallows products embodying the Squishmallows Trade Dress have yielded tens of millions of dollars of sales in the U.S. over the past year.

38.    In fact, Kellytoy's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

39.    Because of Squishmallows' massive success and popularity, consumers have come to associate Kellytoy's high-quality Squishmallows plush toys with the Squishmallows Trade Dress and, conversely, have come to recognize the Squishmallow Trade Dress as a designation of source.

### Defendants' Unlawful Conduct

40.    At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's Squishmallow Designs and/or Squishmallow Trade Dress.

41.    Upon information and belief, sometime in spring of 2018, notably well after Kellytoy established its reputation in its Squishmallow Trade Dress, Defendant Dan-Dee entered into an agreement with defendant Rite Aid to have Dan-Dee sell and supply to Rite Aid various plush toys bearing substantially similar copies of Kellytoy's Squishmallow Designs and Squishmallow Trade Dress (hereinafter referred to as "Infringing Plush") for distribution by Rite Aid through its United States stores.  Photographs of the Infringing Plush bearing Dan-Dee and Rite Aid's trademarks are collectively attached hereto as **Exhibit 6**.

42.    Upon information and belief, Dan-Dee offered to sell the Infringing Plush to Rite Aid in the United States, corresponded across state lines with Rite Aid

-10-

in the United States concerning the production, sale, and distribution of the Infringing Plush, and transported the Infringing Plush to Rite Aid in interstate commerce.

43.     Upon information and belief, Defendants manufactured in, and imported from, China a production run of the Infringing Plush into the United States for the purpose of having the Infringing Plush enter interstate commerce and/or to be transported or used in interstate commerce through the same channels of trade through which Kellytoy sells its Squishmallows plush.  Upon information and belief, Rite Aid has indeed sold the Infringing Plush in interstate commerce.

44.     Upon information and belief, Dan-Dee has agreed to sell the Infringing Plush to Rite Aid at prices that were/are relatively lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is informed and believes that Dan-Dee is able to undercut Kellytoy's sales prices because, rather than investing in creating its own designs and identity, Dan Dee has copied Kellytoy's proprietary Squishmallow Designs and Squishmallow Trade Dress and because Defendants' Infringing Plush are of inferior quality as compared to Kellytoy's SQUISHMALLOW branded plush.

45.     In fact, Kellytoy met with buyers from Rite Aid in 2017 during which Kellytoy showed the buyers Kellytoy's Squishmallows line of products together with pricing therefor, after which, Kellytoy suspects that Rite Aid submitted Kellytoy's bid, together with facsimiles of the designs, to defendant Dan-Dee to obtain a competing bid from Dan-Dee for copies thereof.

46.     Kellytoy is informed and believes that Defendants, without Kellytoy's consent or permission, intend to sell, advertise, promote, display, and distribute, toys bearing Squishmallow Designs and Squishmallow Trade Dress in United States commerce.

47.     The activities of Defendants in copying, distributing, advertising, selling, offering for sale and otherwise using the Squishmallow Trade Dress

1  embodied in the Infringing Plush – including by copying wholesale the shape and
2  look – constitute false designation of origin regarding sponsorship of those plush
3  toys and falsely represent to the public that Defendants' plush toys originate from
4  Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or
5  licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such
6  activities of Defendants are likely to confuse, mislead, and deceive Defendants'
7  customers, purchasers, and members of the public as to the origin of the toys bearing
8  the Squishmallow Trade Dress, or to cause such persons to believe that Defendants'
9  Infringing Plush and/or Defendants have been sponsored, approved, authorized, or
10 licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in
11 violation of 15 U.S.C. §1125(a).

12      48.    Upon information and belief, the activities of Defendants were done
13 willfully with full knowledge of the falsity of such designations of origin and false
14 descriptions or representations, with the intent to trade on the enormous goodwill
15 Kellytoy has earned in its Squishmallows, and with the intent to cause confusion,
16 and to mislead and deceive the purchasing public into believing that the products
17 Defendants sell are directly sponsored by, authorized, by, associated with, or
18 originate from Kellytoy.

19      49.    As further evidence of Dan-Dee's intent to trade upon Kellytoy's
20 goodwill in Kellytoy's Squishmallows line of plush toys, Defendants repurposed
21 one of Dan-Dee's numerous old trademarks, i.e. SQUISHY, used in the past on very
22 different plush toys for use in connection with the Infringing Plush.

23      50.    Defendants, by their unauthorized copying and use of Kellytoy's
24 Squishmallow Designs and Squishmallow Trade Dress, have engaged and will
25 engage in acts of copyright infringement, unfair competition, unlawful
26 appropriation, unjust enrichment, wrongful deception of the purchasing public, and
27 unlawful trading on Kellytoy's good will and the public acceptance of Kellytoy's
28 original works.  Defendants' activities have damaged and will continue to damage

4080086.2

-12-

the reputation, business and good will of Kellytoy nationally and in this judicial district.

51.     Upon information and belief, unless enjoined by the Court, Defendants will continue and further escalate their infringing activities.

52.     Kellytoy has no adequate remedy at law.  Thus said activities of Defendants have caused and, if not enjoined, will continue to cause irreparable, immediate and impending harm and damage to Kellytoy's business, and to the business, business reputation and good will of Kellytoy.

## **FIRST CAUSE OF ACTION**

### **(Federal Copyright Infringement -- 17 U.S.C. §501)**

(Against all Defendants)

53.     Kellytoy repeats and realleges each and every allegation above as though fully set forth herein.

54.     Kellytoy owns a valid copyright in the Squishmallow Designs. The Squishmallow Designs are original, decorative, and non-functional.  After having had access to Kellytoy's Squishmallow Designs, Defendants, without authorization from Kellytoy, have designed, manufactured, distributed, advertised, offered for sale and/or sold the Infringing Plush unicorn design depicted in **Exhibit 7** bearing a design that Defendants copied from the Squishmallow Designs.

55.     All of the Squishmallow Designs were originally created by Kellytoy or were assigned to and are owned by Kellytoy.

56.     The Squishmallow Designs comprise original works of authorship that may be copyrighted under United States law.  In fact, Kellytoy has complied with requirements of Title 17 of the United States Code with respect to the registration of Kellytoy's unicorn Squishmallow Designs depicted in **Exhibit 2**, as evidenced by United States Copyright Registration Nos. VA0002096020 and VA0002093075, entitling Kellytoy to the exclusive rights and privileges in and to the above-referenced copyrights.  These copyright registrations are valid and subsisting.

57.     Defendants have imitated, displayed, reproduced, distributed, and/or created derivative works from the subject matter embodied in the Squishmallow Designs in connection with Defendants' manufacture, promotion, and solicitation and acceptance of orders for the sale of Defendants' Infringing Plush unicorn design depicted in **Exhibit 7**.

58.     Defendants' acts are in violation of the exclusive rights of the copyright holder to reproduce, distribute, display, and create derivative works from the copyrighted Squishmallow Designs, as articulated in 17 U.S.C. § 106.  Defendants have thereby infringed Kellytoy's copyrights in the Squishmallow Designs.

59.     Such activities and conduct has caused Kellytoy injury for which it is entitled to recover under 17 U.S.C. § 504.

60.     On information and belief, Defendants' infringing acts were committed with knowledge or in reckless disregard of Kellytoy's exclusive rights in the Squishmallow Designs.

61.     On information and belief, as a result of Defendants' copyright infringement, they have made substantial profits and gains to which they are not entitled to retain.

62.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have caused and will continue to cause irreparable injury to Kellytoy, for which Kellytoy has no adequate remedy at law.  Unless Defendants are restrained by this Court from continuing their imitation, copying, display, distribution, reproduction and creation of derivative works from the works embodied in the copyrighted Squishmallow Designs, these injuries will continue to occur.  Accordingly, Kellytoy is entitled to preliminary and permanent injunctions restraining Defendants' infringing conduct, pursuant to 17 U.S.C. § 502.

## SECOND CAUSE OF ACTION

### (Trademark Infringement, False Designation of Origin and False Description -- 15 U.S.C. §1125)

(Against All Defendants)

63.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 52 above as if fully set forth herein.

64.     The Squishmallow Trade Dress is non-functional and highly distinctive, and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.

65.     Kellytoy owns all right, title and interest in and to the Squishmallow Trade Dress.

66.     Without Kellytoy's authorization or consent, and having knowledge of Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed, manufactured, imported, distributed, advertised, offered for sale and/or sold and/or will soon commence importation, distribution, advertising, offers for sale, and sale of replicas of the Squishmallow Trade Dress to the consuming public in direct competition with Kellytoy, in or affecting interstate commerce.

67.     The Infringing Plush designs are confusingly similar to the Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

68.     Defendants' use and further threatened uses of the Squishmallow Trade Dress thus constitutes trade dress infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

69.     As a direct and proximate result of Defendants' unlawful conduct, Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

Case 2:23-cv-08895-JAK-ABR Document 47-2 Filed 06/04/24 Page 493 of 816 Page ID
#:1267
Case 2:23-cv-08895-JAK-ABR Document 46-4 Filed 03/05/19 Page 46 of 131 Page ID #:450

1  Dress, as well as the goodwill associated therewith, and have diverted sales and

2  profits from Kellytoy to Defendants. Thus, as a direct and proximate result of

3  Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer

4  damage to its valuable brand and reputation, and other damages in an amount to be

5  proven at trial, including Defendants' profits and Kellytoy's lost profits.

6       70.    Defendants' actions described above will cause, have caused, and will

7  continue to cause irreparable damage to Kellytoy, unless Defendants are restrained

8  by this Court. Kellytoy has no adequate remedy at law with regard to Defendants'

9  infringing conduct. Accordingly, Kellytoy is entitled to a preliminary and

10  permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining

11  Defendants' and their agents, servants, and employees, and all persons acting

12  thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow

13  Trade Dress, or any colorable imitation or variation thereof, in connection with the

14  sale and/or marketing of any products.

15       71.    Defendants' aforesaid acts are exceptional within the meaning of 15

16  U.S.C § 1117.

17            **THIRD CAUSE OF ACTION**

18            **(Common Law Trademark Infringement)**

19            (Against all Defendants)

20       72.    Kellytoy repeats and re-alleges each and every allegation of paragraphs

21  1 through 52 and 64 through 67 as though fully set forth herein.

22       73.    Defendants have violated Kellytoy's exclusive common law rights in

23  the Squishmallow Trade Dress.

24       74.    Kellytoy has continuously used its Squishmallow Trade Dress to

25  identify its goods in California and elsewhere, and to distinguish them from goods

26  of a different origin. As such, Kellytoy has common law rights to the Squishmallow

27  Trade Dress.

28

75.     Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

## FOURTH CAUSE OF ACTION

### (California Common Law Unfair Competition)

(Against all Defendants)

76.     Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 52 and 64 through 67 as though fully set forth herein.

77.     This claim arises under the common law of the State of California relating to unfair competition.

78.     Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress. Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

79.     Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

80.     By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

81.     Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

1   82.   Kellytoy has no adequate remedy at law.  Thus said activities of

2   Defendants have caused, if not enjoined, will continue to cause irreparable harm and

3   damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business

4   reputation and good will.

5   83.   Upon information and belief, Defendants have engaged in their

6   unlawful conduct alleged herein intentionally, maliciously, fraudulently and

7   oppressively entitling Kellytoy to punitive damages in an amount to be determined

8   at trial.

9   ## FIFTH CAUSE OF ACTION

10   **(California Statutory Unfair Competition –**

11   **California Bus. & Prof. Code § 17200,** *et seq.***)**

12   (Against all Defendants)

13   84.   Kellytoy repeats and re-alleges each and every allegation of paragraphs

14   1 through 52, 64 through 68, 73 through 75, and 77 through 80, as though fully set

15   forth herein.

16   85.   By reason of the foregoing, Defendants have been, and are, engaged in

17   "unlawful, unfair or fraudulent business practices" in violation of California

18   Business and Professional Code Section 17200 *et seq.*

19   86.   Said activities of Defendants have caused and, if not enjoined, will

20   continue to cause irreparable harm and damage to the rights of Kellytoy in its

21   Squishmallow Trade Dress and to its business reputation and good will.  Kellytoy

22   has no adequate remedy at law for these wrongs and injuries.  The damage to

23   Kellytoy includes harm to its goodwill and reputation in the marketplace that money

24   cannot compensate.  Accordingly, Kellytoy is entitled to a preliminary and

25   permanent injunction restraining and enjoining Defendants' and their agents,

26   servants, and employees, and all persons acting thereunder, in concert with, or on

27   their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable

28   imitation or variation thereof, in connection with the sale and/or marketing of any

products.  Kellytoy is further entitled to restitutionary disgorgement of all of Defendants' ill-gotten gains pursuant to California Business and Professions Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

1.      That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i)      Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the Squishmallow Designs and/or Squishmallow Trade Dress;

(ii)      Using the Squishmallow Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii)      Using the Squishmallow Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

(iv)      Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers created by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the Squishmallow Trade Dress or Squishmallow Designs;

(v)      Copying, distributing, displaying or making derivative works of the Squishmallow Designs;

4080086.2

-19-

  (vi) Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress or Squishmallow Designs; and

  (vii) Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

 2. That Defendants be directed to file with the Court and serve on Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

 3. That the Court direct any third parties providing services to Defendants in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services to Defendants in connection with the offer for sale and sale of the Infringing Plush or any other products using or embodying the Squishmallow Trade Dress or Squishmallow Designs.

 4. That Defendants be required to pay Kellytoy such damages as it has sustained as a consequence of Defendants' infringement of the of the Squishmallow Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

 5. Adjudge that each of the Defendants, by its unauthorized use of Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it

may have undertaken relating to the Squishmallow Trade Dress, have violated Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including, without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law, and that they have done so willfully and for the purpose of violating Kellytoy's rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade Dress;

6.     Direct Defendants to provide Kellytoy with an identification in writing of any and all entities that are presently using the Squishmallow Designs and/or Squishmallow Trade Dress in the United States on Defendants' behalf and inform them that they must immediately cease such use;

7.     Direct Defendants to immediately recall any and all merchandise previously provided to any United States entity under the Squishmallow Trade Dress or Squishmallow Designs;

8.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to deliver for destruction all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, bearing any unauthorized copy of any of the Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation thereof, and all plates, molds, matrices, programs and other means of making same;

9.     Enter an order, pursuant to 17 U.S.C. § 503(a), impounding all of Defendants' products that infringe Kellytoy's copyrights in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

10.    Enter an order, pursuant to 17 U.S.C § 503(b), requiring the destruction of all copies of Defendants' products that infringe Kellytoy's copyright in the Squishmallow Designs, as well as any plates, molds, matrices, programs, or other

articles by means of which copies of the works embodied in the Squishmallow Designs may be produced;

11.    That each Defendant provide Kellytoy in writing with the following information relating to Defendants' goods marketed, advertised, offered for sale, or sold under the Squishmallow Trade Dress or Squishmallow Designs:

(i)    the name, address and telephone number of each and every United States entity to whom Defendants have made available or otherwise provided any such products; and

(ii)   a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

12.    Direct Defendants to pay the costs of corrective advertising;

13.    Direct Defendants to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

14.    Direct Defendants to pay punitive damages and exemplary damages according to proof;

15.    That Kellytoy recover its actual damages, Kellytoy's lost profits, and Defendant's profits arising from Defendants' conduct complained-of herein;

16.    That the Court award enhanced profits and treble damages;

17.    That Kellytoy be awarded statutory damages;

18.    That Kellytoy be awarded interest, including pre-judgment interest, on the foregoing sums;

19.    That the Court direct such other actions as the Court may deem just and proper to prevent the public from deriving the mistaken impression that any products or services offered, advertised, or promoted by or on behalf of Defendants are authorized by Kellytoy or related in any way to Kellytoy's products or services;

20.    That Defendants be ordered to disgorge all of their ill-gotten gains pursuant to California Business and Professions Code § 17203; and

1    21.    For such other and further relief as the Court may deem just and

2  proper.

3                              Respectfully submitted,

4  DATED: March 5, 2019          FREEMAN, FREEMAN & SMILEY, LLP

5

6

7                         By:      / s / Mark B. Mizrahi

8                                 TODD M. LANDER
                                  MARK B. MIZRAHI
9                                 Attorneys for Plaintiffs
                                  KELLYTOY (USA), INC. and
10                                KELLYTOY WORLDWIDE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<div align="center">

## **DEMAND FOR JURY TRIAL**

</div>

2      Plaintiffs hereby demand and request a trial by jury of all issues raised that

3  are triable by jury.

4                              Respectfully submitted,

5  DATED: March 5, 2019        FREEMAN, FREEMAN & SMILEY, LLP

6

7

8                      By:        */ s / Mark B. Mizrahi*

                                   TODD M. LANDER

9                           MARK B. MIZRAHI

10                          Attorneys for Plaintiffs

                           KELLYTOY (USA), INC. and

11                           KELLYTOY WORLDWIDE, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4080086.2

<div align="center">

-24-

SECOND AMENDED COMPLAINT

</div>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | **2:23-cv-09255-MCS-AGR** | Date | March 5, 2024 |
|---|---|---|---|
| Title | ***Kelly Toys Holdings, LLC et al. v. Zuru, LLC*** | | |

Present: The Honorable   Mark C. Scarsi, United States District Judge

| Stephen Montes Kerr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    (IN CHAMBERS) ORDER ON MOTION TO DISMISS (ECF NO. 23)**

Defendant Zuru, LLC moves to dismiss the complaint of Plaintiffs Kelly Toys Holdings, LLC, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC (collectively, "Kelly Toys"). (Mot., ECF No. 23.) Plaintiffs opposed the motion, (Opp'n, ECF No. 26), and Defendant replied, (Reply, ECF No. 28).

Defendant also filed a request for judicial notice of documents filed in support of its motion to dismiss. (RJN, ECF No. 23-3.) Plaintiffs opposed the request, (RJN Opp'n, ECF No. 27), and Defendant replied, (RJN Reply, ECF No. 29).

## I.    BACKGROUND

Plaintiffs assert that they are among the world's leading manufacturers and distributors of high-quality plush toys. (Compl. ¶ 1, ECF No. 1.) In 2016, Kelly Toys released their Squishmallows line. (*Id.*) The Squishmallows line includes a broad range of plush toys with various designs that share common features. (*Id.* ¶ 24.) Though each design is unique, Plaintiffs aver the Squishmallows share a distinctive trade dress. (*Id.* ¶ 23.) Plaintiffs describe the alleged Squishmallows' trade dress (the "Trade Dress") as:

---

Page 1 of 7                    CIVIL MINUTES – GENERAL                    Initials of Deputy Clerk SMO

EXHIBIT K
Page 136 of 231

> (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

(*Id.* ¶ 24.)

Plaintiffs also include several photos depicting the Trade Dress. According to Plaintiffs, most of the Squishmallows' designs are the subject of United States copyright registrations or pending applications therefor. (*Id.* ¶ 21.)

Plaintiffs allege that in 2023, Zuru released plush toys with the "*same distinctive trade dress*" as Squishmallows, known as "Snackles." (*Id.* ¶ 3.) Plaintiffs allege Zuru has been trying to create confusion in the marketplace "to trick customers looking for Squishmallows to buy Snackles instead." (*Id.* ¶ 4.) Zuru's actions, they aver, have already caused significant harm by forcing them to spend "more time and resources to compete with Snackles products that employ Squishmallows' own trade dress and copyrights." (*Id.* ¶ 6.) Plaintiffs aver Zuru's acts are "willfully infringing" the Trade Dress and are "likewise willfully infringing on [Kelly Toys Holdings, LLC's] copyrights by selling its Snackles products that copy constituent elements of those copyrights." (*Id.* ¶ 7.)

Plaintiffs bring five claims against Defendant: (1) trade dress infringement under the Lanham Act, (2) common law trade dress infringement, (3) copyright infringement under the Copyright Act, (4) common law unfair competition, and (5) California statutory unfair competition. (*Id.* ¶¶ 61–102.)

///

---

## II.   REQUEST FOR JUDICIAL NOTICE

Defendant requests that the Court take judicial notice of several documents filed in support of its motion to dismiss. (RJN ¶¶ 1–6, ECF No. 23-2 to 23-4.) The Court **denies** Defendant's request because consideration of the documents is unnecessary for the resolution of this motion. *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 454 (9th Cir. 2016).

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## IV.   DISCUSSION

Defendant raises two arguments in support of its motion: (1) Plaintiffs failed to meet their burden to adequately define protectable trade dress, and (2) Plaintiffs failed to provide assurance to Defendant that the photos of the "Copyrighted Works" are the same as the toys that are the subject of the copyright registrations. (Mot. 13–24.)

---

EXHIBIT K
Page 138 of 231

## A.    Trade Dress

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)). "To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) (citing *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1005 (9th Cir. 1998)). Defendant argues Plaintiffs' trade dress claims are "too vague and overbroad to adequately articulate any cognizable trade dress rights." (Mot. 13.) The Court interprets this as an argument that Plaintiffs fail to meet their pleading burden under Rule 8(a).

Under Rule 8(a), the complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (ellipsis in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(a) ensures that a complaint "fully sets forth who is being sued, for what relief, and on what theory, with enough detail to guide discovery." *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996). Rule 8 may be violated when a pleading "says *too little*," or "when a pleading says *too much*." *Knapp v. Hogan*, 738 F.3d 1106, 1109 (9th Cir. 2013). A complaint that is too verbose, long, confusing, redundant, irrelevant, or conclusory may be dismissed for failure to comply with Rule 8. *See Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058–59 (9th Cir. 2011) (citing cases upholding dismissals for these reasons).

Defendant argues Plaintiffs' description of the Trade Dress "fail[s] to adequately define any cognizable trade dress that meaningfully encompasses their enormous and highly varied product line-up." (Mot. 14.) For example, Defendant notes, "Plaintiffs do not define what they mean by 'Simplified Asian style Kawaii,' nor is it apparent from looking at the pictures of the Squishmallows, whose appearances are highly varied." (Mot. 16.) In response, Plaintiffs argue that they "have provided a sufficient recitation of the trade dress at issue" because they have "alleged a complete recitation of the concrete elements of its alleged trade dress." (Opp'n 8 (cleaned up).) However, authority cited by Plaintiffs supports the notion

---

EXHIBIT K
Page 139 of 231

that courts should address the sufficiency of a plaintiff's trade dress description prior to evaluating the substantive elements of its trade dress infringement claim. *See Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, No. CV-19-07652-MWF (MAAx), 2019 WL 8064073, at *4 (C.D. Cal. Dec. 4, 2019) (addressing the sufficiency of plaintiff's trade dress description under Rule 8 prior to addressing the elements of plaintiff's trade dress claim). To this point, Plaintiffs aver their "trade dress description and pictures are sufficient to put Defendant on notice under Rule 8." (Opp'n 10; *see id.* at 10–16.) "However, the mere presence of pictures and a written list is not *per se* sufficient [to satisfy Rule 8 on a trade dress claim], [each complaint] must be evaluated on a case by case basis." Order Re Defs.' Mot. to Dismiss 9, *Kellytoy USA, Inc. et al. v. Dan-Dee Int'l, Ltd.*, 2:18-cv-05399-JAK-AGR (C.D. Cal. Feb. 7, 2019) (Kronstadt, J.), ECF No. 39.[1]

Plaintiffs' written description of the claimed trade dress is general and does not provide sufficient specificity as to the nature and scope of Plaintiffs' claim. There are substantial differences among the various designs of the Squishmallows, and neither the description nor the images in the complaint provide the "level of clarity about the nature and scope of the claimed trade dress." *Id.* For example, the "simplified Asian style Kawaii faces" descriptor says nothing about what it means. Plaintiffs rely on questionable orientalist tropes without doing much to describe the asserted trade dress. The Court agrees with Defendant that the claimed trade dress description is too broad and ambiguous to form the basis of a plausible claim for trade dress infringement and therefore does not satisfy the requirements of Rule 8.[2]

---

[1] Defendants attach a copy of Judge Kronstadt's order as an exhibit to counsel's declaration at ECF No. 23-2.

[2] The Court acknowledges that a different court in this district found a similar claimed trade dress description sufficient under Rule 8. *See Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, No. CV-19-07652-MWF (MAAx), 2019 WL 8064073, at *4 (C.D. Cal. Dec. 4, 2019) (Fitzgerald, J.). Respectfully, this Court disagrees. Squishmallows sells hundreds of different products that are vastly different in design. (*See generally* Compl.; Mot.) In comparing the images provided in the complaint and Defendant's motion to Plaintiffs' trade description, it is clear to the Court that the description is vague and does not meaningfully account for the variety in the products. (*See* Opp'n 18–19.) That the claimed trade dress description contains more words than the trade dress description in *Dan-Dee Int'l Ltd.* is irrelevant—the definitions are functionally the same.

EXHIBIT K
Page 140 of 231

Plaintiffs represent that none of their state law claims will be premised on copyright infringement, (Opp'n 21), and assert in the complaint that their unfair competition claims are predicated on their trade dress claims, (*see* Compl. ¶¶ 95–96, 102). Because the Court finds Plaintiffs' trade dress description was not pleaded sufficiently, it **GRANTS** Defendant's motion to dismiss the first, second, fourth, and fifth causes of action.

## B. Copyright Infringement

"To prove copyright infringement, a plaintiff must demonstrate (1) ownership of the allegedly infringed work and (2) copying of the protected elements of the work by the defendant." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984 (9th Cir. 2017) (quoting *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991)).

Although Plaintiffs aver the only plaintiff asserting a claim for federal copyright infringement is Kelly Toys Holdings, LLC, (Opp'n 21), it is not clear from the complaint which parties assert this cause of action, (*see* Compl. ¶¶ 85–89). Therefore, the Court adjudicates Defendant's challenges to the copyright infringement claims assuming those claims were made by all Plaintiffs. Defendant does not challenge the validity of the copyrights. (Mot. 23–24.) Though it purports to request dismissal of the federal copyright claim, Defendant apparently requests that the Court require Plaintiffs to amend their complaint "to clarify whether the images shown as the 'Copyrighted Works' in the Complaint depict the same toys as are shown in the deposit copies at the Copyright Office, or if they are not, Plaintiffs should supply such images as part of an amended pleading." (*Id.* at 24.) Defendant does not provide support for its argument that Plaintiffs' federal copyright claim should be dismissed pursuant to Rule 12(b)(6) on the basis that the pleading lacks this assurance. Defendant provides just one unpublished, out-of-circuit case to support its request that the Court require Plaintiffs to amend their complaint or provide the deposit copies, but that case reviewed a dismissal at summary judgment and does not support the proposition that Defendant is entitled to the relief it requests on a motion to dismiss. *See Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023). Therefore, the Court **DENIES** Defendant's motion to dismiss Plaintiffs' copyright infringement claims on this ground and **DENIES** the alternative relief requested in its motion. On balance, the Court encourages Plaintiffs to cooperate with Defendant's request given that the copyright infringement claims will fail if it cannot establish the photos it provided in the complaint are the subject of copyright registrations. (*See* Initial Standing Order § 8(b), ECF No. 19 (noting

EXHIBIT K
Page 141 of 231

that "[d]iscovery is not stayed prior to the Scheduling Conference" and that "counsel should begin to conduct discovery actively before the Scheduling Conference").)

## C.    Leave to Amend

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). This is Plaintiffs' first complaint. They suggest that, if granted leave to amend, they would "restate the trade dress allegations in greater detail to address those deficiencies." (Opp'n 21.) The Court grants Plaintiffs leave to amend their complaint to address the deficiencies identified by the Court related to their trade dress description and to clarify which Plaintiffs assert the claims for copyright infringement. The Court warns that a subsequent pleading containing another ill-defined trade dress description may result in a final dismissal of the trade dress claims. *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) ("Leave to amend may also be denied for repeated failure to cure deficiencies by previous amendment.").

## V.    CONCLUSION

Defendant's motion is granted in part and denied in part. Plaintiffs' first, second, fourth, and fifth causes of action are dismissed. Plaintiffs may file an amended complaint within 14 days of this Order if they can do so consistent with Federal Rule of Civil Procedure 11(b). Failure to file a timely amended complaint will waive the right to do so. Leave to add new defendants or claims must be sought by a separate, properly noticed motion. Any amended complaint must be accompanied by a redline version showing any additions, deletions, and changes. (Initial Standing Order § 10(a).)

**IT IS SO ORDERED.**

---

EXHIBIT K
Page 142 of 231

1   HUESTON HENNIGAN LLP
2   Moez M. Kaba, State Bar No. 257456
    mkaba@hueston.com
3   Sourabh Mishra, State Bar No. 305185
    smishra@hueston.com
4   523 West 6th Street, Suite 400
5   Los Angeles, CA 90014
    Telephone:   (213) 788-4340
6   Facsimile:   (888) 775-0898

7

8   *Attorneys for Plaintiffs Kelly Toys Holdings, LLC;*
    *Jazwares, LLC; Kelly Amusement Holdings, LLC;*
9   *and Jazplus, LLC.*

10

11              UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                                      | Case No. 2:23-cv-09255 MCS (AGRx)
14   KELLY TOYS HOLDINGS, LLC;
     JAZWARES, LLC; KELLY              | **AMENDED COMPLAINT FOR:**
15   AMUSEMENT HOLDINGS, LLC;
16   and JAZPLUS, LLC,                  1. **Trade Dress Infringement Under**
                                           **the Lanham Act;**
17          Plaintiffs,
                                        2. **Common Law Trade Dress**
18      vs.                                **Infringement;**

19                                      3. **Copyright Infringement Under**
20   ZURU, LLC,                            **the Copyright Act;**

21          Defendant.                  4. **Common Law Unfair**
                                           **Competition; and**
22
                                        5. **California Statutory Unfair**
23                                         **Competition.**

24                                      **DEMAND FOR JURY TRIAL**

25

26

27

28

- 1 -
AMENDED COMPLAINT

6509778

EXHIBIT K
Page 143 of 231

Plaintiffs KELLY TOYS HOLDINGS, LLC, JAZWARES, LLC, KELLY AMUSEMENT HOLDINGS, LLC, and JAZPLUS, LLC (collectively, "Kelly Toys") bring this action against Defendant ZURU, LLC ("Zuru") for injunctive relief and damages under the laws of the United States and the State of California, as follows:

## **INTRODUCTION**

1.     Plaintiffs are among the world's leading manufacturers and distributors of high-quality plush toys and other consumer products.  In 2016, their distinctive line of plush toys branded "Squishmallows" was released.  Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media.  And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide.  As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]



---

[1] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

- 2 -

AMENDED COMPLAINT

2.     Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase. Rather than competing fairly in the marketplace by creating its own unique concepts and product lines, Defendant Zuru, a billion-dollar company, decided that it would be easier to simply copy, imitate, and profit off the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying their products. Zuru is familiar with this business model: it has previously been sued by the LEGO Group for selling toys that are confusingly, strikingly, and substantially similar to the look and feel of LEGO figurines.

3.     In June 2023, Zuru announced the release of its "Snackles" plush toys. As seen below, the Snackles toys have the *same* distinctive trade dress as the popular Squishmallows. And, in marketing Snackles, Zuru likewise urges consumers to, like Squishmallows, "collect" all "12 Snackles" and "start building your Snackle family!" And, likely noticing that consumers refer to Squishmallows as Squish, Zuru boasts on product listings that Snackles has the "softest, squishiest plush."

**Squishmallows Original Product**     **Snackles Copycat Product**

     

- 3 -
AMERICAN COMPLAINT

**Squishmallows Original Product**   **Snackles Copycat Product**









4. In the marketplace, Zuru has been transparently trying to position its products to trick customers looking for Squishmallows to buy Snackles instead. For example, Snackles products are often found right *next to* Squishmallows products in retail stores. In addition, when consumers search for "Squishmallows" on retail websites like Amazon.com, paid search results identify Snackles instead. Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail outlets and pays website operators to appear in search term results, all in an effort to trick consumers into purchasing Snackles even though they are looking to buy Squishmallows.

5. Zuru's efforts have created substantial and actual confusion. For example, consumer reviews on Snackles products indicate that consumers believe that they were buying Squishmallows instead: "My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce." Even Squishmallows fans have noted on message boards that they were confused when they

- 4 -

AMENDED COMPLAINT

first saw Snackles, commenting: "I saw them in a shop earlier and literally had to check the tag to figure out whether they were squishs. In my defense, they weren't in a box like in the picture, they were on a shelf right next to the squishs." As one Squishmallows fan observed about Snackles: "they're 100% trying to trick ppl like your partner."

6.   Zuru's actions have already caused significant harm. For example, customer confusion has led to lost potential customers, sales, and market share. Plus, Zuru's bidding on search result positioning has caused Kelly Toys to have to spend more money to buy paid search term results for its *own* "Squishmallows" mark. In short, Kelly Toys is being forced to spend more time and resources to compete with Snackles products that employ Squishmallows' own trade dress and copyrights.

7.   This is a straightforward case of trade dress and copyright infringement. Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows and Zuru is willfully infringing those trade dress rights. Courts regularly find trade dress infringement in similar cases. *See, e.g.*, *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 714 (9th Cir. 2010) (affirming jury verdict finding trade dress infringement); *MGA Entm't, Inc. v. Multitoy, Inc.*, No. CV04-2524, 2005 WL 8156296, at *3-4 (C.D. Cal. Oct. 11, 2005) (finding that defendant infringed plaintiff toy company's trade dress). Kelly Toys Holdings, LLC also owns copyrights to certain Squishmallows and Zuru is likewise willfully infringing on those copyrights by selling its Snackles products that copy constituent elements of those copyrights. Through this action, Kelly Toys seeks monetary and injunctive relief to stop Zuru's latest copycat efforts, put an end to consumer confusion, and vindicate the intellectual property rights in Squishmallows.

## THE PARTIES

8.   Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

- 5 -
AMENDED COMPLAINT

9.      Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

10.     Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

11.     Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

12.     Plaintiffs are all affiliated entities, governed by common ownership and intercompany agreements.

13.     On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the copyrights and trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products, as well as all registered copyrights in and related to the Squishmallows products, to Plaintiff Kelly Toys Holdings, LLC.  Accordingly, Plaintiff Kelly Toys Holdings, LLC is the legal owner of registered copyrights in and related to its Squishmallows products and the Squishmallows trade dress.

14.     Kelly Toys Holdings, LLC provides the rights to the remaining plaintiffs, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the Squishmallows products that incorporate the protected intellectual property rights.  Plaintiffs are all related companies that each independently have the ability to inspect and monitor the Squishmallows products and to maintain the products' quality.  Each plaintiff thus has a cognizable interest in the infringement at issue.

15.     Defendant Zuru is a consumer toy limited liability company organized under the laws of California with its principal place of business in California.  Zuru is the United States arm of non-party ZURU Group, a group of toy and consumer products companies founded in Cambridge, New Zealand.  Zuru is in the business of manufacturing and selling children's toys, including plush toys.

- 6 -

AMENDED COMPLAINT

## JURISDICTION AND VENUE

16.     This action involves the trademark laws of the United States, 15 U.S.C. § 1125(a), and, specifically, the statutory and common law of trade dress infringement. This action also involves the copyright laws of the United States, 17 U.S.C. § 101, *et seq.*

17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1114, 1116, 1117, 1121, and 1125.  Specifically, the Court has federal question jurisdiction in this case over the claims brought under federal law and supplemental jurisdiction over the claims brought under state law.

18.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 and 1400(a).

19.     This Court has personal jurisdiction over Defendant Zuru because it is a California limited liability company with its principal address listed as: 2121 E. Maple Ave., El Segundo, CA 90245.

## BACKGROUND FACTS

### Kelly Toys Launches Its Squishmallows Products

20.     Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the SQUISHMALLOWS brand.

21.     In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others.  Many of these designs are the subject of United States Copyright Registrations or pending applications therefor, and each is sold in commerce under the Squishmallows brand.  In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.

- 7 -
AMENDED COMPLAINT



22.    Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products that possess unique, recognizable and distinguishing features that are common across much of the Squishmallows line.  From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising and promoting the Squishmallows Trade Dress (defined below), and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products.

### Squishmallows Have a Distinctive Trade Dress

23.    In 2016, designers working at Kellytoy Worldwide conceived of and began creating a line of plush toys designs that were later released as toys named Squishmallows.  With many stuffed animals and toys already on the market, the designers sought to create a look distinct to Squishmallows that would provide them with their own unique look to differentiate them from the many competing products.

- 8 -
AMENDED COMPLAINT

24.     Therefore, when developing the Squishmallows Trade Dress, the designers made specific design choices to ensure that the overall visual impression of Squishmallows was different than the design choices made by the many stuffed animals and other toys available on the market.  The seven original Squishmallows (pictures included below) released in 2017 make clear that the designers intended for the original Squishmallows to bear a common, distinctive overall visual impression:



25.     The overall visual impression of the distinctive Squishmallows Trade Dress is created through a combination of the individual elements discussed in the following section.  Though some plush toys that existed in the marketplace in 2017 had one or more of the below elements, none included all of them in a single plush toy to create the same overall visual impression that the Squishmallows Trade Dress creates.

A.      **Element 1: "Substantially egg/bell/oval shaped plush toys depicting various similarly shaped abstract/fanciful renditions of animals/characters"**

26.     When designing Squishmallows, the designers observed that the plush toys on the market that depicted animals or characters were largely shaped as traditional, full-figure animals, with generally full or proportional head sizes, arms,

- 9 -
AMENDED COMPLAINT

and legs, such as in the following examples:



27.    The designers made a deliberate design choice to differentiate the Squishmallows Trade Dress from these designs by creating an abstract or fanciful rendition of animals and characters that deliberately did *not* use the traditional, full-figure style.  The trade dress instead uses an egg/bell/oval shape, rather than a full-figure or shapes like squares, sphered, and triangles.   And even when the Squishmallows have arms or legs, the limbs are not proportional to what a consumer would expect in a toy that is meant to look like a real animal or character.

28.    This design choice was atypical because consumers at the time preferred purchasing plush toys that looked similar to animals and characters that they were already familiar with.  Even knowing that, the Squishmallows designers preferred creating a plush with a nontraditional shape to better differentiate their new products from the marketplace, even if it would initially be harder to appeal to consumers with such a nontraditional look:

- 10 -

AMENDED COMPLAINT

| Other Cat Toys | Squishmallows Trade Dress in a Cat |
|---|---|
|  | |

**B.    Element 2: "simplified Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys"**

29.    As another intentional design choice to differentiate Squishmallows, the designers opted to create faces on Squishmallows that were different from the industry standard.  Since the face of a plush toy is often one of the first things that consumers see, choosing a nontraditional look for the face further differentiated Squishmallows from other products available on the market.

30. The market generally opted to create faces that were similar to what consumers saw in animals in the wild and media, or characters in media. This included faces, eyes, and snouts that look natural and familiar:

 

31. In contrast, the designers of Squishmallows opted *away* from a realistic animal and character faces and instead chose to utilize some elements from a different style of design commonly known as "Kawaii." A Kawaii design disclaims the use of natural faces and instead employs simple features to create a cute, lovable, or innocent look through use of simplified shapes and soft lines. The Kawaii design originated in Asia, but was not a popular choice in American plush toys. As depicted below, for example, Kawaii-style eyes include simple, but cartoon-style, eyes, as opposed to the traditional glass, plastic, or shoe "button eyes":



- 12 -
AMENDED COMPLAINT

32.     But the designers *also* deviated from the pure Kawaii design as well. Rather than adopt the popular Kawaii features with cartoon-ish elements, the designers focused on using simplified shapes and marks with stylized artworks on the body of the Squishmallows.   The Squishmallows Trade Dress thus does not adopt a pure Kawaii design, as can be seen in the following toy:



33.     In sum, in utilizing elements from the Kawaii design, the designers chose simplified faces for animals and characters that used simple shapes and marks, such as round black eyes, rather than the natural shapes associated with the animals or characters.   This design choice made Squishmallows look *different* than traditional animals or characters *and* pure Kawaii designs, creating the different visual impression the designers sought to create through the Squishmallows Trade Dress:

- 13 -
AMENDED COMPLAINT

| Traditional Faces | Squishmallows Trade Dress in a Fox and a Hedgehog |
|---|---|
|  | |

C.     **Element 3: "embroidered facial features, such as eyes, nostrils, and/or mouths"**

34.     In the toy industry, companies can choose to depict facial features like nostrils and mouths in plush toys through printing and sublimation printing.  At a high level, printing or sublimation printing involves transferring a digital print to fabric through a process using high heat.  The heat helps to ensure that the print, including the colors, will not run or fade, while still ensuring that the physical product displays the features from the digital print.  Employing this process often helps companies save costs.

35.     The designers of the Squishmallows Trade Dress chose to embroider the facial features rather than use printing or sublimation printing.  At a high level,

embroidering involves physically threading the facial features into the toy through hand or machine.

36.    The Squishmallows Trade Dress specifically disclaims the use of printing and sublimation printing for depicting facial features.   Embroidering, rather than printing or sublimation printing, additionally contributes to the different look of the Squishmallows from other plush toys:

| Printing | Squishmallows Trade Dress in Owls |
|---|---|
|  | |

**D.    Element 4: "distinctive contrasting and non-monochrome coloring"**

37.    Many companies use either monochrome coloring or complementary coloring in their plush toys.   Monochrome coloring is using one color for the whole toy.   Companies like using monochrome for popular toys like teddy bears because consumers associate teddy bears with a brown color:



- 15 -
AMENDED COMPLAINT

38.     And even when using multiple colors, companies prefer exclusively using colors that are *complementary* for their product lines.  Some are complementary because the colors naturally complement each other, like dark brown and light brown. Other times, the colors complement each other because consumers associate those colors with one another in the context of, for example, an animal or a character from popular media.  Therefore, many plush toys available on the market exclusively choose designs with complementary colors to appeal to consumers:



39.     In contrast, the designers of Squishmallows did not limit Squishmallows to exclusively monochromatic colors or traditionally complementary colors.  They instead focused on *fun* colors, putting aside whether consumers would associate the colors with the products.  By employing a broad range of colors, the Squishmallows Trade Dress can employ a non-traditional, unique look:

| Monochrome/Complementary | Squishmallows Trade Dress in Penguins and a Fox |
| --- | --- |
|  |  |

- 16 -

AMENDED COMPLAINT

1
2
3

**E.      Element 5: "short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel"**

4   40.      Companies that manufacture plush toys also need to choose the material

5   for the exterior of the toy and the material to fill the inside of the toy.  The choices of

6   the exterior and interior material can contribute to the "look" of the plush toys.

7   41.      For the exterior, many companies choose fabrics like Velboa.  Velboa is

8   a fabric that is intended to have the feel and look of real faux fur.  Since many plush

9   toys are animal-like, having an exterior that mimics real faux fur appeals to consumers

10  who want an animal or character plush toy:



11
12
13
14
15

16  42.      For the interior, many companies opt to use fills like regular polyester

17  stuffing in toy animals and characters.  Regular polyester is cheaper, but can provide

18  a harder feel and look when used as filling in toys.

19  43.      In contrast, but consistent with the understated, unique, and cute look of

20  Squishmallows, Spanboa is used for the exterior and a silky polyester is used as the

21  fill for the interior.  Spanboa is a soft fabric utilizing spandex that can give products a

22  stretchy feel and look.  Silky polyester can also contribute to a softer look.

23  44.      These exterior and filling choices together help contribute to the unique

24  look of products with the Squishmallows Trade Dress from other toys on the market:

25
26
27
28

- 17 -
AMERICAN COMPLAINT

| Traditional | Squishmallows Trade Dress |
|---|---|
|  |  |

*** 

45.     These elements together create an overall visual impression distinct from other toys in the industry.  With this distinctive look—coupled with unique designs, extensive marketing efforts, media coverage, and market penetration—the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when compared to other plush toys.  And, aided by Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.  As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kelly Toys.

46.     Consistent with that advertising and marketing scope, Kelly Toys sells many Squishmallows that feature the iconic trade dress, and whose overall look, feel and image—in particular but without limitation its shapes, colors, textures and graphics—serve as a distinctive source identifier to the consuming public.  As can be seen through the below Squishmallows, though they have differences, they share the elements of the Squishmallows Trade Dress and do not have the elements that the designers specifically disclaimed and opted away from:



47.     In addition, the Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look and feel that is uniquely associated with Squishmallows.  The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture

- 19 -

yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions), (iii) a myriad of alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

48.     Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors.  Competitors have successfully used innumerable alternative design elements and combinations of those elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function.  To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish – and has succeeded in distinguishing – the source of products embodying the Squishmallows Trade Dress from the source of other toys.  Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has

- 20 -
AMENDED COMPLAINT

become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source – Squishmallows.

### Kelly Toys Holdings, LLC Owns Copyrights in Squishmallows

49.    Additionally, Kelly Toys Holdings, LLC is also the owner of registered copyrights in and related to its Squishmallows products (the "Squishmallows Works"), including listed those in the below chart:

| Deposit Copies of Copyrighted Works | Copyright Number |
|---|---|
|  | VAU001395927 |
|  | VA0002093073 |
|  | VA0002096023 |
|  | VA0002118285 |
|  | VA0002183993 |
|  | VA0002118286 |

- 21 -
AMENDED COMPLAINT

| | |
|---|---|
|  | VA0002093075 |
|  | VA0002148804 |
|  | VAU001395816 |
|  | VAU001399134 |
|  | VA0002127224 |
|  | VA0002137255 |

## Squishmallows Are Distinctive and Popular

50.    Kelly Toys and its predecessor have, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its Squishmallows line.   And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade

Dress has acquired distinctiveness in the marketplace when applied to plush toys.  As a further result of Kelly Toys' extensive promotional activities and widespread display of its Squishmallows directed to the public and as a result of its fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high quality goods connected with or offered by a single source.  The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize valuable goodwill and reputation.

51.    In  addition  to  being  original  and  inherently  distinctive,  the Squishmallows Trade Dress is also widely recognized by consumers.  A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

52.    Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.

53.    Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook,  and  Twitter.    Indeed,  Kelly  Toys'  legion  of  loyal  fans  of  its  line  of Squishmallows  have  been  extremely  engaged  on  social  media,  including  TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows.  Squishmallows videos have been viewed more than 11 billion times on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

54.    Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

- 23 -

AMENDED COMPLAINT

55. Indeed, sales of Squishmallows have increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

56. Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others. By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[2]



---

[2] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

- 24 -

AMENDED COMPLAINT

57. The New York Times has proclaimed that "Squishmallows are Taking Over,"[3] Forbes named them "2022's Must-Have Christmas Toy,"[4] and The Guardian has recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[5]

58. Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken over the toy world," and that "as toy stores go, the marshmallow-like plush toy's meteoric rise to the top of the $100 billion global toy market is one for the ages."[6]

59. Squishmallows' fandom ranges across all ages, from children to teens to adults. Celebrities like Kim Kardashian and Lady Gaga have identified themselves as avid devotees of the brand, and have published messages and photos of their Squishmallows collections on their social media accounts:

---

[3] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[4] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,* Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[5] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

[6] Mark Caldwell, *Soft Sell*, Costco Connection, Oct. 2023, at 22, https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-23/US_October_Connection_2023.pdf.

- 25 -



60.    In September of 2022, Squishmallows was awarded the coveted "Toy of the Year, "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation.  Squishmallows are so popular that they have been identified as the most popular toy brand across 41% of the U.S. states—far ahead of other well-known mega brands like Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh.

61.    Due to Squishmallows' massive success and popularity, consumers associate the high-quality Squishmallows toys with the Squishmallows Trade Dress.

## Zuru Has a History of Selling Copycat and Defective Products

62.   Zuru is a direct competitor of Kelly Toys in the plush toy market. However, unlike Kelly Toys, Zuru has made a business model of copying other well-known products, hoping to trade on the goodwill that those companies spent years garnering.  Zuru and its parent company, Zuru Inc., have been sued in the past for similar forms of infringement, including for infringing on the trade dress of other well-known products.  For example, LEGO sued Zuru, Inc. for its creation of miniature toys and packaging which were strikingly similar to the overall look and feel of LEGO's products thereby deliberately creating consumer confusion:[7]

|            *Authentic LEGO Product*            |            *Zuru Copycat Product*            |
| --- | --- |







[7] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, Compl., ECF No. 1 at 12 (D. Conn. Dec. 13, 2018).

- 27 -

AMENDED COMPLAINT



The court agreed with LEGO, granting a preliminary injunction enjoining Zuru from infringing on LEGO's copyrights and trademarks and denying Zuru's motion to dismiss the complaint, finding that LEGO had sufficiently alleged a claim for trade dress infringement.[8]

63.     Zuru products are also of lesser quality.  Just this year in June 2023, Zuru recalled 7.5 million bath toys after "multiple lacerations and puncture wounds were reported in children playing with them."[9]  According to the United States Consumer Product Safety Commission, there were at least twelve injuries from those toys, nine of which required stitches or medical attention.

### The Infringing Snackles Products

64.     On June 16, 2023, Zuru launched "Snackles," a line of plush toys that copies and imitates Squishmallows.  To be clear, Zuru is not licensed or otherwise authorized to market or distribute products embodying the copyrighted designs or the Squishmallows Trade Dress.

65.     Snackles toys have the *same* distinctive trade dress as the popular Squishmallows, including: substantially egg/bell/oval shaped plush toys depicting

_____

[8] *LEGO A/S v. ZURU Inc.*, No. 18-cv-2045, 2019 WL 13158199, at *2 (D. Conn. July 8, 2019).
[9] *7.5 Million Baby Shark Bath Toys are Recalled After They Cut or Stabbed Children*, Associated Press (June 23, 2023), https://apnews.com/article/zuru-baby-shark-bath-toys-recalled-2bace294be48edfb1bfc2bf17d57c097.

- 28 -
AMENDED COMPLAINT

EXHIBIT K
Page 170 of 231

various similarly shaped abstract/fanciful renditions of animals/characters; simplified Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; embroidered facial features, such as eyes, nostrils, and/or mouths; distinctive contrasting and non-monochrome coloring; and short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel. Side by side comparisons of Squishmallows and copycat Snackles products plainly show how striking the similarities are:

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |
|  |  |
|  |  |

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|



| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|   |  |
|  |  |

- 32 -
AMENDED COMPLAINT

| Squishmallows Original Product | Snackles Copycat Product |
|---|---|
|  |  |

### Zuru's Copycat Coco Squishies Products

66.    Zuru has not limited its copying of Squishmallows to its Snackles line; rather, this is just one of several dubious Zuru product lines copying Squishmallows. For example, Zuru also sells a line of egg-shaped plush toys called "Coco Squishies." Not only has Zuru directly copied the name of Squishmallows, the Coco Squishies products also look *strikingly* like authentic Squishmallows.  Zuru is directly trading off of Squishmallows' goodwill and brand name in the hopes that consumers will confuse the products and buy its own thinking they are authentic Squishmallows.

67.    As depicted in the chart below, Zuru's Coco Squishies are direct copies of well-known and beloved Squishmallows characters:

| Squishmallows Original Product | Coco Squishies Copycat Product |
|---|---|
|  |  |
|  |  |

- 34 -

AMENDED COMPLAINT



68.     The direct resemblance between Coco Squishies and Squishmallows rules out any chance of coincidence.  As shown above, Squishmallows has a pink poodle with curly pink hair atop its head and on its ears; Zuru created a pink poodle with curly pink hair atop its head and on its ears.  Squishmallows has a white bull terrier with a pink belly, pink ears, and large dark spot on its eye; Zuru created a white bull terrier with a pink belly, pink ears, and a large dark spot on its eye.  Squishmallows has a light grey husky with light blue eyes; Zuru created a light grey husky with blue eyes.  Squishmallows has a dalmatian with a large black spot over its left eye; Zuru created a dalmatian with a large black spot over its left eye.

## **Consumer Confusion**

69.     Not only do Snackles visually and tactilely simulate Squishmallows, but Zuru has also been trying to intentionally position its products to trick customers looking for Squishmallows into buying Snackles instead.  Zuru has taken steps to

- 35 -

AMENDED COMPLAINT

1  ensure that customers seeking out Squishmallows land upon the confusingly similar
2  Snackles products instead.

3      70.    Upon information and belief, Zuru pays website operators for Snackles to
4  appear when a user searches for "Squishmallows" on retail websites like Amazon.com.
5  As shown below, Zuru is, upon information and belief, purchasing sponsored product
6  and sponsored branded video campaigns under Squishmallows search terms.   For
7  example, when a consumer searches for "Squishmallows" on Amazon.com, some of
8  the very first results they see will be Snackles products instead:



AMENDED COMPLAINT

6509778

544 of 816

71.    Similarly, when a customer is on a specific Squishmallows product on Amazon.com, Snackles advertising appears on the same page in an effort to confuse a consumer into thinking these are the same line of products:



72.    Zuru has also purchased sponsored branded video campaigns on online retail websites under Squishmallows search terms, so that when a consumer searches for "Squishmallows" they may be met with the following Snackles ad, intermixed with authentic Squishmallows products:



- 37 -
AMENDED COMPLAINT

73.     Zuru does not limit this practice to online retailers: it also takes steps to confuse customers shopping in brick-and-mortar retail stores.  Snackles products are placed *directly next* to Squishmallows products in retail stores in an effort to trick consumers into purchasing Snackles instead of Squishmallows.  As depicted below, customers looking for Squishmallows were confused by the inclusion—on the very same shelf—of a Snackles cow that visually resembles Connor the Cow, a Squishmallows product.  Moreover, another Snackles product is also mixed in with authentic Squishmallows:



> **MistyPhoenix** · 2 mo. ago
>
> Who is the black and white one on the bottom shelf???
>
> ⊖ ⇧ 1 ⇩  💬 Reply  ⬆ Share  ⋯
>
> > **boahblake** 🔽 · 2 mo. ago
> >
> > I'm actually not too sure, I believe it was a snackles as well, but I never picked it up to look at it
> >
> > ⊖ ⇧ 1 ⇩  💬 Reply  ⬆ Share  ⋯
> >
> > > **MistyPhoenix** · 2 mo. ago
> > >
> > > I looked, it is a snackles. I've just never heard of them before and thought I missed out on a Connor of some kind lol
> > >
> > > ⇧ 2 ⇩  💬 Reply  ⬆ Share  ⋯

74.     Upon information and belief, Zuru negotiates for shelf space right next to Squishmallows in retail stores in an effort to trick consumers.  For example, the following images show Snackles products displayed directly next to Squishmallows in a Costco store:

 

- 39 -
AMENDED COMPLAINT

75.     Snackles products also create a likelihood of confusion with original Squishmallows products.  In fact, there is evidence of *actual* consumer confusion.  For example, consumer reviews on Snackles products show that consumers have purchased Snackles believing that they were buying Squishmallows instead:

**prak**

★★★★★ **Soooo Cute**
Reviewed in the United States on October 5, 2023
Color: Dragon (Tabasco)   **Verified Purchase**
My grandkids love Squishmallows. My grandson is going to be so surprised when he sees this devil with the hot sauce. Vibrant colors.

**Tammy Huddy**

★★★★★ **LOVE! LOVE! LOVE!**
Reviewed in the United States on October 8, 2023
Color: Sloth (Push Pop)   **Verified Purchase**
First of all, I think I love squishamallows more than my children! This one did not dissapoint! Purchased it as a gift. My child loves it so much that my other girls have requested one as well! Went ahead and purchased the Chicken and we have two mini versions as well!

Priced right and makes a great gift! Highly recommend!

Helpful   |   Report

76.     Other consumers have aired their confusion, noting that they "thought [Snackles] were [Squishmallows] at a glance":

- 40 -

AMENDED COMPLAINT



77.     As the comments on this photo show, other consumers were likewise tricked, again noting that Snackles are being placed "on a shelf right next to the [Squishmallows]" and observing that "they're 100% trying to trick ppl like your partner":



AMENDED COMPLAINT



78.     Other consumers have also noted how similar Snackles are to Squishmallows, even noting particular Squishmallows characters that have been clearly copied by Snackles:



79.     Consumers have noted the obvious similarities between Snackles and Squishmallows in comments of videos presenting Snackles products, including in some cases going so far as to confuse the product names and refer to Snackles products as "Snackmallows," "Snacksquishmallows," and "Snacksquishy":

- 42 -

**pawgjade**

Jade · 8-25

**Follow**

Found the snackmallow in @Smyths Toys Superstores

Of course ive only started with one and luckly got lottie the snackmallow i wanted. Do i need the whole collection?

#snackmallow #squishy #squishies #squishi #snacksquishmallow #snacksquishy

---

**Martina**
They look like squishmallows

8-20   ♡ 34   Reply

View 2 replies ⌄

**shyla(Taylor's_Version)**
yo, these look like squishmallows

8-29   ♡ 0   Reply

**Autumn** 🍁
Literally a rip off of squishmallows

9-18   ♡ 1   Reply

**rachel arnold**
SQUISH MELLO DUPEEEE

1d ago   ♡ 0   Reply

**Garfieldhatesmondaysdotorg**
Zuru jumping on the Squishmallows train five years too late. 😌

8-7   ♡ 2   Reply

---

- 43 -

AMENDED COMPLAINT

80. Zuru's actions have already caused significant harm. As a result of consumer confusion, Kelly Toys has lost potential customers, sales, and market share. For example, customer reviews reveal that customers looking for Squishmallows mistakenly purchased Zuru's Snackles products instead. And, upon information and belief, even customers who knew the difference between Squishmallows and Snackles before purchase have mistakenly purchased Snackles because of Zuru's use of the Squishmallows Trade Dress and infringement of the Squishmallows products.

81. Moreover, Zuru's bidding on Squishmallows search terms on online retailer sites has forced Kelly Toys to in turn increase its spending on search terms for its *own* "Squishmallows" mark. In other words, Kelly Toys has had to spend more money to ensure that when consumers search for "Squishmallows," they will be shown Squishmallows products and not copycat Snackles products strategically placed to confuse them.

82. In sum, Zuru's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys. And, unless enjoined, Zuru will continue to further escalate its infringing activities.

## **FIRST CAUSE OF ACTION**

### **(Trade Dress Infringement – 15 U.S.C. § 1125)**

83. Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

84. Kelly Toys Holdings, LLC owns and has a protectable interest in the Squishmallows Trade Dress.

85. As owner of all rights, title and interest in and to the Squishmallows Trade Dress, Kelly Toys Holdings, LLC has standing to maintain an action for trade dress infringement under the Lanham Act including, 15 U.S.C. § 1125.

86. The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, the Squishmallows brand.

- 44 -

87.    The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

88.    The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows brand plush toys would not impose a non-reputation-related competitive disadvantage against competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize.  The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function; rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys products from those of competitors.

89.    Without Kelly Toys' authorization or consent, and having knowledge of Kelly Toys Holdings, LLC's prior rights in the Squishmallows Trade Dress, Defendant has designed, manufactured, distributed, advertised, offered for sale and/or will continue to design, distribute, advertise, offer for sale, and sell replicas of the Squishmallows Trade Dress to the consuming public in direct competition with Kelly Toys, in or affecting interstate commerce.

90.    Zuru's infringing designs are, each alone and together, confusingly similar to the Squishmallows Trade Dress.  Defendant's use of the Squishmallows Trade Dress has caused, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally,

- 45 -

AMENDED COMPLAINT

1  irreparable injury to goodwill and reputation associated with the Squishmallows Trade
2  Dress.

3      91.    Defendant's use of the Squishmallows Trade Dress thus constitutes trade
4  dress infringement in violation of 15 U.S.C. § 1125(a).

5      92.    As further evidence of Zuru's intent to trade upon Kelly Toys' goodwill
6  in its Squishmallows Trade Dress, in order to ensure consumer confusion, Zuru not
7  only copied Squishmallows Trade Dress and original designs, but also incorporated
8  product placement with products that Kelly Toys had already licensed for use in
9  collaboration with its Squishmallows toys.

10     93.    As a direct and proximate result of Zuru's unlawful conduct, it has
11  misappropriated Kelly Toys Holdings, LLC's rights in the Squishmallows Trade
12  Dress, as well as the goodwill associated therewith, and has diverted sales and profits
13  from Kelly Toys to Zuru.  Thus, as a direct and proximate result of Defendant's acts
14  of willful infringement, Kelly Toys has suffered and/or will suffer irreparable damage
15  to its valuable brand and reputation, and other damages in an amount to be proven at
16  trial, including Defendant's profits and Kelly Toys' lost profits.

17     94.    Defendant's actions described above will cause, have caused, and will
18  continue to cause irreparable damage to Kelly Toys, unless Defendant is enjoined by
19  this Court.  Kelly Toys has no adequate remedy at law with regard to Defendant's
20  infringing conduct.  Accordingly, Kelly Toys is entitled to a permanent injunction,
21  pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents,
22  servants, and employees, and all persons acting thereunder, in concert with, or on their
23  behalf, from using Kelly Toys' Squishmallows Trade Dress, or any colorable imitation
24  or variation thereof, in connection with the sale and/or marketing of any products.

25     95.    Defendant's aforesaid acts are exceptional within the meaning of 15
26  U.S.C. § 1117.

27

28

- 46 -
AMENDED COMPLAINT

## SECOND CAUSE OF ACTION

### (California Common Law Trade Dress Infringement)

96.    Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

97.    Kelly Toys Holdings, LLC is the owner of all right, title, and interest in and to the Squishmallows Trade Dress used by Kelly Toys by virtue of its extensive manufacture and sale of products embodying such trade dress as set forth in the preceding paragraphs of the Complaint.

98.    Kelly Toys' common law trade dress is distinctive, and furthermore, has acquired secondary meaning.  Kelly Toys has continuously used its Squishmallows Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin.  As such, there are common law rights to the Squishmallows Trade Dress.

99.    The Squishmallows Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with plush toy products of the highest quality and reputation finding their origin in a single source, Kelly Toys.

100.   The Squishmallows Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of advertising of products embodying the Squishmallows Trade Dress, the volume of sales, as well as the length and manner of use of the products.

101.   The Squishmallows Trade Dress is nonfunctional because its distinctive aesthetic features yield no utilitarian advantage, there are innumerable alternative stylistic plush toy features available to competitors, even if there were some utilitarian advantages of the design, Kelly Toys' advertising does not tout or market those advantages, and the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features consistent across Squishmallows products would not impose a non-reputation-related competitive disadvantage against

- 47 -

AMENDED COMPLAINT

competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize. The combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. Rather, the highly distinctive Squishmallows Trade Dress is intended to distinguish Kelly Toys' plush toys from those of competitors.

102. The infringing products advertised, distributed, offered for sale, and sold by Defendant incorporate matter constituting replicas and imitations of Kelly Toys' common law trade dress. Such unauthorized use by Defendant of Kelly Toys' common law trade dress constitutes common law trade dress infringement and has already caused, and will likely continue to cause, confusion and mistake in the minds of the trade and the purchasing public as to the source of the products and is causing purchasers to believe such products are authentic products of Kelly Toys when, in fact, they are not.

103. Upon information and belief, Defendant has willfully and intentionally misappropriated aspects of Kelly Toys' common law trade dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent to palm off its goods as those of Kelly Toys, and as such, Defendant has committed trade dress infringement under the common law.

104. By such actions in infringing Kelly Toys' common law trade dress, Defendants are improperly trading upon the reputation and goodwill of, and are impairing valuable rights in, such trade dress.

105. Upon information and belief, Defendant has committed the above alleged acts in conscious disregard of Kelly Toys' rights, and Kelly Toys is therefore entitled to punitive damages pursuant to the common law of the State of California.

106. Kelly Toys has no adequate remedy at law. The conduct of Defendant has caused and, if not enjoined, will continue to cause, irreparable damage to the rights in and business, reputation, and goodwill of the Squishmallows Trade Dress.

- 48 -

AMENDED COMPLAINT

# THIRD CAUSE OF ACTION

## (Federal Copyright Infringement – 17 U.S.C. § 501(a))

## (Kelly Toys Holdings, LLC Only)

107.   Kelly Toys Holdings, LLC repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

108.   Kelly Toys Holdings, LLC is the exclusive owner of the Squishmallows Works.

109.   On information and belief, Defendant had actual notice of Kelly Toys Holdings, LLC's exclusive rights in and to the Squishmallows Works.

110.   Defendant did not attempt and therefore inherently failed to obtain Kelly Toys Holdings, LLC's consent or authorization to use, manufacture, reproduce, copy, display, prepare derivative works of, distribute, sell, transfer, rent, perform and/or market Kelly Toys Holdings, LLC's Squishmallows Works.

111.   Without permission, Defendant knowingly and intentionally reproduced, copied, and displayed the Squishmallows Works by manufacturing, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling infringing products which bear such Squishmallows Works, or artwork that is, at a minimum, substantially similar to the Squishmallows Works.  For example:

- 49 -

6509778

| Deposit Copies of Copyrighted Works | Copyright Number | Infringing Zuru Product |
|---|---|---|
|  | VAU001395927 | <br>"Hugh" |
|  | VA0002093073 | <br>"Daisy" |
|  | VA0002096023 | <br>"Terry" |
|  | VA0002118285 | <br>"Terry" |
|  | VA0002183993 | <br>"Terry" |
|  | VA0002118286 | <br>"Dani" |

- 50 -

AMENDED COMPLAINT

| |  | VA0002093075 | <br>"Richard" |
| --- | --- | --- | --- |
| |  | VA0002148804 | <br>"Richard" |
| |  | VAU001395816 | <br>"Richard" |
| |  | VAU001399134 | <br>"Susie" |
| |  | VA0002127224 | <br>"Susie" |

- 51 -

AMENDED COMPLAINT

| | VA0002137255 | |
|---|---|---|
| | |  |
| | | "Lottie" |

112.   Defendant's unlawful and willful actions as alleged herein constitute infringement of the Squishmallows Works, including exclusive rights to reproduce, distribute and/or sell such Squishmallows Works in violation of 17 U.S.C. § 501(a).

113.   Defendant's knowing and intentional copyright infringement, as alleged herein, has caused substantial and irreparable harm to Kelly Toys Holdings, LLC in an amount as yet unknown but to be proven at trial, for which Kelly Toys Holdings, LLC has no adequate remedy at law, and unless enjoined, Defendant will continue to cause substantial and irreparable harm to Kelly Toys Holdings, LLC.

114.   Based on Defendant's wrongful conduct, Kelly Toys Holdings, LLC is entitled to injunctive relief, Kelly Toys Holdings, LLC's actual damages and lost profits, and Defendant's profits arising from Defendant's conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages, in an amount to be proven at trial and enhanced discretionary damages for willful copyright infringement, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (California Common Law Unfair Competition)

115.   Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

116.   This claim arises under the common law of the State of California relating to unfair competition.   This claim is not based on Kelly Toys Holdings, LLC's copyrights.

- 52 -
AMENDED COMPLAINT

117. Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress. Defendant's unauthorized use of Kelly Toys' Squishmallows Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of Defendant's products and to cause purchasers to believe that Defendant's products are authentic products of Kelly Toys when, in fact, they are not.

118. Upon information and belief, Defendant has intentionally appropriated Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent of palming off their goods as those of Kelly Toys. Defendant has thus committed unfair competition under the common law of the State of California.

119. By its actions in infringing Kelly Toys' Squishmallows Trade Dress, Defendant is improperly trading upon the reputation and goodwill, and impairing valuable rights in, the Squishmallows Trade Dress.

120. Upon information and belief, said activities of Defendant have caused, and if not enjoined, will continue to cause, irreparable harm and damage to the rights in the Squishmallows Trade Dress and to business reputation and goodwill.

121. Upon information and belief, Defendant has engaged in the unlawful conduct alleged herein intentionally, maliciously, fraudulently, and oppressively entitling Kelly Toys to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (California Statutory Unfair Competition –

### Cal. Bus. & Prof. Code § 17200, *et seq.*)

122. Kelly Toys repeats, realleges, and incorporates each and every allegation made above as if fully set forth herein.

123. By reason of the foregoing, Defendant has been and is engaged in "unlawful, unfair or fraudulent business practices" in violation of Cal. Bus. & Prof.

- 53 -

Code § 17200 *et seq.* This claim is not based on Kelly Toys Holdings, LLC's copyrights.

124. The Squishmallows Trade Dress constitutes a protectable property right. Defendant's infringement of the Squishmallows Trade Dress will and has caused an impairment and diminishment of Kelly Toys' rights. Indeed, the activities of Defendant have caused and, if not enjoined, will continue to cause irreparable harm and damage to the rights in the Squishmallows Trade Dress and to business reputation and goodwill. Kelly Toys has no adequate remedy at law for these wrongs and injuries. The damage to Kelly Toys includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Accordingly, Kelly Toys is entitled to a permanent injunction restraining and enjoining Defendant and its agents, servants, employees, and all persons acting thereunder, in concert with, or on its behalf, from using Squishmallows Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. Kelly Toys is further entitled to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kelly Toys prays for judgment against Defendant as follows:

a. That Defendant, its officers, members, directors, agents, servants, employees, successors, licensees, representatives, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

(i) Manufacturing, distributing, advertising, offering to sell or selling their infringing products or any colorable imitations of the Squishmallows Trade Dress or the Squishmallows Works;

(ii) Using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

(iii) Using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products;

- 54 -

AMENDED COMPLAINT

(iv)     Using imitations of the Squishmallows Works in connection with plush toys or other goods;

(v)     Infringing or contributing to infringement of Kelly Toys Holdings, LLC's copyrights or trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant;

(vi)     Engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress; and

(vii)     Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (vi) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (vi) above.

b.     That Defendant be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

c.     That Kelly Toys Holdings, LLC has superior rights to exclusive use in the Squishmallows Works and the Squishmallows Trade Dress in connection with toys vis-à-vis Defendant;

d.     That the Court direct any third parties providing services to Defendant in connection with any infringing and/or enjoined conduct, including social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces (*e.g.*, Amazon, Etsy, eBay, Alibaba), online payment providers, including credit card companies (*e.g.*, PayPal, Visa) and other service providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify)

- 55 -

1   to cease providing services to Defendant in connection with the offer for sale and sale

2   of the infringing products or any other products using, infringing, or embodying the

3   Squishmallows Trade Dress or the Squishmallows Works;

4       e.      That Defendant be required to pay Kelly Toys such damages as it has

5   sustained as a consequence of Defendant's infringement of the Squishmallows Trade

6   Dress;

7       f.      That Defendant be required to pay Kelly Toys Holdings, LLC such

8   damages as it has sustained as a consequence of Defendant's infringement of and the

9   Squishmallows Works and trebling of those damages;

10      g.      Adjudge that the Defendant, by its unauthorized use of the

11  Squishmallows Trade Dress and Squishmallows Works for plush toys, and other acts

12  as it may have undertaken relating to the Squishmallows Trade Dress and/or

13  Squishmallows Works, is in violation of 15 U.S.C. § 1125(a), 17 U.S.C. § 501(a),

14  under California state law (including, without limitation, Cal. Bus. & Prof. Code §

15  17200 *et seq.*), and under common law, and that they have done so willfully;

16      h.      Direct Defendant to provide an identification in writing of any and all

17  entities that are presently using the Squishmallows Trade Dress or Squishmallows

18  Works on Defendant's behalf and inform them that they must immediately cease such

19  use;

20      i.      Direct Defendant to immediately recall any and all merchandise

21  previously provided to any entity embodying or using the Squishmallows Trade Dress

22  or the Squishmallows Works;

23      j.      Enter an order, pursuant to 15 U.S.C. § 1118, directing Defendant to

24  deliver for destruction all products, brochures, marketing materials, decals, stickers,

25  signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their

26  possession or under their control, embodying any unauthorized copy of the

27  Squishmallows Trade Dress or any of the Squishmallows Works, or any simulation,

28  reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation

- 56 -

AMENDED COMPLAINT

therefor, and all plates, molds, matrices, programs, and other means of making the same;

k.    That Defendant provide in writing with the following information relating to Defendant's goods marketed, advertised, offered for sale, or sold under either or both of the Squishmallows Trade Dress and/or Squishmallows Works:

(i)    the name, address, and telephone number of each and every United States entity to whom Defendant has made available or otherwise provided any such products;

(ii)    the total number of units distributed and sold;

(iii)    the total number of units remaining in inventory; and

(iv)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendant in connection with such actions;

l.    Direct Defendant to pay the costs of corrective advertising;

m.    Direct Defendant to pay Plaintiffs' attorneys' fees and costs incurred in initiating and prosecuting this action;

n.    Direct Defendant to pay punitive damages and exemplary damages according to proof;

o.    That Kelly Toys recover its actual damages, Kelly Toys' lost profits, and Defendant's profits arising from Defendant's conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages;

p.    That the Court award enhanced and treble damages;

q.    That Kelly Toys be awarded interest, including pre-judgment interest, on the foregoing sums;

r.    That the Court direct such other actions as it may deem just and proper to prevent the public from deriving the mistaken impression that and products or services

- 57 -

AMENDED COMPLAINT

offered, advertised, or promoted by or on behalf of Defendant is authorized by Kelly Toys or related in any way to Kelly Toys' products or services; and

s.      For such other and further relief as the Court may deem just and proper.

Dated: March 19, 2024      **HUESTON HENNIGAN LLP**

By:   */s/ Moez M. Kaba*
     Moez M. Kaba, State Bar No. 257456
      *mkaba@hueston.com*
     Sourabh Mishra, State Bar No. 305185
      *smishra@hueston.com*
     523 West 6th Street, Suite 400
     Los Angeles, CA 90014
     Telephone:     (213) 788-4340
     Facsimile:      (888) 775-0898

     *Attorneys for Plaintiffs*

- 58 -
AMENDED COMPLAINT

# DEMAND FOR JURY TRIAL

Kelly Toys hereby demands a trial by jury.

Dated: March 19, 2024                    **HUESTON HENNIGAN LLP**

By: _/s/ Moez M. Kaba_
    Moez M. Kaba, State Bar No. 257456
     *mkaba@hueston.com*
    Sourabh Mishra, State Bar No. 305185
     *smishra@hueston.com*
    523 West 6th Street, Suite 400
    Los Angeles, CA 90014
    Telephone:    (213) 788-4340
    Facsimile:    (888) 775-0898

    *Attorneys for Plaintiffs*

- 59 -

1 | JEAN-PAUL CIARDULLO, CA Bar No. 284170
     jciardullo@foley.com
2 | ASHLEY M. KOLEY, CA Bar No. 334723
     akoley@foley.com
3 | **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3300
4 | LOS ANGELES, CA 90071-2418
   TELEPHONE: 213.972.4500
5 | FACSIMILE:   213.486.0065

6 | JONATHAN MOSKIN (*Pro Hac Vice*)
   NY Bar No. 1949031
7 |   jmoskin@foley.com
   **FOLEY & LARDNER LLP**
8 | 90 PARK AVENUE
   NEW YORK, NY 10016
9 | TELEPHONE: 212.682.7474
   FACSIMILE:   212.687.2329

10 |
11 | *Attorneys for Defendant*
    *ZURU, LLC*

12 |

13 |                    **UNITED STATES DISTRICT COURT**

14 |                    **CENTRAL DISTRICT OF CALIFORNIA**

15 |                         **WESTERN DIVISION**

16 | KELLY TOYS HOLDINGS, LLC;        Case No. 2:23-cv-09255 MCS(AGRx)
    JAZWARES, LLC; KELLY
17 | AMUSEMENT HOLDINGS, LLC; and     **ZURU, LLC's NOTICE OF MOTION**
    JAZPLUS, LLC                     **AND MOTION TO DISMISS**
18 |

19 |               *Plaintiffs*,        Hon. Mark C. Scarsi
20 |        v.

21 | ZURU, LLC,                       Date:     May 6, 2024
                                     Time:     9:00 AM
22 |               *Defendant.*       Court:    First Street, 7C

23 |

24 |

25 |

26 |

27 |

28 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on Monday, May 6, 2024, at 9:00 AM before the Honorable Mark C. Scarsi at the First Street Courthouse, 350 W. 1st Street, Courtroom 7C, 7th floor, Los Angeles, California 90012, Defendant, Zuru, LLC ("Zuru") will, and hereby does respectfully move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is made on the grounds that Plaintiffs have failed to plausibly articulate protectable trade dress.

This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the accompanying Declaration of Jean-Paul Ciardullo, the Request for Judicial Notice and exhibits attached thereto, the accompanying Proposed Order, and all pleadings, papers, and records on file in this action, and such matters of which this Court may take judicial notice, and upon such further oral argument and documentary evidence as may be presented at the time of hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on March 25, 2024, as well as prior conferences and correspondence on this matter in connection with Zuru's Original Motion to Dismiss (Dkt. 23).

Dated: April 2, 2024                    Foley & Lardner LLP

                                        */s/ Jean-Paul Ciardullo*
                                        Jean-Paul Ciardullo

                                        *Attorneys for Defendant*
                                        *ZURU, LLC*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ........................................................................................1

II.  BACKGROUND ..........................................................................................2

     A.   Plaintiffs and Squishmallows ...........................................................2

     B.   Zuru and Snackles ............................................................................8

III.  APPLICABLE LAW ....................................................................................9

     A.   Rule 12(b)(6) ....................................................................................9

     B.   Trade Dress ......................................................................................10

IV.  PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A SINGLE TRADE
     DRESS ENCOMPASSING THEIR LARGE AND VARIED LINEUP ...............13

     A.   Having Deliberately Chosen To Build A Brand Around A Wide
         Diversity Of Distinctly Different Cartoon Characters, Plaintiffs
         Cannot Avail Themselves Of A Unitary "Trade Dress" ..............................13

     B.   The FAC Doubles Down On The Same Trade Dress Definition That
         The Court Already Rejected As "Too Broad And Ambiguous" ...................14

         1.   "Substantially Egg/Bell Shaped Plush Toys…" ...............................15

         2.   "Simplified Kawaii faces…" ...........................................................16

         3.   "Embroidered Facial Features" ........................................................18

         4.   "Distinctive Contrasting and Non-monochrome Coloring" ..............18

         5.   "Short-pile velvety velour-like…marshmallow feel" ......................19

         6.   There Is No Whole Greater Than The Sum Of Its Parts Here ...........20

     C.   Plaintiffs Deliberately Omit Squishmallows From Their FAC ...................21

     D.   The "Impossible To Register" Litmus Test ................................................22

     E.   This Court's Past Rulings On Squishmallows Trade Dress...........................23

V.   CONCLUSION...........................................................................................24

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abagninin v. AMVAC Chem. Corp.*,
   545 F.3d 733 (9th Cir. 2008) ................................................................25

*Apple Inc. v. Samsung Elecs. Co.*,
   768 F. Supp. 2d 1040 (N.D. Cal. 2011) ...............................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................9

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
   457 F.3d 1062 (9th Cir. 2006) ..............................................................12

*Crafty Prods. v. Michaels Cos.*,
   389 F. Supp. 3d 876 (S.D. Cal. 2019) ...................................................11

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
   No. CV 15-769 PSG (SSx), 2015 WL 12731929 (C.D. Cal. May 8, 2015) ................10

*Goscicki v. Custom Brass & Copper Specialties, Inc.*,
   229 F. Supp. 2d 743 (E.D. Mich. 2002) ................................................13

*Greenberg v. Johnston*,
   No. CV-14-046505-MWF (VBKx), 2014 WL 12586252 (C.D. Cal. Oct. 22, 2014) ..10

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..............................................................10

*Interactive Health LLC v. King Kong United States, Inc.*,
   No. CV 06-1902-VBF(PLAx), 2008 WL 11337393 (C.D. Cal. Mar. 6, 2008) ..........11

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
   58 F.3d 27 (2d Cir. 1995) ......................................................................20

*Kellytoy Worldwide, Inc. v. TY, Inc.*,
   No. 20 C 748, 2020 WL 5026255 (N.D. Ill. Aug. 25, 2020) .................6, 12

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
   113 F.3d 373 (2d Cir. 1997) ............................................................13, 21

*Leatherman Tool Grp., Inc. v. Cooper Indus.*,
   199 F.3d 1009 (9th Cir. 1999) ..............................................................20

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
   292 F. Supp. 2d 535 (S.D.N.Y. 2003) ...................................................11

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) ................................................................9

*Mike Vaughn Custom Sports, Inc. v. Piku*,
   15 F. Supp. 3d 735 (E.D. Mich. 2014) ..................................................21

*Paramount Farms Int'l LLC v. Keenan Farms Inc.*,
   No. 2:12-cv-01463-SVW-E, 2012 WL 5974169 (C.D. Cal. Nov. 28, 2012) ..............12

iv

*R.F.M.A.S., Inc. v. So*,
    619 F. Supp. 2d 39 (S.D.N.Y. 2009) ........................................................... 14
*Rose Art Indus. v. Swanson*,
    235 F.3d 165 (3d Cir. 2000) ........................................................................ 11
*Sara Designs, Inc. v. A Classic Time Watch Co.*,
    234 F. Supp. 3d 548 (S.D.N.Y. 2017) ........................................................ 17
*Shelbyco Inc. v. Western Trimming Corp.*,
    No. 2:97-CV-196C, 1997 WL 377982 (D. Utah. May 12, 1997) ................ 17
*Sleep Sci. Partners v. Lieberman*,
    No. 09-04200 CW, 2010 WL 1881770 (N.D. Cal. May 10, 2010) .............. 10
*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ...................................................................... 10
*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) ...................................................................................... 12
*Walker & Zanger, Inc. v. Paragon, Indus.*,
    549 F. Supp. 2d 1168 (N.D. Cal. 2007) ................................................. 10, 17
*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*,
    916 F.2d 76 (2d Cir. 1990) ..................................................................... 13, 20
*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) .................................................................................... 12
*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ....................................................................... 11

**Statutes**
15 U.S.C. § 1127 ............................................................................................. 10

**Regulations**
37 C.F.R. § 2.52 .............................................................................................. 22

**Rules**
California Rule of Professional Conduct 3.3(a)(2) ......................................... 28
Fed. R. Civ. P. 12(b)(6) .......................................................................... passim

**Other Authorities**
1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:3
    (4th ed. 2014) ............................................................................................. 10
1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:5.50
    (5th ed. 2020) ............................................................................................. 11
1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §8:5.50
    (5th ed. 2020) ............................................................................................... 2
Trademark Manual of Examining Procedure, §1202.02(c) – (c)(i) .................. 22

v

# I.  __INTRODUCTION__

On March 5, 2024, the Court granted Defendant Zuru, LLC's ("Zuru") Original Motion to Dismiss regarding Plaintiffs' trade dress claims, finding that Plaintiffs' trade dress definition was "too broad and ambiguous to form the basis of a plausible claim for trade dress infringement and therefore does not satisfy the requirements of Rule 8." (Dkt. 32, p.5.) The Court granted leave to amend but cautioned that "a subsequent pleading containing another ill-defined trade dress description may result in a final dismissal of the trade dress claims." (*Id*., p.7.) Zuru now seeks dismissal with prejudice of Plaintiffs' First Amended Complaint (Dkt. 34, "FAC") on the grounds that it fails to cure the deficiencies of the Original Complaint.

Plaintiffs' "new" trade dress definition contains nothing new at all, once again relying on the same purported trade dress elements that the Court already rejected. What Plaintiffs are overreachingly attempting to do here is wield trade dress law as a kind of "uber-copyright" encompassing thousands of distinctly different-looking toy cartoon characters, and in so doing obtain a sweeping monopoly over an abstract idea of a vague kind of "style." And it is a style that Plaintiffs did not even invent (Kawaii is a broad pre-existing category that long pre-dates Squishmallows), and that Plaintiffs cannot even coherently articulate, using wordy commentary that is riddled with hedges and internal inconsistencies. Plaintiffs' FAC essentially just repeats and emphasizes the same purported design elements as the Original Complaint, while improperly cherry-picking examples of Squishmallows that Plaintiffs say conform to their definition, and omitting all the Squishmallows that do not.

Tellingly, this will be Plaintiffs' most recent of numerous different attempts in litigation to define a single trade dress covering all Squishmallows, evidencing the impropriety and futility of this maneuvering. As observed in the McCarthy treatise, "[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas

1

McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §8:5.50 (5th ed. 2020). Zuru has invoked an "impossible to register" argument as a litmus test for this challenge: because the Squishmallows characters lack common features across the entire lineup, it would be impossible to register a single trade dress covering all of them. Plaintiffs must appreciate this, which is why they have not sought to obtain federal registration, despite the professed importance of the purported trade dress. Plaintiffs seek to claim at common law what the Trademark Office would refuse them. More than that, Plaintiffs are improperly trying to ensnare with trade dress law a sweeping market monopoly that no other form of intellectual property would allow.

In sum, under Fed. R. Civ. P. 12(b)(6), the Court should dismiss the trade dress claims of the FAC (Counts I, II, IV, and V), and such dismissal should be with prejudice in view of Plaintiffs' failure to address the defects of the Original Complaint.

## II.   **BACKGROUND**

### A.   **Plaintiffs and Squishmallows**

According to Plaintiffs, Squishmallows were introduced in 2016. (FAC, ¶1.) Although the Complaint shows pictures of some Squishmallows, the Squishmallows product line in fact consists of <u>thousands</u>[1] of distinctly different-looking characters, assuming a wide variety of different physical configurations. Examples of these can be found in **Exhibit A** to the concurrent Request for Judicial Notice, which contains images of Squishmallows from Plaintiffs' own pleadings in other lawsuits. Further images of Squishmallows from Amazon.com, Walmart.com, and Target.com are included at Exhibits

---

[1] Materials online suggest that the Squishmallows character count is in the thousands. Zuru suggested this in its Original Motion to Dismiss, and Plaintiffs did not contest it. As discussed in Section IV.C, having claimed trade dress in their entire product lineup, and having already been called out on not fairly representing that lineup, Plaintiffs should have included a compendium of all their Squishmallows with the FAC, but decided not to share that information.

2

MOTION TO DISMISS
EXHIBIT K
Page 208 of 231

C-E to that Request.[2] Samples of images from Exhibit A are shown below:



---

[2] The Court declined to take judicial notice of these materials in ruling on Zuru's original Motion to Dismiss on the grounds that it would not be necessary to consider the materials to decide that motion. Zuru presents them again here in the event the Court does wish to consider them in deciding the present Motion.

3

Plaintiffs have even turned Squishmallows into stuffed animal slippers, pet beds, and stackable pillows, as shown below.[3]



Indeed, it is clear that Plaintiffs' made a deliberate marketing decision to build their brand around vastly divergent product appearances, choosing to have thousands of different-looking Squishmallow characters rather than a discrete lineup of just a few very similar-looking ones. The very thing that drives sales of these toys is the fact that no two look alike: consumers would not want to collect them otherwise. The entire point is for Squishmallows to all be discrete individual characters with their own unique appearances and back-stories, rather than different versions of the same character design. It also appears that Plaintiffs have adopted a marketing tactic of trying to make the full extent of their lineup unknowable, wanting consumers to believe that there are so many different Squishmallow characters out there that no one person could hope to collect all of them. The Jazwares website itself only lists a small percentage of the products, and appears to be in a state of constant flux. Plaintiffs do not even want to disclose their full lineup in this litigation, or else Plaintiffs would have attached a compendium to the FAC.

---

[3] These images were collected from the Jazwares website (https://shop.jazwares.com/pages/squishmallows) (Item 4 in Zuru's Request for Judicial Notice), and from Walmart.com (*id.*, Exhibit D).

4

Squishmallows are sold under a prominent stylized logo reading "*Original Squishmallows*," that is displayed on product hangtags, store displays, and websites (shown below).[4] It is apparent from this branding that it is the name "Squishmallows" (and accompanying logo design) that is ultimately what is used to distinguish the products in the marketplace. Notably, Plaintiffs do not accuse Zuru of infringing those trademarks.

 

Although Plaintiffs' present Complaint purports to assert trade dress rights, there is no public record available at the U.S. Trademark Office website of any attempt by Plaintiffs to formally register any trade dress in the Squishmallows, and Plaintiffs otherwise confirmed no such applications are pending. (Ciardullo Dec., ¶3.) The fact that Plaintiffs have not sought registration deprives the designs of any presumption of validity, and places a heavy burden of proof on Plaintiffs to establish such rights. Indeed, as discussed *infra*,

---

[4] The image of the Squishmallows bin is from the Complaint, p.30. The other images were obtained from the Jazwares website and are properly the subject of judicial notice. See concurrently filed Request for Judicial Notice, Item 4.

5

Zuru does not believe that Plaintiffs could satisfy Trademark Office requirements for visually depicting their trade dress because there is no consistency across the product line, and hence no way to define the trade dress across the line.

In fact, Plaintiffs have struggled to enforce their purported Squishmallows intellectual property in past litigation, including in this District. In *Kellytoy Worldwide, Inc. et al v. TY, Inc. et al.*, No. 20-cv-00748 (N.D. Ill. Jan. 31, 2020) ("Ty Case"), Plaintiffs had sued Ty over stuffed toys depicted below (Dkt. 1-9):



The Illinois court denied Plaintiffs' Preliminary Injunction Motion, stating that Plaintiffs had only a "modest likelihood of showing that the Squishmallows trade dress is valid," and that its overall chance of success the case was "weak." *Kellytoy Worldwide, Inc. v. TY, Inc.*, No. 20 C 748, 2020 WL 5026255, at *9-10 (N.D. Ill. Aug. 25, 2020). The Ty Case was later dismissed, with Plaintiffs allowing Ty to continue to sell the accused products, amounting to an abandonment of rights in products of that appearance. Below is an image from Ty's current website:[5]

---

[5] The Court may take judicial notice of the products that Ty continues to sell on its website at shop.ty.com. *See* concurrent Request for Judicial Notice, Exhibit F.

6

4887-0007-3393.4



Similarly, Plaintiffs had sued toy company Dan-Dee in this District in 2019. *Kellytoy USA, Inc. et al v. Dan-Dee International, Ltd. et al.*, 2:18-cv-05399-JAK ("Dan-Dee Case"), accusing Dan-Dee's plush toys of infringing Plaintiffs' alleged trade dress and copyrights. Dan-Dee moved to dismiss the complaint under Rule 12(b)(6) arguing (as Zuru now argues in this Motion) that Plaintiffs had failed to adequately define their purported trade dress in the Squishmallows. The Court granted Dan-Dee's motion, ruling that "in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw." (Dan-Dee Case, Dkt. 39, "Dan-Dee Order," copy attached as Ciardullo Ex. 1.)

Plaintiffs amended their complaint, but Dan-Dee moved to dismiss again on the same grounds. (Dan-Dee Case, Dkt. 57.) The case was then dismissed before the Court could rule on the second motion. (*Id.*, Dkt. 74.) An online search shows that Dan-Dee is apparently still selling the product shown here - another abandonment of rights.[6] In all, Plaintiffs have tried their hand at asserting trade dress claims covering all Squishmallows on numerous different occasions, and have invoked many different iterations of their trade dress definition, as reflected in the summary

---

[6] The Court may take judicial notice of the products that Dan-Dee continues to sell. See concurrent Request for Judicial Notice, Exhibit G.

7

attached as Exhibit B to Zuru's Motion for Judicial Notice.

### B.    Zuru and Snackles

Zuru, LLC is the United States arm of the ZURU Group, a collection of family-owned toy and consumer products companies founded in Cambridge, New Zealand in 2004. The ZURU Group is one of the fastest growing toy brands in the world and is known for its creativity and new-age manufacturing techniques. The ZURU Group has successfully built its own global brands such as Bunch O Balloons™, X-Shot™, Robo Alive™, Mayka™, Fidget Cube™, Tangle™, ZURU Smashers™, 5 Surprise™, and Metal Machines™. The toy industry has recognized these and other Zuru brands with numerous awards and honors. The ZURU Group also has partnerships with entertainment properties, including Nickelodeon, Disney, Universal Studios, and DreamWorks. The ZURU Group now employs hundreds of staff, has numerous offices worldwide, produces hundreds of thousands of toys a day, and supplies most major retailers in more than a hundred countries.

As the Complaint notes, Zuru announced the release of the accused Snackles around June 2023. (FAC, ¶3.) As is evident from the Complaint, Snackles are a co-branding effort with several major snack brands like Hershey's® and Pringles®, and Zuru has long-standing licensing arrangements with these brands.[7] In contrast to the Squishmallows, Snackles have prominent noses and limbs projecting forwardly from the bodies of the toys and embracing large plush versions of famous branded snacks, which are paired thematically with the toys that are holding them. The essence of the Snackles brand – from its very name to its overall appearance – is centered on famous snack foods.

---

[7] In fact, Zuru is known among consumers for its co-branding with well-known food brands, such as in its popular Mini Brands™ lineup: https://zurutoys.com/brands/mini-brands/foodie-mini-brands.

8

Snackles are sold under a prominent stylized logo reading "*ZURU SNACKLES*," that is clearly displayed on product hangtags, store displays, and websites (and which concededly does not infringe):[8]

 

## III.   APPLICABLE LAW

### A.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A Rule 12(b)(6) motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept

---

[8] The image of the bin is from Plaintiffs' Complaint, p.30; the other image is from Zuru's online listings. *See* concurrent Request for Judicial Notice, Item 7.

9

as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### B. Trade Dress

The Lanham Act provides for the protection of trademarks and trade dress used to identify and distinguish a producer's goods from those manufactured or sold by others and to indicate the source of the goods. *See* 15 U.S.C. § 1127.

In an action for purported infringement of unregistered trade dress, not only is it the plaintiff's burden to plead non-functionality and secondary meaning as to the claimed trade dress elements, but the plaintiff must also adequately define those trade dress elements. *Greenberg v. Johnston*, No. CV-14-046505-MWF (VBKx), 2014 WL 12586252, at *2 (C.D. Cal. Oct. 22, 2014); *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3 (C.D. Cal. May 8, 2015) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Without an adequate definition, the defendant is not on proper notice of what does or does not infringe, or what elements of the design are purported to be the subject of the validity and infringement analysis in the case. *Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010). This ambiguity can lead to gamesmanship, with the plaintiff modifying its definition and characterization of the trade dress to suit its needs over the course of the litigation. *See* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3 (4th ed. 2014) ("there is no reason why the plaintiff cannot define a list of elements…Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement."). On a broader level, the motivation for requiring a clear definition is that "trade dress claims raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.'" *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp. 2d 1168, 1175-76 (N.D. Cal. 2007) (citations omitted).

10

The plaintiff's burden increases where trade dress is claimed in a diverse line-up of products. 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:5.50 (5th ed. 2020) ("[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116-17 (2d Cir. 2001) ("a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress"); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 542 (S.D.N.Y. 2003) (When a plaintiff seeks trade dress protection in a line of products, it must prove that "the trade dress signifies an overall look which is 'consistent' throughout the line.").

In *Rose Art Indus. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000), the court explained that when trade dress is claimed in a line of products, those products must all have a "consistent overall look" "[b]ecause of the broad reach that protection of trade dress for a series or line of products would embrace…" Although the Ninth Circuit has not specifically addressed the "consistent overall look" test in as many words, district courts in this Circuit have been guided by it because it is self-evident and axiomatic that a claimed trade dress across a product line must have a consistent look in order to evoke a single brand. *Interactive Health LLC v. King Kong United States, Inc*., No. CV 06-1902-VBF(PLAx), 2008 WL 11337393, at *2 (C.D. Cal. Mar. 6, 2008) ("when a plaintiff seeks protection for an entire line of products, the plaintiff must demonstrate the trade dress signifies an overall look that is consistent throughout the entire line.") (citing *Yurman* and other cases); *Apple Inc. v. Samsung Elecs. Co*., 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) ("Although the Ninth Circuit does not appear to have addressed the issue, some circuits have held that where a plaintiff seeks trade dress protection in a line of products, the plaintiff must establish that the line of products has a consistent overall look."); *Crafty Prods. v. Michaels Cos*., 389 F. Supp. 3d 876, 882 (S.D. Cal. 2019) ("To grant such far-reaching, undefined trade dress protection [across a product line not having a consistent look] would unfairly

11

allow inventors to claim any broad design and would leave no room for competition."); *Paramount Farms Int'l LLC v. Keenan Farms Inc.*, No. 2:12-cv-01463-SVW-E, 2012 WL 5974169, at *2-3 (C.D. Cal. Nov. 28, 2012) (distinguishing trade dress in a single product from a line of products in view of *Rose Art*).

In the case of product configuration trade dress, the plaintiff must also plead that the claimed trade dress elements comprise a distinctive aesthetic that, unaided by any unclaimed brand identifiers, would in itself convey a single brand source to most relevant consumers. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). Evidence of past sales and publicity are only relevant if driven by the trade dress features that are claimed. *Kellytoy Worldwide, Inc. v. TY, Inc.*, No. 20 C 748, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020) ("popularity and engagement with a product do not necessarily suggest a connection between the product and its source.")

With respect to functionality, product features are presumed functional until proven otherwise by the party seeking trade dress protection. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001). The Ninth Circuit test for functionality proceeds in two steps. The Court first inquires whether the product feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1067, 1072 (9th Cir. 2006). Generally speaking, the first step looks to utilitarian functionality, *i.e.*, whether or to what extent the product's appearance is driven by concerns over its ability to perform certain practical functions, and its ease of manufacture. *Id*.

If the product features are not deemed to have utilitarian function on the first step, the Court proceeds to a second step of inquiring "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold,* 457 F.3d at 1072. This second step generally equates to an assessment of aesthetic functionality, which looks to whether a product feature has become a "stock" element that consumers generally desire and do not associate with a particular brand, such as a heart-shaped box of chocolates. *Id.*; *Goscicki v. Custom Brass & Copper Specialties,*

12

*Inc.*, 229 F. Supp. 2d 743, 752 (E.D. Mich. 2002) (heart-shaped box).

## IV.   PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A SINGLE TRADE DRESS ENCOMPASSING THEIR LARGE AND VARIED LINEUP

### A.   Having Deliberately Chosen To Build A Brand Around A Wide Diversity Of Distinctly Different Cartoon Characters, Plaintiffs Cannot Avail Themselves Of A Unitary "Trade Dress"

The moment that Plaintiffs made the marketing decision to have Squishmallows comprise thousands of distinctly different-looking cartoon characters with different structural variations they forfeited the ability to use trade dress law to encompass the entire lineup. Squishmallows are not like Coca Cola bottles that all have the same basic appearance. Instead, like Pokemons, the entire point of the brand is to have all of the individual characters be different-looking from each other (and come with their own unique origin stories) so as to motivate consumers to want to collect tens or hundreds of them. A multiplicity of distinctly different cartoon characters cannot be said to be protected jointly as a unitary "trade dress," acting a sort of impermissible "uber-copyright." *See, e.g., Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co*., 916 F.2d 76, 81 (2d Cir. 1990) (finding that the plaintiff sought trade dress protection "not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain").

As shown in the cases cited in Section III.B, and as articulated in *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 380 (2d Cir. 1997):

> a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. [] Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is acute.

As further explained in *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y.

13

2009), where trade dress is claimed in a product line, "[t]he elements specified as the trade dress must be present in every item in that product line." *See also Nat'l Lighting Co., Inc.,* 601 F. Supp. 2d at 562) (dismissing under Rule 12(b)(6) where "plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements"). Here, because the Squishmallows lineup lacks consistent features across all the characters, it cannot be protected as a unitary trade dress.

**B.** **The FAC Doubles Down On The Same Trade Dress Definition That The Court Already Rejected As "Too Broad And Ambiguous"**

Below is a redline of the FAC trade dress definition against the definition from the Original Complaint, showing that they are essentially identical to the recitation of elements that this Court has said are "too broad and ambiguous." (Dkt. 32, p.5.) Notably, this is also the same articulation used to define the scope of the injunction that Plaintiffs hope the Court will impose (FAC, Prayer for Relief, Section (a)).

> (1) substantially egg/bell/oval shaped plush toys depicting various similarly shaped abstract/fanciful renditions of animals/characters;
>
> (2) simplified ~~Asian style~~ Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys;
>
> (3) embroidered facial features, such as eyes, nostrils, and/or mouths;
>
> (4) distinctive contrasting and non-monochrome coloring; and
>
> (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

Adding the words "oval" and "abstract," and removing the word "Asian style" do not cure Plaintiffs' failure to identify a cognizable trade dress. For the same reasons the Court already found, Plaintiffs have failed to adequately define any cognizable trade dress

14

that meaningfully encompasses their enormous and highly varied product line-up. Plaintiffs' vague definition is akin to a car company with a diverse lineup of cars trying to claim rights to non-distinctive and unprotectable elements that are common to all their cars, like "sleek styling," "rounded headlights," and "soft seats." Taken literally, Plaintiffs' Claimed Elements reach far beyond the specific individual toy designs highlighted in their FAC, and would even sweep up designs Plaintiffs concede do not infringe. As reflected in the FAC's Prayer for Relief (which ties back to the Claimed Elements) what Plaintiffs are really seeking via their lawsuit is an overbroad injunction that would impermissibly block Zuru from participating in an entire product category of round, multi-colored, plush animal toys with cartoonish faces. There is no basis in trade dress law for such a sweeping monopoly, nor any plausible basis under *Iqbal/Twombly* to find that Plaintiffs have properly defined protectable trade dress with sufficient specificity and narrowness. *See Nat'l Lighting,* 601 F. Supp. 2d at 562 ("Judicial reluctance to extend trade dress protection to entire product lines is also motivated by this fear of enabling monopolistic behavior").

The FAC attempts to prop up the Claimed Elements with explanations of what the original designers of Squishmallows "intended" when they started creating the products in 2016. But such purported original intent is beside the point: the actual reality of Squishmallows is that they now comprise thousands of distinctly different-looking cartoon characters. Nothing the FAC says changes that, and if anything the FAC only muddies the waters further with its inconsistencies.

### 1. "Substantially Egg/Bell/Oval Shaped Plush Toys…"

As an initial matter, Plaintiffs' term "substantially egg/bell/oval shaped" does not act as a valid limiter of scope because many of Plaintiffs' Squishmallows are in fact circular, like the ones here. It is unclear if

 

15

Plaintiffs added the word "oval" to their definition to try to capture these, but if such near-circles were considered ovals, then Plaintiffs' definition has now overbroadly devolved into anything "round" at this point. Secondly, Plaintiffs cannot lay claim to "fanciful renditions of animals/characters," as that describes virtually any stuffed toy animal. The term "fanciful" is undefined and conclusory. Third, the motif of a stuffed animal/character with an egg shape is a stock aesthetically functional feature dating back to Russian Nesting Dolls that is universally used to convey a smaller "head" atop a larger "body." As with heart-shaped boxes of chocolate, no one company could monopolize such a common aesthetic. Fourth, it is apparent that a chief motivation for a "substantially egg shape" in the context of these toys is so they can double as rounded pillows, also able to stand on one end so that the animal/character is oriented head up, which are all utilitarian functional considerations.

### 2. "Simplified Kawaii faces…"

The Oxford English Dictionary defines "Kawaii" with sweeping breadth as "[c]ute, esp. in a manner considered characteristic of Japanese popular culture; charming, darling; ostentatiously adorable." (*See* www.oed.com.) It is not plausible that Plaintiffs could claim rights in the Kawaii style, as this is an aesthetic that originated from Japan that pre-dates Squishmallows. (*See, e.g.*, Hello Kitty.) Plaintiffs cannot simply appropriate as their own an entire preexisting style: Plaintiffs can no more claim distinctiveness as to Kawaii than they could to Anime.

Even if "Kawaii" were sufficiently defined in itself, the absence of any consistent look across the Squishmallows lineup undercuts the descriptor as-applied. To the extent that Plaintiffs are essentially just claiming simple geometric shapes – like "rounded" "eyes" – those are not distinctive or protectable, and do not even apply to all of Plaintiffs' products. *Shelbyco Inc. v. Western Trimming Corp.*, No. 2:97-CV-196C, 1997 WL 377982, at *4 (D. Utah. May 12, 1997) ("[T]he only consistent feature in [plaintiff's] trade dress is the display of commonplace, ordinary shapes in various colors."). Here, as in *Walker &*

16

*Zanger, Inc. v. Paragon, Indus*., 549 F. Supp. 2d 1168, 1176 (N.D. Cal. 2007), Plaintiffs have resorted to "empty generalities." *See also Sara Designs, Inc. v. A Classic Time Watch Co.,* 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (high level descriptions like "gradient chain" were inadequate).

The FAC's attempt to define "Kawaii" only makes things more confusing. The FAC says that Kawaii is "a cute, lovable, or innocent look through use of simplified shapes and soft lines" (FAC, ¶31), but this does not describe anything concrete. Page 12 includes a chart showing ten different facial images, but the FAC hedges by saying that these are only "*for example*," begging the question of what other unstated "cute, lovable, or innocent look[s]" Plaintiffs intend to be swept in with their definition. Even the ten examples are not uniform in appearance, representing a buffet of options. Furthermore, these ten pictures are just a re-statement of content from the Original Complaint which already included pictures of Squishmallows with similar faces: it was incumbent on the FAC to demonstrate that there was a single facial appearance common to all the Squishmallows, and the FAC fails to do that. Indeed, many Squishmallows have different facial configurations than those shown on Page 12 of the FAC, such as the examples below.[9]



---

[9] Zuru seeks judicial notice of these examples of Squishmallows from Walmart.com in its accompanying Motion for Judicial Notice (Exhibit D).

17

Paragraph 32 of the FAC then confuses things by saying that Kawaii is actually something else, exemplified by a bunny toy, and that Plaintiffs are not employing Kawaii. But no matter which way one looks at it, the reality is unchanged from the Original Complaint: the thousands of Squishmallows all differ widely from each other, and Plaintiffs cannot plausibly lay claim to a generalized "style" (Kawaii or otherwise) as its exclusive trade dress.

### 3. "Embroidered Facial Features"

It is virtually axiomatic that the majority of stuffed animal toys have embroidered facial features. Not only is this feature wholly generic and non-distinctive, but it is also legally functional, as embroidery is one of the most common means to apply facial features to stuffed animals. The FAC now offers up the idea that Plaintiffs "disclaim[] the use of printing and sublimation printing for depicting facial features," but this does nothing to help because Plaintiffs do not deny that embroidery is otherwise commonplace and functional. Using the car analogy, Plaintiffs' concession is akin to disclaiming the use of fabric car seats, while still claiming leather car seats as their exclusive protected trade dress.

### 4. "Distinctive Contrasting and Non-monochrome Coloring"

Read literally, the phrase means nothing more than that the toys are multi-colored. The adjective "distinctive" is just as ambiguous and conclusory, given that the phrase as a whole fails to explain what is distinctive about the color pattern. Having a stuffed animal be "multi-colored" is just a generic and aesthetically functional attribute that cannot be protectable.

The FAC's explanation for what is meant by "non-monochrome" and "contrasting"

18

is no explanation at all. Plaintiffs differentiate their coloration designs as "fun," "non-traditional," and "unique" (FAC ¶39), but these words do not mean anything, and they certainly are not unique to Plaintiffs' toys.

Furthermore, even among Squishmallows, many use the same color tones, such as those below (from Exhibit A):



Also, rather than being "non-traditional," many Squishmallows are exactly the colors you would expect them to be:



### 5.    "Short-pile velvety velour-like…marshmallow feel"

A substantial percentage of all stuffed animal toys could be described this way, so the phrase does not add anything to the overall definition. Soft texture and squeezability are utilitarian functional features that could not be protectable. Just as a car company could not claim a trade dress in "rubbery round tires," Plaintiff cannot enhance their definition of trade dress by adding plainly unprotectable features. *See, e.g., Wallace*, 916 F.2d at 81.

Moreover, a velvety marshmallow feel, as a trade dress, makes no sense when the other elements claimed by Plaintiffs relate solely to a visual appearance. One cannot

19

perceive "marshmallow feel" unless one holds the product in their own hands, which creates a situation where Plaintiffs' purported trade dress could only exist when a customer is physically interacting with the product. This would indeed be a clever trick for expanding one's trade dress rights. Even if "marshmallow feel" were a non-functional protectable feature, if the product were not otherwise protectable based on visual elements alone, it should not be saved by a feature that only a sub-set of customers perceive.

### 6. There Is No Whole Greater Than The Sum Of Its Parts Here

Plaintiffs will argue that even if the Claimed Elements are unprotectable in isolation, the combination of them defines a valid trade dress. This argument also fails because the FAC does not demonstrate how the combination of the Claimed Elements adds up to anything more than the sum of their parts. While it is true that sometimes unprotectable elements can be arranged in an aesthetically distinctive and non-functional way (like stacking building blocks into an artistic sculpture), the Ninth Circuit has also made clear that when the whole of trade dress is nothing more than assemblage of unprotectable elements combined in a predictable way, "it is semantic trickery to say that there is still some sort of separate 'overall appearance'" that is protectable. *Leatherman Tool Grp., Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea.").

When boiled down to their essence, all that the Claimed Elements define in combination is a soft, roundish stuffed animal toy with multiple colors and an embroidered cartoonish face. Taken together, these elements do not yield any protectable whole, but rather just broadly describe attributes of innumerable stuffed toy products that no one company could plausibly monopolize. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir. 1997) ("If the law protected style at such a level of abstraction,

20

Braque might have prevented Picasso from selling cubist paintings"). The FAC's narrow disclaimer of "glass eyes" and "sublimation printing" does effectively nothing to constrain the overreach of the trade dress definition.

Nor do the various photographs supplied in the Complaint assist the Claimed Elements because "courts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 747 (E.D. Mich. 2014) (dismissing claims to trade dress in an entire product line up of hockey gear). Here, Plaintiffs' Complaint does not adequately convey the true scope and diversity of the Squishmallows product line, and even as among the pictures in the FAC, it is apparent that there is no distinctive and protectable feature of the toys that is consistent across the whole line.

One of the several negative consequences of the overbreadth of Plaintiffs' definition is that it makes it impossible to differentiate between stuffed animals that would be deemed infringing and those that would not be. Indeed, the Claimed Elements on their face extend to the products sold by Dan-Dee and Ty that Plaintiffs had previously accused of infringement before withdrawing their claims and dismissing with prejudice. Those dismissals would bar future infringement claims against those toys under principles of res judicata. Despite this, Plaintiffs persist in asserting a trade dress definition that encompasses those non-infringing toys. Such a definition is overreaching and cannot fairly put Zuru on notice of the parameters of Plaintiffs' claimed rights. It is further notable that despite the forgoing argument featuring prominently in Zuru's Original Motion to Dismiss (Dkt. 23 at 6-7, 19), the FAC does nothing to address it, failing to explain how the Ty and Dan-Dee products are not the same as what the FAC claims as Plaintiffs' trade dress.

## C. Plaintiffs Deliberately Omit Squishmallows From Their FAC

Because Plaintiffs are expressly seeking trade dress protection as to their entire Squishmallows lineup, it would have been appropriate for Plaintiffs to attach a compendium of all the Squishmallows to their pleading rather than forcing Zuru to try to rely on an incomplete patchwork of judicial notice documents for such important basic

<div align="center">21</div>

facts that are already in Plaintiffs' possession. Faced with the grant of Zuru's Original Motion to Dismiss, Plaintiffs had a clear opportunity to assist the Court by including a full compendium of Squishmallows with their FAC, but chose not to do so. The FAC exploits this information deficit by cherry-picking examples of Squishmallows that Plaintiffs claim meet their trade dress definition, and excluding Squishmallows that do not. Plaintiffs apparently do not want to disclose publicly what all their Squishmallows actually look like, but having made that decision, Plaintiff should not be surprised at their purported trade dress definition – which is supposed to cover all of the Squishmallows – being found inadequate.

### D. The "Impossible To Register" Litmus Test

Returning to the fact that Plaintiffs appear to have deliberately avoided attempting to obtain any federal registration for the purported Squishmallows trade dress, this can serve as a litmus test for the sufficiency of the trade dress definition. The Trademark Office requires that applicants supply a drawing or image of the claimed trade dress that adequately and specifically puts the public on notice of the design that is claimed. *See* 37 C.F.R. §2.52; Trademark Manual of Examining Procedure ("TMEP") §1202.02(c) – (c)(i). In the case of products that are part of a varied line-up, a single unifying feature may be claimed in solid lines, with variable features shown in dashed lines. *Id*. For example, a car company might seek trade dress protection in the design of a particular front grill used on many different cars, showing it in solid lines and the rest of the car in dashed lines.

In the case of Squishmallows, Plaintiffs would be unable to craft any drawing based on their Claimed Elements that could satisfy Trademark Office requirements. Because there are no common identifying features among all the Squishmallows characters, any attempt to represent them visually would devolve into a collection of amorphous dashed lines. Some Squishmallows are animals, some are not. Some have round eyes, some have slits. Some have mouths, some do not. Some have pronounced appendages, some do not. Some have "bellies," some do not. Some have large ears, some do not. Some wear clothes, some do not. Some have noses, some do not. Some have eyes on top of their heads, some

do not. They have no consistent colors or color patterns. Because of this utter lack of consistency, Plaintiffs would have no way to submit a coherent drawing of the Claimed Elements trade dress that could possibly satisfy regulatory requirements for providing notice to the public of the claimed rights. Even if one deemed the round perimeter shape to be consistent across the lineup, that would not help Plaintiffs: they could hardly register trade dress rights in a circle.

If a claimed trade dress is so abstract and so varied across a product line that it could not be feasibly depicted in a federal registration, it must be rejected.

### E. This Court's Past Rulings On Squishmallows Trade Dress

In its March 5 Order, the Court already commented on the past Squishmallows trade dress rulings in this District, and declined to follow the *Hugfun* case.[10] (Dkt. 32, p.5.) Zuru seeks no different conclusion here, but refers back to Judge Kronstadt's September 23, 2019 ruling in the *Dan-Dee* Case because it remains just as relevant to the analysis of the FAC as it was to the Original Complaint.

Plaintiff's trade dress definition in *Dan-Dee* was as follows:

> (1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light 'marshmallow,' memory foam-like texture.

(Dan-Dee Order, Ciardullo Ex. 1, p.2.)

This Court ruled that these elements are functionally the same as the listing of the

---

[10] Zuru had observed in its Original Motion to Dismiss that despite Judge Kronstadt's ruling in the Dan-Dee case having issued only a few weeks prior, Plaintiffs' former counsel failed to advise the *Hugfun* court of that decision in violation of California Rule of Professional Conduct 3.3(a)(2). Zuru also observed that the *Hugfun* court did not seem to appreciate the sheer numerosity and variety of Squishmallows, nor did the court grapple with the different legal standard applicable to defining trade dress in a large lineup of products. In general, the *Hugfun* defendants did not present all the arguments and authority that Zuru now does.

23

Claimed Elements in the Original Complaint (Dkt. 32, p.5), which in turn now remain essential identical to the Claimed Elements of the FAC. Although the FAC adds further editorial commentary, Zuru contends that the definition supplied in the FAC is also functionally the same as the articulation in *Dan-Dee* for reasons explained in Section IV.B, *supra*, and hence that the same logic that compelled dismissal of the *Dan-Dee* trade dress claims should still apply here as well.

Specifically, in dismissing the trade dress claims in *Dan-Dee*, the Court ruled: "This general description offers little insight into the scope or nature of Kellytoy's claim. [] It is also too broad to form the basis of a plausible claim for trade dress infringement. …in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the FAC do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw. The images do not sufficiently show or explain what about the design of the Squishmallows is claimed as the basis for trade dress protection. Accordingly, the cause of action for federal trademark infringement is not pleaded sufficiently." (Dan-Dee Order, Ciardullo Ex. 1, p.9.)

This same reasoning applies to the present FAC. Plaintiffs have taken the same Claimed Elements and added commentary that does not actually say anything more.

## V.  **CONCLUSION**

The FAC has recycled the same attempted definition of the trade dress that the Court already rejected in its March 5, 2024 Order. More than that, it is by now apparent that Plaintiffs are improperly trying to wield a vague and overbroad definition of the trade dress to try to capture a general style of toy, rather than any specific embodiment of that abstract idea. Having already been afforded an opportunity for amendment, Plaintiffs' trade dress claims should now be dismissed with prejudice. *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).

24

DATED:  April 2, 2024          **FOLEY & LARDNER LLP**

/s/ Jean-Paul Ciardullo
Jean-Paul Ciardullo
Jonathan E. Moskin
Ashley Koley

Attorneys for Defendant
ZURU, LLC

## WORD COUNT CERTIFICATION

I hereby certify that, according to Microsoft Word's Word Count function, the foregoing Memorandum is less than 7,000 words.

*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

25

# EXHIBIT L

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Filing # 190722631 E-Filed 01/29/2024 11:44:39 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

JAZWARES, LLC, a Delaware
Limited Liability Company, KELLY
TOY HOLDINGS, LLC, a Delaware
Limited Liability Company, KELLY
AMUSEMENT HOLDINGS, LLC, a
Delaware Limited Liability Company,
And JAZPLUS, LLC, a Delaware
Limited Liability Company,

      Plaintiff,

vs.

BUILD-A-BEAR WORKSHOP, INC.,
a Delaware Corporation,

      Defendant.

_____/

## VERIFIED *EX PARTE* EMERGENCY MOTION FOR TEMPORARY INJUNCTION

Plaintiffs, Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC (collectively, "Plaintiffs" or "Kelly Toys"), by and through the undersigned counsel, and pursuant to Rule 1.610(a) of the Florida Rules of Civil Procedure and Florida Statute § 501.211, respectfully move this Court to enter an emergency temporary injunction preventing the continued use and misappropriation of Plaintiffs' trade dress by Defendant, Build-A-Bear Workshop, Inc. ("Defendant" or "Build-A-Bear"). In support thereof, Plaintiffs state as follows:

[2533354/4]

1

EXHIBIT L
Page 1 of 96

599 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## I.     BACKGROUND

The conduct here is egregious.  After being told its conduct was improper by the product manufacturer it used to carry out its bad-acts, Defendant Build-A-Bear has taken and is misusing Plaintiffs' most valuable trade dress.  Defendant must be stopped.

### a.  The World Famous Squishmallows

Plaintiffs (who are either affiliated entities, governed by common ownership, governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows) are among the world's leading manufacturers and distributors of high-quality plush toys and other consumer products.  In 2016, their distinctive line of plush toys branded "Squishmallows" was released.  Squishmallows share common, unique features distinguishing them from the goods of others.  Often referred to as just "Squish," these soft, huggable toys immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Squishmallows are some of the most well-known and fastest growing toys in the world.

In essence, Kelly Toys' creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.  Plaintiff Kelly Toys

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products that possess unique, recognizable, and distinguishing features that are common across much of the Squishmallows line.  From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising, and promoting the Squishmallows trade dress, and the product designs embodying Squishmallows, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products that are well known (and well loved) for their distinctive look.

Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase of all ages searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.  Due to Squishmallows' massive success and popularity, consumers associate the high-quality Squishmallows toys with the Squishmallows distinctive trade dress. For example, The New York Times has proclaimed that "Squishmallows are Taking Over,"[1] Forbes named them "2022's Must-Have Christmas Toy,"[2] and The Guardian has recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[3]  And In September of 2022, Squishmallows was awarded the coveted "Toy of the Year," "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation. Squishmallows are so popular that they have been identified as the most popular toy brand across

---

[1] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[2] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,* Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[3] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

[2533354/4]

3

EXHIBIT L
Page 3 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

41% of the U.S. states—far ahead of other well-known mega brands such as Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh. There are only just a few of the countless recognitions received by Squishmallows.

Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade dress, and whose overall look and image—and in particular but without limitation its shapes, colors, textures, and graphics—serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile exterior (collectively, the "Squishmallows Trade Dress"). Simply stated, the Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look that is *uniquely* associated with Squishmallows.

Due to the distinctive Squishmallows Trade Dress, coupled with the unique designs, extensive marketing efforts, media coverage, and market penetration, the Squishmallows trade dress has acquired distinctiveness in the marketplace when applied to plush toys. In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered by Kelly Toys. As a result, the Squishmallows

[2533354/4]                                              4

EXHIBIT L
Page 4 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Trade Dress has valuable goodwill and consumer recognition associated with it and has come to symbolize the exemplary reputation of Kelly Toys.

**b. Plaintiffs Vigilantly Protect Their Intellectual Property**

As the creators of sought-after toys such as Squishmallows, Kelly Toys takes steps to ensure that their intellectual property is protected. And, when this information is misappropriated, Kelly Toys will stop at no length to prevent the dissemination of its sought-after information. As recently as July 2021, Plaintiff Jazwares, LLC (a partial owner and affiliate of Kelly Toys) secured an emergency injunction **in this Court** against a former employee after the former employee stole Jazwares, LLC's protected trade secrets. *Jazwares, LLC v. Cymonda Wilson*, CACE21014464 (Fla. 17th Jud. Cir.).

This case is no different. Kelly Toys Holdings, LLC contracted with a Chinese Manufacturer that has the sole rights to manufacture Squishmallows (the "Manufacturer Contract"). A true and correct copy of the Manufacturer Contract is attached hereto as **Exhibit 1**. As seen by the Manufacturer Contract, Kelly Toys Holdings, LLC included robust trade dress protections. Little did Kelly Toys Holdings, LLC know that Build-A-Bear would clandestinely discover the identity of Kelly Toys' Squishmallows manufacturer and ask the manufacturer to use Squishmallows Trade dress to create a near identical Squishmallows copycat under the Build-A-Bear brand. Consequently, Build-A-Bear had previously used this manufacturer and used its monetary influence over the manufacturer to pressure the manufacturer into building the copycat goods. But, the manufacturer knew that creating Skoosherz was wrong and initially pushed back. It told Build-A-Bear that the products it was asking for were very close to the famed and protected Squishmallows. Build-A-Bear ignored this caution, asserting that it was not improper to copy these items because they were sold to the public, directing the manufacturer to build the copycat goods.

[2533354/4]                                          5

EXHIBIT L
Page 5 of 96

603 of 816

Uneasy about the situation, the manufacturer reached out to a Kelly Toys representative and informed them about the above referenced correspondence, which the manufacturer claims is memorialized in three (3) emails that Build-A-Bear wants hidden from Kelly Toys (thus highlighting the need for the *ex parte* nature of this Motion).

### c. Build-A-Bear's Blatant Misappropriation of Squishmallows

Rather than competing fairly in the marketplace by creating its own unique concepts and products, Defendant Build-A-Bear, a company worth over 300 million dollars, decided that it would be easier to simply copy, imitate, and profit off of the popularity and goodwill of Squishmallows. Its goal: confuse consumers into buying Build-A-Bear's products instead of Kelly Toys' products. Specifically, in January 2024, Defendant Build-A-Bear announced the release of its "Skoosherz" plush toys—toys that look exactly like the well-known Squishmallows:



Squishmallows Original Product    Skoosherz Copycat Product

Further demonstrating the misconduct here is the fact that Build-A-Bear is not even in the business of selling completely assembled plush toys like Squishmallows. Instead, Build-A-Bear is best known for providing a place for people to create their own customizable toys, offering a

[2533354/4]                                    6

EXHIBIT L
Page 6 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

number of unstuffed plush animals and characters that consumers can stuff themselves to build their own toy.   Nonetheless, n January 11, 2024, Build-A-Bear launched "Skooserz," a line of already complete (stuffed, stitched, etc.) plush toys that copies and imitates Squishmallows. Build-A-Bear does not just copy the shape, material and general characteristics of Squishmallows, Build-A-Bear went design by design and made an almost exact replica of each Squishmallows design; Squishmallows has a rainbow bear, Build-A-Bear made a rainbow Skooserz; Squishmallows has a green frog, Build-A-Bear made a green frog Skooserz; Squishmallows has a pink cow, Build-A-Bear made a pink cow Skooserz. This list goes on and is not complete.  Dinosaurs, axolotls, and soon vegetables—Build-A-Bear made sure that each of its original five Skooserz was an exact copy of a popular Squishmallows character. This includes the beloved and extremely unique Squishmallows axolotl, which Build-A-Bear ensured to copy with precision.  Simply stated, instead of maintaining its original business practice of allowing consumers to create their own toys, Build-A-Bear now seeks to trade off the goodwill of Squishmallows by marketing obvious copycat products—plush toys that look almost identical to popular Squishmallows.

Skooserz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior. Side by side comparisons of Squishmallows and the copycat Skooserz products plainly show how striking the similarities are:

EXHIBIT L
Page 7 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|
|  |  |

EXHIBIT L
Page 8 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 9 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|



Even worse, and as briefly detailed above, Build-A-Bear not only parroted Squishmallows, but it also tricked Squishmallows' manufacturer into creating the infringing Skoosherz copycat products. Specifically, Build-A-Bear reached out to the Squishmallows manufacturer (with whom Kelly Toys has an airtight confidentiality contract) and asked the manufacturer to create a Squishmallows look-alike. Plaintiffs are informed and believe that when the manufacturer expressed concerns that the Skoosherz sought to be manufactured were Squishmallows copycats,

[2533354/4]                                    10

EXHIBIT L
Page 10 of 96

608 of 816

Build-A-Bear brazenly ignored this caution, instead asserting, contrary to law, that its copycat products were permitted. Build-A-Bear then told the manufacturer to proceed with producing the violative goods. There can only be one explanation for Build-A-Bear's insistence on both using the same manufacturer as Squishmallows and proceeding with its copycat product despite the manufacturer's warning: Build-A-Bear intended on misappropriating the Squishmallows Trade Dress and hoped to leverage Squishmallows' confidential information in the manufacturer's possession.

**d. Build-A-Bear's Actions Have Caused Great Customer Confusion**

Not only has Build-A-Bear created Skoosherz to visually and tactilely mirror Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") are mistaken by the confusingly similarly named Skoosherz instead.

Build-A-Bear has sought to market off of this confusion by portraying its Skoosherz as the "most squishable," and advertising that consumers can "Squish Em," plainly seeking to create an association between the infringing Skoosherz and the wildly popular Squishmallows, or "Squish:"

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



Build-A-Bear's descriptions of individual Skoosherz toys similarly seek to associate with Squishmallows, noting that they are "squishable." For example, the product details for Build-A-Bear's axolotl (a copy of the unique animal that is one of Squishmallows' most popular characters) state:



Product Details    Specifications    Gift Options    Store Availability

Skoosherz are our most squishable, lovable and huggable friends! Our fan favorite pink axolotl gets the Skoosherz treatment with this adorable plush. The large, round plush has the axolotl's signature smiley face with fuzzy pink gills on its side. Make a splash with this ultra huggable axolotl friend!

[2533354/4]                    13

EXHIBIT L
Page 13 of 96

611 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Skoosherz products create a likelihood of confusion with Squishmallows products.  In fact,
there is evidence of *actual* consumer confusion.  For example, on a recent promotional Skoosherz
Instagram post, a user asked whether Build-A-Bear was now making Squishmallows:



Other consumers have also noted how similar Skoosherz are to Squishmallows.  Indeed, as
shown below, the official Build-A-Bear Instagram account was forced to clarify that these were
indeed Skoosherz, not Squishmallows, when a commenter posted "SQUISHMALLOW!? !?" to
Build-A-Bear's promotional video of Skoosherz:



[2533354/4]                                      14

EXHIBIT L
Page 14 of 96

612 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

These users were not alone.  Build-A-Bear's Instagram post announcing its new Skoosherz

line is riddled with posts calling them "knockoff Squishmallows" and noting the obvious

similarities between these new products and the well-known Squishmallows:





EXHIBIT L
Page 15 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 17 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 18 of 96

616 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC66B499



DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 20 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Other consumers noted that Skoosherz are "like a worse Squishmallow," even noting that Skoosherz chose to copy several of the most popular Squishmallows characters. Still others highlight the fact that Skoosherz represent a radical departure from Build-A-Bear's traditional model of building a custom toy, referring to them as "soulless ripoff[s]":



**lairviniaa** · 10 hr. ago

I'm sorry but I really can't see the appeal 😅 like I collect both squishmallows and bab but these designs are just lazy and look like cheap squishmallow knockoffs (they literally used the most popular squishmallow animals/designs) and like I don't understand why they'd make these (besides wanting an easy cash grab) they have none of the features that make babs special and unique, they didn't even make clothes for them and they're overpriced too (and imo they're not even cute 😕 ) I mean if you enjoy them I'm happy for you i don't wanna ruin the fun but its just a no from me



**stabby_coffin_salt** · 2 days ago

It's like a worse Squishmallow. I'd rather just get one of those Squishem's or whatever they're called (they have one that's a plague doctor).

These knockoffs remind me of those TY squish things. Can't stand the lack of quality or thought.

The cow is kinda cute I guess?

⊖ ⬆ 177 ⬇     💬 Reply     ⬆ Share     ⋯



**saredarebear** · 4 hr. ago

I feel like if they were going to make something resembling squishmallows they could at least make it so you "build" it and make a line of clothing for it so it does not feel like such a a soulless ripoff. It's cute, but Build a Bear has something that is pretty unique and I do not understand why these were released the way they were.



⬆ 3 ⬇     💬 Reply     ⬆ Share     ⋯

Even Build-A-Bear's photos and ad campaigns directly mirror Squishmallows:

[2533354/4]     21

EXHIBIT L
Page 21 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

**Squishmallows**                    **Skoosherz**



### e.  Build-A-Bear Has New Copycats in the Works

Kelly Toys also has reason to believe that Build-A-Bear is working to roll out multiple new Skoosherz characters by mid-2024, including fruits and vegetables Skoosherz (which it will likely accelerate if notice is given).  As seen below, Squishmallows' has long produced a popular line of fruit and vegetable Squishmallows:



It is evident that Build-A-Bear's actions have caused and will continue to cause significant harm.  As a result of consumer confusion, Kelly Toys has lost and will continue to lose potential customers, sales, and market share.  It is important to note that Skoosherz have only been around for just over two weeks.  If the foregoing confusion ensued within this short time, imagine what would happen if Skoosherz remained on the market indefinitely.

[2533354/4]                                    22

EXHIBIT L
Page 22 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## II.    STANDARD ON AN EX PARTE TEMPORARY INJUNCTION

### a. Notice Standard

Rule 1.610 of the Florida Rules of Civil Procedure governs the imposition of temporary injunctions and states "[a] temporary injunction may be granted without written or oral notice to the adverse party only if: (A) it appears from the specific facts shown by affidavit or verified pleading that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts that have been made to give notice and the reasons why notice should not be required." Fla. R. Civ. P. 1.610(a)(1).

"To satisfy the rule's mandate of establishing why notice should not be required, a Plaintiff seeking an ex parte temporary injunction must demonstrate (1) how and why the giving of notice would accelerate *or* precipitate the injury or (2) that the time required to notice a hearing would actually permit the threatened irreparable injury to occur." *Smith v. Knight,* 679 So. 2d 359, 361 (Fla. 4th DCA 1996) *(citing Dixie Music Co. v. Pike,* 135 Fla. 671, 185 So. 441, 446 (1938); *Lieberman v. Marshall,* 236 So. 2d 120, 125 (Fla. 1970); *Minimatic Components, Inc. v. Westinghouse Elec. Corp.,* 494 So. 2d 303, 304 (Fla. 4th DCA 1986); *Shouman v. American Express Travel Related* Servs. Co., 566 So. 2d 875 (Fla. 3d DCA 1990). "Examples of such a showing are where notice of a hearing will prompt a defendant to destroy records, cause unsecured assets to be liquidated in the context of a fraudulent enterprise, or precipitate the disposal of the major asset of a partnership subject to an accounting." *Smith,* at 361-62 (footnotes omitted). *See also Tobin et al v. Hanna et al*, 2012 WL 12335474 (Fla. 17th Cir., August 8, 2012) (ruling that permitting the defendant to receive notice will likely precipitate additional fraudulent activities and stated grounds for an *ex parte* preliminary injunction).

[2533354/4]                                     23

EXHIBIT L
Page 23 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## b. Injunction Standard

In seeking a temporary injunction, the movant must show: (1) irreparable harm if the status quo is not maintained; (2) no adequate remedy at law; (3) a clear legal right to the relief requested; (4) that any public interest will not be disserved; and (5) a substantial likelihood of success on the merits. *Shafer v. Shafer*, 898 So. 2d 1053, 1055 (Fla. 4th DCA 2005) (citing to *Wexler v. Lepore,* 878 So. 2d 1276, 1281 (Fla. 4th DCA 2004), *rev. denied,* 888 So. 2d 625).

## III.   DEFENDANT'S ACTIONS ARE SUFFICIENT TO ENTITLE KELLY TOYS TO AN *EX PARTE* TEMPORARY INJUNCTION

## a.  Injunctions Are Justified to Protect intellectual Property

Injunctions are viable relief in the context of trademark infringement or misappropriation, and because trade dress claims are a form of trademark claim, state common law trade dress claims draw largely upon the state common law for infringement of trademarks.  *See M&E Distributors v. Worley*, 840 So. 2d 457, 459 (Fla. 4th DCA 2003) (finding that enjoining a competitor's use of a registered mark will protect the public interest and constitutes an irreparable injury as a matter of law) (citing to *Callaway Golf Co. v. Golf Clean, Inc.*, 915 F. Supp. 1206, 1215 (M.D. Fla. 1995) ("In trademark infringement cases, irreparable harm is presumed."); *Laboratorios Roldan, C. por A. v. Tex Int'l, Inc.*, 902 F. Supp. 1555, 1571 (S.D. Fla. 1995) (granting a temporary injunction for unfair competition and trademark infringement, recognizing that the likelihood of confusion constitutes irreparable injury as a matter of law); *Stagg Shop of Miami, Inc. v. Moss*, 120 So. 2d 39, 40–41 (Fla. 2d DCA 1960) (explaining that monetary damages an insufficient remedy for trademark infringement).  Common law trade dress claims are evaluated under a similar analysis as claims under the Lanham Act.  *See, e.g., Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (evaluating common law unfair competition/trademark claim under Lanham Act framework and noting "[c]ourts may use an analysis of federal infringement claims

[2533354/4]                                      24

EXHIBIT L
Page 24 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

as a 'measuring stick' in evaluating the merits of state law claims of unfair competition"). The term trade dress refers to "the appearance of a product when that appearance is used to identify the producer." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197 (11th Cir. 2004). "'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color . . . , texture, graphics, or even particular sales techniques." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986). To prevail on a claim for trade dress infringement, a party must prove that: "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." *Dippin' Dots*, Inc., 369 F.3d 1197.

That the elements of infringement are met here is unquestionable. **First**, the similarity of these products is irrefutable. The photos referenced herein make clear that Skoosherz are Squishmallows by a different name. **Second**, the features are non-functional. The items at issue are plush toys—functionality is not a focus. The unique shape and design of Squishmallows are are not essential to their "use" and do not increase their cost or quality. *See e.g.*, *Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1318 (S.D. Fla. 2001)("A functional characteristic is one that is 'essential to the use or purpose of the article or [one that] affects the cost or quality of the article.' 'There is no bright line test for functionality.' 'The question of whether features are nonfunctional is one of fact.'") citing *Epic Metals Corp. v. Souliere*, 99 F.3d at 1039. **Third**, Squishmallows have taken the world by storm because of their creative, cute, and quite original Asian-style Kawaii faces, rounded shape, embroidered facial features, bright colors, small facial features, small appendages, and overall unique minimalistic depiction of cute animals and shapes. The onslaught of consumers correctly identify Skoosherz as Squishmallows in the many social media posts herein. The fact that consumers are referring to Build-A-Bear's copycat product as

EXHIBIT L
Page 25 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Squishmallows leaves little doubt that Squishmallows have a secondary meaning in the marketplace.

By way of example, in *M&E Distributors*, the court affirmed the entry of an injunction after the defendant began producing a product that "utilized the same distinctive color, shaped bottle, and label appearance as" the plaintiff's product. 840 So. 2d at 458–49. Similarly here, an injunction should be granted because (as noted above) Build-A-Bear infringed on the Squishmallows Trade Dress by creating and selling Skoosherz, which share the same or substantially similar appearance as Squishmallows.

## b. An Injunction is Proper Under Florida's Deceptive and Unfair Trade Practices Act

A party is entitled to an injunction as a result of a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). § 501.211(1), Fla. Stat. ("Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action . . . to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."). FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" § 501.204(1), Fla. Stat. "Trade dress or trademark infringement is an 'unfair and deceptive trade practice that constitutes a violation of FDUTPA.'" *Lanard Toys Ltd. v. Dolgencorp, LLC*, 2021 WL 8200197, at *32 (M.D. Fla. Aug. 20, 2021), as corrected (Oct. 19, 2021), supplemented, 3:15-CV-849-MMH-PDB, 2022 WL 1597276 (M.D. Fla. Feb. 2, 2022) citing Commodores Ent. Corp. v. McClary, 324 F. Supp. 3d 1245, 1252 (M.D. Fla. 2018) (trademark), aff'd, 822 F. App'x 904 (11th Cir. 2020); *see also Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1317 (S.D. Fla. 2001). The Eleventh Circuit has explained, "[c]ommon law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion*, 261 F.3d at

EXHIBIT L
Page 26 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

1193 n.5; *see also TracFone Wireless, Inc. v. GSM Group, Inc.*, 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) (citing *Laboratorios Roldan v. Tex Int'l Inc.*, 902 F. Supp. 1555, 1569–70 (S.D. Fla. 1995) (explaining that intentionally palming off or passing off products is the type of behavior which FDUTPA was meant to protect against); *see also Niles Audio Corp.*, 174 F. Supp. 2d at 1318(plaintiff stated a claim for FDUTPA violation based upon trade dress infringement).

In *Laboratorios Roldan*, the court found that the plaintiff had a substantial likelihood of success on the merits in its FDUTPA claim stemming from the defendants' trademark and trade dress infringement of plaintiffs' cosmetics products that were sold in commerce. 902 F. Supp. 1555. In granting the plaintiff's motion for preliminary injunction, the court expressly found that the defendants' "intentional[] palming or passing off their products as those of Plaintiff or someone associated with Plaintiff . . . is the type of behavior which [FDUTPA] was designed to protect." 902 F. Supp. at 1570.

Plaintiffs are similarly entitled to injunctive relief here based on Build-A-Bear's deceptive and unfair practice of misleading consumers by misappropriating the Squishmallows Trade Dress. Build-A-Bear launched "Skoosherz," a line of plush toys that perfectly copies and imitates Squishmallows. The resulting deception in the marketplace is not a secondary result, but rather, was Build-A-Bear's primary goal. Skoosherz toys have the same distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; and distinctive and non-monochrome coloring. As a result of Defendant's infringement, Plaintiffs have suffered and continue to suffer irreparable harm.

EXHIBIT L
Page 27 of 96

**c. Defendant's Actions will Result in Continuing and Irreparable Harm to Plaintiffs' Name and Business**

Defendant's actions have caused Kelly Toys substantial harm. Harm, which is irreparable, ongoing, and for which there is no adequate remedy at law. In the short amount of time Defendant has been marketing and selling Skoosherz, Kelly Toys has already lost business and public confusion is at an all-time high. If Defendant is permitted to continue its conduct, it will undoubtedly cause continued irreparable harm. Kelly Toys respectfully request that this Court enter an injunction to preserve the Squishmallows Trade Dress.

Defendant is knowingly misappropriating the Squishmallows Trade Dress. Defendant is improperly advertising in a way to trick consumers into believing Build-A-Bear is part of the Squishmallows brand. It is not. Through these actions, Defendant is causing consumer confusion and misleading the public by selling Skoosherz with the infringed Squishmallows Trade Dress.

There is little to no chance that an injunction will cause Defendant any damage whatsoever. Every day that Defendant is permitted to continue its deceptive actions gives Kelly Toys customers reason to purchase Skoosherz instead of Squishmallows. Giving Defendant notice of Kelly Toys' request for an injunction against Build-A-Bear's prohibited activities may well cause Build-A-Bear to destroy any evidence of using the Squishmallows Trade Dress and/or hide evidence of harmful conduct.

An injunction will not disserve the public interest. Instead, it will protect the public from the wide spread confusion caused by Build-A-Bears bad acts. If these two products were side by side, a consumer would not be able to tell the difference. In fact, if a consumer were to perform a web-search to see if Build-A-Bear sells Squishmallows, the search result would yield both products side by side and indistinguishable, with some retailers calling Skoosherz, "Build-A-Bear Squishmallows:"

[2533354/4]                                   28

EXHIBIT L
Page 28 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



Kelly Toys has a substantial likelihood of success on the merits of their case against Build-A-Bear. In fact, Build-A-Bear's misappropriation and deceptive tactics here are more blatant than actions that this Court's has previously found to lead to a substantial likelihood of success on the merits in intellectual property misappropriation. *See, e.g., Designer Eyes, Inc. v. Sevan Ayvazian, et al.*, CACE22002457 (Fla. 17th Jud. Cir. March 4, 2022); *Jazwares, LLC v. Cymonda Wilson*, CACE21014464 (Fla. 17th Jud. Cir. July 21, 2021); *Designer Eyes, Inc. v. Michael Goodfriend, et al.*, CACE1911361 (Fla. 17th Jud. Cir. June 3, 2019). If Build-A-Bear is permitted to continue copying Squishmallows, it would turn trade dress law on its head. The jury in this case will be made up of the same people who have expressed confusion about these products in social media

[2533354/4]                                  29

EXHIBIT L
Page 29 of 96

627 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

posts. There is a substantial likelihood that the ultimate verdict in this case will affirm that confusion and yield positive results for Kelly Toys.

Kelly Toys has an absolute legal right to enforce its intellectual property rights and demand the cease of the use of the Squishmallows Trade Dress. If Defendant is given notice of this Motion and Plaintiffs' Complaint, the danger of Defendant taking additional fraudulent actions designed to harm Plaintiffs and the public is "real and not merely speculative." *Tobin*, 2012 WL 12335474 at *2.

## IV.    CONCLUSION

Plaintiffs are entitled to emergency *ex parte* relief. The harm caused by Defendant's actions to Plaintiffs greatly outweighs any potential harm to Defendant. In addition, Plaintiffs have no adequate remedy at law as their damages will result from the destruction of a meticulously built brand with near impossible consumer recognition. Therefore, monetary damages will not sufficiently compensate Plaintiffs for their losses.

**WHEREFORE,** Plaintiffs respectfully requests this Court and enter an emergency *ex parte* temporary injunction, requiring that Defendant:

1. Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

2. Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

[2533354/4]

EXHIBIT L
Page 30 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

3. Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4. Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5. Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6. Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7. Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8. Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

[2533354/4]                               31

EXHIBIT L
Page 31 of 96

629 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

9. Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

## STATEMENT OF WHY NO NOTICE SHOULD BE REQUIRED

The undersigned counsel hereby certifies on this 29th day of January, 2024, pursuant to Rule 1.610 of the Florida Rules of Civil Procedure, that Plaintiffs have made no attempt to provide notice to Defendant, and that this Motion is made *ex parte* for the reasons stated below.

Kelly Toys suffers immeasurable and insurmountable harm is every day that Build-A-Bear is permitted to sell these misappropriated products. The social media posts about Skoosherz on Instagram alone have over sixteen thousand (16,000) likes and 300 comments in just over two weeks. This means that between other marketing, social media, and retail marketing, every day that passes yields tens of thousands of people who are subject to confusion. Providing notice would cause additional incalculable harm.

In addition (and concerningly) Build-A-Bear has already shown a willingness proceed with producing its Skoosherz products, despite warnings from its manufacturer that these were Squishmallows copycats. As noted above, Build-A-Bear reached out to the manufacturer of Squishmallows (in China) and asked the manufacturer to make the violative products. When the manufacturer expressed concerns that the items were a Squishmallows copycat, Build-A-Bear first incorrectly represented that such copycat products were permitted because the products were sold

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

in the public domain, and then sent another correspondence directing the manufacturer and produce the violative goods. The manufacturer indicated that emails were confidential.

In other words, the last time Build-A-Bear was given notice of potential wrongdoing, they pushed ahead and demanded the production of more products—86,000 units to be exact. The communications between Build-A-Bear and the manufacturer are only within the possession of Build-A-Bear and a Chinese manufacturer. While the manufacturer told Kelly Toys of Build-A-Bear's conduct, it would be near impossible to force the manufacturer produce the correspondence. Moreover, there is a concern that once Build-A-Bear receives notice it will try to improperly remove the case to federal court to temporarily divest this Court of jurisdiction pending remand, in order to delay the process. Simply stated, because of (1) the fact that the last time Build-A-Bear was given notice, it proceeded in-spite of the notice it to produce and launch nearly 90,000 of the violative products (2) the potential that Build-A-Bear may destroy information that is otherwise unobtainable if it is given notice, and (3) the risk that Build-A-Bear will attempt to delay any hearing by (improperly) removing the case to federal court before any hearing, this motion must be heard and considered *ex-parte.*

[2533354/4]                                    33

EXHIBIT L
Page 33 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## **VERIFICATION**

I declare under penalty of perjury that I have read the foregoing Verified *Ex Parte* Emergency Motion For Temporary Injunction, and the facts contained herein, are true and correct to the best of my knowledge.

January 29, 2024 | 11:07 AM EST

Jazwares, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Toys Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Amusement Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Jazplus, LLC
By: Jack Elum
Its: Authorized Representative

[2533354/4]                                34

EXHIBIT L
Page 34 of 96

632 of 816

Respectfully submitted this 29th of January, 2024, contemporaneous with Plaintiff's Complaint Verified by:

> ZEBERSKY PAYNE SHAW LEWENZ, LLP
> 110 S.E. 6th Street, Suite 2900
> Fort Lauderdale, FL 33301
> Telephone: (954) 595-6060
> Facsimile: (954) 989-7781
> Primary: jshaw@zpllp.com; zludens@zpllp.com;
> lpalen@zpllp.com; ezebersky@zpllp.com
> Secondary: mlomastro@zpllp.com;
> lgrealy@zpllp.com; kgonzalez@zpllp.com

> _/s/ Jordan A. Shaw_
> EDWARD H. ZEBERSKY, ESQ.
> Fla. Bar No.: 908370
> JORDAN A. SHAW, ESQ.
> Fla. Bar No.: 111771
> ZACHARY D. LUDENS, ESQ.
> Fla. Bar No.: 111620
> LAUREN N. PALEN, ESQ.
> Fla. Bar No.: 1038877

EXHIBIT L
Page 35 of 96

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

JAZWARES, LLC, a Delaware
Limited Liability Company, KELLY
TOYS HOLDINGS, LLC, a Delaware
Limited Liability Company, KELLY
AMUSEMENT HOLDINGS, LLC, a
Delaware Limited Liability Company,
And JAZPLUS, LLC, a Delaware
Limited Liability Company,

      Plaintiff,

vs.

BUILD-A-BEAR WORKSHOP, INC.,
a Delaware Corporation,

      Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiffs, Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC,

and Jazplus, LLC (collectively, "Plaintiffs" or "Kelly Toys"), by and through the undersigned

counsel, hereby sue Defendant, Build-A-Bear Workshop, Inc. ("Defendant" or "Build-A-Bear"),

and, for their Complaint, Plaintiffs state the following:

## INTRODUCTION

1.      The facts of this case are truly concerning.

2.      Plaintiffs (who are either affiliated entities, governed by common ownership,

governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute

Squishmallows) are among the world's leading manufacturers and distributors of high-quality toys

and other consumer products.   In 2016, their distinctive line of plush toys branded

[2532761/4]             1

EXHIBIT L
Page 36 of 96

634 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

"Squishmallows" was released.  Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike.  Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released.  Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media.  And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide.  As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]

3.      Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase. Rather than competing fairly in the marketplace by creating its own



unique concepts and product lines, Defendant Build-A-Bear, a company worth over 300 million dollars, decided that it would be easier to simply copy, imitate, and profit off of the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying Build-A-Bear's

---

[1]  Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[2532761/4]                                    2

EXHIBIT L
Page 37 of 96

635 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

products instead.  Build-A-Bear is even using the same manufacturer as Squishmallows in an attempt to gain access to the Squishmallows trade dress.

4.    In    January 2024,    Build-A-Bear announced the release of its "Skoosherz" plush toys.  As seen herein, the Skoosherz toys    have    the    *same* distinctive trade dress as the popular    Squishmallows, including:   shaped   fanciful renditions            of animals/characters;



Squishmallows Original Product    Skoosherz Copycat Product

simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.  And, likely noticing that consumers refer to Squishmallows as Squish, Build-A-Bear named its line Skoosherz to evoke an association with the word "Squish."

5.    Even worse, Build-A-Bear has been trying to trick customers in the marketplace who are looking for Squishmallows into buying their own Skoosherz instead.  Indeed, the similarities have not gone unnoticed—immediately upon the launch of Skoosherz, multiple media outlets have already referred to Skoosherz as "Squishmallow-like" and "Squishmallow-adjacent."[2] Consumers have likewise taken no time to identify Build-A-Bear's attempt to replicate the

---

[2] Josh Coulson, *Build-a-Bear Reveals Its Squishmallow-Like Skoosherz Line,* (Jan. 11, 2024), https://www.thegamer.com/build-a-bear-squishmallow-like-skoosherz/.

[2532761/4]                                    3

EXHIBIT L
Page 38 of 96

636 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Squishmallows trade dress, commenting that Skoosherz are "like a worse Squishmallow" and that Build-A-Bear is "just trying to copy Squishmallow[s]" and is "ripping off Kellytoys." Others have noted that Skoosherz "look like cheap squishmallow knockoffs," even expressing that "they literally used the most popular squishmallow animals/designs."

6.      Build-A-Bear's efforts have created substantial and actual confusion even in the short time that they have been available.  For example, a confused consumer asked on the Build-A-Bear Instagram post announcing its newest line, Skoosherz, "so now ur making squishmallows?"

7.      Build-A-Bear's actions have already caused significant harm.  For example, customer confusion has and will continue to lead to lost potential customers, sales, and market share.

8.      For these reasons and those that follow, this is a straightforward case of trade dress infringement.  Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows, and Build-A-Bear is willfully infringing those trade dress rights.  Through this action, Kelly Toys seeks monetary and injunctive relief to stop Build-A-Bear's copycat efforts and put an end to consumer confusion.

## PARTIES, JURISDICTION, & VENUE

9.      This is an action for injunctive relief and damages in excess of fifty thousand dollars ($50,000.00), exclusive of attorneys' fees and costs.

10.     Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

11.     Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

[2532761/4]                                4

EXHIBIT L
Page 39 of 96

637 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

12.     Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

13.     Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

14.     Plaintiffs are either affiliated entities, governed by common ownership, governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows.

15.     Defendant Build-A-Bear is a consumer toy corporation company organized under the laws of Delaware with its principal place of business in St. Louis, Missouri.

16.     Defendant Build-A-Bear is subject to the jurisdiction of this Court pursuant to Florida Statutes Section 48.193(1)(a)(1) because it operates, conducts, engages in, and carries on a business venture in Broward County, Florida.  Specifically, Build-A-Bear is registered to do business in Florida and has over twenty locations in Florida where Build-A-Bear sells its products, including the infringing Skoosherz.  The infringing Skoosherz are also available for order online via Build-A-Bear's website and pick up at physical locations in Florida.  In order to sell Skoosherz in Build-A-Bear's Florida branches, the infringing articles were either manufactured in or shipped to Florida.

17.     Venue is proper in this Court pursuant to Florida Statute § 47.051 in that Defendant Build-A-Bear has numerous stores located in this county and in that Plaintiff Jazwares, LLC is headquartered in this county, giving rise to injuries sustained in this county.

<u>FACTS</u>

**A. World Famous Squishmallows**

[2532761/4]                                   5

EXHIBIT L
Page 40 of 96

638 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

18.   Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the Squishmallows brand.



19.   In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others.   In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.

20.   From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising, and promoting the Squishmallows trade dress, and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products that are well known (and well loved) for their distinctive look.

21.   On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products to Plaintiff Kelly Toy Holdings, LLC.   Accordingly, Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products (including the Squishmallows trade dress discussed herein) that possess

[2532761/4]                                    6

EXHIBIT L
Page 41 of 96

639 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC88B499

unique, recognizable, and distinguishing features that are common across much of the Squishmallows line.

22.     Kelly Toy Holdings, LLC provides the rights to the remaining Plaintiffs, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the Squishmallows products.  Plaintiffs are all related companies that each independently have the ability to inspect and monitor the Squishmallows products and to maintain the products' quality. Each Plaintiff thus has a cognizable interest in the infringement at issue.

**B. Squishmallows Has a Distinctive Trade Dress**

23.     Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade dress, and whose overall look and image—and in particular but without limitation its shapes, colors, textures and graphics—serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters;        (2) simplified Asian style Kawaii faces with repeating



and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts, and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive

[2532761/4]                                    7

EXHIBIT L
Page 42 of 96

contrasting and non-monochrome coloring; and (5) short-pile exterior (collectively, the "Squishmallows Trade Dress").

24.     The Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look that is *uniquely* associated with Squishmallows.  The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions); (iii) myriad alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

25.     Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors.  Competitors have successfully used innumerable alternative design elements and combinations of those

[2532761/4]                                    8

EXHIBIT L
Page 43 of 96

641 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish—and has succeeded in distinguishing—the source of products embodying the Squishmallows Trade Dress from the source of other toys. Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source: Squishmallows.

### C. Squishmallows Are Distinctive and Popular

26.   Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of the Squishmallows line. And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kelly Toys' extensive promotional activities and widespread display of Squishmallows directed to the public and as a result of Kelly Toys' fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered only by Plaintiffs. The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it. As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize a secondary meaning of the exemplary reputation of Kelly Toys.

[2532761/4]                                    9

EXHIBIT L
Page 44 of 96

642 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

27.    In addition to being original and inherently distinctive, the Squishmallows Trade Dress is also widely recognized by consumers. A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

28.    Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, which each feature dozens of photographs of its plush toys and models holding its Squishmallows—some of which were directly copied by Build-A-Bear.

29.    Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook, and Twitter. Indeed, Kelly Toys' legion of loyal fans of its line of Squishmallows have been extremely engaged on social media, including TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows. Squishmallows videos have been viewed more than 11 billion times on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

30.    Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase of all ages searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

31.    Indeed, sales of Squishmallows increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

[2532761/4]                                    10

EXHIBIT L
Page 45 of 96

643 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

32.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others.  By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[3]





33.     The New York Times has proclaimed that "Squishmallows are Taking Over,"[4] Forbes named Squishmallows "2022's Must-Have Christmas Toy,"[5] and The Guardian has

---

[3] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

[4] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[5] Mark Faithull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy*, Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

[2532761/4]                                    11

EXHIBIT L
Page 46 of 96

644 of 816

recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[6]

34.    Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken over the toy world," and that "as toy stores go, the marshmallow-like plush toy's meteoric rise to the top of the $100 billion global toy market is one for the ages."[7]

35.    Squishmallows' fandom ranges across all ages, from children to teens to adults. Even celebrities like Kim Kardashian and Lady Gaga have identified themselves as avid devotees of the brand, and have published messages and photos of their Squishmallows collections on their social media accounts:



---

[6] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.
[7]    Mark    Caldwell,    *Soft    Sell*,    Costco    Connection,    Oct.    2023,    at    22, https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-23/US_October_Connection_2023.pdf.

[2532761/4]                                    12

EXHIBIT L
Page 47 of 96

645 of 816



36.     In September of 2022, Squishmallows was awarded the coveted "Toy of the Year," "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation. Squishmallows are so popular that they have been identified as the most popular toy brand across 41% of the U.S. states—far ahead of other well-known mega brands such as Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh.

37.     Due to Squishmallows' massive success and popularity, Squishmallows have created a secondary meaning in the marketplace and consumers associate the high-quality Squishmallows toys with Kelly Toys and the Squishmallows Trade Dress.

### D. Build-A-Bear's Skoosherz as a Copycat of Squishmallows

38.     True to its name, Build-A-Bear is best known for providing a place for people to create their own customizable toys. Build-A-Bear offers a number of premade, unstuffed plush animals and characters that consumers can stuff themselves to build their own toy. Consumers

[2532761/4]                                    13

EXHIBIT L
Page 48 of 96

646 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

can also customize their plush toy by purchasing audio recordings to incorporate inside the plush toy, clothing for the plush toy, and other accessories.

39.     On January 11, 2024, Build-A-Bear launched Skoosherz, a line of already complete (stuffed, stitched, etc.) plush toys that copies and imitates Squishmallows. The Skoosherz products are a radical departure from Build-A-Bear's typical products.  Indeed, Skoosherz lack all the customizable aspects that Build-A-Bear is known for.  Consumers cannot go into a Build-A-Bear Workshop and build their own Skoosherz.  Instead, Skoosherz are pre-made and available for purchase in the same way any traditional manufacturer would sell a toy—and the same way Squishmallows are sold.

40.     In other words, instead of maintaining its original business practice of allowing consumers to create their own toys, Build-A-Bear now seeks to trade off the goodwill of Squishmallows by marketing obvious copycat products—plush toys that look almost identical to popular Squishmallows.  To be clear, Build-A-Bear is not licensed or otherwise authorized by Kelly Toys to market or distribute products embodying the Squishmallows Trade Dress.

41.     Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

42.     Build-A-Bear does not just copy the shape, material and general characteristics of Squishmallows, Build-A-Bear went design by design and made an almost exact replica of each Squishmallows design; Squishmallows has a rainbow bear, Build-A-Bear made a rainbow Skoosherz; Squishmallows has a green frog, Build-A-Bear made a green frog Skoosherz; Squishmallows has a pink cow, Build-A-Bear made a pink cow Skoosherz. This list goes on and is not complete.

[2532761/4]                              14

EXHIBIT L
Page 49 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

43.     Dinosaurs, axolotls, and soon vegetables—Build-A-Bear made sure that each of its original five Skoosherz was an exact copy of a popular Squishmallows character. This includes the beloved and extremely unique Squishmallows axolotl, which Build-A-Bear ensured to copy with precision.   Side by side comparisons of Squishmallows and just a few of the copycat Skoosherz products plainly show how striking the similarities are:

| Squishmallows Original Product | Skoosherz Copycat Product |
| --- | --- |
|  |  |

[2532761/4]                                    15

EXHIBIT L
Page 50 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 51 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



| Squishmallows Original Product | Skoosherz Copycat Product |
|---|---|

44.    Build-A-Bear is already working on creating additional infringing Skoosherz characters, including characters that copy the widely-popular fruit and vegetable Squishmallows.

45.    Even worse, Build-A-Bear not only parroted Squishmallows, but it also tricked Squishmallows' manufacturer into creating the infringing Skoosherz copycat products. Specifically, Build-A-Bear reached out to the Squishmallows manufacturer (with whom Kelly Toys has an airtight confidentiality contract "Manufacturer Contract") and asked the manufacturer

[2532761/4]                                          17

EXHIBIT L
Page 52 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

to create a Squishmallows look-alike.  A true and correct copy of Pursuant to the Manufacturer Contract is attached hereto as **Exhibit 1.**

46.     Plaintiffs are informed and believe that when the manufacturer expressed concerns that the Skoosherz sought to be manufactured were Squishmallows copycats, Build-A-Bear first incorrectly represented that such copycat products were permitted because the products were sold in the public domain, and then sent another correspondence directing the manufacturer and produce the violative goods.

47.     There can only be one explanation for Build-A-Bear's insistence on both using the same manufacturer as Squishmallows and proceeding with its copycat product despite the manufacturer's warning: Build-A-Bear intended on misappropriating the Squishmallows Trade Dress and hoped to leverage Squishmallows' confidential information in the manufacturer's possession.

**E. Build-A-Bear's Actions Have Caused Great Consumer Confusion**

48.     Not only has Build-A-Bear created Skoosherz to visually and tactilely mirror Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows Skoosherz, Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead.

49.     Build-A-Bear has sought to market off of this confusion by portraying its Skoosherz as the "most squishable," and advertising that consumers can "Squish Em," plainly seeking to create an association between the infringing Skoosherz and the wildly popular Squishmallows, or "Squish:"

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





[2532761/4]                                    19

EXHIBIT L
Page 54 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499






50.   Build-A-Bear's descriptions of individual Skoosherz toys similarly seek to associate with Squishmallows, noting that they are "squishable."   For example, the product details for Build-A-Bear's axolotl (a copy of the unique animal that is one of Squishmallows' most popular characters) state:





| Product Details | Specifications | Gift Options | Store Availability |

Skoosherz are our most squishable, lovable and huggable friends! Our fan favorite pink axolotl gets the Skoosherz treatment with this adorable plush. The large, round plush has the axolotl's signature smiley face with fuzzy pink gills on its side. Make a splash with this ultra huggable axolotl friend!

51.   Skoosherz products create a likelihood of confusion with original Squishmallows products.   In fact, there is evidence of *actual* consumer confusion.   For example, on a recent promotional Skoosherz Instagram post, a user asked whether Build-A-Bear was now making Squishmallows:

[2532761/4]                                                20

EXHIBIT L
Page 55 of 96



52.     Other consumers have also noted how similar Skoosherz are to Squishmallows. Indeed, the official Build-A-Bear Instagram account was forced to clarify that these were indeed Skoosherz, not Squishmallows, when a commentor posted "SQUISHMALLOW!? !?" to Build-A-Bear's promotional video of Skoosherz.



53.     This post is not only conclusive evidence of consumer confusion, but it is also evidence of Squishmallows' above-described secondary meaning. When consumers saw Skoosherz characteristics, they did not refer to them as a build a bear, plush toy, or pink cow, they referred to them as "Squishmallow."

[2532761/4]                          21

EXHIBIT L
Page 56 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

54.     These users were not alone.  Build-A-Bear's Instagram post announcing its new
Skoosherz line is riddled with posts calling them "knockoff Squishmallows" and noting the
obvious similarities between these new products and the well-known Squishmallows:





EXHIBIT L
Page 57 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





EXHIBIT L
Page 58 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 59 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 60 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



EXHIBIT L
Page 61 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



55.     Other consumers noted that Skoosherz are "like a worse Squishmallow," even

noting that Skoosherz chose to copy several of the most popular Squishmallows characters.  Still

[2532761/4]                              27

EXHIBIT L
Page 62 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

others highlight the fact that Skoosherz represent a radical departure from Build-A-Bear's traditional model of building a custom toy, referring to them as "soulless ripoff[s]":

 **lairviniaa** · 10 hr. ago

I'm sorry but I really can't see the appeal 😅 like I collect both squishmallows and bab but these designs are just lazy and look like cheap squishmallow knockoffs (they literally used the most popular squishmallow animals/designs) and like I don't understand why they'd make these (besides wanting an easy cash grab) they have none of the features that make babs special and unique. they didn't even make clothes for them and they're overpriced too (and imo they're not even cute 😅) I mean if you enjoy them I'm happy for you i don't wanna ruin the fun but its just a no from me

 **stabby_coffin_salt** · 2 days ago

It's like a worse Squishmallow. I'd rather just get one of those Squishem's or whatever they're called (they have one that's a plague doctor).

These knockoffs remind me of those TY squish things. Can't stand the lack of quality or thought.

The cow is kinda cute I guess?

⊖   ⬆ 177 ⬇   💬 Reply   ⬆ Share   ⋯

 **saredarebear** · 4 hr. ago

I feel like if they were going to make something resembling squishmallows they could at least make it so you "build" it and make a line of clothing for it so it does not feel like such a a soulless ripoff. It's cute, but Build a Bear has something that is pretty unique and I do not understand why these were released the way they were.

⬆ 3 ⬇   💬 Reply   ⬆ Share   ⋯

56.    Even Build-A-Bear's photos and ad campaigns directly mirro Squishmallows:

**Squishmallows**                    **Skoosherz**

   

57.    Defendant Build-A-Bear has never had common law trade dress rights to the Squishmallows Trade Dress.

[2532761/4]                                    28

EXHIBIT L
Page 63 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

58.     Build-A-Bear's actions have caused and will continue to cause significant harm to Kelly Toys.  As a result of consumer confusion, Kelly Toys has lost and will continue to lose potential customers, sales, and market share.

59.     In sum, Build-A-Bear's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys.  And, as can be seen from Build-A-Bear's plans to release additional infringing Skoosherz, unless enjoined, Build-A-Bear will continue to further escalate their infringing activities.

60.     All conditions precedent to the filing of this Action have been performed, have occurred, have been excused, and/or have been waived or otherwise satisfied.

61.     Plaintiffs have retained the undersigned counsel to prosecute this action and is obligated to pay them attorneys' fees for their services in bringing this action and costs associated with the same.

<div align="center">

**COUNT I**
**COMMON LAW TRADE DRESS INFRINGEMENT**

</div>

62.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully stated herein.

63.     Kelly Toys owns the Squishmallows Trade Dress.

64.     Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                                    29

EXHIBIT L
Page 64 of 96

662 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

65.     Simply stated, the Squishmallows Trade Dress has a secondary meaning that, when viewed as a whole, presents a non-functional look that is uniquely associated with Squishmallows and Kelly Toys.

66.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

67.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.  Simply stated, the design of Squsihmallows and Skoosherz are confusingly similar.

68.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows.  It is not.

69.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

70.     Defendant Build-A-Bear's continued marketing and distribution of "Skoosherz" that so closely resemble Squishmallows has and will continue to cause a likelihood of confusion, mistake, and deception in the marketplace and among customers, causing irreparable harm to Plaintiffs and in violation of Plaintiffs' common law trade dress rights.

[2532761/4]                                    30

EXHIBIT L
Page 65 of 96

663 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

71.     As a result of Defendant's infringement, Plaintiffs have been damaged by the resulting confusion.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

<div align="center">

**COUNT II**
**COMMON LAW UNFAIR COMPETITION**

</div>

72.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

73.     Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress.  Defendant's unauthorized use of Kelly Toys' Squishmallows Trade Dress constitutes unfair competition and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of Defendant's products and to cause purchasers to believe that Defendant's products are authentic products of Kelly Toys when in fact, they are not.

74.     Defendant has intentionally appropriated Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent of palming off Defendant's goods as those of Kelly Toys.  Defendant has thus committed unfair competition under the common law of the State of Florida.

75.     By its actions in infringing Kelly Toys' Squishmallows Trade Dress, Defendant is improperly trading upon the reputation and goodwill, and impairing valuable rights in, the Squishmallows Trade Dress.

76.     Said activities of Defendant have caused irreparable harm and damage to the rights in the Squishmallows Trade Dress and to Kelly Toys' business reputation and goodwill.

77.     As a result of Defendants' conduct, Plaintiffs have suffered damages.

[2532761/4]                                      31

EXHIBIT L
Page 66 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

### COUNT III
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
Florida Statute § 501.021, *et seq.*

78.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

79.     This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute Section 501.201, *et seq.* ("FDUTPA").

80.     A primary purpose of FDUTPA is "[t]o protect the consuming public and *legitimate business enterprises* from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. (emphasis added).

81.     Plaintiffs have standing to sue under FDUTPA because they are legitimate business enterprises that were directly harmed by Defendant's unfair business practices.

82.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress. Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line. In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                                        32

EXHIBIT L
Page 67 of 96

665 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

83.    At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

84.    Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

85.    Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

86.    Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

87.    Even further, Build-A-Bear infringed on the Squishmallows Trade Dress when Build-A-Bear tricked Squishmallows' manufacturer into making Skoosherz.  Build-A-Bear knew or had reason to know that the Squishmallows Trade Dress was improperly obtained and copied. In fact, the Squishmallows manufacturer told Build-A-Bear that its designs too closely resembled Squishmallows. Nonetheless, Build-A-Bear used the same manufacturer in an attempt to benefit from the goodwill and brand recognition associated with Squishmallows.

[2532761/4]                          33

EXHIBIT L
Page 68 of 96

666 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

88.     Defendant's actions as indicated herein were and are willful and constitute an unfair method of competition, an unconscionable act or practice, and/or an unfair or deceptive act or practice in violation of § 501.204, Fla. Stat.

89.     Further, Defendant's actions are likely to mislead (and have actually mislead) the consumer acting reasonably in the circumstances, to the consumer's detriment.

90.     Defendant's actions have directly caused actual damage to the Squishmallows brand and Plaintiffs individually.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant, award Plaintiffs attorneys fees and costs pursuant to § 501.2105, Fla. Stat., award injunctive relief pursuant to § 501.222(1), Fla, Stat., and award other and further relief as this Court deems just and proper.

## COUNT IV
## PRELIMINARY INJUNCTION

91.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

92.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

[2532761/4]                          34

EXHIBIT L
Page 69 of 96

667 of 816

93. At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

94. Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows. Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

95. Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

96. Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

97. Defendant's actions have caused direct damage to the Squishmallows brand and Plaintiffs individually. Defendant's actions must be stopped.

98. Plaintiffs have no adequate remedy at law. If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

99. Monetary damages alone will not correct or remedy the damages caused by Defendant.

100. Plaintiffs have a substantial likelihood of success on the merits.

EXHIBIT L
Page 70 of 96

668 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

101.   Plaintiffs have a clear legal right to the relief sought.

102.   Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

103.   If Defendant is allowed to continue to improperly use the Squishmallows Trade Dress, the injury to Plaintiffs would outweigh any alleged harm an injunction may cause Defendant.

104.   An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skoosherz" are associated with Squishmallows.  They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary injunction, requiring that Defendant:

1.   Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

2.   Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3.   Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4.   Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

[2532761/4]                             36

EXHIBIT L
Page 71 of 96

669 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

5.   Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6.   Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7.   Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8.   Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9.   Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

[2532761/4]                                    37

EXHIBIT L
Page 72 of 96

670 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

11. And any further relief this Court deems just and proper.

## COUNT V
## PERMANENT INJUNCTION

105.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

106.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress. Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line. In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

107.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

108.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows. Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

109.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

110.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying

[2532761/4]                                     38

EXHIBIT L
Page 73 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

111.    Defendant's actions have caused direct damage to the Squishmallows brand and to Plaintiffs individually.  Defendant's actions must be stopped.

112.    Plaintiffs have no adequate remedy at law.  If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

113.    Monetary damages alone will not correct or remedy the damages caused by Defendant.

114.    Plaintiffs have a substantial likelihood of success on the merits.

115.    Plaintiffs have a clear legal right to the relief sought.

116.    Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

117.    An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skoosherz" are associated with Squishmallows.  They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a permanent injunction, requiring that Defendant:

1.  Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

[2532761/4]                                    39

EXHIBIT L
Page 74 of 96

672 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

2. Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3. Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4. Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5. Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6. Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7. Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

[2532761/4]                                      40

EXHIBIT L
Page 75 of 96

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

8.  Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9.  Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

[2532761/4]                                    41

EXHIBIT L
Page 76 of 96

674 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

## VERIFICATION

I declare under penalty of perjury that I have read the foregoing Verified Complaint, and

the facts contained herein, are true and correct to the best of my knowledge.

January 29, 2024 | 11:07 AM EST

Jazwares, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Toys Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM ES

Kelly Amusement Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Jazplus, LLC
By: Jack Elum
Its: Authorized Representative

[2532761/4]                                       42

EXHIBIT L
Page 77 of 96

675 of 816

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

Respectfully submitted this 29th day of January, 2024, by:

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781
Email: ezebersky@zpllp.com; jshaw@zpllp.com;
zludens@zpllp.com; lpalen@zpllp.com;
mlomastro@zpllp.com

_/s/ Jordan A. Shaw_____
EDWARD H. ZEBERSKY, ESQ.
Fla. Bar No.: 908370
JORDAN A. SHAW, ESQ.
Fla. Bar No.: 111771
ZACHARY D. LUDENS, ESQ.
Fla. Bar No.: 111620
LAUREN N. PALEN, ESQ.
Fla. Bar No.: 1038877

[2532761/4]                              43

EXHIBIT L
Page 78 of 96

676 of 816

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 677 of 816   Page ID #:1631

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

KELLY TOY HOLDINGS, LLC, et al.,       **Case No. CACE-24-001221**

       Plaintiff,

v.

BUILD-A-BEAR WORKSHOP, INC.,

       Defendant.

_____/

<u>**DEFENDANT BUILD-A-BEAR WORKSHOP, INC.'S
MOTION TO DISMISS**</u>

Defendant Build-A-Bear Workshop, Inc. ("Build-A-Bear"), by and through its undersigned counsel, and pursuant to Florida Rules of Civil Procedure 1.140 and 1.110, hereby moves to dismiss with prejudice the Verified Complaint of Plaintiffs Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC ("Plaintiffs").  In support thereof, Build-A-Bear states as follows:

**I.**      <u>**INTRODUCTION**</u>

As they have previously done in multiple lawsuits, Plaintiffs attempt to assert in this lawsuit overly broad, vague, generic, and ever-changing rights in unregistered trade dress purportedly associated with their Squishmallows product line.  Plaintiffs even acknowledge in their own Complaint that they themselves have difficulty articulating the contours of their supposed unregistered rights.  *See* Verified Complaint ("Complaint"), ¶23 (conceding their alleged trade dress "is not easily reduced to writing").  In their latest claims, this time against Build-A-Bear, Plaintiffs have entirely failed to articulate a plausible and proper definition of their asserted trade dress and thereby have failed to give the defendant fair notice of what the claim is and the grounds upon which it rests.  *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1235 (M.D. Fla. 2017), *aff'd*, 898 F.3d 1279 (11th Cir. 2018); *Vital Pharms., Inc. v. Monster*

EXHIBIT L
Page 79 of 96

677 of 816

*Energy Co.*, 553 F. Supp. 3d 1180, 1238 (S.D. Fla. 2021); *Haskel Realty Grp., Inc. v. KB Tyrone, LLC*, 253 So. 3d 84, 85 (Fla. 2d DCA 2018).

Based on Plaintiffs' pleading failures, the Court should dismiss Plaintiffs' claims against Build-A-Bear for trade dress infringement under Florida common law (Count I) as well as Plaintiffs' Florida common law claim for unfair competition (Count II), Plaintiffs' Florida statutory claim for alleged violations of the Florida Deceptive and Unfair Trade Practices Act (Count III), and Plaintiffs' requests for preliminary and permanent injunction (Counts IV and V), which are all premised on Plaintiffs' alleged trade dress rights.[1]

Trade dress generally refers to the non-functional physical detail and design of a product that clearly distinguishes it from the products of others, such that consumers identify these products as coming from a single and exclusive source (typically referred to as "secondary meaning" in the marketplace). *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).[2] Plaintiffs bear the burden to sufficiently plead not only the non-functionality and secondary meaning of its trade dress, but also to clearly and specifically define in the Complaint the elements of their claimed trade dress. *See Vital Pharm., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1236 (S.D. Fla. 2021) ("While there are several compelling reasons to require plaintiffs to precisely define their trade dress, only one bears mentioning here—that it is only with a clearly defined trade dress that the court and the parties [can] coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an

---

[1] For context regarding the procedural posture of this matter, please see Build-A-Bear's Motion to Stay filed contemporaneously herewith.

[2] Florida common law trade dress infringement follows the framework of the Lanham Act, which governs federal trade dress claims, and looks to federal precedent for guidance when applying the Lanham Act. *See Keefe Group, LLC v. Rajab*, 6:20-CV-2090-ACC-GJK, 2021 WL 4173842, at *4 (M.D. Fla. Aug. 19, 2021); *see also PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (citing *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003) ("The analysis of liability for Florida common law trademark infringement is the same as under the Lanham Act"); *Vital Pharms., Inc.*, 553 F. Supp. 3d at 1244-74, n.28 (utilizing the trade dress framework of the Lanham Act to analyze and dispose of plaintiff's Florida common law trade dress claim).

2

EXHIBIT L
Page 80 of 96

678 of 816

infringement.") (internal quotation marks omitted). Plaintiffs' purported trade dress claims under Florida common law fail to articulate a plausible and proper definition of their asserted trade dress. Notably, Plaintiffs assert <u>three different</u> iterations of their purported trade dress against Build-A-Bear in this Court (including two different iterations in the Complaint).

Plaintiffs' shifting sands approach is the direct result of the commonly recognized fact that, "[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is ***common to all items in the series or line***." 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §8:5.50 (5th ed. 2020) ("MCCARTHY") (emphasis added). Plaintiffs' Squishmallows product line includes thousands of different-looking designs (Complaint, ¶30), which vary widely in shape, color, facial features, and overall appearance. A few of the Squishmallows designs are shown here and in Section III., below, which are from Plaintiffs' Complaint.

EXHIBIT L
Page 81 of 96



Because Plaintiffs' Squishmallows products differ so greatly, Plaintiffs' descriptions of their purported rights are similarly varying, overbroad, vague, and inconsistent, including generic and functional features commonly found in plush products for many years, including before Squishmallows' existence.  For example, Plaintiffs claim trade dress rights in "embroidered facial features, such as eyes, nostrils, and/or mouths" (*see* Complaint, ¶23; *see also* Verified *Ex Parte* Emergency Motion for Temporary Injunction ("*Ex Parte* Emergency Motion"), p. 4) – which have been in plush toys for decades – as well as "non-monochrome coloring" – which is simply a way

4

EXHIBIT L
Page 82 of 96

680 of 816

of saying "multiple colors", another basic plush toy feature undoubtedly used for decades by many different companies.  In short, Plaintiffs' descriptions fail to provide Build-A-Bear with sufficient notice of what their purported trade dress rights actually are compared to what plush toy makers have been selling for years.

Other courts have recognized the fundamental deficiencies in Plaintiffs' lawsuits, and have dismissed similarly overbroad and unspecific claims of unregistered trade dress asserted in the Squishmallows product line against Dan-Dee International and Zuru, LLC, two plush toy manufacturers.  *See Kellytoy USA, Inc. et al. v. Dan-Dee Int'l, Ltd. et al.*, Case No. 2:18-cv-05399-JAK ("*Kellytoy v. Dan-Dee*"); *see also Kelly Toys Holdings, LLC et al. v. Zuru, LLC*, Case No. Case No. 2:23-cv-09255 ("*Kelly Toys v. Zuru*").  In *Kellytoy v. Dan-Dee*, the Central District of California dismissed claims of unregistered trade dress in the Squishmallows product line, calling out that: "in light of the substantial differences among the designs of the products in the Squishmallows line, the images included in the [First Amended Complaint] do not provide the level of clarity about the nature and scope of the claimed trade dress as is required by the caselaw." *See Kellytoy v. Dan-Dee*, ECF No. 39, at 9.  More recently, in *Kelly Toys v. Zuru*, another Central District of California Court dismissed similar unregistered trade dress claims in the Squishmallows product line, warning Plaintiffs "that a subsequent pleading containing another **ill-defined** trade dress description may result in a final dismissal of the trade dress claims." *See Kelly Toys v. Zuru*, ECF No. 32, p. 7 (emphasis added).

The oft-revised trade dress descriptions, combined with Plaintiffs' failure to even attempt to register their purported trade dress, suggests that Plaintiffs themselves cannot clearly identify their own purported rights. If Plaintiffs could have articulated their rights in a concise and clear fashion, they would have done so.  They have not and cannot.

Reduced to its simplest form, Plaintiffs are absurdly attempting to convince this Court that they have exclusive intellectual property rights over multi-color, plush toys with cartoon-like faces.  Plaintiffs are not entitled to exclusivity over such ubiquitous features. Because Plaintiffs cannot sufficiently describe their unregistered trade dress rights, their trade dress claims (and all

EXHIBIT L
Page 83 of 96

681 of 816

other claims predicated on such purported rights) fail as a matter of law and should be dismissed pursuant to Florida Rules of Civil Procedure 1.140 and 1.110.

## II.   APPLICABLE LAW

### A.  Florida Rule 1.110

Florida Rule of Civil Procedure 1.110(b)(2) requires that a complaint contain "a short and plain statement of the ultimate facts showing that the pleader is entitled to relief." Consequently, "[a] motion to dismiss tests the legal sufficiency of the complaint." *Haskel Realty Grp., Inc. v. KB Tyrone, LLC*, 253 So. 3d 84, 85 (Fla. 2d DCA 2018) (quoting *Gann v. BAC Home Loans Servicing LP*, 145 So. 3d 906, 908 (Fla. 2d DCA 2014) (internal quotations and citation omitted)). In considering a motion to dismiss, a court need not accept as true, "[l]egal conclusions presented as allegations of fact." *Point Conversions, LLC v. Omkar Hotels, Inc.*, 321 So. 3d 326, 328 (Fla. Dist. Ct. App. 2021).

### B.  Trade Dress[3]

Trade dress, specifically, "involves the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986) (internal quotations omitted). However, a plaintiff bears the burden to sufficiently plead and adequately define the elements of plaintiff's claimed trade dress "with specificity," in addition to pleading non-functionality and secondary meaning. *Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1238 (S.D. Fla. 2021). Otherwise, without a clearly articulated and adequate definition, the defendant is not properly put on notice of

---

[3] Florida trade dress, unfair competition, and deceptive trade practices law track the same requirements for pleading trade dress as the Lanham Act. *See Keefe Grp., LLC v. Rajab*, No. 6:20-CV-2090-ACC-GJK, 2021 WL 4173842, at *4 (M.D. Fla. Aug. 19, 2021) ("The analysis of liability under Florida common law trademark and trade dress infringement is the same as under the Lanham Act."); *Rain Bird Corp. v. Taylor*, 665 F. Supp. 2d 1258, 1267 (N.D. Fla. 2009) (noting that the "legal standards for Florida statutory and common law claims of trademark infringement and unfair competition … are the same as those for federal claims"); *Suntree Tech., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) ("[t]he legal standards we apply to [the FDUPTA] claim are the same as those we have applied under section 43(a) of the Lanham Act."); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n. 4 (11th Cir.2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition.").

6

EXHIBIT L
Page 84 of 96

what does or does not infringe or even what the elements are to analyze validity and infringement. *See Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1256 (M.D. Fla. 2012), *aff'd,* 505 F. App'x 928 (11th Cir. 2013); *see also  Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000) ("[I]f a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly infringing 'does not exist,' and the defendant must prevail.") (internal quotations omitted).

The reason this is so important is that any ambiguity in the pleading stage can lead to gamesmanship and changing descriptions of the trade dress by a plaintiff as the litigation proceeds. *See* MCCARTHY § 8:3 (5th ed.) ("[T]here is no reason why the plaintiff cannot define a list of elements … Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.").  Clear definitions of unregistered trade dress are necessary to make sure the marketplace is operating with full information, allowing proper competition.  *See* MCCARTHY § 8:3 (5th ed.) ("The law of trade dress should not be used as an anti-competitive weapon based upon undefined claims of 'trade dress.'").

Where, as here, a plaintiff claims trade dress over a product line, "the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is ***common to all items in the series or line***." MCCARTHY § 8:5.50 (emphasis added); *see also Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1235 (M.D. Fla. 2017) ("[A] plaintiff who seeks protection for a line of products 'faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress.") (internal quotation marks omitted); *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1255 (M.D. Fla. 2012), *aff'd,* 505 F. App'x 928 (11th Cir. 2013) ("Plaintiff has failed to articulate what consistent overall look is present in its family of products.").

EXHIBIT L
Page 85 of 96

### III.    BACKGROUND ON THE SQUISHMALLOWS PRODUCTS

In their Complaint, Plaintiffs claim to be the sole and exclusive owners of unregistered trade dress rights in their Squishmallows product line.  *See* Complaint, ¶21.  However, Plaintiffs' definitions of those rights have not only changed greatly over the past five years[4] – they have even changed as applied to Build-A-Bear within the pleadings of the instant case.  *Compare* Complaint, ¶¶23, 41 and *Ex Parte* Emergency Motion, pp. 4, 7 (Descriptions (1) and (2) below) *with Ex Parte* Emergency Motion, p. 25 (Description (3) below).

Plaintiffs' trade dress descriptions of their Squishmallows product line within the Complaint are as follows (hereinafter referred to as the "Claimed Squishmallows Trade Dress"):

(1)  Complaint (filed Jan. 29, 2024), ¶23:

   a.    substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

   b.    simplified Asian style Kawaii faces[5] with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

   c.    embroidered facial features, such as eyes, nostrils, and/or mouths

   d.    distinctive contrasting and non-monochrome coloring

   e.    short-pile exterior

---

[4] For the Court's information only, Plaintiffs have asserted at least *13 different trade dress descriptions* over the past 5 years in lawsuits against numerous plush toy manufacturers, including: Dan-Dee International filed in 2018 (*Kelly Toy v. Dan-Dee*, Case No. 2:18-cv-05399-JAK (C.D. Cal.)); Hugfun International, Inc. filed in 2019 (*Kellytoy Worldwide, Inc. v. Hugfun International, Inc.*, Case No. CV-19-07652-MWF (C.D. Cal.)); Ty, Inc. filed in 2020 (*Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.)); Zuru, LLC in filed 2023 (*Kelly Toys v. Zuru*, Case No. 2:23-cv-09255 (C.D. Cal.)); and Build-A-Bear (in the instant case and the California Lawsuit) filed in 2024.

[5] The Central District of California has criticized this description of Squishmallows products as bearing "simplified Asian style Kawaii faces", as invoking "questionable orientalist tropes without doing much to describe the asserted trade dress". (*Kelly Toys v. Zuru*, Case No. 2:23-cv-09255, ECF No. 32, at p. 5).

EXHIBIT L
Page 86 of 96

(2)  Complaint (filed Jan. 29, 2024), ¶41:

      a.     shaped fanciful renditions of animals/characters

      b.     simplified Asian style Kawaii faces

      c.     embroidered facial features

      d.     distinctive and non-monochrome coloring

      e.     short-pile exterior

As the Court can see from the simultaneously filed *Ex Parte* Emergency Motion, Descriptions (1) and (2) are the same as at pages 4 and 7 of that motion, but yet another differing description is also found in the *Ex Parte* Motion:

(3)  *Ex Parte* Emergency Motion, p. 25:

      a.     Asian-style Kawaii faces

      b.     rounded shape

      c.     embroidered facial features

      d.     bright colors

      e.     small facial features

      f.     small appendages

      g.     overall unique minimalistic depiction of cute animals and shapes

These varying, but more importantly, inadequate descriptions of the trade dress fail to provide fair notice to competitors in the industry of Plaintiffs' claimed trade dress rights. As just one example, what began as Plaintiffs' asserted rights in "substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters" (Description (1), above), eventually became "shaped fanciful renditions of animals/characters" (Description (2), above), and then a "rounded shape" and "overall unique minimalistic depiction of cute animals and shapes" (Description (3), above).  If Plaintiffs cannot clearly define their own asserted

9

EXHIBIT L
Page 87 of 96

685 of 816

unregistered trade dress rights, it is impossible for competitors like Build-A-Bear to know what those asserted rights are and govern their actions accordingly.

However, no matter how creative Plaintiffs' endeavors into wordsmithing are, the various vague features Plaintiffs have claimed as components of the Claimed Squishmallows Trade Dress are not consistently present throughout the Squishmallows product line (which, according to Plaintiffs, has over 3,000 plush characters) (Complaint, ¶30), undermining the assertion of a total product image recognizable by the consuming public as an identifier of a single source. The continuously varying descriptions fall well short of providing Build-A-Bear with sufficient notice under the law. *See* Complaint, ¶¶19-20, 26, 42 (referring to the features of the Squishmallows not as source identifiers but as "designs" or "product designs"). As shown below, no consistent overall look and feel or stable visual appearance can easily be discerned from a review of just a few of Plaintiffs' Squishmallows products specifically asserted by Plaintiffs as exemplifying the Claimed Squishmallows Trade Dress (*see* Complaint):



EXHIBIT L
Page 88 of 96



*See* Complaint, pp. 3, 6-7, 15-17.[6]

In the examples shown above, the snouts are all different (*e.g.*, circular, oval, triangular, and "comma" shaped), with some containing a nose attached to a curved mouth (dogs, panda, bear, mouse, lion), one containing a nose and a separate mouth (baby yoda p. 11), some containing nostrils only (unicorn p. 12, pig, giraffe p. 2, cow, zebra p. 2, bull), and some toys lacking a snout

---

[6] All images of Squishmallows products above are specifically depicted in the photographs displayed and pled in Plaintiffs' Complaint. Further, all Squishmallows product designs discussed herein are depicted in the various photographs in Plaintiffs' Complaint, as cited herein.

11

EXHIBIT L
Page 89 of 96

687 of 816

altogether (burger, mushroom p. 11, snowflake dinosaur, clown fish p. 11, etc.). One cannot discern "distinctive contrasting and non-monochrome coloring" in the depicted toys, which run the gamut from various shades of black, brown, tan, white, pink, blue and gray, and including colors and prints found in nature, such as grey for the mouse, orange and white for the clown fish, green for the frog, pink for the pig, and zebra and giraffe prints for the corresponding animals. Even the embroidered, purportedly "Asian-style" eyes have no discernible consistency:  some eyes have eyelashes (unicorn) and some even have "closed" eyes (unicorn, rainbow heart dog, pumpkin spice latte p. 13, rainbow mane lion).  Some of the toys have contrasting, semi-circular "bellies," whereas others do not, and some have a contrasting irregularly-shaped panel covering the belly of the toy (panda, baby yoda p. 11). The various "appendages" also differ between the toys depicted above, with horns, manes, and differently shaped ears placed on different parts of the toys (floppy, round, folded, not folded, or none at all). One of the toys does not have appendages at all (burger p. 11). *See* Complaint, pp. 2-3, 6-7, 11-13, 15-17.

All of Plaintiffs' Squishmallows products do not have "rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys". Instead, Plaintiffs' Squishmallows products have all manner of features and graphics that are linear (panda, baby yoda p. 11, burger p. 11) squiggled (clownfish lines p.11 and unicorn hair), or pointed (fox facial features p. 2), while others have details not "Kawaii" in style (British-style octopus with monocle, moustache, and top hat octopus). *See* Complaint, pp. 2-3, 6-7, 11-13, 15-17.

Further, the images show Squishmallows products with different shapes (pink stingray with triangle fins, rounded octopus with tentacles); non-rounded facial features (panda with heart-shaped eyes, lion with closed eyes, candy character with closed eyes); monochrome or indistinct coloring (octopus, panda, mouse); and different length fabric (lion, bull).[7]

---

[7] All Squishmallows products described above are specifically depicted in the photographs included in Plaintiffs' Complaint.

EXHIBIT L
Page 90 of 96

In sum, Plaintiffs claim a variously shaped plush toy with *a* face and *a* color—a description that encompasses most of the world's plush toys.  Plaintiffs' improper attempt to hold a far-reaching monopoly over the plush toy industry, vis-à-vis the Claimed Squishmallows Trade Dress, is unsupported by trade dress, unfair competition, and unfair and deceptive trade practices law, and should be emphatically rejected by this Court.

## IV.   **ARGUMENT**

    **A. This Court Should Dismiss Plaintiffs' Trade Dress Claims (Including Plaintiffs' Unfair Competition and Florida Deceptive and Unfair Trade Practices Act Claims and Plaintiffs' Preliminary and Permanent Injunction Requests Based on Trade Dress) Because Plaintiffs Do Not and Cannot Clearly and Adequately Describe the Claimed Squishmallows Trade Dress.**

Plaintiffs' Complaint asserts unregistered trade dress rights over the Squishmallows product line comprising thousands of different product designs.  *See* Complaint, ¶¶19-20, 30.   In effect, Plaintiffs are trying to exclude Build-A-Bear from making multi-color, plush toys with cartoon-like faces, even though such toys have existed for years before Squishmallows even came to market.  Trade dress law does not support Plaintiffs' improper monopolistic efforts nor does it support generic trade dress.   Plaintiffs' vague, overbroad, and ever-changing trade dress descriptions fail to set forth a plausible claim.  Therefore, this Court should dismiss Plaintiffs' state law trade dress claims, as well as Plaintiffs' unfair competition and deceptive and unfair trade practices claims, which are premised on their purported trade dress.

Plaintiffs' Complaint against Build-A-Bear in this Court evidence Plaintiffs' attempts to redefine its trade dress as they continue to face legal challenges from their adversaries. Indeed, the widely varying descriptions above show Plaintiffs' inability to provide Build-A-Bear with legally sufficient notice of their asserted trade dress – because, as Plaintiffs admit, they can "not easily reduce[] to writing" the Claimed Squishmallows Trade Dress. Complaint, ¶23.

Further, the 3,000+ products in the Squishmallows product line have features that vary widely and thus are inconsistent with the Claimed Squishmallows Trade Dress.  Some products

<div align="center">13</div>

EXHIBIT L
Page 91 of 96

689 of 816

have Kawaii style faces, some do not.[8]   Some have noses, some do not.   Some are non-monochrome, some are not.   Some are brightly colored, some are not.   Some are oval, some are not.   Some have appendages, some do not.   Some have bellies, some do not.

Plaintiffs cannot claim trade dress rights over a potentially unlimited number of shapes, colors, patterns, textures, and facial features embodied into a plush or stuffed toy, especially where, as here, the claimed elements existed in similar products long before the creation of the Squishmallows product and remain ubiquitous today.   Indeed, by changing the Claimed Squishmallows Trade Dress description against Build-A-Bear at least three times within Plaintiffs' initial pleadings (including twice within the Complaint), Plaintiffs have proven the futility of attempting to craft one complete description of the trade dress elements because the Squishmallows designs in the product line take the form of numerous varying features. In any event, even using the description found within the Complaint, there is no common feature across the entire line and Plaintiffs cannot obtain intellectual property rights over plush toys generally. *See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, No. 09-80918-CIV, 2009 WL 6812111, at *9 (S.D. Fla. Oct. 13, 2009) (noting that plaintiff's trade dress elements were too "ordinary to be considered symbols of origin" in part because the design elements did not distinguish plaintiff from others in the industry and were not unique).

Plaintiffs' inability to formulate a list of the elements that make up its trade dress also makes it impossible for Plaintiffs to provide "sufficient notice of [their] trade dress claim." *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1256 (M.D. Fla. 2012), aff'd, 505 F. App'x 928 (11th Cir. 2013). Moreover, although "image[s] of the trade dress … greatly assist[] courts in clarifying what design or mark a plaintiff seeks to protect," in this case, images of Plaintiffs' Claimed Squishmallows Trade Dress (*i.e.*, the Squishmallows products themselves)

---

[8]  The Oxford English Dictionary defines "Kawaii" as: "[c]ute, esp. in a manner considered characteristic of Japanese popular culture; charming, darling; ostentatiously adorable." *See* www.oed.com. Although Build-A-Bear contends otherwise, if the term "Kawaii" is sufficiently defined in itself, the absence of any consistent look across the product line undercuts the descriptor as-applied.

14

EXHIBIT L
Page 92 of 96

only create further confusion because the images themselves clearly show an inconsistent overall look. *See Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. SACV150246DOCDFMX, 2016 WL 6138416, at *3 (C.D. Cal. May 6, 2016); *see also Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1235 (M.D. Fla. 2017), *aff'd*, 898 F.3d 1279 (11th Cir. 2018) (noting that more than a set of images of a product line is necessary to distill common elements of a plaintiff's asserted trade dress).

The fact of the matter is that Plaintiffs' current descriptions of its asserted trade dress are so amorphous, vague, and inconsistent with its own Squishmallows product line (as have been the other descriptions asserted in the last five years against various plush toy manufacturers). This Court should therefore dismiss all of Plaintiffs' trade dress claims (and unfair competition and deceptive and unfair trade practices claims dependent thereon) for failure to state a claim under Florida Rule of Civil Procedure 1.110.

**B.  This Court Should Dismiss Plaintiffs' Trade Dress Claims (Including Plaintiffs' Unfair Competition and Florida Deceptive and Unfair Trade Practices Claims Based on Trade Dress) Because, as Pled, the Claimed Squishmallows Trade Dress Is Not Protectable.**

Additionally, the Claimed Squishmallows Trade Dress is not protectable in the first instance. This is because: (1) Plaintiffs have failed to adequately plead facts supporting secondary meaning of the Claimed Squishmallows Trade Dress; and (2) the descriptions of the Claimed Squishmallows Trade Dress are so generic and commonplace that it cannot be protected under the law even if secondary meaning in the marketplace could be proven.

As background, some trade dress is considered "inherently distinctive," in that their "intrinsic nature serves to identify a particular source." *Wal–mart v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). Trade dress that is not inherently distinctive may nevertheless acquire distinctiveness (*i.e.*, "secondary meaning") over time if consumers "have formed an association in their minds between **the trade dress** and the source or origin of the product." *See Vital Pharms., Inc. v. Am. Body Bldg. Prod., LLC*, 511 F. Supp. 2d 1303, 1310 (S.D. Fla. 2007) (emphasis added).

15

EXHIBIT L
Page 93 of 96

However, "a product design trade dress *can never be* inherently distinctive." *Hyde Park Storage Suites Daytona, LLC v. Crown Park Storage Suites, LLC*, 631 F. Supp. 3d 1203, 1213 (M.D. Fla. 2022) (emphasis added). Instead, a product's design may *only* be protected as trade dress if it has acquired distinctiveness. *See Wal–mart*, 529 U.S. at 211-12, 216. Evidence of past sales, alone, is irrelevant unless it is proven that the sales were actually driven by Plaintiffs' trade dress. *See, e.g.*, *Kellytoy Worldwide, Inc. v. TY, Inc.*, No. 20 C 748, 2020 WL 5026255, at *3 (N.D. Ill. Aug. 25, 2020) ("popularity and engagement with a product do not necessarily suggest a connection between the product and its source.").

Here, Plaintiffs admit in their Complaint that the Claimed Squishmallows Trade Dress encompasses "product design" but then only pleads as facts its efforts to market the product and its purported sales volume as supporting secondary meaning. *See, e.g.*, Complaint, ¶¶19-20, 26, 28-29, 42. These facts, as pled, are insufficient to plead secondary meaning in this product design.

Further, Florida (and many other) courts have recognized that trade dress protection is not meant to extend to broad, imprecisely defined, and generic product designs because of concerns that "[d]ifferent jurors may understand the trade dress to be made up of different elements, and any resulting verdict could be based on inconsistent findings." *Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1236 n.23 (S.D. Fla. 2021). For this reason, generic trade dress is deserving of no protection. *Id.* at 1315 (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986)) (discussing that "[t]rade dress may be classified as generic, descriptive, suggestive, or arbitrary," but that "[g]eneric marks refer to a particular genus or class of which an individual service [or product] is but a member, [and] such marks may never receive … protection").

In this case, Plaintiffs' descriptions of its trade dress in Paragraphs 23 and 41 of the Complaint (and further at pages 4, 7, and 25 of the *Ex Parte* Emergency Motion) reveal a vague, overbroad, and outright generic purported trade dress as well as a product design that has been commonplace in the plush toy industry for decades (or longer), and therefore unworthy of trade dress protection irrespective of acquired distinctiveness, if any. Plaintiffs' Claimed Squishmallows Trade Dress fails to specify elements such as the color, shape, fabric, and facial

<div align="center">16</div>

EXHIBIT L
Page 94 of 96

features of their product designs that inconsistently appear in their product line.  Generic references like "non-monochrome coloring" (*i.e.*, multiple colors), "embroidered two-dimensional facial features" (*i.e.*, any sewn facial features), and "short-pile exterior" (*i.e.*, short fabric outside) are far too overbroad and generalized because they do not "define" any particular "size, shape, color or color combinations, texture, [or] graphics" with sufficient "specificity."  *Vital Pharms., Inc.*, 553 F. Supp. 3d at 1238, 1244.

For these reasons, the Claimed Squishmallows Trade Dress as set forth in Paragraph 23 of the Complaint (and, for that matter, Plaintiffs' other varying descriptions in Plaintiffs' *Ex Parte* Emergency Motion) is generic and commonplace and cannot be protected under the law.

## V.   <u>CONCLUSION</u>

Defendant Build-A-Bear respectfully requests that this Court dismiss Plaintiffs' Complaint in its entirety, including dismissing Plaintiffs' trade dress claims, unfair competition, and deceptive and unfair trade practices claims based on the Claimed Squishmallows Trade Dress, with prejudice, because allowing Plaintiffs to attempt a fourteenth trade dress description will not cure Plaintiffs' fundamental legal defects and would be futile, *see Quality Roof Servs., Inc. v. Intervest Nat. Bank*, 21 So. 3d 883, 885 (Fla. Dist. Ct. App. 2009) ("[a] proposed amendment is futile if it is insufficiently pled … or is 'insufficient as a matter of law'"), and award any further relief to Build-A-Bear as this Court deems appropriate.

17

EXHIBIT L
Page 95 of 96

DATED: March 14, 2024

Respectfully submitted,

By: *s/Paul Ranis*

**GREENBERG TRAURIG, P.A.**

Paul Ranis
Florida Bar No. 64408
ranisp@gtlaw.com
Joshua Brown
Florida Bar No. 826391
Joshua.brown@gtlaw.com
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 765 – 0500
Facsimile:  (954) 765 – 1477

**LEWIS RICE LLC**

Michael J. Hickey, applying *Pro Hac Vice*
mhickey@lewisrice.com
Philip J. Mackey, applying *Pro Hac Vice*
pmackey@lewisrice.com
Edward T. Pivin, applying *Pro Hac Vice*
epivin@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

*Attorneys for Defendant Build-A-Bear Workshop, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of March 2024, a true and correct copy of the foregoing was filed Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to counsel of record.

GREENBERG TRAURIG
401 East Las Olas Blvd., Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Telefax: 954-765-1477

By: *s/Paul Ranis*
PAUL RANIS
Florida Bar No. 64408

18

EXHIBIT L
Page 96 of 96

694 of 816

# EXHIBIT M

Case 2:24-cv-01169-MWF-MAR   Document 27-2   Filed 04/04/24   Page 696 of 816   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 19-2   Filed 10/14/19   Page 1 of 25   Page ID #:120
#:1650

TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
MARK B. MIZRAHI (BAR NO. 179384)
mark.mizrahi@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, 15th Floor
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

*Attorneys for Plaintiff Kellytoy
Worldwide, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>HUGFUN, INTERNATIONAL, INC. a/k/a Hugfun Int'l Inc., a Hong Kong entity of unknown form, BJ'S WHOLESALE CLUB, INC., a Massachusetts corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 19-cv-07652-MWF-MAA<br><br>**PLAINTIFF KELLYTOY WORLDWIDE, INC.'S OPPOSITION TO MOTION TO DISMISS**<br><br>Date:  November 4, 2019<br>Time:  10:00 a.m.<br>Place:  Courtroom 5A<br>           350 W. First Street<br>           Los Angeles, CA 90012<br><br>Date Filed:  September 6, 2019<br>Trial Date:  None |

Case 2:24-cv-01169-MWF-MAR   Document 27-2   Filed 04/04/24   Page 697 of 816   Page ID
#:1651
Case 2:19-cv-07652-MWF-MAR   Document 49-2   Filed 10/14/19   Page 2 of 25   Page ID #:121

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................6

II.     FACTUAL BACKGROUND ...........................................................7

        A.    KELLYTOY DEVELOPS THE SQUISHMALLOW PLUSH
              TOYS ...................................................................................7

        B.    HUGFUN'S INFRINGING CONDUCT................................9

        C.    PROCEDURAL HISTORY..................................................10

III.    DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED.............10

        A.    STANDARDS ON A MOTION TO DISMISS....................10

        B.    KELLYTOY'S CLAIM FOR TRADE DRESS
              INFRINGEMENT IS SUPPORTED BY THE ALLEGATIONS
              IN THE COMPLAINT ........................................................11

              1.    Kellytoy's Allegations as to Non-Functionality Are
                    Sufficient.................................................................12

              2.    "Functionality" Is Not Properly Decided on a Motion to
                    Dismiss......................................................................14

              3.    Kellytoy's Trade Dress Is Not Functional...................14

              4.    Kellytoy Adequately Identifies Its Trade Dress ...........20

        C.    KELLYTOY SHOULD BE GRANTED LEAVE TO AMEND .........24

IV.     CONCLUSION ..............................................................................25

-2-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

EXHIBIT M
Page 2 of 58

Case 2:24-cv-01169-MWF-MAR Document 27-2 Filed 04/04/24 Page 698 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 19-2 Filed 10/14/19 Page 3 of 25 Page ID #:12
#:1652

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
   457 F.3d 1062 (9th Cir. 2006) ......................................................... 13, 16

*Aurora World, Inc. v. Ty Inc.*,
   719 F. Supp. 2d 1115 (C.D. Cal. 2009) ........................................... 18, 19

*Auster Oil & Gas, Inc. v. Stream*,
   764 F.2d 381 (5th Cir. 1985) .................................................................. 10

*Balistreri v. Pacifica Police Dep't.*,
   901 F.2d 696 (9th Cir. 1990) .................................................................. 11

*Clicks Billiards, Inc. v. SixShooters, Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ................................... 11, 14, 15, 17, 18, 23

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*,
   911 F.2d 242 (9th Cir. 1990) .................................................................. 24

*Dean v. Cortes*,
   No. CV 2:18-02335-CAS, 2018 WL 3425016 (C.D. Cal. July 12,
   2018) ...................................................................................................... 23

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
   No. CV 15-769 PSG, 2015 WL 12731929 (C.D. Cal. May 8, 2015).
   (Mot. 10:15-20.) ................................................................ 12, 14, 18, 21

*Dehoog v. Anheuser-Busch InBev SA/NV*,
   899 F.3d 758 (9th Cir. 2018) .................................................................. 12

*Disc Golf Ass'n v. Champion Discs, Inc.*,
   158 F.3d 1002 (9th Cir. 1998) ................................................................ 15

*DO Denim, LLC v. Fried Denim, Inc.*,
   634 F. Supp. 2d 403 (S.D.N.Y. 2009) .................................................... 12

*Five Star Gourmet Foods, Inc. v. Ready Pac Foods, Inc.*,
   CV 18-2436 ............................................................................................ 14

4311236.2
-3-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
698 of 816
EXHIBIT M
Page 3 of 58

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ........................................................ 15, 17

*Gilligan v. Jamco Dev. Corp.*,
   108 F.3d 246 (9th Cir. 1997) ............................................................... 10

*Glassybaby, LLC v. Provide Gifts, Inc.*,
   No. C 11-380 MJP, 2011 WL 2218583 (W.D. Wash. Jun. 6, 2011) .................. 12

*Greenberg v. Johnson*,
   2014 WL 12586252 (C.D. Cal. 2014) .......................................... 21, 22

*H.I.S.C., Inc. v. Franmar International Importers, Ltd.*,
   CV 3:16-00480-BEN-WVG, 2016 WL 7439355 (S.D. Cal. 2016) .................... 20

*Hall v. City of Santa Barbara*,
   833 F.2d 1270 (9th Cir. 1986) .............................................................. 10

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
   4 F.3d 819 (9th Cir. 1993) ................................................................... 11

*Lepton Labs, LLC v. Walker*,
   55 F. Supp. 3d 1230 (C.D. Cal. 2014) ................................................ 20

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) .............................................................. 11

*Mercado Latino, Inc. v. Indio Prods.*,
   No. CV 13-01027 DDP, 2017 WL 1356315 (C.D. Cal. Apr. 11,
   2017) ................................................................................. 17, 19, 22

*Millennium Labs. v. Ameritox, Ltd.*,
   817 F.3d 1123 (9th Cir. 2016) ..................... 11, 13, 14, 15, 16, 17, 18, 19

*Morton v. Rank Am., Inc.*,
   812 F. Supp. 1062 (C.D. Cal. 1993) ................................................ 14, 17

*One Indus., LLC v. Jim O'Neal Distrib.*,
   578 F.3d 1154 (9th Cir. 2009) .............................................................. 11

*Pareto v. FDIC*,
   139 F.3d 696 (9th Cir. 1998) ............................................................... 10

4311236.2

-4-

Case 2:24-cv-01169-MWF-MAR Document 27-2 Filed 04/04/24 Page 700 of 816 Page ID
Case 2:13-cv-07652-MWF-MAR Document 27-2 Filed 10/14/13 Page 5 of 25 Page ID #:124
#:1654

*Parks Sch. of Bus., Inc. v. Symington*,
51 F.3d 1480 (9th Cir. 1995) ................................................................. 10

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*,
806 F.2d 1393 (9th Cir. 1986) .............................................................. 24

*Sleep Science Partners v. Lieberman*,
CIV. No. 09–04200 CW, 2010 WL 1881770 ...................................... 22

*Spirit Clothing Co. v. N.S. Enters.*,
No. CV 13-2203-RGK, 2013 WL 12144107 (C.D. Cal. July 23,
2013) ........................................................................................................ 23

*Stephen W. Boney, Inc. v. Boney Servs., Inc.*,
127 F.3d 821 (9th Cir. 1997) ................................................................ 15

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
532 U.S. 23 (2001) ...................................................................... 13, 16

*U.S. v. Redwood City*,
640 F.2d 963 (9th Cir. 1981) ................................................................ 10

*Wal-Mart Stores, Inc., v. Samra Brothers, Inc.*,
529 U.S. at 216 ...................................................................................... 23

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
419 F.3d 925 (9th Cir. 2005) ................................................................ 22

*Yurman Design v. PAJ, Inc.*,
262 F.3d 101 (2nd. Cir. 2001) .............................................................. 23

**Other Authorities**

Federal Rule of Civil Procedure 8(a)(2) ..................................................... 10

Federal Rule of Civil Procedure Rule 12(b)(6) ........................................ 10

Federal Rule of Civil Procedure 15(a)(2) .................................................. 24

4311236.2

-5-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

700 of 816

EXHIBIT M
Page 5 of 58

Case 2:24-cv-01169-MAR Document 27-2 Filed 04/04/24 Page 701 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 197-2 Filed 10/14/13 Page 6 of 25 Page ID #:125
#:1655

# I.

# INTRODUCTION

Defendant Hugfun International, Inc. ("Hugfun" or "Defendant") moves to dismiss the complaint filed by Plaintiff Kellytoy Worldwide, Inc. ("Kellytoy") on the grounds that Kellytoy's trade dress and related claims fail to state a cause of action. But the Motion must be denied because it relies principally on unsupported factual assertions that have no place in a motion to dismiss, and expansive legal assertions that are almost uniformly overreaching. Beyond that, Defendant repeatedly mischaracterizes Kellytoy's Squishmallow Trade Dress by improperly analyzing each of its individual elements in isolation, rather than assessing the totality of its elements as the law requires. The myriad fatal defects demand only one result – the Motion fails and must be denied.

This conclusion is more clear when these shortcomings are addressed more specifically. First, Defendant argues that the trade dress alleged in Kellytoy's Complaint is comprised solely of functional elements common to plush toys. That issue, however, is one that courts have repeatedly held is a question of fact not appropriate for resolution on a motion to dismiss. Defendants tacitly acknowledging that fact, but nonetheless attempt to circumvent this legal proscription by characterizing its unsupported opinions as indisputable facts. It then proceeds to compound the problem by similarly misapplying the law governing the question of functionality, which requires that the Court view the trade dress as a whole – i.e., the visual representations viewed in conjunction with all of the various verbal descriptions – not as a catalogue of discrete elements. But when the appropriate legal standard is applied and the Squishmallow Trade Dress is viewed "as a whole," it cannot reasonably be characterized as functional.

Second, Defendant argues that Kellytoy fails to plead the precise elements of its trade dress and then attempts to *prove* that Kellytoy cannot do so. This argument ignores the fact that Kellytoy's description explains in great detail the elements of

4311236.2
-6-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
701 of 816
EXHIBIT M
Page 6 of 58

Case 2:34-cv-01169-MS-MAR Document 27-2 Filed 04/04/24 Page 702 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 19-2 Filed 10/14/19 Page 7 of 25 Page ID #:126
#:1656

1   the Squishmallow Trade Dress, both verbally and graphically – detail that

2   sufficiently articulates the design elements that compose the trade dress.  And

3   contrary to Defendant's suggestion, the cases cited by Defendant do not indicate

4   otherwise.  Whether a product of genuine intellectual befuddlement or deliberate

5   distraction, Defendant is confusing a lack of adequate description with the breadth

6   of description.  That confusion is critical here, because the latter issue is one better

7   considered a question of genericness rather than specificity, something that likewise

8   is a question of fact that cannot be addressed or resolved  on a motion to dismiss.

9        Accordingly, and based on the arguments set forth in greater detail below,

10   Defendant's motion to dismiss should be denied in its entirety.

11                          **II.**

12                **FACTUAL BACKGROUND**

13   A.     <u>KELLYTOY DEVELOPS THE SQUISHMALLOW PLUSH TOYS</u>

14        Kellytoy creates, manufactures, distributes and sells unique plush toys.

15   (Complaint ¶ 17.)  In 2016, Kellytoy conceived and began creating its

16   Squishmallows line of plush toy designs, ultimately marketed in connection with the

17   SQUISHMALLOW trademark (collectively, "Squishmallows").  (*Id.* ¶ 20.)  From

18   2016 to the present, Kellytoy expended large sums of money to develop, advertise,

19   and promote these product designs throughout the United States.  (*Id.* ¶ 21.)

20   Kellytoy spends in excess of $1,000,000 annually in direct to consumer and

21   business-to-business advertising in connection with its Squishmallows. (*Id.*)

22        Kellytoy sells a wide range of Squishmallows that feature the brand's iconic

23   trade dress.  (Complaint ¶ 22.)  This trade dress includes, without limitation:

24           (1) substantially egg/bell shaped plush toys

25           depicting various similarly shaped fanciful renditions of

26           animals/characters; (2) simplified Asian style Kawaii faces

27           with repeating and complementary rounded/oval shaped

28           graphics depicting features on the characters themselves

4311236.2               -7-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
702 of 816

EXHIBIT M
Page 7 of 58

Case 2:24-cv-01169-WLS-MAR   Document 27-2   Filed 04/04/24   Page 703 of 816   Page ID
Case 2:19-cv-07652-MWF-MAR   Document 49-2   Filed 10/14/19   Page 8 of 25   Page ID
#:1657

(such as eyes, snouts and bellies) and which conform to
and support the overall egg/bell shape of the toys; (3)
embroidered facial features, such as eyes, nostrils, and/or
mouths; (4) distinctive contrasting and non-monochrome
coloring; and (5) short-pile velvety velour-like textured
exterior with a light and silky memory foam-like stuffing
providing an extremely soft and squeezable marshmallow
feel.  These features, and the resulting overall look and
feel of the toys bearing them, are more fully depicted,
without limitation, in **Exhibit 1** hereto – features common
to Kellytoy's line of Squishmallows (collectively together
with **Exhibit 1** the "Squishmallow Trade Dress").

(*Id.*)

Beginning in 2016, Kellytoy expended a great deal of time, effort, and money
in the promotion of its Squishmallows.  Due to Kellytoy's unique design, extensive
marketing efforts, media coverage, and market penetration, the Squishmallow Trade
Dress acquired distinctiveness in the marketplace when applied to plush toys.
(Complaint ¶ 23.)   The relevant consuming public has come to recognize and
associate plush toys bearing the Squishmallow Trade Dress as high quality goods
connected with or offered by a single source, Kellytoy.  (*Id.*)  The Squishmallow
Trade Dress has valuable goodwill and consumer recognition associated with it and
has come to symbolize the valuable goodwill and reputation of Kellytoy.  (*Id.*)

Squishmallows have been featured in numerous magazines, press articles,
reviews, and videos; have appeared in multiple holiday and other gift guides; have
been the subject of numerous industry awards and product recommendation lists;
and have tens of thousands of social media followers.  (Complaint ¶¶ 27-38.)   In
addition, hundreds of well-known YouTube influencers and vloggers have shared
and posted images and videos of themselves holding Squishmallow products, and

4311236.2                                    -8-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
703 of 816

EXHIBIT M
Page 8 of 58

1  tens of thousands of consumers have done the same through numerous media

2  platforms, including, Facebook, Instagram, Pinterest and YouTube. (*Id.* ¶¶ 39-40.)

3  Squishmallows are listed among the leading global brands and toys such as

4  Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry

5  publications. (Complaint ¶ 41.) They are sold through hundreds of retailers

6  including Costco, Walmart, Walgreens, Kroger, Target, and Party City, among

7  others. (*Id.* ¶ 42.) Since the summer of 2017, alone, Kellytoy has sold

8  approximately 40 million (40,000,000) million Squishmallows with no indication

9  that sales will slow down anytime soon. (*Id.* ¶ 43.)

10  In fact, Kellytoy's Squishmallows branded toys have become so popular

11  among, sought after by, and recognizable as a brand by the public that some

12  members of the public have been selling unauthorized non-toy merchandise, such as

13  T-shirts and jewelry, bearing the images of some of Kellytoy's most popular

14  Squishmallows branded toys – a distinction typically reserved for famous brands

15  such as Disney and Looney Tunes. (Complaint ¶ 44.) In fact, because of the

16  immense popularity – no, ubiquity – of Kellytoy's Squishmallows line of plush toys,

17  Kellytoy has recently embarked on a global licensing initiative to license these

18  designs to include diverse categories of merchandise, including apparel, sleepwear,

19  accessories, headwear, home decor, health and beauty, back to school, stationery

20  and paper goods, games and puzzles, novelty, publishing and magazines, food and

21  beverage, and mobile gaming. (Complaint ¶ 45.)

22  B.  <u>HUGFUN'S INFRINGING CONDUCT</u>

23  Sometime in 2019, and notably well after Kellytoy established its reputation

24  in its Squishmallow Trade Dress, Hugfun entered into an agreement with defendant

25  BJ's Wholesale Club, Inc. to have Hugfun supply BJ's with plush toys copying the

26  Squishmallow Trade Dress (the "Infringing Plush"). (Complaint ¶ 48.) Hugfun was

27  able to sell the Infringing Plush to BJ's at lower prices than those charged by

28  Kellytoy for the Squishmallows because, rather than investing in the creation and

4311236.2                    -9-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
704 of 816

EXHIBIT M
Page 9 of 58

Case 2:24-cv-01169-WLS-MAR   Document 27-2   Filed 04/04/24   Page 705 of 816   Page ID
#:1659
Case 2:19-cv-07652-MWF-MAR   Document 23   Filed 10/14/19   Page 10 of 29   Page ID #:129

1   development of its own designs and brand identity, Hugfun simply copied the

2   Squishmallow Trade Dress and produced a lower-quality (and thus cheaper)

3   product. (*Id.* ¶ 50.)

4   C.    <u>PROCEDURAL HISTORY</u>

5        Kellytoy filed its complaint against Hugfun and BJ's on September 6, 2019.

6   (Docket No. 1.)  Kellytoy alleges claims against Defendants for statutory and

7   common law trademark infringement, and statutory and common law unfair

8   competition.  (Complaint ¶¶ 57-80.)  Defendant Hugfun filed the motion to dismiss

9   opposed herein and defendant BJ's has failed to timely respond, resulting in the

10  Clerk of the Court entered default against it.  (Docket Entry No. 17.)

11                                    **III.**

12        **DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED**

13  A.    <u>STANDARDS ON A MOTION TO DISMISS</u>

14       The Federal Rules of Civil Procedure require that a complaint set forth "a

15  short and plain statement of the claim showing that the pleader is entitled to relief."

16  Fed. R. Civ. P. 8(a)(2).  This rule "contains 'a powerful presumption against

17  rejecting pleadings for failure to state a claim.'"  *Gilligan v. Jamco Dev. Corp.*, 108

18  F.3d 246, 249 (9th Cir. 1997) (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d

19  381, 386 (5th Cir. 1985)).  It is "axiomatic" that motions to dismiss are viewed with

20  disfavor and rarely granted.  *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274

21  (9th Cir. 1986).  Indeed, dismissal is proper only in "extraordinary" circumstances.

22  *U.S. v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

23       In keeping with this policy, a court considering a motion to dismiss must view

24  the complaint in the light most favorable to the plaintiff.  *Parks Sch. of Bus., Inc. v.*

25  *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  The court must liberally construe

26  the complaint, accepting all material allegations as true and providing plaintiff with

27  all reasonable inferences to be drawn from those allegations.  *Pareto v. FDIC*, 139

28  F.3d 696, 699 (9th Cir. 1998).  Thus, a dismissal pursuant to Rule 12(b)(6) is

4311236.2                              -10-

Case 2:24-cv-01169-WLS-MAR   Document 27-2   Filed 04/04/24   Page 706 of 816   Page ID
#:1660
Case 2:13-cv-07032-MWF-MAR   Document 19-2   Filed 10/14/13   Page 11 of 29   Page ID #:130

1   "appropriate only where the complaint lacks a cognizable legal theory or sufficient

2   facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med.*

3   *Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citing *Balistreri v. Pacifica Police Dep't.*,

4   901 F.2d 696, 699 (9th Cir. 1990)).

5

6   B.   KELLYTOY'S CLAIM FOR TRADE DRESS INFRINGEMENT IS

7         SUPPORTED BY THE ALLEGATIONS IN THE COMPLAINT

8         Trade dress refers to the "total image, design, and appearance of a product,"

9   including features such as its size, shape, color, color combinations, texture and

10  graphics. *Clicks Billiards, Inc. v. SixShooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.

11  2001) (citing *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.

12  1993)).   In order to state a claim for trade dress infringement, the plaintiff must

13  plead that (1) its trade dress is nonfunctional; (2) its trade dress serves a source-

14  identifying role either because it is inherently distinctive or has acquired secondary

15  meaning; and (3) the defendant's product creates a likelihood of consumer

16  confusion. *Millennium Labs. v. Ameritox, Ltd.*, 817 F.3d 1123, 1126 n.1 (9th Cir.

17  2016) (citing *Clicks Billiards, Inc.*, 251 F.3d at 1258; *One Indus., LLC v. Jim*

18  *O'Neal Distrib.*, 578 F.3d 1154, 1166 (9th Cir. 2009) (citation omitted).

19        Kellytoy alleges each of the elements above.   In particular, Kellytoy alleges

20  that (1) its trade dress is nonfunctional (Complaint ¶¶ 22, 58, Ex. 1); (2) its trade

21  dress serves a source-identifying role because it is both inherently distinctive and

22  has acquired secondary meaning (*Id*. ¶¶ 21-46); and (3) the Defendants' products at

23  issue create a likelihood of consumer confusion (*Id*. ¶ 48-52).

24        Nonetheless, Defendant argues that Kellytoy is required to plead *how* its trade

25  dress is non-functional and that, regardless, Kellytoy's trade dress is demonstrably

26  functional as a matter of law.  Defendant further argues that Kellytoy's trade dress is

27  insufficiently pled.  Defendant's arguments are meritless.

28

4311236.2
-11-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
706 of 816
EXHIBIT M
Page 11 of 58

1      **1.     Kellytoy's Allegations as to Non-Functionality Are Sufficient**

2         The United States Supreme Court made it clear in *Ashcroft v. Iqbal* that in

3   order to survive a motion to dismiss, "a complaint must contain sufficient factual

4   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

5   *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   Ignoring the

6   Supreme Court's clear direction, Hugfun argues that Kellytoy must explain *how* its

7   trade dress is non-functional in its complaint, rather than simply including sufficient

8   factual matter which, if accepted as true, would render Kellytoy's trade dress claim

9   plausible on its face.  (Mot. 10:14-14:23.)   There are multiple problems with this

10  approach.

11        First, Defendant's argument is inexplicably premised solely on the

12  unpublished Central District decision in *Deckers Outdoor Corp. v. Fortune

13  Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3-4 (C.D. Cal.

14  May 8, 2015).  (Mot. 10:15-20.)  The requirement supposedly imposed by *Deckers

15  Outdoor Corp.* is not remotely settled law.  The opinion itself relies solely on the

16  unpublished decisions of other out-of-state district courts.  *Deckers Outdoor Corp.*,

17  2015 WL 12731929, at *3-4 (citing *Glassybaby, LLC v. Provide Gifts, Inc.*, No. C

18  11-380 MJP, 2011 WL 2218583 (W.D. Wash. Jun. 6, 2011); *DO Denim, LLC v.

19  Fried Denim, Inc.*, 634 F. Supp. 2d 403, 407-408 (S.D.N.Y. 2009).)

20        In addition, the "rule" announced in *Deckers Outdoor Corp.* has never been

21  adopted by the Ninth Circuit or the United States Supreme Court which, again,

22  require only that factual allegations support a claim that is plausible on its face.  *See,

23  e.g., Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018)

24  (*Iqbal* and *Twombly* are the standard); *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S.

25  at 570.  Setting aside the impracticality of requiring a plaintiff to plead "how a trade

26  dress is non-functional"– essentially to prove a negative – at the pleading stage, it is

27  evident from the afore-cited case law that, the holding in *Deckers Outdoor Corp.* is

28

4311236.2

-12-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

707 of 816

EXHIBIT M
Page 12 of 58

Case 2:24-cv-04129-WLH-MAR   Document 27-2   Filed 04/04/24   Page 708 of 816   Page ID
#:1662
Case 2:13-cv-07032-MWF-MAR   Document 15-2   Filed 10/14/13   Page 370 of 29   Page ID #:132

1   simply an unjustified overstatement as to the pleading requirements imposed by

2   *Iqbal/Twombly.*

3        Third, Kellytoy *does* allege the facts necessary to state a claim for relief for

4   trade dress infringement that is plausible on its face (at the very least), including

5   whether the trade dress at issue is non-functional.  (Complaint ¶ 22, 58-64, Ex. 1.)

6   The assessment of trade dress functionality is, in that regard,  a two-step analysis

7   explained thoroughly below but which generally requires that a court determine

8   whether the trade dress is essential to the use or purpose of the article or affects its

9   cost or quality and, if not, whether protection of the trade dress as a trademark

10  would impose a "significant non-reputation-related competitive disadvantage."

11  *Millennium Labs. v. Ameritox, Ltd.*, 817 F.3d 1123, 1128-29 (citing *Au-Tomotive*

12  *Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006)).

13       In this case, the Squishmallow Trade Dress thoroughly described in paragraph

14  22 and depicted in Exhibit 1 to the Complaint is not *essential* to the use or purpose

15  of a plush toy in general, nor affects its cost or quality -- at least not in the sense

16  intended by the relevant authority, given that this test is most often applied in cases

17  involving "utilitarian, physical devices."  *Millennium Labs.*, 817 F.3d at 1128-29

18  (report graphically charting whether patients are taking the pain medications as

19  prescribed and to assess whether the patients are taking any non-prescribed drugs);

20  *see also TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 25-26

21  (2001) (trade dress claimed for temporary road signs with spring mechanisms).  It is

22  equally true that the protection afforded to the Squishmallow Trade Dress would not

23  impose a significant non-reputation-related competitive disadvantage on other toy

24  makers, since there are obviously an infinite number of forms, features, and textures

25  in which to design a plush toy – the vast majority of which do not infringe upon

26

27

28

4311236.2

-13-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
708 of 816

EXHIBIT M
Page 13 of 58

Case 2:34-cv-01159-JLS-MAR   Document 27-2   Filed 04/04/24   Page 709 of 816   Page ID
#:1663
Case 2:13-cv-07032-MWF-MAR   Document 19-2   Filed 10/14/13   Page 470 of 29   Page ID #:133

1    Kellytoy's alleged Squishmallow Trade Dress.[1]  Kellytoy's allegations in this regard
2    are sufficient.

3       **2.    "Functionality" Is Not Properly Decided on a Motion to Dismiss**

4            At the outset, the issue of "functionality" of trade dress is not appropriately
5    determined at the pleading stage.  Indeed, the Ninth Circuit has also made it clear
6    that the question as to whether trade dress is functional is "an *intensely* factual
7    issue."  *Millennium Labs.*, 817 F.3d at 1129 (emphasis added); *see also Clicks*
8    *Billiards, Inc.*, 251 F.3d at 1258 (functionality is question fact).  Indeed, even the
9    district court in *Deckers Outdoor Corp.* held that it was "a question of fact, not of
10   law, that is generally not suitable to disposition on a motion to dismiss."  *Deckers*
11   *Outdoor Corp.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *5; *accord*
12   *Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1069 (C.D. Cal. 1993) (holding that
13   question of functionality is a question of fact and cannot be decided as a matter of
14   law at the motion to dismiss stage); *accord Five Star Gourmet Foods, Inc. v. Ready*
15   *Pac Foods, Inc.*, CV 18-2436 DDP (KKx), 2019 WL 1260634 (C.D. Cal. 2019).
16   Therefore, based on this fact alone, the Court should deny Defendant's motion to
17   dismiss premised on the issue of "functionality."

18      **3.    Kellytoy's Trade Dress Is Not Functional**

19           In addition to improperly raising the issue of functionality on a motion to
20   dismiss, Defendant's analysis utterly misapplies the functionality analysis, by
21   ignoring the fact that it is *the design as a whole* of an article that must be non-
22   functional for it to serve as a trademark – Defendant instead improperly
23   disaggregates the features of Kellytoy's claimed trade dress for the analysis,
24   divorcing each such feature from the overall visual impression of the products at
25   issue.  (Mot. § 3.B.1-5, 12:1-14:5.)  Again, the Ninth Circuit has expressly rejected
26   this piecemeal approach to trade dress analysis.  *Clicks Billiards, Inc.*, 251 F.3d at

27   _____
     [1] For example, traditional teddy bears – arguably one of the most ubiquitous plush toys –
28   do not fit within the Squishmallow Trade Dress.

1  1261; *see also Fuddruckers, Inc.*, 826 F.2d at 843, n. 7 ("We examine trade dress as

2  a whole to determine its functionality, [citation omitted]; functional elements that

3  are separately unprotectable can be protected together as part of a trade dress.").

4      Indeed, the Ninth Circuit has explained that "'[t]rade dress is the *totality* of

5  elements in which a product or service is packaged or presented.'"  *Stephen W.*

6  *Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th Cir. 1997) (emphasis

7  added) (quoting 1 McCarthy on Trademarks and Unfair Competition § 8:1 (4th ed.

8  1996)).  This includes, as set forth above, features such as the product's size, shape,

9  color, color combinations, texture or graphics.  *Clicks Billiards, Inc.*, 251 F.3d at

10  1257.

11      Notwithstanding that, and contrary to Defendant's suggestion that each

12  element of the trade dress at issue must be evaluated and analyzed separately and in

13  isolation from each other, courts are required to focus on the overall visual

14  impression of a product, rather than its individual elements, in evaluating whether

15  the trade dress at issue is functional.  *Clicks Billiards, Inc.*, 251 F.3d at 1259.  This

16  is because elements which might otherwise be considered functional may be

17  protected together as a product's trade dress.  *Fuddruckers, Inc. v. Doc's B.R.*

18  *Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987).

19      The Ninth Circuit applies a two-step test in order to determine whether a

20  particular trade dress is functional.  First, the court must determine: (1) whether the

21  design yields a utilitarian advantage; (2) whether alternative designs are available;

22  (3) whether advertising touts the utilitarian advantages of the design; and (4)

23  whether the particular design results from a comparatively simple or inexpensive

24  method of manufacture.  *Millennium Labs.*, 817 F.3d at 1128-30.  Again, "'[n]o one

25  factor is dispositive; all should be weighed collectively.'"  *Id.* at 1130 (citing *Disc*

26  *Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).

27      If the court determines that the trade dress at issue is not functional, it

28  proceeds to the second step in order to determine "'whether the protection of the

4311236.2
-15-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
710 of 816
EXHIBIT M
Page 15 of 58

1   feature as a trademark would impose a significant non-reputation-related

2   competitive disadvantage.'" *Id.* at 1128 (quoting *TrafFix Devices, Inc.*, 532 U.S. at

3   33).   This analysis only applies, however, to "'product features that serve an

4   aesthetic function wholly independent of any source identifying function.'" *Id.* at

5   1130 (quoting *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062,

6   1073 (9th Cir. 2006).   If the feature serves *any* source identifying function, the

7   determination as to whether protecting it would impose a significant non-reputation-

8   related competitive disadvantage is a question of fact.[2]  *Id.* at 1131 (evidence that

9   graphical format served, in part, a source-identifying function was sufficient to

10  allow jury to assess question of aesthetic functionality).

11         This two-step analysis is best exemplified in *Millennium Laboratories*, itself –

12  predictably, a case wholly ignored by Defendant.   The trade dress at issue was

13  Millennium's design of a report (the "R.A.D.A.R.® Report") associated with a test

14  for healthcare providers to use with chronic pain patients who have been prescribed

15  pain medications.  *Id.* at 1125.   Millennium described its trade dress as including,

16  among other things, a "graphical form" with a side-by-side presentation of a bell

17  curve on the left, a historical plot graph on the right, and a combination of bold and

18  dashed lines on the bell curve graph and a combination of numbers and letters on the

19  plot graph on the right.  *Id.* at 1129.

20         The court held that genuine issues of material fact precluded summary

21  judgment as to whether the claimed trade dress had any utilitarian advantage since a

22  jury could conclude that elements of the design were purely aesthetic in nature, that

23  there were many alternatives to the design of the R.A.D.A.R.® Report, that

24  Millennium's advertising did not focus on the utility of the layout of its report, and

25

26         [2] Defendant makes no reference to this test or the limitations on the doctrine
    of aesthetic functionality in their moving papers.  Instead, Defendant wrongly
27  suggests that aesthetic features of products are *inherently* functional and thus
    ineligible for trade dress protection.  (Mot. 10:21-11:1-16; 12:1-14:23.)

28

4311236.2                                    -16-

Case 2:34-cv-01169-JLS-MAR Document 27-2 Filed 04/04/24 Page 712 of 816 Page ID
Case 2:13-cv-07032-MWF-MAR Document 15-2 Filed 10/14/13 Page 77 of 29 Page ID #:136
#:1666

that the design actually increased the cost of the product. *Id.* at 1130. The court held that, since the design of the test results was "at least in part, crafted to distinguish the R.A.D.A.R.® Report from its competitors, and not simply to attract consumers," the question of "aesthetic functionality" was best left to the jury. *Id.* at 1131.

The Squishmallow Trade Dress (as a whole) does not offer a utilitarian advantage under step one of the *Millennium Laboratories* analysis since, as in *Millennium*, a jury could conclude that many (if not all) elements of the design are purely aesthetic in nature. (Complaint ¶ 22.) This is particularly obvious when the specific features analyzed separately in Defendant's motion are viewed in the aggregate, as required. The shape, appearance, texture, and feel of the product are all aesthetic features as to which there are innumerable alternatives and which, indeed, were specifically designed to distinguish the Squishmallows from other toys. (*Id.* ¶¶ 20-21.) Such a finding is all the more appropriate where, as here, the matters being considered at the motion to dismiss stage, rather than on summary judgment.

The determination under step two of the test, viz., whether the protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage, presents a question of fact as much as the rest of the functionality analysis.[3] *Mercado Latino, Inc. v. Indio Prods.*, No. CV 13-01027 DDP (RNBx), 2017 WL 1356315, at *3 (C.D. Cal. Apr. 11, 2017) (citing *Fuddruckers, Inc.*, 826 F.2d at 842-43). Kellytoy would have no difficulty amending the Complaint to supplement its allegations as they relate to either step in the analysis but this remains a factual issue that is not appropriate for resolution on a motion to dismiss. *Id.*; *Clicks Billiards, Inc.*, 251 F.3d at 1258; *Morton v. Rank Am., Inc.*, 812 F. Supp. at 1069.

---

[3] Kellytoy will have no trouble introducing evidence at summary judgment or trial as to the myriad alternative designs for plush toys in the marketplace which embody one or more elements of the Squishmallow Trade Dress without infringing on the trade dress as a whole, in contrast to Hugfun's accused infringing goods.

4311236.2

-17-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

712 of 816

EXHIBIT M
Page 17 of 58

Case 2:34-cv-01129-WS-MAR  Document 27-2  Filed 04/04/24  Page 713 of 816  Page ID
Case 2:13-cv-07032-MWF-MAR  Document 19-2  Filed 10/14/13  Page 18 of 29  Page ID #:137
#:1667

1      Indeed, even putting aside the numerous flaws discussed above, Defendant's

2   motion depends upon a series of unsubstantiated *factual* assertions concerning (i)

3   the "essentiality" and purpose of the Squishmallow egg/bell shape; (ii) the "essential

4   selling features of the toys"; (iii) the impact on competition of protecting the anime-

5   inspired facial features of the Squishmallow; (iv) the necessity of the Squishmallow

6   textured exterior; (v) the essential qualities of stuffed toys, generally[4]; (vi) the

7   precise stuffing in the Squishmallow, in particular; and (vi) the design of "[a]ll plush

8   toys that fall into the category of anime-inspired plush toys, Kawaii, or cute." (Mot.

9   12:1-14:23.) The unstated premise of Defendant's argument appears to be that these

10  assertions are all so obvious that they do not require proof and are, thus, appropriate

11  for determination on a motion to dismiss. Defendant's position is flatly

12  contradicted, however, by the holdings in *Millennium Laboratories*, *Clicks Billiards*,

13  and even *Deckers Outdoor. Millennium Labs.*, 817 F.3d at 1130-31; *Clicks*

14  *Billiards, Inc.*, 251 F.3d at 1258; *Deckers Outdoor Corp.*, No. CV 15-769 PSG

15  (SSx), 2015 WL 12731929, at fn. 2 ("Accordingly, Defendants' factual arguments

16  for dismissal based on the functional and generic nature of the Bailey Button Boot

17  Trade Dress, see Mot. 10:4-16:10, are not appropriate for this stage of the

18  proceedings."). Likewise, Defendant ignores the fact that Kellytoy need only

19  present a plausible set of facts to state a claim for trade dress infringement rather

20  than address each of Defendant's unsubstantiated factual assertions. *Ashcroft*, 556

21  U.S. at 678. As stated *supra*, Kellytoy as presented a plausible set of facts to

22  support its obligation of non-functionality.

23      Defendant's reliance on the Central District's decision in *Aurora World, Inc.*

24  *v. Ty Inc.*, 719 F. Supp. 2d 1115 (C.D. Cal. 2009) is equally misplaced. Defendant

25  _____

26      [4] Although Kellytoy could rebut the "essential" nature of each of the elements of the
    Squishmallow Trade Dress, these are factual issues not appropriate for determination here on a
27  motion to dismiss. Regardless, by way of example, contrary to Defendant's bald assertion that
    "'light and silky' memory foam-like stuffing is likewise an essential property of any stuffed toy"
28  (Mot. 14:1-4), numerous varieties of stuffings are used, beans, polyesters, cottons, hard foam, etc.

1   cites the decision for the dual propositions that (a) the aesthetic features of plush

2   toys are functional because they are essential selling features of the toys; and (b)

3   facial features on such toys are functional since they make the toys look like

4   animals. (Mot. 11:1-16; 13:6-19.) *Aurora World* was decided, however, seven (7)

5   years before the Ninth Circuit in *Millennium Laboratories* made it clear that the

6   notion of aesthetic functionality was to be tested *solely* by reference to the question

7   as to whether the protection of the feature as a trademark would impose a significant

8   non-reputation-related competitive disadvantage. *Millennium Labs.*, 817 F.3d at

9   1128, 1130.

10       Moreover, the holding in *Millennium Laboratories* would, by its very nature,

11   preclude the application of a *per se* rule as to whether a given aesthetic feature is

12   necessarily functional in all cases, since the determination posed by the second step

13   in the analysis (indeed, the entire analysis) is a question of fact. *Mercado Latino,*

14   *Inc.*, No. CV 13-01027 DDP (RNBx), 2017 WL 1356315, at *3; *Millennium Labs.*,

15   817 F.3d at 1129. The decision in *Aurora World* itself concerned a motion for

16   preliminary injunction, the analysis of which required the district court to consider

17   *proof* of Aurora's claims. *Aurora World, Inc.*, 719 F. Supp. 2d at 1124-1125. The

18   record included numerous declarations in support of, and in opposition to, the

19   motion, including testimony and documentary evidence regarding the appearance,

20   development, marketing, and sale of the products at issue, among other things. *Id.*

21   nn.5, 8-9, 11, 13, 15-26, 32-33, 37, 39-40, 46, 49-50, 53, 55, 61, 65-66, 84, 86, 89,

22   92-96, 106, 114, 115.

23       The conclusions reached by the court on such a record cannot properly be

24   applied at the pleading stage of *this* action, where Kellytoy expressly alleges that

25   "the relevant consuming public has come to recognize and associate plush toys

26   bearing the Squishmallow Trade Dress as high quality goods connected with or

27

28

4311236.2

-19-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

714 of 816

EXHIBIT M
Page 19 of 58

1   offered by a single source, Kellytoy." (Complaint ¶¶ 23, 46, 58.)  Those are

2   assertions of fact which simply cannot be discounted at the pleading stage of this

3   matter.

4           **4.**     **Kellytoy Adequately Identifies Its Trade Dress**

5         In order to survive a motion to dismiss with respect to the description of its

6   trade dress, a plaintiff need only allege "a complete recitation of the concrete

7   elements of its alleged trade dress." *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d

8   1230, 1240 (C.D. Cal. 2014).  The defendant's belief that this recitation does not

9   make out a claim for protectable trade dress is not a grounds for dismissal at the

10  pleading state of an action.  *Id.* ("A court must test the legal merits of a plaintiff's

11  alleged trade dress at summary judgment or trial when the parties provide with all

12  relevant, admissible evidence—not at the pleading stage when the court has little

13  more than the plaintiff's allegations and the defendant's summary denial of them.").

14        In this case, the Complaint both depicts and recites the elements of Kellytoy's

15  trade dress and, like the plaintiff in *Lepton Labs*, alleges that the depiction of the

16  trade dress in its totality makes up the "Squishmallow Trade Dress." (Complaint ¶

17  22, Ex. 1); *Lepton Labs*, 55 F. Supp. 3d at 1241.  The court in *Lepton Labs* found

18  this sufficient, while opining that the Coca-Cola Company could meet this standard

19  by alleging the trade dress of its famous bottle as "a contoured glass or plastic bottle

20  having a plurality of vertical striations extending from the top to the bottom of the

21  bottle and being interrupted by a smooth, horizontal band nearly half way down the

22  bottle." *Id.* at 1240.  *See also, H.I.S.C., Inc. v. Franmar International Importers,*

23  *Ltd.*, CV 3:16-00480-BEN-WVG, 2016 WL 7439355 (S.D. Cal. 2016)("The

24  combination of Franmar's written description of its claimed trade dress and the

25  images provided is a sufficient 'short and plain statement of the claim' to indicate to

26  Plaintiffs what Franmar alleges is its protectable trade dress [citations omitted].")

27

28

4311236.2

-20-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

715 of 816

EXHIBIT M
Page 20 of 58

Case 2:24-cv-01169-WLS-MAR   Document 27-2   Filed 04/04/24   Page 716 of 816   Page ID
Case 2:13-cv-07032-MWF-MAR   Document 19-2   Filed 10/14/13   Page 21 of 29   Page ID #:140
#:1670

1    For this reason, the rhetorical questions posed in Defendant's motion ("What
2  constitutes a 'complementary' shaped graphics for 'eyes, snouts, and bellies'?[5]
3  What about the contrasting coloring is 'distinctive'?  How do the 'simplified Asian
4  style Kawaii faces' 'conform to and support the overall egg/bell-shaped toys'"?) are
5  all answered by reference to the images of the products at issue.[6]  (*Compare* Mot.
6  pp. 8-9 *with* Complaint Ex. 1.)   Defendant's reliance on this Court's opinion in
7  *Greenberg v. Johnson*, 2014 WL 12586252 (C.D. Cal.  2014), does not help its
8  cause, as in that case the plaintiff acting pro se utterly failed to describe or identify
9  the alleged trade dress – not the case here.  Equally misguided, Defendant attempts
10  to show that each element on its own is too broad to constitute protectable trade
11  dress, rather than looking at the combination of all of the elements, as it is required
12  to do under applicable case law.  This alone proves fatal to at Defendant's motion.

13    Regardless, Defendant's argument regarding Kellytoy's description of the
14  claimed trade dress appears to be less a question of articulation, however, than of
15  overbreadth.  For example, on the one hand, Defendant claims to be "at a loss to
16  know what constitutes a 'simplified Asian style Kawaii face'" (Mot. 8:24-25)[7], but
17  then goes on to acknowledge that "Kellytoy appears to be describing an entire genre
18  of products that have flooded the toy market and broader culture."  (Mot. 9:4-6.)
19  Putting aside Defendant's misleading approach of discussing the protectability of

---

[5] The relevant portion of Kellytoy's description reads, however, "and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell-shaped of the toys." (*See*, Complaint, at ¶ 22.)

[6] Once again, Defendant's own authority supports this conclusion.  The court in *Deckers Outdoor Corp.* held that pictures of a product combined with a list of the elements of the trade dress were sufficient to put defendants on notice as to the claimed trade dress.  *Id.* at *3-4.

[7] A simple Google search for "Kawaii faces" turns out numerous standard examples thereof under the images tab of the results page.  Anybody in the toy and design fields knows exactly what is meant by the term.  This will be subject to proof as the case progresses – something not appropriate for consideration at the pleading stage.

4311236.2                                                    -21-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
716 of 816
EXHIBIT M
Page 21 of 58

each individual element of the Squishmallow Trade Dress, in isolation – it well knows that trade dress must be viewed in its entirety, with all of the elements read conjunctively – Defendant goes on to argue that "Kellytoy's claim to have the exclusive right to manufacture *Kawaii*-style animal plush toys is impermissibly vague and overbroad…" (Mot. 9:6-7.)   Similarly, Defendant states "Kellytoy is attempting to use a vague and overly broad definition of a purported trade dress to try and keep Hugfun and other competitors out of the market for plush toys." (Mot. 10:3-4.)[8]  As this argument suggests, problems of overbreadth are better considered as questions of genericness rather than specificity. *Mercado Latino, Inc.*, No. CV 13-01027 DDP (RNBx), 2017 WL 1356315, at *2.  Questions of genericness, however, are questions of fact.  *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005).

Similarly, Defendant's claim that "the entire Squishmallow does not have a consistent appearance" is belied by the fact that they all contain all of the numerous elements described at paragraph 22 of the Complaint.

Moreover, the case law cited by Defendant supports, rather than undermines, Kellytoy's contention that the description of the Squishmallow Trade Dress set forth in the complaint adequately defines the design elements that compose the asserted trade dress.  In *Greenberg v. Johnston*, CV 14-04606-MWF-VBKx, 2014 WL 12586252, cited by Defendant, in contrast to Kellytoy, the pro se plaintiff utterly failed to provide *any* guidance, let alone description, as to the nature of the claimed trade dress.  *Greenberg v. Johnston*, CV 14-04606-MWF-VBKx, 2014 WL 12586252, *3 ("The FAC does not describe trade dress, nor does it identify which of these accused actions Defendant Richard Johnson undertook.").  *See also*, *Sleep Science Partners v.  Lieberman*, CIV. No. 09–04200 CW, 2010 WL 1881770, *3

---

[8] Aside from being overstated, it is also false, as most plush toys do not contain all of the various features described in the Squishmallow Trade Dress.  For example, teddy bears – arguably one of the most ubiquitous plush toys – do not fit within the Squishmallow Trade Dress.

4311236.2                                        -22-
PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS
717 of 816

EXHIBIT M
Page 22 of 58

("Although it has cataloged several components of its website, Plaintiff has not clearly articulated which of them constitute its purported trade dress."); *Yurman Design v. PAJ, Inc.*, 262 F.3d 101, 117 (2nd. Cir. 2001)("Pressed by PAJ on appeal to provide some description of its trade dress, Yurman produced the following: "the artistic combination of cable [jewelry] with other elements.").  There is simply no reasonable comparison between these nondescript descriptions and Kellytoy's detailed multi-element description set forth at paragraph 22 of the Complaint.

Defendant also argues – without evidence – that various features identified by Kellytoy as part of its Squishmallow Trade Dress "cannot possibly serve as a source-identifying function." (*E.g.*, Mot. 12:10-11 and 13:10-12.)  This proposition is a gloss on the obligation to prove secondary meaning in cases of trade dress infringement involving product designs, imposed by the Supreme Court in *Wal-Mart.  Wal-Mart Stores, Inc., v. Samra Brothers, Inc.,*529 U.S. at 216.  In order to do so, a plaintiff must demonstrate that the primary significance of its trade dress in the minds of the public is to identify the source of the product rather than the product itself. *Id.* at 211.

Like the determination as to whether trade dress is functional, however, the determination as to whether it has acquired secondary meaning is a question of fact. *Clicks Billiards, Inc.*, 251 F.3d at 1262.  As a result, the Central District has held that secondary meaning "need only be pled *generally* for purposes of defeating a motion to dismiss."  *Dean v. Cortes*, No. CV 2:18-02335-CAS (JPRx), 2018 WL 3425016 (C.D. Cal. July 12, 2018) (emphasis added); *accord Spirit Clothing Co. v. N.S. Enters.*, No. CV 13-2203-RGK (PJWx), 2013 WL 12144107 (C.D. Cal. July 23, 2013).

Moreover, and even if this were not the case, Kellytoy alleges that the Squishmallow Trade Dress has acquired secondary meaning and alleges, in great detail, the manner in which it has done so.  (Complaint ¶¶ 21-46, Exhs. 2-5.) Defendant's attempt to prove that the Squishmallow Trade Dress "cannot possibly

4311236.2                                    -23-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

718 of 816

EXHIBIT M
Page 23 of 58

1  serve as a source-identifying function" is simply an improper attempt to resolve a

2  question of fact on a motion to dismiss. *Cook, Perkiss & Liehe, Inc. v. N. Cal.*

3  *Collection Serv.*, 911 F.2d 242, 245 (9th Cir. 1990).

4        Here, Kellytoy's detailed description of its claimed trade dress is adequate to

5  put defendant on notice, particularly in light of Kellytoy's inclusion of images of the

6  claimed trade dress in the Complaint. Therefore, Defendant's motion to dismiss

7  Kellytoy's claim for trade dress infringement, along with Kellytoy's related claims

8  for trademark infringement and unfair competition, should be denied.

9  **C.**    **KELLYTOY SHOULD BE GRANTED LEAVE TO AMEND**

10        It is well-established that, if the court dismisses a complaint for failure to state

11  a claim, leave to amend should be granted unless the court determines that "the

12  allegation of other facts consistent with the challenged pleading could not possibly

13  cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806

14  F.2d 1393, 1401 (9th Cir. 1986). Federal Rule of Civil Procedure 15(a)(2) similarly

15  provides that leave to amend should be "freely" granted when justice requires. Fed.

16  R. Civ. P. 15(a)(2).

17        In this case, there are no deficiencies in the Complaint. However, if the Court

18  determines that Kellytoy must plead additional facts as to what renders its trade

19  dress non-functional, the specifics of its claimed trade dress, or any other matters,

20  Kellytoy requests leave to amend to cure any defects in its pleading.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

4311236.2

-24-

PLAINTIFF KELLYTOY WORLDWIDE, INC.'S
OPPOSITION TO MOTION TO DISMISS

Case 2:24-cv-01169-WLS-MAR   Document 27-2   Filed 04/04/24   Page 720 of 816   Page ID
Case 2:19-cv-07053-MWF-MAR   Document 19-2   Filed 10/14/19   Page 25 of 29   Page ID #:144
#:1674

IV.

**CONCLUSION**

For the foregoing reasons, Kellytoy respectfully requests that Defendant's motion to dismiss be denied in its entirety.  In the event that the Court is inclined to grant Defendant's motion, in whole or in part, Kellytoy respectfully requests leave to amend the Complaint to cure any defects in its pleading.

DATED: October 14, 2019        FREEMAN, FREEMAN & SMILEY, LLP


                               By:    _/ s / Mark B. Mizrahi_____
                                      MARK B. MIZRAHI
                                      Attorneys for Plaintiff
                                      Kellytoy Worldwide, Inc.

4311236.2

-25-

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 04/04/24 Page 721 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26 Filed 12/04/19 Page 1 of 10 Page ID #:171
#:1675

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)          **Date: December 4, 2019**

**Title:**  Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

**Present:**  The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

|  |  |
|---|---|
| Deputy Clerk: | Court Reporter: |
| Rita Sanchez | Not Reported |
|  |  |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| None Present | None Present |

**Proceedings (In Chambers):**   ORDER GRANTING DEFENDANT HUGFUN INTERNATIONAL, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6) [12]

Before the Court is Defendant Hugfun International, Inc.'s ("Hugfun") Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) (the "Motion") filed on October 2, 2019. (Docket No. 12). Plaintiff Kellytoy Worldwide, Inc. ("Kellytoy") filed an Opposition on October 14, 2019. (Docket No. 19). Defendant filed its Reply on October 21, 2019. (Docket No. 21). Pursuant to the parties' stipulation, Defendant BJ's Wholesale Club, Inc. ("BJ's") is deemed to have joined in the Motion. (Docket No. 25).

The Motion was noticed to be heard on November 4, 2019. The Court has read and considered the papers filed in this matter and deems the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); Local Rule 7-15. The hearing was therefore **VACATED** and removed from the Court's calendar.

For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** ***with leave to amend***. Although Plaintiff's description of the alleged Squishmallows trade dress is sufficiently pleaded, the Court must dismiss Plaintiff's First Claim for Relief for failing to allege how the trade dress is non-functional. Plaintiff's Second, Third, and Fourth Claims for Relief are also dismissed because they depend on a proper pleading of the First Claim for Relief.

---

**CIVIL MINUTES—GENERAL**                                                      1

EXHIBIT M
Page 26 of 58

Case 2:24-cv-01169-MWF-MAR  Document 26-2  Filed 04/04/24  Page 722 of 816  Page ID
Case 2:19-cv-07652-MWF-MAA  Document 25  Filed 12/04/19  Page 2 of 10  Page ID #:172
#:1676

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-19-07652-MWF (MAAx)          Date: December 4, 2019
Title:    Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

## I.    **BACKGROUND**

On September 4, 2019, Plaintiff filed a Complaint alleging various federal and California trade dress infringement and unfair competition claims against the Defendants.  (*See generally* Compl. ¶¶ 5-8 (Docket No. 1)).  Specifically, Plaintiff asserts four claims for relief: (1) trademark infringement, false designation of origin, and false description under section 43 of the Lanham Act, 15 U.S.C. § 1125; (2) common law trademark infringement; (3) California common law unfair competition; and (4) unfair competition under California Business & Professional Code § 17200, *et seq.*  (*Id.* ¶¶ 57-80).

The following facts are based on the Complaint, which the Court assumes are true; the Court further construes any inferences arising from these facts in the light most favorable to Plaintiff.  *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (restating generally-accepted principle that "[o]rdinarily, when we review a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept a plaintiff's allegations as true 'and construe them in the light most favorable' to the plaintiff" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009))).

For nearly two decades, Plaintiff has been in the business of manufacturing, distributing, and selling plush toys.  (Compl. ¶¶ 17-18).  In that time, Plaintiff has developed a reputation for high quality, unique products that are popular with consumers.  (*Id.* ¶ 18).  In 2016, Plaintiff created its "Squishmallows" line of plush toys, which it markets under the SQUISHMALLOW trademark.  (*Id.* ¶ 20).  Most of the designs have or are pending approval for U.S. copyright registrations.  (*Id.*).

Plaintiff's Squishmallows line includes a broad range of plush toys.  (*Id.* ¶ 22).  Plaintiff describes its alleged Squishmallows' trade dress (the "Trade Dress") as:

(1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped

---

**CIVIL MINUTES—GENERAL**                                          2

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 04/04/24 Page 723 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26 Filed 12/04/19 Page 3 of 10 Page ID
#:1677

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV-19-07652-MWF (MAAx)          Date: December 4, 2019
Title:      Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shaped of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

(*Id.*). Plaintiff also includes several photos depicting the Trade Dress. (*Id.*, Ex. 1).

Plaintiff is the sole owner of all rights, title, and interest in and to the Squishmallows line of toys. (*Id.* ¶ 21). Since their creation, Plaintiff has dedicated substantial time, effort, and resources to the promotion of its Squishmallows toys. (*Id.* ¶ 23). For example, Plaintiff is currently spending over $1 million annually in advertising. (*Id.* ¶ 21). The Squishmallows have been featured in over 300 publications, including mainstream magazines, news articles, reviews, and videos. (*Id.* ¶ 28). The toys have also earned numerous industry awards and recommendations. (*Id.* ¶ 31). Since the summer of 2017, Plaintiff has shipped approximately 40 million units of Squishmallows, and the toys have generated tens of millions of dollars in sales over the past year alone. (*Id.* ¶ 43).

Plaintiff alleges that sometime in 2019, Defendants began selling and distributing plush toys substantially and confusingly similar to Plaintiff's Trade Dress. (*Id.* ¶ 48). Defendant Hugfun allegedly sells the infringing plush toys to Defendant BJ's at a fraction of the price that Plaintiff charges for its toys. (*Id.* ¶ 50). Plaintiff alleges that Defendant Hugfun can do so because it copied the Trade Dress instead of spending resources developing its own product, and because Defendant Hugfun's toys are of inferior quality. (*Id.*). Plaintiff also alleges that Defendants' activities "are likely to confuse, mislead, and deceive Defendants' customers, purchasers, and members of the public as to the origin of the toys." (*Id.* ¶ 52). Thus, Defendants' acts constitute "trademark infringement, unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the purchasing public, and unlawful trading on

_____

CIVIL MINUTES—GENERAL                                              3

EXHIBIT M
Page 28 of 58

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 04/04/24 Page 724 of 816 Page ID
Case 2:19-cv-07652-MWF-MAR Document 26-2 Filed 12/04/19 Page 4 of 10 Page ID #:174
#:1678

Case 2:19-cv-07652-MWF-MAR Document 26-2 Filed 12/04/19 Page 4 of 10 Page ID #:174

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)          **Date:** December 4, 2019
Title:     Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

Kellytoy's good will and the public acceptance of Kellytoy's original works." (*Id.* ¶ 54).

## II.  **LEGAL STANDARD**

In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their Ninth Circuit progeny.

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court must disregard allegations that are legal conclusions, even when disguised as facts. *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' . . . plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 556-57).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief. *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). Where the facts as pleaded in the complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also

---

**CIVIL MINUTES—GENERAL**                                        4

Case 2:21-cv-01169-MWF-MAR   Document 26-2   Filed 04/04/24   Page 725 of 816   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 26   Filed 12/04/19   Page 5 of 10   Page ID
#:1679

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)          **Date:** December 4, 2019
**Title:**   Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

consistent with the alternative explanation.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."  *Eclectic Props.*, 751 F.3d at 996-97.

## III.  **DISCUSSION**

Defendants raise three main arguments in their Motion to Dismiss: (1) the First Claim for Relief should be dismissed because Plaintiff failed to meet its Rule 8 obligation to provide sufficient facts in describing the Trade Dress and alleging that it is non-functional; (2) the First Claim for Relief should be dismissed with prejudice because Plaintiff cannot state a claim under the Lanham Act at all given that the alleged Trade Dress is functional; and (3) the Second, Third, and Fourth Claims for Relief should be dismissed because they are substantially congruent to the First Claim for Relief.  (Mot. at 11-21).

### A.   **First Claim for Relief: Lanham Act**

To state an infringement claim under section 43(a) of the Lanham Act—whether it be a trademark claim or a trade dress claim—a plaintiff must identify the dress and allege three basic elements: (1) distinctiveness, (2) non-functionality, and (3) likelihood of confusion.  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046-47 (9th Cir. 1998) (upholding summary judgment ruling that grape leaves are generic emblem for wine and so not subject to trademark protection). Plaintiff is also required to adequately define the trade dress for which it claims protection.  *Sleep Sci. Partners v. Lieberman*, No. 09–04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) ("Without an adequate definition of the elements comprising the website's 'look and feel,' [defendant] is not given adequate notice."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116–17, (2d Cir. 2001) ("[W]e hold that a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress."); *see also* 1 *McCarthy on Trademarks and Unfair Competition* § 8:3 (4th ed. 2014) ("While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features. . . .  Only then can the court

---

**CIVIL MINUTES—GENERAL**                                                  **5**

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 04/04/24 Page 726 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26 Filed 12/04/19 Page 6 of 10 Page ID #:176
#:1680

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** **CV-19-07652-MWF (MAAx)** **Date: December 4, 2019**
Title:    Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.”).

"Trade dress is the total image of a product, including features such as size, shape, color, texture, and graphics." *Moldex-Metric, Inc. v. Mckeon Prods., Inc.*, 891 F.3d 878, 881 (9th Cir. 2018) (internal quotation marks and citation omitted). In evaluating a trade dress claim, a court must not focus on individual elements, “but rather on the overall visual impression that the combination and arrangement of those elements create.” *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001). "Trade dress is the composite tapestry of visual effects." *Id.*

### 1. Description of the Alleged Trade Dress

Defendants allege that “Kellytoy’s Complaint fails to provide Hugfun and the Court with a detailed and precise description of its alleged ‘Squishmallow Trade Dress.’” (Mot. at 11). According to Defendants, the description of the Trade Dress “offers only superficial insight into the scope or nature of Kellytoy’s alleged trade dress.” (*Id.* at 8). For example, Defendants question the meaning of Plaintiff’s reference to a “simplified Asian style Kawaii face,” or its description of “complementary rounded/oval shaped graphics.” (*Id.* at 8-9). Defendants argue that these terms are too broad and vague to give sufficient notice under Rule 8. (*Id.*). Finally, Defendants point out that the images that Plaintiff filed as Exhibit 1 to the Complaint reveal that there is no “sufficiently precise trade dress that covers the entire line.” (*Id.* at 9).

In response, Plaintiff argues that its Complaint “both depicts and recites the elements of Kellytoy’s trade dress and . . . alleges that the depiction of the trade dress in its totality makes up the ‘Squishmallow Trade Dress.’” (Opp’n at 20). Plaintiff dismisses Defendants’ arguments as misguided for focusing on individual elements instead of assessing them in their combined form. (*Id.* at 21).

The Court finds that Plaintiff’s Trade Dress description satisfies the requirements of Rule 8. In its Complaint, Plaintiff describes the Trade Dress in detail

---

**CIVIL MINUTES—GENERAL** 6

Case 2:24-cv-01169-MWF-MAR   Document 26-2   Filed 04/04/24   Page 727 of 816   Page ID
#:1681
Case 2:19-cv-07652-MWF-MAA   Document 26   Filed 12/04/19   Page 7 of 10   Page ID #:177

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV-19-07652-MWF (MAAx)          **Date: December 4, 2019**
**Title:**     Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

and attaches photos of its line of plush toys. (Compl. ¶ 22 & Ex. 1). Specifically, the Complaint includes a description of the Trade Dress's shape ("substantially egg/bell shaped"); color combinations ("distinctive contrasting and non-monochrome coloring"); and texture ("short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel"). (*Id.* ¶ 22).

Plaintiff also describes the Trade Dress's graphics as "simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys." (*Id.*). Defendants argue that this description is vague and overbroad, and that Plaintiff is attempting to claim the exclusive right to manufacture plush toys with "Asian style Kawaii faces." (Mot. at 12; Reply at 7). Defendants err in focusing on this feature on its own instead of the "composite tapestry of visual effects" that it creates along with the Trade Dress's shape, colors, and texture. *See Clicks*, 251 F.3d at 1259 ("[I]t is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."). For example, the Trade Dress as described does not appear to cover monochromatic animal plush toys with "Asian style Kawaii faces" that have proportionally-sized limbs.

In short, the Court finds that the overall description of the Trade Dress gives Defendants sufficient notice to survive dismissal. *See, e.g.*, *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *3-4 (C.D. Cal. May 8, 2015) (accepting description listing several elements of the alleged trade dress accompanied by photographs). The question now is whether the Court should nonetheless dismiss Plaintiff's Complaint due to defects in claiming non-functionality.

## 2. Non-functionality

Defendants raise two different issues with Plaintiff's allegation of non-functionality. First, Defendants argue that Plaintiff failed to plead non-functionality adequately as required by *Iqbal*. (Mot. at 14; Reply at 5). Second, Defendants urge

---

**CIVIL MINUTES—GENERAL**                                          7

Case 2:24-cv-01169-MWF-MAR Document 26-2 Filed 04/04/24 Page 728 of 816 Page ID
Case 2:19-cv-07652-MWF-MAA Document 26 Filed 12/04/19 Page 8 of 10 Page ID #:178
#:1682

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-19-07652-MWF (MAAx)          Date: December 4, 2019
Title:    Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

the Court to evaluate the Trade Dress's functionality at this stage and conclude that
Plaintiff cannot state a claim for trade dress protection.  (Mot. at 15) (quoting *Iqbal*,
556 U.S. at 679).

As previously noted, a plaintiff must allege non-functionality to state a claim for
trade dress protection under the Lanham Act.  *See Moldex-Metric*, 891 F.3d at 881
("No protection under the Lanham Act is available if the claimed trade dress is
functional." (citing *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29
(2001))).  Defendants argue that Plaintiff's non-functionality assertion in the
Complaint is conclusory and devoid of factual support.  (Mot. at 14; Reply at 8-10).
Citing to *Deckers*, Defendants argue that Plaintiff must allege "how" the Trade Dress
is non-functional.  2015 WL 12731929, at *4 (citing cases).  Plaintiff counters that it
has alleged sufficient facts regarding non-functionality.  (Opp'n at 13) (citing Compl.
¶¶ 22, 58-64, Ex. 1).

Plaintiff failed to plead sufficient facts in support of its assertion that the Trade
Dress is non-functional.  Plaintiff's only mention of functionality in the Complaint is
the conclusory statement that "[t]he Squishmallow Trade Dress is non-functional."
(Compl. ¶ 58).  Although Plaintiff does not have to plead "detailed factual allegations"
in its Complaint, Rule 8 does require sufficient facts to "state a claim to relief that is
plausible on its face," including how the Trade Dress is non-functional.  *Iqbal*, 556
U.S. at 678 (citation omitted).  Multiple courts in this district have adopted this
approach.  *See, e.g., Deckers*, 2015 WL 12731929, at *3-4 ("The Court holds that
Plaintiff's conclusory statement of non-functionality fails to sufficiently allege the
element."); *Green Crush LLC v. Paradise Splash I, Inc.*, No. CV 17-1856 CJC (JDEx),
2018 WL 4940824, at *4 (C.D. Cal. Mar. 8, 2018) (same); *Virgin Scent, Inc. v. Bel Air
Naturals Care Corp.*, No. CV 17-8284 AB (RAOx), 2018 WL 5264145, at *4 (C.D.
Cal. Feb. 8, 2018) (same).

Defendants appear to be advocating for dismissal without leave to amend based
on their contention that the Trade Dress is functional, and thus, not entitled to
protection under the Lanham Act.  The Court rejects Defendants' arguments for two
reasons.  First, simply because Plaintiff has ***yet*** to plead non-functionality adequately

Case 2:24-cv-01169-MWF-MAR   Document 26-2   Filed 04/04/24   Page 729 of 816   Page ID
Case 2:19-cv-07652-MWF-MAA   Document 26   Filed 12/04/19   Page 9 of 10   Page ID #:179
#:1683

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-19-07652-MWF (MAAx)           Date: December 4, 2019
Title:      Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

does not mean that Plaintiff could not possibly do so.  It is premature to ask the Court to rule on the issue without an understanding of what Plaintiff's "claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (citation omitted).

Second, to the extent that Defendants are claiming that functionality is obvious from the face of the Complaint, the Court disagrees with their conclusion. "Functionality is generally viewed as an intensely factual issue."  *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1129 (9th Cir. 2016) (alteration and citation omitted).  The Court sees no reason to deviate from the well-established approach that functionality should not be resolved at this stage.  *See Five Star Gourmet Foods, Inc. v. Ready Pac Foods, Inc.*, No. CV 18-2436, 2019 WL 1260634, at *4 (C.D. Cal. Mar. 18, 2019) ("[C]ourts have held that [functionality] cannot be resolved at the motion to dismiss stage." (citing cases)); *see also Virgin Scent*, 2018 WL 5264145, at *5 ("The Court agrees that functionality is a question of fact that is generally not suitable to disposition on a motion to dismiss." (citing cases)); *Deckers*, 2015 WL 12731929, at *5 (same).  Indeed, a quick glance at the Parties' pleadings reveal numerous disputes of fact and law interwoven into each prong of the multi-step functionality analysis established by the Supreme Court and Ninth Circuit.  Thus, the Court will not entertain the merits of functionality at this stage.

Accordingly, because Plaintiff failed to plead non-functionality adequately, Defendants' Motion is **GRANTED** *without prejudice* as to Plaintiff's First Claim for Relief under the Lanham Act.

## B.    Second, Third, and Fourth Claims for Relief

Defendants argue that Plaintiff's common law trademark infringement and state law claims fail because Plaintiff has not stated a claim for protection under the Lanham Act.  (Mot. at 21.)  The Court agrees that these claims are not adequately pled unless Plaintiff corrects the defect in pleading non-functionality.  *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) ("The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion." (citation omitted)); *Cleary v. News Corp.*, 30 F.3d 1255,

EXHIBIT M
Page 34 of 58

Case 2:34-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 730 of 816   Page ID
#:1684
Case 2:19-cv-07652-MWF-MAR   Document 26   Filed 12/04/19   Page 10 of 10   Page ID #:130

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** **CV-19-07652-MWF (MAAx)**          **Date: December 4, 2019**

Title:      Kellytoy Worldwide, Inc. *v.* Hugfun International, Inc., et al.

1262-63 (9th Cir. 1994) ("[A]ctions pursuant to California Business and Professions
Code § 17200 are substantially congruent to claims made under the Lanham Act."
(citations omitted)).  Therefore, Defendants' Motion is likewise **GRANTED** *with*
*leave to amend* as to the Second, Third, and Fourth Claims for Relief.

Accordingly, Defendants' Motion is **GRANTED** *with leave to amend* to cure
the defect as to the non-functionality claim.  Plaintiff shall file a First Amended
Complaint on or before **December 20, 2019.**  Defendant shall file a response to the
operative Complaint by **January 10, 2020**.

IT IS SO ORDERED.

**CIVIL MINUTES—GENERAL**                                        **10**

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 731 of 816   Page ID
#:1685
Case 2:19-cv-07652-MWF-MAA   Document 1   Filed 12/20/19   Page 1 of 52   Page ID #:1

1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  MARK B. MIZRAHI (BAR NO. 179384)
   mark.mizrahi@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, 15th Floor
4  Los Angeles, California 90067
   Telephone:  (310) 255-6100
5  Facsimile:  (310) 255-6200

6  *Attorneys for Plaintiff Kellytoy*
   *Worldwide, Inc.*

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| 10  KELLYTOY WORLDWIDE, INC., a California corporation, | Case No. 2:19-cv-07652-MWF-MAA |
| 11 | **FIRST AMENDED COMPLAINT FOR:** |
| 12          Plaintiff, | **1.  FEDERAL TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTION (15 U.S.C. § 1125);** |
| 13      vs. | |
| 14  HUGFUN, INTERNATIONAL, INC. a/k/a Hugfun Int'l Inc., a Hong Kong entity of unknown form, BJ'S WHOLESALE CLUB, INC., a Massachusetts corporation, and DOES 1 through 10, inclusive, | |
| 15 | **2.  COMMON LAW TRADEMARK INFRINGEMENT;** |
| 16 | **3.  CALIFORNIA COMMON LAW UNFAIR COMPETITION; AND** |
| 17          Defendants. | **4.  CALIFORNIA STATUTORY UNFAIR COMPETITION.** |
| 18 | **DEMAND FOR JURY TRIAL** |

19

20          Plaintiff KELLYTOY WORLDWIDE, INC., a California corporation

21  ("Kellytoy") brings this action against defendant HUGFUN, INTERNATIONAL,

22  INC. a/k/a Hugfun Int'l Inc., a Hong Kong entity of unknown form ("Hugfun"),

23  BJ'S WHOLESALE CLUB, INC., a Massachusetts corporation, and DOES 1

24  through 10 (collectively, "Defendants") for injunctive relief and damages under the

25  laws of the United States and the State of California as follows:

26              <u>**JURISDICTION AND VENUE**</u>

27          1.     This action arises under the trademark laws of the United States, 15

28  U.S.C. § 1125(a), and under the statutory and common law of trademark/tradedress

---

FIRST AMENDED COMPLAINT

1  infringement and unfair competition.

2  2.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367,

3  and 15 U.S.C. §§ 1116, 1117, 1121, and 1125.

4  3.  Venue lies in this judicial district pursuant to 28 U.S.C. § 1391.

5  4.  This Court has personal jurisdiction over Defendants, as they are doing

6  business in California and this District and are subject to the jurisdiction of this

7  Court.  Indeed, Hugfun is headquartered in and actively distributes plush toys

8  throughout the state of California and this District.  And, BJ's purchases goods,

9  including the Infringing Plush, from defendant Hugfun, a California resident, and

10  operates a website through which it offers for sale and sells numerous goods,

11  including the Infringing Plush, to customers within the state of California and this

12  District.  In addition, defendants Hugfun and BJ's knowingly infringed on

13  Kellytoy's trade dress, knowing that Kellytoy is a California resident and knowing

14  that Kellytoy would suffer harm, particularly, in the State of California, and thereby

15  purposefully directed and expressly aimed their activities towards California.

16  **<u>NATURE OF THE ACTION</u>**

17  5.  This is an action for trade dress infringement, trademark infringement,

18  unfair competition and false designation of origin under the Lanham Act, 15 U.S.C.

19  § 1125(a), California Bus. & Prof. Code § 17200, *et seq*., and the common law.

20  6.  Kellytoy's SQUISHMALLOW branded plush toys ("Squishmallows")

21  – representative samples of which are depicted in **Exhibit 1** hereto – are one of the

22  world's hottest plush toy lines.  Kellytoy's Squishmallows feature a highly

23  distinctive and widely recognized trade dress, which Kellytoy pioneered and

24  created.  Kellytoy actively markets its Squishmallows through numerous media

25  outlets, including, without limitation, on social media, at tradeshows, through

26  Squishmallows.com, amazon.com, walmart.com, walgreens.com and target.com,

27  and on Kellytoy's website and social media accounts, depicting images of its

28  proprietary Squishmallows line of plush toys.

Case 2:24-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 733 of 816   Page ID
#:1687
Case 2:19-cv-07652-MWF-MAA   Document 1   Filed 12/20/19   Page 3 of 52   Page ID #:103

1   7.  The explosion in popularity of Kellytoy's Squishmallows and the

2 resulting and widespread customer and industry recognition, has unfortunately led to

3 illegal imitation by Kellytoy's competitors.  Indeed, Kellytoy has discovered that

4 defendant Hugfun has been manufacturing and offering for sale to customers,

5 including, on information and belief, BJs, (which they have re-sold), numerous units

6 of seven knock-off products for distribution within this state and district that

7 infringe upon Kellytoy's trade dress.

8   8.  Accordingly, to prevent and remediate the rampant consumer confusion

9 and misappropriation of Kellytoy's reputation and identity resulting from

10 Defendants' unauthorized use, promotion and sale of the Infringing Plush (defined

11 below), and to compensate Kellytoy for its injuries, Kellytoy seeks immediate and

12 permanent injunctive relief, compensatory damages, disgorgement of Defendants'

13 profits, statutory damages, punitive damages, Kellytoy's reasonable attorneys' fees

14 and expenses, a product recall, and corrective advertising sufficient to address

15 Defendants' wrongdoing and its resulting damage to Kellytoy.

16       **THE PARTIES**

17   9.  Kellytoy Worldwide, Inc. is a California corporation with its principal

18 place of business located in Los Angeles, California.

19   10.  Kellytoy is in the business of developing, manufacturing and selling

20 children's toys including, among other things, plush toys.

21   11.  On information and belief, defendant Hugfun, International, Inc. a/k/a

22 Hugfun Int'l Inc. ("Hugfun") is a Hong Kong entity of unknown form with an

23 established place of business in the City of Industry, California

24   12.  Hugfun is in the business of manufacturing and selling children's toys

25 including plush toys.

26   13.  On information and belief, defendant BJ's Wholesale Club, Inc.

27 ("BJ's") is a Massachusetts corporation with a corporate address in Massachusetts.

28   14.  BJ's is in the business of operating brick-and-mortar retail stores and an

1  online e-commerce website that sell various merchandise, including plush toys.

2      15.    The true names and capacities of defendants sued herein as DOES 1-

3  10, inclusive, are unknown to Kellytoy, who therefore sues said defendants by such

4  fictitious names.  Kellytoy will amend this Complaint to allege their true names and

5  capacities when the same are ascertained.

6      16.    Upon information and belief, at all relevant times mentioned in this

7  Complaint, Defendants, and each of them, were acting in concert and active

8  participation with each other in committing the wrongful acts alleged herein, and

9  were the agents of each other and were acting within the scope and authority of that

10  agency and with the knowledge, consent and permission of one another.

11  ### BACKGROUND FACTS

12  ### Kellytoy and Its Protected Intellectual Property Rights

13      17.    Kellytoy is an innovative and highly successful creator, manufacturer,

14  distributor and seller of unique plush toys, including, without limitation, its

15  Squishmallows line of plush under the SQUISHMALLOW brand.  (*See, e.g.,*

16  **Exhibit 1**.)

17      18.    Kellytoy has been in business for nearly two decades and in that time

18  has developed a reputation for producing high quality, unique, creative and

19  innovative plush toys that are highly prized in the industry and in widespread

20  demand by the consuming public.

21      19.    Kellytoy devotes extensive time and resources promoting and

22  preserving its image and identity and the image and identity of its high quality plush

23  toys.  That includes, without limitation, creating distinctive designs and marks for

24  use on its products and seeking U.S. trademark and copyright registrations for such

25  designs and marks, including those at issue in this Complaint.

26      20.    In 2016, Kellytoy conceived of and began creating its Squishmallows

27  line of plush toy designs – ultimately marketed in connection with the

28  SQUISHMALLOW trademark – that share common, unique features distinguishing

them from the goods of others.  Most of these designs are the subject of United States Copyright Registrations or pending applications therefor.

21.　　Indeed, Kellytoy has been and is the sole owner of all right, title and interest in and to the Squishmallows line that possesses unique, recognizable and distinguishing features that are common across much of the Squishmallows line. From 2016 to the present, Kellytoy has expended large sums of money in developing, advertising and promoting these product designs through the United States.  In fact, Kellytoy is spending over $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its SQUISHMALLOW branded goods.

22.　　Consistent with that advertising and marketing scope, Kellytoy sells a broad range of SQUISHMALLOW branded plush toys featuring the brand's iconic trade dress, and whose overall look, feel and image – and in particular but without limitation its shapes, colors, textures and graphics – serve as a distinctive source identifier to the consuming public.  Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring; and (5) short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.  These features, and the resulting overall look and feel of the toys bearing them, are more fully depicted, without limitation, in **Exhibit 1** hereto – features common to Kellytoy's line of Squishmallows (collectively together with **Exhibit 1** the "Squishmallow Trade Dress").

23.　　Kellytoy has, beginning in 2016 and continuing without interruption, expended a great deal of time, effort, and money in the promotion of its

Squishmallows.  And due to Kellytoy's unique design, robust marketing efforts, media coverage, and market penetration, the Squishmallow Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys.  Indeed, because of Kellytoy's extensive promotional activities and widespread display of its Squishmallows directed to the public, and as a consequence of Kellytoy's fair and honorable dealings with its customers, the relevant consuming public has come to recognize and associate plush toys bearing the Squishmallow Trade Dress as high quality goods connected with or offered by a single source, Kellytoy.  The Squishmallow Trade Dress thus embodies valuable goodwill and consumer recognition associated with it and has come to symbolize the valuable goodwill and reputation of Kellytoy.

24.    In addition to being original and inherently distinctive, the Squishmallow Trade Dress is widely recognized by consumers.  A simple Internet search using the Google search engine yields about 1,210,000 "results" for the search term "Squishmallows."

25.    In addition to marketing and selling them through thousands of retail stores nationwide, Kellytoy markets and sells its Squishmallows on its website <squishmallows.com> featuring dozens of copyright-protected photographs of its plush toys and models holding its Squishmallows.  Copies of the homepage and other representative pages from <squishmallows.com> are attached as **Exhibit 2**.

26.    Kellytoy's Squishmallow website traffic has, not surprisingly, grown exponentially since its launch in 2017, and has now reached an average in excess of 5,500 visits per day.

27.    Kellytoy also actively engages in promoting its line of Squishmallows branded plush toys through its numerous social media accounts, including on Instagram, Facebook, and Twitter.  Indeed, Kellytoy's legion of loyal fans of its line of Squishmallows branded plush toys have been extremely engaged on social media, including Facebook and Instagram, demonstrating their awareness and affection for

1  Kellytoy's Squishmallows.  For example, the average Squishmallows post likes on

2  Instagram, for example, hovering over 2000+ per post and 45-100 average

3  comments per post.  In fact, Kellytoy's Squishmallows branded plush toys have

4  garnered over 200 Million media impressions.

5        28.    Further adding to their recognition and secondary meaning in the

6  marketplace, Squishmallows have been featured in over 300 publications, including

7  magazines, press articles, reviews, and videos, as set forth in greater detail in

8  **Exhibit 3** hereto, including many mainstream media publications such as the

9  *Washington Post*, the *Chicago Tribune*, the *Daily Harold*, O*kay! Magazine*, among

10  others.  By way of example only, Squishmallows have been also recognized by: (1)

11  The *Washington Post* and *Consumer Reports* on their 2017 Holiday Gift Guides; (2)

12  *LA Parent* in its October 2017 issue, under the "Products We Love" section, which

13  specifically identified Squishmallows; and (3)  *OK!* Magazine in its August 21,

14  2017 issue, which, as depicted below, featured Squishmallows and described them

15  in flattering terms, stating "Cuddly as they are cute, they make great couch pals,

16  pillows and bedtime buddies in any home.  Collect the whole squad!

17  squishmallows.com."



29.     There are many additional examples of the popularity and market penetration of the Squishmallow line.  Squishmallows were also been featured in the October 2017 issues of *L.A. Parent Magazine*, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, and *L.A. Parent*.

30.     In fact, Kellytoy's Squishmallows sold out through Walgreens.com during their Gift of the Week promotion in early November 2017, as well as exceeding all sales goals for the campaign, both online and in stores.

31.     Kellytoy's Squishmallows have also been the subject of numerous industry awards and product recommendation lists, including by the National Parenting Product Awards, Parents' Choice, and TTPM, as more fully set out in **Exhibit 3**.  In fact, Kellytoy's Squishmallows were named by *Toy Insider* as one of the "Top Holiday Toys," made the cover the September/October 2017 *Toy Book Magazine*, and have been featured in numerous other trade magazines, such as, *Teddy Bear and Friends Magazine* and *Animal Tales Magazine*.

32.     The popular blog *Trendy Mom Reviews* listed Squishmallows as one of The Best Gifts for 2018!"  Similarly, the popular blog *Two Kids And A Coupon* did its own review of Kellytoy's Squishmallows branded plush, saying, among other things, that they are "a gift for anyone on our list this holiday!"

33.     Squishmallows was also named one of "The Best New Toys" by Minnesota Parent Magazine! and was named a Great Holiday Gifts For Littles by Texas Lifestyle Magazine!

34.     *Gifts & Decorative Accessories* also selected Kellytoy's Squishmallows branded toys among its "5 Editor's Picks From Toy Fair" 2019.

35.     *The Toy Insider* featured Kellytoy's Squishmallows branded toys in connection with its March 13, 2019 article entitled "Tips for Tackling Testing & Student Stress."

Case 2:34-cv-01169-MWF-MAR Document 27-2 Filed 04/04/34 Page 739 of 816 Page ID
Case 2:13-cv-07552-MWF-MAR Document 9-1 Filed 12/20/13 Page 9 of 52 Page ID#:159
#:1693

36.     Kellytoy's Squishmallows were featured on the cover of *The Toy Book's* "Plush Issue" and its Toy Fair New York 2019 issue. *The Toy Book* also featured Kellytoy's upcoming Halloween Squishmallows line on August 5, 2019 and featured Kellytoy's Squishmallows branded turtle on May 15, 2019.

37.     *TFE Toys & Family Entertainment* also featured Kellytoy's Squishmallows branded toys in its NYC Toy Fair 2019 issue.

38.     Kellytoy's Squishmallows branded toys have also won the *Parent and Teacher Choice Award* for 2019 from HowtoLearn.com.

39.     This widespread publicity and recognition has occurred in conjunction with Kellytoy's advertising efforts concerning Squishmallows, which, as alleged above, have comprised consistent and elaborate marketing campaigns, including email campaigns, social media posts, and direct to consumer advertising.  Kellytoy's Squishmallows currently more than 96,000 Instagram followers, more than 77,000 Facebook followers – more than many longer-existing and well-known plush brands.  To its followers, Kellytoy regularly publishes photographs of its Squishmallows.  Many of these followers, in turn, share these posts with their friends and social media followers.  A copy of Squishmallows Instagram page is attached as **Exhibit 4**.

40.     In addition, hundreds of well-known YouTube influencers and vloggers have shared and posted images and videos of themselves holding plush toys in Kellytoy's line of Squishmallows products.  Tens of thousands of consumers have done the same through numerous media platforms, including, Facebook, Instagram, Pinterest and YouTube.  These posts have generated millions of "likes" and "shares."

41.     Kellytoy's Squishmallows are listed amongst the leading global brands and toys such as Hatchimals, Hasbro, RB, Hot Wheels, NERF, and Spin Master by several industry publications.

42.     As a direct result of Kellytoy's efforts at promoting and building its brand, Kellytoy's Squishmallows line has exploded in popularity, creating

1   substantial demand for and interest in Squishmallows, and generating enormous

2   goodwill in the Squishmallows brand and the Squishmallows Trade Dress in the

3   United States and around the world. In fact, Kellytoy's Squishmallows are sold

4   through hundreds of retailers including some of the largest retailers in the country,

5   including, approximately 1000 Costco stores, 5,500 Walmart stores, 8,500

6   Walgreens stores, 6200 CVS stores, 4,000 Kroger supermarkets and Fred Meyer

7   stores, 1,800 Target stores, 700 Justice stores, 900 Party City stores, amongst other

8   outfits such as Dave & Busters, Knotts Berry Farms and numerous others.

9       43.   Since the summer of 2017, Kellytoy has shipped approximately a

10   whopping 40 million (40,000,000) units of Squishmallows and there is no indication

11   that sales will be slowing down anytime soon. Kellytoy's Squishmallows products

12   embodying the Squishmallows Trade Dress have yielded tens of millions of dollars

13   of sales in the U.S. over the past year.

14       44.   The pace of sales of Kellytoy's Squishmallows branded toys has been

15   steadily increasing in there is no indication of their popularity waning any time

16   soon. In fact, Kellytoy's Squishmallows branded toys have become so popular

17   among, sought after by, and recognizable as a brand by the public that some

18   members of the public have been selling unauthorized merchandise, such as T-shirts

19   and jewelry, bearing the images of some of Kellytoy's most popular Squishmallows

20   branded toys. Few plush lines can boast having third parties attempt to

21   "merchandise" its copyrighted designs – something typically reserved for Disney,

22   Looney Tunes, and the like. While Kellytoy has since put a stop to such

23   unauthorized uses, it has preserved exemplars of some such infringements by three

24   different infringers, as depicted below:

25

  

26

27

28

Case 3:34-cv-04169-WS-MAR   Document 27-2   Filed 04/04/24   Page 741 of 816   Page ID
Case 2:19-cv-07052-MWF-MAR   Document 27-2   Filed 12/20/19   Page 217 of 62   Page ID #:191
#:1695



45.   In fact, because of the immense popularity – no, ubiquity – of Kellytoy's Squishmallows line of plush toys, including those set forth on **Exhibit 1**, Kellytoy has recently embarked on a global licensing initiative to license these designs to include diverse categories of merchandise, including apparel, sleepwear, accessories, headwear, home decor, health and beauty, back to school, stationery and paper goods, games and puzzles, novelty, publishing and magazines, food and beverage, and mobile gaming.  (*See*, *e.g.*, **Exhibit 5** hereto.)

46.   Because of Squishmallows' massive success and popularity, consumers have come to associate Kellytoy's high-quality Squishmallows plush toys with the Squishmallows Trade Dress and, conversely, have come to recognize the Squishmallow Trade Dress as a designation of source.

### **Defendants' Unlawful Conduct**

47.   At the outset, none of the defendants to this action is licensed or otherwise authorized by Kellytoy to market or distribute products bearing or embodying Kellytoy's Squishmallow Trade Dress.

48.   Upon information and belief, sometime in 2019, notably well after Kellytoy established its reputation in its Squishmallow Trade Dress and that Trade Dress acquired distinctiveness in the marketplace, Defendant Hugfun began offering for sale and supplying various plush toys bearing substantially and confusingly

-11-
**FIRST AMENDED COMPLAINT**

1   similar copies of Kellytoy's Squishmallow Trade Dress (hereinafter referred to as
2   "Infringing Plush") to customers throughout the United States.  Photographs of the
3   Infringing Plush bearing Hugfun's trademarks are collectively attached hereto as
4   **Exhibit 6**.

5        49.    Upon information and belief, Defendants manufactured in, and
6   imported from, China the Infringing Plush into the United States for the purpose of
7   having the Infringing Plush enter interstate commerce and/or to be transported or
8   used in interstate commerce through the same channels of trade through which
9   Kellytoy sells its Squishmallows branded plush.  On information and belief, Hugfun
10  has in fact sold the Infringing Plush to, among others, the popular big box retailer
11  BJs which has in turn sold and is currently selling the Infringing Plush in interstate
12  commerce.

13       50.    Upon information and belief, Hugfun has agreed to sell the Infringing
14  Plush to its customers, including defendant BJ's, at prices that were/are relatively
15  lower than the prices charged by Kellytoy for its Squishmallows plush.  Kellytoy is
16  informed and believes that Hugfun is able to undercut Kellytoy's sales prices
17  because, rather than investing in creating its own designs and identity, Hugfun has
18  instead copied and infringed Kellytoy's proprietary Squishmallow Trade Dress and
19  otherwise because its Infringing Plush are of inferior quality as compared to
20  Kellytoy's SQUISHMALLOW branded plush.

21       51.    Kellytoy is further informed and believes that Defendants, without
22  Kellytoy's consent or permission, sell, advertise, promote, display, and distribute,
23  toys bearing Squishmallow Trade Dress in United States commerce.

24       52.    The activities of Defendants in copying, distributing, advertising,
25  selling, offering for sale and otherwise using the Squishmallow Trade Dress
26  embodied in the Infringing Plush – including by copying wholesale of the shape and
27  look – constitute false designation of origin regarding sponsorship of those plush
28  toys and falsely represent to the public that Defendants' plush toys originate from

Kellytoy, and/or that Defendants' plush toys have been sponsored, approved or

licensed by Kellytoy, or in some way affiliated or connected with Kellytoy.  Such

activities of Defendants are likely to confuse, mislead, and deceive Defendants'

customers, purchasers, and members of the public as to the origin of the toys bearing

the Squishmallow Trade Dress, or to cause such persons to believe that Defendants'

Infringing Plush and/or Defendants have been sponsored, approved, authorized, or

licensed by Kellytoy or in some way affiliated or connected with Kellytoy, all in

violation of, among other laws, 15 U.S.C. §1125(a).

53.    Upon information and belief, the activities of Defendants were done

willfully with full knowledge of the falsity of such designations of origin and false

descriptions or representations, with the intent to trade on the enormous goodwill

Kellytoy has earned in its Squishmallows, and with the intent to cause confusion,

and to mislead and deceive the purchasing public into believing that the products

Defendants sell are directly sponsored by, authorized, by, associated with, or

originate from Kellytoy.

54.    Defendants, by their unauthorized copying and use of Kellytoy's

Squishmallow Trade Dress, have engaged and will engage in acts of trademark

infringement, unfair competition, unlawful appropriation, unjust enrichment,

wrongful deception of the purchasing public, and unlawful trading on Kellytoy's

good will and the public acceptance of Kellytoy's original works.  Defendants'

activities have damaged and will continue to damage the reputation, business and

good will of Kellytoy nationally and in this judicial district.

55.    Upon information and belief, unless enjoined by the Court, Defendants

will continue and further escalate their infringing activities.

56.    Kellytoy has no adequate remedy at law.  Thus, these activities of

Defendants have caused and, if not enjoined, will continue to cause irreparable,

immediate and impending harm and damage to Kellytoy's business, and to the

business, business reputation and good will of Kellytoy.

**FIRST CAUSE OF ACTION**

**(Trademark Infringement, False Designation of Origin and False Description -**
**- 15 U.S.C. §1125)**

(Against All Defendants)

57.     Kellytoy repeats and realleges each and every allegation of paragraphs 1 through 56 above as if fully set forth herein.

58.     The Squishmallow Trade Dress – comprised of a proprietary combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – is non-functional and highly distinctive, and has become associated in the minds of the consuming public with plush toy products of the highest quality and reputation finding their origin in a single source, Kellytoy.  Indeed, the Squishmallow Trade Dress when viewed as a whole – comprised of a combination of aesthetic and stylized plush toy features, including the shape, color, color combinations, texture and graphics – presents a non-functional look and feel that is uniquely associated with Kellytoy's Squishmallows. The non-functional nature of these aesthetic features are evidenced and clear, in part, by reference to the following:  (1) the unique combination of stylistic elements yielding no utilitarian advantage; (2) the innumerable alternative stylistic plush toy features available to and used competitors, including, (i) countless alternative plush toy shapes (e.g., traditional animal designs as opposed to Kellytoy's whimsical, abstract renditions of animals, cube shaped plush toys, etc.), (ii) numerous alternative means to depict facial features (e.g., plastic eyes, traditional plush toy facial features, etc.), (iii) myriad alternative shell materials (e.g., terrycloth, long pile plush, velboa, satin, etc.), and (iv) countless alternative stuffing materials available (e.g., beans, cotton, hard foam, etc.); furthermore, when the features of the Squishmallow Trade Dress are viewed collectively – as the law provides in assessing trade dress – it is clear that there are innumerable alternative plush designs actually used and available to competitors in the marketplace; (3) Kellytoy's not

1  touting or marketing utilitarian advantages of its Squishmallow Trade Dress, and (4)

2  the Squishmallow Trade Dress not resulting from a comparatively simple or

3  inexpensive method of manufacture vis-à-vis other plush toys.  Moreover, protection

4  of the Squishmallow Trade dress as a trademark would not impose a non-reputation-

5  related competitive disadvantage.  Regardless, however, the product features of the

6  Squishmallow Trade Dress do not serve an aesthetic function wholly independent of

7  any source identifying function.  To the contrary, the Squishmallow Trade Dress

8  was specifically designed to distinguish – and has succeeded in distinguishing – the

9  source of products embodying the Squishmallow Trade Dress from the source of

10  other toys. Kellytoy owns all right, title and interest in and to the Squishmallow

11  Trade Dress.

12       59.    Without Kellytoy's authorization or consent, and having knowledge of

13  Kellytoy's prior rights in the Squishmallow Trade Dress, Defendants have designed,

14  manufactured, imported, distributed, advertised, offered for sale and/or sold and/or

15  will continue to import, distribute, advertise, offer for sale, and sell replicas of the

16  Squishmallow Trade Dress to the consuming public in direct competition with

17  Kellytoy, in or affecting interstate commerce.

18       60.    The Infringing Plush designs are confusingly similar to the

19  Squishmallow Trade Dress.  Defendants' use of the Squishmallow Trade Dress has

20  caused and, unless enjoined by this Court, will continue to cause a likelihood of

21  confusion and deception of members of the public and, additionally, injury to

22  Kellytoy's goodwill and reputation as symbolized by the Squishmallow Trade Dress.

23       61.    Defendants' use and further threatened uses of the Squishmallow Trade

24  Dress thus constitutes trade dress infringement, false designation of origin and

25  unfair competition in violation of 15 U.S.C. § 1125(a).

26       62.    As a direct and proximate result of Defendants' unlawful conduct,

27  Defendants have misappropriated Kellytoy's rights in the Squishmallow Trade

28  Dress, as well as the goodwill associated therewith, and have diverted sales and

profits from Kellytoy to Defendants. Thus, as a direct and proximate result of Defendants' acts of willful infringement, Kellytoy has suffered and/or will suffer damage to its valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and Kellytoy's lost profits.

63.    Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to Kellytoy, unless Defendants are restrained by this Court.  Kellytoy has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, Kellytoy is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants' and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Kellytoy's Squishmallow Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products.

64.    Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C § 1117.

### SECOND CAUSE OF ACTION

### (Common Law Trademark Infringement)

(Against all Defendants)

65.    Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 61 as though fully set forth herein.

66.    Defendants have violated Kellytoy's exclusive common law rights in the Squishmallow Trade Dress.

67.    Kellytoy has continuously used its Squishmallow Trade Dress to identify its goods in California and elsewhere, and to distinguish them from goods of a different origin.  As such, Kellytoy has common law rights to the Squishmallow Trade Dress.

68.    Defendants' acts described above constitute trade mark infringement under the common laws of the United States, including California.

Case 2:34-cv-01169-JLS-MAR   Document 27-2   Filed 04/04/24   Page 747 of 816   Page ID
#:1701
Case 2:13-cv-07032-MWF-MAR   Document 27-2   Filed 12/20/13   Page 77 of 82   Page ID #:197

**<u>THIRD CAUSE OF ACTION</u>**

**(California Common Law Unfair Competition)**

(Against all Defendants)

69. Kellytoy repeats and re-alleges each and every allegation of paragraphs 1 through 61, 67, and 68 as though fully set forth herein.

70. This claim arises under the common law of the State of California relating to unfair competition.

71. Defendants' Infringing Plush incorporate matter constituting reproductions, copies and colorable imitations of Kellytoy's Squishmallow Trade Dress. Defendants' unauthorized use of Kellytoy's Squishmallow Trade Dress constitutes unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the parties' products and to cause purchasers to believe Defendants' products are authentic products of Kellytoy when in fact they are not.

72. Upon information and belief, Defendants have intentionally appropriated Kellytoy's Squishmallow Trade Dress with the intent of causing confusion, mistake, and deception as to the source of their goods and with the intent of palming off their goods as those of Kellytoy and to place others in the position to palm off their goods as those of Kellytoy. Defendants have thus committed unfair competition under the common law of the State of California.

73. By their actions in infringing Kellytoy's Squishmallow Trade Dress, Defendants are improperly trading upon the reputation and good will of Kellytoy and are impairing Kellytoy's valuable rights in its Squishmallow Trade Dress.

74. Upon information and belief, said activities of Defendants alleged herein were and are willful and intentional acts of unfair competition.

75. Kellytoy has no adequate remedy at law. Thus said activities of Defendants have caused, if not enjoined, will continue to cause irreparable harm and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its business

Case 2:24-cv-04129-WLS-MAR   Document 27-2   Filed 04/04/24   Page 748 of 816   Page ID
Case 2:13-cv-07032-MWF-MAR   Document 27-2   Filed 12/20/13   Page 87 of 92   Page ID
#:1702

1  reputation and good will.

2      76.     Upon information and belief, Defendants have engaged in their unlawful

3  conduct alleged herein intentionally, maliciously, fraudulently and oppressively

4  entitling Kellytoy to punitive damages in an amount to be determined at trial.

5                              **FOURTH CAUSE OF ACTION**

6                    **(California Statutory Unfair Competition –**

7                    **California Bus. & Prof. Code § 17200, *et seq.*)**

8                          (Against all Defendants)

9      77.     Kellytoy repeats and re-alleges each and every allegation of paragraphs

10  1 through 61, 67 through 69, and 71 through 75, as though fully set forth herein.

11      78.     By reason of the foregoing, Defendants have been, and are, engaged in

12  "unlawful, unfair or fraudulent business practices" in violation of California

13  Business and Professional Code Section 17200 *et seq.*

14      79.     Kellytoy's Squishmallows Trade Dress constitutes a protectable

15  property right, and the Defendants' conduct – including without limitation their

16  infringement of the Squishmallows Trade Dress – will and has caused an

17  impairment and diminishment of that property right.  Indeed, the activities of

18  Defendants have caused and, if not enjoined, will continue to cause irreparable harm

19  and damage to the rights of Kellytoy in its Squishmallow Trade Dress and to its

20  business reputation and good will.  Kellytoy has no adequate remedy at law for

21  these wrongs and injuries.  The damage to Kellytoy includes harm to its goodwill

22  and reputation in the marketplace that money cannot compensate.  Accordingly,

23  Kellytoy is entitled to a preliminary and permanent injunction restraining and

24  enjoining Defendants' and their agents, servants, and employees, and all persons

25  acting thereunder, in concert with, or on their behalf, from using Kellytoy's

26  Squishmallow Trade Dress, or any colorable imitation or variation thereof, in

27  connection with the sale and/or marketing of any products.  Kellytoy is further

28  entitled to restitutionary disgorgement of all of Defendants' ill-gotten gains pursuant

4266850.2                              -18-

to California Business and Professions Code § 17203 and to recover its costs and attorneys' fees incurred in bringing and prosecuting this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Kellytoy prays for judgment against Defendants as follows:

1.      That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, successors, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

      (i)     Manufacturing, importing, distributing, advertising, offering to sell or selling the Infringing Plush or any colorable imitations of the Squishmallow Trade Dress;

      (ii)    Using the Squishmallow Trade Dress or any confusingly similar trade dress in connection with plush or other toys;

      (iii)   Using the Squishmallow Trade Dress, or any confusingly similar mark, in connection with the advertisement, offer to sell or sale of any toy products;

      (iv)   Using any false designation of origin, or representing or suggesting directly or by implication that Defendants, or any brands or other sources identifiers created by Defendants, or their toys, are affiliated with, associated with, authorized by, or otherwise connected to Kellytoy, or that Defendants are authorized by Kellytoy to use the Squishmallow Trade Dress;

      (v) Engaging in any other activity constituting unfair competition with Kellytoy, or constituting infringement of the Squishmallow Trade Dress; and

      (vi)   Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (v) above, or effecting any assignments

1   or transfers, forming new entities or associations, or utilizing any
2   other device for the purpose of circumventing or otherwise
3   avoiding the prohibitions set forth in subparagraphs (i) through
4   (v) above.

5   2.   That Defendants be directed to file with the Court and serve on
6   Kellytoy, within thirty (30) days after entry of a final injunction, a report in writing
7   under oath setting forth in detail the manner and form in which Defendants have
8   complied with the injunction.

9   3.   That the Court direct any third parties providing services to
10  Defendants in connection with any infringing and/or enjoined conduct, including
11  social media platforms (*e.g.*, Instagram, Facebook, Twitter), online marketplaces
12  (*e.g.*, Alibaba, eBay, Etsy, AliExpress, Amazon, Taobao), online payment
13  providers, including credit card companies (*e.g.*, PayPal, Visa) and other service
14  providers (*e.g.*, Google, GoDaddy, LiveChat, Shopify) to cease providing services
15  to Defendants in connection with the offer for sale and sale of the Infringing Plush
16  or any other products using or embodying the Squishmallow Trade Dress.

17  4.   That Defendants be required to pay Kellytoy such damages as it has
18  sustained as a consequence of Defendants' infringement of the of the Squishmallow
19  Trade Dress and trebling of those damages under 15 U.S.C. § 1117;

20  5.   Adjudge that each of the Defendants, by its unauthorized use of
21  Kellytoy's the Squishmallow Trade Dress for plush toys, and such other acts as it
22  may have undertaken relating to the Squishmallow Trade Dress, have violated
23  Kellytoy's rights under 15 U.S.C. § 1125(a), under California state law (including,
24  without limitation, Cal. Bus. & Prof. Code § 17200 *et seq.*), and under common law,
25  and that they have done so willfully and for the purpose of violating Kellytoy's
26  rights and damaging Kellytoy's goodwill and reputation in the Squishmallow Trade
27  Dress;

28  6.   Direct Defendants to provide Kellytoy with an identification in writing

1  of any and all entities that are presently using the Squishmallow Trade Dress in the

2  United States on Defendants' behalf and inform them that they must immediately

3  cease such use;

4         7.     Direct Defendants to immediately recall any and all merchandise

5  previously provided to any United States entity under the Squishmallow Trade

6  Dress;

7         8.     Enter an order, pursuant to 15 U.S.C § 1118, directing Defendants to

8  deliver for destruction all products, brochures, marketing materials, decals, stickers,

9  signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their

10  possession or under their control, bearing any unauthorized copy of any of the

11  Squishmallow Trade Dress, or any simulation, reproduction, counterfeit, copy,

12  confusingly similar likeness, or colorable imitation thereof, and all plates, molds,

13  matrices, programs and other means of making same;

14         9.     That each Defendant provide Kellytoy in writing with the following

15  information relating to Defendants' goods marketed, advertised, offered for sale, or

16  sold under the Squishmallow Trade Dress:

17                 (i)     the name, address and telephone number of each and every

18                        United States entity to whom Defendants have made available or

19                        otherwise provided any such products; and

20                (ii)    a full accounting as to the precise dollar amount of such products

21                        made available or provided and the profits recognized by

22                        Defendants in connection with such actions;

23       10.     Direct Defendants to pay the costs of corrective advertising;

24       11.     Direct Defendants to pay Plaintiff's attorneys' fees and costs incurred

25  in initiating and prosecuting this action;

26       12.     Direct Defendants to pay punitive damages and exemplary damages

27  according to proof;

28       13.     That Kellytoy recover its actual damages, Kellytoy's lost profits, and

1 Defendant's profits arising from Defendants' conduct complained-of herein;

2       14.     That the Court award enhanced profits and treble damages;

3       15.     That Kellytoy be awarded interest, including pre-judgment

4 interest, on the foregoing sums;

5       16.     That the Court direct such other actions as the Court may deem just and

6 proper to prevent the public from deriving the mistaken impression that any

7 products or services offered, advertised, or promoted by or on behalf of Defendants

8 are authorized by Kellytoy or related in any way to Kellytoy's products or services;

9       17.     That Defendants be ordered to disgorge all of their ill-gotten gains

10 pursuant to California Business and Professions Code § 17203; and

11       18.     For such other and further relief as the Court may deem just and

12 proper.

13                       Respectfully submitted,

14 DATED: December 20, 2019      FREEMAN, FREEMAN & SMILEY, LLP

15

16                  By:       / s / Mark B. Mizrahi

17                     TODD M. LANDER

                      MARK B. MIZRAHI

18                     Attorneys for Plaintiff,

19                     KELLYTOY WORLDWIDE, INC.

20

21

22

23

24

25

26

27

28

4266850.2                -22-
FIRST AMENDED COMPLAINT
752 of 816             EXHIBIT M
Page 57 of 58

1    ## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands and requests a trial by jury of all issues raised that

3    are triable by jury.

4                               Respectfully submitted,

5    DATED: December 20, 2019      FREEMAN, FREEMAN & SMILEY, LLP

6

7                             By:       */ s / Mark B. Mizrahi*

8                                 TODD M. LANDER

                             MARK B. MIZRAHI

9                                 Attorneys for Plaintiff,

10                                KELLYTOY WORLDWIDE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| BUILD-A-BEAR WORKSHOP, INC, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. |
| KELLY TOYS HOLDINGS, LLC, | ) ) | |
| KELLY AMUSEMENT HOLDINGS, LLC, | ) | **JURY TRIAL DEMANDED** |
| JAZWARES, LLC, and JAZPLUS, LLC. | ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Build-A-Bear Workshop, Inc. ("Plaintiff" or "Build-A-Bear") brings this declaratory judgment action against Kelly Toys Holdings, LLC ("Kelly Toys"), Kelly Amusement Holdings, LLC ("Kelly Amusement"), Jazwares, LLC ("Jazwares"), and Jazplus, LLC ("Jazplus") (collectively "Defendants") pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, and alleges as follows:

## NATURE OF THE CASE

1.      This is a declaratory judgment action seeking a ruling that: (a) Defendants' claimed trade dress rights in their Squishmallows products are invalid, unenforceable, and unprotectable under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.; and (b) Build-A-Bear's SKOOSHERZ™ plush toys do not infringe any of Defendants' claimed trade dress rights in their Squishmallows products under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Build-A-Bear is a Delaware corporation with its principal place of business located at 415 South 18th Street, St. Louis, Missouri 63103.

3. Upon information and belief, Defendant Kelly Toys is a Delaware limited liability company with its principal place of business located at 4811 South Alameda Street, Los Angeles, California 90058.

4. Upon information and belief, Defendant Kelly Amusement is a Delaware limited liability company with its principal place of business located at 350 Michael Drive, Syosset, New York 11791.

5. Upon information and belief, Defendant Jazwares is a Delaware limited liability company with its principal place of business located at 1067 Shotgun Road, Sunrise, Florida 33326.

6. Upon information and belief, Defendant Jazplus is a Delaware limited liability company with its principal place of business located at 7284 West Palmetto Park Road, Boca Raton, Florida 33433.

7. Defendants assert that they are either affiliated entities, governed by common ownership and/or intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows products.

8. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

10. This Court has personal jurisdiction over Defendants because Defendants performed acts within the Eastern District of Missouri subjecting Defendants to the laws of this District, including entering into contracts and transacting business in this District. Among other things, Defendants' Squishmallows products with their claimed trade dress are available for

2

purchase in physical retail stores in this District, including but not limited to: Target stores in the City of St. Louis, Kirkwood, Town and Country, and Cape Girardeau, Missouri; Walgreens stores in the City of St. Louis, Kirkwood, Des Peres, and Cape Girardeau, Missouri; and Walmart stores in the City of St. Louis, Kirkwood, Maplewood, and Cape Girardeau, Missouri. Additionally, Defendants' Squishmallows products are available for order online through Defendant Jazware's website at https://shop.jazwares.com/pages/squishmallows and on https://www.Amazon.com for delivery to physical addresses and customers in this District. In order to sell Squishmallows products in and to these Missouri locations, the Squishmallows products with the claimed trade dress were shipped to Missouri by one or more Defendants or their agents.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendants' Squishmallows products with the claimed trade dress are sold in competition with Build-A-Bear's SKOOSHERZ™ plush toys in this District, Build-A-Bear's SKOOSHERZ™ plush toys were designed and conceived of in this District, and Defendants can otherwise be found in this District by virtue of the acts identified above.

12. There is an actual, ripe, and justiciable controversy between Build-A-Bear and Defendants concerning whether Defendants have valid and enforceable trade dress rights under the Lanham Act in their Squishmallows products and whether Plaintiff Build-A-Bear's SKOOSHERZ™ plush toys infringe any trade dress rights associated with Defendants' Squishmallows products under the Lanham Act. One or more Defendants have previously or are currently asserting trade dress rights in their Squishmallows products under the Lanham Act against multiple manufacturers and sellers of plush toys, including Ty, Inc., Dan-Dee International, and Zuru, LLC, among others. Additionally, Defendants sued Build-A-Bear on January 29, 2024,

3

EXHIBIT N
Page 3 of 54

in the 17th Judicial District Circuit Court for Broward County, Florida (*Jazwares, LLC, et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221), attempting to assert Florida state law claims of trade dress infringement and unfair competition relating to Build-A-Bear's SKOOSHERZ™ plush toys.  Also on January 29, 2024, Defendants filed an *ex parte* emergency motion for preliminary injunction, in which Defendants asserted injuries purportedly occurring across the country and not limited or specific to Florida (which motion was subsequently denied by the Broward County, Florida court later in the day).

### **FACTS RELATING TO BUILD-A-BEAR AND ITS SKOOSHERZ™ PLUSH TOYS**

13.     Founded in 1997, Build-A-Bear is a multi-generational global brand focused on its mission to "add a little more heart to life" appealing to a wide array of consumer groups who enjoy the personal expression in making their own "furry friends" to celebrate and commemorate life moments.

14.     Build-A-Bear currently has nearly 500 interactive brick-and mortar experience locations across the country and around the world, where a variety of formats provide guests of all ages a hands-on entertaining experience and foster a lasting and emotional brand connection.

15.     Build-A-Bear also offers engaging e-commerce/digital purchasing experiences on www.buildabear.com including its online "Bear-Builder", the animated "Bear Builder 3D Workshop" and its age-gated, adult-focused "Bear Cave".

16.     Although Build-A-Bear started with consumers building their own stuffed plush toys, for many years Build-A-Bear has also sold pre-stuffed plush toys in its retail stores and online at www.buildabear.com and its Build-A-Bear store on Amazon.com.

17. From humble beginnings and a single retail store in St. Louis, Missouri, Build-A-Bear has emerged as one of the world's leaders in high-quality plush toys, innovative store experiences, and engaging, family-friendly entertainment.

18. In January 2024, and in anticipation of Valentine's Day celebrations, Build-A-Bear introduced on a global basis its new line of collectible plush friends – SKOOSHERZ™ – uniquely styled for optimal hugging benefits. Displaying a trademarked, unique name evoking their huggability, the adorable SKOOSHERZ™ spherical plush friends are made with an ultra-soft plush and stuffing perfect for hugging.

19. Build-A-Bear's first five SKOOSHERZ™ plush toys are all based on original, popular Build-A-Bear plush animals, including:



Build-A-Bear's **SKOOSHERZ™** Pink Axolotl



Build-A-Bear's **SKOOSHERZ™** Strawberry Cow

5



Build-A-Bear's **SKOOSHERZ™** Spring Green Frog



Build-A-Bear's **SKOOSHERZ™** Rainbow Sparkles Teddy Bear



Build-A-Bear's **SKOOSHERZ™** Red Raptor

20.     Build-A-Bear's SKOOSHERZ™ plush toys are distinctly round or spherical in shape, with bright coloring and features matching Build-A-Bear's original, full animal designs (which it continues to sell).

6

21.     Shown below is a visual comparison of Build-A-Bear's current SKOOSHERZ™ plush toys to its original plush animals on which the SKOOSHERZ™ plush toys are based.


Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl


Build-A-Bear's Original
Pink Axolotl


Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow


Build-A-Bear's Original
Strawberry Cow


Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog


Build-A-Bear's Original
Spring Green Frog

7



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Build-A-Bear's Original
Rainbow Sparkle Teddy Bear



Build-A-Bear's **SKOOSHERZ™**
Red Raptor



Build-A-Bear's Original
Red Raptor

22.     Each SKOOSHERZ™ plush toy not only has labels and/or hang tags depicting Build-A-Bear's long-standing common law and federally registered Build-A-Bear Workshop® name and logo (shown below), but every SKOOSHERZ™ plush toy also has right and left arms, with one arm bearing Build-A-Bear's common law, federally registered, and iconic BAB® heart-shaped paw pad logo (also shown below).

8



23.    Build-A-Bear's advertising and marketing of its new SKOOSHERZ™ plush toys consistently and prominently include references to Build-A-Bear as the sole and exclusive source

EXHIBIT N
Page 9 of 54

of the SKOOSHERZ™ plush toys. This includes references to the Build-A-Bear name, the Build-A-Bear Workshop logo, the BAB logo, and other brand indicators on the products, on its website at www.buildabear.com, and in product displays in its physical retail locations, as shown by example below:







24.     Currently, Build-A-Bear's SKOOSHERZ™ plush toys can only be purchased in a Build-A-Bear physical retail store or online through Build-A-Bear's website at www.buildabear.com or the Build-A-Bear store on Amazon.com and are not available for purchase in third-party stores, such as Walgreen's, Walmart, or Target.

### FACTS RELATING TO KELLY TOYS' SQUISHMALLOWS PRODUCTS

25.     Defendants claim to be the sole and exclusive owners of claimed trade dress rights in their Squishmallows product line.

26.     Defendants' descriptions of the features purportedly comprising their claimed trade dress have changed greatly over the years and as applied to various third parties accused by Defendants of trade dress infringement.  Moreover, none of those purported features are consistently used by Defendants as an identifier of source, but instead constitute a mere product design aimed to aesthetically appeal to consumers.

27.     Over time, Defendants and apparently related entities have asserted at least twelve (12) different descriptions of the combined features purportedly make up their claimed trade dress in the Squishmallows product line, including the following descriptions and the respective cases where such assertions were made (With varying descriptions sometimes found even within the same pleadings!):

(1)     *Kellytoy USA, Inc., et al. v. Dan-Dee Int'l, Ltd., et al.*, Case No. 2:18-cv-05399 (C.D. Cal.), at ECF No. 16, First Amended Complaint (filed Aug. 24, 2018), ¶23:

    a.  substantially bell-shaped plush toys embodying fanciful renditions of animals/characters
    b.  embroidered anime-inspired minimalist, whimsical facial features
    c.  a velvety velour-like textured exterior, and
    d.  stuffing with a light "marshmallow," memory foam-like texture

(2)     *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 21, Memorandum in Support of Motion for Preliminary Injunction (filed Feb. 21, 2020), p. 3:

<div align="center">11</div>

a. specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs
b. abstract, embroidered facial features based on the Japanese Kawaii style
c. oval/rounded graphic features
d. ultra-soft shell and mooshy, silky stuffing

(3) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 24, Declaration of Jeanne Yoon in Support of Kelly Toys' Motion for Preliminary Injunction (filed Feb. 21, 2020), ¶10

a. The specific shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs
b. Kawaii abstract, embroidered facial features
c. Oval/rounded graphic features
d. An ultra-soft shell and mooshy, silky stuffing

(4) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 24, Declaration of Jeanne Yoon in Support of Kelly Toys' Motion for Preliminary Injunction (filed Feb. 21, 2020), ¶28:

a. egg/bell-like shape
b. absence of proportionate/pronounced limbs
c. simplified Kawaii-inspired aesthetics
d. short pile silky shell
e. airy, silky stuffing

(5) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 69, First Amended Complaint (filed May 21, 2020), ¶32:

a. Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
b. Simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
c. Embroidered facial features, such [as] nostrils, and/or mouths
d. Distinctive contrasting and non-monochrome coloring
e. Short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(6) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.), at ECF No. 105, Second Amended Complaint (filed Oct. 21, 2020), ¶34:

12

    a.  Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
    b.  Simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
    c.  Embroidered facial features, such as nostrils, eyes and/or mouths
    d.  Distinctive contrasting and non-monochrome coloring
    e.  Short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(7)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 1, Complaint (filed Nov. 2, 2023), ¶3:

    a.  Shaped fanciful renditions of animals/characters
    b.  Simplified Asian style Kawaii faces
    c.  Embroidered facial features
    d.  Distinctive and non-monochrome coloring
    e.  Velvety velour-like textured exterior

(8)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 26-2, Exhibit A to Jazplus Opposition to Motion to Dismiss (filed Jan. 22, 2024), ¶23:

    a.  substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters
    b.  simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys
    c.  embroidered two-dimensional facial features, such as eyes, nostrils, mouths
    d.  distinctive contrasting and non-monochrome coloring
    e.  short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(9)  *Kelly Toys Holdings, LLC, et al v. Zuru, LLC*, Case No. 2:23-cv-09255 (C.D. Cal.), at ECF No. 26, Jazplus Opposition to Motion to Dismiss (filed Jan. 22, 2024), p. 1:

    a.  fanciful rendition of a unique animal with simplified Asian style Kawaii faces in an egg/bell shape in combination with other features that create a distinguishing aesthetic look

(10) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 4:

    a. Substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

    b. simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

    c. embroidered facial features, such as eyes, nostrils, and/or mouths

    d. distinctive contrasting non-monochrome coloring

    e. short-pile exterior

(11) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 7:

    a. Shaped fanciful renditions of animals/characters

    b. simplified Asian style Kawaii faces

    c. embroidered facial features

    d. distinctive and non-monochrome coloring

    e. short-pile exterior

(12) *Jazwares, LLC., et al. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.), at Emergency Motion for Temporary Injunction (filed Jan. 29, 2024), p. 25:

    a. Asian-style Kawaii faces

    b. Rounded shape

    c. embroidered facial features

    d. bright colors

    e. small facial features

    f. small appendages

    g. overall unique minimalistic depiction of cute animals and shapes

(any and all combinations of the foregoing are hereinafter referred to as the "Claimed Squishmallows Trade Dress").

28. Most recently, Defendants have asserted infringement of trade dress descriptions (10) – (12) by Build-A-Bear in Florida state court under Florida common law, but Defendants'

14

litigation history against third parties suggests that Defendants will likely also claim features found in descriptions (1) – (9) but not found in descriptions (10) – (12), to be identifiers of source for purposes of the Claimed Squishmallows Trade Dress vis-à-vis Build-A-Bear. For these reasons and others set forth herein, Build-A-Bear is seeking declarations of invalidity, unenforceability, and non-infringement under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., for all features of the Claimed Squishmallows Trade Dress.

29. The various features Defendants have claimed as components of the Claimed Squishmallows Trade Dress are not all consistently present throughout the entire Squishmallows product line, undermining the assertion of a total product image recognizable by the consuming public as an identifier of a single source. Defendants contend that their various claimed trade dress features are not easily reduced to writing and that the overall look and image of the Claimed Squishmallows Trade Dress are not limited to specific shapes, colors, textures and graphics. In fact, Defendants and apparently related entities have previously filed complaints alleging trade dress infringement that included images of the wide variety of Squishmallows products and designs, which images do not consistently display any total product image or commercial impression, such as the following:



15

EXHIBIT N
Page 15 of 54



30. No consistent overall look and feel or stable visual appearance can be discerned from Defendants' Squishmallows products. For example, the snouts are all different (*e.g.*, circular, oval, triangular, and "comma" shaped), with some containing a nose attached to a curved mouth (*e.g.*, dog, leopard, bear, sheep and mouse), one containing a nose and a separate mouth (*e.g.*, sloth), some containing nostrils only (*e.g.*, unicorn, pig, frog, and giraffe), one with lines to resemble an elephant trunk, and some toys lacking a snout altogether (*e.g.*, penguin, which has a beak, and monkey). One cannot discern distinctive contrasting and non-monochrome coloring in the depicted toys, which run the gamut from various shades of black, brown, tan, white, pink, blue and gray, and including colors and prints found in nature, such as black for the bat, brown for the dog, sloth, bear and monkey, green for the frog, pink for the pig, grey for the mouse and elephant, and leopard and giraffe prints for the corresponding animals. Even the embroidered, Asian style

16

eyes have no discernible consistency: some eyes have eyelashes (*e.g.*, pink unicorn), some are placed on contrasting fabric bands or face masks (*e.g.*, sloth, monkey and blue sheep), and some even have "closed" eyes (*e.g.*, penguin and blue dog). Some of the toys have contrasting, semi-circular "bellies" whereas others do not, and some have a contrasting irregularly-shaped panel covering the face and belly of the toy (sloth and penguin). The various "appendages" also differ between the toys depicted above, with horns, manes, and differently shaped ears placed on different parts of the toys (floppy, round, folded, not folded, elephant-shaped, or no ears at all).

31.     Additional examples of Squishmallows purportedly featuring Defendants' claimed trade dress have been submitted in other cases, and further demonstrate that the Claimed Squishmallows Trade Dress features are not consistently found in every Squishmallows product and accordingly do not create a commercial impression of a single source. For example, not all Squishmallows have "short-pile" fabric or "velvety velour-like textured exterior" because some are made with longer pile fabric (lion's mane and bird's feathers) and some are made with scratchy sequined fabric:



32.     All of Defendants' Squishmallows products do not have "rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys". Instead, Defendants' Squishmallows products have all manner of features and graphics that are linear (snowman and

EXHIBIT N
Page 17 of 54

gingerbread man scarf, mummy tape, elf and nutcracker belts, butterfly belly, witch's bodice), squiggled (clownfish lines, gingerbread man trim and unicorn hair), triangular (elf's collar, pumpkin eyes, and dinosaur mane), or pointed (fox facial features), while others have details not "kawaii" in style (nutcracker, jack-o-lantern, witch):





33. Defendants' ever-changing claimed trade dress features are essential to the use or purpose of plush products and affect the cost or quality of the products. If Defendants were granted the exclusive use of any or all of the Claimed Squishmallows Trade Dress used in any combination and/or variation, their competitors would be put at a significant non-reputation-related disadvantage with regard to generic, functional, and non-source identifying features. Moreover, the claimed trade dress features constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product.

34.     The main messages communicated by Defendants' advertising for its Squishmallows product line are softness/squeezability – and collectability.  Defendants also frequently advertise that their Squishmallows can be used as pillows, which message is mentioned in dozens of marketing materials for the products, demonstrating the functionality of the products. Advertising for Defendants' Squishmallows has touted the fact that "[s]ince 2017, the Squishmallows … have offered comfort, support and warmth as … pillow pals" and Kelly Toys' CEO Jonathan Kelly has also declared that Squishmallows can be used as pillows (among other things) in a news release about the toy:  "Squishy and comforting, they are great … pillows." Because Squishmallows function as pillows, those aspects of the products that render them useful as pillows are functional.  The functional "pillow" features of Squishmallows include, at least, the egg/bell shape, the embroidered facial features (hard or plastic features can be too uncomfortable for a pillow), the short-pile, ultra-soft, velvety velour-like textured exterior, and the light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel.

35.     These same elements have been advertised by Defendants as being washable – another functional feature, including in exhibits to Defendants' own complaints against alleged third party infringers, including advertising about the Squishmallows products stating that "the unique line is made of super soft spandex EF and polyester stuffing, similar to memory foam, for crazy, cuddly fun.  Caring for Squishmallows is easy:  give them lots of love, wash in warm water and tumble dry on medium heat."

36.     Defendants also advertise the fact that Squishmallows serve the function of offering comfort and "helping to relieve stress and anxiety."  These claims, along with statements about the tactile appeal of the toys and how the products assist those with sensory issues, have been repeated in numerous marketing materials for the products.

37.     Tags, packages, displays and advertisements for Defendants' Squishmallows products tout the functionality of the fact that the toys are "soft", "squishable" and "huggable," with slogans like "SQUEEZE AND CUDDLE ME":



38.     Upon information and belief, Defendants do not own any trademark registrations or exclusive, common law trademark rights to the terms "SQUISH", "SQUISHY", "SQUISHABLE", or "HUGGABLE" in connection with plush toys.

39.     If each aspect of the claimed trade dress were in fact protected trade dress, it would be virtually impossible for competitors to create alternative designs.  For example, Defendants claim as trade dress those elements of its plush products that make the product resemble an animal, including "eyes, snouts and bellies" and "nostrils, and/or mouths."  However, features like eyes, nostrils, ears, and noses are essential to the purpose of creating animal or character figures and are, therefore, functional.  Indeed, many of the asserted elements that are necessary to make Squishmallows resemble their counterparts in nature or a fanciful character (such as eyes, ears, snouts, bellies, nostrils, mouths, coloring, etc.) are functional, and therefore cannot be protectable trade dress.

20

40. Defendants' claimed "distinctive contrasting non-monochrome coloring" is also functional. Fanciful coloring of toy and the overall design of plush toys is aesthetically functional in that it is the toys' aesthetic that drives the consumer to purchase them, and this functionality exists independently of any source-identifying function.

41. If features such as an egg/bell shape, Asian style Kawaii faces with rounded/oval shaped graphics, embroidered facial features, distinctive contrasting non-monochrome coloring, or short-pile fabric exterior were protected trade dress, it would be virtually impossible for competitors to create alternative toy designs for this item's purpose. From a toy designer's perspective, each of these claimed trade dress features is necessary to either depict the various characters or animals, or is necessary to create this category of pillow-type plush that is currently trending.

**NUMEROUS SQUISHY PLUSH TOYS EXISTED BEFORE
SQUISHMALLOWS ENTERED THE MARKETPLACE IN 2017**

42. Long before Defendants introduced their Squishmallows product line allegedly featuring the claimed trade dress in 2017, third parties offered for sale and sold (and continue to sell) across the United States a number of products featuring all of the elements of Defendants' claimed trade dress, including but not limited to Squishable's plush animal line starting in 2008, Ty's 2011 and 2012 BEANIE BALLZ, Ty's 2013 BABY BALLZ, and KidRobot's Yummy World products starting in 2015:

21







YUMMY WORLD Large Macaroon
$ 29.99

YUMMY WORLD Large Pea Pod
$ 29.99

43.     Long before Defendants introduced their Squishmallows product line featuring the claimed trade dress, each of the claimed trade dress elements, either alone or combined, was prevalent in the U.S. toy market and offered for sale and sold by third parties in interstate commerce.  Many of such toys (or variations thereof) are still sold today, including for example:



Molang 2016    Suikko Gurashi 2013    Pusheen 2015    Totoro 2016    Gudetama 2015    Noodoll Pre-2017

Schrodinger's Cat Pre-2017    Squooshies 2017    Sago Minis 2017    Grumpy Cat Pre-2017    Fiesta Owl 2012

23

44.     Moreover, Defendants or related entities have dismissed their complaints against multiple major competitors and their plush products with the claimed trade dress elements, either alone or combined, including but not limited to Ty and its Squishaboos (or Squishy Beanies) plush products and Dan-Dee International and its Squishy plush products.  After such lawsuits were dismissed with prejudice, neither Ty nor Dan-Dee publicly identify that their use is licensed by or affiliated with Defendants in any manner.  Therefore, the product features of these third parties (previously alleged to infringe Defendants' claimed trade dress) do not and cannot identify Defendants as the sole and exclusive source of such trade dress elements, either alone or in combination.

45.     In other words, Defendants have, by their own actions, permitted major third-party competitors like Ty and Dan-Dee to use, without any attribution to Defendants, the same trade dress features that Defendants now claim Build-A-Bear infringes.  Defendants are thereby prevented from acquiring any distinctiveness or secondary meaning in Defendants' Claimed Squishmallows Trade Dress due to a crowded field of products utilizing the very same features Defendants currently claim as trade dress.  Defendants' repeated dismissals with prejudice amounts to admissions that Defendants' claimed rights cannot extend to those products or any others with a similar appearance.  Examples of Ty's current Squishy Beanies and Dan-Dee's current Squishy plush toy are respectively shown below:

**Ty's Squishy Beanies**

**Dan-Dee's Squishy plush toy**



46.     Because third parties have been selling their squishy plush products as identified above before 2017 and for many years thereafter, consumers do not identify any features of the Claimed Squishmallows Trade Dress exclusively with Defendants as the sole source.  Moreover, Defendants' marketing activities and associated expenditures have not established secondary meaning in any trade dress asserted in the Squishmallows product line, because the advertising did not encourage consumers to identify the claimed trade dress solely and exclusively with Defendants.   Indeed, Defendants' own advertising of its product line as the "Original" Squishmallows implicitly acknowledges that there are many other products with similar aesthetic and functional features.

47.     Any commercial success of the Squishmallows product line is attributable to the desirability of the product configuration and functionality rather than the source-designating capacity of the claimed trade dress.

### BUILD-A-BEAR'S SKOOSHERZ<sup>TM</sup> PLUSH TOYS ARE EASILY DISTINGUISHED FROM DEFENDANTS' SQUISHMALLOWS PRODUCTS

48.     Soft, pillow-like squishie-type products have been trending in the toy industry for a number of years.  Build-A-Bear's SKOOSHERZ$^{TM}$ plush toys are simply the most recent example of pillow-type products in this space, including Squishables, Dan-Dee's Squishy toys,

EXHIBIT N
Page 25 of 54

Ty's Squishaboos, and toys made by Gund, Fiesta, First and Main, Rhode Island Novelty, Moosh, and others, all predating and/or sold contemporaneously in interstate commerce with Defendants' Squishmallows products such that Defendants cannot have acquired any distinctiveness or secondary meaning in the marketplace.

      49.    As described above, Build-A-Bear's SKOOSHERZ™ plush toys were not copied from Defendants' Squishables but are based upon, and derive from, preexisting Build-A-Bear toys which have been sold for a number of years. Moreover, Build-A-Bear's SKOOSHERZ™ plush toys demonstrate functional revisions (in a pillow-like presentation) to its preexisting Build-A-Bear toys, creating a consistent product offering by Build-A-Bear, and not copied or derived from any source-identifying feature purportedly in Defendants' Squishmallows products. The features present in each of Build-A-Bear's SKOOSHERZ™ plush toys including, for example, the coloration, fabric patterns, facial features, and ear shape and placement come directly from Build-A-Bear's preexisting plush animal products of the same name and design:





Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl

Build-A-Bear's Original
Pink Axolotl

26

EXHIBIT N
Page 26 of 54



Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow



Build-A-Bear's Original
Strawberry Cow



Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog



Build-A-Bear's Original
Spring Green Frog



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Build-A-Bear's Original
Rainbow Sparkle Teddy Bear

27





Build-A-Bear's **SKOOSHERZ™**
Red Raptor

Build-A-Bear's Original
Red Raptor

50. The design features on Build-A-Bear's SKOOSHERZ™ plush toys come from Build-A-Bear, not Defendants.

51. There is no confusing similarity between Build-A-Bear's SKOOSHERZ™ plush toys and Defendants' claimed trade dress. In terms of overall appearance of the products, Build-A-Bear's SKOOSHERZ™ are distinctly spherical or rounded in shape, in contrast to the claimed egg/bell-shaped design of Defendants' Squishmallows product line. Build-A-Bear's facial features match their preexisting designs and do not mimic Defendants' facial features, including eyes and mouth features that are specifically distinguished in terms of shape (for example, round eyes vs. oval or moon-shaped eyes). The coloration of Build-A-Bear's products functionally matches the specific animal depicted, including the distinctive yellow colored belly in its original Build-A-Bear "raptor" design and which is a functionally accurate part of this dinosaur depiction. The parties' respective source-identifying labels and tags are prominently displayed on their respective toys as well. A visual contrast of Build-A-Bear's SKOOSHERZ™ plush toys and Defendants' Squishmallows products is shown below:

28



Defendants' Archie the Pink Axolotl
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Pink Axolotl



Defendants' Evangelica Cow
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Strawberry Cow



Defendants' Wendy Green Frog
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Spring Green Frog

29



Defendants' Marley Rainbow Bear
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Rainbow Sparkle Teddy Bear



Defendants' Red Snowflake Dinosaur
Squishmallow



Build-A-Bear's **SKOOSHERZ™**
Red Raptor

52. Defendants' Claimed Squishmallows Trade Dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features. That is, Defendants' claimed trade dress is nonexistent, because product shape and feel and the cosmetic depiction of animals almost invariably serves purposes other than source identification, because the claimed trade dress lacks commercial strength in the form of secondary meaning, and because the features alleged to be Defendants' trade dress were used (and continue to be used) by multiple competitors in interstate commerce long before Defendants offered for sale and/or attempted to acquire trade dress rights in its Squishmallows products.

53. Upon information and belief, Defendants consistently and prominently offer for sale and sell their Squishmallows products utilizing their federally registered SQUISHMALLOWS

30

trademarks, and to the extent the consuming public identifies the source of Defendants' products, it does so by such registered trademarks, and not the overall shape, size, or commercial appearance of any of Defendants' products. Indeed, Defendants have not even attempted to register trade dress at the federal level in any of their Claimed Squishmallows Trade Dress designs, presumably because they know the U.S. Trademark Office would not approve of Defendants' shifting, vague, and overbroad descriptions of their purported trade dress, and because Defendants know they cannot prove acquired distinctiveness, secondary meaning, and/or sole and exclusive rights to their Claimed Squishmallows Trade Dress.

54.     Although Defendants want their amorphous trade dress definition to include the entirety of a vast, varied product line, the Squishmallows product line lacks any common features, so Defendants cannot register it. Some Squishmallows are animals, some are not. Some have round eyes, some have slits. Some have mouths, some do not. Some have arms or feet, some do not. Some have bellies, some do not. Some have ears, some do not. Some wear clothes, some do not. Some have noses or snouts, some do not. Some have eyes on the tops of their heads, some do not. Defendants' Squishmallows have no consistent colors or color patterns. Because of this utter lack of consistency, Defendants would not be able to submit a single drawing of the claimed trade dress that could possibly satisfy the U.S. Trademark Office's regulatory requirements for providing notice to the public of Defendants' claimed rights. Even if one found the oval/egg-shaped perimeter to be consistent across the product lineup (which it is not), that would not help Defendants because they cannot register trade dress rights in an oval.

55.     In other words, Defendants have avoided any attempt at federal registration of their claimed trade dress because Defendants do not own a single trade dress encompassing all Squishmallows and therefore cannot properly assert trade dress claims against Build-A-Bear.

31

56. Additionally, consumers are not likely to be confused between the source of the Build-A-Bear SKOOSHERZ$^{TM}$ plush toys compared to Defendants' Squishmallows products. Adults, as purchasers of the Build-A-Bear SKOOSHERZ$^{TM}$ plush toys, are likely to exercise reasonable care when purchasing the parties' respective plush products and can easily distinguish the sources of the parties' products, which, among other things, are clearly and prominently labeled with the parties' names and trademarks.

57. By selling its SKOOSHERZ$^{TM}$ plush toys, Build-A-Bear does not seek to confuse any consumer as to the source of its products, and there is in fact no actual confusion. Each of Build-A-Bear's SKOOSHERZ$^{TM}$ plush toys is sold in connection with its source-identifying SKOOSHERZ$^{TM}$ trademark and its famous Build-A-Bear name and logo that clearly and prominently identifies Build-A-Bear as the source of the products, including on the product hang tag, the product label, and even with its iconic "BAB" heart paw logo on the arm of each Build-A-Bear SKOOSHERZ$^{TM}$ plush toy.

58. The advertising and marketing of Build-A-Bear's SKOOSHERZ$^{TM}$ plush toys always includes references to Build-A-Bear as the sole and exclusive source, including on its website at www.buildabear.com and in product displays in its physical retail locations. Moreover, Build-A-Bear's SKOOSHERZ$^{TM}$ plush toys can only be currently purchased in a Build-A-Bear physical retail store or online through Build-A-Bear's website at www.buildabear.com and the Build-A-Bear store on Amazon.com and are not available for purchase in third-party stores like Walgreen's, Walmart, or Target.

59. This clarity of labeling in packaging, advertising, and sale avoids any likelihood of consumer confusion as to source stemming from the product's configuration, even if any features

of the Claimed Squishmallows Trade Dress could be deemed valid and enforceable against any features of Build-A-Bear's SKOOSHERZ™ plush toys.

<div style="text-align:center">

**COUNT I – DECLARATORY JUDGMENT OF INVALIDITY AND UNENFORCEABILITY OF THE CLAIMED SQUISHMALLOWS TRADE DRESS**

</div>

60.     Build-A-Bear incorporates by reference Paragraphs 1 through 59 as if fully set forth herein.

61.     Defendants have a history of litigious conduct, wherein Defendants have previously asserted in multiple cases against multiple third parties that Defendants have valid and enforceable trade dress in their Squishmallows product line under the Lanham Act.

62.     Further, Defendants have previously asserted in multiple cases against multiple third parties that those third parties' manufacture, advertising and sale of plush toys infringe Defendants' claimed trade dress rights in their Squishmallows product line.

63.     In particular, Defendants and related entities have filed at least thirty-three (33) federal district court lawsuits regarding Defendants' Squishmallows products against hundreds of defendants under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and/or other federal and common law claims.  Those 33 federal lawsuits have been filed over the course of the last seven (7) years in the United States District Courts for the Southern District of New York, the Northern District of Illinois, and the Central District of California.  Defendants have continued filing such federal Lanham Act infringement lawsuits regarding Defendants' Squishmallows products in just the past few months, including filing a Lanham Act trade dress infringement lawsuit against Zuru, LLC, in the Central District of California on November 2, 2023 (*Kelly Toys Holdings, LLC, et al. v. Zuru, LLC*, Case No. 2:2023cv09255), and a Lanham Act trademark infringement lawsuit against over 135 internet toy sellers in the Northern District of Illinois on January 5, 2024 (*Kelly Toys Holdings,*

<div style="text-align:center">

33

</div>

*LLC v. The Partnerships and Unincorporated Associations Identified on Schedule A*, Case No. 1:2024cv00165).

64.     Defendants have further asserted that Build-A-Bear's SKOOSHERZ™ plush toys infringe Defendants' claimed trade dress rights in its Squishmallows product line under Florida law, having filed a lawsuit against Build-A-Bear in Broward County, Florida, on January 29, 2024. Although nominally brought under Florida law, Defendants' Complaint against Build-A-Bear and subsequently denied *ex parte* emergency motion for preliminary injunction contain contentions not limited to injuries or activities in Florida. By their allegations in that Florida state court action, Defendants clearly contend that Build-A-Bear's SKOOSHERZ™ plush toys infringe Defendants' claimed trade dress rights in its Squishmallows product line across the United States and not just Florida, thereby directly implicating Defendants' claimed trade dress rights under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., as Defendants have previously asserted and are currently asserting those Lanham Act trade dress rights against hundreds of defendants.

65.     Defendants have also expressly stated in their Florida state court action that Defendants "**Vigilantly Protect Their Intellectual Property**", that "Kelly Toys takes steps to ensure that their intellectual property is protected," and that "Kelly Toys will stop at no length to prevent" misuse of its intellectual property. Defendants' statements of intent to enforce their claimed intellectual property rights and history of litigious conduct are indicative of an actual controversy.

66.     Build-A-Bear has been actively selling and marketing its SKOOSHERZ™ plush toys across the United States starting in January 2024, and otherwise taking concrete steps to conduct activity that could constitute alleged infringement.

EXHIBIT N
Page 34 of 54

67.     Build-A-Bear has a reasonable apprehension of suit by Defendants in view of, among other things, Defendants' history of litigious conduct in federal court under the Lanham Act with respect to their Squishmallows products, Defendants' statements of intent to enforce their claimed intellectual property rights in their Squishmallows products, Defendants' actual lawsuit against Build-A-Bear in Florida state court alleging infringement of trade dress under Florida law, and Build-A-Bear's active sale and marketing of its SKOOSHERZ™ plush toys across the United States.

68.     Build-A-Bear seeks specific relief through a decree of conclusive character so that Build-A-Bear can remove the cloud of Defendants' asserted trade dress infringement with respect to Build-A-Bear's SKOOSHERZ™ plush toys currently being sold and marketed on a nationwide basis.

69.     An actual and justiciable controversy has arisen between Build-A-Bear and Defendants regarding the validity and enforceability of Defendants' claimed rights in the Claimed Squishmallows Trade Dress under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which controversy between the parties having adverse legal interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in this matter.

70.     Build-A-Bear is entitled to a declaratory judgment under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, declaring that no features of Defendants' Claimed Squishmallows Trade Dress are valid, enforceable, or protectable because, *inter alia*: (1) the claimed trade dress is generic; (2) the claimed trade dress is not specifically articulated but instead uses terms to describe its claimed trade dress that are variable, vague, overbroad, and open-ended; (3) the claimed trade dress is not used across the entire Squishmallows product line to gain any consumer recognition as source-identifying features; (4) the claimed trade dress elements are functional; (5) the claimed

trade dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features; (6) Defendants cannot prove first use of the claimed trade dress; and/or (7) the claimed trade dress lacks secondary meaning in the marketplace, such that Defendants are not recognized by consumers as being the sole and exclusive source of goods bearing any or all of the claimed trade dress elements.

### COUNT II – DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE CLAIMED SQUISHMALLOWS TRADE DRESS

71.     Build-A-Bear incorporates by reference Paragraphs 1 through 70 as if fully set forth herein.

72.     Build-A-Bear's SKOOSHERZ™ plush toys do not infringe Defendants' Claimed Squishmallows Trade Dress because no features of Defendants' Claimed Squishmallows Trade Dress are valid or enforceable because, *inter alia*: (1) the claimed trade dress is generic; (2) the claimed trade dress is not specifically articulated but instead uses terms to describe its claimed trade dress that are variable, vague, overbroad, and open-ended; (3) the claimed trade dress is not used across the entire Squishmallows product line to gain any consumer recognition as source-identifying features; (4) the claimed trade dress elements are functional; (5) the claimed trade dress is not capable of creating a commercial impression distinct from generic, functional, and/or descriptive features; (6) Defendants cannot prove first use of the claimed trade dress; and/or (7) the claimed trade dress lacks secondary meaning in the marketplace, such that Defendants are not recognized by consumers as being the sole and exclusive source of goods bearing any or all of the claimed trade dress elements.

73.     To the extent Defendants own any valid or enforceable trade dress rights, Build-A-Bear's SKOOSHERZ™ plush toys do not create any likelihood of consumer confusion, nor are

<div align="center">36</div>

they likely to cause mistake or deceive, or misrepresent the nature, characteristics, qualities or geographic origin of any goods and/or services.

74.     An actual and justiciable controversy has arisen between Build-A-Bear and Defendants regarding Build-A-Bear's purported infringement of Defendants' Claimed Squishmallows Trade Dress under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which controversy between the parties having adverse legal interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in this matter.

75.     Build-A-Bear has not infringed and does not infringe any valid or enforceable rights in Defendants' Claimed Squishmallows Trade Dress, and Defendants have not been and are not likely to be damaged by Build-A-Bear's conduct.

76.     Build-A-Bear is entitled to a declaratory judgment under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, that its manufacture, marketing, and sale of its SKOOSHERZ™ plush toys does not infringe Defendants' claimed trade dress or any of Defendants' related rights in their Squishmallows product line.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Build-A-Bear Workshop, Inc. prays for judgment as follows:  (a) declaring that any and all claimed trade dress rights by Defendants in their Squishmallows products are invalid and unenforceable under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., including specifically 15 U.S.C. §§ 1114 and 1125, and other applicable federal law; (b) declaring that Build-A-Bear's SKOOSHERZ™ plush toys do not infringe any of Defendants' claimed trade dress rights in its Squishmallows products under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., including specifically 15 U.S.C. §§ 1114 and 1125, and other applicable federal law; (c) awarding Build-A-Bear its attorneys' fees, costs, and other expenses, including as an

EXHIBIT N
Page 37 of 54

exceptional case under 15 U.S.C. § 1117 and other applicable federal law; and (d) awarding Build-A-Bear such other and further relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff Build-A-Bear demands a trial by jury as to all claims and all issues so triable.

EXHIBIT N
Page 38 of 54

Dated:  February 12, 2024

Respectfully submitted,

**LEWIS RICE LLC**

By:    /s/  Michael J. Hickey
        Michael J. Hickey, #47136(MO)
        mhickey@lewisrice.com
        Philip J. Mackey, #48630(MO)
        pmackey@lewisrice.com
        Allison E. Knopp, #74724(MO)
        aknopp@lewisrice.com
        600 Washington Avenue, Suite 2500
        St. Louis, Missouri 63101
        (314) 444-7600
        (314) 241-6056 (fax)

        ***Attorneys for Plaintiff Build-A-Bear
        Workshop, Inc.***

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| BUILD-A-BEAR WORKSHOP, INC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.  4:24-cv-00211 |
| | ) |
| KELLY TOYS HOLDINGS, LLC, | ) |
| KELLY AMUSEMENT HOLDINGS, LLC, | ) **JURY TRIAL DEMANDED** |
| JAZWARES, LLC, and JAZPLUS, LLC. | ) |
| | ) |
| Defendants. | ) |

<u>**MOTION TO ENJOIN DEFENDANTS FROM PROCEEDING WITH BAD FAITH,**</u>
<u>**LATER-FILED LAWSUIT**</u>

COMES NOW Plaintiff Build-A-Bear Workshop, Inc. ("Plaintiff" or "Build-A-Bear"), by and through its undersigned counsel, and for its Motion to Enjoin Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, Jazwares, LLC, and Jazplus, LLC (collectively the "Defendants") from Proceeding with Bad Faith, Later-Filed Lawsuit, states as follows:

1.      Build-A-Bear filed its Complaint for Declaratory Judgment on February 12, 2024 at 9:59 a.m. CST, and served the same on all Defendants at 2:05 p.m. CST that same day.

2.      Defendants filed a Complaint for Trade Dress Infringement Under the Lanham Act, Common Law Trade Dress Infringement, Copyright Infringement Under the Copyright Act, Common Law Unfair Competition, and California Statutory Unfair Competition against Build-A-Bear in the United States District Court for the Central District of California (the "California Lawsuit") later on February 12, 2024 and served Build-A-Bear on February 13, 2024.

3.      Pursuant to *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002 (8th Cir. 1993), Defendants should be enjoined from proceeding with the California Lawsuit and this

action should proceed because, among other things, Build-A-Bear was the first to file, and Defendants have engaged in bad faith litigation tactics and blatant forum shopping.

4.　　Plaintiff's Memorandum in Support of this Motion to Enjoin Defendants from Proceeding with Bad Faith, Later-Filed Lawsuit is filed contemporaneously herewith and incorporated herein.

WHEREFORE, for all the foregoing reasons, and those more fully set forth in Plaintiff's Memorandum in Support, Plaintiff Build-A-Bear Workshop, Inc. respectfully requests that this Court enjoin Defendants from proceeding in the California Lawsuit in favor of this first-filed action, and grant such other and further relief as this Court deems just and proper under the circumstances.

　　　　　　　　　　　　　　　　Respectfully submitted,

Dated: February 16, 2024　　　　　**LEWIS RICE LLC**

　　　　　　　　　　By:　　/s/ Michael J. Hickey
　　　　　　　　　　　　　Michael J. Hickey, #47136(MO)
　　　　　　　　　　　　　mhickey@lewisrice.com
　　　　　　　　　　　　　Philip J. Mackey, #48630(MO)
　　　　　　　　　　　　　pmackey@lewisrice.com
　　　　　　　　　　　　　Allison E. Knopp, #74724(MO)
　　　　　　　　　　　　　aknopp@lewisrice.com
　　　　　　　　　　　　　600 Washington Avenue, Suite 2500
　　　　　　　　　　　　　St. Louis, Missouri 63101
　　　　　　　　　　　　　(314) 444-7630
　　　　　　　　　　　　　(314) 612-7630 (fax)

　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　*Build-A-Bear Workshop, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February 2024, a copy of the foregoing was filed electronically.  Further, I certify that a true and accurate copy of the foregoing will be served on Defendants' Registered Agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808, with a courtesy copy provided by email to:

> Moez M. Kaba
> Hueston Hennigan LLP
> 523 West 6th Street
> Suite 400
> Los Angeles, CA 90014
> mkaba@hueston.com

> *Attorneys for Defendants*

/s/ Michael J. Hickey

3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

BUILD-A-BEAR WORKSHOP, INC.,       )
                                    )
         Plaintiff,       )
                                      )
vs.       )    Case No. 4:24-cv-00211-MTS
                                      )
KELLY TOYS HOLDINGS, LLC,       )
KELLY AMUSEMENT HOLDINGS, LLC,       )
JAZWARES, LLC, and JAZPLUS, LLC,       )
                                      )
         Defendants.       )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ENJOIN DEFENDANTS FROM PROCEEDING WITH BAD FAITH, LATER-FILED LAWSUIT

Defendants Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC, Jazwares, LLC, and Jazplus, LLC (collectively, "Defendants") have engaged in coast-to-coast forum shopping relating to their purported intellectual property rights in their Squishmallows products, draining judicial resources along the way. This Court can, and should, put an end to it.

Defendants began their latest litigation campaign[1] by filing a lawsuit and seeking an "*emergency*," *ex parte* temporary injunction from a Florida state court against Build-A-Bear Workshop, Inc. ("Build-A-Bear") concerning Defendants' asserted intellectual property rights under Florida law in their Squishmallows products (the "Florida Lawsuit"). Incredibly, Defendants provided *no notice to Build-A-Bear, and in fact, deliberately hid the lawsuit and request for injunctive relief from Build-A-Bear*. The Florida state court rightly and summarily

---

[1] Over the last seven years, Defendants and related entities have filed 33 lawsuits attempting to assert various intellectual property rights, including common law trade dress rights in their Squishmallows products (they have no federal trade dress registrations or applications pending), historically filing in federal court. However, it appears that Defendants chose to file their *first* lawsuit against Build-A-Bear in Florida state court due to the "unconventional" approach and relief sought (*i.e.*, a "secret" lawsuit seeking an *ex parte* injunction to stop a global retailer's sales of products).

rejected Defendants' underhanded request.  In contrast to the initially asserted "emergency" purportedly justifying secretive, *ex parte* proceedings, Defendants thereafter allowed the Florida Lawsuit to languish.  Indeed, to this day, Defendants have not served the Florida Lawsuit on Build-A-Bear or taken any further action in the Florida Lawsuit.

Build-A-Bear properly filed its Complaint in this Court seeking a declaration of its rights under federal law, after learning of the allegations made against it in the Florida Lawsuit and the apparent existence of an intellectual property dispute between the parties, and given Defendants' uncertain intentions and failure to move forward with the Florida Lawsuit after their misguided attempt to "sneak one past the goalie" had failed.  Apparently undeterred by their failed *ex parte* attack in Florida and just hours after Build-A-Bear filed its Complaint in this Court, Defendants brazenly attempted to try their luck again, this time across the country on the West Coast, by filing a parallel action against Build-A-Bear in the United States District Court for the Central District of California (the "California Lawsuit").

Longstanding and clear Eighth Circuit law squarely prohibits the blatant forum shopping Defendants are attempting.  As discussed more fully below, this action—which was filed and served before Defendants' California Lawsuit—must proceed first, and Defendants should be enjoined from pursuing the California Lawsuit pending entry of a final judgment by this Court.

## BACKGROUND

### A.    The Florida Lawsuit

On January 29, 2024, Defendants filed a Verified Complaint in the Circuit Court of Broward County, Florida alleging, *inter alia*, common law trade dress infringement against Build-

A-Bear for the sale of its Skoosherz™ plush toys. (*See* <u>Exhibit 1</u>.)[2] That same day, Defendants also filed a "Verified *Ex Parte* Emergency Motion for Temporary Injunction" in which they sought to enjoin Build-A-Bear from selling its Skoosherz™ products. (*See* <u>Exhibit 2</u>.) In support of their request for extraordinary, "emergency" relief, Defendants told the Florida state court that no notice of the proceedings or request for an injunction should be provided to Build-A-Bear (or even attempted) because such notice "may well cause Build-A-Bear to destroy . . . and/or hide evidence[.]" (*Id.*, at 28.) In a "Request for Emergency Relief" also filed that day, Defendants purported to express concern that Build-A-Bear might remove the case to federal court if it learned of the lawsuit against it. (*See* <u>Exhibit 3</u>, at 2.) Defendants also claimed they were being irreparably harmed "every day" and therefore were entitled to immediate, *ex parte* relief. (*See id.*, at 1.)

Later that same day, the Florida state court denied Defendants' baseless assertion that an "emergency" existed in the first instance. (*See* <u>Exhibit 4</u>.) As of the filing of this Motion, Defendants have taken no further action in the Florida state court since that denial. (*See* <u>Exhibit 5</u>.)

## B.       This Action

After Build-A-Bear learned of the apparent existence of a dispute between the parties concerning intellectual property matters (despite Defendants' concerted efforts to conceal it, including filing an unsuccessful motion to seal its Complaint and *Ex Parte* Emergency Motion for Temporary Injunction (*see* <u>Exhibit 6</u>)), Defendants took no action to advance the Florida Lawsuit. Build-A-Bear was therefore uncertain as to Defendants' intentions and took the initiative to seek a comprehensive resolution of the dispute on a national basis by filing the instant action on February 12, 2024, and serving Defendants that same day. (*See* ECF Nos. 1, 7-10.)

---

[2] Because Build-A-Bear has never been served with the Florida Lawsuit, its access is limited to the publicly available pleadings from the court file, which bear a "Not an Official Copy – Public Access – Not an Official Copy" watermark.

Resolution of this action will refute Defendants' blatantly false allegations concerning the lawfulness of Build-A-Bear's national sales of its Skoosherz™ products, and remove any cloud Defendants have improperly put on Build-A-Bear's good name.

**C.     The California Lawsuit**

Build-A-Bear filed the instant action on February 12, 2024 at 9:59 a.m. CST.  (*See* E-Filing Receipt, <u>Exhibit 7</u>.)  Defendants filed the California Lawsuit later that same day and, at 4:14 p.m. CST, sent each of the three undersigned counsel for Build-A-Bear an email attaching a copy of the California Lawsuit.  (*See* <u>Exhibit 8</u>.)  The California Lawsuit is largely duplicative of the instant action.  In their Complaint, Defendants (who are plaintiffs in the California Lawsuit) attempt to assert claims for trade dress infringement under the Lanham Act and common law, copyright infringement under the Copyright Act, and common law and California statutory unfair competition. *See Kelly Toys Holdings, LLC, et al. v. Build-A-Bear Workshop, Inc.*, 2:24-cv-01169-JLS-MAR, ECF No. 1 (C.D. Cal.).  The allegations and claims in the California Lawsuit arise out of the same facts, transactions, and occurrences as those at issue in Build-A-Bear's earlier-filed Complaint in this Court.  Defendants served Build-A-Bear with the California Lawsuit on February 13, 2024. *See id.*, ECF Nos. 12-13.

<div align="center">

**<u>ARGUMENT</u>**

</div>

Because the instant action was filed before Defendants' parallel California Lawsuit, and because the California Lawsuit itself is flagrant forum shopping designed to further harass Build-A-Bear and waste judicial resources,  Defendants should be enjoined from pursuing the California Lawsuit pending issuance of a final judgment by this Court.

<div align="center">

4

</div>

A.      **The First-to-File Rule and Injunctive Relief**

Where, as here, litigation is commenced by a party after that party was named in a lawsuit and that subsequent litigation concerns substantially similar matters as the earlier-filed lawsuit, the proper remedy is the issuance of an injunction in the first-filed suit that enjoins the party from pursuing later-filed, duplicative litigation.  *See Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1004 (8th Cir. 1993).

Indeed, the Eighth Circuit has recognized that, "[t]he discretionary power of the federal court in which the first-filed action is pending to enjoin the parties from proceeding with a later-filed action in another federal court is firmly established."  *Id.* (collecting cases).  Such injunctions are not the sort governed by the factors set forth in *Dataphase Systems Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*).  *See Nw. Airlines*, 989 F.2d at 1004.  Rather, the issue "is simply whether, as between two courts both having jurisdiction over the parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action."  *Id.*

To this end, as the Eighth Circuit has explained, it is "well-established" that "in cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case."  *Id.* at 1005 (quoting *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488-49 (8th Cir. 1990) (internal quotation omitted)).  While this rule is not "rigid, mechanical, or inflexible" and should be applied "in a manner best serving the interests of justice," the "prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply."  *Id.* (quoting *United States Fire Ins. Co.*, 920 F.2d at 488-89 (internal quotations and citation omitted)); *see also Pragmatic Software Corp. v. Antrim Design Sys., Inc.*, No. CIV. 02-2595 (JRT/FL, 2003 WL 244804, at *2 (D. Minn. Jan. 28, 2003) (recognizing that, subject to the

<div align="center">5</div>

interests of justice, the first-to-file rule is a "relatively firm rule"); *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F. Supp. 1334, 1346 (N.D. Iowa 1996), *aff'd*, 119 F.3d 688 (8th Cir. 1997), *cert. denied*, 522 U.S. 1029 (Dec. 15, 1997) ("The 'first-filed rule' has the benefit of being a relatively firm rule that, while providing for the exceptional case, avoids in the main the need for *ad hoc* balancing of innumerable factors on a case-by-case basis and therefore is both more predictable for litigants . . . and more easily applied by the courts . . . ." (internal quotation and alteration omitted)).

Build-A-Bear filed this action before Defendants filed the California Lawsuit. Build-A-Bear also served Defendants with this action (on February 12, 2024) before Defendants served Build-A-Bear with the California Lawsuit (on February 13, 2024). Thus, this action was the first-filed action.[3] And although both this action and the later-filed (and later-served) California Lawsuit were both filed and served in relatively close proximity to one another, the "rebuttable presumption that the first-filed suit should have priority" still applies. *See, e.g.*, *Aqua-Care Mktg. LLC. v. Hydro Sys., Inc.*, 99 F. Supp. 3d 959, 963–64 (S.D. Iowa 2015) (quoting *Terra Int'l*, 922 F. Supp. at 1353 n.3); *see also Barry-Wehmiller Cos., Inc. v. Marschke*, No. 4:09-CV-760 TIA, 2009 WL 3698009, at *2 (E.D. Mo. Nov. 2, 2009) (holding that the "dead heat" exception to the first-to-file rule did not apply where one suit was filed three hours and seven minutes before the second suit); *Anheuser-Busch, Inc. v. Novelis Corp.*, No. 4:06-CV-1399 RWS, 2007 WL 9805625, at *2 n.1 (E.D. Mo. Jan. 3, 2007) ("Because the Court can determine that the Ohio action was filed almost four hours before this one, the 'dead heat' exception to the first-filed rule does not apply."

---

[3] The Eighth Circuit has not clearly stated whether the first-to-file rule depends on the *filing* of the action or *service* of the action. *See, e.g.*, *Marden's Ark, Inc. v. UnitedHealth Grp., Inc.*, No. 19-CV-1653 (PJS/DTS), 2020 WL 13002517, at *6 n.4 (D. Minn. Aug. 20, 2020) (recognizing that "[t]here is some disagreement" on this issue (collecting cases)). Here, like in *Marden's Ark*, the Court need not resolve this issue because, under both standards, this action was first-filed. *See id.*

6

(quoting *Terra Int'l*, 922 F. Supp. at 1350)); *Elec. Controlled Sys., Inc. v. Winegard Co.*, No. CV 09-2670 (MJD/AJB), 2010 WL 11497066, at *3 (D. Minn. Jan. 25, 2010) ("The Court concludes that, even though the Iowa and Minnesota actions were filed close in time, the first-filed rule still applies because the record is uncontradicted that the Iowa action was filed first." (collecting cases)).

Further, this action and the California Lawsuit are sufficiently similar to trigger the first-to-file analysis.  While "[n]o definitive standard exists to determine which cases are sufficiently overlapping or duplicative to apply the first-to-file rule[, m]any courts look to whether there is 'substantial overlap' between the various actions or whether the cases are 'substantially similar.'" *Marden's Ark, Inc.*, 2020 WL 13002517, at *7 n.5 (collecting cases) (internal citations omitted); *see also Anheuser-Busch*, 2007 WL 9805625, at *1 ("The two cases do not have to be identical but must have issues that substantially overlap." (citing *Monsanto Tech. LLC v. Syngenta Crop Prot., Inc.*, 212 F. Supp. 2d 1101, 1103 (E.D. Mo. 2002)).  As between this action and the California Lawsuit, there is more than "substantial overlap" or "substantial[] similar[ity]."  Among other things: (1) the products in which Defendants assert their intellectual property rights (the Squishmallows products) are the same in both actions; (2) Build-A-Bear's accused products (the Skoosherz™ plush toys) are the same in both cases; (3) the principal claims of infringement and validity center around Defendants' claimed trade dress rights under the Lanham Act; and (4) the parties are identical.  Indeed, the only differences are that Defendants' later-filed California Lawsuit adds a federal copyright claim for just two of Build-A-Bear's Skoosherz™ plush toys as well as California state law trade dress and unfair competition claims, which include overlapping issues compared to the Lanham Act claims.

<center>7</center>

As a result, absent compelling circumstances to the contrary, Defendants must be enjoined from pursuing the California Lawsuit during the pendency of this action. *See, e.g.*, *Nw. Airlines*, 989 F.2d at 1004. As discussed below, the facts of this case do not warrant departure from the first-filed presumption, and indeed further militate in favor of the issuance of the injunction.

## B. No Compelling Circumstances Warrant Departure from the First-Filed Presumption

In considering whether to depart from the first-filed presumption, the Court must examine the particular facts and circumstances for: (i) the existence of bad faith; (ii) whether a "race to the courthouse" occurred; and (iii) whether any undue burden would result from litigating in the first-filed forum. *See Nw. Airlines*, 989 F.2d at 1007. In the end, the Court must consider whether enjoining later-filed, duplicative litigation is warranted given "the spectre of duplicative efforts and costs and of inconvenience to the parties, together with the waste of judicial resources inherent in parallel litigation." *Id.* As the parties against whom the first-to-file rule would be applied, Defendants bear "the burden of showing compelling circumstances." *Lewis & Clark Reg'l Water Sys., Inc. v. Carstensen Contracting, Inc.*, 339 F. Supp. 3d 886, 892 (D.S.D. 2018). Defendants cannot come close to making such a showing, as the undisputed facts clearly demonstrate that *Defendants—not Build-A-Bear—*have engaged in blatant, bad-faith forum shopping.

First, Defendants engaged in bad faith litigation tactics by filing the Florida Lawsuit, in which they asserted that an "emergency" existed requiring the Florida state court to issue an *ex parte* injunction (with no notice) against Build-A-Bear, only to thereafter apparently abandon that litigation and not even serve Build-A-Bear with the Florida Lawsuit. Moreover, Defendants told the Florida state court that this matter was an "emergency" and they needed immediate injunctive relief, but subsequently filed the California Lawsuit (*after* Build-A-Bear filed this action) in which they seek only a permanent injunction, and are not even alleging the need for preliminary relief,

EXHIBIT N
Page 50 of 54

much less that an "emergency" exists. This kind of duplicitous conduct evidences bad faith on the part of Defendants.

Second, Build-A-Bear commenced these proceedings only after Defendants appeared to have given up on the Florida Lawsuit after their sneak attack on Build-A-Bear failed. In other words, despite their best efforts to conceal their litigation conduct, Defendants made known their belief that a dispute exists with Build-A-Bear relating to the Squishmallows products and Skoosherz™ plush toys, but took no further action to resolve that dispute after the Florida state court shut down Defendants' covert scheme. Build-A-Bear rightly commenced these proceedings to resolve that dispute on a national basis, as the dispute did not appear likely to be resolved in the Florida state court.[4] *See Nw. Airlines*, 989 F.2d at 1007 (explaining that plaintiff's suit was not filed in anticipation of defendant's lawsuit because defendant's lawsuit "was not truly contemplated until after [plaintiff] had filed its action"). Build-A-Bear was not required to wait by idly to see whether Defendants would pursue the apparent dispute by commencing separate proceedings against Build-A-Bear elsewhere. *See, e.g.*, *Nw. Airlines, Inc. v. Filipas*, No. CIV 07-4803 JNE/JJG, 2008 WL 1773756, at *4 (D. Minn. Apr. 15, 2008) (agreeing with Washington court's conclusion that party who filed declaratory judgment action "was not under an obligation to sit quietly and wait for plaintiffs to make up their minds" regarding whether or not they would sue). Build-A-Bear was fully entitled to commence these proceedings, to which the later-filed California Lawsuit must yield. *See Nw. Airlines*, 989 F.2d at 1007 (affirming the district court's

---

[4] The passage of time has proven Build-A-Bear's belief to be well-founded. Again, as of the filing of this Motion, Defendants have taken no action to pursue the Florida Lawsuit. Instead, Defendants improperly filed separate litigation in federal court—the California Lawsuit—after Build-A-Bear filed this action. As noted, the "emergency" Defendants urged the Florida state court to immediately enjoin without prior notice to Build-A-Bear has apparently subsided, as Defendants seek only permanent injunctive relief in the California Lawsuit.

EXHIBIT N
Page 51 of 54

conclusion that plaintiff did not act in bad faith or race to the courthouse because plaintiff brought its action to remove the chilling effect imposed by defendant's assertion that plaintiff was violating the law).

Third, it was *Defendants'* later-filed litigation—the California Lawsuit—that was reactionary, not the instant Declaratory Judgment Complaint. Defendants filed a lawsuit in Florida, in attempted secrecy, concerning this plush toy product dispute. Defendants then apparently abandoned that lawsuit once their requested relief was denied and they lost credibility with the Florida state court.[5] Then, after Build-A-Bear commenced this action to ensure resolution of the apparent intellectual property dispute, Defendants filed the California Lawsuit. If there was any race to the courthouse, it was by Defendants, not Build-A-Bear.

Given all of the foregoing, the relevant circumstances, including the lack of any plausible undue burden that would result from Defendants litigating this matter in this forum, only reinforce application of the first-filed presumption in favor of Build-A-Bear.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Build-A-Bear Workshop, Inc. respectfully requests that this Court enjoin the Defendants from proceeding in the California Lawsuit in favor of this first-filed action.

---

[5] In its denial (Exhibit 4) of Defendants' *ex parte* motion as not qualifying as an "emergency," the Florida state court cited its own Administrative Order regarding civil emergency matters (Administrative Order 2021-50-CIV) (*available at* https://www.17th.flcourts.org/wp-content/uploads/2021/09/2021-50-Civ.pdf), which in turn states that "an attorney or party who seeks 'emergency' review loses credibility when the court determines there is no true emergency." (citing *USAA Cas. Ins. Co. v. Pembroke Pines MRI, Inc.*, 24 So. 3d 588 (Fla. 4th DCA 2009)).

10

Respectfully submitted,

Dated: February 16, 2024

**LEWIS RICE LLC**

By:   /s/  Michael J. Hickey
Michael J. Hickey, #47136(MO)
mhickey@lewisrice.com
Philip J. Mackey, #48630(MO)
pmackey@lewisrice.com
Allison E. Knopp, #74724(MO)
aknopp@lewisrice.com
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7630
(314) 612-7630 (fax)

***Attorneys for Plaintiff***
***Build-A-Bear Workshop, Inc.***

11

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of February 2024, a copy of the foregoing was filed electronically.  Further, I certify that a true and accurate copy of the foregoing will be served on Defendants' Registered Agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808, with a courtesy copy provided by email to:

Moez M. Kaba
Hueston Hennigan LLP
523 West 6th Street
Suite 400
Los Angeles, CA 90014
mkaba@hueston.com

*Attorneys for Defendants*

/s/ Michael J. Hickey

<div align="center">12</div>

# EXHIBIT O

## PLAINTIFFS' FOURTEEN ALLEGED
## SQUISHMALLOWS TRADE DRESS DESCRIPTIONS

(1) *Kelly Toys Holdings, LLC, et al. v. Build-A-Bear Workshop, Inc.*, Case No. 2:24-cv-01169 JLS (MARx) (C.D. Cal.) ("*Kelly Toys v. Build-A-Bear – California*") ECF No. 1, ¶26:

    a.   substantially egg/bell/oval shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

    b.   simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell/oval shape of the toys

    c.   embroidered facial features, such as nostrils, eyes and/or mouths

    d.   distinctive contrasting and non-monochrome coloring

    e.   short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(2) *Kelly Toys v. Build-A-Bear – California*, ECF No. 25, pp. 9-17:

    a.   substantially egg/bell/oval shaped plush toys depicting various similarly shaped abstract/fanciful renditions of animals/characters

    b.   simplified Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and

2

EXHIBIT O
Page 1 of 7

which conform to and support the overall egg/bell shape of the toys

c.   embroidered facial features, such as nostrils, eyes and/or mouths

d.   distinctive contrasting and non-monochrome coloring

e.   short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(3) *Kellytoy v. Dan-Dee*, ECF No. 16, First Amended Complaint (filed Aug. 24, 2018) (Exhibit I)[1], ¶23:

a.   substantially bell-shaped plush toys embodying fanciful renditions of animals/characters

b.   embroidered anime-inspired minimalist, whimsical facial features

c.   a velvety velour-like textured exterior, and

d.   stuffing with a light "marshmallow," memory foam-like texture

(4) *Kellytoy Worldwide, Inc., et al. v. Ty, Inc., et al.*, Case No. 1:20-cv-00748 (N.D. Ill.) ("*Kellytoy v. Ty*"), ECF No. 21, Memorandum in Support of Motion for Preliminary Injunction (filed Feb. 21, 2020) (Exhibit J), p. 3:

a.   specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs

---

[1]  Each exhibit citation refers to the exhibits attached to Build-A-Bear's Request for Judicial Notice. Build-A-Bear compiles the following descriptions for the Court's ease of review.

  b.  abstract, embroidered facial features based on the Japanese Kawaii style

  c.  oval/rounded graphic features

  d.  ultra-soft shell and mooshy, silky stuffing

(5) *Kellytoy v. Ty*, ECF No. 24, Yoon Declaration (filed Feb. 21, 2020) (Exhibit J), ¶10:

  a.  the specific shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs

  b.  Kawaii abstract, embroidered facial features

  c.  oval/rounded graphic features

  d.  an ultra-soft shell and mooshy, silky stuffing

(6) *Kellytoy v. Ty*, ECF No. 24, Yoon Declaration (Exhibit J), ¶28:

  a.  egg/bell-like shape

  b.  absence of proportionate/pronounced limbs

  c.  simplified Kawaii-inspired aesthetics

  d.  short pile silky shell

  e.  airy, silky stuffing

(7) *Kellytoy v. Ty*, ECF No. 69, First Amended Complaint (filed May 21, 2020) (Exhibit J), ¶32:

  a.  substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

  b.  simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and

4

bellies) and which conform to and support the overall egg/bell shape of the toys

    c.    embroidered facial features, such [as] nostrils, and/or mouths

    d.    distinctive contrasting and non-monochrome coloring

    e.    short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

(8) *Kellytoy v. Ty*, ECF No. 105, Second Amended Complaint (filed Oct. 21, 2020) (Exhibit J), ¶34; *Kellytoy Worldwide, Inc. v. Hugfun International, Inc.*, Case No. CV-19-07652-MWF (C.D. Cal.) ("*Kellytoy v. Hugfun*"), ECF No. 27, First Amended Complaint (filed Dec. 4, 2019) (Exhibit M), ¶22; *Kelly Toys v. Zuru*, ECF No. 1, Complaint (filed Nov. 2, 2023) (Exhibit K), ¶24:

    a.    substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

    b.    simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

    c.    embroidered facial features, such as nostrils, eyes and/or mouths

    d.    distinctive contrasting and non-monochrome coloring

    e.    short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

<div align="center">5</div>

(9) *Kelly Toys v. Zuru*, ECF No. 1, Complaint (filed Nov. 2, 2023) (<u>Exhibit K</u>), ¶3:

    a.    shaped fanciful renditions of animals/characters

    b.    simplified Asian style Kawaii faces

    c.    embroidered facial features

    d.    distinctive and non-monochrome coloring

    e.    velvety velour-like textured exterior

(10) *Kellytoys v. Dan-Dee*, ECF No. 46, Second Amended Complaint (filed March 5, 2019) (<u>Exhibit I</u>), ¶23; *Kelly Toys v. Zuru*, ECF No. 26-2, Exhibit A to Opposition to Motion to Dismiss (filed Jan. 22, 2024) (<u>Exhibit K</u>), ¶23:

    a.    substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

    b.    simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

    c.    embroidered two-dimensional facial features, such as eyes, nostrils, mouths

    d.    distinctive contrasting and non-monochrome coloring

    e.    short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel

6

(11)   *Kelly Toys v. Zuru*, ECF No. 26, Opposition to Motion to Dismiss (filed Jan. 22, 2024) (Exhibit K), p. 1:

   a.   fanciful rendition of a unique animal with simplified Asian style Kawaii faces in an egg/bell shape in combination with other features that create a distinguishing aesthetic look

(12)   *Kelly Toys Holdings, LLC, et al.. v. Build-A-Bear Workshop, Inc.*, Case No. CACE-24-001221 (Florida 17th Cir. Ct.) ("*Kelly Toys v. Build-A-Bear – Florida*"), Complaint (filed Jan. 29, 2024) (Exhibit L), ¶23:

   a.   substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters

   b.   simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys

   c.   embroidered facial features, such as eyes, nostrils, and/or mouths

   d.   distinctive contrasting and non-monochrome coloring

   e.   short-pile exterior

(13)   *Kelly Toys v. Build-A-Bear – Florida*, Complaint (Exhibit L), ¶41:

   a.   shaped fanciful renditions of animals/characters

   b.   simplified Asian style Kawaii faces

   c.   embroidered facial features

   d.   distinctive and non-monochrome coloring

e.      short-pile exterior

(14)   *Kelly Toys v. Build-A-Bear – Florida*, Emergency Motion for

Temporary Injunction (<u>Exhibit L</u>), p. 25:

a.      Asian-style Kawaii faces

b.      rounded shape

c.      embroidered facial features

d.      bright colors

e.      small facial features

f.      small appendages

g.      overall unique minimalistic depiction of cute animals and
shapes

8